UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SONYA LARSON,

       Plaintiff

     v.

DAWN DORLAND PERRY,
COHEN BUSINESS LAW GROUP, PC and
JEFFREY A. COHEN, ESQUIRE,

       Defendants.

C. A. No.: 1:19-CV-10203-IT

**DEFENDANT DAWN DORLAND PERRY'S MEMORANDUM IN SUPPORT OF HER PARTIAL MOTION TO DISMISS COUNTS I, II, V, AND VIII OF THE COMPLAINT**

Howard M. Cooper, Esq. (BBO # 543842)
Suzanne Elovecky, Esq. (BBO # 670047)
Elizabeth E. Olien, Esq. (BBO # 689350)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel.: 617-720-2626
Fax: 617-227-5777
hcooper@toddweld.com
selovecky@toddweld.com
eolien@toddweld.com

Dated:  April 25, 2019

*Counsel for Dawn Dorland Perry*

## i. Introduction

Dawn Dorland Perry ("Ms. Dorland" or "Dawn Dorland") respectfully submits this memorandum in support of her partial motion to dismiss Count I (intentional interference by Ms. Dorland with Ms. Larson's ASF contract), Count II (intentional interference by Ms. Dorland with Ms. Larson's BBF contract), Count V (violation of Chapter 93A by Ms. Dorland), and Count VIII (defamation claim against Ms. Dorland) of the Complaint and Demand for Trial by Jury ("the Complaint") asserted against her by the plaintiff, Sonya Larson ("Ms. Larson") for failure to state any legally viable claim. Fed. R. Civ. P. 12(b)(6).

Not only has Ms. Dorland been forced to suffer through the hurtful betrayal by a fellow writer and former friend, who took and used Ms. Dorland's own words and specific life experience in a short story called *The Kindest*, in an attempt to further her own career, but Ms. Dorland is now forced to defend a lawsuit against Ms. Larson's illegal and improper use of *Ms. Dorland's* own letter and personal narrative. As Ms. Larson admits, a mutual acquaintance recognized Ms. Dorland's narrative after attending a reading of *The Kindest* at a reading in Boston bookstore, and contacted Ms. Dorland to inquire whether she was "the source of the inspiration."  Ms. Larson claims that her reason for bringing this lawsuit against Ms. Dorland is that Ms. Dorland raised concerns to various members of the writing community about Ms. Larson's specific use of her sentences and ideas. However, as is set forth below, Ms. Dorland was justified in doing so, as her concerns were valid and based in truth, as is supported by the Complaint on its face.

Ms. Larson's claims against Ms. Dorland are utterly without merit, and for at least the following reasons should be dismissed:

- Ms. Larson generally alleges Ms. Dorland violated G.L. c. 93A, but fails to allege that she and Ms. Dorland were engaged in trade or commerce with each other, and, as a matter of law, the Parties were not; Ms. Larson similarly fails to allege that Ms. Dorland is engaged in trade and commerce at all.

- Ms. Larson alleges that Ms. Dorland made defamatory statements about her to various members of the writing community, but fails to identify the precise language of the statements she alleges are defamatory. Further, as a limited purpose public figure with regard to her publication and promotion of *The Kindest*, Ms. Larson fails to allege actual malice – a necessary element of her claim.

- Finally, Ms. Larson alleges intentional interference by Ms. Dorland with Ms. Larson's alleged contracts with American Short Fiction ("ASF") and with the Boston Book Festival ("BBF"), but fails to allege that either entity actually breached their contract with her, and therefore, fails to state a claim.

Therefore, for these reasons and the reasons stated below, Ms. Larson has failed to state a claim upon which relief can be grated and the Court should dismiss Counts I, II, V, and VIII of Plaintiff's' Complaint and Jury Demand as asserted against her, with prejudice and without leave to amend.

## ii. Facts Alleged in the Complaint[1]

### a.  Ms. Dorland Wrote a Letter to the Final Recipient of the Kidney Chain.

In June 2015, Ms. Dorland donated one of her kidneys out of a desire to make a maximum impact in the lives of others. Complaint ("Compl."), ¶ 8, Ex. A. Shortly after her procedure in Los Angeles, Ms. Dorland wrote a letter to the final recipient of the kidney chain

---

[1] The facts alleged in the Amended Complaint are assumed to be true solely for purposes of this motion.

related to her donation (the "Original Letter"). *Id.* at ¶ 9, 11 Exs. A, B, F at 3.[2]  The letter, titled

"Dorland kidney chain final recipient letter July 2, 2015," detailed Ms. Dorland's motivations

behind making an altruistic kidney donation and is written in Ms. Dorland's unique and personal

style. *Id.* at Ex. A, B. She posted the letter to a "private group forum on Facebook" that she

created to share her kidney donation story and related thoughts and experiences. *Id.* at ¶ 10.

