UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SONYA LARSON<br><br>                    Plaintiff,<br><br>v.<br><br>DAWN DORLAND PERRY, et al.<br><br>                    Defendants. | Civil Action<br><br>No. 1:19-cv-10203-IT |

**PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS OF
DEFENDANT, DAWN DORLAND PERRY
AND MEMORANDUM IN SUPPORT THEREOF**

**<u>Plaintiff, Sonya Larson Requests Oral Argument</u>**

Respectfully submitted,

SONYA LARSON,
By her attorney,

/s *Andrew D. Epstein*

May 9, 2019

Andrew D. Epstein, Esquire (BBO #155140)
Barker, Epstein & Loscocco
176 Federal Street
Boston, MA 02110
Tel: (617) 482-4900
Fax: (617) 426-5251
<u>Photolaw@aol.com</u>

Plaintiff, Sonya Larson ("Larson") opposes Defendant, Dawn Dorland Perry's Partial Motion to Dismiss (Dkt. No. 25). Defendant, Dawn Dorland Perry will hereinafter be referred to as "Dorland." As grounds for this Opposition, Larson states as follows:

Dorland's Motion is related to a pending Motion to Dismiss (Dkt. Nos. 11 & 12) previously filed in this Action by Defendants, Cohen Business Law Group, LLC and Jeffrey A. Cohen (hereinafter collectively, the "Law Firm"). While the legal bases for Dorland's Motion to Dismiss (Dkt. No. 25) are different from the Law Firm's Motion, most of the relevant facts are the same.

## A.     Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Although detailed factual allegations are not necessary to survive a motion to dismiss, the standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555, 127 S.Ct. 1955. "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." Ocasio–Hernandez v. Fortuno–Burset, 640 F.3d 1, 13 (1st Cir. 2011). In evaluating a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. American Airlines, Inc., 199 F.3d 68, 68 (1st Cir. 2000).

**B.      Larson is a published author and Dorland is an aspiring writer.**

Sonya Larson is a published author who works at not-for-profit creative writing center in

Boston known as GrubStreet.[1]  (Compl. ¶ 2)  Larson is very active in the writing community and

she has received honors and fellowships from various writer's organizations.  (See,

https://larsonya.com).  Dorland is an aspiring writer whose career to date seems focused

primarily on teaching occasional writing workshops.  [Compl. ¶ 4]

**C.      Larson is the author of a critically acclaimed short story called, *The Kindest*.  The Story is about the relationship between an anonymous kidney donor and the kidney recipient.**

Larson is the author of a short story entitled, *The Kindest*.[2]  *The Kindest* is a story about

relationships centered around the donation of a kidney made anonymously by a wealthy, white,

female donor to a poor Chinese-American female recipient.  [Compl. ¶ 18]  *The Kindest*,

hereinafter the "Short Story" or the "Story," has received wide-spread acclaim and was published

as an audio book by www.audible.com ("Audible") [Compl. ¶ 28], an on-line book by American

Short Fiction ("ASF"), and in print by ASF.  [Compl. ¶ 29].  As will be explained, a version of

the Story was also published without Larson's permission or authority by a company known as

Brilliance Audio.

Larson's Story also won a prestigious competition in 2018, through the Boston Book

Festival (the "BBF"), a not-for-profit organization that promotes reading and ideas for writers

---

[1] For a more detailed recitation of facts, see Larson's Complaint (Dkt. No. 1) and her Opposition to the Law Firm's Motion at Docket No. 16. Factual references are made to relevant paragraphs in the Complaint and to the Opposition and exhibits.

[2] A copy of *The Kindest* is attached to the Complaint as Exhibit C.  *The Kindest* was registered with the U.S. Copyright Office before this Action was filed and it was given Registration No. TX-8-678-446, effective December 17, 2018.  A copy of the Certificate of Registration is attached as "Exhibit A" to Larson's Opposition to the Law Firm's Motion (Dkt. No. 16).

and bibliophiles.  The Short Story was to have been extensively distributed at the BBF's premier event through a program called "One City/One Story."  Over 30,000 copies of the Story were printed and were to have been distributed to BBF members, festival participants, local libraries and participating businesses.  [Compl. ¶¶ 30-31]

### D.   Dorland claims to be an anonymous kidney donor.

Dorland claims to be an anonymous kidney donor.  In 2015, Dorland posted a letter on Facebook that she either sent or intended to send to the recipient of her kidney.  In the letter, Dorland introduces herself, explains why she donated her kidney, and asks to meet her recipient. Dorland's letter is similar in many respects to several sample letters that are readily available online for use by organ donors to send to their recipients.[3]  [Compl. ¶ 20]

