# Exhibit 1

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONYA LARSON <br><br>               Plaintiff, <br><br> v. <br><br> DAWN DORLAND PERRY, <br><br> COHEN BUSINESS LAW GROUP, PC <br><br> and <br><br> JEFFREY A. COHEN, ESQUIRE <br><br>               Defendants. | Civil Action No. <br><br> 1:19-cv-10203-IT |

## AMENDED COMPLAINT
## AND DEMAND FOR TRIAL BY JURY

This is an action for declaratory judgment and damages brought in part under the

Copyright Act of the United States as amended, 17 U.S.C. §§ 101 et seq.  Plaintiff is the author

of a copyrighted short story called, *The Kindest*.  Defendant, Dawn Dorland Perry accused

Plaintiff of copyright infringement for basing her story on a small portion of a letter Dorland-

Perry posted on Facebook.  Plaintiff is seeking a declaration that her accused short story does not

infringe Dorland Perry's copyright to the Facebook letter, and therefore, that Dorland Perry is

not entitled to copyright damages and/or attorney's fees.

Plaintiff is also seeking damages for the intentional interference with two of Plaintiff's

advantageous contractual relationships perpetrated by all Defendants, as well as for certain unfair

and deceptive acts and practices committed by the Defendant law firm (Cohen Business Law Group, PC) in violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, and for defamation of the Plaintiff by one or more of the Defendants.

Jurisdiction is conferred upon this Court under Count VIII pursuant to 28 U.S.C. § 1338(a). Supplemental jurisdiction is conferred on this Court under the remaining counts pursuant to 28 U.S.C. § 1367(a). Proper venue exists against the Defendants pursuant to 28 U.S.C. §1400(a), and the Massachusetts Long Arm Statute, M.G.L. c. 223A § 3, for causing tortious injury in this Commonwealth.

Parties

1.     Plaintiff, SONYA LARSON (hereinafter, "Larson"), is an individual who resides at 89 Concord Avenue, Somerville, Middlesex County, Commonwealth of Massachusetts. Larson is a mixed-race Chinese-American woman.

2.     Larson is a professional writer and a Director at GrubStreet, Inc., a Boston area not-for-profit corporation dedicated to educating and helping creative writers.

3.     Defendant, DAWN DORLAND PERRY, also known as Dawn Chryselle Dorland Perry (hereinafter, "Dorland"), is an individual who once lived in or around Boston, Massachusetts, and now resides at 3111 West 69th Street, Los Angeles, California 90043.

4.     Dorland previously took several classes at Grubb Street as a student.

5.     Upon information and belief, Dorland is an aspiring professional writer who teaches and conducts a few writing workshops in California and other places in the United States.

6.      Defendant, COHEN BUSINESS LAW GROUP, P.C. (hereinafter, "Cohen Law"), is a law firm incorporated in the State of California, with a usual place of business at 10990 Wilshire Boulevard, Los Angeles, California 90024.

7.      Cohen Law claims that it has nearly three decades of experience in business, intellectual property and Internet law.

8.      Defendant, JEFFREY A. COHEN, ESQUIRE (hereinafter, "Attorney Cohen"), is an attorney in the Cohen Law firm, and he is the sole officer and director of Cohen Law where he holds the positions of Chief Executive Officer, Chief Financial Officer and Secretary of the firm.  Attorney Cohen maintains an office for the practice of law at Cohen Law located at 10990 Wilshire Boulevard, Los Angeles, California 90024.

<u>Dorland donated one of her kidneys to an unknown recipient and</u>
<u>publicized this gesture extensively on social media and elsewhere.</u>

9.      On information and belief, Dorland donated one of her kidneys to an unknown recipient sometime in or around 2015.

10.      In or around July 2015, Dorland wrote a half-page letter ostensibly addressed to the recipient of her kidney, in which Dorland introduces herself, outlines her reasons for donating the kidney, expresses an interest in learning more about her recipient, and possibly meeting that person one day.  The letter is hereinafter referred to as the "2015 Factual Letter."  A copy of the 2015 Factual Letter is attached hereto as "Exhibit A" and is incorporated herein by reference.

11.      Sometime around July 2015, Dorland posted the 2015 Factual Letter on a semi-public group forum on Facebook, which on information and belief, included at the time,

approximately 250 to 300 people.  Larson was added to this Facebook group forum without her knowledge or permission.

12.     It appears that one of the purposes of Dorland's Facebook group forum was to give Dorland a platform to share her personal experiences with donating a kidney.

13.     Dorland's 2015 Factual Letter was posted on her Facebook forum without a copyright notation.

14.     The 2015 Factual Letter, dated July 2, 2015, was registered with the United States Copyright Office about three years after it was posted on Facebook, under the title "Dorland kidney chain final recipient letter July 2, 2015."  The 2015 Factual Letter was given copyright registration number TXu 2-101-420, effective June 10, 2018.  A copy of the Copyright Office registration information along with a copy of the deposit material consisting of the 2015 Factual Letter is attached hereto as "Exhibit B" and is incorporated herein by reference.

15.     Since the time that Dorland donated her kidney, she has been very public and outspoken about her kidney donation experience.  Dorland has used social media and other public forums extensively to raise awareness about her own kidney donation and about kidney donations in general.

### Larson and Dorland are nominal acquaintances of each other.

16.     Larson and Dorland have had a nominal relationship with each another in the past.  The relationship consisted mostly of a few dozen work-related emails, scant social media exchanges, and a few in-person pleasantries at various social gatherings when Dorland was living in the Boston area.

17.     Larson saw the 2015 Factual Letter that Dorland posted on Dorland's Facebook group page and she found it interesting.  Larson did not download or print the 2015 Factual

Letter but instead recorded a few thoughts and ideas from the letter in her notes for future reference.

Larson wrote a story about a kidney donor meeting a kidney recipient.

18.    In 2015, Larson began to write a fictional short story about an alcoholic, working class Chinese-American woman living in Boston with her husband, who receives a kidney donation from a wealthy white woman.  The story is divided into four parts.  Each part explores the different stages in the main character's journey.  The story deals with the complexities of indebtedness, addiction, love, shame, and race, and its central aim is to depict a person of color resisting a white savior narrative.

19.    Larson's short story is called, *The Kindest*, and it includes a brief letter in the second part of the story that is sent by the donor character to the kidney recipient character.  The letter (hereinafter, the "Fictional Letter") is a small part of the narrative and it is used primarily to introduce the kidney donor character, and to set the stage for the eventual meeting of the recipient character and the donor character.  Larson's story is hereinafter referred to either as "*The Kindest*," the "Short Story," the "Story" or the "Work."

20.    When Larson was writing *The Kindest*, she researched and viewed dozens of letters from other organ donors that were widely available on the Internet.  She also viewed many websites devoted to advising organ donors and recipients on how to correspond with each another, including bullet points of the kinds of information people share and in what order.  Some of the online letters include points similar to those raised by Dorland in her 2015 Factual Letter.

**Dorland heard about Larson's Short Story in 2016 and
she was very upset with Larson and felt threatened by the Short Story.**

21.     On June 22, 2016, Larson read a portion of an early draft of *The Kindest* at a

Boston bookstore.  She read from the fourth part of the story where the donor and recipient

finally meet.  Larson did not read any part of the Fictional Letter that is included in her Short

Story.

22.     A mutual acquaintance of both Larson and Dorland attended the bookstore

reading and posted the following comment about Larson's Short Story on Dorland's Facebook

page:

> Sonya [Larson] read a cool story about giving out a kidney, you
> came to mind, and I wondered if you were the source of the inspiration.

Dorland apparently read the post.

23.     Once Dorland learned that Larson wrote a story about a kidney donation, Dorland

began to hound Larson with emails and text messages insinuating that the Short Story in its

entirety was based on Dorland's life experiences.

24.     Dorland claimed that because they were "friends," Larson had no right to

fabricate a fictional story about a kidney donation without consulting Dorland.

25.     Dorland insisted on an apology and threatened to write about Larson in a memoir

or essay.  Even though Larson's Short Story was fiction, Dorland seemed very threatened

by Larson's Short Story.

26.     Larson repeatedly informed Dorland that the Work was not about Dorland, nor

was it about Dorland's personal experience as a kidney donor.

**Larson was scouted by a literary studio that wanted to help
her to publish an audio version of the Story.**

27.     After Larson had written a preliminary version of her Story, she was contacted by

a literary studio known as Plympton, Inc. ("Plympton"). Plympton was looking for new stories

and offered to help Larson produce the Story as an audio book. Larson supplied Plympton with a

draft copy of her Short Story for the sole purpose of helping Plympton arrange to have the Story

published. Larson and Plympton eventually entered into an agreement, a copy of which is

attached hereto as "Exhibit C," and which is incorporated herein by reference. In the Agreement,

Larson granted to Plympton the right to sublicence the Work for publication as an audiobook

solely to a company known as www.Audible.com ("Audible").

28.     Plympton was successful in sublicensing *The Kindest* to Audible, and Audible

agreed to publish Larson's Short Story as an audio book.

29.     After Audible accepted *The Kindest* as an audio book, Larson continued to refine,

modify, change and improve on the Work in order to smooth out the language, rhythm and tone

of the Story, a procedure Larson frequently undertakes. In light of Dorland's reaction to

Larson's reading of the Short Story at the Boston bookstore, and in order to further avoid

resemblance between Larson's Fictional Letter and Dorland's 2015 Factual Letter, Larson also

changed parts of the Fictional Letter that was incorporated in the Story. Larson sent her

revisions to Audible so that the Story could be recorded.

30.     An early version of the Story was accidentally posted online by Audible on

August 3, 2016, followed by the correct version a short time thereafter. Larson was paid $125 by

Plympton for arranging for the audio recording of the Work by Audible. Larson was under the

impression that her Short Story would remain on Audible's site for the duration of her copyright.

The Kindest was also published online and in print form.

31.     In August 2017, about a year after Audible published the Short Story, American

Short Fiction ("ASF") agreed to publish a slightly different version of *The Kindest* in its literary

magazine.  The Work was also featured by ASF online in May 2018.   Larson was paid $300 by

ASF for the right to publish *The Kindest*.  ASF was given the right to publish *The Kindest* for the

duration of Larson's copyright including extensions and renewals of the copyright.  A copy of

Larson's agreement with ASF is attached hereto as "Exhibit D" and is incorporated herein by

reference.

Larson submitted her Short Story to a competition
run by the Boston Book Festival.

32.     In 2018, Larson entered *The Kindest* in a competition run by the Boston Book

Festival, Inc. ("BBF"), a not-for-profit organization that promotes reading and ideas for writers

and bibliophiles.

33.     The BBF presents year-round events culminating in an annual festival.  As part of

its annual festival, which is the organization's premier event, the BBF features a short story that

it distributes extensively in the Boston area through an event called, "One City/One Story."

34.      The winner of the competition gets to have the winning story distributed to over

30,000 BBF members, participants in the Festival, local libraries and participating businesses

and other sponsors.  The Festival features the winning story for educational and discussion

purposes in the hope of incorporating divergent audiences in new conversations about an

important topic.

35.     In May 2018, the BBF informed Larson that *The Kindest* was chosen as its One

City/One Story winner.  The Short Story was to be the central literary work that would be

featured from August through October 2018, as the BBF's annual One City/One Story selection. The BBF also told Larson that the Work would likely be part of other future events sponsored by the BBF after the Festival ended.

36.     The BBF and Larson entered into an agreement in June 2018, memorializing the selection of Larson's Work as the One City/One Story winner.  In the agreement, Larson granted to the BBF the right to publish the Short Story online in multiple languages, and to print and distribute up to 30,000 copies of *The Kindest* throughout the Greater Boston Area.  The license to the BBF was to extend for the full term of the copyright.  A copy of Larson's agreement with the BBF is attached hereto as "Exhibit E" and is incorporated herein by reference.

<u>Dorland was incensed that Larson's Story<br>was being published.</u>

37.     In or around May 2018, shortly after ASF published the online version of *The Kindest*, Dorland accused Larson of plagiarism, by telling ASF that Larson's Story "plagiarized" Dorland's 2015 Factual Letter and used it in her Short Story.

38.     Thereafter, starting in or around June 2018, after Dorland apparently heard that the BBF selected Larson's Work as the winner of its One Story/One City competition, Dorland made further accusations of plagiarism by communicating her unfounded claim of plagiarism to the BBF and to members of Larson's writing group.

39.     For weeks, Dorland relentlessly called and emailed ASF staff and board members, and BBF staff multiple times per day with her false and malicious accusations of plagiarism, demanding at different times, a citation for the authorship of Dorland's 2015 Factual Letter, that Larson's Short Story be pulled from ASF and the BBF in its entirety, that ASF publish one of Dorland's essays instead of Larson's Work and/or that she be paid several thousand dollars.

40.     In addition, Dorland apparently complained to GrubStreet, Larson's employer, repeating her baseless claim that Larson's Short Story plagiarized Dorland's 2015 Factual Letter.

41.     Dorland also asserted the utterly false contention to the Bread Loaf Writers' Conference, a prestigious and influential writer's organization ("Bread Loaf"), that Larson's fellowship application contained plagiarism, with an email entitled, "Plagiarism in Tuition Fellow's 2017 Application."  Dorland's contention was unfounded since Larson did not include *The Kindest* in her fellowship application to Bread Loaf.   With total disregard for the truth, Dorland pressed repeatedly for Bread Loaf to sanction Larson "retroactively."  Dorland continued her phone calls, voice messages, and emails to Bread Loaf's staff and even its retired staff for many months.  In addition, Dorland told Bread Loaf in June 2018, that she contacted "other writing conferences of similar repute" about Larson's "plagiarism."

Larson tried to appease Dorland by making
further changes to the Fictional Letter.

42.     Based in part on Dorland's persistent and continuing accusations of plagiarism and her demands including her demand for monetary damages, the BBF suggested that Larson change some of the language in the Fictional Letter that is part of *The Kindest* in order to avoid any future demands or interference by Dorland with the BBF and its upcoming festival.

43.     Larson had already made a number of unrelated revisions to *The Kindest* for the BBF, including the story's location and certain objects, details, dialogue, gestures, word choices and the ending.  However, in an attempt to appease Dorland and stop her frequent contacts with the BBF and others, Larson agreed to modify the Fictional Letter in *The Kindest*.

44.     After Larson made changes to the Fictional Letter, the BBF proceeded to print approximately 30,000 copies of the revised version of *The Kindest*.  A copy of the Short Story

that was printed by the BBF is attached hereto as "Exhibit F" and is incorporated herein by reference. This version of *The Kindest* was registered with the United States Copyright Office under Registration No. TX-8-678-446, effective December 17, 2018. A copy of the Certificate of Registration is attached hereto as "Exhibit G" and is incorporated herein by reference.

45.     None of Larson's efforts seemed to satisfy Dorland. Dorland continued her attacks on Larson by repeatedly contacting members of various writing communities in the United States and reiterating her claim of plagiarism.

46.     In June 2018, Larson hired Attorney James A. Gregorio to deal with the hornet's nest that Dorland was stirring up. Dorland refused to permit a representative of ASF to share Dorland's communications and demands with Larson or Attorney Gregorio. Accordingly, Attorney Gregorio requested that ASF forward his contact information to Dorland, and convey that he would be willing to talk with Dorland or her attorney about any concerns she might have regarding the Work. Gregorio requests were ignored and in or around late June 2018, Dorland hired Cohen Law to represent her.

47.     On or about July 3, 2018, Cohen Law was supplied with a copy of the version of Larson's Story that the BBF had printed. A comparison of the Fictional Letter in the BBF version of the Story with Dorland's 2015 Factual Letter shows that there is insufficient similarity between the two letters to support a reasonable claim for copyright infringement.

48.     Based on the BBF version of *The Kindest* that was supplied to Cohen Law, a law firm that claims to have extensive experience in handling and litigating intellectual property matters, Cohen Law knew or should have known that Dorland's copyright infringement claim against the BBF was unreasonable, unwarranted, frivolous, futile and/or advanced primarily to harass the BBF into acquiescing to Dorland's demands.

49.     Additionally, Cohen Law knew or should have known that under 17 U.S.C. § 412, statutory damages and attorney's fees under the Copyright Act were available to Dorland only if Dorland's 2015 Factual Letter was registered with the Copyright Office before the claimed infringement by Larson. Since Dorland's 2015 Factual Letter was registered on June 10, 2018, almost a year after the Short Story was initially published by Audible and ASF, and long after Dorland knew that Larson was using a letter from a kidney donor to a recipient as a literary device in a story about kidney donors, Dorland was never entitled to Statutory Damages or attorney's fees under Sections 504 and 505 of the Copyright Act.

50.     On July 3, 2018, with knowledge that Larson's Short Story was the winner of the BBF short-story competition, Cohen Law sent a letter to the BBF alleging that Larson's Short Story contains Dorland's 2015 Factual Letter "in whole or in part." Attorney Cohen demanded that the BBF cease and desist from further printing, copying, distributing or undertaking any other activities related to Larson's Short Story. He stated that unless the BBF acquiesced to Dorland's demand for an acknowledgement that Dorland's 2015 Factual Letter was included in Larson's Short Story without permission or authority, Dorland's claim would be for copyright infringement for which Statutory Damages under 17 U.S.C. § 504(c) could amount to $150,000. See copy of the letter from Cohen Law to the BBF dated July 3, 2018, a copy of which is attached as "Exhibit H" and is incorporated herein by reference.

Dorland hired legal counsel to escalate her claim
from plagiarism to copyright infringement.

51.     Attorney Gregorio responded to Attorney Cohen by letter dated July 17, 2018.

Gregorio asked for a copy of Dorland's 2015 Factual Letter and evidence that Larson infringed

Dorland's 2015 Factual Letter in *The Kindest*. A copy of the letter from Attorney James A.

Gregorio, dated July 17, 2018, is attached hereto as "Exhibit I" and is incorporated herein by

reference.

52.     In order to cause further damage to Larson's reputation in the community, and to

further pressure the BBF to drop *The Kindest* from its One City/One Story event, Dorland

contacted the *Boston Globe* in or around June 2018, to help her publicize her false claim of

plagiarism and more broadly disparage Larson's reputation. The *Globe* subsequently published

two articles based on statements made by Dorland accusing Larson of plagiarism.

53.     The first article, "Inspiration or Plagiarism? Writing Hackles Raised in Boston

Dispute," was published on July 26, 2018 (hereinafter referred to as the "July 26th Article"). A

copy of the July 26th Article is attached as "Exhibit J" and is incorporated herein by reference.

54.     The *Boston Globe* published a second article, "Boston Book Festival Cancels One

City One Story Event Amid Plagiarism Flap," on August 14, 2018 (hereinafter referred to as the

"August 14th Article"). The August 14th Article is attached as "Exhibit K" and incorporated

herein by reference.

55.     In or around July 2018, Dorland and her attorneys escalated Dorland's demands

to the BBF, seeking thousands of dollars in compensation, full attribution to Dorland for

Larson's Short Story, and a link to Dorland's favored kidney donation website, and language

encouraging readers to learn how to donate their kidneys. In August 2018, Dorland further

intensified her threats against the BBF by doubling her monetary demand mere days before BBF

was set to distribute thousands of copies of Larson's Short Story.

### The BBF rescinded its selection of Larson's Short Story.

56.     Cohen Law and Attorney Cohen made demands against the BBF for Statutory

Damages and legal fees under the Copyright Act in order to pressure the BBF into acquiescing to

Dorland's unfounded claim of copyright infringement, and her unwarranted demand for an

acknowledgment in Larson's Short Story and a link to a kidney donation website.

57.     As a direct and proximate result of these and other baseless actions by Dorland,

acting alone and/or in concert with Attorney Cohen and Cohen Law, the BBF rescinded its

selection of *The Kindest* as the One City/One Story selection.

58.     Upon information and belief, the BBF had already printed 30,000 copies of the

Short Story at a cost of around $10,000, and spent thousands of dollars in attorneys'

fees.  Irrespective of the merits of Dorland's claims, the BBF was concerned that a lawsuit by

Dorland had the potential to financially cripple the BBF by draining its modest resources, risk

sponsorship dollars, and jeopardize its future existence.

59.     The BBF's decision to pull Larson's Short Story had nothing to do with the

purported validity of Dorland's claims of plagiarism or copyright infringement.  The decision

was based on Dorland's persistence, which was aided and abetted by claims of copyright

infringement made by Attorney Cohen and Cohen Law, and warnings of thousands of dollars in

legal fees and substantial Statutory Damages under the Copyright Act, to which Cohen Law and

Attorney Cohen knew or should have known that Dorland was not entitled.

