UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

SONYA LARSON

                Plaintiff,

v.

DAWN DORLAND PERRY, et al.

                Defendants.

Civil Action

No. 1:19-cv-10203-IT

**PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS OF DEFENDANT,
DAWN DORLAND PERRY,
AND MEMORANDUM IN SUPPORT THEREOF,
SUPERSEDING THE OPPOSITION AT DOCKET NO. 29**

**<u>Plaintiff, Sonya Larson Requests Oral Argument</u>**

Plaintiff, Sonya Larson ("Larson") opposes Defendant, Dawn Dorland Perry's Partial Motion to Dismiss (Dkt. No. 25), and submits this revised memorandum in place of her previously filed opposition at Docket No. 29. Defendant, Dawn Dorland Perry will hereinafter be referred to as "Dorland." As grounds for this Opposition, Larson states as follows:

Dorland's Motion is related to a pending Motion to Dismiss (Motion at Dkt. 11 & Memo at Dkt. 12) filed in this Action by Defendants, Cohen Business Law Group, LLC and Jeffrey A. Cohen (hereinafter collectively, the "Law Firm"). While the legal bases for Dorland's Motion to Dismiss (Dkt. No. 25) are different from the Law Firm's Motion, most of the relevant facts are the same. Plaintiff refers to the court to the Amended Complaint and to her Opposition to the Law Firm's Motion to Dismiss for a complete recitation of facts relevant to this Opposition.

1

**A.      Legal Standard to Survive a Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v Twombly, 550 U.S. 544, 570 (2007)).  In ruling on a motion to dismiss, a court must accept as true all well-pled facts alleged in the complaint and "in the light most favorable to the nonmovant and draw all reasonable inferences therefrom." In re: Loestrin 24 Fe Antitrust Litigation, 814 F.3d 538, 549 (1st Cir. 2016) (citations omitted).  The court must accept all factual allegations in the complaint in plaintiff's favor. Langadinos v. American Airlines, Inc., 199 F.3d 68, 68 (1st Cir. 2000). "The question confronting a court on a motion to dismiss is whether *all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 14–15 (1st Cir. 2011)

In addition to the complaint, a district court considering a Rule 12(b)(6) motion may also consider "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (citation omitted).  See also, Jovani Fashion, Ltd. v. Cinderella Divine, Inc., 808 F.Supp.2d 542, 545 (S.D.N.Y. 2011) (courts may also consider "documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit...."

**B.**   **Larson is the author of a critically acclaimed short story called, *The Kindest*, which is about a woman who meets her anonymous kidney donor.**

Larson is the author of a short story entitled, *The Kindest*.[1]   *The Kindest* is a story about relationships centered around the donation of a kidney made anonymously by a wealthy, white, female donor to a poor Chinese-American female recipient.  [Am. Compl. ¶ 18]  *The Kindest*, hereinafter the "Short Story" or the "Story," has received wide-spread acclaim and was published as an audio book, an on-line book, and in print.  [Am. Compl. ¶¶ 28, 30-1].  Larson's Story also won a prestigious competition in 2018, through the local non-profit Boston Book Festival, Inc. (the "BBF"), and was to have been extensively distributed at the BBF's premier event through a program called "One City/One Story."  Over 30,000 copies of the Story were printed and were to have been distributed to BBF members, festival participants, local libraries and participating businesses.  [Am. Compl. ¶¶ 34-36]

**C.**   **Dorland claims to be an anonymous kidney donor.**

Dorland claims to be an anonymous kidney donor, who in 2015, posted a letter on her Facebook page that she either sent or intended to send to the recipient of her kidney.  In the letter, Dorland introduces herself, explains why she donated her kidney, and asks to meet her recipient.  [Am. Compl. ¶ 9-12]

**D.**   **Three variations of *The Kindest* were published.**

Three versions of *The Kindest* were published.  Each version contains a letter from the kidney donor to her recipient.  Larson uses the letter as a literary device to introduce a new

---

[1] A copy of *The Kindest* is attached to the Amended Complaint as Exhibit F.  *The Kindest* was registered with the U.S. Copyright Office <u>before</u> this Action was filed and it was given Registration No. TX-8-678-446, effective December 17, 2018.  A copy of the Certificate of Registration is attached to the Amended Complaint as "Exhibit G."

