UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SONYA LARSON,

        Plaintiff

   v.

DAWN DORLAND PERRY,
COHEN BUSINESS LAW GROUP, PC and
JEFFREY A. COHEN, ESQUIRE,

      Defendants.

      AND

DAWN DORLAND PERRY

        Plaintiff-in-Counterclaim

  v.

SONYA LARSON

        Defendant-in-Counterclaim

C. A. No.: 1:19-CV-10203-IT

## **DAWN DORLAND PERRY'S ANSWER AND COUNTERCLAIM**

Comes now Dawn Dorland Perry ("Ms. Dorland") and submits this Answer to the Amended Complaint and Demand for Trial by Jury (the "Amended Complaint"). Ms. Dorland responds to said Amended Complaint, paragraph-by-paragraph, as follows:

The initial, unnumbered paragraphs of the Amended Complaint serve as an introduction and do not contain specific allegations, and, as such no response is required. To the extent a response to the introduction is required, those paragraphs are denied.

1.      Ms. Dorland lacks knowledge sufficient to admit or deny the allegations contained in Paragraph 1, and therefore denies same.

2.      Ms. Dorland lacks knowledge sufficient to admit or deny the allegations contained in Paragraph 2, and therefore denies same.

3.      Admitted.

4.      Admitted.

5.      Ms. Dorland admits that she teaches writing workshops in various locations in the United States.  Ms. Dorland denies the remaining allegations contained in Paragraph 5.

6.      Paragraph 6 does not refer to or implicate Ms. Dorland, and therefore, Ms. Dorland offers no response to Paragraph 6.

7.      Paragraph 7 does not refer to or implicate Ms. Dorland, and therefore, Ms. Dorland offers no response to Paragraph 7.

8.      Paragraph 8 does not refer to or implicate Ms. Dorland, and therefore, Ms. Dorland offers no response to Paragraph 8.

9.      Ms. Dorland admits that she donated one of her kidneys in 2015. Ms. Dorland denies the remaining allegations contained in Paragraph 9.[1]

10.      Ms. Dorland admits that she wrote a letter in July of 2015 (the "Dorland Letter"). The Dorland Letter is a document which speaks for itself, and Ms. Dorland denies any and all characterizations of same.  Ms. Dorland denies the remaining allegations contained in Paragraph 10.

---

[1] The header preceding Paragraph 9 is not a numbered paragraph, and therefore does not require a response; to the extent a response is required, Ms. Dorland denies the characterization and/or allegation contained in the header preceding Paragraph 9.

11.     Ms. Dorland admits that she posted the Dorland Letter in a Facebook group in July of 2015.  Ms. Dorland denies that the Facebook group was "semi-public," as it had been designated "private" and "secret," which were the most restrictive designations available at that time according to Facebook policies.  Ms. Dorland denies that there were 250 to 300 people in the Facebook group at the time that she posted the Dorland Letter.  Ms. Dorland further denies that Ms. Larson was added to the Facebook group without her knowledge or permission.

12.     Ms. Dorland admits that one of the purposes of the private Facebook group was to share with her personal network her personal experience of donating a kidney.  Ms. Dorland denies the remaining allegations contained in Paragraph 12.

13.     Ms. Dorland admits that the Dorland Letter did not include a "copyright notation" when she posted it.

14.     The Copyright Office registration documentation is a document that speaks for itself, and any characterization of same is denied.  Ms. Dorland admits that she registered the Dorland Letter in 2018.

15.     Ms. Dorland admits that she has used her social media accounts to speak about kidney donations.  Ms. Dorland denies the remaining allegations contained in Paragraph 15.

16.     Ms. Dorland denies the allegations contained in Paragraph 16.[2]

17.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 17, and therefore denies same.

---

[2] The header preceding Paragraph 16 is not a numbered paragraph, and therefore does not require a response; to the extent a response is required, Ms. Dorland denies the characterization and/or allegation contained in the header preceding Paragraph 16.

18.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 18, and therefore denies same.[3]

19.     Ms. Dorland admits that Ms. Larson's story is titled "*The Kindest*," and that it includes a letter that is purportedly sent by a kidney donor.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 19, and therefore denies same.

20.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 20, and therefore denies same.

21.     Ms. Dorland admits that, at some point in June of 2016, Ms. Larson read a portion of *The Kindest* at a bookstore in the Boston area.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 21, and therefore denies same.[4]

22.     Admitted.

23.     Ms. Dorland denies the allegations contained in Paragraph 23.

24.     Ms. Dorland denies the allegations contained in Paragraph 24.

25.     Ms. Dorland denies the allegations contained in Paragraph 25.

26.     Ms. Dorland denies the allegations contained in Paragraph 26.

27.     The agreement referenced in Paragraph 27 is a document which speaks for itself, and Ms. Dorland denies any and all characterizations of same.  Ms. Dorland lacks sufficient

---

[3] The header preceding Paragraph 18 is not a numbered paragraph, and therefore does not require a response; to the extent a response is required, Ms. Dorland denies the characterization and/or allegation contained in the header preceding Paragraph 18.

[4] The header preceding Paragraph 21 is not a numbered paragraph, and therefore does not require a response; to the extent a response is required, Ms. Dorland denies the characterizations and/or allegations contained in the header preceding Paragraph 21.

knowledge to admit or deny the remaining allegations contained in Paragraph 27, and therefore denies same.[5]

28.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 28, and therefore denies same.

29.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 29, and therefore denies same.

30.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 30, and therefore denies same.

31.     Ms. Dorland admits that *The Kindest* was printed in the American Short Fiction anthology and on its website.  Further responding to Paragraph 31, the agreement between American Short Fiction and Ms. Larson is a document which speaks for itself; Ms. Dorland denies any and all characterizations of same.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 31.[6]

32.     Admitted.[7]

33.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 33.

---

[5] The header preceding Paragraph 27 is not a numbered paragraph, and therefore does not require a response; to the extent a response is required, Ms. Dorland denies the characterizations and/or allegations contained in the header preceding Paragraph 27.

[6] The header preceding Paragraph 31 is not a numbered paragraph, and therefore does not require a response; to the extent a response is required, Ms. Dorland denies the characterization and/or allegation contained in the header preceding Paragraph 31.

[7] The header preceding Paragraph 32 is not a numbered paragraph, and therefore does not require a response; to the extent a response is required, Ms. Dorland denies the characterization and/or allegation contained in the header preceding Paragraph 32.

34.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 34.

35.     Ms. Dorland admits that the BBF selected *The Kindest* to be published as a "One City/One Story" feature.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 35.

36.     The agreement between BBF and Ms. Larson is a document which speaks for itself, and Ms. Dorland denies any and all characterizations of same.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 36.

37.     Ms. Dorland denies the allegations contained in Paragraph 37.[8]

38.     Ms. Dorland denies the allegations contained in Paragraph 38.

39.     Ms. Dorland admits that she communicated with representatives from ASF and the BBF; the remaining allegations contained in Paragraph 39 are denied.

40.     Ms. Dorland denies the allegations contained in Paragraph 40.

41.     Ms. Dorland admits that she communicated with representatives from Bread Loaf Writers' Conference concerning *The Kindest*.  Ms. Dorland denies the remaining allegations contained in Paragraph 41.

42.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 42.[9]

---

[8] The header preceding Paragraph 37 is not a numbered paragraph, and therefore does not require a response; to the extent a response is required, Ms. Dorland denies the characterization and/or allegation contained in the header preceding Paragraph 37.

[9] The header preceding Paragraph 42 is not a numbered paragraph, and therefore does not require a response; to the extent a response is required, Ms. Dorland denies the characterization and/or allegation contained in the header preceding Paragraph 42.

43.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 43.

44.     The documents referenced in Paragraph 44 – the Copyright Registration and the BBF version of *The Kindest* – are documents which speak for themselves; Ms. Dorland denies any and all characterizations of said documents.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 44.