### b. Ms. Larson Read Ms. Dorland's Letter on Her Private Facebook Group That Was Not Open to the Public.

When Ms. Dorland lived in the Boston area, she and Ms. Larson were friends and

colleagues at GrubStreet, a Boston literary nonprofit where Ms. Larson works. *Id.* at Ex. F at 3;

Ex. G at 3. During the time that Ms. Dorland lived near Boston, the women had various

interactions in person, by email, and over social media. *Id.* at ¶ 16. Ms. Larson was a member of

Ms. Dorland's private group on Facebook that Ms. Dorland created to share her kidney donation

story. *Id.* at ¶¶ 10, 11, 17. By virtue of being a "private group forum on Facebook," the group

was not open to the public. *See id.* at ¶ 10. Ms. Larson admits reading Ms. Dorland's Original

Letter on Facebook and that she found the letter "interesting."  *Id*. She also admits that she took

notes on the Original Letter "for future reference."  *Id*. In an article dated August 14, 2018, the

Boston Globe reported that "[Ms.] Larson has said that her former friend's experience as a

kidney donor served as inspiration for her fictional story of a woman who was a kidney

recipient."  *Id*. at Ex. G at 3.

### c. Ms. Larson Wrote A Story Called *The Kindest* Using Ms. Dorland's Letter.

After reading Ms. Dorland's letter, in or around 2015, Ms. Larson wrote a short story

about a "wealthy white woman" who made an anonymous kidney donation to a stranger. *Id.* at ¶¶

15, 18. Ms. Larson titled her story *The Kindest*. *Id.* at ¶ 21. The story contains a letter from the

---

[2] Page number citations to Exhibits to the Complaint refer to the stamped ECF page number.

previously anonymous donor to the donee. *Id.* at ¶ 19. Integral to the plot of *The Kindest*, the

donor's letter "is used primarily to introduce the character of the kidney donor, and to set the

stage for the eventual meeting of the recipient character and the donor character."  *Id.*; Compl.,

Ex. C. The letter is a necessary part of the story to explain how and why the donor and donee

came to meet. *See id*. Ms. Larson alleges that she "researched and viewed dozens of letters from

other organ donors," "viewed many websites devoted to advising organ donors and recipients on

how to correspond with each [other], including bullet points of the kinds of information people

share and in what order."  *Id.* at 20. The Complaint does not identify these alleged examples or

sources. *See id.*

   Since 2015, Ms. Larson alleges that she has written, presented, or published different

versions of *The Kindest* that contain varying versions of a letter from the story's donor to her

donee. *See* Compl., ¶¶ 26 (Audible accepted *The Kindest* for publication in December 2015); ¶

21 ("preliminary draft" read at a Boston bookstore in June 2016); 27 (revisions to *The Kindest*

for Audible); ¶ 28 (on August 3, 2016, "Audible published an earlier version" in electronic

format"); ¶ 29 (in August 2017 "American Short Fiction ('ASF') published an earlier version …

"); ¶ 30 (submitted *The Kindest* to the Boston Book Festival ("BBF") in 2018)¶ 39 (BBF request

in 2018 to "change some of the language in the Fictional Letter"); *see also* Ex. D[3] (current

version); Ex. D (previously version); Ex. F (comparing Original Letter to "Excerpt from 'The

Kindest' (Brilliance Audio 2016 version)" ("Brilliance Audio Version")). In the Complaint, Ms.

Larson refers to all versions of the letter in *The Kindest* collectively as "the Fictional Letter." *See*

*generally* Compl.

---

[3] On April 23, 2019, the Court allowed an assented to motion to exchange the version of the letter
attached to the Complaint as Exhibit D. Electronic Order Allowing Assented-to Motion, Apr. 23, 2019,
ECF No. 23.

In a July 26, 2018 article, the Boston Globe published a side-by-side comparison of the Original Letter and the Brilliance Audio Version. *Id*. at Ex. F. at 8. Both letters begin with an introduction that states the writer's name, age, race, and hometown. *Id*. The next paragraph of each letter explains how the writer came to know about "living kidney donation." *Id*. The Original Letter states inspiration came from "**the dire need in our country for kidneys**" and the Brilliance Audio Version states the inspiration was the "**urgent need for kidneys in our country**." *Id*. (emphasis supplied.)  The letters then state why each writer decided to move forward with her donation. The Original Letter states, "**[o]nce I had all the information** … I stood to make an **maximum impact in others' lives with only minimal risk to myself**." *Id*. (emphasis supplied.)  The Brilliance Audio Version states, "**[e]quipped with this new awareness**, I set forth on a journey to make a **maximum impact on another's life with only minimal risk to myself**." *Id*. (emphasis supplied.)