While Dorland's 2015 Letter was one of many inspirational elements for Larson's Short Story, Larson did not copy the Letter.  Larson uses the letter in her Story as a literary device to introduce a new character.  Larson's letter is not the central focus of the Story.  [Compl. ¶ 19]

### E.   Three variations of *The Kindest* were published.

Three versions of *The Kindest* were published and each of them contains a letter from a kidney donor to her recipient.  The first version of the Story is the Audible/Brilliance print-on-demand CD variant.  The Audible/Brilliance print-on-demand CD variant is the version of the Story that Dorland claims contains a letter that mimics a few parts of her 2015 Letter (see Dorland Memo pp. 5-6, 17-18), and because it was print-on-demand, it was created only for persons who actually purchased the CD.  As will be discussed later, this variant was produced

---

[3] See, for example, https://www.kidney.org/atoz/content/writing-to-transplant-recipients-guide-donor-families-and-living-donors.  Other letters can be found by doing a Google search using the phrases such as, "Letters from organ donors to anonymous recipients," and "letters to recipient of organ donations."

<u>without</u> Larson's permission and authority.  The second variant is the Audible/Brilliance Audio mp3 and ASF variant that was published in mp3 format in October 2016, in print in August 2017, and online in May 2018. The Audible/Brilliance Audio mp3 and ASF variant was submitted to the BBF and it is the version that won the One City/One Story contest.  The second variant was further modified by Larson and it became the third variant, which is the one that the BBF printed and intended to distribute at its annual summer book festival.  (Larson Aff. ¶ 4).

Each of the three variants reflects the natural progression of Larson's writing style; constantly modifying, changing and improving on her narrative. Larson Aff. ¶ 5).  Copies of Dorland's 2015 Letter is attached as Exhibit A, the unauthorized Audible/Brilliance print-on-demand CD variant is attached as Exhibit B, the Audible/Brilliance Audio mp3 and ASF variant is attached as Exhibit C, and the BBF variant that was to have been distributed to the public is attached as Exhibit D.

Larson maintains that focusing on the letter in *The Kindest* is like losing sight of the forest for the trees.  Larson's letter is only a small part of *The Kindest* and was used simply to introduce a new character.  Dorland's 2015 Letter is 381 words long and the three variations of the letter that Larson used in the subsequent iterations of her Story are all shorter.  The Audible/Brilliance variant is 250 words long, the ASF variant is 237 words long and the BBF variant is 268 in length.  Compare the length of Dorland's letter (381 words) with *The Kindest*, which contains 5,514 words.

As shown in the many samples of letters from organ donors to recipients that are readily available online (<u>See</u> Note 3 herein), the concept or idea of writing a letter to a kidney recipient is hardly an original idea, perhaps not even capable of being copyrighted.  <u>Johnson v. Gordon</u>, 409 F.3d 12, 19 (1st Cir. 2005) ("copyright law protects original expressions of ideas but it does

not safeguard either the ideas themselves or banal expressions of them"); <u>Matthews v. Freedman</u>,

157 F.3d 25, 27 (1st Cir. 1998) ("A major limitation on what is protectible under the copyright

laws is capsulized in the notion that copyright protects the original expressions of ideas but not

the ideas expressed.")  (<u>Harney v. Sony Pictures Television, Inc.</u>, 704 F.3d 173 (1st Cir. 2013)

(No infringement claim lies if the similarity between two works rests necessarily on non-

copyrightable aspects of the original.) (<u>Williams v. Gaye</u>, 895 F.3d 1106, 1120 (9th Cir. 2018)

(Distinguishing between "broad" and "thin" copyright protection based on the "range of

expression" involved.  If there's only a narrow range of expression, then copyright protection is

'thin' and a work must be 'virtually identical' to infringe.)

**F.**      **When Dorland heard that Larson wrote a story about a kidney donation, and long before she knew the Story contained any letter, she began to hound Larson about it.**

Dorland heard that Larson wrote a story about a kidney donation after Larson gave a

reading from a portion of *The Kindest* at a Boston bookstore on June 22, 2016.  [Compl. ¶ 21,

Larson Aff. ¶ 6].  Once Dorland learned about the subject of Larson's Story, and before the Story

had even been published, Dorland began to hound Larson with emails and text messages

insinuating that the Short Story in its entirety was based on Dorland's "life experiences" and

"personal narrative."  [Compl. ¶ 22 and Dorland Memo pp. 1 & 7].  Dorland claimed that Larson

had no right to fabricate a fictional story about a kidney donation without consulting Dorland on

the basis that they were "friends."  [Compl. ¶¶ 23-24].  Dorland insisted on an apology and

threatened to write about Larson in a memoir or essay.  Even though Larson's Short Story was

fiction, Dorland obviously felt very threatened by someone she knew who was writing about

what Dorland perceived as her personal and unique experience as an organ donor.  (Compl. ¶

24).  While Dorland's gift was a kind deed, it was hardly unique.