60.     Even after the BBF rescinded its decision to use *The Kindest* as its One Story/One

City selection, Larson is informed and believes that Dorland continued to call and email

members of Larson's writing group through September 2018, accusing them of "complicity" in Larson's alleged plagiarism and "artistic betrayal." Upon information and belief, Dorland also repeatedly called and emailed current and former staff of Bread Loaf through September 2018, reiterating her utterly false claim that Larson applied for and received a prestigious fellowship with plagiarized material.

## Count I
### (Intentional Interference by Dorland with Larson's ASF Contract)

61.     Plaintiff realleges Paragraphs 1 through 60 of the Complaint as if said allegations have been restated and realleged herein, in their entirety.

62.     In May 2017, ASF offered to publish *The Kindest* and Larson accepted the offer and agreed to let ASF publish her Short Story in ASF's literary magazine, and to feature the Work on its website "for the duration of the Author's copyright period including extensions and renewals." The parties signed a Publishing Agreement a copy of which is attached hereto as Exhibit D. Larson was paid $300 by ASF.

63.     At all relevant times, Dorland and her agents, servants and/or attorneys knew that Larson's Work was published by ASF.

64.     Sometime after the Work was published, Dorland contacted ASF and accused Larson of "plagiarizing" her 2015 Factual Letter by using it in *The Kindest*. Dorland complained that Larson's Work was a "paraphrase" of Dorland's 2015 Factual Letter, and that Larson "plagiarized" the 2015 Factual Letter in Larson's Short Story.

65.     Dorland relentlessly called and emailed various ASF employees and board members for weeks, sometimes multiple times per day, asserting her unfounded claim of plagiarism.

66.    Dorland's actions in making claims of plagiarism and sending aggressive and coercive correspondence to ASF without just cause were malicious and calculated to cause damage to Larson.

67.    ASF told Larson that it did not have the financial means nor sufficient staff to deal with Dorland's demands, and as a direct and proximate result of Dorland's demands and actions, ASF, in consultation with Larson, decided to pull *The Kindest* from the ASF website, earlier than it had envisioned it would and in violation of its agreement with Larson.

68.    Larson was damaged in that she lost the benefit of widespread online distribution of her Short Story and the exposure of her work to new audiences.  Additionally, Larson lost a significant professional achievement, which would likely have advanced her career.  All of this has been to Larson's great damage.

**Count II**
**(Intentional Interference by Dorland with Larson's BBF Contract)**

69.    Plaintiff realleges Paragraphs 1 through 60 of the Complaint as if said allegations have been restated and realleged herein, in their entirety.

70.    In June 2018, after the BBF selected Larson's Short Story as its 2018 One City/One Story winner, the BBF and Larson entered into an agreement for consideration memorializing the selection of Larson's Work.  In the agreement, Larson granted the BBF a license for the full term of the copyright, to publish the Short Story online in any language, and to print and distribute up to 30,000 copies of *The Kindest*.   A copy of the Agreement with the BBF is attached hereto as Exhibit E.

71.    In or around May or June 2018, Dorland and her agents, servants and/or attorneys found out that Larson's Work was selected as the winner of the BBF short-story competition and that it was going to be featured in the One City/One Story event.

72.     Starting in June 2018, Dorland and her agents, servants and attorneys contacted the BBF and frequently made unsupportable claims against the BBF for possible copyright infringement, as well as claims for Statutory Damages and attorney fees under the Copyright Act.  Dorland and her agents, servants and/or attorneys intentionally utilized aggressive and coercive language and made demands in correspondence with the BBF in order to cause damage to Larson and to coerce the BBF either to attribute *The Kindest* to Dorland, or ultimately pull *The Kindest* from BBF's One City/One Story project.

73.     At the time, Dorland and/or Cohen Law knew or should have known that the letter in the BBF version of *The Kindest* that the BBF was about to distribute bears virtually no similarity to Dorland's 2015 Factual Letter, and thus Dorland had no legal basis for continuing her crusade against the BBF either to attribute *The Kindest* to Dorland, ultimately pull *The Kindest* from BBF's One City/One Story project, or for damages.  Nonetheless, Dorland and Cohen Law continued to threaten the BBF, grossly misrepresent facts, and make unwarranted demands.  Fearing that a lawsuit would cripple its modest resources, and as a direct result of Dorland's escalating and baseless threats, the BBF decided to rescind its use of Larson's Story.

74.     The actions of Dorland, and her agents servants and attorneys in communicating with the BBF were made to pressure the BBF into acquiescing with Dorland's unfounded claim of plagiarism and copyright infringement and her unwarranted demands for attribution and damages.

75.     The actions of Dorland, and/or her agents, servants or attorneys in making unsupportable claims for copyright infringement and damages, intentionally misrepresenting the facts, and deploying aggressive and coercive correspondence with the BBF without just cause were malicious and were calculated to cause damage to Larson, and directly resulted in the

decision by the BBF to pull *The Kindest* from its One City/One Story project in breach of its agreement with Larson.

76.     As a direct and proximate result of this and other intentional actions by Dorland, and/or her agents, servants or attorneys, the BBF rescinded its selection of *The Kindest* to Larson's great damage.  Larson was further damaged in that she was publicly humiliated when the BBF rescinded her Short Story as the 2018 One City/One Story selection, and she has had to explain this event to her friends, family, employer, and colleagues.  In addition, Larson has lost the publicity and exposure that would have resulted from widespread distribution of the Work in multiple languages before whole new audiences.  The loss of this significant professional achievement was substantial in that it would likely have resulted in numerous speaking engagements and print, television and radio interviews, as previous One City/One Story winners received, all to Larson's great damage.

### Count III
### (Interference by Cohen Law with Larson's BBF Contract)

77.     Plaintiff realleges Paragraphs 1 through 60 and 70 through 76 of the Complaint as if said allegations have been restated and realleged herein, in their entirety.

78.     One of Cohen Law's reasons for making erroneous claims against the BBF for potential copyright infringement, Statutory Damages and attorney's fees was to conspire with Dorland to pressure the BBF into succumbing to Dorland's unwarranted claims for copyright infringement, and her unjustified demand for monetary damages and attribution in Larson's Short Story.

79.     Dorland's actions and those of Cohen Law acting on her behalf in making unsupportable claims for significant damages for copyright infringement, misrepresenting the

facts, and deploying overly aggressive and coercive correspondence with the BBF were
calculated to pressure the BBF into withdrawing *The Kindest* from its One City/One Story
project and securing other unwarranted concessions.  As a direct result of Cohen Law's
escalating, baseless and intentional threats and demands, and fearing that a lawsuit would cripple
its modest resources, the BBF decided to rescind use of Larson's Story.  The decision of the BBF
to pull *The Kindest* was made to mollify BBF's sponsors and to avoid additional legal fees.  It
was not a concession of wrongdoing by the BBF or Larson.

80.     As a direct and proximate result of the actions by Cohen Law, the BBF breached
its agreement with Larson and rescinded its selection of *The Kindest* as its One City/One Story
selection.  Larson was greatly damaged in that she has had to endure the public humiliation
resulting from the BBF's decision to rescind the Short Story as its One City/One Story selection,
has had to explain the events to her friends, family, employer, and colleagues.  Additionally,
Larson has lost the publicity and exposure that the widespread distribution of the Work to over
30,000 new readers would have created.  Furthermore, Larson lost a significant professional
achievement that likely would have resulted in receiving numerous speaking engagements and
print, television and radio interviews as previous winners of the One City/One Story competition
had received, all to her great damage.

### Count IV
(Interference by Attorney Cohen with Larson's BBF Contract)

81.     Plaintiff realleges Paragraphs 1 through 60 and 70 through 80 of the Complaint as
if said allegations have been restated and realleged herein, in their entirety.

82.     Starting in or around June 2018, Attorney Cohen began to represent Dorland with
respect to her alleged plagiarism and copyright infringement claims against Larson, and her
claims for copyright infringement and damages against the BBF.

83.     In May 2018, the BBF informed Larson that it had selected her Short Story as its 2018 One City/One Story winner.  In June 2018, the BBF and Larson entered into an agreement, memorializing the selection of Larson's Work.  In the agreement, Larson granted the BBF a license to publish the Short Story online, and to print and distribute 30,000 free copies of *The Kindest* throughout the Greater Boston Area.  A copy of the BBF agreement with Larson is attached as Exhibit E.

84.     On July 3, 2018, with knowledge that Larson's Short Story was the winner of the 2018 BBF short-story competition, Attorney Cohen sent a letter to the BBF alleging that *The Kindest* infringed the copyright to Dorland's 2015 Factual Letter.  Attorney Cohen demanded that the BBF cease and desist from printing, copying and distributing Larson's Short Story, or risk incurring up to $150,000 in Statutory Damages under the Copyright Act.

85.     At the time that the July 3, 2018 letter was written, Attorney Cohen knew or should have known that under 17 U.S.C. § 412, Statutory Damages and attorney's fees were not available to Dorland under the Copyright Act, because Dorland's 2015 Factual Letter was registered with the Copyright Office after the alleged infringement was made by Larson.

86.     One of Attorney Cohen's reasons for making erroneous claims for Statutory Damages and attorney's fees against the BBF was to pressure the BBF into submitting to Dorland's unfounded claim of copyright infringement, and her unwarranted demand for damages and attribution in Larson's Short Story.

87.     Attorney Cohen's actions in making unsupportable claims, misrepresenting the facts, and deploying aggressive and coercive correspondence with the BBF were intentional and were calculated to cause damage to Larson.

88.     Larson contends that the wholly unsupported claims for Statutory Damages and attorney's fees proffered by Attorney Cohen for any perceived copyright infringement under the facts presented, directly resulted in the decision by the BBF to breach its agreement with Larson and to pull *The Kindest* from the One City/One Story event.

89.     As a direct and proximate result of this and other actions by Attorney Cohen, and his agents, servants or employees, the BBF rescinded its selection of *The Kindest* and Larson was greatly damaged.  Larson was further damaged in that she has had to endure the public humiliation resulting from the BBF's decision to rescind the Short Story as its One City/One Story selection, and has had to explain this event to her friends, family, employer, and colleagues.  Additionally, Larson has lost the publicity and exposure that the widespread distribution of the Work to over 30,000 new readers would have created.  Moreover, Larson lost a significant professional achievement that likely would have resulted in receiving numerous speaking engagements and print, television and radio interviews as previous winners of the One City/One Story competition had received, all to her great damage.

### Count V
### (Commission by Cohen Law of
### Unfair and Deceptive Acts and Practices in violation of M.G.L. c. 93A.)

90.     Plaintiff realleges Paragraphs 1 through 60 and 70 through 80 of the complaint as if said allegations have been restated and realleged herein, in their entirety.

91.     On July 3, 2018, Cohen Law sent a letter to the BBF on behalf of Dorland making claims of copyright infringement against the BBF, and demanding unwarranted Statutory Damages and attorney's fees under the Copyright Act.

92.     Cohen Law made further unwarranted demands to the BBF and its agents, servants and attorneys in July and August 2018, as well as written demands to Larson's attorney,

James A. Gregorio by letters dated July 20, 2018 and September 6, 2018, demanding without justification damages, attorney's fees and that Larson cease and desist from using a letter from a kidney donor to her recipient in *The Kindest*. Copies of Cohen Law's letters of July 20, 2018 and September 6, 2018, are attached hereto as "Exhibit L" and "Exhibit M" respectively, and are incorporated herein by reference.

93.     The claims made by Cohen Law for potential copyright infringement violations and the demand for substantial damages were made with knowledge that they lacked any verification or legal justification and were unreasonable, unwarranted, frivolous, futile and/or advanced primarily to coerce the BBF into acquiescing to Dorland's demands, and attempting to extract unwarranted damages, attorney's fees and other relief from Larson.

94.     As a result of Cohen Law's actions, the BBF cancelled *The Kindest* as the winner of its One City/One Story event.

95.     Pursuant to Massachusetts Consumer Protection Act, Mass. General Laws, chapter 93A, a thirty-day demand letter was sent to Cohen Law. A copy of said letter is attached as "Exhibit N" and is incorporated herein by reference. Cohen Law responded to said letter within thirty days, however its response was inadequate under the law. A copy of said letter is attached as "Exhibit O" and Larson's attorney's letter in response is attached as "Exhibit P." All of said letters are incorporated herein by reference.

96.     The totality of circumstances including Cohen Law's communications with the BBF, its agents, servants and attorneys, and its various letters to the BBF and Larson's attorney starting on or about July 3, 2018, and continuing thereafter, contain wholly insupportable legal claims and demands, and are evidence of outrageous conduct in trade or commerce within Massachusetts, which constitutes a violation of Massachusetts General Laws, chapter 93A.

97. As a result of the conduct of Cohen Law, in making false statements and accusations of plagiarism and copyright infringement and threatening substantial damages from Larson and the BBF, the BBF canceled the selection of *The Kindest* from the One City/One Story event. The BBF's cancelation has greatly injured Larson's reputation and her reputation as a writer within and among writer's groups, her friends, colleagues and others. In addition, Larson has had to endure the public humiliation resulting from the BBF's decision to rescind the honor, has had to explain the events to her friends, family, employer, and colleagues. Further, Larson has lost the publicity and exposure that the widespread distribution of the Work before whole new audiences would have created and has lost numerous speaking engagements and print, television and radio interviews as previous winners of the One City/One Story competition had received, all to her great damage.

**Count VI**
(Commission by Attorney Cohen of
Unfair and Deceptive Acts and Practices in violation of M.G.L. c. 93A.)

98. Plaintiff realleges Paragraphs 1 through 60 and 70 through 97 of the complaint as if said allegations have been restated and realleged herein, in their entirety.

99. On July 3, 2018, Attorney Cohen sent a letter to the BBF on behalf of Dorland making claims of copyright infringement against the BBF, and demanding unwarranted Statutory Damages and attorney's fees under the Copyright Act.

100. Attorney Cohen, and his agents, servants or employees made further unwarranted demands to the BBF and its agents, servants and attorneys in July and August 2018, as well as written demands to Larson's attorney, James A. Gregorio by letters dated July 20, 2018 and September 6, 2018, demanding without justification damages, attorney's fees and that Larson

cease and desist from using a letter from a kidney donor to her recipient in *The Kindest*.  Copies of letters dated July 20, 2018 and September 6, 2018, which were written on behalf of Attorney Cohen are attached hereto as "Exhibit L" and "Exhibit M" respectively, and are incorporated herein by reference.

101.    The claims made by Attorney Cohen and his agents, servants and employees for potential copyright infringement violations and the demand for substantial damages were made with knowledge that they lacked any verification or legal justification and were unreasonable, unwarranted, frivolous, futile and/or advanced primarily to coerce the BBF into acquiescing to Dorland's demands, and attempting to extract unwarranted damages, attorney's fees and other relief from Larson.

102.    As a result of Attorney Cohen's actions, the BBF cancelled *The Kindest* as the winner of its One City/One Story event.

103.    Pursuant to Massachusetts Consumer Protection Act, Mass. General Laws, chapter 93A, a thirty-day demand letter was sent to Attorney Cohen.  A copy of said letter is attached as "Exhibit N" and is incorporated herein by reference.  Attorney Cohen responded to said letter within thirty days, however his response was inadequate under the law.  A copy of said letter is attached as "Exhibit O" and Larson's attorney's letter in response is attached as "Exhibit P."  All of said letters are incorporated herein by reference.

104.    The totality of circumstances including the communications of Attorney Cohen and his those of his agents, servants and employees with the BBF, its agents, servants and attorneys, and his various letters to the BBF and Larson's attorney starting on or about July 3, 2018, and continuing thereafter, contain wholly insupportable legal claims and demands, and are

evidence of outrageous conduct in trade or commerce within Massachusetts, which constitutes a violation of Massachusetts General Laws, chapter 93A.

105.    As a result of the conduct of Attorney Cohen, in making false statements and accusations of plagiarism and copyright infringement and threatening substantial damages from Larson and the BBF, the BBF canceled the selection of *The Kindest* from the One City/One Story event.  The BBF's cancelation has greatly injured Larson's reputation and her reputation as a writer within and among writer's groups, her friends, colleagues and others.  In addition, Larson has had to endure the public humiliation resulting from the BBF's decision to rescind the honor, has had to explain the events to her friends, family, employer, and colleagues.  Further, Larson has lost the publicity and exposure that the widespread distribution of the Work before whole new audiences would have created and has lost numerous speaking engagements and print, television and radio interviews as previous winners of the One City/One Story competition had received, all to her great damage.

106.    The claims made by Attorney Cohen about potential copyright infringement liability and the demand for substantial damages and attorney's fees were made with knowledge that they were false, and lacked any verification or legal justification, and were unreasonable, unwarranted, frivolous, futile and/or advanced primarily to harass the BBF into acquiescing to Dorland's demands.

107.    As a result of these actions, the BBF cancelled *The Kindest* as the winner of its One City/One Story event.

108.    Pursuant to Massachusetts Consumer Protection Act, Mass. General Laws, chapter 93A, a thirty-day demand letter was sent to Attorney Cohen (A copy of said letter is attached as "Exhibit H" and is incorporated herein by reference).  Attorney Cohen responded to

said letter within thirty days, however his response was inadequate under the law.  (A copy of said letter is attached as "Exhibit Q" and is incorporated herein by reference).

109.     The totality of circumstances including Attorney Cohen's various letters to the BBF and Larson's attorney starting on or about July 3, 2018, and continuing thereafter, contain wholly insupportable legal claims and demands, and are evidence of outrageous conduct in trade or commerce in Massachusetts, which constitutes a violation of Massachusetts General Laws, chapter 93A.

110.     As a result of the conduct of Attorney Cohen, in making false statements and accusations of copyright infringement and demanding substantial damages, the BBF canceled the selection of *The Kindest* from the One City/One Story event, and has greatly injured Larson's reputation and her reputation as a writer within and among writer's groups, friends, colleagues and others.  In addition, Larson has had to endure the public humiliation resulting from the BBF's decision to rescind the honor, has had to explain the events to her friends, family, employer, and colleagues. Further, Larson has lost the publicity and exposure that the widespread distribution of the Work before whole new audiences would have created and has lost numerous speaking engagements and print, television and radio interviews as previous winners of the One City/One Story competition had received, all to her great damage.

### Count VII
#### (Defamation Claim against Dorland)

111.     Plaintiff realleges Paragraphs 1 through 89 of the complaint as if said allegations have been restated and realleged in their entirety.

112.     In or around 2018, Dorland started a campaign against Larson, orally and in writing, accusing Larson of plagiarizing her 2015 Factual Letter by including it in whole or in

part in *The Kindest*.  Dorland contacted ASF, the BBF, GrubStreet, Bread Loaf, the *Boston Globe*, Larson's writer's group, and in Dorland's own words, "other writing conferences of similar repute," spreading false and malicious claims of plagiarism against Larson.

113.    Dorland's statements were false and had no validity in fact or in law, and they were made in large part to discredit Larson, to force ASF to remove Larson's Short Story from its website, to pressure the BBF to cancel *The Kindest* as the winner of the BBF's One City/One Story competition, and to discredit and disparage Larson in front of her friends, acquaintances, colleagues, relatives, employers and other professionals in the writing community throughout the United States.

114.    The nature of the statements damaged Larson's reputation in the Boston writing community at the time they were made, because they portrayed Larson as a plagiarist and a copyright infringer, caused two organizations to discontinue involvement with Larson and distance themselves from her work, caused harm to Larson's reputation within the writing community in Boston and beyond, and damaged and discredited her career as a writer.

115.    Dorland was at fault for claiming that the Fictional Letter in Larson's Short Story infringed on Dorland's 2015 Factual Letter either because the 2015 Factual Letter is not sufficiently original to be accorded copyright protection, or that Larson's use of the 2015 Factual Letter was *de minimus* or permitted under the fair use doctrine.

116.    Dorland's false statements and accusations of plagiarism and copyright infringement have resulted in ASF removing *The Kindest* from publication, and the BBF canceling the Work's inclusion in its One City/One Story event, and has otherwise greatly injured Larson's personal reputation and her reputation as a writer among writer's groups, friends, colleagues, and others.  In addition, Larson has had to endure and will have to continue

to endure the public humiliation which has accompanied the BBF rescinding the honor of the selection of *The Kindest*, has had to explain this event and will have to continue to explain this event to her friends, family, future employers, and colleagues, and has lost the publicity and exposure that would have been created through the widespread distribution of the Work before whole new audiences.  Further, as an award-winning author Larson would have garnered a significant professional achievement, and likely would have received numerous speaking engagements and print, television and radio interviews as previous winners of the One City/One Story competition had received, all to her great damage.

### Count VIII
#### (Declaration of Rights - Declaratory Judgment)

117.     Larson repeats and realleges paragraphs 1 through 116 of this Complaint, as if each paragraph was restated herein.