3

character.  Larson's letter is not the central focus of her Story.  [Am. Compl. ¶ 19]   Each of the three variants reflects the natural progression of Larson's writing style; constantly modifying, changing and improving on her narrative.  (Am. Compl. ¶ 29)

Larson maintains that focusing on the letter in *The Kindest* is like losing sight of the forest for the trees.  Larson's letter is only a small part of *The Kindest* and was used simply to introduce a new character.  Dorland's 2015 Letter is 381 words long and the three variations of the letter that Larson used in the subsequent iterations of her Story are all shorter.  Compare the length of Dorland's letter (Exhibit A to the Am. Compl. -- 381 words) with *The Kindest* (Exhibit F), which contains 5,514 words.  (See "Exhibit A" attached hereto; hereinafter referred to as "Larson Aff." ¶ 1).

The concept or idea of writing a letter to a kidney recipient is hardly an original idea, perhaps not even one that is capable of being copyrighted.[2]  Johnson v. Gordon, 409 F.3d 12, 19 (1st Cir. 2005) ("copyright law protects original expressions of ideas but it does not safeguard either the ideas themselves or banal expressions of them"); Matthews v. Freedman, 157 F.3d 25, 27 (1st Cir. 1998) ("A major limitation on what is protectible under the copyright laws is capsulized in the notion that copyright protects the original expressions of ideas but not the ideas expressed.")  (Harney v. Sony Pictures Television, Inc., 704 F.3d 173 (1st Cir. 2013) (No infringement claim lies if the similarity between two works rests necessarily on non-copyrightable aspects of the original.) (Williams v. Gaye, 895 F.3d 1106, 1120 (9th Cir. 2018) (Distinguishing between "broad" and "thin" copyright protection based on the "range of

---

[2] See, for example, https://www.kidney.org/atoz/content/writing-to-transplant-recipients-guide-donor-families-and-living-donors.  Other letters can be found by doing a Google search using phrases such as, "Letters form organ to anonymous recipients," and "letters to recipient of organ donations".

expression" involved.  If there is only a narrow range of expression, then copyright protection is "thin" and a work must be "virtually identical" to infringe.)

Even if a few specific words across Larson's and Dorland's letters are similar, the use of the words was likely transformative and therefore, not infringing.  Where something new is added to the original work with a further purpose or a different character, altering the first with new expression, meaning or message, the use is a transformative fair use.  Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 185 (D. Mass. 2007)

**E.      When Dorland heard that Larson wrote a story about a kidney donation, and long before she knew the Story contained a letter from the donor to the recipient, Dorland began to hound Larson about her Story.**

Dorland heard that Larson wrote a story about a kidney donation after Larson gave a reading from a portion of *The Kindest* at a Boston bookstore on June 22, 2016.  [Am. Compl. ¶¶ 21-2].  Once Dorland learned about the subject of Larson's Story, and before the Story had even been published, Dorland began to hound Larson with emails and text messages insinuating that the Short Story in its entirety was based on Dorland's "life experiences" and "personal narrative."  [Am. Compl. ¶ 23, and Dorland Memo (Dkt. 26, pp. 1 & 7].  Dorland claimed that Larson had no right to fabricate a fictional story about a kidney donation without consulting Dorland on the basis that they were "friends."  [Am. Compl. ¶ 24].  Dorland insisted on an apology and threatened to write about Larson in a memoir or essay.  Even though Larson's Short Story was fiction, Dorland obviously felt very threatened by someone she knew who was writing about what Dorland perceived to be her personal and "unique" experience as an organ donor. (Am. Compl. ¶¶ 25-26).  While Dorland's gift of a kidney was a kind deed, it was hardly unique.