45.     Ms. Dorland denies the allegations contained in Paragraph 45.

46.     Ms. Dorland admits that she did not consent to ASF sharing her communications with Ms. Larson.  Ms. Dorland further admits that she retained Cohen Law in or around June of 2018.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 46, and therefore denies same.

47.     Ms. Dorland admits that Cohen Law was provided with an updated version of *The Kindest* in July of 2018.  The remaining allegations contained in Paragraph 47 constitute conclusions of law, to which no response is required.  To the extent a response is required, said allegations are denied.

48.     The allegations contained in Paragraph 48 do not address the claims brought against Ms. Dorland, and therefore no response from Ms. Dorland is required.  Further, the allegations contained in Paragraph 48 constitute conclusions of law, to which no response is required.  To the extent a response from Ms. Dorland is required, the allegations in Paragraph 48 are denied.

49.     The allegations contained in Paragraph 49 do not address the claims brought against Ms. Dorland, and therefore no response from Ms. Dorland is required.  Further, the allegations contained in Paragraph 49 constitute conclusions of law, to which no response is

required.  To the extent a response from Ms. Dorland is required, the allegations in Paragraph 49 are denied.

50.     The letter referred to in Paragraph 50 is a document which speaks for itself; any characterizations of said letter are denied.

51.     Paragraph 51 concerns a document – a letter from Attorney Gregorio to Attorney Cohen – which speaks for itself; Ms. Dorland denies any and all characterizations of same.[10]

52.     Ms. Dorland admits that the Boston Globe published two articles concerning *The Kindest*.  Ms. Dorland denies the remaining allegations contained in Paragraph 52.

53.     The newspaper article referred to in Paragraph 53 is a document which speaks for itself; Ms. Dorland denies any and all characterizations of same.

54.     The newspaper article referred to in Paragraph 54 is a document which speaks for itself; Ms. Dorland denies any and all characterizations of same.

55.     Ms. Dorland admits that her demands changed over time, as the situation evolved and her costs increased.

56.     Paragraph 56 does not address claims brought against Ms. Dorland, and, therefore, no response from Ms. Dorland is required.  Further responding, the allegations in Paragraph 56, at least in part, consist of legal conclusions, and therefore, no response is required. To the extent a response is required, Ms. Dorland states that she lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 56.[11]

---

[10] The header preceding Paragraph 51 is not a numbered paragraph, and therefore does not require a response; to the extent a response is required, Ms. Dorland denies the characterization and/or allegation contained in the header preceding Paragraph 51.

[11] The header preceding Paragraph 56 is not a numbered paragraph, and therefore does not require a response; to the extent a response is required, Ms. Dorland denies the characterization and/or allegation contained in the header preceding Paragraph 56.

57.     Ms. Dorland admits that the BBF ultimately rescinded its selection of *The Kindest* as a One City/One Story feature.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 57, and therefore denies same.

58.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 58, and therefore denies same.

59.     Ms. Dorland lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 59, and therefore denies same.

60.     Ms. Dorland admits that she communicated with "members of Larson's writing group" in 2018, as they are colleagues, friends and acquaintances of Ms. Dorland's.  Ms. Dorland denies the remaining allegations contained in Paragraph 60.

**Count I**
**(Intentional Interference by Dorland with Larson's ASF Contract)**

61.     Count I was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 61 is required.

62.     Count I was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 62 is required.

63.     Count I was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 63 is required.

64.     Count I was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 64 is required.

65.     Count I was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 65 is required.

66.     Count I was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 66 is required.

67.     Count I was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 67 is required.

68.     Count I was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 68 is required.

## Count II
### (Intentional Interference by Dorland with Larson's BBF Contract)

69.     Count II was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 69 is required.

70.     Count II was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 70 is required.

71.     Count II was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 71 is required.

72.     Count II was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 72 is required.

73.     Count II was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 73 is required.

74.     Count II was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 74 is required.

75.     Count II was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 75 is required.

76.     Count II was dismissed by this Court on March 27, 2020, and therefore no response to Paragraph 76 is required.

**Count III**
**(Interference by Cohen Law with Larson's BBF Contract)**

77.     Ms. Dorland incorporates her responses to the foregoing paragraphs as if they were fully restated herein.

78.     Paragraph 78 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 78 is required.  Further responding, Ms. Dorland denies "conspiring" with Cohen Law at any time and for any purpose.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 78 and therefore denies same.

79.     Paragraph 79 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 79 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 79.

80.     Paragraph 80 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 80 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 80.

**Count IV**
**(Interference by Attorney Cohen with Larson's BBF Contract)**

81.     Ms. Dorland incorporates her responses to the foregoing paragraphs as if they were fully restated herein.

82.     Paragraph 82 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 82 is required.  To the extent a response is required, Ms. Dorland admits that Attorney Cohen represented her in 2018; Ms. Dorland declines to respond to the remaining allegations contained in Paragraph 82 on the grounds of attorney-client privilege.

83.     Paragraph 83 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 83 is required.  To the extent a response is required, Ms. Dorland states

that the agreement between Larson and the BBF is a document which speaks for itself; Ms. Dorland denies any and all characterizations of said document.  Further responding, Ms. Dorland states that she lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 83, and therefore denies same.

84.     Paragraph 84 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 84 is required.  To the extent a response is required, Ms. Dorland admits that Attorney Cohen sent a letter on July 3, 2018; that letter is a document which speaks for itself and Ms. Dorland denies any and all characterizations of said document.

85.     Paragraph 85 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 85 is required.  To the extent a response is required, Ms. Dorland states that she lacks sufficient knowledge to admit or deny the allegations contained in Paragraph 85, and therefore denies same.  Further responding, Paragraph 85 contains legal conclusions, to which no response is required.  To the extent a response is required, Ms. Dorland denies same.

86.     Paragraph 86 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 86 is required. To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 86.

87.     Paragraph 87 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 87 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 87.

88.     Paragraph 88 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 88 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 88.

89.     Paragraph 89 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 89 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 89.

### Count V
### (Commission by Cohen Law of Unfair and Deceptive Acts and Practices in Violation of M.G.L. c. 93A)

90.     Ms. Dorland incorporates her responses to the foregoing paragraphs as if they were fully restated herein.

91.     Paragraph 91 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 91 is required.  To the extent a response is required, Ms. Dorland admits that Attorney Cohen sent a letter on July 3, 2018; that letter is a document which speaks for itself and Ms. Dorland denies any and all characterizations of said document.  Ms. Dorland denies the remaining allegations contained in Paragraph 91.

92.     Paragraph 92 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 92 is required.  To the extent a response is required, Ms. Dorland admits that Attorney Cohen sent letters on July 20, 2018 and September 6, 2018; those letters are documents which speak for themselves and Ms. Dorland denies any and all characterizations of said documents.  Ms. Dorland denies the remaining allegations contained in Paragraph 92.

93.     Paragraph 93 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 93 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 93.

94.     Paragraph 94 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 94 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 94.

95.    Paragraph 95 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 95 is required.  Further responding, Ms. Dorland states that Paragraph 95 states conclusions of law, to which no response is required.  To the extent a response is required, Ms. Dorland states that the letters referenced in Paragraph 95 are documents which speak for themselves, and Ms. Dorland denies any and all characterizations of same.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 95, and therefore denies same.

96.    Paragraph 96 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 96 is required.  Further, Paragraph 96 contains conclusions of law to which no response is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 96.

97.    Paragraph 97 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 97 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 97.

**Count VI**
**(Commission by Attorney Cohen of Unfair and Deceptive Acts and Practices in violation of M.G.L. c 93A)**

98.    Ms. Dorland incorporates her responses to the foregoing paragraphs as if they were fully restated herein.

99.    Paragraph 99 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 99 is required.  To the extent a response is required, Ms. Dorland admits that Attorney Cohen sent a letter on July 3, 2018; that letter is a document which speaks for itself and Ms. Dorland denies any and all characterizations of said document.  Ms. Dorland denies the remaining allegations contained in Paragraph 99.