The next section of each of the letters explains that giving the gift of life to a stranger was driven by past abuse and trauma. The Original Letter states:

> Personally, **my childhood was marked by trauma and abuse**; I didn't have the **opportunity to form secure attachments with my family of origin**. A positive outcome of my early life is **empathy**, that it opened a well of possibility between me and strangers. While perhaps many more people would be motivated to **donate an organ to a friend or family member in need, to me, the suffering of strangers is just as real.**

*Id.* (emphasis supplied.) In a nearly identical matter, the Brilliance Audio Version states:

> **My** own **childhood was marked by trauma and abuse**. I wasn't given an **opportunity to form secure attachments with my family of origin**. But in adulthood that experience provided a strong sense of **empathy**. While others might desire **to give to a family member or friend, to me, the suffering of strangers is just as real**.

*Id.* (emphasis supplied.)

Next the letters express happiness about the fact that the donee's life would be extended. The Original Letter states, "I was most excited about the recipient who would come off the deceased donor list and end our [donation] chain." *Id*. Similarly, the Brilliance Audio Version states that "[a]s I prepared to make this gift, what sustained me was the knowledge that my recipient would be getting a second chance at life."

The letters then go on to express where the donors gained the strength to make a kidney donation. *Id*. The Original Letter states, "I focused a majority of my mental **energy on imagining and celebrating *you***."[4] *Id*. (emphasis supplied). The Brilliance Audio Version states, "I channeled my **energies into imagining and celebrating YOU**." *Id*. (emphasis supplied).

Finally, the letters conclude with Ms. Dorland's signature phrase, "[m]y gift ... trails no strings," well wishes, and an invitation to meet, if the donee so desires. *Id*. The Original Letter ends:

> **My gift**, which begat Debbie's, **trails no strings**. **You are deserving** of an extended and healthly life **simply for being here**.
>
> Please know that my husband and **I would love to know more about you, and perhaps even meet** you one day. **But I accept any level of involvement** or response from you, **even if it is none**.

*Id*. (emphasis supplied.) In nearly identical fashion, the Brilliance Audio Version concludes:

> **My gift**, you must know, **trails no strings**. **You deserve** all that life has to offer, **simply because you exist**. That said, **I would love to know more about you**. **Perhaps we can meet**. **But I accept any level of involvement, even if it is none**.

*Id*. (emphasis supplied.)

> **d.  Ms. Dorland Learned About Ms. Larson's Use of Her Letter in *The Kindest* and Ms. Larson Refused to Acknowledge the Striking Similarities.**

---

[4] The copy of the Original Letter in Complaint, Ex. A depicts the word "you" with underscores ("_you_") whereas the copy printed by the Boston Globe in Complaint, Ex. F shows the "you" in the Original Letter in italics ("*you*").

It was not until sometime on or after June 22, 2016 that Ms. Dorland first became aware that Ms. Larson wrote a story about her. *See id.* at ¶ 21. Ms. Larson alleges that she presented a "preliminary draft" of *The Kindest* at a reading at a Boston bookstore. *Id*. Afterwards, a mutual friend, who had attended the reading, contacted Ms. Dorland via Facebook. *Id*. The Facebook post allegedly stated: "Sonya [Larson] read a cool story about giving out a kidney, you came to mind, and I wondered if you were the source of the inspiration." *Id*. Ms. Larson alleges that the "Fictional Letter that is included in the [*The Kindest*] was not part of the reading." *Id.* After receiving the message on Facebook, Ms. Dorland contacted Ms. Larson to inquire about *The Kindest* and to ask if she could read the story. *Id.* at ¶ 22.

Understandably, Ms. Dorland was upset that Ms. Larson took her personal experience and personal narrative and shared it without first extending the common courtesy of consulting with her or at the very least notifying her. *See id.* at ¶ 23, 24. Despite the obvious similarities between the two letters and the two donors – <u>D</u>awn <u>D</u>orland, a white woman, 35 years of age, who used to live in the Boston area, and donated a kidney to a stranger, citing inspiration from an article she read, and the fictional <u>R</u>ose <u>R</u>othario, a white woman, 38 years of age, who lives in the Boston area and donated a kidney to a stranger citing inspiration from a documentary – and Ms. Larson's admission that she read and found the Original Letter "interesting" and was inspired by it, Ms. Larson staunchly refuses to admit that *The Kindest* is based on Ms. Dorland and  her experience, or the Original Letter. *Compare* Compl., ¶ 25 *to* Compl., ¶ 17 & Ex. G at 3. Instead, Ms. Larson insensitively dismissed Ms. Dorland's personal narrative in a Boston Globe article: "Let's keep this in perspective: Ms. Dorland's letter was not art; it was correspondence that she posted on Facebook."  *Id.* at Ex. G at 3.

**e.  Ms. Larson Actively Submitted and Published Various Versions of *The Kindest* in Audio and Print Formats Through Multiple Outlets Before and *After* Ms. Dorland Raised Concerns About Use of Her Letter and Personal Story.**

Since 2015, Ms. Larson alleges the submission and acceptance of various versions of *The Kindest* for publication by third parties in print and in online formats. Ms. Larson alleges that in December 2015, *The Kindest* was accepted for publication as an audio story by the audio-book company Audible (www.Audible.com). Compl., ¶ 26. Ms. Larson admits that in direct response to Ms. Dorland's concerns about her use of the Original Letter, Ms. Larson "changed parts of the [letter in *The Kindest*] to avoid any resemblance between [it] and [Ms.] Dorland's Original Letter." *Id*. at 27. On August 3, 2016, Audible posted an earlier version of the story. *Id*. at ¶ 28. Audible was asked to remove the earlier version until the new version was recorded and posted. *Id*. Ms. Larson alleges she received $125. *Id*.