**G.     Dorland began a relentless campaign to disparage and cause damage to Larson by contacting ASF, the BBF and other writer's groups and conferences.**

The Complaint further alleges that Dorland later called and emailed ASF, the BBF, GrubStreet (Larson's employer), members of Larson's writing group, and the Bread Loaf Writers' Conference, a prestigious and influential writer's organization ("Bread Loaf"), often multiple times each day, and accused Larson of plagiarism.  Dorland complained that Larson's Letter was a "paraphrase" of Dorland's Factual Letter, and that Larson received a prestigious fellowship to Bread Loaf using Dorland's "plagiarized" Factual Letter in Larson's Short Story. [Compl. ¶ 34]  Dorland demanded at different times, a citation for the authorship of Dorland's Factual Letter, that Larson's Short Story be pulled from ASF and the BBF in its entirety, that ASF publish one of Dorland's essays instead of Larson's Work and/or that she be paid considerable damages.  Neither ASF nor the BBF acquiesced to Dorland's demands [Compl. ¶¶ 35-36], although the ASF did remove the story from its website [Compl. ¶ 63] and the BBF decided not to use *The Kindest* in its summer book festival [Compl. ¶ 70].

Dorland also made the utterly false claim to Bread Loaf that Larson's fellowship application contained plagiarism, starting with an email titled, "Plagiarism in Tuition Fellow's 2017 Application."  Dorland's claim was baseless since Larson did not include *The Kindest* in her application to Bread Loaf. [Compl. ¶ 37].

Dorland's actions in making claims of plagiarism and sending aggressive and coercive correspondence to ASF, the BBF and others without just cause were calculated to cause damage to Larson.   [Compl. ¶¶ 62, 68 & 70]

**H.     Dorland set out to damage Larson's reputation by accusing her of plagiarism within the writing community by contacting Larson's employer, writer's conferences and publishers.**

Larson's Complaint clearly states that Dorland contacted various third parties, including Larson's employer, several writers' conferences and publishers and accused Larson of plagiarism. (Compl. ¶¶ 33 thru 37). Larson contends that these contacts, made both orally and in writing, caused damage to her reputation within the writing community. The assertions of plagiarism and threats to sue them for significant damages eventually led to the withdrawal of *The Kindest* from the ASF website, and the decision by the BBF to forgo its use of Larson's Short Story in its annual One City/One Story project. (Compl. ¶¶ 60-63 & 68-69).

Several courts have acknowledged that there is no question that an allegation of plagiarism is damaging to a writer. (Roberts v. Columbia Coll. Chicago, 821 F.3d 855, 864 (7th Cir. 2016)) (plagiarism is considered by most writers, teachers, journalists, scholars, and even members of the general public to be the "capital intellectual crime." Plagiarism is considered an egregious and serious offense.) Buckley v. Littell, 529 F.2d 882, 884-885 (2nd Cir.1976) (stating or printing that a journalist is a "fascist" is a statement of opinion and not an actionable assertion of fact. However, stating that that journalist committed plagiarism or lied about certain people does constitute an actionable assertion of fact.)

I.   **In Massachusetts, all libel is actionable per se, while slander is actionable if it prejudices or tends to prejudice a plaintiff in their office, profession or business.**

In Sharratt v. Housing Innovations, Inc., 365 Mass. 141 (1974), Massachusetts joined other states in holding that all libel is actionable per se. The "words need not hold a plaintiff up to ridicule or damage his reputation in the community at large, or among all reasonable men. It is enough that they do so among 'a considerable and respectable class' of people." Id. at 145. While under Massachusetts' law, words spoken orally may not be actionable per se, they are actionable if they charge a person with a crime, or state that he or she is suffering from certain

diseases, or prejudice him or her in his office, profession or business. (Sharratt, 365 Mass. at 147, note 1.) Dorland has certainly committed the "capital intellectual crime" by accusing Larson of plagiarism, thus causing damage to Larson's writing career by impugning her professional integrity and honesty.

The general damages recoverable in a defamation action are those naturally and necessarily flowing from the wrong. They include compensatory damages for actual injury and harm to a plaintiff's reputation, as well as for mental pain and suffering. These elements of recovery are based on the harm which the law assumes is done by defamatory words. Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 860 (1975).