118.     Larson is the author of *The Kindest* and she is the owner of all rights to the Short Story including the copyright thereto.

119.     *The Kindest* contains a brief Fictional Letter written by a kidney donor to her kidney recipient.

120.     Larson is seeking judgment from this court declaring her rights as follows:

    a.     Larson is the author of *The Kindest*;

    b.     Larson owns the copyright to *The Kindest*;

    c.     *The Kindest* is a fictional story that includes the Fictional Letter;

    d.     The Fictional Letter in *The Kindest* does not infringe on Dorland's 2015 Factual Letter.

    e.     Larson has not infringed on the copyright to Dorland's 2015 Factual Letter

nor on any other rights Dorland may have under the U.S. Copyright Act;

f.      Dorland is not entitled to actual or profit damages under the U.S.
Copyright Act, 17 U.S.C. § 504(b); and

g.      Dorland is not entitled to statutory damages under the U.S. Copyright Act,
17 U.S.C. § 504(c), or attorney's fees under the U.S. Copyright Act 17
U.S.C. § 505;

WHEREFORE, Plaintiff, SONYA LARSON, demands judgment against
Defendants, DAWN DORLAND PERRY, COHEN BUSINESS LAW GROUP, P.C., and
JEFFREY A. COHEN, as follows:

a)      That under Count I, Defendant Dorland be required to pay Plaintiff damages for
her intentional interference with Larson's contractual business relationship with ASF in an
amount to be determined by the court.

b)      That under Count II, Defendant Dorland be required to pay Plaintiff damages for
her intentional interference with Larson's contractual business relationship with the BBF in an
amount to be determined by the court.

c)      That under Count III, Defendant Cohen Law be required to pay Plaintiff damages
for its intentional interference with Larson's contractual business relationship with the BBF in an
amount to be determined by the court.

d)      That under Count IV, Defendant Attorney Cohen be required to pay Plaintiff
damages for his intentional interference with Larson's contractual business relationship with the
BBF in an amount to be determined by the court

e)      That under Count V, Defendant Cohen Law be required to pay Plaintiff damages

for the commission of unfair and deceptive acts and practices in an amount to be determined by

the court, and that said damages be trebled but no less than doubled and that Larson be awarded

her costs and attorney's fees.

f)      That under Count VI, Defendants Attorney Cohen be required to pay Plaintiff

damages for the commission of unfair and deceptive acts and practices in an amount to be

determined by the court, and that said damages be trebled but no less than doubled and that

Larson be awarded her costs and attorney's fees.

g)      That under Count VII, Defendant Dorland be required to pay Larson damages for

defaming Larson in an amount to be determined by the court.

h)      That under Count VIII, the court declare that the Plaintiff is the owner of all rights

to *The Kindest*, that the Short Story does not infringe on Defendant Dorland's 2015 Factual

Letter, that Dorland is not entitled to damages, attorney's fees or costs, and that Larson be

awarded her damages, costs and attorney's fees.

i)      That Plaintiff have such other and further relief, including interests and her costs

as is deemed to be just and proper by the court.

## PLAINTIFF CLAIMS TRIAL BY JURY

SONYA LARSON,
By her attorney,

/s Andrew D. Epstein

Andrew D. Epstein, Esquire (BBO #155140)
Barker, Epstein & Loscocco
176 Federal Street
Boston, MA 02110
Tel: (617) 482-4900
Fax: (617) 426-5251
Photolaw@aol.com

## List of Exhibits

**Case**: Larson v. Dorland et al.
Docket No.1:19-cv-10203-IT

## EXHIBITS

Exhibit A – Dorland's 2015 Factual Letter

Exhibit B – Copyright registration information for Dorland's 2015 Factual Letter

Exhibit C – Agreement by and between Larson and Plympton, Inc.

Exhibit D – Agreement by and between Larson and ASF

Exhibit E – Agreement by and between Larson and the BBF

Exhibit F – Copy of *The Kindest*

Exhibit G – Certificate of Copyright Registration for *The Kindest*

Exhibit H – Letter from Attorney Cohen of Cohen Law to the BBF dated July 3, 2018

Exhibit I – Letter from Attorney Gregorio to Attorney Cohen of Cohen Law dated July 17, 2018

Exhibit J – July 26, 2108, *Boston Globe* article

Exhibit K – August 14, 2108, *Boston Globe* article

Exhibit L – Letter from Cohen Law to Attorney Gregorio dated July 20, 2018

Exhibit M – Letter from Cohen Law to Attorney Gregorio dated September 6, 2018

Exhibit N – Larson's M.G.L. Chapter 93A thirty-day demand letter

Exhibit O – Response of Dorland, Cohen Law, Attorney Cohen to Larson's Chapter 93A letter

Exhibit P – Plaintiff's attorney's response to Defendants Chapter 93A letter.

# Exhibit A

"FACTUAL LETTER"                    Dorland's 2015 Letter

Dear Recipient,

My name is Dawn Dorland. I'm a 35-year-old white female, and I live with my husband
in LA.

In 2009 I read my first article about living kidney donation, and in the years since, I have
been constantly reminded--whether triggered by my reading (I am a writer), or through
the stories of people I know--of the harrowing experience of dialysis and the dire need in
our country for kidneys. I believe that I knew, from the moment I first became aware of
the possibility of donating one of my kidneys, that I would one day find a way to do this.

Once I had all the information, I was motivated to donate at a time when, due to medical
advances and the existence of the National Kidney Registry--especially the leaps they've
made matching compatible strangers through paired exchange--I stood to make an
maximum impact in others' lives with only minimal risk to myself. Personally, my
childhood was marked by trauma and abuse; I didn't have the opportunity to form secure
attachments with my family of origin. A positive outcome of my early life is empathy,
that it opened a well of possibility between me and strangers. While perhaps many more
people would be motivated to donate an organ to a friend or family member in need, to
me, the suffering of strangers is just as real.

I can't tell you how happy I am that my donation eventually—two organs and four
surgeries later--resulted in your receiving Debbie Striks' kidney. Throughout my
preparation for becoming a donor, which spanned precisely eight months from my first
testing to the date of our surgeries, I was most excited about the recipient who would
come off of the deceased donor list and end our chain. I focused a majority of my mental
energy on imagining and celebrating _you_.

My gift, which begat Debbie's, trails no strings. You are deserving of an extended and
healthy life simply for being here.

Please know that my husband and I would love to know more about you, and perhaps
even meet you one day. But I accept any level of involvement or response from you, even
if it is none.

Thank you for reading this letter, and be well.

Kindly,

Dawn

# Exhibit B



# COPY OF DEPOSIT
# TXu 2-101-420

***NOTE: Deposits submitted electronically bear no identifying marks

Type of Work:        Text

Registration Number / Date:
                     TXu002101420 / 2018-06-10

Application Title: Dorland kidney chain final recipient letter July 2, 2015.

Title:               [Dorland kidney chain final recipient letter July 2, 2015]

Description:         Electronic file (eService)

Notes:               Title taken from appl.

Copyright Claimant:
                     Dawn Chryselle Dorland Perry, 1980-  .

Date of Creation:  2015

Authorship on Application:
                     Dawn Chryselle Dorland Perry, 1980-  ;  Citizenship: United
                        States. Authorship: text.

Names:               Dorland Perry, Dawn Chryselle, 1980-

===============================================================================

# Exhibit C

# Plympton

**135 Dore Street Unit A, San Francisco, CA 94103**
**Short Fiction Audiobook Licensing Agreement**

This Agreement is made between Plympton, Inc., a Delaware Corporation, having its principal place of business at 135 Dore Street Unit A, San Francisco, CA 94103, ("Plympton") and Sonya Larson (the "Author"), respecting the short stories identified in Exhibit A (collectively, the "Work"). The parties hereby agree as follows:

## 1. GRANT OF RIGHTS

Subject to the restrictions and conditions elsewhere in this Agreement, Author hereby grants Plympton the following rights:

### 1.1. Audiobook Rights

The exclusive, sublicensable, worldwide right to produce, manufacture, sell, display, distribute and transmit a reading of the Work in audio form (as an "Audiobook").

### 1.2. Associated Electronic Publishing Rights

The nonexclusive, sublicensable, worldwide right to republish the Work in electronic or ebook form, including, as reasonably necessary, the right to produce, manufacture, sell, display, distribute and transmit the Work, as an accompaniment to the Audiobook version of the Work.

## 2. LICENSE RESTRICTIONS

### 2.1. Commercial Audiobook Licensing and Related Commercial Publishing Through Audible.com

Plympton's only use of the licensed rights shall be to make commercially reasonable efforts to sublicense the Audiobook Rights and Associated Electronic Publishing Rights to Audible.com, subject to the royalty provisions of Section 5. Any exclusive sublicense of the Audiobook Rights Plympton grants shall be terminable after a term of no more than ten years.

### 2.2. Text Alterations.

Plympton and its licensees will make no alterations to the Work's text or title without the Author's written approval. Plympton reserves the right to make minor copyediting changes to conform the style of the text to its customary form and usage. Plympton assumes responsibility and costs for copyediting.

### 2.3. Audiobook Alterations

The Work may be adapted and edited in order to make it suitable for the Audiobook format. Such alterations include: adding an intro and outro; dividing the Works into parts, chapters or other appropriate sub-divisions; and excluding from production any portions of the Works that are not suitable for audio, such as prologues, epilogues, appendices, footnotes, endnotes, and visual elements.

### 2.4. Copyright Notice and Attribution

Plympton shall include, and shall have its licensees include, copyright notices and other credits provided by Author in all copies of the Work.

## 3. AUTHOR'S UNDERTAKINGS

### 3.1. Delivery

Author shall deliver the Work no later than 30 days from the execution of this Agreement.

### 3.2. Name, Likeness, and Biographical Information

At Plympton's request, Author shall provide biographical information about Author. Author hereby permits Plympton to grant Audible.com the right to use such information, along with Author's name and likeness, to market the Work, the Audiobook, and the Audible.com service.

## 4. PLYMPTON'S UNDERTAKINGS

### 4.1. Covers

Plympton shall, at its own expense, create or have made original artwork to serve as covers for the Work. Upon request, Author shall have the opportunity to review and comment on any such cover before publication.

### 4.2. Summaries

Plympton shall create or have made short summaries of the Work for promotional and informational purposes. Author may, at Author's election, provide such summaries for Plympton's use.

## 5. COMPENSATION AND ROYALTIES

As consideration for the grant of rights in Section 1, Plympton agrees to pay the royalties specified in Exhibit B.

## 6. REPORTS AND PAYMENTS

If there is revenue to report, Plympton will report licensing and sales revenue quarterly. Payments will be made quarterly, providing that either (a) Author's outstanding royalties exceed $125.00, or (b) author has filed with Plympton a written request for payment of all outstanding royalties with at least 30 days notice.

## 7. TERM AND TERMINATION

This agreement shall last an initial term of one year, at which point it shall automatically renew for successive one-year terms. After the initial term, either party shall have the right to terminate this agreement upon sixty days notice.

Upon termination of this Agreement, Plympton shall make all outstanding royalty payments to Author, cease publishing or licensing the Work, and use commercially reasonable efforts to delete, destroy, or otherwise render inaccessible all copies of the Work in Plympton's possession, except for any copies required to be maintained by law or file and reference copies that are maintained in accordance with Plympton's ordinary business practices. Notwithstanding the foregoing, Plympton's licensees shall have the right to make use of the Work for the full term of their respective licenses. All provisions of this Agreement relating to payment and indemnification rights shall survive termination.

## 8. WARRANTIES AND REPRESENTATIONS

Author represents, warrants, and covenants:

   a. that he or she is the author of the Work;
   b. that he or she is the owner of all the rights granted to Plympton hereunder and has full power to enter into this Agreement and to make the grants herein contained;
   c. that the Work is not libelous or obscene or otherwise contrary to law; and
   d. that it does not infringe upon any copyright or upon any other proprietary or personal right of any third parties.

## 9. INDEMNIFICATION

Author shall indemnify Plympton against any loss, injury, or damage finally sustained (including any legal costs or expenses and any compensation costs and disbursements paid by Plympton) occasioned to Plympton in connection with or in consequence of any breach of the warranties of Section 8 for which Plympton is not able to recover under its insurance policies.

## 10. GENERAL

### 10.1. Integration and Modification

This Agreement comprises the entire understanding of the parties, and supersedes and merges all prior and contemporaneous agreements, understandings and discussions between the parties relating to the subject matter of this Agreement. No modification or amendment of this Agreement will be effective unless in writing.

### 10.2. Severability

In the event that any law prohibits any provision of this Agreement, such provision shall be ineffective to the extent of such prohibition without invalidating any of the remaining provisions of the Agreement.

### 10.3. Governing Law

This agreement shall be interpreted under the laws of the State of California. All disputes

arising out of or relating to this Agreement may only be brought in the state or federal courts located in San Francisco, California, and the parties hereby submit to the personal and exclusive jurisdiction and venue of these courts.

**Agreed and accepted by:**

Sonya Larson

02 / 16 / 2016

Jennifer 8. Lee on behalf of Plympton, Inc.

## Short Fiction Licensing Agreement

### Exhibit A — The Work

For the purposes of the Agreement, the "Work" shall mean, collectively, the short stories specified below, including any artwork, graphics, or images included in such stories.

| Story Title | Original Publication | Original Publication Date |
|---|---|---|
| It's Better to be Lucky than Good | West Branch | 2014 |
| Gabe Dove | | |
| The Kindest | | |
| | | |
| | | |
| | | |
| | | |

### Exhibit B — Compensation and Royalties

Plympton shall pay Author:

- An initial payment of $125 per story; and

- 50% of the gross royalties revenues received from the licensing of the Work to Audible.com.

# Exhibit D

# AMERICAN SHORT FICTION

P.O. Box 4152        Austin, TX 78765
www.americanshortfiction.org

### PUBLISHING AGREEMENT

This agreement ("Agreement") is made between American Short Fiction, Inc., a Texas nonprofit corporation located in Austin, Texas, hereinafter referred to as "Publisher," and Sonya Larson whose address is __89 Concord Ave. #1, Somerville, MA 02143_____, hereinafter referred to as "Author." The Author and Publisher may be referred to individually as a party or collectively as parties.

The parties agree as follows:

## I.      Author's Grant.

(a).    Author grants to Publisher a worldwide English-language license for the duration of the Author's copyright period including extensions and renewals to publish, reproduce, distribute, display, and store Author's work, entitled "The Kindest," a short story, hereinafter referred to as the "Work," in the following manner.

(1).    included in an upcoming issue of *American Short Fiction*, a serial publication, hereinafter referred to as the "Issue," and in any electronically distributed formats of the Issue, including but not limited to Kindle or iBooks editions.

(2).    on the Publisher's World Wide Web site (currently located at www.americanshortfiction.org).

(3).    in an audio recording included in the Publisher's podcast, which currently is available for free through iTunes and which may be available in the future through other platforms, such as but not limited to SoundCloud.

(4).    in an audio and visual reading of the Work, which may be distributed electronically, including but not limited through YouTube.

(b).    Author grants to Publisher a worldwide license for the duration of the Author's copyright period including extensions and renewals to create summaries of the Work or use excerpts of the Work for the sole purpose of advertising the Work, the Issue, or American Short Fiction in any medium, be it written, spoken or electronic.

(c).    The Author grants the right of first publication in any medium, including but not limited to printed form or electronic form, anywhere in North America.

## II.    Author's Rights.

(a).    The author maintains the right to use the in any and all future publications that are published concurrently or after the initial publication in American Short Fiction.

(b).    Any edits made to the story will be done in consultation with the author, not to be unreasonably withheld or delayed.

## III.    Author's Warranties and Indemnities.

(a).    Author represents and warrants that he/she is the sole author of the Work, that the Work is original, that no one has previously been granted the rights granted in this Agreement, and that in all respects Author has the right and authority to make the Work available pursuant to these terms and conditions.   Furthermore, the Author represents, to the best of his/her knowledge, that the Work does not contain libelous language, does not infringe on an existing copyright and does not invade the rights of privacy or publicity of any individual or institution.

(b).    Author indemnifies, protects, defends and holds harmless the Publisher, its directors and officers against all liabilities, claims, damages, causes of action, judgments and expenses of any nature, directly or indirectly arising out of, caused by, or resulting from the breach of any warranty, representation or covenant made by Author hereunder.

## IV.    Payment.

The Author shall receive a payment of $300 as compensation for the rights granted under this Agreement.   Additionally, the Author will receive a year's subscription to *American Short Fiction.*

## V.    Age of Consent.

Author represents and warrants that he/she has reached the age of majority and is legally capable of entering into this Agreement.  If the Author is under the age of majority, this Agreement shall be signed by the parent or legal guardian of Author.   It is the responsibility of the Author to inform the Publisher if Author is under the age of majority at the time of execution of this Agreement. Publisher shall not be held responsible for the withholding of this information by the Author.

## VI.    Venue.

The parties consent that venue of any action brought under this Agreement shall be in state or federal court residing in Travis County, Texas.

## VII.    Entire Agreement.

This Agreement supersedes any and all other agreements, either oral or in writing, between the Author and the Publisher with respect to the subject of this Agreement.


## VIII. Counterparts.

This Agreement may be executed by facsimile in multiple counterparts, each of which will, for all purposes, be deemed an original, but which together will constitute one and the same instrument.

IN WITNESS WHEREOF the parties hereto have executed this Agreement on the __4th__ day of _____June_____, 2017.

**AUTHOR**

By: _____

Name: Sonya Larson

**PUBLISHER**

By: _____

Name:  Rebecca Markovits

Title:  Coeditor, American Short
         Fiction, Inc.


and

By: _____

Name:  Adeena Reitberger

Title:  Coeditor, American Short
         Fiction, Inc.

# Exhibit E

June 11, 2018

Sonya Larson
89 Concord Ave #1
Somerville, MA 02143

Dear Ms. Larson,

      We are pleased to inform you of our decision to publish your piece *The Kindest* (the "Work") as the feature portion of Boston Book Festival, Inc.'s ("BBF") 2018 *One City One Story* program.  In consideration of the mutual covenants and obligations set for herein, we mutually agree to the following terms:

1.      Grant of Rights.  You grant to BBF, during the full term of copyright in the Work, the right to publish the Work in any language in not more than 30,000 printed copies of *One City, One Story*, and the right to publish and distribute for download at www.bostonbookfest.org, electronic versions of the Work in any language.  ~~You further agree that the Work shall not be published or distributed by you, or any other person or entity, in any form, from July 16, 2010 through January 16, 2011.~~

2.      Delivery.  You agree to agree to deliver the final manuscript of the Work, in a form acceptable to the BBF, no later than Thursday, June 14, 2018.

3.      Consideration.  You acknowledge that you have declined the BBF's offer to provide financial compensation in exchange for the rights granted by you herein.  You make such grant in consideration of the BBF's providing to you the opportunity to contribute to the goals of the BBF and to participate in the *One City One Story* program.

4.      Credit.  You shall be appropriately credited as the author and copyright holder in each published copy of the Work.

5.      Copyright.  BBF acknowledges that you reserve all rights in the Work, including copyright, not expressly granted herein.

6.      Warranty and Representation. You represent and warrant that you have the right to enter into this Agreement and make the grants of rights contained herein, that the use of the Work, as contemplated herein, shall not infringe any copyright, trademark, or other right of any person or entity, that the Work shall not violate any right of privacy or publicity, and that no payments to any other person or entity shall be required in connection with the use and exploitation of the Work.

7.      Indemnity. You agree to indemnify and hold BBF, its partners, employees, agents, affiliates, designees, and assigns, harmless from any loss, damage, liability, and expenses (including reasonable

attorneys' fees) that result from any actual or alleged breach by you of the above warranties, covenants, or agreements.

8.     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts applicable to contracts entered into and fully performed therein.  Any legal proceedings brought to resolve any dispute arising out of this Agreement shall be commenced in the appropriate Suffolk County court or the United States District Court for the District of Massachusetts.  No action or proceeding brought pursuant to this Agreement shall be commenced or maintained outside of Suffolk County.  Regardless of the parties' respective domicile or residence, the parties hereby submit to the exercise of personal jurisdiction over them by the Suffolk County courts or the United States District Court for the District of Massachusetts.

9.     Counterparts. This Agreement may be executed in one or more counterparts which when taken together shall constitute once and the same instrument.

10.     Entire Agreement.  This Agreement shall constitute the entire and binding agreement between the parties hereto and their respective heirs, successors or assigns. This Agreement merges and supersedes all prior and contemporaneous understandings and agreements (whether written or oral) between the parties regarding the subject matter hereof and may only be amended or modified by a subsequent written agreement signed by all parties.

We are most grateful for your participation in this project!  Please confirm your agreement to these terms by signing and dating two copies of this letter agreement and returning one fully-executed copy to us.