**F.      Dorland began a relentless campaign to disparage and cause damage to Larson by contacting ASF, the BBF and other writer's groups and conferences.**

The Amended Complaint further alleges that Dorland later called and emailed ASF, the BBF, GrubStreet (Larson's employer), members of Larson's writing group, and the Bread Loaf Writers' Conference, a prestigious and influential writer's organization ("Bread Loaf"), often multiple times each day, and accused Larson of plagiarism.  Dorland complained that Larson's Letter was a "paraphrase" of Dorland's Factual Letter, and that Larson received a prestigious fellowship to Bread Loaf using Dorland's "plagiarized" Factual Letter in Larson's Short Story. [Am. Compl. ¶¶ 37-41]  Dorland demanded at different times, a citation for the authorship of Dorland's Factual Letter, that Larson's Short Story be pulled from ASF and the BBF in its entirety, that ASF publish one of Dorland's essays instead of Larson's Work and/or that she be paid considerable damages.  (Am. Compl. ¶ 39)  Neither ASF nor the BBF acquiesced to Dorland's demands [Am. Compl. ¶¶ 59, 67], although ASF did remove the story from its website [Am. Compl. ¶ 67] and the BBF ultimately decided to rescind the use of *The Kindest* as the winner of its One City/One Story competition.  [Am. Compl. ¶ 57].

Dorland also made the utterly false claim to Bread Loaf that Larson's fellowship application contained plagiarism, starting with an email titled, "Plagiarism in Tuition Fellow's 2017 Application."  Dorland's claim was baseless since Larson did not include *The Kindest* in her application to Bread Loaf.  [Am. Compl. ¶ 41].

Dorland's actions in making claims of plagiarism and sending aggressive and coercive correspondence to ASF, the BBF and others without just cause were calculated to cause damage to Larson and did interfere with her contracts with these organizations.  [Am. Compl., Count I, ¶¶ 61-68; and Count II, ¶¶ 69-76]

**G.      Dorland set out to damage Larson's reputation by accusing her of plagiarism within the writing community by contacting Larson's employer, writer's groups and publishers.**

Larson's Amended Complaint clearly states that Dorland contacted various third parties, including Larson's employer, several writers' conferences and publishers and accused Larson of plagiarism.  (Am. Compl. ¶¶ 37-41).  Larson contends that these contacts, made both orally and in writing, caused damage to her reputation within the writing community.  The assertions of plagiarism and threats to sue for significant damages eventually led to the withdrawal of *The Kindest* from the ASF website, and the decision by the BBF to forgo its use of Larson's Short Story in its annual One City/One Story project. (Am. Compl. ¶¶ 67, 75).

Several courts have acknowledged that there is no question that an allegation of plagiarism is damaging to a writer.  (Roberts v. Columbia Coll. Chicago, 821 F.3d 855, 864 (7th Cir. 2016)) (plagiarism is considered by most writers, teachers, journalists, scholars, and even members of the general public to be the "capital intellectual crime."  Plagiarism is considered an egregious and serious offense.)  Buckley v. Littell, 529 F.2d 882, 884-885 (2nd Cir.1976) (stating or printing that a journalist is a "fascist" is a statement of opinion and not an actionable assertion of fact.  However, stating that that journalist committed plagiarism or lied about certain people does constitute an actionable assertion of fact.)

**H.      In Massachusetts, all libel is actionable per se, while slander is actionable if it prejudices or tends to prejudice a plaintiff in their office, profession or business.**

In Sharratt v. Housing Innovations, Inc., 365 Mass. 141 (1974), Massachusetts joined other states in holding that all libel is actionable per se.  The "words need not hold a plaintiff up to ridicule or damage his reputation in the community at large, or among all reasonable men.  It is enough that they do so among 'a considerable and respectable class' of people."  Id. at 145.

While under Massachusetts' law, words spoken orally may not be actionable per se, they are actionable if they charge a person with a crime, or state that he or she is suffering from certain diseases, or prejudice him or her in his office, profession or business. (Sharratt, 365 Mass. at 147, note 1.) Dorland has certainly committed the "capital intellectual crime" by accusing Larson of plagiarism, thus causing damage to Larson's writing career by impugning her professional integrity, honesty and reputation in the writing community.

The general damages recoverable in a defamation action are those naturally and necessarily flowing from the wrong. They include compensatory damages for actual injury and harm to a plaintiff's reputation, as well as for mental pain and suffering. These elements of recovery are based on the harm which the law assumes is done by defamatory words. Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 860 (1975).