100.     Paragraph 100 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 100 is required.  To the extent a response is required, Ms. Dorland admits that Attorney Cohen sent letters on July 20, 2018 and September 6, 2018; those letters are documents which speak for themselves and Ms. Dorland denies any and all characterizations of said documents.  Ms. Dorland denies the remaining allegations contained in Paragraph 100.

101.     Paragraph 101 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 101 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 101.

102.     Paragraph 102 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 102 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 102.

103.     Paragraph 103 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 103 is required.  Further responding, Ms. Dorland states that Paragraph 103 states conclusions of law, to which no response is required.  To the extent a response is required, Ms. Dorland states that the letters referenced in Paragraph 103 are documents which speak for themselves, and Ms. Dorland denies any and all characterizations of same.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 103, and therefore denies same.

104.     Paragraph 104 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 104 is required.  Further, Paragraph 104 contains conclusions of law to which no response is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 104.

105.     Paragraph 105 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 105 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 105.

106.     Paragraph 106 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 106 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 106.

107.     Paragraph 107 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 107 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 107.

108.     Paragraph 108 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 108 is required.  Further responding, Ms. Dorland states that Paragraph 108 states conclusions of law, to which no response is required.  To the extent a response is required, Ms. Dorland states that the letters referenced in Paragraph 108 are documents which speak for themselves, and Ms. Dorland denies any and all characterizations of same.  Ms. Dorland lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 108, and therefore denies same.

109.     Paragraph 109 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 109 is required.  Further, Paragraph 109 contains conclusions of law to which no response is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 109.

110.     Paragraph 110 does not address claims brought against Ms. Dorland, and therefore, no response to Paragraph 110 is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 110.

## Count VII
## (Defamation Claim against Dorland)

111.    Ms. Dorland incorporates her responses to the foregoing paragraphs as if they were fully restated herein.

112.    Ms. Dorland admits that, in 2018, she contacted ASF, the BBF and Bread Loaf concerning *The Kindest*, as well as other entities.  Ms. Dorland further admits that she communicated with various individuals at her employer, GrubStreet, concerning her dispute with Ms. Larson.  Ms. Dorland further admits that she spoke with a reporter at the Boston Globe in 2018.  Ms. Dorland denies the remaining allegations contained in Paragraph 112.

113.    Ms. Dorland denies the allegations contained in Paragraph 113.

114.    Ms. Dorland denies the allegations contained in Paragraph 114.

115.    Paragraph 115 consists solely of legal conclusions to which no response is required.  To the extent a response is required, Ms. Dorland denies the allegations contained in Paragraph 115.

116.    Ms. Dorland denies the allegations contained in Paragraph 116.

## Count VIII
## (Declaration of Rights – Declaratory Judgment)

117.    Ms. Dorland incorporates her responses to the foregoing paragraphs as if they were fully restated herein.

118.    Ms. Dorland denies the allegations contained in Paragraph 118.

119.    Ms. Dorland denies the allegations contained in Paragraph 119.

120.    Ms. Dorland denies that Ms. Larson is entitled to the declarations sought in Paragraph 120.

## **AFFIRMATIVE DEFENSES**

### First Affirmative Defense

Ms. Dorland states that the claims advanced against her in Ms. Larson's Amended Complaint are wholly insubstantial, frivolous, without merit, not advanced in good faith, and as a result, Ms. Dorland is entitled to cost and attorneys' fees pursuant to Fed. R. Civ. P., Rule 11 and/or this Court's inherent powers.

### Second Affirmative Defense

Ms. Dorland states that Ms. Larson's defamation claim is without merit because Ms. Dorland's statements were true.

### Third Affirmative Defense

Ms. Dorland states that Ms. Larson's defamation claim is without merit because Ms. Dorland's statements were non-defamatory as a matter of law.

### Fourth Affirmative Defense

Ms. Dorland states that Ms. Larson's defamation claim is barred because the alleged statements made by Ms. Dorland are protected by virtue of the 1st Amendment to the U.S. Constitution.

### Fifth Affirmative Defense

Ms. Dorland states that Ms. Larson's defamation claim is barred because the alleged statements made by Ms. Dorland were opinion and therefore not defamatory.

### Sixth Affirmative Defense

Ms. Dorland states that Ms. Larson cannot recover for alleged damages suffered by a third party.

<u>Seventh Affirmative Defense</u>

Ms. Dorland states that Ms. Larson cannot recover since she cannot show actual damages.

<u>Eight Affirmative Defense</u>

Ms. Dorland states that Ms. Larson's claims are barred by the doctrine of unclean hands.

<u>Ninth Affirmative Defense</u>

Ms. Dorland states that Ms. Larson's action is barred because Ms. Larson, by her own conduct and actions, has waived any and all rights she may have had against Ms. Dorland, and therefore, Ms. Larson cannot recover in this action.

<u>Tenth Affirmative Defense</u>

Ms. Dorland states that Ms. Larson's action is barred by operation of the applicable statute of limitations, and, therefore, the Amended Complaint should be dismissed.

<u>Eleventh Affirmative Defense</u>

The claims arising out of the subject matter of the transactions and occurrences alleged were the result of the acts or omissions of a third party or parties for whose conduct Ms. Dorland is not legally responsible.

<u>Twelfth Affirmative Defense</u>

The claims arising out of the subject matter of the transactions and occurrences alleged were the risks assumed by Ms. Larson.

<u>Thirteenth Affirmative Defense</u>

Ms. Larson's claims are barred by operation of the doctrine of laches.

Fourteenth Affirmative Defense

Ms. Larson has failed to mitigate, minimize or avoid damages, if any, alleged in her Amended Complaint; accordingly, any recovery must be reduced by the amount of damage resulting from such failure.

Fifteenth Affirmative Defense

Ms. Dorland, at all times relevant to the allegations contained in the Amended Complaint, acted with reasonable prudence.

Sixteenth Affirmative Defense

Ms. Dorland acted pursuant to and with reliance on the advice of counsel.

* * * * * * * *

## DAWN DORLAND PERRY'S COUNTERCLAIMS ASSERTED AGAINST SONYA LARSON

Dawn Dorland Perry, known professionally and artistically as Dawn Dorland ("Ms. Dorland") brings these counterclaims against the Plaintiff/Defendant-in-Counterclaim, Sonya Larson ("Ms. Larson") in this action, to enforce her copyright in a letter that she wrote following an altruistic, living kidney donation she participated in during 2015.  Ms. Larson had access to that letter because Ms. Dorland invited Ms. Larson to a private and secret Facebook group wherein Ms. Dorland shared updates and personal details with her friends and family. Unbeknownst to Ms. Dorland, Ms. Larson made the decision to abandon the parties' friendship in favor of Ms. Larson's writing career.  Instead of offering support to Ms. Dorland surrounding her surgery and donation of her kidney, Ms. Larson mined the Facebook page for source material for her writing – not only for ideas – which may be hurtful to a friend but permissible under the law – but for actual text.

While Ms. Larson told Ms. Dorland in July of 2016 that her short story – *The Kindest* – was an unpublished work in progress, and that it was not at all about a "kidney donation," Ms. Dorland would later find out that her "friend" had lied to her.  *The Kindest* had been published as early as February or March of 2016, was in fact about a kidney donation, and – most remarkably – contained a near exact copy of Ms. Dorland's letter written to the final recipient in the surgical chain from Ms. Dorland's kidney donation. Not only did Ms. Larson copy Ms. Dorland's unique, creative and heartfelt words, but she knowingly coopted Ms. Dorland's expression concerning her childhood trauma and abuse – knowing full well, after years of friendship, the emotional distress that this (as well as her other actions) would inflict on Ms. Dorland.