Ms. Larson also alleges that ASF "published an earlier version of *The Kindest* in print in its literary magazine in August 2017, and featured [*The Kindest*] online in May 2018." *Id*. at ¶ 29. The Complaint does not allege whether ASF agreed to feature *The Kindest* on its website for a specific period of time. *See id*. Ms. Larson alleges she received $300 from ASF. *Id*. The Complaint lacks any other allegations concerning any specific terms of Ms. Larson's agreement with ASF. *Id*. Ms. Larson generally alleges that Ms. Dorland "complained [to ASF] that [the letter in *The Kindest*] was a 'paraphrase' of [Ms.] Dorland's [Original Letter], and that [Ms.] Larson 'plagiarized' the [Original Letter]" in *The Kindest*. *Id*. at ¶ 60. The Complaint does not state the precise language of any alleged statement by Ms. Dorland to ASF, the date of the alleged statement, or the specific person to whom the alleged statement was made. *See, e.g., id*. at ¶¶ 35, 57-64, 116-121. Ms. Larson alleges that ASF "decided to pull *The Kindest* from the ASF website." *Id*. at¶ 63. The Complaint does not address any action that occurred with respect to the printed copies of the ASF literary magazine that Ms. Larson alleges contained the "earlier

version." *See id*. at ¶29. In statements to the Boston Globe, ASF stated that "the story had completed a one-month run on our website," when ASF decided to "sunset it." *Id.* at Ex. F. at 6.

Ms. Larson alleges that in 2018, the BBF selected *The Kindest* for its "One City/One Story" event. *Id*. at ¶¶ 31, 32. Ms. Larson alleges that she "granted the BBF a license to publish [*The Kindest*] online in multiple languages, and to print and distribute 30,000 free copies of *The Kindest* throughout the Greater Boston Area." *Id*. at ¶ 66. The Complaint does not allege that the BBF violated the terms its license with Ms. Larson. *See id*. Ms. Larson alleges that "[s]tarting in June 2018, [Ms.] Dorland and her agents, servants, and attorneys contacted the BBF and frequently made unsupportable claims of plagiarism and copyright infringement against [Ms. Larson] and the BBF" and other claims for damages and attorneys' fees. *Id*. at ¶ 68. The Complaint does not state the precise language of any alleged statement by Ms. Dorland, the date of the alleged statement, or the specific person to whom the alleged statement was made. *See, e.g., id*. at ¶¶65-71, 116-121. The Complaint generally alleges that the "BBF's decision to pull [*The Kindest*] had nothing to do with the purported validity of [Ms.] Dorland's [alleged] claims of plagiarism or copyright infringement." *Id*. at ¶ 53.

The Complaint also generally alleges various communications by Ms. Dorland to the BBF, ASF, Grub Street, the Bread Loaf, and to "various writing communities in the United States" about Ms. Dorland's concern that the letter in *The Kindest* "was a 'paraphrase'" of the Original Letter and that Ms. Larson "plagiarized" Ms. Dorland's Original Letter. *See, e.g.*, Compl., ¶¶ 33-38, 52, 53, 60, 61, 68, 69, 117. The Complaint does not allege the precise language of Ms. Dorland's alleged statements, the specific person(s) to whom she allegedly made the statements, or specifically when Ms. Dorland allegedly made the statements. *See id*. After Ms. Larson contacted Ms. Dorland through counsel, Ms. Dorland retained her own

attorney and the attorneys exchanged demands within the litigation privilege. *See* Compl., Exs. E, H, I, J.

### iii. Argument

### I.   STANDARD OF REVIEW

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.,* 496 F.3d 1, 5 (1st Cir.2007) (citing *Rogan v. Menino,* 175 F.3d 75, 77 (1st Cir. 1999). To survive a motion to dismiss, Plaintiff must allege sufficient facts that, when taken as true, demonstrate a plausible claim of relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (internal citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 556). Dismissal is appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC,* 521 F.3d 76, 84 (1st Cir. 2008) (internal quotations and original alterations omitted).

When deciding a motion to dismiss, the "plausibility" standard asks the court: (1) to distinguish between the complaint's factual allegations, which must be accepted as true, and its conclusory legal allegations which are afforded no credence, and (2) to determine whether the factual allegations "are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged." *Garcia-Catalan v. U.S.*, 734 F.3d 100, 103 (1st Cir. 2013); *see*

*Iqbal*, 556 U.S. at 678 (mere conclusions need not be credited on a motion to dismiss). A complaint should be dismissed if it "shows no set of facts which could entitle plaintiff to relief." *Zona v. Clark University*, 436 F. Supp. 2d 287, 288 (D. Mass. 2006).