**J.     Larson did not monopolize stories about kidney donors; Dorland is free to write her own story as fact or fiction.**

Dorland contends that Larson took her "specific life experience" and used it to fabricate *The Kindest*. (Dorland's Memo p. 1).  This is simply not true.  There is nothing about Dorland's specific life experience in *The Kindest*.  Furthermore, there nothing so special and unique about Dorland's donor experience that would prevent Larson from writing a fictional story about a poor, alcoholic Chinese-American woman who meets her kidney donor.  Dorland is not the only person who has ever donated a kidney and Larson is not the only person who has written about kidney donations.[4]

That Larson uses a letter to a kidney recipient about a quarter of the way into her Story as a vehicle to introduce a new character, is not plagiarism.  Larson was simply doing what countless fiction professors, instructors, authors, conference directors, and craft books advise

---

[4] A Google search for "books about kidney donations" and "fiction books about kidney donations" results in a plethora of examples.

writers to do every day -- to take inspiration from the world and use it to imagine new characters,

situations, and worlds.  As with the thousands of fictional stories, novels, and poems published

each year in this country, Larson has no legal obligation to create footnotes or pay damages

to one of her story's many original sources of ideas and inspiration.[5]

Dorland should be angry at herself for not writing a story about her own donor

experience before Larson did.  Frankly, even now, there is nothing that Larson has done that

would prevent Dorland from writing about her own specific life experience as a kidney donor, if

she so chooses.

### K.    Larson admits that she recorded a few thoughts and ideas from Dorland's 2015 Letter.

That there may be overlap in some of the words in Dorland's 2015 Letter and Larson's

letter is not surprising.  Larson admits that she saw Dorland's Factual Letter that Dorland posted

on Facebook, without a copyright notice, and found it interesting.  However, Larson did not

download or print the Factual Letter but instead recorded a few thoughts and ideas from the letter

in her notes for future reference.  (Compl. ¶ 17).

### L.    The first variant of The Kindest was published by Audible.com.  Apparently, it was also published by Brilliance Audio <u>without</u> Larson's knowledge or consent.

In her Memo, Dorland uses examples of what she perceives as infringing quotes from a

version of *The Kindest* that appeared on Brilliance Audio

(https://www.brilliancepublishing.com).  This Brilliance Audio version of the Story is not in the

---

[5] Instruction textbooks and manuals for fiction writers suggest numerous ways for writers to find inspiration. <u>See</u>, for example, <u>Naming the World and Other Exercises for the Creative Writer</u>, edited by Bret Anthony Johnston (Random House, 2008), a widely-used college and writer's text.  (See, Larson Aff. ¶ 7)  In this text, writers are encouraged to find inspiration from poems or newspaper stories, [John Dufresne, p. 6]; grocery store receipts, Post-it notes, sorority-rush ratings books, love letters, to-do lists and breakup notes. [Thisbe Nissen, p. 19-20].

record and technically should not be used by this court in deciding the pending Motion. Nevertheless, some explanation for this recording is necessary under the circumstances.

Larson gave a literary studio named Plympton, Inc., the right to license *The Kindest* in audible form to Audible.com. Larson submitted a draft copy of her Story to Plympton for the sole purpose of helping Plympton reach a deal with Audible. (See, Larson Aff. ¶ 8). A copy of the agreement with Plympton is included with the Larson's Affidavit (¶ 8 - "Exhibit 1") See Provision 2.1, which states as follows:

> Plympton's only use of the licensed rights shall be to make commercially reasonable efforts to sublicense the Audiobook Rights and Associated Electronic Publishing Rights to Audible.com, subject to the royalty provisions of Section 5.

[Emphasis supplied.]

On July 25, 2018, Larson became aware for the first time that both Audible and Brilliance Audio published a version of *The Kindest*. Larson's contract with Plympton was restricted specifically to Audible. Brilliance was never authorized to publish the Short Story. Larson has since discovered that Audible and Brilliance are both owned by Amazon. [see their respective websites at: https://www.audible.com/ and https://www.brilliancepublishing.com/] Presumably, Audible allowed Brilliance to simultaneous publish Larson's Story. If this is what happened, Brilliance published *The Kindest* without Larson's permission or authority. (Larson Aff. ¶ 9).

If this were not enough, Audible posted the draft version of the Story on its website in downloadable mp3 format and print-on-demand CD format. When Larson realized what happened, she promptly instructed Audible to remove and replace the draft version with the proper version, which it did for the downloadable mp3, but apparently neglected to do for the print-on-demand CD (Compl. ¶ 28). Brilliance apparently neglected to do so as well. Of course,

Dorland points out the similarities in her 2015 Letter with the letter from the unauthorized Brilliance draft version of *The Kindest*.