Sincerely,

Boston Book Festival, Inc/

By: _____ ~~Deborah Porter~~ _____

Deborah Z Porter, its President

ACCEPTED AND AGREED TO:

By: _____

Sonya Larson, an individual

Date: _____

2

# Exhibit F

**The Kindest**

By Sonya Larson

When I was dying, people were nicer to me. Nurses washed my hair. Old teachers and old

roommates and total randoms came to see me, kissing my bandaged hand. Bao brought me

underwear and slept beside me on a chair. Mom drove from Malden, Dad up from Quincy, and

Sui from Xian, all the way across the planet. The flowers! The questions! *What hurts? How*

*much?* I was scared and they wanted to hear all about it. No one said *Why?* or *How come?* or

*How could you?* No one rolled their eyes or said *Well I'd better get going*. They didn't let me

smoke, but I saw them mull it over, as if to say *Well it isn't going to kill her*. They leaned

forward. They were riveted. They were hungry and I was their food.

Getting born must be like that. If you could remember. But you can't.

Then along came my Angel. A real one, too: no accident of her own, no sudden onset

anything. She wasn't dead, and she wasn't even doing a chain thing, aimed ultimately at saving

her husband or her sister or her very best bud.

It was just that she had two kidneys and she only needed one. And on top of that, grinned

the surgeon: we matched.

1

We rushed to Boston Medical. That night a thin tube dripped cold dreams into my elbow. Bao squeezed my fingers and kissed the cross around his neck. "It's happening," he said.

*It's happening?* I tried to speak but my throat felt stuffed with rags. Beyond my eyelids Bao stammered mutely, like a face in a flipbook. I counted backwards and drifted down a valley of misty waterfalls.

A finger snapped. It was over. I woke to the sight of my husband crying into his hands, overwhelmed like I've never seen him. "Bao?" said my voice.

"Baby!" He leapt from his chair and wedged his eager arms underneath me, and we were laughing and the laughter felt strange traveling up my lungs, like a language I was remembering only now. Even the ceiling looked new: large tiles sprayed freely with black dots of so many shapes and sizes. I could see in them intricate patterns, like constellations in stars.

Bao looked up too, but his eyes were somewhere else. "How can we ever thank her?" he said, so joyful he was enraged. "How? How?"

The people gathered around me. They shook the surgeon's hand, clinked champagne over my bed. It spilled on the sheet, it spilled on me.

Night came. The people left. They said *Thank God* this was behind us. They said *It's time we got some rest.* Bao pried my fingers off his arm as nurses wheeled me behind curtains, putting a tube in my hand with a button for trouble. Lights went dark, fans slowed to a stop. A janitor wheeled a bucket down a hall. And there was me: blinking fool, alone in my anger just like they've always wanted. At 3:13 I started buzzing on the tube— listening for echoes, for shouts, for footsteps come running. I buzzed and buzzed. I jammed it with my thumb. I wanted to know didn't anybody give a shit.

*****

I got better. They brought me home. I learned to angle my wheelchair, then stand, take a step. Weeks went by—four long months—strength creeping into my neck, my arms, my back. Bao whirred loose the screws of the handrails. Little dark holes remained in the walls, damp with stray fibers, and when I touched them I remembered where the smooth cold metal had been. I found our I ♥ Sullivan Square coffee mug, rolled behind the washing machine and miraculously intact. Even my hands hardened with muscle: I was a superhero discovering her powers. On my pelvis a new scar stretched in a cracked smile. I poked it when I sat on the toilet, the pain underneath still tender. Who's in there? I thought. Who are you?

Okay. So we no longer had a car. But Bao didn't seem angry. Instead he was grateful, dutiful, the person he used to be. He poured me my Froot Loops. He signed up for Hubway and used those bikes. I was still sleeping on the rollaway, worried that somehow I'd now be bad at sex. But Bao didn't seem to mind. Instead he looked at me each day like I was worth something immeasurable. After a while I started getting the hang of that too.

Little things amazed me. The smooth curves of the teakettle, dotted with moisture.

Tree needles, sprayed out and brushing the window in a breeze.

More and more the hospital seemed far away: its shiny boxes, relentlessly clean.

From the basement Bao brought up Grandmah's zitan chair. He slid off the sheet, eased it to the table, smoothed its legs with a damp silver cloth. I lowered myself onto the bony cushion, thumbing the grooves of dragon tails that curled down the armrests. Suddenly the chair seemed too big for me, too grand. But that was ridiculous—when Grandmah was alive she would fart all over this thing. I scooched my butt, got comfy. Bao folded up the wheelchair. To the curb went the crutches, the walker, both canes. We could have recycled them or given them away, but we

3

liked watching the garbage men hurl them into the truck, those grimy walls descending to slurp them up for good.

Right about then is when the letter shows up.

Bao was at work. It was a sunny, ignorant day.

It came in the mailbox: real envelope and paper and gold sticker sealing the flap. It was wrapped in a second letter from the surgeon himself, his boxy handwriting rushed with loops of fervor. So awestruck was he by the selflessness that he just had to chaperone the missive himself. I looked at his letter. I thought that doctors couldn't write at all, not even their own names.

Then came hers. She had used a notepad shaped like a daisy. Blue gel pen.

*Dear Friend,*

*By now you are likely wondering just who this person-- your kidney donor-- could possibly be. Today I reach out to share a warm hello. It is me.*

*I am a thirty-eight-year-old white female, and I live in Newton, Massachusetts (born and raised). Last year, while lost in a difficult period, I saw a documentary about altruistic kidney donation. As the credits rolled, I felt shocked by the daily hardship of so many people in need. Equipped with this new awareness, I set forth on a journey to offer a great gift, to do my part in bettering a fellow human's life.*

I shook open the letter. Six whole daisy pages. Stuff about her surgery, the prep, the PT. It went on.

*I'm so grateful to the MGH transplant team, who held my hand from my very first blood test. I myself know something of suffering, but from those experiences I've learned courage and perseverance. Whatever you've endured, remember that you are never alone.*

*A few things about me: I like sailing, camping, jewelry, and cats.*

*My journey to you has entailed immense time, money, and yes-- pain. But throughout it all I found a profound sense of purpose, knowing that your life depended on my gift.*

I stared at the YOUR LIFE, underlined three times.

*Now I smile at the thought that you are enjoying renewed health. I hope-- with all my heart-- that you feel emboldened with a new sense of hope.*

*Naturally, I am curious about your healing, and perspective on our shared experience. Perhaps we could meet. If you'd rather not, that's fine, but I'll leave my number here regardless. Consider it token of my affection-- a lifeline, should you ever need reminding that you are loved.*

*Kindly,*

*Rose M. Rothario*

There was a photograph. She was tall, slender, a bursting ponytail harnessed to one side. Scissors had cut away the image near her shoulder, as if to remove a person who'd been standing beside her. I held it to my nose but it just smelled like a photograph: paper and faint glue, with no whiff

5

of a particular person. She was at some county fair. She was around my age. She was standing by a Tilt-A-Whirl, surrounded by blurry feet, holding a rainbow-swirled lollipop in her fist.

So her name was Rose.

I wanted a cigarette.

But I didn't have one. Bao was at work. Sui was in Xian, obviously asleep. Mom out cleaning and Dad at the shop, but they had never been any help at all.

I hobbled to the kitchen, opened the cupboard. A stupid move—what did I expect? No car and no booze. I looked for the mouthwash, the vanilla extract, that vial of Estée Lauder. But Bao had done a full sweep.

I sat on the couch. I breathed in and out.

At some point Bao came home. I woke to see him scanning the letter sprayed across the table, wearing red bike shorts circled with sweat. Bao in bike shorts! He looked like no one I knew. Just a stranger pausing to examine a map. He read the whole thing standing up, helmet still on. "Wow," he said, blinking at the wall.

"I know," I said.

"Where did she come from?"

"How should I know?" I said, sounding ugly. But Bao didn't seem to hear; he was glancing frantically around our house.

"We need to do something," he said. "We need to show our thanks."

"Of course," I said, though that wasn't what I'd been thinking at all. But all of this gratitude: it shut me up.

There was some debate over who should make the call. "Can you do it?" I said. "Can you say I'm still recovering?"

6

Bao frowned and unclicked his helmet. He pulled at the Velcro straps on his gloves. Okay: I could see that he didn't want to. But when I was dying he'd stopped saying No, and the habit—for now—was sticking. I saw indecision worming under his face. I let it. Finally he went to the kitchen and beeped forcefully at the microwave.

We washed the dishes. We dried them. Then Bao called her up. He was nervous, chewing rapidly on a wedge of Big Red that I could smell from the couch. I could see that he wanted a drink. I hugged my knees, bending to suck the wet collar of my sweatshirt.

Bao's voice twisted to a whole new register, leaping to each sentence like he was competing for enthusiasm. "We would love, love, love to have you," he said. I held still. Bao never love, love, loved anything. "Her name is Chuntao. That's Shun, tow-oo. No, no. It would be an honor for *us*."

Arrangements were made. She would come on Thursday.

Suddenly the whole house looked barbarically disarrayed—the faded curtains, outdated carpet, objects that made no sense, revealing our vulgarities. That old panicky feeling. I imagined her perched on this sagging couch, tanned legs too long to fold under the coffee table. It was too late to change the cabinets, too late to paint the trims. This wasn't a place where we chummed out with guests. This wasn't a place where people wanted to hang.

She would come at eleven a.m. "What do we get her?" said Bao, shaking his head. He laughed in choked bursts. "Your other kidney? Your spleen?"

I wanted to be sick, to hide under the table. I said that I'd better get going—there's this yoga thing at seven. "There is?" Bao smiled, startled, like someone slapped across the face. "That's great, baby. Good for you." He hurried his gloves back on. "I'd better get a haircut. And something we can cook."

"Okay," I said, and stood as he left like I was about to put on my shoes.

But I didn't. Instead I dropped to the couch, scanned my phone. *Did you take your Xyletenol?* Mom had written. *U ok?* said Sui. *Where did u go?* I ignored them all and played Angry Birds. They weren't writing to check in. They were writing to *check*.

*****

In the morning I went to the basement. Looked for something sentimental. On some boxes were a wine decanter, a stereo system, scratched roller blades, a jar of batteries. A ceramic Christmas tree that lit up, a velvet painting of John Wayne. An exercise ball with some wind chimes slumped on top. I thought about the wind chimes. They were nice, I could dust them off. But all these things had to do with me, not my Angel. She needed something that meant something. Like a pint of my own blood.

I figured out the bus. I went to Target. And oh my god: the white floor tiles: so shiny! They reflected the fluorescents gleaming overhead, as if the whole place was lit from under my feet. The shopping cart wheeled over each blip of tile—so smooth. Glossy loops of blond samples down aisles of hair dye—delightful! I grabbed shampoo, a pack of Slims (oh, sweet aroma through the plastic), and a can of white paint.

I thought about a card. I went to Thank You and Thank You For Her. Fanned through the options of embossed sayings. "Life is measured not by the number of breaths we take, but by the moments that take our breath away." Um. Can you say no way? I stuffed them back and went to Accessories. She said she liked jewelry, so.

I loaded up. Like I was tearing stuff off the spinning Y-shaped displays. Clinking necklaces and heavy bangles and crystal rings and something called a toe clutch. A dozen

watches—who wore watches? I had a field day. I filled my cart like they do in the movies when a shooter's on the loose or the neighborhood's on fire, grabbing for my Angel like I'd never do for myself.

At Checkout the glittering pile moved down the conveyor belt. The girl beeped her gun around the stash and said that'll be $193.80. Whoa now. Hold up.

She looked through my face. She wanted to know did I want to put something back. Um, yeah, you think? So I came home with a pendant, the toe clutch, and two bracelets on clearance. $34.17 total. But nobody would know.

"What in God's name?" said Bao. He found me kneeling on newspaper in the foyer, holding a paintbrush wet with harsh chemicals.

"Our trims," I said. "They're a wreck."

Bao breathed through his nostrils. "Baby," he said. "This isn't taking it easy."

"I know, I know." I tried getting to my feet, but pain like a snapped trap unfolded with my body. Bao grabbed my arm. I was dizzy and restless. I didn't know what to do. I didn't want her here.

*****

"Can you move your stuff? said Bao. I wiped down the coffee table. I gathered the crap on the staircase.

I ripped the tags off the jewelry and rummaged for a box. No box. Fetched a Gladware and buried them in there with Kleenex, pretty-like. Found an old gift certificate to Olive Garden and put that in too. Wrapped it up—technically Christmas paper, red with snowflakes, but pretty ambiguous, and anyway it was November. No card. What was I supposed to say?

Bao painted some crackers with cream cheese. I warmed potato skins. "We cooked!" he said, marching the plate to the living room. I watched his excitement. I wanted a drink. Instead I went to the fridge and checked on my apple juice. Slipped into my pocket two harmless Slims.

At 10:56 the doorbell went off. Bao almost dropped the plate in his rush to the door. I stayed behind, neatening things, my fingers shaking rudely like they belonged to someone else.

I heard her voice before I saw her. So much exclaiming, hugging, everything loud. They came gliding toward me, Bao grinning anxiously and searching my face. She was even more radiant than the photo. Slightly older-looking—crinkly eyes, thin hair—but emanating a glow that no camera could capture without filters. Out came her arm and her long, elegant hand, the delicate fingernails, tips creamy white.

"Baby?" said Bao. His eyebrows urged me on.

"Hi!" I said. "Hi hi hi. Come in, come in." I guess I was staring. We shook. Her hands were cold from outside. Mine were sweaty and I wiped them on my pants, though I worried maybe that would look rude, like I didn't want her germs. I watched her shoes, two sculptures of soft green suede. She was too shiny to look at. It was like squinting at the sun.

"This," she said, eyes probing my socks, my sweatshirt, the whole of me, "is incredible."

"Right on," I said. "Sorry. I feel super weird right now."

The lips of Rose Rothario spread in a generous smile. "I can't believe it either, Chuntao. Am I saying it correctly?" I nodded that she was. She placed her hand on her chest. She gazed around our house, at our weird stuff and the carpet slashed with lines from the vacuum cleaner.

Bao chatted with Rose Rothario, both nodding vigorously. The crescendo of a siren, of trucks guzzling by: the voice of Rose Rothario rose above them all. It was like a singing melody, exuberant and controlled. She stepped around our living room. Bao followed, explaining photos

and stuff on the mantle, a breeze of high-pitched peaches trailing in her wake. I felt like a zoo animal watching human onlookers make their way toward more interesting exhibits. Suddenly my arms were too long, hair was sticking to my face. At least they were moving, killing time.

"Is this a family heirloom?" Rose Rothario lifted her glasses from her nose. She bent to examine the carvings on the zitan chair.

"I guess so," said Bao, hands folded like a docent. "It's Chuntao's."

"It's mine," I said.

"It's a stunning relic," said Rose Rothario, roving her head along the back, the armrests, the deflated cushion. A stunning relic? It was a chair. I imagined Grandmah hunched in the seat, raising her furry eyebrows, wondering *Who the hell?*

Bao suggested that we sit around the coffee table. "We got some snacks," he said. "Nothing special."

"Oh my goodness," said Rose Rothario, admiring the Ritz crackers fanned around the plate. I hated the sight of them: everything the same pale color. But Rose didn't seem to care. She sat, folding her skirt and holding her abdomen on the way down. I wondered if it hurt: the hole inside of her. I wondered if she missed it. But I sort of didn't want to know.

Rose pulled her phone from her purse.

"Pardon," she said. "I just love this so much." She aimed the phone at the crackers, concentrating. Then—satisfied— she put it away.

We faced each other, the triangle of us. Nobody ate. Finally I lifted a cracker and put it in my mouth, which tasted like nothing, like water, just cold and crumbs and creamy stuff, mashing around.

"You sure don't look like you just had surgery," Bao said to Rose Rothario.

11

"Thank you," she grinned. "Everyone's been so supportive. So many cards and flowers. And from people you'd never expect." I went in for my apple juice. The eyes of Rose Rothario snagged on my glass, following my hand as it floated from the table to my lips. "Is that wine?" she said.

I stopped mid-sip. "No. It's a Welch's."

"Oh!" she said, bursting into a nervous smile. "Ha ha ha." She peered at Bao, then at me, then the hands in her lap.

We were quiet. I drank my drink. And I tried to remember the things I've had to learn: don't react, don't react. I tipped back into the cushions, the air fuzzy with shapes and colors. Bao and Rose Rothario discussed the neighborhoods of Charlestown—which restaurants were nice and which ones you should skip. They were talking holidays, or somebody's pet, or the best commute from this place to that. "But this neighborhood is also beautiful," she said, ridiculously. "Do you like to go for walks?"

"We're definitely going to," said Bao. "We're going to get into that."

"Not me," I said, swirling my glass. "I'm still healing. So, yeah."

Bao cleared his throat. Rose Rothario studied me tenderly. "Of course," she said. "I found that yoga and gentle stretching was all I could do at first."

"I've been thinking about the yoga," I said. "But I bet I'd be bad."

"Maybe Rose could teach you," said Bao.

The woman's eyes perked up. "Truly?"

He nodded and tipped his drink in her direction. "You could go together. You could show her the ropes."

"I could show you the ropes," said Rose, turning my way. My face must have been doing something, because then she said, "Or. We could not. Whatever you prefer."

"What? What?" Bao gaped at me, hands up in surrender. "I thought you wanted someone to go with!"

Rose waved everyone off the subject. "It's really not important." She smoothed her skirt. "It's okay, Bao." And I didn't like her saying my husband's name.

"Excuse me," said Bao, and stood up to make for the bathroom.

I followed him. Inched open the door and slipped myself inside. Bao was peeing into the toilet, and when he saw me he had to hold himself in place. "Are you out of your mind?" he hissed in a soft-loud voice.

I hissed back. "Yoga with her? Are you crazy? I would rather die."

"That's great," said Bao, shaking and zipping his pants. "That's just what I want to hear." He scrambled with his buckle and pushed passed me to the sink.

"And that photo?" I said. "She'll like, show it to everyone…"

He twisted the faucets and splashed all over. "I happen to be thankful," he said. "The woman saved my wife. You—you scared the shit out of me. But then she comes along and helps a person in need."

"So I guess she's a saint?" I said. "She's the kindest bitch on the planet?"

"Can you just go be with her?" he said, hurrying a towel up his arms. "Can you just go be a good person?"

"You go," I said.

"No, you," he said. And we stood there in the bathroom, panting and scared of the woman in our house.

13

We exited. In the living room Rose was sitting pin-straight on the couch, waiting just liked we'd left her, like somebody's dog.

Bao squared his eyes on her. "Before we let another moment pass, Rose, we just want to say…we just want to express to you…" He glared at me, but I couldn't say it. That angry puppy face made me want to say nothing at all.

"Well!" said Bao, rocking on his heels. "I think I'll leave you two alone now."

Air leapt down my throat. "What? Where are you going?"

"You must have a lot to say to each other." He jerked on his jacket.

*Don't,* I pleaded silently. *Don't you dare.* But he snapped up his helmet, rushing his feet into shoes with the ankles smashed flat. Rose Rothario sat still, eyes roving between us. And I felt through my heart the spear that would orphan me.

The click of the door left a loud and bristling silence. Like the world tipping over. I was in my living room, I was standing on the carpet, a bus rumbling by like it was any old day.

*****

I hurried up and gave Rose her present. She practically squealed in delight, there were little tears in her eyes. Okay. That was done. I sunk into the cushions. She lifted the pendant—long chain with a copper sunburst—and eased it over her head. Wrapping paper remains were cracked open on the coffee table. She hid the Gladware in her purse, saying she'd fully relish the rest later.

"It was fun to buy," I said. "I had to figure out the bus, but that was actually totally fine."

Rose Rothario frowned, leaning forward. "Forgive me, but I was told there was an accident."

"Yup," I said.

She bit her worried lip. "That must have been terrifying."

"You bet," I said, but the truth was that I couldn't remember. I just remembered going for my stash in the basement, the icy vodka in the Sullivan Square mug. Washing machine and stray coins vibrating across. When had I decided to go downtown? How had I even gotten in the car? It was the logic of a dream. "Trees!" I said, saluting with my glass. "They come out of nowhere."

"There was a storm?" She followed along with goony eyes.

"Big time," I lied. I described fierce winds, driving hail, windshield wipers that flapped like my hands. I marveled at my voice, making this stuff up. It sounded correct. "The dash slammed me all over. They even took out a rib—it was total smithereens." I pointed at the torso of Rose Rothario. "Hey, you got any extras in there?"

I chuckled. Rose Rothario let out a strained little laugh. Immediately I felt terrible and wished that she would go. I thought about the cigarettes—I'd told Bao I wouldn't smoke in the house. But he had left, so.