**I.      Larson did not monopolize stories about kidney donors; Dorland is free to write her own story as fact or fiction.**

Dorland contends that Larson took her "specific life experience" and used it to fabricate *The Kindest*. (Dorland's Memo, Dkt. 26, p. 1). This is simply not true. There is nothing about Dorland's specific life experience in *The Kindest*. Furthermore, there nothing so special and unique about Dorland's donor experience that would prevent Larson from writing a fictional story about a poor, alcoholic Chinese-American woman who meets her kidney donor. Dorland is not the only person who has ever donated a kidney and Larson is not the only person who has written about kidney donations.[3]

---

[3] A Google search for "books about kidney donations" and "fiction books about kidney donations" results in an abundance of examples.

That Larson uses a letter to a kidney recipient about a quarter of the way into her Story as a vehicle to introduce a new character is not plagiarism.  Larson was simply doing what countless fiction professors, instructors, authors, conference directors, and craft books advise writers to do every day -- to take inspiration from the world and use it to imagine new characters, situations, and worlds.  As with the thousands of fictional stories, novels, and poems published each year in this country, Larson has no legal obligation to create footnotes or pay damages to one of her story's many original sources of ideas and inspiration.[4]

Dorland should be angry at herself for not writing a story about her own donor experience before Larson did.  Frankly, even now, there is nothing that Larson has done that will prevent Dorland from writing about her own specific experience as a kidney donor, if she so chooses.

**J.     Larson admits that she recorded a few thoughts and ideas from Dorland's 2015 Letter.**

That there may be overlap in some of the words in Dorland's 2015 Letter and Larson's letter is not surprising.  Larson admits that she saw Dorland's Factual Letter that Dorland posted on Facebook and found it interesting.  However, Larson did not download or print the Factual Letter but instead recorded a few thoughts and ideas from the letter in her notes for future reference.  (Am. Compl. ¶ 17).

---

[4] Instruction textbooks and manuals for fiction writers suggest numerous ways for writers to find inspiration. See, for example, Naming the World and Other Exercises for the Creative Writer, edited by Bret Anthony Johnston (Random House, 2008), a widely-used college and writer's text.  (See, Larson Aff. ¶ 7)  In this text, writers are encouraged to find inspiration from many sources, such as poems or newspaper stories, [John Dufresne, p. 6]; grocery store receipts, Post-it notes, sorority-rush ratings books, love letters, to-do lists and breakup notes. [Thisbe Nissen, p. 19-20].

Even if some of Larson's words were the same or similar to those in Dorland's 2015 Letter, Larson's use of these words was transformative, and therefore fair use.  <u>Authors Guild v. Google, Inc.</u>, 804 F.3d 202, 214 (2d Cir. 2015) (While recognizing that a transformative use is "not absolutely necessary for a finding of fair use," <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 114 S. Ct. 1164 (1994), explains that the "goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works" and that "[s]uch works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." <u>Id.</u> at 579.  "In other words, transformative uses tend to favor a fair use finding because a transformative use is one that communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge.")

**K.     The first variant of The Kindest was published by Audible.com.  Apparently, it was also published by Brilliance Audio <u>without</u> Larson's knowledge or consent.**

In her Memo, Dorland uses examples of what she says are infringing quotes come from a version of *The Kindest* that appeared on Brilliance Audio (https://www.brilliancepublishing.com).  Under the circumstances, some explanation for this recording is necessary.

Larson gave a literary studio named Plympton, Inc., the right to license *The Kindest* in audible form to Audible.com.  Larson submitted a draft copy of her Story to Plympton for the sole purpose of helping Plympton reach a deal with Audible.  (Am. Compl. ¶ 27).  A copy of the agreement with Plympton is attached to the Amended Complaint as "Exhibit C."  Provision 2.1, states as follows:

Plympton's <u>only use of the licensed rights</u> shall be to make commercially reasonable efforts <u>to sublicense the Audiobook Rights</u> and Associated Electronic Publishing Rights **to Audible.com**, subject to the royalty provisions of Section 5.