From 2016 to 2019, Ms. Larson proceeded to publish multiple version of The Kindest, each containing an infringing version of Ms. Dorland's letter.  Ms. Larson's actions constitute not only copyright infringement, but also intentional infliction of emotional distress, where she manipulated her friendship with Ms. Dorland, made material misrepresentations in order to mislead Ms. Dorland from discovery of her infringement, and engaged in other extreme and outrageous conduct designed to inflict harm on Ms. Dorland.

Through this Counterclaim, Ms. Dorland seeks damages from Ms. Larson, as well as a declaration concerning her exclusive copyright over her letter, an injunction preventing any further publication of the infringing work, and her attorney's fees, as permitted by law.

## **PARTIES**

1.       Plaintiff-in-Counterclaim Dawn Dorland Perry, known professionally as Dawn Dorland, ("Ms. Dorland") is an author, editor and writing educator who resides in Los Angeles, California.

2.      Defendant-in-Counterclaim Sonya Larson ("Ms. Larson") is an author and a director at GrubStreet, a creative writing Center in Boston.  Ms. Larson resides in Somerville, Massachusetts.

## JURISDICTION AND VENUE

3.      Jurisdiction and venue are appropriate in this Court because Plaintiff-Counterclaim Defendant Sonya Larson ("Ms. Larson") voluntarily brought this lawsuit in this Court. These counterclaims arise out of the same occurrence as those addressed in the Complaint in this matter.

## FACTUAL ALLEGATIONS

Ms. Dorland's Educational and Professional Background

4.      Ms. Dorland was born and raised in rural Iowa.  She subsequently attended Scripps College in California, from which she graduated *magna cum laude* with a B.A. in Religious Studies in 2002.

5.      In 2004, Ms. Dorland obtained a Master's in World Religions from Harvard Divinity School in Cambridge, Massachusetts, and in 2014, she received a Master's in Fine Arts ("MFA") from the University of Maryland.

6.      Ms. Dorland has a diverse professional background, as she pursued an academic career in religious studies for several years before changing tracks and rising in the ranks in television advertising to the executive level, where she worked on Emmy nominated anti-tobacco commercials, and other recognized campaigns.

7.      In 2009, however, Ms. Dorland devoted herself to her writing fiction and non-fiction full time, leaving the advertising profession, and becoming involved full time with workshops at GrubStreet in Boston, as well as summer programs at the Fine Arts Work Center in

Provincetown.  Once she was able to obtain funding for the full-time program MFA program at

the University of Maryland, she moved from Boston to Washington, D.C. for that opportunity.

Once she completed the residency requirements of her MFA, Ms. Dorland moved to Los

Angeles, California, where she still resides today.

Ms. Dorland's Friendship with Ms. Larson

8.      Ms. Dorland met Ms. Larson in 2007 when Ms. Dorland first registered for part-

time classes at GrubStreet, where Ms. Larson worked full-time as the Program Coordinator.

9.      While the two were friendly in 2008 and 2009, they began to develop a true

friendship in 2010.

10.      Throughout 2010 and 2011, Ms. Dorland and Ms. Larson frequently socialized.

They were both active at GrubStreet, are approximately the same age, had many mutual friends,

shared their passion for writing and educating aspiring writers, and generally enjoyed each

other's company.

11.      Ms. Dorland and Ms. Larson's friendship played out through significant email

correspondence, shared cocktails, meals, invitations to each other's birthday celebrations,

gatherings with each other's spouses and GrubStreet writing colleagues.

12.      Ms. Dorland and Ms. Larson also participated in writing workshops and other

literary events together.

13.      Ms. Dorland and Ms. Larson were guests at and/or were invited to each other's

homes on several occasions.

14.      Ms. Dorland and Ms. Larson's conversations included their career paths and

personal lives.

15.     When Ms. Larson's partner at the time's mother passed away, in 2011, Ms. Dorland attended the services and provided support to Ms. Larson and her partner.

16.     Throughout their friendship, Ms. Dorland and Ms. Larson shared with one another various personal details about their lives, their pasts, and their aspirations.

17.     Over the course of their friendship, through conversation, as well as non-fiction writing that she shared, Ms. Dorland told Ms. Larson that Ms. Dorland had a difficult childhood, wherein she suffered physical and emotional abuse, neglect, and poverty.

18.     Ms. Larson knew, at least since 2011 when Ms. Dorland published an essay on the GrubStreet website, of Ms. Dorland's traumatic upbringing, and her struggle to come to terms with it as an adult.

19.     Just prior to Ms. Dorland's move to Washington, D.C. to attend the full-time MFA program, Ms. Larson attended a farewell dinner hosted by Ms. Dorland and her spouse at their Jamaica Plain apartment.  At that dinner, Ms. Larson gave Ms. Dorland a very thoughtful and personal going away gift, which Ms. Larson put together herself with many personal touches, and references to the friends' shared history.

20.     After Ms. Dorland moved, Ms. Dorland and Ms. Larson stayed in touch.  While it was difficult to keep up regular communication while in school full-time, Ms. Dorland and Ms. Larson reconnected several times each year at writing conferences.

21.     Specifically, from 2014 - 2017, Ms. Larson invited Ms. Dorland to Boston to participate in GrubStreet's Muse & The Marketplace writing conference as an instructor.

Ms. Dorland's Living Kidney Donation

22.    In or about 2009, Ms. Dorland first read about living kidney donations, and hoped that she would one day be able to contribute to someone in need through such a donation, knowing that such a contribution would make a significant impact on the life of the recipient.

23.    In 2015, after she obtained her MFA, and while living within a short distance of the world-renowned UCLA campus hospitals, Ms. Dorland realized the time to act on her long-held hope of making such a contribution had arrived.

24.    In June of 2015, as a nondirected donor, Ms. Dorland started a short kidney surgical chain: she provided her compatible kidney to a Los Angeles-based father of 12, whose wife was not a compatible donor. His wife, in response, donated her non-compatible kidney to a young mother in Oregon – a stranger to both Ms. Dorland and to the recipient of her kidney.

25.    Because Ms. Dorland had designated her kidney for the greatest need, interstate health officials themselves identified the young mother in Oregon as the final recipient in Ms. Dorland's surgical chain.

26.    Within this surgical chain, Ms. Dorland participated in what is termed a "paired exchange" with the young mother in Oregon.

27.    A "paired exchange" refers to the algorithmic practice of matching one or more willing but incompatible donor-recipient pairs within a surgical chain of donations between strangers and often over distances, across cities and states.

28.    This practice permits several incompatible donors to essentially "mix and match" until each has a compatible donor and recipient so that the chain is complete.

29.    The Oregon recipient had not otherwise identified a living donor and was waiting on the deceased donor list for a transplant when Ms. Dorland elected to donate her kidney.

30.     Ms. Dorland's nondirected or "altruistic" donation meant that the young mother could receive a living kidney rather than a cadaveric kidney.

31.     Living kidneys perform on average 50% or 5 years longer than kidneys transplanted from deceased donors, reducing the need for multiple transplants or dialysis over the lifespan of an individual with kidney disease.

32.     In Ms. Dorland's chain, the entire process consisted of four surgeries across all patients and was a success for all of the patients.

33.     Ms. Dorland successfully recuperated within the expected time period and remains healthy with one kidney today.

Ms. Dorland's Private Facebook Group and the Dorland Letter

34.     As Ms. Dorland was preparing for her kidney retrieval surgery, in April of 2015, she created a Facebook Group to share her experience with her friends and family (the "Facebook Group").

35.     From the moment of its creation, Ms. Dorland designated the Facebook Group both "private" and "secret" which, according to Facebook policies in 2015, meant that the group was not visible in Facebook search results, and that comments and other activity would not be seen anywhere other than inside the group.

36.     In order for someone to be added to the Facebook Group, Ms. Dorland would need to add them, as the administrator, and then that person would decide whether or not they wanted to join.  If they accepted, they would be part of the Facebook Group and would be able to see Ms. Dorland's posts and the other members' comments.