Under this standard, Counts I, II, V, and VII brought against Ms. Dorland should be dismissed with prejudice and without leave to amend.

## II. THE COURT SHOULD DISMISS PLAINTIFF'S CLAIM FOR AN ALLEGED VIOLATION OF CHAPTER 93A (COUNT V) WHERE THE COMPLAINT DOES NOT - AND AS A MATTER OF LAW CANNOT - ALLEGE THAT MS. DORLAND ENGAGED IN TRADE OR COMMERCE WITH MS. LARSON.

In order to bring a claim under either Section 9 or 11 of Chapter 93A, the plaintiff must allege the defendant engaged in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." G.L. c. 93A, § 2(a). Ms. Larson has failed to allege that either Ms. Dorland or Ms. Larson are engaged in "trade or commerce" – nor can she do so -  and, accordingly, her claim alleging generally a violation of an unknown provision of G.L. c. 93A ("Chapter 93A") fails as a matter of law.

Chapter 93A defines "trade or commerce" as including "the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security … and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth." G.L. c. 93A, § 1(b). When considering whether activity falls within the bounds of "trade or commerce," such factors to be considered include: (1) the nature of the transaction, (2) the character of the parties, (3) the activities participated in, and (4) whether the transaction was motivated by business or personal reasons. *Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 491 (1986) (citing *Begelfer v. Najarian,*

381 Mass. 177, 190–191 (1980)). Thus, Chapter 93A "is intended to protect against unfair and deceptive practices in trade, not unfair practices in general." *Swenson v. Yellow Transp. Inc.,* 317 F. Supp. 2d 51, 56 (D. Mass. 2004) (quoting *L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.*, 121 F. Supp. 2d 147, 151 (D. Mass. 2000) (dismissing Chapter 93A claim where both parties engaged in trade or commerce, but not with each other)).

The Complaint is completely devoid of any allegation that Ms. Dorland and Ms. Larson engaged in trade or commerce with each other or that they were otherwise engaged in any other type of business transaction or contractual relationship, and therefore fails to state a claim and should be dismissed. *See, generally,* Compl. While Ms. Larson alleges that she entered into contracts with third parties like Audible and ASF, she does not allege that she had a contract with Ms. Dorland. *See, e.g.,* Compl., ¶¶ 28 (paid $125 by Audible), 29 (paid $300 by ASF). Likewise, Ms. Larson makes no allegation that she gained access to the Original Letter in the context of trade or commerce. *See id.*, ¶¶ 88-101. Rather, Ms. Larson only alleges that she viewed the Original Letter on Ms. Dorland's "private group forum on Facebook." *Id.* at ¶10. The fact that Ms. Dorland allegedly contacted various third parties who may have been engaged in trade or commerce with Ms. Larson does not mean that Ms. Larson and Ms. Dorland were in trade or commerce with *each other*. *See L.B. Corp.*, 121 F. Supp. 2d at 151. Similarly, Ms. Larson does not allege that Ms. Dorland is engaged in trade or commerce at all, or that she ever intended to engage in trade or commerce with the Original Letter, which was only posted on a *private* Facebook page. *See* Compl., ¶ 10, 88-101. Accordingly, the Court must dismiss Plaintiff's conclusory claim for a violation of Chapter 93A (Count V). *See Garcia-Catalan v. U.S.*, 734 F.3d at103 (dismissal required where factual allegations not sufficient to support reasonable inference of liability).

**III.   THE COURT SHOULD DISMISS PLAINTIFF'S CLAIM FOR DEFAMATION (COUNT VIII) WHERE THE COMPLAINT FAILS TO ALLEGE SPECIFIC DEFAMATORY STATEMENTS MADE BY MS. DORLAND OR THAT MS. DORLAND ACTED WITH ACTUAL MALICE.**

    **a.   Ms. Larson Fails to Identify the Precise Statements She Alleges Are Defamatory.**

To prevail on a claim for defamation, plaintiff must show that:  1) the defendant made a statement concerning the plaintiff to a third party; 2) the statement had the potential to damage plaintiff's reputation in the community; 3) the defendant was at least negligent in making the statement; and 4) the statement either caused the plaintiff economic loss or is actionable without proof of economic loss. *Ravnikar v. Bogojavlensky,* 438 Mass. 627, 629–30 (2003). "This threshold question, whether a communication is reasonably susceptible of a defamatory meaning, is a question of law for the court."  *Amrak Prods., Inc. v. Morton*, 410 F.3d 69, 72 (1st Cir.2005) (quoting *Phelan v. May Dept. Stores Co.*, 443 Mass. 52, 56 (2004)). "The court [must] examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence."  *Amrak Prods*, 410 F.3d at 73 (affirming dismissal given appellants failure to satisfy the threshold question of defamatory meaning).