**M.    The timeline for publication of the different variants of The Kindest is important but Dorland's sequence of events is misleading.**

Dorland correctly observes that since 2015, Larson has written or published different versions of *The Kindest* that contain different versions of a letter within her story. (Dorland Memo p. 4). However, Dorland's rendition of the relevant timeline of events is misleading.

Larson's first public presentation of her Short Story occurred on June 22, 2016. Larson read a portion of her Story but did not read from or refer in any way to the letter that was embedded within the Story. Dorland was informed by a fellow acquaintance about the Story solely because it was about a kidney donation. Immediately afterwards, Dorland began hounding Larson with upsetting emails and text messages, claiming that Larson had no right to write a fictional story involving a kidney donation without consulting Dorland. [Compl. ¶¶ 21-22].

Larson submitted a draft copy of *The Kindest* to Plympton, which Audible accepted for publication as an audio story in December 2015. Larson requested revisions to the submission in May and July 2016. (Larson Aff. ¶ 10). However, on August 3, 2016, by mistake, Audible posted the draft version of the Short Story online instead of the updated version. When it did, Larson immediately notified Audible about its mistake, and Audible replaced the draft copy of *The Kindest* with the correct version. Next, ASF published an in-print version of the Story in August 2017, and an electronic version in May 2018.

As stated, the publication of the Brilliance Audio print-on-demand CD version of the Story was never authorized by Larson. Audible published the correct version of *The Kindest* as a

downloadable MP3 audiobook in 2016, but apparently neglected to tell Brilliance to replace the incorrect file for its print-on-demand CD. Brilliance later corrected its mistake after it was notified of the error by Larson on July 26, 2018. (Larson Aff. ¶ 11)

Publication of the Brilliance Audio version of the Story was never authorized by Larson and is clearly contrary to Larson's agreement with Plympton. In any event, Dorland somehow got a copy of the Brilliance Audio version, but she has not said when, how or from whom she got the copy. The *Boston Globe* used the Brilliance Audio version in its story on August 14, 2018. (Compl. Exhibit G). We do not know when Dorland first saw a copy of the Brilliance Audio version. This is important.

Dorland accused Larson of plagiarism starting in early June 2018. Dorland complained to BBF on or around June 6, 2018, ASF on or around June 6, 2018, Bread Loaf (and "other writing conferences") on or around June 7, 2018, and GrubStreet on or around July 3, 2018. (Larson Aff. ¶ 16). If Dorland did not find the Brilliance Audio version until August 2018, then Dorland had no basis to accuse Larson of being a plagiarist, and certainly not in early June 2018, when she started to make her hurtful accusations.

Crucially, on or around July 3, 2018, Dorland and her Law Firm were supplied with a copy of the final version of *The Kindest* that the BBF was set to publish shortly thereafter. They knew that the final version of the Story had no word or phrase in common with Dorland's letter. (Compare Exhibit A (Dorland's letter) with Exhibit D (the final BBF variant). Dorland and the Law Firm knew full-well that the BBF's publication would not constitute plagiarism or copyright infringement in *any* way, and yet they continued to press their claims and make outrageous demands through September 2018.

**N.      Dorland accused Larson of plagiarism and published this to the writing community.**

**Analysis of the Brilliance Audio version of *The Kindest* and Dorland's 2015 Factual Letter.**

The introduction that Dorland claims is similar in both letters is pretty basic information. It would be difficult to start a letter sent from an anonymous kidney donor to her recipient without an introduction. Dorland's letter then addresses the "dire need for kidneys" while Larson's letter refers to the "urgent need" for kidneys. These basic elements are probably not even subject to copyright protection.[6]

Again, Dorland says that she wanted to make an impact on other's lives with only minimal risk to herself. Larson repeats this sentiment in a slightly different way. Most people have two healthy kidneys and they need only one of them to survive. While perhaps not as risk-free as giving blood, kidney donations are likely the most risk-free of all organ donations.[7]

That there are a few words and phrases in the Brilliance Audio version and Dorland's 2015 letter is understandable. The Brilliance Audio version was posted by mistake and clearly without Larson's permission. Even if Larson had copied the entirety of Dorland's letter rather than mimicking a few words and phrases, it would be highly improbable that anyone other than Dorland would ever have grasped the significance of the minimal similarities.

**O.    In addition to being called a plagiarist, Larson does allege specific defamatory statements.**

Dorland called Larson a plagiarist and published this allegation to Larson's employer and others in her writing community. This allegation damaged Larson's reputation in the community,

---

[6] See, for example, http://www.kidneyfund.org/kidney-disease/kidney-donation.html. ("Nearly 100,000 people are on the waiting list for a kidney transplant. Many more people are waiting for a kidney than for all other organs combined. Unfortunately, the number of people waiting for kidneys is much larger than the number of available kidneys from living and deceased donors. You can save a life by being a kidney donor.")