Rose Rothario squeezed the hem of her skirt. "Has your recovery been very difficult?"

I sipped my juice. "I'm not *in* recovery, if that's what you're asking."

"What?" she blinked. "Oh. That's not what I mean. I hope you know that's not what I mean."

I could see that she was uncomfortable. So what? I leaned in for a cracker and put the whole thing in my mouth. "I'm great," I said. "I can walk up stairs, catch the bus."

"I'm glad to hear it." I chowed down and she watched. "I do find that yoga helps," she said. "But I still can't quite sleep through the night."

"Neither can I," I said. "I keep getting up to pee."

"Are you finding it hard to tie your shoes? And just to bend over, generally?"

"Yeah," I said.

"Me too."

"What a bitch," I said.

Rose Rothario took a cracker and bit off an edge. She chewed in silence. More and more it seemed hard for her to look at me. Her eyes drifted to the window, to the ceiling, to her free hand in her lap. Finally she turned my way, her jaw working the cracker, but she looked right through me, as if to some far-off mountain. Then I realized. She was watching my torso. She was thinking about her kidney, buried inside of me. "Do take care of it," she said quietly.

"You think that I wouldn't?" I said.

"No, that's not what I mean." She turned away, waving off the thought. "It's yours, of course. Never mind. It's yours now."

"Well, sort of," I said, feeling bad. "You gave it to me. It's still sort of yours." She squirmed and knocked her knees together. "Hey," I said. "Don't you worry." Her head lowered, hair shielding her face. "So much is different now. I'm going to treat it so good. I'm going to take good care."

"I'm sure," she said. "Of course."

"Look," I said, "I have to be honest with you." I concentrated on the limp hand in her lap. "I'm not really looking for connections right now. Like I'm not really looking to hang out. Don't get me wrong: I am totally grateful. Like one hundred percent. But I've got too many friends already. I can barely keep up."

"Oh, no no no no," she said. "I'm not interested in friendship."

"Like I don't want to offend you, but."

16

"I just wanted to meet you," she said. "I just thought it would be a meaningful experience."

"It is," I said. "No doubt."

I looked up. She was chewing and cupping her palm to catch the crumbs. My heart pooled with relief. I'd said what I needed to. Now she could leave.

But she didn't. She kept on munching her cracker like that. What was she waiting for? What did she want? "Is there something that you want?" I said.

And that's when the face of Rose Rothario blotched and crumpled. Her eyes squeezed up, her hair fell forward. She was crying into her hand. The other hand pinched her bitten cracker, keeping it aloft. "I'm sorry," she said. "It's all just so much."

I didn't know what was happening. What I thought was: What is this, this white woman, crying on my couch? Crying to *me*. I felt bad for her, but I also wanted to slap her. Instead I leaned forward and put my hand on Rose Rothario's knee. It was warm, shivering, faceted with bone.

Her mouth contorted with sobs, articulating nothing. But I knew what she was thinking. She was thinking it was supposed to be different. "I hear you," I said quietly. "When I was dying, people were nicer."

Rose Rothario swallowed. "What—what are you saying?" She was whimpering now, fingers pressed into her eyes like she didn't want to look.

I saw my hand and I saw her knee. But they weren't as sharp as the thought in my head. That when I was dying none of it mattered: what I'd done or what I was. People bared their love and I thought I had my hands on it.

"I can't explain," I said. "Things were different. But now..."

Rose Rothario uncovered her shiny, bloated face. Then her fingers fluttered down and with no warning at all they rested themselves on my hand. I flinched. Her skin was cold, hovering and weightless, but I still could feel the warmth of her, pinning me.

"Have you told people about me?" she said.

I was tense, dutiful, careful not to move. "Of course," I said.

"And what do they say?" Her eyes were strained and glistening, as if from hunger.

What do they say? Just: eager things, stunned things. Like people who'd glimpsed promised lands, or had been spared by magnificent storms. "All the things you'd expect," I said.

Rose Rothario let out a strange, sloppy laugh.

"Come on," I said. "People worship you. That's pretty clear."

She pinched the bridge of her nose, squinting as if from pain. Then the waterworks started up again. "Never mind," I said, sliding out my hand and rubbing my muscles. My wrist bones sank and shifted, accompanying her sad song. I covered them. Didn't look at her. Maybe I'd just wait this one out.

But after a while Rose Rothario quieted. She reached around for the Gladware and fetched some Kleenex, dabbed her eyes. "I'll tell you what I would like. I would love to have a photo with you." She smiled weakly through her wet face. "That would mean a lot to me. To the people in my life."

I imagined my face immortalized next to Rose Rothario's. I didn't like this move. But if that's what it took to get her out, to get on. "If that floats your boat," I said.

She rose. Balled the Kleenex in her fist and looked for the spot that she wanted. I watched her circle the living room, thinking It's okay. It'll only take a second. She traced her

steps around the foyer, the mantle, the photos on the wall. But I knew what she was after. She curled her hands on it. My chair.

I hesitated. "You're not going to post this somewhere, are you?"

"Do you want me to?"

"Never."

"Then no," she said. I stood, shuffled over. The black wood gleamed with white lines of lighted grooves. "Do you want to sit in it?" she offered.

"Doesn't matter," I said. But then I changed my mind. "Actually, yes. I want to sit in it." I lowered myself onto the knotty cushion. I rested my elbows. Beside me Rose Rothario crouched down, touching the armrest for balance.

"Careful," I said.

"Wow—how old is this?"

"Old," I said. Rose Rothario knelt on the carpet. She smelled like peach shampoo. There were squiggly grays in her hair and a bumpy mole behind her ear.

She fussed with her phone, stuck out her arm. I didn't know where to look until she angled it toward me and I saw our faces looking back. The photo would be fuzzy, rough with sediments of darkness, but I knew that she would treasure it always. Because the thing about the dying is they command the deepest respect, respect like an underground river resonant with primordial sounds, the kind of respect that people steal from one another.

"Ready?" she said. And we peered into her outstretched hand. I saw my grandmah's chair. I saw the face of Rose Rothario. I saw that I was smiling, my eyes cast slightly sideways, looking at something off the screen but I didn't know what it was.

19

# Exhibit G

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Tusle*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-678-446

**Effective Date of Registration:**
December 17, 2018

---

## Title

| | |
|---|---|
| **Title of Work:** | The Kindest |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2018 |
| **Date of 1st Publication:** | June 08, 2018 |
| **Nation of 1st Publication:** | United States |

## Author

| | |
|---|---|
| • **Author:** | Sonya Larson |
| **Author Created:** | text |
| **Citizen of:** | United States |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | Sonya Larson |
| | 89 Concord Avenue, Unit 1, Somerville, MA, 02143, United States |

## Rights and Permissions

| | |
|---|---|
| **Organization Name:** | Barker, Epstein & Loscocco |
| **Name:** | Andrew D Epstein |
| **Email:** | photolaw@aol.com |
| **Telephone:** | (617)482-4900 |
| **Alt. Telephone:** | (617)272-5700 |
| **Address:** | 176 Federal Street |
| | 5th Floor |
| | Boston, MA 02110 United States |

## Certification

# Exhibit H



# COHEN | BUSINESS LAW GROUP

A Professional Corporation

**Attorneys**
Jeffrey A. Cohen
Michael S. Hanna

**Of Counsel**
J. Eric Kirkland
Bennet G. Kelley

**Los Angeles Office**
10990 Wilshire Blvd., Suite 1025
Los Angeles, CA 90024
Telephone: (310) 469-9600
Facsimile: (310) 469-9610

**South bay Office**
2321 Rosecrans Ave., Suite 3225
El Segundo, CA 91423
Telephone: (310) 906-1900
Facsimile: (310) 906-1901

July 3, 2018

The Boston Book Festival
32R Essex Street, Suite 5
Cambridge, MA 02139

**Via Overnight Mail &**
**Email to info@bostonbookfest.org**

Re:   **Dawn Dorland Copyright Claim**
Our Client:   Dawn Dorland
Our File no.:   7277.001

### SETTLEMENT COMMUNICATION FRE RULE 408; CRE §§1152, 1154

To the Boston Book Festival:

Please be advised that this office is copyright counsel for Dawn Dorland with respect to her copyrighted work "Dorland kidney chain final recipient Work July 2, 2015" (hereinafter, the "Work"). Please direct any communications concerning this matter to this office.

We have reviewed various communications between our client and members of your staff, Norah Piehl and Raquel Hitt, regarding the Boston Book Festival ("BBF") decision to publish a short story authored by Sonya Larson entitled "The Kindest" as part of the 10th annual festival, to be featured in the festival's One City One Story ("1C1S") section. BBF has previously been placed on notice by our client that this short story contains the Work in whole or in part. We are informed that prior to the involvement of this office, our client attempted to amicably resolve this matter by requesting that BBF include an acknowledgment of the Work in the "The Kindest". We understand that her proposal was flatly, if not somewhat dismissively and rudely rejected without fully considering the rights of our client or the potential liability of BBF. By this letter we hope to resolve this matter with you, but in the event that is not possible, you may rest assured that we will protect our client's rights.

BBF has already admitted infringement of the Work by Ms. Larson and potentially either direct or contributory infringement by BBF. We do not have the benefit of having reviewed any purported revision to "The Kindest" to determine whether any infringement remains, however, the duplication in some instances, and striking similarity in others, between the Work and The Kindest, is so particularly egregious that it is our opinion that any decision to publish The Kindest would necessarily infringe our client's rights. **As such, please accept this correspondence as a formal**

The Boston Book Festival
July 3, 2018
Page 2 of 2

demand that you cease and desist of and from any further printing, copying, distribution, or other activities related to "The Kindest" until such time as this matter has been resolved. Any failure to acknowledge the rights of our client or failure to cooperate with this office towards finding an amicable resolution will require further formal action to protect our client's rights. We and our client remain hopeful that BBF is more reasonable than its previous response to our client would make it seem. Do not test our resolve in this regard, nor our willingness to reach an appropriate resolution.

In order to further evaluate this matter, we ask that you provide this office with an advance copy of the purportedly revised "non-infringing" version of "The Kindest". We are willing to consider a stipulated protective order or stipulation of non-disclosure in this regard if you believe that would be helpful, and we ask that you provide the advance copy within ten (10) days of the date of this letter. Further, we will take your failure to provide such a copy as an admission that no such change or that only a *de minimis* change has been made, such that the revised version continues to violate the rights of our client. As such, we would be left with no alternative but to proceed accordingly to prevent intended publication and otherwise protect our client's rights. Be further advised that such action, if necessary, would no longer be for attribution, but will demand the full measure of penalties for statutory copyright infringement under 17 U.S.C. § 504(c), which as you likely are aware, could be as high as $150,000 under facts such as those presented herein wherein BBF has admitted infringement and willfully proceeds in complete and intentional disregard of our client's rights despite such advance knowledge of infringement. The shortness, and quite frankly the rudeness of your prior response to our client will not be considered favorably by the court.

Again, the purpose of this correspondence is to confirm your admission of infringement and likely liability as a result thereof. However, our purpose is also to genuinely provide BBF the opportunity to correct this situation, and this office remains open to legitimate discussions in this regard. Nothing contained herein or not contained herein should be taken as a waiver of any rights of our client, all of which are hereby expressly reserved.

Very truly yours,

COHEN BUSINESS LAW GROUP
A Professional Corporation

JEFFREY A. COHEN

JAC/
L-BBF 20180628.5(JAC)

# Exhibit I

GREGORIO PLLC
301 S. Elm St., Ste 507
Greensboro, NC 27401
(336) 645-3595
james@gregoriopllc.com

July 17, 2018

*Via Email:* jac@cohenblg.com

Jeffrey A. Cohen, Esq.
Cohen Business Law Group
10990 Wilshire Blvd., Suite 1025
Los Angeles, CA 90024

Re. Dawn Dorland Copyright Claim

Dear Mr. Cohen:

I am legal counsel to Sonya Larson. Your correspondence of July 3, 2018 to The Boston Book Festival ("BBF") has been forwarded to me.

**The allegations presented in your letter are absolutely, unequivocally, entirely, irrefutably, demonstrably false, frivolous, and without merit.**

I am skeptical that *"BBF has already admitted infringement of the Work by Ms. Larson,"* as you allege. Regardless, BBF is not authorized to communicate on my client's behalf and, in any case, *no infringement occurred, and no attribution to your client is warranted.*

Regrettably, your client made no effort whatsoever to engage directly with Ms. Larson regarding this matter. Nor did I receive any communication after my invitation, *via* Rebecca Markovits (*"please forward my contact information to Ms. Dorland, and convey to her that I will be happy to talk with her (or her attorney) about any concerns she may have regarding Sonya's story."*).

In order to further evaluate this matter, please immediately forward to me for review: (1) a copy of *"Dorland kidney chain final recipient Work July 2, 2015,"* (2) evidence of the allegedly egregious *"duplication in some instances, and striking similarity in others"* between The Kindest and your client's work, (3) the date of first publication of your client's work, and (4) copyright registration number/date of your client's work.

Be advised: **Your client's actions constitute harassment, defamation *per se*, and tortious interference with business and contractual relations. In particular: Demand is hereby made that your client cease and desist from any and all defamatory communication regarding my client, including without limitation any contact regarding this matter with any media organization, and with her employer.**

Jeffrey A. Cohen, Esq.
July 17, 2018
Page 2 of 2

My client is humbled and honored to have her work recognized by the Boston Book Festival. If BBF elects – as would be their prerogative – not to publish The Kindest as its 2018 *One City One Story* selection, we shall consider the actions of Dawn Dorland to be the proximate cause of the resulting injury to my client. Be assured, Ms. Dorland *will* be held accountable. Furthermore, if Ms. Dorland commences a lawsuit in connection with this matter in any state or federal court, my client will seek Rule 11 sanctions against Ms. Dorland and her attorneys.

**I strongly recommend you withdraw your demand letter immediately.**

You have been notified.

Nothing contained herein or not contained herein should be taken as a waiver of any rights of my client, all of which are hereby expressly reserved.

Most sincerely,

GREGORIO PLLC

James A. Gregorio, Esq.

cc:      Paul Sennott, Esq. *via email:* paul@sennottwilliams.com

# Exhibit J



**Arts**

# Inspiration or plagiarism? Writing hackles raised in Boston dispute



ANTHIA CUMMING/ISTOCKPHOTO

**By Graham Ambrose**

GLOBE CORRESPONDENT   JULY 26, 2018

Good artists copy, but great artists steal, or so the old saying goes. But the truth may be far more complicated, as shown by a recent case of alleged plagiarism that rattled through Boston's literary scene.

Accusations arose in June that a small section of a piece of short fiction chosen by the Boston Book Festival for its annual One City One Story program contained material lifted from another, real-life source. The group is planning to distribute now slightly modified copies of the work for free starting in late August.

The story, "The Kindest," by Boston writer Sonya Larson, involves a kidney donation and was published last year in American Short Fiction to praise and acclaim. The objections, raised by a former friend of Larson who said the writer had lifted material from her Facebook post, eventually triggered legal and ethical inquiries, as well as questions of when and how it is acceptable for the stuff of real life — someone else's life in particular — to be transformed into art.

The dispute began in June 2015, when Los Angeles writer Dawn Dorland made a kidney donation. Dorland, who lived in Boston until 2011, says she has known Larson since 2005 as a friend and colleague at GrubStreet, the Boston literary nonprofit where Larson serves as director of the Muse in the Marketplace conference and advocacy.



CHRIS PERRY

**Dawn Dorland**

Larson belonged to a private Facebook group in which Dorland posted updates for friends and family about her donation process.

In July 2015, a few weeks after her operation, Dorland posted a 380-word open letter she had written to a beneficiary of her donation about why she decided to get involved.

"In 2009 I read my first article about living kidney donation, and in the years since, I have been constantly reminded — whether triggered by my reading (I am a writer), or through the stories of people I know — of the harrowing experience of dialysis and the dire need in our country for kidneys," Dorland wrote.

Larson has acknowledged that she saw the letter and that Dorland's donation to a stranger helped inspire her to write "The Kindest," a story told from the perspective of a woman who receives a kidney.

Larson never mentioned to Dorland the story she was working on. In June 2016, when Dorland heard about the tale through a mutual friend, she felt surprised and hurt not to have been looped in.

Dorland confronted Larson, who in turn defended her actions. "I want to emphasize that my story is not about you or your particular gift, but about narrative possibilities I began thinking about in the context of kidney donation," Larson wrote in an e-mail. "It is a work of fiction, formed wholly by my particular imagination," she said in another.

Dorland did not read the story until June 2018, when she was surprised to find a donor letter in Larson's fiction that bore striking similarities to her own. Dorland's feeling of personal betrayal turned to professional indignation.

"I think it's fairly obvious she was working from a copy of my letter," Dorland said. "This isn't really writing. It's almost like Mad Libs. 'I've got this structure and now I'm going to plug-and-play.'"

For instance, this is a line in Dorland's original letter: "I focused a majority of my mental energy on imagining and celebrating *you*."

"I withstood the pain by imagining and rejoicing in YOU," reads a line in the version of "The Kindest" published by American Short Fiction.

The original, 2016 version of "The Kindest," published on Audible.com, put it even more closely: "I channeled my energies into imagining and celebrating YOU."

"The Kindest" runs about 5,500 words, and the portion in question makes up about 100 words of that.

Larson denies copying Dorland's post. "There's only so many ways to write this letter. It's a standard letter you write, and you can go online and find many samples of it — which is what I did. I wrote my own fictional letter," she said.

"Fiction writers encounter ideas all the time from real life," she added. "You'd be hard-pressed to find a writer who doesn't work with real-life materials and fictionalize them.

Dorland said that some lawyers told her that the story might constitute an infringement of intellectual property law.

But lawyers consulted by the Globe say that while there appear to be strong similarities between the Facebook post and the note in the story, Dorland's case could be a difficult one to win.

According to Joseph Liu, a professor at Boston College Law School, Larson could mount two defenses: de minimis, or the idea that the extent of the copying is minimal so not worthy of punishment; and fair use, a doctrine of copyright law that allows for materials to be copied on a limited basis without permission from the original owner for certain educational or artistic purposes.

To print the document, click the "Original Document" link to open the original PDF.
At this time it is not possible to print the document with annotations.

But some writers and editors say they can understand why the incident might trigger a confrontation, legal questions nowithstanding.

"As a writer, I would have told my friend, 'Hey, I'm writing this story. Can I use that?' I would have gotten permission," said Bret Lott, a novelist and former editor of The Southern Review. "It screams, 'I should have talked to my friend.'"

For their part, the institutions that have published "The Kindest" view the dispute as a private matter between the two writers, although both the Boston Book Festival and American Short Fiction have taken steps in reaction to Dorland's accusation.

The Book Festival asked Larson to rewrite the offending passages and printed a statement to accompany the story before printing it: "'The Kindest' originally appeared, in slightly different form, in American Short Fiction Summer 2017." The story will be discussed at a town hall event at the festival in October.

Deborah Porter, festival founder and executive director, said that the story-selection committee was "100 percent unanimous that that was the appropriate acknowledgment."

American Short Fiction, which posted "The Kindest" online in May, decided to pull the story from the site in late June.

"After doing our due diligence, we found this to be more of a private issue between two acquainted writers," the editors said in a statement to the Globe. "In any case, the story had completed a one-month run on our website, and in the interests of finding an agreeable solution, we decided to sunset it."

Dorland says that she would be satisfied with an apology and a more specific acknowledgment of her contribution to the story, which she feels has been "erased" from the work.

"We as writers are free to do what we're free to do," Dorland said. "But I'm not going to hurt people I know by letting them read about their lives in my fiction first. If I'm going to borrow something from someone's life, I'm going to have a conversation with them."

*Graham Ambrose can be reached at graham.ambrose@globe.com.*

---

© 2019 Boston Globe Media Partners, LLC

**ORIGINAL LETTER**
**by DAWN DORLAND**

Dear Recipient,

My name is Dawn Dorland. I'm a 35-year-old white female, and I live with my husband in LA.

In 2009 I read my first article about living kidney donation, and in the years since, I have been constantly reminded--whether triggered by my reading (I am a writer), or through the stories of people I know--of the harrowing experience of dialysis and the dire need in our country for kidneys. I believe that I knew, from the moment I first became aware of the possibility of donating one of my kidneys, that I would one day find a way to do this.

 I was motivated to donate at a time when, due to medical advances and the existence of the National Kidney Registry—especially the leaps they've made matching compatible strangers through paired exchange-- ███████████████████████████████. Personally, my childhood was marked by trauma and abuse; I didn't have the opportunity to form secure attachments with my family of origin. A positive outcome of my early life is empathy, that it opened a well of possibility between me and strangers. While perhaps many more people would be motivated to donate an organ to a friend or family member in need, to me, the suffering of strangers is just as real.