[Emphasis supplied]

On July 25, 2018, Larson became aware for the first time that both Audible and Brilliance Audio published a version of *The Kindest*.  (Am. Compl. ¶ 30 and Larson Aff. ¶ 2)  Larson's contract with Plympton was restricted specifically to Audible.  Brilliance was <u>never</u> authorized to publish the Short Story.  Larson has since discovered that Audible and Brilliance are both owned by Amazon.  [See their respective websites at: https://www.audible.com/ and https://www.brilliancepublishing.com/]  Presumably, Audible allowed Brilliance to simultaneous publish Larson's Story.  If this is what happened, Brilliance published an early version of *The Kindest* without Larson's permission or authority.  (Larson Aff. ¶ 3).

If this were not enough, Audible posted the draft version of the Story on its website in downloadable mp3 format and print-on-demand CD format.  When Larson realized what happened in August 2016, she promptly instructed Audible to remove and replace the draft version with the proper version, which it did for the downloadable mp3, but apparently neglected to do for the print-on-demand CD (Larson Aff. ¶ 4). Brilliance apparently neglected to do so as well.  Of course, for her own self-serving purposes, Dorland points out the similarities in her 2015 Letter with the letter from the unauthorized Brilliance draft version of *The Kindest*.

**L.     The timeline for publication of the different variants of The Kindest is important but Dorland's sequence of events is misleading.**

Dorland correctly observes that since 2015, Larson has written or published different versions of *The Kindest* that contain different versions of a letter within her story.  (Dorland Memo p. 4).  However, Dorland's rendition of the relevant timeline of events is misleading.

Larson's first public presentation of a portion of her Short Story occurred on June 22, 2016. Larson read a portion of her Story but did not read from or refer in any way to the letter that was embedded within the Story. Immediately after Dorland was informed by a fellow acquaintance that Larson's Story was about a kidney donation, Dorland began hounding Larson with upsetting emails and text messages, claiming that Larson had no right to write a fictional story involving a kidney donation without consulting Dorland. [Am. Compl. ¶¶ 24-25].

Larson submitted a draft copy of *The Kindest* to Plympton, which Audible accepted for publication as an audio story in December 2015. Larson requested revisions to the submission in May and July 2016. (Larson Aff. ¶ 5). However, on August 3, 2016, by mistake, Audible posted the draft version of the Short Story online instead of the updated version. When it did, Larson immediately notified Audible about its mistake, and Audible replaced the draft copy of *The Kindest* with the correct version. Next, ASF published an in-print version of the Story in August 2017, and an electronic version in May 2018. (Larson Aff. ¶ 5).

As stated, the publication of the Brilliance Audio print-on-demand CD version of the Story was never authorized by Larson. Audible published the correct version of *The Kindest* as a downloadable MP3 audiobook in 2016, but apparently neglected to tell Brilliance to replace the incorrect file for its print-on-demand CD. Brilliance later corrected its mistake after it was notified of the error by Larson on July 26, 2018. (Larson Aff. ¶ 4)

Publication of the Brilliance Audio version of the Story was never authorized by Larson and is clearly contrary to Larson's agreement with Plympton. In any event, Dorland somehow got a copy of the Brilliance Audio version, but she has not said when, how or from whom she got the copy. The *Boston Globe* used the Brilliance Audio version in its story on August 14,

2018.  (See, Compl. Exhibit J).  We do not know when Dorland first saw a copy of the Brilliance Audio version.  This is important.

Dorland accused Larson of plagiarism starting in early June 2018.  Dorland complained to BBF on or around June 6, 2018, ASF on or around June 6, 2018, Bread Loaf (and "other writing conferences") on or around June 7, 2018, and GrubStreet on or around July 3, 2018.  If Dorland did not find the Brilliance Audio version until August 2018, then Dorland had no basis to accuse Larson of being a plagiarist, and certainly not in early June 2018, when she started to make her hurtful accusations of plagiarism and later of copyright infringement.  (Larson Aff. ¶ 6).

Crucially, on or around July 3, 2018, Dorland and her Law Firm were supplied with a copy of the final version of *The Kindest* that the BBF was set to publish shortly thereafter.  They knew that the final version of the Story had no word or phrase in common with Dorland's letter.  (Compare Exhibit A of the Am. Compl. (Dorland's letter) with Exhibit F (the final BBF variant of *The Kindest*).  Dorland and the Law Firm knew full-well that the BBF's publication would not constitute plagiarism or copyright infringement in *any* way, and yet they continued to press their claims and make outrageous demands through September 2018.