37.     By virtue of being a "private" and "secret" group forum, the Facebook Group was not open to the public.

38.     One of the friends Ms. Dorland invited to the Facebook Group was Ms. Larson.

39.     Ms. Larson has admitted multiple times that she had access to the Facebook Group.

40.     Ms. Dorland posted updates concerning her surgery to her Facebook Group, as well as updates concerning her kidney-recipient's recuperation.

41.     Ms. Dorland also posted information concerning living kidney donations, generally.

42.     Following Ms. Dorland's surgery, her recipient's surgery, and her recipient's wife's surgery, all three Los Angeles-based individuals of the Dorland surgical chain met onsite at UCLA's Ronald Reagan Medical Center with Ms. Dorland's spouse and her kidney-recipient's adult children. After recovering from their surgeries, Ms. Dorland, her recipient, and his wife held an additional meeting six weeks later where Ms. Dorland and her spouse were introduced to other members of her recipient's family. Ms. Dorland and her spouse posted about these gatherings discreetly in Ms. Dorland's private/secret Facebook Group.

43.     Several members would express their support of Ms. Dorland and her kidney donation by either "liking" Ms. Dorland's posts, or commenting on her posts, using their own words.

44.     Ms. Larson never "liked" a post.

45.     Ms. Larson never commented on a post.

46.     Facebook would also track who "saw" each post, and Ms. Dorland was able to see that information, as well.

47.     Ms. Larson "saw" *every* post.

48.     Ms. Larson "saw" *every* comment, whether made by Ms. Dorland or another member of the Facebook Group.

49.     Shortly after the June 2015 procedure in Los Angeles, Ms. Dorland wrote a letter to the woman in Oregon – the final recipient in the surgical chain. A true and accurate copy of the letter Ms. Dorland wrote is attached hereto as **Exhibit A** ("the Dorland Letter").

50.     The Dorland Letter detailed Ms. Dorland's motivations behind making an altruistic kidney donation and is written in Ms. Dorland's unique and personal style.

51.     Ms. Dorland carefully crafted the Dorland Letter using her own words, without referring to other letters, works or writings.

52.     The Dorland Letter is creative and original.

53.     Immediately after Ms. Dorland wrote the Dorland Letter and it was fixed, and as a function of Copyright Law, Ms. Dorland had a copyright in the Dorland Letter.

54.     Ms. Dorland subsequently registered the Dorland Letter with the U.S. Copyright Office.  Proof of the registration is attached hereto as **Exhibit B**.

55.     On July 7, 2015, Ms. Dorland posted the Dorland Letter to the Facebook Group.

56.     Ms. Larson had access to the Dorland Letter.

57.     Ms. Larson read the Dorland Letter.

58.     Ms. Larson took notes on the Dorland Letter.

59.     Upon information and belief, Ms. Larson recorded entire passages from the Dorland Letter.

60.     Upon information and belief, Ms. Larson recorded specific phrases and paragraphs from the Dorland Letter.

61.     Notwithstanding Ms. Larson's interactions with the Dorland Letter and Ms. Dorland's Facebook Group, when Ms. Dorland corresponded with Ms. Larson in July of 2015, Ms. Larson disclaimed any knowledge of Ms. Dorland's kidney donation.

62.     In a July 2015 email exchange, when Ms. Dorland reminded Ms. Larson that Ms. Dorland had donated her kidney, Ms. Larson responded to say, "Ah yes – I did see on Facebook that you donated your kidney. What a tremendous thing!"

Ms. Dorland Learns that Ms. Larson is Writing About Kidney Donation

63.     In June of 2016, Ms. Dorland was informed by a friend in Boston that he had attended a reading in a Boston area bookstore where Ms. Larson had read an excerpt from a short story that she was working on about a woman who received a living kidney donation.

64.     Ms. Dorland's friend asked Ms. Dorland if she had been the "inspiration" for Ms. Larson's story.

65.     Ms. Dorland was very surprised to learn that Ms. Larson was working on a story about a kidney donation, since the two women had crossed paths at national literary events, corresponded and interacted on social media several times in the year since Ms. Dorland had donated her kidney, and Ms. Larson had not mentioned that she was working on a story about a kidney donation.

66.     Ms. Dorland emailed Ms. Larson in June of 2016 and casually asked her about the story and asked if she could read it.

67.     In response to Ms. Dorland's email, Ms. Larson stated that yes, she had been working on a short story about a "woman who receives a kidney," that was "partially inspired by how my imagination took off after learning of your own tremendous donation."

68.    Ms. Larson further stated, "I hope it doesn't feel too weird for your gift to have inspired works of art[.]"

69.    Ms. Larson ultimately declined to share the story, stating that she was "still working on the story" and didn't "feel quite ready to show the full thing to people".

70.    While the two authors continued to exchange emails over the course of the next days and weeks, Ms. Larson admitted that she joined Ms. Dorland's Facebook Group.

71.    In an email later in the chain, in July of 2016, Ms. Larson again stated, "your tremendous gift certainly prompted my imagination[.]"

72.    In Ms. Dorland's view, at that point in time, her friend had used her personal details, to which she had gained access by virtue of their friendship, but yet had not provided even the most minimal support, such as an email or check-in via the Facebook Group.  Ms. Dorland was left feeling that Ms. Larson had taken advantage of their friendship and Ms. Dorland's gesture in order to further her own artistic development.

73.    However, by the end of the discussion, wherein Ms. Dorland believed the two authors were taking the time to carefully and thoughtfully share their perspectives, Ms. Dorland was clear with Ms. Larson that she willing to let the situation go and resume their friendship.

74.    Throughout the 2016 email discussion, however, the Dorland Letter was not raised.

75.    There was no indication in 2016 that the Dorland Letter was used in Ms. Larson's short story, which Ms. Larson characterized in her emails as a work in progress.

76.    In fact, in the course of the email chain between Ms. Dorland and Ms. Larson, Ms. Larson informed Ms. Dorland that she had not even mentioned the short story to anyone other than her writing group.

77.     Further, Ms. Larson had told Ms. Dorland that her story was actually not about a kidney donation, but rather about "race, shame, grandiosity, addition."

78.     During this summer 2016 email chain, Ms. Larson informed Ms. Dorland that she had intended to tell Ms. Dorland about the story "should it ever be published."

79.     At the conclusion of the email chain, in August of 2016, Ms. Dorland believed the two authors had made peace, and were looking forward to their next opportunity to speak in person and resume their relationship.

80.     In fact, Ms. Larson stated in the final email to Ms. Dorland, "I look forward to seeing you again with the strength of this conversation between us."

81.     While Ms. Dorland and Ms. Larson did continue to interact during 2016 and early 2017, Ms. Larson suddenly and inexplicably refused to speak to Ms. Dorland at the 2017 Muse & the Marketplace conference. Despite the fact that Ms. Dorland attended that conference at Ms. Larson's invitation, Ms. Larson refused to even greet Ms. Dorland when Ms. Dorland approached Ms. Larson, creating a very tense atmosphere for the parties' mutual friends and Ms. Dorland.  Ms. Larson provided no explanation for her abrupt cessation of the relationship.


Ms. Dorland Learns that Ms. Larson Published <u>*The Kindest* with American Short Fiction</u>

82.     Three months after Ms. Larson unilaterally and publicly ended the parties' friendship during the 2017 Muse conference, Ms. Dorland learned that *The Kindest* had been published in the Emerging Writers issue of American Short Fiction ("ASF"), a literary anthology.

83.     Ms. Dorland learned of the publication through a Facebook post on Ms. Larson's Facebook page in or about August of 2017.  The post was open to the public.

84.     In Ms. Larson's public Facebook post, she thanked and/or acknowledged several authors and fellow students.  She did not acknowledge or thank Ms. Dorland.