Further, given the constitutional considerations at issue in a defamation case, the First Circuit has made it clear that a defendant is "entitled to knowledge of the <u>precise language challenged as defamatory</u>."  *Phantom Touring, Inc. v. Affiliated Publ'ns,* 953 F.2d 724, 728 n. 6 (1st Cir. 1992); *see Bishop v. Costa*, 495 F.Supp.2d 139, 141 (D. Me. 2007) (while compliance with heightened pleading requirement of Fed. R. Civ. P. 9(b) not required, "the pleadings in a defamation case need to be sufficiently detailed to the extent necessary to enable the defendant to respond").

Ms. Larson's allegations of defamation are limited to non-specific, generalized claims that "[Ms.] Dorland started a campaign against [Ms.] Larson, orally and in writing, accusing [Ms.] Larson of plagiarizing her Original Letter," Compl., ¶ 117, that Ms. Dorland was "spreading false and malicious claims of plagiarism against [Ms.] Larson," *id.*, and that Ms. Dorland made "false statements and accusations of plagiarism and copyright infringement," *id.*, ¶ 121. Although Ms. Larson alleges that Ms. Dorland's "statements [to ASF and the BBF] were false and had no validity in fact or in law," Compl., ¶ 118, she fails to "identify the <u>precise language challenged as defamatory</u>." *See Phantom Touring,* 953 F.2d at 728 n. 6. Nowhere in the Complaint has she identified a single, specific statement that she accuses Ms. Dorland of making. She does not identify the specific words which were used, the identity of the person to whom the comments were directed, or the dates these comments were allegedly made. Instead, she vaguely and generally alleges that "[Ms.] Dorland contacted ASF, the BBF, Grub Street, Bread Loaf, the *Boston Globe*, Larson's writer's group, and in [Ms.] Dorland's own [but unidentified] words, other writing conferences of similar repute." Compl., ¶ 117. Where Ms. Larson fails to identify the "precise language challenged as defamatory," she cannot meet her threshold burden to allege that any statements by Ms. Dorland are reasonably susceptible of a defamatory meaning. *Amrak Prods*, 410 F.3d at 73 (stating defamatory meaning is question of law for the court and affirming dismissal given appellants failure to satisfy the threshold question of defamatory meaning).  Accordingly, Ms. Larson fails to state a claim for defamation as a matter of law and Count IV should be dismissed. *Twombly,* 550 U.S. at 555 ("[f]actual allegations must be enough to raise a right to relief above the speculative level"); s*ee Phantom Touring,* 953 F.2d at 725 (upholding dismissal of complaint); 728 n. 6 (requiring "precise language challenged as defamatory").

**b.  As A Limited Purpose Public Figure, Ms. Larson Fails to Allege Actual Malice.**

Ms. Larson also fails to state a claim for defamation where, as a limited purpose public figure,[5] she does not allege that Ms. Dorland made any statements with actual malice. Because Ms. Larson alleges facts that she is a limited purpose public figure as to this dispute, she must allege actual malice. Thus, Ms. Larson's failure to allege Ms. Dorland made statements with actual malice means the Court must dismiss her claim for defamation.

A limited purpose public figure is "an otherwise private figure who 'voluntary injects [her]self or is drawn into a particular public controversy,' thus becoming a limited-purpose public figure for that particular controversy." *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 23–24 (1st Cir. 2018) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)) (finding plaintiff at least limited-purpose public figure, if not general public figure, where plaintiff participated in media coverage generally and specifically as to the dispute). The Supreme Court has extended the requirement of actual malice beyond general public figures to apply to limited purpose public figures. *Gertz*, 418 U.S. at 315. Ms. Larson alleges facts that she is a limited purpose public figure based on her statements to the Boston Globe about the controversy, as well as her public promotion and publication of *The Kindest*. Compl., Ex. F (July 26, 2018, Boston Globe article regarding dispute and quoting Larson); Ex. G (Aug. 14, 2018, Boston Globe article regarding dispute and quoting Larson); *see* Compl., ¶¶ 21 (Ms. Larson promoted *The Kindest* at a public bookstore reading), 26-29 (describing online and print publication of *The Kindest*).

To prove defamation, a private plaintiff must establish that "the defendant was at fault for the publication of a false statement ... regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of

[5] While Ms. Dorland believes that Ms. Larson is a public figure for all purposes, she will assume only for the purpose of this motion that Ms. Larson is a limited purpose public figure as to her promotion and publication of *The Kindest*. *See* Compl., ¶¶ 21, 29-29, 32, 60, etc.

15

economic loss." *Van Liew v. Eliopoulos*, 92 Mass. App. Ct. 114, 120, *review denied* 478 Mass.

1105 (2017) (quoting *White v. Blue Cross & Blue Shield of Mass., Inc.*, 442 Mass. 64, 66

(2004)). However, a person who is a public figure must also allege actual malice to recover for

defamation. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *Sindi v. El-Moslimany*,

896 F.3d 1, 13–14 (1st Cir. 2018). That is, such a plaintiff must allege that "the defamatory

falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Id*.