[7] Google "Kidney Donations" for a discussion of the need for and relatively low level of risk for kidney donations.

and her unfounded threats caused ASF to pull the Story, and the BBF to forgo its use of *The Kindest* as its One City/One Story competition winner.  (See *Boston Globe* article of August 14, 2018 attached to Compl. as Exh. G.)  Whether Dorland was justified or at fault for publicly accusing Larson of plagiarism is a question of fact for the jury.  Amrak Productions, Inc. v. Morton, 410 F.3d 69, 72–73 (1st Cir. 2005)  The only question at this juncture is whether Dorland's allegation of plagiarism made against Larson and published to various members of Larson's writing community, including Audible.com, ASF, Larson's employer, Bread Loaf and other writer's groups, is capable of a defamatory meaning.  This threshold question, "whether a communication is reasonably susceptible of a defamatory meaning, is a question of law for the court."  Id.

> A communication is susceptible to defamatory meaning if it 'would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community.'  The communication 'must be interpreted reasonably,' leading a 'reasonable reader' to conclude that it conveyed a defamatory meaning.

Amrak Productions, 410 F.3d at 72 [citations omitted].

If the answer to the question, whether the communication is reasonably susceptible of a defamatory meaning is "yes," then the ultimate issue of whether the accusation is defamatory is not the court's to decide.  Id. (quoting Phelan v. May Dep't Stores Co., 443 Mass. 52, 56–57 (Mass.2004)).

Dorland and her Law Firm were given a copy of the final BBF version of *The Kindest* on or around July 3, 2018.  (Larson Aff. ¶ 17)  At this time, Dorland and Law Firm knew that the letter in the BBF version (Exhibit D) was in no way similar to Dorland's letter (Exhibit A) and that nothing in *The Kindest* constituted plagiarism or copyright infringement in *any* way.

Dorland contends that the Larson's letter used in one of the early variants of *The Kindest*
mimicked small portions of Dorland's 2015 Letter. At worst, Larson contends that any similarity
was either <u>de minimis</u> or fair use. This is a matter for the jury. Furthermore, it is highly likely
that Dorland's 2015 Letter did not contain sufficient original material to be even afforded
copyright protection. Nonetheless, Dorland's continuing claims of plagiarism to the BBF and
the *Globe*, and her Law Firm's accusations of copyright infringement to the BBF, in its demand
letters from July 3, 2018 through September 2018, were utterly without merit.[8] (<u>Stanton v.
Metro Corp.</u>, 438 F.3d 119, 124–25 (1st Cir. 2006) (To prevail on a claim of defamation, a
plaintiff must establish that the defendant was at fault for the publication of a false statement
regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which
either caused economic loss or is actionable without proof of economic loss.)

**P.      Dorland realizes that she was wrong in characterizing Larson as a plagiarist and she
is now trying to brand Larson a limited purpose public figure requiring an
allegation of actual malice.**

Dorland is trying to characterize Larson as a "limited purpose public figure" which
Dorland claims would require an allegation of actual malice in order to prove defamation rather
than just negligence. "The level of fault required varies between negligence (for statements
concerning private persons) and actual malice (for statements concerning public officials and
public figures)." <u>Ravnikar v. Bogojavlensky</u>, 438 Mass. 627, 630, (2003).

Contrary to Dorland's assertion, Larson is not a limited purpose public figure, who
voluntarily injected herself into a particular public controversy. Larson works for a creative
writing center and she wrote a Short Story that won a contest. Neither of these things made

---

[8] The demand letter Dorland's Law Firm sent to the BBF is attached as Exhibit E to Larson's Opposition to the Law
Firm's Motion to Dismiss (Dkt. No. 16). Copies of other letters between Dorland's Law Firm, Larson's predecessor
legal counsel and present counsel are attached hereto as Exhibit E.)

Larson a public figure until Dorland accused her of plagiarism and then involved the *Boston Globe* in July 2018, to help her broadcast the claim to a huge audience.[9]  The *Globe* article was certainly not written at Larson's suggestion.  The negative publicity is last thing that Larson wanted.