I can't tell you how happy I am that my donation eventually--two organs and four surgeries later--resulted in your receiving xxxxxxx's kidney. Throughout my preparation for becoming a donor, which spanned precisely eight months from my first testing to the date of our surgeries, I was most excited about the recipient who would come off of the deceased donor list and end our chain. █████████████████████████████

My gift, which begat xxxxxxx's, trails no strings. You are deserving of an extended and healthy life simply for being here.

Please know that my husband and I would love to know more about you, and perhaps even meet you one day. But I accept any level of involvement or response from you, even if it is none.

Thank you for reading this letter, and be well.

Kindly,
Dawn

**EXCERPT FROM "THE KINDEST"** (Brilliance Audio 2016 version)
**by SONYA LARSON**

*Dear Recipient,*

*My name is Rose Rothario. I'm a thirty-eight-year-old white female, and I live in Greater Boston.*

*In 2015, I saw my first documentary about living kidney donation, and from that point forward I was constantly reminded of the urgent need for kidneys in our country.*

███████████████████████████████
███████████████████████████████

[...]

*I'm grateful to the entire transplant team at MGH, who gave such attentive care from my very first blood test to the date of our paired exchange.*

*My own childhood was marked by trauma and abuse. I wasn't given an opportunity to form secure attachments with my family of origin. But in adulthood that experience provided a strong sense of empathy. While others might desire to give to a family member or friend, to me the suffering of strangers is just as real.*

*A few things about me: I like sailing, camping, jewelry, and cats.*

*As I prepared to make this gift, what sustained me was the knowledge that my recipient would be getting a second chance at life.* ███████████████████████████
███████████████████

[...]

*My gift, you must know, trails no strings. You deserve all that life has to offer, simply because you exist. That said, I would love to know more about you. Perhaps we can meet. But I accept any level of involvement, even if it is none.*

*Warmly,*

*Rose M. Rothario*

# Exhibit K

𝔅 | **Metro**

# Boston Book Festival cancels One City One Story event amid plagiarism flap

**By Graham Ambrose**

GLOBE CORRESPONDENT   AUGUST 14, 2018

The Boston Book Festival is canceling its popular One City One Story event, the latest development in a controversy ignited by plagiarism allegations that dogged Sonya Larson's "The Kindest," the work that had been selected for the marquee session, which will take place in October.

Deborah Porter, founder and executive director of the festival, said yesterday's decision was made under some legal pressure brought by Dawn Dorland, who accused Larson of lifting material from her Facebook post and using it in a section of her short story.

"This is not a happy choice for us, as we have already sunk resources, time, and effort into this project. We are a tiny nonprofit with a very small staff, and we need to turn our attention now to our central mission, which is producing the Boston Book Festival," Porter said in an e-mail.

Dorland said she took no pleasure from the resolution. "I find it personally painful that the parties involved could not reconcile over the straightforward misrepresentation of another writer's original ideas, language — and in this case, personal trauma — as one's own literary creation," she said.

ADVERTISING

**RELATED: Inspiration or plagiarism? Writing hackles raised in Boston dispute**

Larson has said that her former friend's experience as a kidney donor served as inspiration for her fictional story of a woman who was a kidney recipient. But she has steadfastly denied plagiarizing from Dorland's online post.

"Fiction writers regularly encounter ideas in the world — whether from ads, catalogues, tombstones, or tweets — and we re-imagine and transform their elements for completely fictional narratives," Larson wrote in an e-mail to the Globe this weekend. "Let's keep this in perspective: Ms. Dorland's letter was not art; it was correspondence that she posted on Facebook."

Larson said yesterday that her position had not changed and that she was considering her own legal options.

The saga began in June when Dorland notified festival organizers of her concerns about Larson's story. After examining the evidence, festival officials asked Larson, a program director at the GrubStreet literary center in Boston, to rework the contested section, and she agreed to do so.

In response to the controversy, American Short Fiction, which published "The Kindest" online in May, said in a June statement that "in the interests of finding an agreeable solution, we decided to sunset" the story, which had already "completed a one-month run on our website."

Late last week Audible and Brilliance Audio said they would suspend audiobook sales of the story. The decisions by the audiobook publishers, which are both owned by Amazon, came

about after the discovery of a Brilliance version of the story, which contained more similarities to Dorland's Facebook post than did the Audible version or the one originally accepted by the Boston Book Festival.

The origin tale of the Brilliance version contains twists worthy of a detective mystery.

Larson recorded "The Kindest" for Audible in 2016, according to Yael Goldstein Love, editorial director of Plympton, which produces fiction for digital platforms. Goldstein Love helped connect Larson and Audible and provided a chronicle of the publication process, an account that was verified by Audible.

Around that same time, Dorland, who had heard about the existence of the story through a mutual friend, confronted Larson by e-mail about it. Dorland said that she had not yet read the piece and was unaware of any actual similarities. Instead she was upset to learn that a focus of Larson's tale was a kidney donation and that she had been left out of the loop.

After a tense e-mail exchange, Larson circled back to Audible and on July 15, 2016, asked to re-record a short section of "The Kindest" — which included the material that would later become the focus of the dispute.

"The Kindest" was then re-recorded, and that revised version was released by Audible in August 2016 as a downloadable file.

But by mistake, Brilliance Audio accidentally published the original, unrevised version of "The Kindest."

"Personally, my childhood was marked by trauma and abuse; I didn't have the opportunity to form secure attachments with my family of origin," reads one line in Dorland's letter.

"My own childhood was marked by trauma and abuse; I wasn't given an opportunity to form secure attachments with my family of origin," reads the corresponding part of the Brilliance version.

"I've always acknowledged that I read her letter and found it inspirational," Larson wrote in an e-mail this weekend. "What I consented to have published is fiction, as is its language."

When contacted for response over the weekend, Eve Bridburg, founder and executive director of GrubStreet, said that "we're naturally troubled when accusations of this nature are raised, but the creative process is a complex one, and we do not publicly discuss specific issues involving our employees." On Monday a GrubStreet representative, who spoke on behalf of Bridburg, who was on vacation, said she stands by the comment.

*Graham Ambrose can be reached at graham.ambrose@globe.com.*

---

© 2019 Boston Globe Media Partners, LLC

# Exhibit L



# COHEN | BUSINESS LAW GROUP

### A Professional Corporation

**Attorneys**
Jeffrey A. Cohen
Michael S. Hanna

**Of Counsel**
J. Eric Kirkland
Bennet G. Kelley

**Los Angeles Office**
10990 Wilshire Blvd., Suite 1025
Los Angeles, CA 90024
Telephone: (310) 469-9600
Facsimile: (310) 469-9610

**South bay Office**
2321 Rosecrans Ave., Suite 3225
El Segundo, CA 91423
Telephone: (310) 906-1900
Facsimile: (310) 906-1901

July 20, 2018

James A. Gregorio, Esq.                                   Via Email and U.S. Mail
Gregorio PLLC                                             james@gregoriopllc.com
301 S. Elm St., Ste 507
Greensboro, NC 27401

**Re: Dawn Dorland Copyright Claim**

| | |
|---|---|
| Our Client: | Dawn Dorland |
| Our File No.: | 7277.001 |
| Copyrighted Work: | "Dorland Kidney chain final recipient letter July 2, 2015" by Dawn Dorland |
| Infringing Content: | Portions of "The Kindest" by Sonya Larson |

Dear Mr. Gregorio:

This office is counsel for Dawn Dorland with respect to the issues address herein. We are in receipt of your letter dated July 17, 2018, and this correspondence is a response to that letter.

Pursuant to your request, please find enclosed herewith a redacted copy of our client's work "Dorland Kidney chain final recipient letter July 2, 2015" ("Work"), U.S. Copyright application number 1-6654473411. While we believe that your client is already in possession of an unredacted copy, please let us know if that would be of assistance to your analysis and we can discuss providing an unredacted copy.

Given your request for a copy of the Work, it appears that the positions expressed in your letter were taken without ever having reviewed the Work. Now that you are in possession of the Work, we are certain that you will agree that it is not only possible that your client copied the Work, but that it would be impossible for your client to have independently created her version of the Work that is included in the short story "The Kindest," without having copied the Work.

As you can see, certain portions of "The Kindest" are included almost verbatim from the Work, and the entire letter portion of "The Kindest" is indisputably adapted directly from the Work. There can be no reasonable dispute in this regard that your client is has infringed upon our client's copyright in the Work under 17 U.S.C. § 501(a), including our client's exclusive rights under 17

James Gregorio
July 20, 2018
Pg. 2

U.S.C. §§ 106(1), 106(2), 106(3), and 106(5) by reproducing the Work in "The Kindest," preparing a derivative work in "The Kindest" based upon the Work, distributing copies of the Work to American Short Fiction, Audible.com, and the Boston Book Festival, and by publicly displaying the Work, respectively.

Given the obvious and substantial similarities between the relevant portions of "The Kindest" and the Work, we intend to assert all available rights and remedies that our client may have, unless we are able to come to a mutually agreeable solution with all parties involved, including your client. Our client's position in this matter, at least to this point, has been extraordinarily conciliatory. Frankly, despite the tone of your letter and the failure to include any law or facts upon which your positions are based (including your threat to seek Rule 11 sanctions), our client remains willing to settle this matter without a full recovery of the damages to which she may be entitled. However, this willingness could change should your client continue to make baseless threats or take any action to interfere with our client's rights.

We are in discussions with Boston Book Festival ("BBF") concerning settlement of our claims against them. BBF has advised that they are reluctant to publish "The Kindest" until the claims between your client and our client are settled. If BBF has contacted you for authority to include an appropriate attribution or for any other authority to allow them to proceed with a settlement, we would suggest that you take them seriously. It appears that your failure to reach an agreement with our client would not be in your client's best interest.

To the extent that your client is willing to recognize the rights of our client and to the extent that she is interested in exploring the settlement of the potential claims against your client at this time, we would be willing to entertain such discussions, as we do wish to achieve a solution for all involved in a timely manner. Accordingly, please contact this office to discuss this matter further, as time is of the essence for all involved. Otherwise, please stop interfering with our efforts to prevent the further violation of our client's rights.

Very truly yours,

COHEN BUSINESS LAW GROUP
A Professional Corporation

MICHAEL S. HANNA

cc: Paul Sennott, Esq. via email at paul@sennottwilliams.com

MSH/nk

L-Gregorio 20180720.2



# COHEN | BUSINESS LAW GROUP

A Professional Corporation

**Attorneys**
Jeffrey A. Cohen
Michael S. Hanna

**Of Counsel**
J. Eric Kirkland
Bennet G. Kelley

**Los Angeles Office**
10990 Wilshire Blvd., Suite 1025
Los Angeles, CA 90024
Telephone: (310) 469-9600
Facsimile: (310) 469-9610

**South bay Office**
2321 Rosecrans Ave., Suite 3225
El Segundo, CA 91423
Telephone: (310) 906-1900
Facsimile: (310) 906-1901

September 6, 2018

James A. Gregorio, Esq.
Gregorio PLLC
301 S. Elm St., Ste 507
Greensboro, NC 27401

Via Email and U.S. Mail
james@gregoriopllc.com

### FRE 408 & California Evidence Code Section 1152 & 1154

#### Re: Dawn Dorland Final Settlement Demand and Reservation of Rights

| | |
|---|---|
| Our Client: | Dawn Dorland |
| Our File No.: | 7277.001 |
| Copyrighted Work: | "Dorland Kidney chain final recipient letter July 2, 2015" by Dawn Dorland (The "Work") |
| Infringing Content: | Portions of "The Kindest" by Sonya Larson |

Dear Mr. Gregorio:

As you are aware, this office is counsel for Dawn Dorland with respect to the issues addressed herein as well as in our July 20, 2018 correspondence to you.

It has come to our attention that your client continues to engage in conduct violative of the rights of our client. While the Boston Book Festival has apparently agreed with our position as to your client's infringement, we are aware of further and additional conduct by your client that we believe has infringed and continues to infringe upon the rights of our client. The purpose of this letter is to demand that your client CEASE AND DESIST of and from all further infringement of the rights of our client, copyright and otherwise.

Specifically, our client has discovered claims which include but are not limited to claims under 17 U.S.C. §§ 106(1), 106(2), 106(3), and 106(5), respectively, for:

- reproducing the Copyrighted Work ("Work") in "The Kindest";
- preparing a derivative work in "The Kindest" based upon the Work;
- distributing copies of the Work to AmericanShortFiction.org, Audible.com (in the United States, United Kingdom, and Australia), BrillianceAudio.com, and the Boston Book Festival; and

**TRANSACTIONS AND LITIGATION**
| BUSINESS | CORPORATE | INTERNET & TECHNOLOGY | INTELLECTUAL PROPERTY | DATA BREACH | NEW MEDIA |

James Gregorio
September 6, 2018
Pg. 2

- publicly displaying the Work on the aforementioned websites.

While the Boston Book Festival has decided not to publish "The Kindest", by no means does this address the infringement by your client that has occurred up to this point in time, nor the damages inflicted as a result of her actions, including attorney's fees and costs incurred in the enforcement and protection of our client's rights.

We have attempted to resolve this matter with your client through your office by requesting that your client agree, at least informally, to cease and desist of and from further violations, and thus far, your client has refused to acknowledge the rights of our client or admit what everyone else seems to agree upon, that the actions of your client have already infringed the rights of our client. There has been no explanation for the refusal to acknowledge these rights or the wrongdoing of your client except ambiguous, wholly inapplicable assertions of "fair use"; unfortunately, this leaves us in a difficult position.

At this time, we require that your client acknowledge the rights of our client, in writing, and we require that your client formally agree to cease and desist of and from further violations. Additionally, we need to resolve the matter of significant attorney's fees and costs incurred as the direct result of your client's actions. The failure to take these matters seriously and to resolve this matter informally at this time may result in the formal assertion of such rights against your client.

Specifically, to the extent that your client is unwilling to voluntarily agree to cease and desist from further violation of our client's rights, we intend to take action to require her compliance. Should that be necessary, we will be asserting a full litany of claims against your client and seek all available damages, including attorney's fees and costs. Furthermore, given the nature of the infringement, we intend to address these claims in the Central District of California located in Los Angeles, California.

We have attempted to come to a mutually agreeable solution with you about these past claims, and despite not yet obtaining a resolution of these claims, we remain willing to discuss settling these claims once and for all. However, given the time and resources we have expended to-date on this matter, we now shall be seeking a full recovery of the damages to which our client may be entitled, in addition to satisfaction of claims that can be pursued in a court of law.

Such an endeavor will most certainly cause both of our clients to devote substantial resources including time and energy to these claims. There is virtually no likelihood that your client will prevail, as your client's infringement is undeniable. **In order to avoid this path, our client demands the following:**

1) Your client will execute a stipulated judgment in the amount of $180,000 to be held and not filed unless and until your client violates the further terms of a written settlement agreement.
2) That your client agrees to cease and desist of and from any further violation of our client's copyrights with respect to the Work, or anything derivative thereof in "The Kindest", or any other publication.
3) Your client agrees to reimburse actual legal expenses incurred of $15,000.00 commensurate with execution of the settlement agreement.
4) Other terms typical of an agreement of this type.

James Gregorio
September 6, 2018
Pg. 3

Should your client continue to stonewall further discussions along these lines, she will not be pleased with the result. Should we not hear from you within ten (10) days of the date of this letter, this demand shall automatically expire without further notice and shall not be renewed.

The foregoing is not intended to be a full litany of all rights that our client may have. Nothing contained herein, or not expressly included, shall be taken as a waiver of any other rights that our client may have, and all such rights are expressly reserved. Our client is truly hopeful that your client takes the reasonable path here, but please understand that the present circumstances will simply not be tolerated any further.

Very truly yours,

COHEN BUSINESS LAW GROUP
A Professional Corporation

MICHAEL S. HANNA

MSH/nk

L-Gregorio 20180808.5

# Exhibit M



# COHEN | BUSINESS LAW GROUP

A Professional Corporation

**Attorneys**
Jeffrey A. Cohen
Michael S. Hanna

**Of Counsel**
J. Eric Kirkland
Bennet G. Kelley

Los Angeles Office
10990 Wilshire Blvd., Suite 1025
Los Angeles, CA 90024
Telephone: (310) 469-9600
Facsimile: (310) 469-9610

South bay Office
2321 Rosecrans Ave., Suite 3225
El Segundo, CA 91423
Telephone: (310) 906-1900
Facsimile: (310) 906-1901

September 6, 2018

James A. Gregorio, Esq.
Gregorio PLLC
301 S. Elm St., Ste 507
Greensboro, NC 27401

Via Email and U.S. Mail
james@gregoriopllc.com

### FRE 408 & California Evidence Code Section 1152 & 1154

### Re: Dawn Dorland Final Settlement Demand and Reservation of Rights

| | |
|---|---|
| Our Client: | Dawn Dorland |
| Our File No.: | 7277.001 |
| Copyrighted Work: | "Dorland Kidney chain final recipient letter July 2, 2015" by Dawn Dorland (The "Work") |
| Infringing Content: | Portions of "The Kindest" by Sonya Larson |

Dear Mr. Gregorio:

As you are aware, this office is counsel for Dawn Dorland with respect to the issues addressed herein as well as in our July 20, 2018 correspondence to you.

It has come to our attention that your client continues to engage in conduct violative of the rights of our client. While the Boston Book Festival has apparently agreed with our position as to your client's infringement, we are aware of further and additional conduct by your client that we believe has infringed and continues to infringe upon the rights of our client. The purpose of this letter is to demand that your client CEASE AND DESIST of and from all further infringement of the rights of our client, copyright and otherwise.

Specifically, our client has discovered claims which include but are not limited to claims under 17 U.S.C. §§ 106(1), 106(2), 106(3), and 106(5), respectively, for:

- reproducing the Copyrighted Work ("Work") in "The Kindest";
- preparing a derivative work in "The Kindest" based upon the Work;
- distributing copies of the Work to AmericanShortFiction.org, Audible.com (in the United States, United Kingdom, and Australia), BrillianceAudio.com, and the Boston Book Festival; and

James Gregorio
September 6, 2018
Pg. 2

- publicly displaying the Work on the aforementioned websites.

While the Boston Book Festival has decided not to publish "The Kindest", by no means does this address the infringement by your client that has occurred up to this point in time, nor the damages inflicted as a result of her actions, including attorney's fees and costs incurred in the enforcement and protection of our client's rights.

We have attempted to resolve this matter with your client through your office by requesting that your client agree, at least informally, to cease and desist of and from further violations, and thus far, your client has refused to acknowledge the rights of our client or admit what everyone else seems to agree upon, that the actions of your client have already infringed the rights of our client. There has been no explanation for the refusal to acknowledge these rights or the wrongdoing of your client except ambiguous, wholly inapplicable assertions of "fair use"; unfortunately, this leaves us in a difficult position.

At this time, we require that your client acknowledge the rights of our client, in writing, and we require that your client formally agree to cease and desist of and from further violations. Additionally, we need to resolve the matter of significant attorney's fees and costs incurred as the direct result of your client's actions. The failure to take these matters seriously and to resolve this matter informally at this time may result in the formal assertion of such rights against your client.

Specifically, to the extent that your client is unwilling to voluntarily agree to cease and desist from further violation of our client's rights, we intend to take action to require her compliance. Should that be necessary, we will be asserting a full litany of claims against your client and seek all available damages, including attorney's fees and costs. Furthermore, given the nature of the infringement, we intend to address these claims in the Central District of California located in Los Angeles, California.

We have attempted to come to a mutually agreeable solution with you about these past claims, and despite not yet obtaining a resolution of these claims, we remain willing to discuss settling these claims once and for all. However, given the time and resources we have expended to-date on this matter, we now shall be seeking a full recovery of the damages to which our client may be entitled, in addition to satisfaction of claims that can be pursued in a court of law.

Such an endeavor will most certainly cause both of our clients to devote substantial resources including time and energy to these claims. There is virtually no likelihood that your client will prevail, as your client's infringement is undeniable. **In order to avoid this path, our client demands the following**:

1) Your client will execute a stipulated judgment in the amount of $180,000 to be held and not filed unless and until your client violates the further terms of a written settlement agreement.
2) That your client agrees to cease and desist of and from any further violation of our client's copyrights with respect to the Work, or anything derivative thereof in "The Kindest", or any other publication.
3) Your client agrees to reimburse actual legal expenses incurred of $15,000.00 commensurate with execution of the settlement agreement.
4) Other terms typical of an agreement of this type.

James Gregorio
September 6, 2018
Pg. 3

Should your client continue to stonewall further discussions along these lines, she will not be pleased with the result. Should we not hear from you within ten (10) days of the date of this letter, this demand shall automatically expire without further notice and shall not be renewed.