**M.      A comparison of the Brilliance Audio version of the letter in *The Kindest* and Dorland's 2015 Factual Letter shows only trivial similarities.**

The introduction that Dorland claims is similar in both letters is pretty basic information. It would be difficult to start a letter from an anonymous kidney donor to her recipient without some kind of introduction.  Dorland's letter then addresses the "dire need for kidneys" while

Larson's letter refers to the "urgent need" for kidneys.  These basic elements are probably not even subject to copyright protection.[5]

Again, Dorland says that she wanted to make an impact on other's lives with only minimal risk to herself.  Larson repeats this sentiment in a slightly different way.  Most people have two healthy kidneys and they need only one of them to survive.  While perhaps not as risk-free as giving blood, kidney donations are likely the most risk-free of all organ donations.[6]

That there are a few words and phrases in the Brilliance Audio version and Dorland's 2015 letter is understandable.  The Brilliance Audio version was posted by mistake and clearly without Larson's permission.  Even if Larson had copied the entirety of Dorland's letter rather than mimicking a few words and phrases, it would be highly improbable that anyone other than Dorland would ever have grasped the significance of the minimal similarities because Larson's letter was used is such a transformative way.

**N.      Larson alleges specific defamatory statements in her Amended Complaint that were published to the writing community.**

Dorland called Larson a plagiarist and published this allegation to Larson's employer and others in her writing community.  (Am. Compl. ¶¶ 37-41)  This allegation damaged Larson's reputation in the community, and her unfounded threats caused ASF to pull the Story, and the BBF to forgo its use of *The Kindest* as its One City/One Story competition winner.  (See *Boston Globe* article of August 14, 2018 attached to the Am. Compl. as Exh. K.)  Whether Dorland was justified or at fault for publicly accusing Larson of plagiarism remains to be established.  Amrak

---

[5] See, for example, http://www.kidneyfund.org/kidney-disease/kidney-donation.html. ("Nearly 100,000 people are on the waiting list for a kidney transplant. Many more people are waiting for a kidney than for all other organs combined. Unfortunately, the number of people waiting for kidneys is much larger than the number of available kidneys from living and deceased donors. You can save a life by being a kidney donor.")

[6] Google "Kidney Donations" for a discussion of the need for and relatively low level of risk for kidney donations.

Productions, Inc. v. Morton, 410 F.3d 69, 72–73 (1st Cir. 2005)  The only question at this juncture is whether Dorland's allegation of plagiarism made against Larson and published to various members of Larson's writing community, including Audible.com, ASF, Larson's employer, Bread Loaf and other writer's groups, is capable of a defamatory meaning.  This threshold question, "whether a communication is reasonably susceptible of a defamatory meaning, is a question of law for the court."  Id.

> A communication is susceptible to defamatory meaning if it 'would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community.'  The communication 'must be interpreted reasonably,' leading a 'reasonable reader' to conclude that it conveyed a defamatory meaning.

Amrak Productions, 410 F.3d at 72 [citations omitted].  (Phelan v. May Dep't Stores Co., 443 Mass. 52, 56 (2004)) ("A threshold issue in a defamation action, whether a communication is reasonably susceptible of a defamatory meaning, is a question of law for the court."  However, "[w]here the communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury.")

Dorland and her Law Firm were given a copy of the final BBF version of *The Kindest* on or around July 3, 2018.  (Am. Compl. ¶ 47)  At this time, Dorland and Law Firm knew that the letter in the BBF version of *The Kindest* (Exhibit F) was in no way similar to Dorland's letter (Exhibit A).  Simply, the BBF version of *The Kindest* did not plagiarize or infringe Dorland's 2015 Letter in *any* way.

Dorland contends that the Larson's letter used in one of the early variants of *The Kindest* mimicked small portions of Dorland's 2015 Letter.  At worst, Larson contends that any similarity was either de minimis or fair use.  This is a matter for the court to determine.  Furthermore, it is highly likely that Dorland's 2015 Letter did not contain sufficient original material to be even

afforded copyright protection.  Nonetheless, Dorland's continuing claims of plagiarism to the

BBF and the *Globe*, and her Law Firm's accusations of copyright infringement to the BBF in its

demand letters from July 3, 2018 through September 2018 (Exhibits H, I, L & M), were utterly

without merit.  (Stanton v. Metro Corp., 438 F.3d 119, 124–25 (1st Cir. 2006) (To prevail on a

claim of defamation, a plaintiff must establish that the defendant was at fault for the publication

of a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the

community, which either caused economic loss or is actionable without proof of economic loss.)