85.     While Ms. Dorland learned, at some point in 2017, that the ASF publication was available both in hard copy (in book format), and also on-line on ASF's website, the on-line version required a paid subscription.  Ms. Dorland did not pay to read Ms. Larson's story either on line or via the hard copy.

86.     At that time, in August of 2017, Ms. Dorland understood – from the 2016 email exchange with Ms. Larson – that Ms. Larson's story was loosely inspired by, but otherwise not at all related to, Ms. Dorland's own kidney donation history.


Ms. Dorland Discovers that Ms. Larson Copied the Dorland Letter in *The Kindest*

87.     In early June 2018, Ms. Dorland accidentally came across an online promotion of *The Kindest* on ASF's website, which was published free of charge, and read it for the first time.

88.     Ms. Dorland was shocked to see, for the first time, that *The Kindest* included a version of the Dorland Letter.

89.     The letter included in *The Kindest*, as published by ASF on its website, is substantially similar to the Dorland Letter.

90.     Ms. Dorland immediately recognized her own letter when she read the letter included in *The Kindest* as published by ASF.  The letter included in *The Kindest*, as published on the ASF website, is attached hereto as Exhibit C (the "ASF Web Letter").

91.     In addition to striking similarities with the phrasing, the letter included in *The Kindest* followed the structure of the Dorland Letter, paragraph by paragraph.

92.     The ASF Web Letter opens by addressing the reader with "Dear Recipient," as does the Dorland Letter.  See Exhibits A and C.

93.     The first paragraph then introduces the writer by name, age, race, and location, as does the Dorland Letter.  See Exhibits A and C.

94.     The second paragraph explains to the reader how the author of the letter came to learn about kidney donations, and why they were motivated to donate, as does the Dorland Letter.  See Exhibits A and C.

95.     The third paragraph – which the ASF Web Letter breaks into two paragraphs - discusses the medical process, what the author learned through that process, and shares some personal details about the author of the letter, as does the Dorland Letter.  See Exhibits A and C.

96.     The ASF Web Letter, in discussing the medical process, uses the term "paired exchange," as does the Dorland Letter.  See Exhibits A and C.

97.     However, the kidney donation described in *The Kindest* is not a paired exchange.

98.     Ms. Dorland's kidney donation, which was part of a surgical chain, was a paired exchange.

99.     The next paragraph speaks to the author's preparation for surgery and focusing on the reader during that process, as does the Dorland Letter.  See Exhibits A and C.

100.    Using phraseology and emphasis nearly identical to the Dorland Letter, the ASW Web Letter states, "I withstood the pain by imagining and rejoicing in YOU."  See Exhibit C.

101.    The next paragraph, in both letters, includes the authors' expression of pleasure that the reader is healthy, and an affirmation that the reader deserves the gift given by the author not because of anything they did, but simply because.  See Exhibits A and C.

102.     In both letters, the author expresses an interest to know more about the reader, including a potential meeting, but makes clear that if the reader is not interest in meeting, the author will "accept" that response.  <u>See</u> Exhibits A and C

103.     Both letters end with a single word as a sign off; in the Dorland Letter, it is "Kindly," which is Ms. Dorland's typical email sign off since 2007, and in the ASF Web Letter, it is "Warmly."  <u>See</u> Exhibits A and C.

104.     The ASF Web Letter is substantially similar to the Dorland Letter.

105.     As Ms. Larson later explained, the donor's letter is integral to the plot of *The Kindest*, as it "is used primarily to introduce the character of the kidney donor, and to set the stage for the eventual meeting of the recipient character and the donor character."

106.     While the hard copy version of The Kindest may contain variations of the text in the letter, it is substantially similar to the Dorland Letter, and constitutes a copy of the Dorland Letter.

107.     Upon information and belief, Ms. Larson made certain changes to The Kindest, including the letter contained therein, while it was published on the ASF website.

108.     Notwithstanding those changes, which are reflected in certain filings in this litigation (<u>see</u> ECF No. 29-3), each version of the letter contained in The Kindest, as published by ASF, is substantially similar to the Dorland Letter and infringes on Ms. Dorland's copyright.

109.     After she recognized her own writing in *The Kindest*, Ms. Dorland contacted ASF to express her concerns.

110.     Subsequently, ASF removed *The Kindest* from its website.

111.     Ms. Larson profited from ASF's publication of *The Kindest*, both on the website and in the hard copy book publication.

34

112.    Ms. Dorland suffered damages as a result of Ms. Larson's copying of the Dorland Letter into the ASF version of *The Kindest*.

<u>Infringing Publication of the Dorland Letter by Audible and Brilliance Audio</u>

113.    After she discovered the use of her letter in *The Kindest*, Ms. Dorland conducted internet searches to see if there were other instances of publication of the story utilizing her letter.

114.    In July of 2018, Ms. Dorland discovered an audio recording of *The Kindest*, published by Brilliance Audio, available to the public on the internet, that contained a different version of the letter from that used in the ASF Web version of *The Kindest*.

115.    A copy of the Brilliance version of the letter included in *The Kindest*, which was provided by Ms. Larson in this litigation, is attached hereto as **Exhibit D** (the "Brilliance Letter").

116.    What Ms. Dorland subsequently learned, is that the Brilliance Letter ***pre-dated*** the ASF Web Letter.

117.    In fact, contrary to Ms. Larson's statements to Ms. Dorland in the summer of 2016, Ms. Larson entered into a contract with Plympton, Inc. in February of 2016 to publish *The Kindest*.

118.    *The Kindest* was recorded by at least one voice actor and released as an audio file available to the public by both Audible.com and Brilliance Audio in 2016.

119.    The version initially published by Ms. Larson, and the version that Ms. Dorland heard in July of 2018, contains a letter written by the kidney donor character in *The Kindest* that has significant similarities to the Dorland Letter.

120.   For example, in her letter, Ms. Dorland speaks of her childhood, stating "Personally, my own childhood was marked by trauma and abuse; I didn't have the opportunity to form secure attachments with my family of origin." <u>See</u> Exhibit A.

121.   In the Brilliance Letter, Ms. Larson's character writes, "My own childhood was marked by trauma and abuse; I wasn't given an opportunity to form secure attachments with my family of origin." <u>See</u> Exhibit D.

122.   Of course, in light of their decade-plus friendship, which included the sharing of personal writing projects, Ms. Larson is well aware of Ms. Dorland's difficult and traumatic upbringing and knows that copying this part of Ms. Dorland's story for her own artistic gain would cause emotional distress for Ms. Dorland.

123.   Ms. Dorland wrote in the Dorland Letter, "While perhaps many more people would be motivated to donate an organ to a friend or family member in need, to me, the suffering of strangers is just as real." <u>See</u> Exhibit A.

124.   In the Brilliance Letter, Ms. Larson's character writes, "While others might desire to give to a family member or friend, to me the suffering of strangers is just as real." <u>See</u> Exhibit C.

125.   Ms. Dorland also employed her own unique and artistic turn of phrase, stating, "My gift, which begat [another member of the chain's], ***trails no strings***." <u>See</u> Exhibit A (emphasis supplied).

126.   Ms. Larson copied that phrase directly, stating "My gift, you must know, ***trails no strings***." <u>See</u> Exhibit D (emphasis supplied).

127.   A simple Google search for the phrase "trails no strings" evidences that there is <u>no other instance</u> wherein that phrase has been used.

36

128.    Throughout the Brilliance Letter, there are multiple other instances of direct copying of not only the structure and tone of the Dorland letter, but exact words and phrases.

129.    The Brilliance Letter is substantially similar to the Dorland letter.

130.    Ms. Larson has since admitted that after Ms. Dorland learned, in the summer of 2016, that Ms. Larson had taken advantage of her friendship with Ms. Dorland, and access to Ms. Dorland's private Facebook Group, mining it for material to shape Ms. Larson's own story concerning a kidney donation, Ms. Larson decided to edit the letter in *The Kindest* "in order to further avoid resemblance between" the Dorland Letter and the clearly infringing copy.