This requirement applies both to plaintiffs whose "pervasive fame or notoriety" makes them

"public figure[s] for all purposes and in all contexts" and to plaintiffs who are public figures with

respect to the "limited range of issues" surrounding the claimed defamation. *Gertz*, 418 U.S. at

351; *see McKee v. Cosby*, 874 F.3d 54, 61–62 (1st Cir. 2017), *cert. denied,* 139 S. Ct. 675 (2019)

("While ascertaining public-figure status may in some cases require a detailed fact-sensitive

determination, the matter is resolved as a question of law, and when possible, it is perfectly

reasonable to decide whether a plaintiff is a public figure during pretrial proceedings.") (internal

citations omitted).

Ms. Larson only makes bald conclusory allegations that Ms. Dorland's alleged statements

to ASF, the BBF, GrubStreet, Bread Loaf, the Boston Globe, "Larson's writers group," and

"other writing conferences of similar repute" were "false and had no validity in fact or in law."

*Id*. at ¶ 117. Ms. Larson does not identify the language that she alleges is false. *See id*. at ¶¶ 116-

121. By failing to identify the precise statements she alleges are false, Ms. Larson cannot allege a

claim for defamation as a matter of law because, "only statements that are 'provable as false' are

actionable; hyperbole and expressions of opinion unprovable as false are constitutionally

protected." *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 108 (1st Cir. 2000); *see McKee v. Cosby*,

236 F. Supp. 3d 427, 438 (D. Mass.), aff'd*,* 874 F.3d 54 (1st Cir. 2017) ("[b]ecause defamation

requires a false statement at its core, opinions typically do not give rise to liability since they are not susceptible to objective verification."). Whether or not the Original Letter and the versions of the letter contained in the *The Kindest* are *legally* "substantially similar," is not something that Ms. Dorland can determine as a legal matter as a lay person, and Ms. Larson has not alleged that Ms. Dorland is qualified to make a legal determination about a copyright matter.[6]  However, as a lay person, Ms. Dorland can have an *opinion* about the similarities between the Original Letter and *The Kindest* and she was entitled to communicate her *opinion* about that comparison. *See McKee*, 236 F. Supp. 3d at 438 (opinions not susceptible to objective verification).

Further, while Ms. Larson focuses primarily on the version of the "Fictional Letter" that is included in *The Kindest* as of today's date, prior versions were published previously, and were distributed publicly. *See e.g.*, Compl., Ex. C (current version of *The Kindest*); Ex. F at p. 8 (Brilliance Audio Version). As an attachment to an article about the Parties' pre-litigation dispute, dated July 26, 2018, the Boston Globe made a side-by-side comparison of the Original Letter to the Brilliance Audio Version, which was published in 2016 and which shows a striking similarity in structure, order, and content. *See* Compl., Ex. F at 8. The Original Letter and the Brilliance Audio Version contain many of the same phrases:

- "maximum impact [in others' lives/on another's life] with only minimal risk to myself"

- "my childhood was marked by trauma and abuse"

- "opportunity to form secure attachments with my family of origin"

- "the suffering of strangers is just as real"

---

[6] As the First Circuit has observed, "substantial similarity is an elusive concept, not subject to precise definition." *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600 (1st Cir. 1988). Substantial similarity does not require word-for-word copying to prove infringement.  *See* 4 *Nimmer on Copyright* § 13.03[B][1][a] & nn.121-22 (citing *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir. 1936)).

- "[energy on /energies into] imagining and celebrating [*you*/YOU]"

- "My gift … trails no strings"

- "I would love to know more about you [and] perhaps [we can/even] meet"

*Id.*, Ex. F at 8. These phrases are exactly the same as phrases contained in Ms. Dorland's Original Letter. Of course, truth is a complete defense to a claim for defamation. "The lodestar of Massachusetts defamation law is the axiom that truth is an absolute defense to defamation." *Noonan v. Staples, Inc.,* 707 F. Supp. 2d 85, 90 (D. Mass. 2010) citing *Taylor v. Swartwout,* 445 F.Supp.2d 98, 102 (D.Mass.2006) (Gorton, D.J.) citing *Massachusetts Sch. of Law at Andover, Inc.,* 142 F.3d at 42); *Reilly v. Assoc. Press,* 59 Mass.App.Ct. 764, 770, 797 N.E.2d 1204 (2003).

Accordingly, Plaintiff's conclusory claim for defamation (Count VIII) that relies on generalized descriptions of alleged statements fails as a matter of law because Ms. Larson did not allege Ms. Dorland made any defamatory falsehood with knowledge of its falsity or with reckless disregard for the truth. *See Iqbal*, 556 U.S. at 678 (mere conclusions need not be credited on a motion to dismiss).