The First Circuit employs a two-pronged test to determine whether a defamation plaintiff is a limited-purpose public figure.  First, defendant must prove (1) that a <u>public controversy existed prior</u> to the alleged defamation, and (2) that the plaintiff has attempted to influence the resolution of that controversy.  <u>Alharbi v. Theblaze, Inc.</u>, 199 F. Supp. 3d 334, 355 (D. Mass. 2016), citing <u>Bruno & Stillman, Inc. v. Globe Newspaper Co.</u>, 633 F.2d 583 (1st Cir. 1980).  In this Action, Dorland is alleged to have defamed Larson <u>before</u> there was a public controversy.  In fact, the public controversy arose when the *Boston Globe* article was published on July 26, 2018.  There were allegations of plagiarism made by Dorland before the article was published but there was no public controversy until then.

Dorland argues that Larson voluntarily injected herself into the controversy by granting an interview to the *Globe*.  However, one does not become a public figure merely by defending oneself publicly against accusations.  (<u>Pendleton v. City of Haverhill</u>, 156 F.3d 57, 68 (1st Cir. 1998))  The court in <u>Lluberes v. Uncommon Prods., LLC</u>, 663 F.3d 6, 19 (1st Cir. 2011) noted that "an individual should not risk being branded with an unfavorable status determination merely because he defends himself against accusations, especially those of a heinous character."  663 F.3d at 19.  Larson was drawn into a controversy orchestrated by Dorland and the fact that Larson tried to defend her reputation by commenting to the press, does not transform her into a limited purpose public figure.

---

[9] See *Boston Globe* article, 'Inspiration or Plagiarism? Writing Hackles raised in Boston Dispute," published on July 26, 2018.  A copy of the article is attached to Larson's Complaint as "Exhibit F."

Furthermore, Larson believes that Dorland's accusation of that "capital intellectual crime" known as plagiarism that was broadcast repeatedly within the writing community and beyond, connotes sufficient malice under any imaginable status to satisfy the notice pleading requirement set forth in Fed. R. Civ. P. 8. Larson does not merely allege that Dorland made disparaging statements about her, she accuses Dorland of calling her a plagiarist and then broadcasted this accusation to various members of Larson's writing community and the *Globe*. By the time the *Globe* article was published, Dorland and the Law Firm had been given a copy of the BBF version of *The Kindest* which contains absolutely nothing that could be perceived as infringing. Accordingly, Larson has made sufficient allegations for a reasonable jury to conclude that Dorland did not act reasonably in verifying the truth of her accusations. (Jones v. Taibbi, 400 Mass. 786, 799, (1987)). Thus, Dorland's Motion to Dismiss Count VIII should be denied.

**Q.     Dorland's relentless calls and emails to ASF interfered with Larson's contract with ASF and resulted in the removal of The Kindest by ASF**

Larson alleges that ASF offered to publish *The Kindest* in ASF's literary magazine, and to feature the Work on its website in May 2018, and Larson accepted. (Compl. ¶ 58) (A copy of the ASF agreement is attached as Exhibit 2 to Larson's Aff. at ¶ 18.) After the Story was published, Dorland contacted ASF and accused Larson of "plagiarizing" her 2015 Letter in *The Kindest*. Dorland complained that Larson's Work was a "paraphrase" of Dorland's Factual Letter, and that Larson "plagiarized" the Factual Letter in Larson's Short Story. (Compl. ¶ 60)

Larson further alleges that Dorland relentlessly called and emailed various ASF employees and board members for weeks making claims of plagiarism and sending aggressive and coercive correspondence. (Compl. ¶¶ 61-62). ASF told Larson that it did not have the

financial means nor sufficient staff to deal with Dorland's demands, and as a direct and

proximate result of Dorland's demands and actions, ASF in consultation with Larson, decided to

pull *The Kindest* from the ASF website as a result of which Larson lost the benefit of widespread

online distribution. (Compl. ¶ 63-64). Although the length of time that *The Kindest* was to have

been made available by ASF was not specified in the agreement, Larson believed it would

remain for years. This assertion is verified by Larson. (Larson Aff. ¶ 18). Therefore, Dorland's

motion to dismiss Count I should be denied.

R.     ***The Kindest*** **was chosen as the winner of the BBF contest for its One City/One Story**
       **project, and 30,000 copies of the Story were printed and ready for distribution.**

The BBF selected Larson's Short Story as its 2018 One City/One Story winner in June

2018, and the BBF and Larson signed an agreement memorializing the selection of Larson's

Story. (A copy of the BBF agreement is attached as Exhibit 3 to Larson's Aff. at ¶ 19.) In the

Agreement, Larson granted the BBF a license to publish the Short Story in electronic versions

and to print and distribute not more than 30,000 printed. (Compl. ¶ 66) The agreement says,

> We are pleased to inform you of our decision to publish your piece *The Kindest* (the
> "Work") as the feature portion of Boston Book Festival, Inc. ("BBF") 2018 *One City One
> Story* program.