The foregoing is not intended to be a full litany of all rights that our client may have. Nothing contained herein, or not expressly included, shall be taken as a waiver of any other rights that our client may have, and all such rights are expressly reserved. Our client is truly hopeful that your client takes the reasonable path here, but please understand that the present circumstances will simply not be tolerated any further.

Very truly yours,

COHEN BUSINESS LAW GROUP
A Professional Corporation

MICHAEL S. HANNA

MSH/nk

L-Gregorio 20180808.5

# Exhibit N

Barker, Epstein & Loscocco
176 Federal Street
Boston, Massachusetts 02110
----------
(617) 482-4900
FAX: (617) 426-5251

Andrew D. Epstein
Photolaw@aol.com

September 28, 2018

**U.S. Express Mail**
**Return Receipt Requested**

**PERSONAL AND CONFIDENTIAL**

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
10990 Wilshire Blvd., Suite 1025
Los Angeles, CA 90024

> **Re:** **Sonya Larson**
> **v.** **Cohen Business Law Group and Jeffrey A. Cohen**
> **Thirty (30) Day Demand Letter Under Mass. Gen. Laws. C. 93A**

Dear Mr. Cohen:

I represent Sonya Larson as successor counsel to James A. Gregorio of Greensboro, North Carolina. I will be representing Ms. Larson going forward regarding all claims for plagiarism and copyright infringement raised by your client, Dawn Dorland Perry (hereinafter, "Dorland"), and by you (Jeffrey A. Cohen), and Cohen Business Law Group relative to my client's short story, *The Kindest*.

Ms. Larson contends that you and Cohen Business Law Group ("Cohen Law") violated one or more of my client's rights by defaming her, interfering with an advantageous contractual relationship, and committing unfair and deceptive acts and practices. The facts and circumstances of these claims, which are outlined below, are based on presently available information and belief.

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
September 28, 2018
Page 2.

A somewhat revised version of this letter is being sent simultaneously to Ms. Dorland and is enclosed. Both the letter to Dorland as well as this letter are thirty (30) day demand letters sent pursuant to the Massachusetts Consumer Protection Act, Massachusetts General Laws, Chapter 93A. Under the Act, you and Cohen Law have thirty days from receipt of this letter within which to respond to the allegations and claims for relief that are outlined herein. If you and Cohen Law fail to make a reasonable written response to this letter within thirty (30) days, a Massachusetts court can award treble but no less than double damages against you and Cohen Law, in addition to awarding my client her costs and attorney's fees.

Sonya Larson is a mixed-race Chinese-American professional writer residing in the Boston area. My client works at GrubStreet, Inc., a not-for-profit organization dedicated to educating and helping creative writers. Over the course of her young career, Larson has had several of her works published. See, www.larsonya.com for a list of her publications to date.

Dorland appears to be a minimally published writer who once lived in the Boston area and now lives in Los Angeles. Her writing career seems focused primarily on teaching occasional writing workshops. In 2015, Dorland claims to have donated a kidney to an anonymous recipient. Dorland wrote a letter to her anonymous kidney recipient in which she introduces herself, outlines her reasons for donating a kidney, and expresses an interest in learning more about the recipient and even meeting that person one day. A copy of the letter (the "Factual Letter") is enclosed.

Larson and Dorland appear to have had a nominal relationship with each other, the majority of which took place through a few dozen emails (most of which were in response to mass emails concerning conferences and class logistics), scant social media exchanges, a few exchanged pleasantries, and a large dinner party my client attended about eight years ago when Dorland lived in the Boston area.

Since the time that Dorland donated her kidney in 2015, she has not, by any stretch of the imagination, been subtle about her kidney donation and her advocacy for organ donations in general. Dorland has utilized social media extensively (e.g., Twitter, Facebook and Instagram) to raise awareness about her kidney donation and organ donations in general. In addition, Dorland posted a copy of the Factual Letter to a relatively large Facebook group. The letter may also have been posted elsewhere. The letter on Facebook was posted without a copyright notation.

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
September 28, 2018
Page 3.

Ms. Larson was inexplicably and involuntarily added as a member of Dorland's Facebook group, which included approximately 250 to 300 people. It appears that the primary focus of this group was to create a platform for Dorland to share her personal experiences with donating a kidney. Ms. Larson saw the Factual Letter on Facebook after it was posted. Ms. Larson found the letter interesting. She did not copy the Factual Letter but instead recorded a few thoughts and phrases from the letter into her notes for future reference.

My client was intrigued by the idea of kidney donations and began to fabricate a fictional short story from the perspective of an alcoholic, working class Chinese-American woman living in Boston with her husband, who receives a kidney donation from a wealthy white woman and then prepares to meet her. The story explores the complexities of indebtedness, addiction, love, shame and race. Its central aim is to depict a person of color resisting a white savior narrative.

Larson's eventual short story included a letter received by the kidney recipient character and sent by the donor character. The letter was a small part of the story and used primarily to introduce the character of the kidney donor, and to set the stage for the eventual meeting of the recipient and donor characters. When Ms. Larson was writing her story, she researched and viewed dozens of other organ donation letters that were widely available online. She also viewed many websites devoted to advising organ donors and recipients on how to correspond with one another, including bullet points of the kinds of things people share with one another and in what order.[1]

Ms. Larson worked on her story for several months and was ultimately scouted by Plympton Literary Studio for a possible audiobook production of this story, among others, via www.Audible.com ("Audible"). Audible accepted Larson's story entitled, *The Kindest*, and prepared to publish it as an audio book. As the story was being recorded in the summer of 2016, my client asked the producer if Audible would re-record the story using different wording in the story's fictional letter to avoid any conceivable resemblance to the Factual Letter. Audible agreed to re-record that section, but accidentally posted the incorrect version on August 3, 2016, in downloadable mp3 format and print-on-demand CD format. They agreed to remove this recording from its site entirely until the correct version was recorded and posted on October 25, 2016. Larson was paid $125 for *The Kindest* from Plympton Literary Studio. She received nothing from Audible.

---

[1] See, for example, http://www.donorrecovery.org/families-of-donors/writing-to-transplant-recipients/.

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
September 28, 2018
Page 4.

On June 22, 2016, my client did a reading from *The Kindest* at a bookstore in Boston. The reading did not include any portion the letter in her story. Someone who attended the reading posted a comment on Dorland's Facebook page about Ms. Larson's story. Dorland apparently saw the post and noticed it included a kidney donation.[2]

Dorland soon became incensed by the concept of Ms. Larson's story, and she proceeded to hound my client with constant emails and text messages. Dorland insinuated that the story was based on her life experience and that Sonya Larson had no right "as a friend" to fabricate a story about a kidney donation without consulting her. Despite my client's insistence that the story was not about Dorland, and that she and all other writers have the right to write fiction about kidney donations, your client refused to desist. Dorland expressed dismay that my client had not "liked" and commented on her Facebook posts about her kidney donation. Dorland demanded to read the story, insisted on an apology, and threatened to write about Ms. Larson in a memoir or essay. Even though Ms. Larson's short story was fiction, Dorland seemed very threatened by *The Kindest*.

In August 2017, American Short Fiction ("ASF") published *The Kindest* in its literary magazine and featured it online in May 2018. Ms. Larson was paid $300 by ASF.

Meanwhile, the Boston Book Festival, Inc. ("BBF"), a not-for-profit organization that promotes reading and ideas for writers and bibliophiles in and around Boston, sponsors a project called One City/One Story as part of its annual festival for writers and readers. One short story is selected for distribution throughout the Boston area. Copies of the selected story are sent to BBF members, participants in the Festival, local libraries and participating businesses and it is promoted by the Eastern Massachusetts public transportation authority, the MBTA. The Festival features the story for educational and discussion purposes in hopes of incorporating divergent audiences in new conversations about an important topic. Larson's *The Kindest* was chosen in May 2018, to be the short story that it was going to feature as the One City/One Story work at its premier annual event in October 2018.[3]

---

[2] Tom Meek, a mutual Facebook friend of both Dorland and Larson, posted a comment on a Facebook post of Dorland: "Sonya read a cool story about giving out a kidney, you came to mind, and I wondered if you were the source of the inspiration."

[3] Former winners of the One City/One Story honor have credited the publicity and exposure to numerous professional achievements. Former winners express that "One City/One Story was a total game-changer for my writing career" and "speaking career," and that they have earned literally thousands of dollars for speaking engagements related to the honor. These include engagements in New England, Texas, and Chicago, and at Laboure College, Milton Academy, UMASS-Boston, Swarthmore College, Worcester State, and many more. "It really built up my 'cred' in terms of earning these speaking gigs," says one winner. "I was also interviewed on NPR and by reporters for the *Globe* and *Milton Times* and *Patriot Ledger*. Nice articles that I've used on my website and CV."

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
September 28, 2018
Page 5.

In June 2018, Dorland apparently heard about the choice of *The Kindest* as the BBF selection and she started a multifaceted smear campaign against Sonya Larson by accusing my client of plagiarizing her Factual Letter. Dorland contacted ASF, the BBF, GrubStreet, members of Ms. Larson's writing group, and, inexplicably, the Bread Loaf Writer's Conference, hosted by Middlebury College in Vermont.[4] Dorland did not specify how the language of her Factual Letter was plagiarized in *The Kindest* but simply stated that the relatively short letter in Ms. Larson's story was a "paraphrase" of her considerably longer Factual Letter.

To the Bread Loaf Writers' Conference, Dorland made the additional false claim that Larson applied for and received a prestigious fellowship to the conference using this story, which she misleadingly claimed "plagiarizes my unpublished work." Once again Dorland offered zero evidence to substantiate her claim, but nonetheless asked that something "be done, retroactively, about it." When Bread Loaf declined to engage with her, she threatened the conference by saying that she was "writing an article about plagiarism in the writing community and will list this response on behalf of the Breadloaf Writing Conference." Dorland continued to call and email Bread Loaf staff-- and even the retired Director, Michael Collier-- through late August and September 2018.

Although requested to do so by James Gregorio, my predecessor counsel, Dorland refused to contact him with supporting evidence for her claim of plagiarism so that my client and her attorney could respond. Instead, Dorland emailed and called ASF and BBF multiple times per day, demanding at various times, a citation for the Factual Letter, or that Ms. Larson's story be pulled from ASF and the BBF in its entirety, and/or that ASF publish one of Dorland's essays, purportedly about friendship, ethics and writing.

Neither ASF nor BBF acquiesced to Dorland's demands. Nevertheless, BBF did offer for Ms. Larson to change some of the language in her fictional letter to avoid any possibility of any legal claims against the BBF.[5] My client agreed to the BBF's suggestion, since the fictional letter was only a minor part of the story. Besides, Ms. Larson had already changed many

---

Says another winner, "To be selected for One City One Story is an honor. I got a beautiful email just two weeks ago from someone who had read this story. It's a matter of prestige, it can bring you speaking events, and increase your worth when you sell your first story collection or novel...Your story is published in many different languages, so whole new audiences get to engage."

[4] To date, over a dozen individuals and organizations have been contacted by Dorland, an assault which she continues by Dorland's recent contacts of present and even retired staff of the Bread Loaf Writers Conference. As described by *The New Yorker* magazine, Bread Loaf is known in literary and publishing worlds as "the oldest and most prestigious writers conference in the country."

[5] This was done to placate Dorland and was not an admission of any wrongdoing.

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
September 28, 2018
Page 6.

elements of her story for the BBF publication specifically-- including locations in the fictional
story, objects, details, several lines of dialogue, gestures, word choices and the ending.

None of Sonya Larson's efforts appeased Dorland. Dorland next contacted the *Boston
Globe* to further publicize her claim of plagiarism against Ms. Larson, and then made a
professional complaint to GrubStreet, Ms. Larson's employer, repeating her accusation that my
client plagiarized her Factual Letter. Dorland also apparently complained, falsely and
frivolously, that my client did not speak with Dorland at a GrubStreet event, and that she advised
Dorland not to write about certain topics.

Then, on July 3, 2018, obviously realizing that plagiarism is not actionable, you and
Cohen Law ratcheted things up to copyright infringement by sending a letter to the Boston Book
Festival stating that *The Kindest* contains Dorland's Factual Letter "in whole or in part." You
further stated that even without having the benefit of reviewing any revisions that may have been
made to *The Kindest*, "to determine whether any infringement remains," you boldly claimed that
any decision by the BBF to publish the story would infringe Dorland's rights. You then
demanded that the BBF cease and desist from further printing, copying, distributing or
undertaking other activities related to *The Kindest*.

You also said that if the BBF did not supply you with a copy of the revised story within
ten days, you would act to prevent the publication of Ms. Larson's story, and seek damages
under 17 U.S.C. § 504(c), for up to $150,000 in statutory damages.

According to the Copyright Office records, Dorland's Factual Letter was registered as
unpublished text entitled "Dorland kidney chain final recipient letter July 2, 2015," effective
June 10, 2018, under registration number TXu 002101420. As will be shown, the June 10, 2018
date is significant.

Next, on July 20, 2018, Michael S. Hanna of Cohen Law wrote to Attorney Gregorio
expressing a willingness to settle Dorland's claims without a full recovery of damages to which
Dorland claims to be entitled. There appears to have been some discussions with Attorney
Gregorio and with Paul Sennott, BBF's lawyer, of settling Dorland's claims for $5,000 plus
attribution and/or a referral link to a kidney donor site. The discussions did not lead to a
resolution of Dorland's claims for monetary compensation, attribution or the payment of her
legal fees.

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
September 28, 2018
Page 7.

Dorland continued her attack on Ms. Larson by contacting the press where she masterminded a smear campaign against my client by publicly accusing Ms. Larson of plagiarism.[6] This occurred even before the BBF announced that Ms. Larson's story was chosen as the One City/One Story selection. During those initial settlement negotiations, when it became clear that the *Boston Globe* would run the article that Dorland prompted, Mr. Hanna told James Gregorio, Larson's attorney, that if Ms. Larson gave Dorland everything she wants, Dorland would give her "full effort to try to kill the [Globe's] story." After the article came out, Dorland emailed members of Ms. Larson's writing group, accusing them of "complicity" in "artistic betrayal." She continued to contact them through September 2018.

I am told that on August 10, 2018, just as the *Boston Globe* was about to print its second newspaper article about Dorland's plagiarism claims, Hanna called Attorney Sennott and increased his settlement demand to $10,000. At this time, Hanna likely knew that the BBF would be publishing a revised version of *The Kindest*, which the BBF had previously supplied to him, that was rewritten to fully remove any possible offending portions. Accordingly, Hanna knew or should have known that Dorland did not have a cause of action against Larson because her letter was not registered at the appropriate time. The increased demand to $10,000 was apparently the straw that broke BBF's back.

As a direct and proximate result of this and other actions by Dorland, you and Cohen Law, the BBF rescinded its selection of *The Kindest* for fear of being sued by your client.[7] The BBF had already printed 30,000 of *The Kindest* at a reported cost of $13,000, and it was concerned that continuing legal fees, already in the thousands of dollars, would strain its modest budget and jeopardize its existence. The BBF decision had nothing to do with any concern of actual plagiarism or copyright infringement. The decision was based entirely on Dorland's persistence which was aided and abetted by claims of copyright infringement and threats of tens of thousands of dollars in legal fees and damages by you and your office.

Not satisfied with the extensive damage already brought to bear on Ms. Larson, Attorney Hanna again wrote to Attorney Gregorio on September 6, 2018, claiming Ms. Larson continues to infringe Dorland's rights by reproducing the Factual Letter, preparing a derivative copy of the letter, and distributing copies of the letter to ASF, Audible.com, BrillianceAudio.com, and the BBF. Hanna is again seeking damages and attorney's fees for "a full litany of claims" he asserts will be filed against Ms. Larson in Federal Court in Los Angeles.

---

[6] Graham Ambrose, "Inspiration or plagiarism? Writing hackles raised in Boston dispute." *Boston Globe*, July 26, 2018. https://tinyurl.com/ybo3xbl5; Graham Ambrose, "Boston Book Festival cancels One City One Story event amid plagiarism flap." *Boston Globe*, August 14, 2018. https://tinyurl.com/yb6vqgnq.

[7] Emails from Deborah Porter state that the BBF did not want to get sued because the financial risk and burden would cripple the organization.

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
September 28, 2018
Page 8.

In its latest letter, Cohen Law is seeking a judgment for $180,000, which it proposes will be held in escrow to ensure that Ms. Larson will never violate Dorland's rights in the Factual Letter. Hanna is also demanding that Ms. Larson pay Dorland's legal expenses that now amount to $15,000. Hanna's allegations and demands are absurd and completely without merit. It must be noted that *The Kindest* is not presently available in any form from ASF, Audible.com, BrillianceAudio.com or the BBF.

Certainly, Ms. Larson was inspired by Dorland's kidney donation, and she admits that she initially used a few words and phrases that appear in Dorland's Factual Letter in preliminary drafts of her story. However, Ms. Larson's actions do not amount to copyright infringement under any interpretation of the law. There is no one who would ever consider the final version of *The Kindest* that was to be distributed by the BBF to be similar in any respect to Dorland's Factual Letter other than as an idea or a *scene-á-faire*. Dorland is not the only person who has written to their organ recipient and she is still free to write either a fictional or factual account of her kidney donation experience.

I am enclosing for your reference, a copy of the final version of *The Kindest* that was to be distributed by the BBF as the One City/One Story. This is the same version that was previously supplied to Attorney Hanna.

Cohen Law's website says that the firm has extensive experience in handling and litigating intellectual property matters. Accordingly, when you sent a letter to the BBF on July 3, 2018, you knew or should have known that damages under Section 504(c) of the Copyright Act are available only if the provisions of Section 412 of the Copyright Act are satisfied. If any version of *The Kindest* infringed Dorland's rights in the Factual Letter, which we vociferously deny, the registration of the Factual Letter effective June 10, 2018, does not satisfy Section 412, because any perceived infringement of Dorland's Factual Letter occurred years earlier.

The only conceivable reason for including erroneous and unavailable claims for statutory damages and attorney's fees was to pressure the BBF into complying with your unfounded claim of copyright infringement. Agreeing with a client to pursue legally baseless claims merits a cause of action for our client. See Rickley v. Goodfriend, 212 Cal. App. 4th 1136, 1153, 151 Cal. Rptr. 3d 683, 699 (2013) ("A license to practice law does not shield an attorney from liability when he or she engages in conduct that would be actionable if committed by a layperson. An attorney who commits such conduct may be liable under a conspiracy theory when the attorney agrees with his or her client to commit wrongful acts.")

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
September 28, 2018
Page 9.

Furthermore, your latest claim that a lawsuit will be brought in Federal Court in Los Angeles is flagrantly unfounded.  Simply put, California does not have jurisdiction over my client.  Dole Food Co. v. Watts, 303 F.3d 1104, 1110–11 (9th Cir. 2002).  Ms. Larson does not have continuous and systematic contacts with California and all relevant acts, and most potential witnesses are located in Massachusetts.  If you bring any action against Sonya Larson in California, we will seek an immediate dismissal for lack of jurisdiction. We will also seek attorney's fees and costs, which under the circumstances, we are confident that any court will be eager to award.

We believe that your actions and those of Cohen Law far exceed the bounds of zealous representation of a client.  Although we dispute every notion of copyright infringement by Ms. Larson, Dorland would, at a maximum, be entitled only to her actual damages and any profits that Ms. Larson earned from any infringement of the Factual Letter.

It is a mystery exactly how Dorland was damaged.  Ms. Larson simply took a factual letter written by a kidney donor that was posted on a group Facebook page without a copyright notation, used it as inspiration for a fictional letter, and used that fictional letter as a small set-up for a fictional encounter between a Chinese-American kidney recipient and a white donor.  That Ms. Larson may have initially used a few words and phrases in her fictional story that are included in the Factual Letter will not support an award of anything other than nominal damages at best.

Furthermore, my client's gross receipts from *The Kindest* amounted to $425.  Since the word count for the letter which is part of the story is less than 5% of the total word count of the story, Dorland's profit damages might amount to $21.25 (5% of $425 = $21.25).  Damages at this level do not warrant your intentional interference with my client's relationship with the BBF, which resulted in the loss of the prestige and notoriety she would have received if her story was distributed by the Boston Book Festival.  Additionally, it absolutely does not merit the contact with Bread Loaf, Larson's writing group, GrubStreet, or the more than a dozen other people and organizations that Dorland contacted.

We contend that your inflated claims for damages and attorney's fees, and your failure to articulate reasonable demands on behalf of Dorland in light of the limited damages available for any perceived copyright infringement under the facts presented, resulted in the BBF withdrawing its use of *The Kindest* from the One City/One Story project.