**O.**      **Dorland realizes that she was wrong in characterizing Larson as a plagiarist and she
          is now trying to brand Larson a limited purpose public figure requiring an
          allegation of actual malice.**

Dorland is trying to characterize Larson as a "limited purpose public figure" which

Dorland claims would require an allegation of actual malice in order to prove defamation rather

than just negligence.  "The level of fault required varies between negligence (for statements

concerning private persons) and actual malice (for statements concerning public officials and

public figures)." Ravnikar v. Bogojavlensky, 438 Mass. 627, 630, (2003).

Contrary to Dorland's claim, Larson is not a limited purpose public figure, who

voluntarily injected herself into a particular public controversy.  Larson works for a creative

writing center and she wrote a Short Story that won a contest.  Neither of these things make

Larson a public figure.  It was not until Dorland accused Larson of plagiarism and then contacted

the *Boston* Globe in June 2018 (Exhibit J), to help her broadcast the claim to a huge audience

that Larson came into the public eye.  The *Globe* article was certainly not written at Larson's

suggestion.  Widespread negative publicity is last thing that Larson wanted.

The First Circuit employs a two-pronged test to determine whether a defamation plaintiff

is a limited-purpose public figure.  First, defendant must prove (1) that a public controversy

existed prior to the alleged defamation, and (2) that the plaintiff has attempted to influence the resolution of that controversy.  Alharbi v. Theblaze, Inc., 199 F. Supp. 3d 334, 355 (D. Mass. 2016), citing Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583 (1st Cir. 1980).  In this Action, Dorland is alleged to have defamed Larson before there was a public controversy.  In fact, the public controversy arose when the *Boston Globe* article was published on July 26, 2018. There were allegations of plagiarism made by Dorland before the article was published but there was no public controversy until then.

Dorland argues that Larson voluntarily injected herself into the controversy by granting an interview to the *Globe*.  However, one does not become a public figure merely by defending oneself publicly against accusations. (Pendleton v. City of Haverhill, 156 F.3d 57, 68 (1st Cir. 1998))  The court in Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 19 (1st Cir. 2011) noted that "an individual should not risk being branded with an unfavorable status determination merely because he defends himself against accusations, especially those of a heinous character." Id., 663 F.3d at 19.  Larson was drawn into a controversy orchestrated by Dorland and the fact that Larson tried to defend her reputation by commenting to the press, does not transform her into a limited purpose public figure.

Furthermore, Larson believes that Dorland's accusation of that "capital intellectual crime" known as plagiarism that Dorland broadcasted repeatedly within the writing community and beyond, connotes sufficient malice under any status, public or private, to satisfy the notice pleading requirement set forth in Fed. R. Civ. P. 8.  Larson does not merely allege that Dorland made disparaging statements about her, she accuses Dorland of calling her a plagiarist and then broadcasted this accusation to various members of Larson's writing group, to Larson's employer, to ASF, to BBF, to Bread Loaf, to other writing conferences of similar repute, and the *Globe*.  By

17

the time the *Globe* article was published, Dorland and the Law Firm had been given a copy of

the BBF version of *The Kindest* which contains absolutely nothing that could be perceived as

infringing.  Accordingly, Larson has made sufficient allegations for a reasonable jury to

conclude that Dorland did not act reasonably in verifying the truth of her accusations.  (Jones v.

Taibbi, 400 Mass. 786, 799, (1987)).  Thus, Dorland's Motion to Dismiss Count VII should be

denied.