131.    Ms. Larson chose to make these edits despite the fact that the Brilliance Letter had already been published.

132.    Ms. Larson chose to make these edits despite the fact that she had misled Ms. Dorland into believing that her story concerning a kidney donation – which Ms. Larson told Ms. Dorland, falsely, in 2016, wasn't actually about a donation at all - was an unpublished work in progress.

133.    Ms. Larson chose to make these edits knowing that Ms. Dorland did not know that the Dorland Letter had been incorporated into *The Kindest*.

134.    Despite Ms. Larson's statements that she intended for these edits to carry across all published versions of *The Kindest*, the prior publications remained available on the internet, accessible to the public, for several years.

135.    Ms. Larson profited from the publication of *The Kindest* by Plympton on both Audible.com and Brilliance Audio.

136.    Ms. Dorland was damaged by Ms. Larson's copying of the Dorland Letter into the Audible.com and Brilliance versions of *The Kindest*.

Infringement Through Submission to the Boston Book Festival

137.   During 2018, Ms. Larson submitted *The Kindest* to the Boston Book Festival ("BBF").

138.   In June 2018, Ms. Dorland learned that the BBF had selected Ms. Larson's story as a winner of the One Story/One City competition.

139.   Ms. Dorland contacted the BBF to inform the organization that *The Kindest* used her unauthorized copyrighted material.

140.   While Ms. Dorland attempted in good faith to negotiate with both the BBF and Ms. Larson, through counsel, to reach mutually agreeable terms, the parties were ultimately unable to reach an agreement.

141.   Absent an agreement, *The Kindest* continued to infringe on the Dorland Letter without permission or attribution.

142.   The letter contained in *The Kindest*, which is central to the story, remains substantially similar to the Dorland Letter.

143.   Upon information and belief, Ms. Larson profited from *The Kindest's* selection by the BBF as a featured short story in 2018.

144.   Ms. Dorland has suffered damages as a result of Ms. Larson's copying of the Dorland Letter in the BBF version of the Kindest.

Ms. Larson Infringes Ms. Dorland's Copyright by Publishing the Dorland Letter in 2019

145.   Ms. Dorland, through counsel, put Ms. Larson on notice throughout 2018 that *The Kindest* infringed on her copyright in the Dorland Letter.

146.     Ms. Larson is aware of Ms. Dorland's registered copyright, as expressed in the Amended Complaint, which is the operative complaint, filed in this matter.

147.     Yet in 2019, Ms. Larson published *The Kindest*, containing yet another version of the Dorland Letter, in the anthology Welcome to the Neighborhood ("WTTN") (the "WTTN Letter").

148.     The WTTN Letter is substantially similar to the Dorland Letter.

149.     The WTTN Letter infringes on the Dorland Letter.

150.     Ms. Larson has profited from publication of *The Kindest* with WTTN.

151.     Ms. Dorland has suffered damages as a result of Ms. Larson's copying of the Dorland Letter in the WTTN version of the Kindest.


Ms. Larson Registers a Copyright for *The Kindest*

152.     On June 8, 2018, Ms. Larson registered a copyright for *The Kindest*.

153.     In that registration, she stated that the work was "completed" in 2018, and that the date of "first publication" was June 8, 2018.

154.     However, Ms. Larson has published *The Kindest* multiple times, beginning in 2016, prior to said registration.

155.     In the version of *The Kindest* for which she registered the copyright, Ms. Larson has edited the letter she copied from the Dorland Letter, attempting to conceal her infringement. See Amended Complaint at Exhibit F.

156.     In this "scrubbed" version of the Dorland Letter, Ms. Larson has now inserted an introductory paragraph, in a rudimentary attempt to alter the substantially similar structure of the

two letters; removed her erroneous reference to a "paired exchange;" removed several of the phrases that were identical to the Dorland Letter, and generally shortened the letter.

157.    Ms. Larson failed, however, to create her own letter.  The letter in *The Kindest* is clearly still the Dorland Letter, and still infringes on Ms. Dorland's copyright.

158.    The registered version of The Kindest contains a letter that is substantially similar to the Dorland Letter.

159.    Most remarkably, Ms. Larson exchanged the one-word signature line to resemble the Dorland Letter.

160.    Not only does the new signature line copy the Dorland Letter, it copies Ms. Dorland's characteristic email sign off / signature: "Kindly."

161.    After three years – across several versions - of using the signature "Warmly, Rose M. Rothario", Ms. Larson edited the letter in her short story to brazenly (and hurtfully) mimic Ms. Dorland's unique email sign-off.

162.    This last-minute change of the signature line raises questions about Ms. Larson's long-held intent behind the title of the story.


Ms. Dorland's Has Suffered Emotional Distress Resulting from Ms. Larson's Actions

163.    Ms. Dorland has suffered significant emotional distress as a result of Ms. Larson's actions, which has manifested in physical symptoms.

164.    After extensive required testing, Ms. Dorland was medically and psychologically cleared to donate her kidney to a stranger in 2015 by a panel of UCLA medical professionals.

165.    The requisite evaluations included thorough psychological evaluations of her mental health and family life.

166.    As someone who had lived and struggled with the fallout of childhood abuse in her early adulthood, Ms. Dorland found her medical and psychological clearance an empowering benchmark of her own resilience and healing.

167.    Ms. Larson's cruel actions and deceptions, however, as set forth above, a set of hurtful and shocking artistic and personal betrayals, inflicted emotional distress upon Ms. Dorland, creating physical manifestations requiring medical treatment.

168.    Without limitation, Ms. Dorland has suffered sleeplessness, sleep bruxism, gastrointestinal disruption, anxiety, depression, panic attacks, weight loss and several incidents of self-harm.

169.    Ms. Dorland has sought treatment from medical providers for the emotional distress and the physical manifestations she has suffered resulting in significant financial cost.

170.    Ms. Larson knew, at all times, that her actions were likely to inflict emotional distress on Ms. Dorland.

171.    Ms. Dorland has suffered damages as a result of Ms. Larson's actions.

## COUNT I
## COPYRIGHT INFRINGEMENT

172.    Ms. Dorland incorporates the foregoing paragraphs as if fully stated herein.

173.    Ms. Larson reproduced and distributed, and continues to reproduce and distribute, the versions of the Dorland Letter in *The Kindest* without permission in violation of Ms. Dorland's exclusive rights under 17 U.S.C. § 106.

174.    The Dorland Letter constitutes copyrightable subject matter under the laws of the United States under 17 U.S.C. § 102(a)(1).

175.    The various versions of *The Kindest* contain copies of the Dorland Letter.

176.     Specifically, the Brilliance Audio version, the ASF Web Version, the hard copy version published by ASF, any and all versions published by Audible.com, the version printed by the BBF, the version published by Welcome to the Neighborhood, and any other versions of *The Kindest*, all contain copies of the Dorland Letter and therefore infringe on Ms. Dorland's copyright.

177.     Each copy of the Dorland Letter contained in each version of *The Kindest* is substantially similar to the Dorland Letter.

178.     The Dorland Letter was registered with the United States Copyright Office as indicated in Exhibit B.

179.     Ms. Larson reproduced and distributed, and continues to reproduce and distribute, the Dorland Letter and *The Kindest* without permission in violation of Ms. Dorland's exclusive rights under 17 U.S.C. § 106.

180.     Therefore, Ms. Larson has committed copyright infringement and continues to infringe the copyright in the Dorland Letter.

181.     As a result of such copyright infringement, Ms. Dorland has suffered damages in an amount to be determined at trial.

182.     As a result of Ms. Larson's copyright infringement, Ms. Dorland is to recover actual damages and/or Ms. Larson's past and future profits.

183.     As a result of Ms. Larson's copyright infringement, Ms. Dorland is entitled to recover her attorney's fees pursuant to 17 U.S.C. § 505.