## IV. THE COURT SHOULD DISMISS PLAINTIFF'S CLAIMS INTENTIONAL INTERFERENCE WITH CONTRACT (COUNTS I & II) WHERE THE COMPLAINT FAILS TO ALLEGE A BREACH OF CONTRACT BY ASF OR BBF.

Ms. Larson's complaint fails to state a claim for intentional interference by Ms. Dorland with either the ASF or BBF contracts. To state a claim for intentional interference with contract under Massachusetts law, a complaint must contain enough factual matter to demonstrate that: (1) the plaintiff had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. *Platten v. HG Berm. Exempted Ltd.,* 437 F.3d 118, 130 (1st Cir. 2006) (quoting *G.S. Enters., Inc.*

*v. Falmouth Marine, Inc.,* 410 Mass. 262, 272 (1991)). Counts I and II fail as a matter of law because they only contain conclusory allegations that Ms. Dorland intentionally interfered with Ms. Larson's agreements with ASF or BBF. The Complaint wholly fails to allege that either ASF or the BBF broke a contract with Ms. Larson. Therefore, the Court should dismiss Counts I and II. *Iqbal*, 556 U.S. at 678 (mere conclusions need not be credited on a motion to dismiss).

As to ASF, Ms. Larson only alleges that ASF "decided to pull *The Kindest* from the ASF website." *Id.* at ¶ 63. She does not allege that ASF's decision to do so broke their alleged contract. *See id.* Instead, Ms. Larson only alleges that "ASF offered to publish *The Kindest*," that she "accepted the offer and agreed to let ASF publish [*The Kindest*] in ASF's literary magazine, and to feature the Work on its website," and that she "was paid $300 by ASF." Compl., ¶ 58. She also alleges that *The Kindest* "was published by ASF." *Id.* at ¶59; *see id.* at ¶ 29 ("ASF published an earlier version of *The Kindest* in its literary magazine in August 2017, and featured [*The Kindest*] online in May 2018."). But Ms. Larson does not allege that the specific terms of her agreement with ASF stated how long ASF was required to feature *The Kindest* online, or that ASF had any obligation to publish *The Kindest* online beyond May 2018. *See id.* at Ex. F at 6 (statement regarding removal decision by ASF in Boston Globe article, dated July 26, 2018, "[i]n any case, the story had completed a one-month run on our website"). Therefore, Ms. Larson does not allege sufficient facts that ASF breached its alleged contract with her. Accordingly, where she does not allege the second element of the claim, Ms. Larson does not allege a claim for intentional interference by Ms. Dorland with her contract with ASF. *Iqbal*, 556 U.S. at 678 (mere conclusions need not be credited on a motion to dismiss).

As to the BBF, Ms. Larson only alleges that she "granted the BBF a license to publish [*The Kindest*] online in multiple languages, and to print and distribute 30,000 free copies of *The*

*Kindest* throughout the Greater Boston Area." Compl., ¶ 66. By definition, "[t]he word 'license,' means permission or authority; and a license to do any particular thing, is a permission or authority to do that thing; and if granted by a person having power to grant it, transfers to the grantee the right to do whatever it purports to authorize." *Gibbons v. Ogden*, 22 U.S. 1, 213 (1824). In this case, Ms. Larson alleges that she gave the BBF permission to publish *The Kindest* under certain terms. *Id.* at ¶ 66. By alleging that she gave the BBF a "license," she alleges only that she gave the BBF permission to use her story, subject to certain restrictions. *Id.* She does not allege that the BBF had or has an ***obligation*** to use its license, or that BBF's non-use of the license broke any agreement. Therefore, Ms. Larson does not allege sufficient facts that BBF breached its alleged contract with her. Accordingly, where she does not allege the second element of the claim, Ms. Larson does not allege a claim for intentional interference by Ms. Dorland with her contract with the BBF. *Iqbal*, 556 U.S. at 678 (mere conclusions need not be credited on a motion to dismiss).

Accordingly, Ms. Larson fails to state a claim for intentional interference with contractual relations, and Ms. Dorland respectfully requests that Counts I and II of the Complaint be dismissed with prejudice.

### iv. Conclusion

For all of the reasons set forth above, Defendant Dawn Dorland Perry respectfully requests that the Court dismiss Counts I, II, V, and VIII of Plaintiff's' Complaint and Jury Demand as asserted against her, with prejudice and without leave to amend.

Respectfully submitted,

DAWN DORLAND PERRY,

By her attorneys,


*/s/ Suzanne Elovecky*
Howard M. Cooper, Esq. (BBO # 543842)
Suzanne Elovecky, Esq. (BBO # 670047)
Elizabeth E. Olien, Esq. (BBO # 689350)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel.: 617-720-2626
Fax: 617-227-5777
hcooper@toddweld.com
selovecky@toddweld.com
eolien@toddweld.com

Dated:  April 25, 2019



## CERTIFICATE OF SERVICE


I, Suzanne Elovecky, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 25th day of April, 2019.



*/s/ Suzanne Elovecky*

Dated:  April 25, 2019

21