The Complaint alleges that Dorland and her attorneys knew that Larson's Story won the

BBF competition. (Compl. ¶ 67). Thereafter, Dorland and her attorneys contacted the BBF and

frequently made claims of plagiarism and copyright infringement, as well as claims for Statutory

Damages and attorney fees that were clearly not available to Dorland under the Copyright Act

because Dorland did not register the copyright to her 2015 Letter in a timely manner. Dorland

and her attorneys made unwarranted demands against the BBF in order to damage Larson and

coerce the BBF either to attribute *The Kindest* to Dorland, or ultimately pull *The Kindest* from

BBF's One City/One Story project. (Compl. ¶ 68). These actions directly resulted in the BBF's decision to pull *The Kindest* from its One City/One Story project. (Compl. ¶ 69- 70), as a result of which Larson was damaged. (Compl. ¶ 71).

These allegations are sufficient to support Count II against Dorland for intentionally interfering with Larson's agreement with the BBF to use and distribute *The Kindest* as part of its One City/One Story project. Therefore, Dorland's motion to dismiss Count II should be denied.

**S.      Dorland was involved in trade or commerce within the meaning of M.G.L. c. 93A.**

One could argue that until Dorland hired her Law Firm, she was acting alone in her efforts to discredit Larson and to stop the further distribution of *The Kindest*. However, once she hired the Law Firm to pursue her claims against Larson, she began to act through "her agents, servants or attorneys" in a business context vis-a-vis Larson. (Compl. ¶ 101). Section 1 of Chapter 93A specifically includes in the definition of "trade" and "commerce," the distribution of any <u>tangible or intangible property</u> directly or indirectly affecting the people of this commonwealth.

Accordingly, when Attorney Cohen sent his July 3, 2018 letter to the BBF, Cohen and the Law Firm were acting on behalf of Dorland, demanding that the BBF "cease and desist of and from any further printing, copying, distribution, or other activities related the 'The Kindest'" (Exhibit E to Larson's Opposition to the Law Firm's Motion to Dismiss (Dkt. 16))

The demand letter the Law Firm sent to the BBF threatened statutory damages under the Copyright Act as high as $150,000 for the willful infringement Dorland's copyright. When it sent its letter, the Law Firm knew or should have known that such damages were clearly not available to Dorland under any circumstances. (See Opposition at Dkt. No. 16.) The Law Firm acting for Dorland thrust this controversy into the realm of commerce that had a direct impact on

the BBF and Larson.  The Law Firm was acting in a business context in attempting to interfere with commerce regarding intellectual property that directly involved a citizens of this Commonwealth.  The attempts first by Dorland and then the Law Firm to stop the BBF from distributing Larson's Story by claiming infringement and demanding unwarranted damages is an entry into a "commercial" sphere through which Dorland wanted to enhance her economic interests.

Dorland's colluded with her attorneys and their actions directly impacted commerce affecting both the BBF and Larson.  They should be held accountable under Chapter 93A. Larson suggests that it is premature to dismiss Count V until further factual issues can be explored. Therefore, Larson asks that this court deny Dorland's Motion to Dismiss Count V.

**T.     Conclusion.**

Larson believes that she has included sufficient factual allegations in her Complaint to demonstrate a plausible entitlement to relief, from which this Court can make reasonable inferences of liability from the facts alleged.  Therefore, Larson opposes Dorland's Motion to Dismiss Counts I, II, V and VIII.

However, if this court finds that any of Larson's claims have not been fully and artfully expressed, she is seeking leave to amend her complaint.  Fed.R.Civ.P 15(a) declares that leave to amend a complaint "shall be freely given when justice so requires"; "this mandate is to be heeded." Foman v. Davis, 371 U.S. 178, 182, (1962).

Respectfully submitted,
SONYA LARSON,
By her attorney,

/s *Andrew D. Epstein*

_____
Andrew D. Epstein, Esquire (BBO #155140)

May 9, 2019

SONYA LARSON,
By her attorney,

/s *Andrew D. Epstein*

May 9, 2019

Andrew D. Epstein, Esquire (BBO #155140)
Barker, Epstein & Loscocco
176 Federal Street
Boston, MA 02110
Tel: (617) 482-4900
Fax: (617) 426-5251
Photolaw@aol.com

Certificate of Service

I certify that Plaintiff's Opposition to the Motion to Dismiss of Defendant, Dawn Dorland
Perry, and Memorandum in support thereof was filed through the court's ECF system and a copy
was sent electronically on the day it was filed to all counsel of record.

*/s/ Andrew D. Epstein*

May 9, 2019

Andrew D. Epstein