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
September 28, 2018
Page 10.

The BBF clearly stated that it only pulled Ms. Larson's story because the BBF did not want to get sued. The BBF has limited financial resources and it did not want to incur legal expenses in fighting Dorland's claims. Your actions and that of Cohen Law in making unsupportable claims, misrepresenting the facts, and deploying overly aggressive and coercive correspondence with the BBF was calculated to cause damage to my client. Furthermore, these actions contributed directly in the decision by the BBF to pull *The Kindest* from the One City/One Story project. The combination of your letters and your exaggerated and unsupported monetary demands surpasses the bounds of zealous advocacy, and amount to an interference with Larson's advantageous contractual relationships with the BBF for which Sonya Larson is entitled to substantial damages for the irreparable injuries to her reputation and her career.

The totality of circumstances including the combination of Dorland's unrelenting, multifaceted campaign to damage and defame Sonya Larson's reputation and career, your letter and the letters and demands of Michael Hanna of Cohen Law consisting of wholly insupportable claims and demands that further Dorland's defamatory behavior, are evidence of outrageous conduct that constitutes a violation of Massachusetts General Laws, chapter 93A. See Kattar v. Demoulas, 433 Mass. 1, 12–13 (2000) (Chapter 93A is "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). The relief available under c. 93A is "sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action." Id. at 704. It "mak[es] conduct unlawful which was not unlawful under the common law or any prior statute." Commonwealth v. DeCotis, 366 Mass. 234, 244 n. 8 (1974). Thus, a cause of action under c. 93A is "not dependent on traditional tort or contract law concepts for its definition." Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 626 (1978). See Nei v. Burley, 388 Mass. 307, 313 (1983) ("[A]nalogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many of the essential elements of those common law claims").

Under Massachusetts Law, you have thirty (30) days from receipt of this letter to answer the allegations herein and provide a reasonable explanation for your actions or make a reasonable settlement offer, failing which, my client can file an action in court in which she will be seeking up to three times her damages plus attorney's fees. Cassano v. Gogos, 20 Mass. App. Ct. 348, 350-53 (1985); Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 802-03 (1976); (Defendants who make a timely and reasonable offer of settlement limit the scope of possible damages). Failure to provide a reasonable settlement offer may allow the plaintiff to receive treble damages. Loddie v. Anton's Cleaners, 1993 Mass. App. Div. 29 (defendant's offer of only $100 for mink coat valued at $4,000 was made in bad faith, therefore damages were trebled).

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
September 28, 2018
Page 11.


I urge you to respond to this letter within thirty days of receipt.

Very truly yours,

Andrew D. Epstein

ADE/d

cc: James A. Gregorio, Esquire

# Exhibit O

# COHEN
BUSINESS
LAW
GROUP

A Professional Corporation

**Attorneys**
Jeffrey A. Cohen
Michael S. Hanna
Nuzayra J. Haque

**Of Counsel**
J. Eric Kirkland
Bennet G. Kelley

**Los Angeles Office**
10990 Wilshire Blvd., Suite 1025
Los Angeles, CA 90024
Telephone: (310) 469-9600
Facsimile: (310) 469-9610

**South bay Office**
2321 Rosecrans Ave., Suite 3225
El Segundo, CA 91423
Telephone: (310) 906-1900
Facsimile: (310) 906-1901

October 26, 2018

Andrew D. Epstein
Barker, Epstein & Loscocco
176 Federal Street
Boston, MA 02110

Via Email and U.S. Mail
photolaw@aol.com

**SETTLEMENT DISCUSSIONS - CA EVID CODE §§1152, 1154 and F.R.C.P §408**

Re: **Response to Demand Letter and Mass Gen Laws c 93A Demand**

| | |
|---|---|
| Our Client: | Dawn Dorland |
| Infringing Author: | Sonya Larson |
| US. Copyright Reg. No. | TXu002101420 |
| Copyrighted Work: | "Dorland Kidney chain final recipient letter July 2, 2015" by Dawn Dorland (The "Work") |
| Infringing Content: | Portions of "The Kindest" by Sonya Larson |
| Our File No.: | 7277.001 |

Dear Mr. Epstein:

We are in receipt of correspondence from you directed to the undersigned dated September 28, 2018, and correspondence from you directed to our client, Dawn Dorland, dated September 27, 2018. This correspondence shall respond to both letters (collectively the "Letters").

**Massachusetts State Bar Rules Violation**

Despite your awareness that this office is counsel for Dawn Dorland, you still chose to make a direct communication with our client by writing her on September 27, 2018 about the subject of our representation, without obtaining our consent to do so, an act in violation of Massachusetts Rules of Professional Conduct § 4.2, which for your reference states:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

**TRANSACTIONS AND LITIGATION**
| BUSINESS | CORPORATE | INTERNET & TECHNOLOGY | INTELLECTUAL PROPERTY | DATA BREACH | NEW MEDIA |

Andrew Epstein
October 26, 2018
Pg. 2

At no time has this office ever granted consent for you or your firm to communicate directly with our client, and your actions are a direct violation of § 4.2. We take this violation very seriously and require your immediate assurance that this will not occur again.

**Settlement Discussions**

Firstly, you have completely misrepresented the Cease and Desist letter sent to your client's attorney on or about September 6, 2018 (the "C&D Letter"). While we had the decency to send the letter to your client's prior counsel and provide you with a courtesy copy once we were made aware of your involvement, you chose to contact our client directly in response, and in doing so you have either misunderstood or misread the letter, or you are intentionally attempting to create a misleading record.

Despite the inaccurate and misleading summary set forth in your letter, the C&D Letter from this office was sent to your client's prior counsel demanding that your client immediately cease and desist the continued intentional violation of our client's rights in connection with the work **"Dorland Kidney chain final recipient letter July 2, 2015"** by Dawn Dorland bearing Federal Copyright Registration Number TXu002101420 (the "Work"). Even a cursory review of the C&D Letter establishes that the C&D Letter is well taken in all respects. That letter makes the following points:

1. Our client created and published the Work on or about July 2, 2015.
2. Your client has republished a derivative work in violation of the rights of our client wherein she has reproduced nearly identical portions of the Work in her publication entitled "The Kindest".
3. Your client, knowing that she had acted improperly, entered into various agreements with AmericanShortFiction.org, Audible.com and BrillianceAudio.com and the Boston Book Festival to publish the Kindest, in violation of the rights of our client without any attribution or authorization.
4. Your client has taken steps to publicly display The Kindest featuring the Work on various publicly available websites.

Furthermore, your letter to this office adds the following to the analysis:

1. You have expressly admitted both access to the Work and actual copying.
2. Your client has publicly displayed The Kindest in a manner that was close enough to the Work, and sufficiently identified the Work, that at least one member of the public at the performance saw fit to contact our client and inform her.
3. You appear to admit "plagiarism" standing on the belief that it is not actionable.
4. You admit that The Kindest was "inspired by" the Work and you have confirmed that she "admits that she initially used a few words and phrases that appear in" the Work.
5. Numerous other previously unknown factual statements beneficial to any case against your client.

///
///
///

The C&D Letter demands the following:

1. A stipulated judgment in the amount of $180,000.00 to be held and not filed unless your client violates the terms of a settlement agreement to be drafted and agreed between the parties;
2. Assurance that your client agrees to cease and desist of and from any further violation of our client's copyrights with respect to the Work or anything derivative thereof in "the Kindest" or any other publication;
3. Reimbursement of actual legal expenses incurred by our client as the result of the Larson infringement; and
4. Other terms typical for a settlement agreement of this type.

The prior demand expired on its own terms September 16, 2018 after it was not accepted. There has been no counter offer until your Letters. Please be advised that based upon the failure to accept this demand, it is hereby withdrawn.

Notably missing from the C&D Letter is the fact that there is no compensatory demand other than the request that our client be reimbursed her actual fees incurred as the direct result of your client's actions and her refusal to act reasonably upon first being contacted, and as was suggested by the Boston Book Festival, who in their wisdom attempted to mediate this dispute between the parties – which failed because your client refused to engage in reasonable discussions. The request for a non-entered stipulated judgment is preventative only.

Contrary to your letter, there is no claim of any entitlement to statutory damages for any publication occurring prior to the Work's registration date. There is, however, a demand that your client not take further steps to violate Dorland's rights which would absolutely be entitled to statutory damages at the highest given her obvious awareness of her infringement as made clear by her proposals to BBF as we negotiated a solution to the problem created by your client and as made clear by the admissions in your letter.

**Legitimate Copyright Claims**

Your position fails to recognize our client's legitimate rights. In order for our client to prevail in the present claim against your client, she need only establish (1) ownership by the plaintiff of a protectible property interest; (2) unauthorized copying of the material by the defendant; and (3) damage resulting from the copying." Golding v. R.K.O. Pictures, Inc., 35 Cal.2d 690, 694, 221 P.2d 95 (1950). Your letter and the communications from your client to our client, the Boston Book Festival, and others establishes without any shred of doubt the first two elements. Your letter appears to focus solely upon the issue of damages, asserting that she is not entitled to statutory damages.

However, this argument is fatally flawed for several reasons. Ms. Dorland is and will absolutely be entitled to statutory damages as the result of your client's conduct after her registration – as we have made clear in our C&D Letter. Your client is on notice of our client's claim of right, and if she continues to disregard our client's rights, we will take steps to require your client's cooperation and collect damages for her willful infringement in the range of $180,000.00 per intentional infringement.

Andrew Epstein
October 26, 2018
Pg. 4

Should your client agree to provide her assurances that she will stop infringing on our client's rights to the Work, there is still the question of your client's past infringement. Whether our client is entitled to statutory damages or not, and even if all she is entitled to is actual or even nominal damages, our client is still entitled to those, plus attorney's fees, costs and potentially exemplary damages, which we would assert should be measured by the applicable measure of statutory damages.

Furthermore, there are other causes of action reserved in the C&D Letter which could and will result in additional claims under state and/or Federal law including but not limited to California Business and Professions Code §17200 for your client's unfair and unlawful competition in publishing the Work, depriving our client of the methodology and timing of how, when, and where to publish and display her work. Given the astounding reasonableness of the existing demand, we do not see it as necessary to go into the full extent of all claims against your client at this time. What we have presented is far more than sufficient.

## Massachusetts General Laws c. 93A

Your effort to invoke inapplicable Mass. Gen. Laws. c.93A is absurdly inapplicable, not only from a jurisdictional standpoint but also from a factual one. Your use of the obviously pre-drafted canned paragraphs in your letter which contain errors and mis-citations causes one to wonder whether you have ever bothered to read the cases that you cited. In the event that you have not done so, please be aware that those cases deal with factual situations which are highly factually distinct from anything even alleged in the present case. We suspect this firm is not the first to be blessed with this exact language from your office. If you take the time to understand 93A, you will see that it applies where there is bad faith effort to refuse to engage in good faith discussions toward "damage control" in the exact situation that your client has caused here. The purpose of the C&D Letter was to encourage your client to stop violating the rights of our client – in good faith – in an effort to try to avoid having to secure her cooperation by way of court order. The C&D Letter is precisely what your 93A statute is intended to encourage – good faith discussions about a solution to the problems that she has created for our client.

Your client is fully aware that the initial conversations with your client sought simply an attribution. Your client's bad faith refusal to acknowledge her wrongdoing have led us to the point where our client has had to request reimbursement of her expended fees – which your client has also refused – at least to this point. In fact, casting stones with regard to your c.93A statute is particularly unwise since it is your client and your letter that in reality are in violation of c.93A. You have in your possession a legitimate demand letter in the form of a request that your client cease and desist from further violation of our client's rights. Your response letter is exactly what cases like Lodie v. Anton's Cleaners 1993 Mass. App. Div. 29 (cited in your letter as "Loddie") are intended to address in finding that c.93A is applicable. That case was not as much about the 100 offers in response to 4,000 losses, but the fact that Anton's Cleaners, in bad faith, sought to enforce a release on the back side of the ticket that the plaintiff's mother would never have even had a chance to read. This is much like your position that despite your client admitting accessing and actual copying of a portion of the Work, that your client bears no responsibility for the damages that she has caused. We would point out that your response is far more in violation than the C&D Letter could ever be characterized – even were it to be mischaracterized as you have attempted to do.

Andrew Epstein
October 26, 2018
Pg. 5

Your position seems to be one of "the best defense is a good offense"; lacking any meritorious defense for the actions of your client and seeing all of the elements of an action for copyright infringement laid out in front of you, you have chosen to attack the messenger. Neither our client, Ms. Dorland, a selfless, anonymous kidney donor, nor this firm, bears any responsibility for your client's wrongs. Rest assured that if we cannot reach a reasonable settlement, that our client's rights will be protected.

Rather than continue any discussion regarding your client's nonsensical, non-existent claims against our client arising out of the C&D letter, we suggest that you focus upon your further compliance with your own State's state bar rules, and seeing what you can do to provide a response to our C&D letter which is both reasonable and complies with your rule c.93A.

### Jurisdiction

Finally, the only appropriate jurisdiction applicable to the dispute between our clients as to your client's infringement of her copyright is California, with the appropriate venue being Los Angeles. If we cannot reach a resolution, which we encourage your client to take very seriously, this is legitimately where we intend to proceed, and your letter contains no legitimate position to the contrary. Rest assured that if you decide to file any claim in Massachusetts involving this firm or our California resident client, we will swiftly move to dismiss your suit for lack of jurisdiction and seek attorneys' fees and costs as well as treble damages under your c.93A statute.

### Further Discussions

Should you be interested in a serious conversation about resolution of this matter involving your client's enforceable assurances that she will cease and desist of and from any further infringement and reimburse the costs our client has had to incur thus far in this matter, please let us know. Otherwise, please understand that we intend to proceed accordingly to protect the interests of our client, those of this firm and its attorneys. I would suggest that rather than exchanging any further "saber rattling" letters, that we set up a call, a mediation, an arbitration, or some other effort to try to resolve this matter for our respective clients. If that is not to be, that is ok too.

The forgoing is not intended to be a full litany of all rights that our client may have. Nothing contained herein, or not expressly included, should be taken as a waiver of any other rights that our client may have, and all such rights are expressly reserved. Please do not take our expression of continued willingness to reach a resolution with your client as a sign of weakness - as that would be an error. We look forward to hearing from you accordingly.

Very truly yours,

COHEN BUSINESS LAW GROUP
A Professional Corporation

JEFFREY A. COHEN

JAC/nk
L-Epstein 20181015.3

# Exhibit P

**Barker, Epstein & Loscocco**
176 Federal Street
Boston, Massachusetts 02110
----------
(617) 482-4900
FAX: (617) 426-5251

Andrew D. Epstein
Photolaw@aol.com

November 7, 2018

**Via Email: jac@cohenblg.com and U.S. Mail**

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
10990 Wilshire Boulevard, Suite 1025
Los Angeles, CA  90024

**Re: Dawn Dorland and Sonya Larson**

Dear Mr. Cohen:

I received your letter dated October 26, 2018.  Unfortunately, your letter fails to address numerous issues that are disputed between Sonya Larson, Dawn Dorland, and your office.

First, I want to address your claim that I violated Massachusetts Rules of Professional Conduct, Rule 4.2.  I assure you that I did not.  Comment 4 to Rule 4.2 specifically allows an attorney to communicate with a represented person in order to send written demands required by statutes such as Mass. Gen. Laws Chapter 93A.  I am enclosing for your reference a copy of Massachusetts Rule 4.2 together with the Comment 4 to official Editor's Notes.

Second, your letter fails to address the fact that Ms. Dorland is entitled to neither statutory damages nor attorney's fees under the Copyright Act.  Any alleged infringement by Ms. Larson occurred before Ms. Dorland registered the copyright to the "Dorland Kidney Chain Final Recipient Letter July 2, 2015."

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
November 7, 2018
Page 2.

If, as you claim, the Kidney Recipient Letter was posted on July 2, 2015, registration was not made until June 10, 2018. Section 412 of the Copyright Act does not permit recovery of any statutory damages or attorney's fees for works that were registered with the Copyright Office after an alleged infringement. There is absolutely no statutory basis for your request that Ms. Larson reimburse Dorland for her legal fees. Latin Am. Music Co. v. Am. Soc'y Of Composers, Authors & Publishers (ASCAP), 642 F.3d 87, 90 (1st Cir. 2011) (Section 412 only applies to plaintiffs who assert copyright infringement claims and not to defendants who successfully defend against such claims).

Third, my client had no obligation to acknowledge Ms. Dorland's letter in her short story. Sonya Larson agrees that she read Dorland's letter and took a few notes about the letter. She did not copy the letter, nor was the fictitious letter within the copy of The Kindest slated for distribution by the Boston Book Festival (BBF) in any way similar to Dorland's factual kidney recipient letter.

Fourth, your contention that a member of the public heard Ms. Larson read a portion of her story at a Boston bookstore and contacted Dorland is misguided. Ms. Larson did not include any element of her fictitious letter in that public reading. The member of the public who contacted your client did so only because the story was about a kidney donation.

Fifth, you seem to equate plagiarism with copyright infringement. Plagiarism is not actionable. As you well know, to prove copyright infringement, a party must prove access to the original work and substantial similarity between the original work and the copy. In all of Ms. Dorland's many attempts at damaging my client's reputation and career, at no time has she demonstrated where there is substantial similarity between Dorland's letter and the letter in Ms. Larson's story.

Sixth, there is nothing in the Boston Book Festival (BBF) version of The Kindest that would infringe Dorland's Kidney Recipient Letter in any respect. I sent you a copy of the BBF version of The Kindest so that you could see this for yourself. Again, your client is not entitled to statutory damages or attorney's fees for the BBF version of the story even if there was substantial similarity. The most Dorland would ever be entitled to recover are her actual damages (which will likely be nominal) and a possible small share of any profits earned by Ms. Larson. Accordingly, I have advised Ms. Larson to continue to market and publish the latest version of The Kindest without fear.

Jeffrey A. Cohen, Esquire
Cohen Business Law Group
November 7, 2018
Page 3.

Seventh, not only does your claim for $180,000 in attorney's fees exceed the statutory maximum imposed by Section 504(c) of the Copyright Act, I repeat again that such damages are not even available to your client. Also, your additional claim to exemplary damages is clearly not an option under the Copyright Act since the Federal law preempts damages under all state laws.

Eighth, I presented claims against Dorland and your office for defamation and intentional interference with Ms. Larson's contractual agreement with BBF. You completely ignored the claims. Clearly, Ms. Larson was damaged by your actions and those of your client. In fact, over a dozen organizations and individuals that Dorland contacted have sent us ample evidence of Dorland's defamatory behavior and have expressed disgust at her conduct. There was no reason for Dorland to make repeated false claims other than to damage Larson's reputation and career.

Dorland and your office were informed on July 16, 2018 in a letter from Attorney James Gregorio, that claims of defamation and interference with contractual relations *would* arise should your repeated demands cause the BBF to break its contract with Larson. This is exactly what happened.

You asked Ms. Larson to cease and desist from "further infringement" of Dorland's copyright to the Kidney Recipient Letter and that my client reimburse your client for her attorney's fees. You have failed to establish that there ever was infringement of Dorland's factual letter. Certainly, there is nothing in the BBF version of *The Kindest* that was sent to you that infringes your client's Kidney Recipient Letter. The only conceivable similarity is that both Ms. Larson's fictitious letter within her story and Doland's letter are about kidney recipients. This is minor similarity at best, not substantial similarity. Also, as I have said numerous times, there is no basis for Dorland to claim statutory damages or attorney's fees under the Copyright Act.

While I am amenable to serious conversations about resolving this matter, I see no reason to do so unless the numerous allegations in my September letters to you and your client, and in this letter are thoroughly addressed. Unless you address these issues, there is nothing to discuss.

Very truly yours,

Andrew D. Epstein

ADE/d

## Massachusetts Rules of Professional Conduct (Mass.R.Prof.C.), Rule 4.2

### Rule 4.2. Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

## Editors' Notes

### COMMENT

[4] This Rule does not prohibit communication with a represented person, or an employee or agent of such a person, concerning matters outside the representation. For example, the existence of a controversy between a government agency and a private party, or between two organizations, does not prohibit a lawyer for either from communicating with nonlawyer representatives of the other regarding a separate matter. Nor does this Rule preclude communication with a represented person who is seeking advice from a lawyer who is not otherwise representing a client in the matter. Parties to a matter may communicate directly with each other, and a lawyer is not prohibited from advising a client concerning a communication that the client is legally entitled to make. A lawyer may not, however, make a communication prohibited by this Rule through the acts of another. See Rule 8.4(a). **Also, a lawyer having independent justification or legal authorization for communicating with a represented person is permitted to do so. For example, counsel could prepare and send written default notices and written demands required by such laws as Chapter 93A of the General Laws.**