**P.**     **Dorland's relentless calls and emails to ASF interfered with Larson's contract with ASF and resulted in the removal of *The Kindest* by ASF**

ASF agreed to publish *The Kindest* in its literary magazine and to feature the Work on its

website in 2017.  (Am. Compl. ¶ 28)  (The ASF agreement is attached to the Amended

Complaint as Exhibit D.)  After the Story was published, Dorland contacted ASF and accused

Larson of "plagiarizing" her 2015 Letter in *The Kindest*.  Dorland complained that Larson's

Work was a "paraphrase" of Dorland's Factual Letter, and that Larson "plagiarized" the Factual

Letter in Larson's Short Story.  (Am. Compl. ¶ 37)

Larson further alleges that Dorland relentlessly called and emailed various ASF

employees and board members for weeks making claims of plagiarism and sending aggressive

and coercive correspondence.  (Am. Compl. ¶¶ 38-41).  ASF told Larson that it did not have the

financial means nor sufficient staff to deal with Dorland's demands, and as a direct and

proximate result of Dorland's demands and actions, ASF in consultation with Larson, decided to

pull *The Kindest* from the ASF website as a result of which Larson lost the benefit of widespread

online distribution. (Am. Compl. ¶ 67).  Larson claims that she was under the impression that her

Short Story would remain on ASF's website for the duration of her copyright.  (Am. Compl. ¶

31).  Therefore, Dorland's motion to dismiss Count I should be denied.

**Q.** ***The Kindest* was chosen as the winner of the BBF contest for its One City/One Story project, and 30,000 copies of the Story were printed and ready for distribution.**

The BBF selected Larson's Short Story as its 2018 One City/One Story winner in June 2018, and the BBF and Larson signed an agreement memorializing the selection of Larson's Story.  (Am. Compl. ¶ 36, Exhibit E)  In the Agreement, Larson granted the BBF a license to publish the Short Story in electronic versions and to print and distribute not more than 30,000 printed copies.  (Am. Compl. ¶ 36)  The agreement says,

> We are pleased to inform you of our decision to publish your piece *The Kindest* (the "Work") as the feature portion of Boston Book Festival, Inc. ("BBF") 2018 *One City One Story* program.

The Amended Complaint alleges that Dorland and her attorneys knew that Larson's Story won the BBF competition.  (Compl. ¶ 38).  Thereafter, Dorland and her attorneys contacted the BBF and frequently made claims of plagiarism and copyright infringement, as well as claims for Statutory Damages and attorney fees that were clearly not available to Dorland under the Copyright Act because Dorland did not register the copyright to her 2015 Letter before any alleged infringement by Larson.  (See, Am. Compl. Exhibit B.)  Dorland and her attorneys made unwarranted demands against the BBF in order to damage Larson and coerce the BBF either to attribute *The Kindest* to Dorland, or ultimately pull *The Kindest* from BBF's One City/One Story project. (Am. Compl. ¶¶ 50, 55).  These actions directly resulted in the BBF's decision to pull *The Kindest* from its One City/One Story project. (Am. Compl. ¶ 57), as a result of which Larson was damaged.  (Am. Compl. ¶¶ 76, 80, 89).

These allegations are sufficient to support Count II for intentionally interfering with Larson's agreement with the BBF to use and distribute *The Kindest* as part of its One City/One Story project.  Therefore, Dorland's motion to dismiss Count II should be denied.

**R.     Conclusion.**

Larson believes that she has included sufficient factual allegations in her Amended

Complaint to demonstrate a plausible entitlement to relief, from which this Court can make

reasonable inferences of liability from the facts alleged, and that Dorland's Motion to dismiss

should be denied.  Larson further requests that  she be awarded her costs and attorney's fees in

defense of Dorland's frivolous and baseless motion to dismiss.


Respectfully submitted,

SONYA LARSON,
By her attorney,

/s *Andrew D. Epstein*
_____

August 22, 2019                          Andrew D. Epstein, Esquire (BBO #155140)
Barker, Epstein & Loscocco
176 Federal Street
Boston, MA 02110
Tel: (617) 482-4900
Fax: (617) 426-5251
Photolaw@aol.com


Certificate of Service


I certify that Plaintiff's Opposition to the Motion to Dismiss of Defendant, Dawn Dorland Perry, and Memorandum in support thereof was filed through the court's ECF system and a copy was sent electronically on the day it was filed to all counsel of record.


*/s/ Andrew D. Epstein*
_____

August 22, 2019                          Andrew D. Epstein