## COUNT II
## DECLARATORY RELIEF

184.    Ms. Dorland incorporates the foregoing paragraphs as if fully reinstated herein.

185.    There exists a live case and controversy between Ms. Larson and Ms. Dorland concerning the matters stated herein.

186.    Ms. Dorland is the author of the Dorland Letter, and is the owner of all rights to that letter, including the registered copyright.  <u>See</u> Exhibit B.

187.    Ms. Larson copied the Dorland Letter, without permission or attribution, and incorporated it into *The Kindest*, throughout several various versions.

188.    Ms. Larson has admitted that the Dorland Letter is a crucial and central character development element of *The Kindest*.

189.    Ms. Larson's use of the Dorland Letter constitutes infringement of Ms. Dorland's copyright.

190.    Ms. Dorland seeks declarations from the Court as follows:

   a.    Ms. Dorland has a valid copyright interest in the Dorland Letter, as reflected in Exhibit B;

   b.    Ms. Dorland's valid copyright interest in the Dorland Letter pre-dates the registration, as it existed as a matter of law once the Dorland Letter was fixed, as reflected in the July 7, 2015 post in the Facebook Group;

   c.    Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter when she copied the Dorland Letter in the Brilliance Audio version of The Kindest in 2016;

d.   Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter
when she copied the Dorland Letter in all versions of *The Kindest*
published on Audible.com in 2016, 2017, 2018 and 2019;

e.   Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter
when she copied the Dorland Letter in the ASF Web Version of *The
Kindest* in 2017 and 2018;

f.   Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter
when she copied the Dorland Letter in the ASF hard copy version of the
*The Kindest* printed in 2017;

g.   Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter
when she copied the Dorland Letter in the BBF One City One Story
version of *The Kindest* printed in 2018;

h.   Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter
when she copied the Dorland Letter in the Welcome to the Neighborhood
anthology version of *The Kindest* in 2019; and

i.   Ms. Larson's registered copyright in *The Kindest*, reflected at Exhibit G to
the Amended Complaint in this matter, is hereby declared invalid as a
result of Ms. Larson's infringement of Ms. Dorland's copyright to the
Dorland Letter.

## COUNT III

### INJUNCTIVE RELIEF PURSUANT TO 17 U.S.C. § 502

191.    Ms. Dorland incorporates the foregoing paragraphs as if fully reinstated herein.

192.    Ms. Larson reproduced and distributed, and continues to reproduce and distribute, the Dorland Letter and *The Kindest,* which contains an unauthorized copy of Ms. Dorland's copyrighted material – the Dorland Letter - without permission in violation of Ms. Dorland's exclusive rights under 17 U.S.C. § 106.

193.    Therefore, Ms. Larson has committed copyright infringement and continues to infringe the copyright in the Dorland Letter.

194.    Ms. Larson has refused to remove the *The Kindest* from circulation, continues to publish *The Kindest* and will continue to infringe the Dorland Letter unless enjoined by this Court.

195.    Therefore, Ms. Dorland is entitled to an order from this Court, enjoining Ms. Larson from any further publication of *The Kindest* in its current form, or in any form that includes the Dorland Letter.

## COUNT IV
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

196.    Ms. Dorland incorporates the foregoing paragraphs as if fully stated herein.

197.    By using her friendship with Ms. Dorland, and access to Ms. Dorland's personal information concerning Ms. Dorland's participation in a living kidney donation, in order to further her own writing and artistic career, Ms. Larson intended to inflict emotional distress upon Ms. Dorland.

198.     Ms. Larson copied Ms. Dorland's letter, the Dorland Letter, violating Ms. Dorland's trust, and the friendship that the parties had built beginning in 2007.

199.     Through their friendship, Ms. Larson knew that Ms. Dorland had suffered trauma and abuse as a child and adolescent, and Ms. Larson saw that Ms. Dorland wrote about that trauma in the Dorland Letter.

200.     Ms. Larson copied Ms. Dorland's writings about her personal experiences, including her trauma and abuse, and incorporated those writings into *The Kindest*, without Ms. Dorland's knowledge or permission.

201.     When pressured by third parties to make edits to her copy of the Dorland Letter, Ms. Larson nevertheless failed to create her own letter, with her final version of *The Kindest* (see Amended Complaint, Ex. F) continuing to contain an infringing copy of the Dorland Letter.

202.     Even in her final, failed attempt to create a non-infringing copy, Ms. Larson could not resist to include a further intentionally harmful jab at Ms. Dorland – changing the sign-off in the letter from "warmly" – as it had been in all published versions from 2016 until 2019 – to "kindly" – the same sign-off that Ms. Dorland has used in her correspondence since 2007.

203.     Ms. Larson further misrepresented to Ms. Dorland the truth about (a) the nature of the story she was writing, and (b) the status of the story (i.e., saying it was not completed or published, when it had in fact been published for several months).

204.     Additionally, Ms. Larson misrepresented to Ms. Dorland her knowledge and understanding about Ms. Dorland's kidney donation, despite the fact that Ms. Larson had seen every single post and comment in Ms. Dorland's Facebook Group.

205.     Ms. Larson used Ms. Dorland's Facebook Group as a source of research for *The Kindest* yet pretended to have no knowledge of Ms. Dorland's kidney donation – which was the

very purpose of the Facebook Group – until Ms. Dorland forced Ms. Larson to acknowledge that she had been aware of Ms. Dorland's surgery.

206.   In 2017, after Ms. Dorland confronted Ms. Larson concerning her actions, and after Ms. Larson stated her intention to proceed with the parties' friendship, Ms. Larson abruptly ceased speaking with Ms. Dorland in the midst of a professional writing conference, in an unprofessional, embarrassing, and intentionally harmful manner.

207.   Ms. Larson has further taken steps to ostracize Ms. Dorland from their mutual acquaintances in the writing community, isolating Ms. Dorland from a valuable support network, including Ms. Dorland's mentors.

208.   Ms. Larson knew or should have known that emotional distress was likely to result from her conduct; said emotional distress did in fact result from her conduct.

209.   The actions described above were and are extreme and outrageous conduct.

210.   Ms. Dorland has suffered harm due to emotional distress in the form of chronic sleeplessness, sleep bruxism, gastrointestinal disruptions, panic attacks, anxiety, depression and self-harm.

211.   Ms. Dorland has further incurred significant medical expenses in connection with the emotional distress, and the physical manifestation of the emotional distress.

212.   Ms. Dorland's emotional distress is so severe and is of a nature that no reasonable person could be expected to endure it.

## JURY DEMAND

**DAWN DORLAND PERRY DEMANDS A TRIAL BY JURY FOR ALL CLAIMS SO TRIABLE.**

WHEREFORE, Ms. Dorland respectfully requests that this Court:

A.  Enter judgment in Dawn Dorland Perry's favor on Counts VII and VIII of the Amended Complaint;

B.  Enter a judgment on in Dawn Dorland Perry's favor on Counts I, II, III and IV of the Counterclaim and award all damages to which she is entitled;

C.  Award Dawn Dorland Perry her reasonable attorney's fees;

D.  Award Dawn Dorland Perry interest and costs on all damages assessed against Counterclaim Defendant;

E.  Enjoin Sonya Larson from any and all further publication, distribution, circulation, posting or any other form of infringement of Dawn Dorland Perry's copyright in the Dorland Letter; and

F.  Grant all such other and further relief to Dawn Dorland Perry as the Court deems just and proper.

Respectfully submitted,

DAWN DORLAND PERRY

By her attorney,


*/s/ Suzanne M. Elovecky*
Suzanne M. Elovecky (BBO #670047)
PARTRIDGE SNOW & HAHN LLP
30 Federal Street
Boston, MA  02110
(617) 292-7900 / (617) 292-7910 FAX
DATED:  April 24, 2020                    selovecky@psh.com


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants, if any, on April 24, 2020.


*/s/ Suzanne M. Elovecky*


3822576.1/30402-2