UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONYA LARSON<br><br>                    Plaintiff,<br>v.<br><br>DAWN DORLAND PERRY et al.,<br><br>                    Defendants. | Civil Action No.<br><br>1;19-cv-10203-IT |

MEMORANDUM IN SUPPORT OF PLAINTIFF, DEFENDANT IN COUNTERCLAIM,
SONYA LARSON'S MOTION TO DISMISS COUNTERCLAIM OF
<u>DEFENDANT, PLAINTIFF IN COUNTERCLAIM, DAWN DORLAND PERRY</u>

Sonya Larson,
By her attorney,

May 15, 2020

/s/ *Andrew D. Epstein*
_____
Andrew D. Epstein, Esquire
BBO #155140
Barker, Epstein, & Loscocco
176 Federal Street
Boston, MA 02110
(617) 482-4900
FAX: (617) 426-5251
Email: Photolaw@aol.com

I.      **Basic Facts.**

A.      <u>The Parties met in 2007 at a creative writing center in Boston.</u>

This lawsuit involves two writers, both of whom are authors, editors and writing

educators.  Dorland lives in Los Angeles [Countercl.¶ 1], and Larson lives in Somerville.

[Countercl. ¶ 2].

The women met each other in 2007 when Larson worked at GrubStreet, a creative writing

center in Boston.  At the time, Dorland was a student who was taking a few classes at

GrubStreet.  [Countercl. ¶ 8].  Dorland eventually moved from Boston, Washington, DC, and

then to California.  [Countercl.¶ 7]   Larson still works at GrubStreet.  [Countercl. ¶ 2].

The parties disagree about the strength and nature of their relationship.  Larson claims

that the parties had a nominal relationship that consisted of a few dozen work-related emails,

scant social media exchanges, and a few in-person pleasantries at various social gatherings when

Dorland was living in the Boston area.  [Am. Compl. ¶ 16]. Larson does not consider Dorland a

close personal friend by any measure.

Conversely, Dorland claims that the Parties started to develop a "true friendship" in 2010,

and that they frequently socialized, had many mutual friends and shared a passion for writing and

educating aspiring writers.  [Countercl. ¶ 9-15]. Dorland's implication is that the two women

were extremely close friends.  Dorland claims that she had a traumatic upbringing and struggled

to come to terms with this as an adult.  Dorland asserts that Larson knew of Dorland's struggles

because Dorland published an essay on the subject on the GrubStreet website in 2011.

[Countercl. ¶ 16-18]. There is no affirmation that Larson actually read the essay. When Dorland

moved from Boston to Washington, DC, Dorland allegedly hosted a farewell dinner where

Larson gave her a "thoughtful and personal going away gift." Dorland further states that the Parties stayed in touch while Dorland was in Washington, and they reconnected several times each year at writing conferences. [Countercl. ¶ 19-21].

B.    <u>Dorland donated one of her kidneys anonymously in 2015.</u>

In 2015, Dorland donated one of her kidneys to a then-unknown recipient. [Countercl. ¶ 22-33]. Dorland created a Facebook Group in 2015 "to share her [donation] experience with her friends and family." [Countercl. ¶ 34] Dorland designated the Facebook Group both "private" and "secret," which, according to Dorland, means that the Facebook Group was not visible in Facebook search results and could only be seen by members of the Facebook Group. [Countercl. ¶ 35] In order to be become a member of the group, Dorland needed to add that person and then that person had to decide if they wanted to join. If they accepted the invitation to the group, they would be able to see Dorland's posts and other member's comments. [Countercl. ¶ 36] Dorland invited Larson to join the Facebook Group. [Countercl. ¶ 38]

Dorland acknowledges that several members of the group expressed their support of Dorland and her kidney donation by "liking" the posts or commenting on them. According to Dorland, Larson never liked or commented on any of Dorland's posts. [Countercl. ¶ 43-45].

Shortly after Dorland's kidney was removed, Dorland wrote a letter to the final recipient of her kidney. [Countercl. ¶ 49] This letter (the "Dorland Letter") was posted on Dorland's Facebook group on July 7, 2015. [Countercl. ¶ 55 and Exhibit A thereto]. Larson believes that there were approximately 250 to 300 people in the group, but Dorland denies there was this number, at least at the time she posted the Dorland Letter. [Am. Compl. ¶ 11 and Dorland's Answer Doc. No. 75, ¶ 11]. It is not known how many others Dorland may have been added to the Facebook Group after the Dorland Letter was posted. Anyone added to the Group *after* the

letter was posted would still have access to the post containing the Dorland Letter.  The Dorland

Letter was not registered with the Copyright Office until June 2018, almost three years after its

original publication on the Facebook Group. [Countercl. ¶ 54 and Exhibit B thereto].

Larson admits that she had access to the Dorland Letter and found it interesting.  Larson

did not download or print the 2015 Factual Letter but instead recorded a few thoughts and ideas

from the letter in her notes for future reference.   [Am. Compl. ¶ 17].

C.     Larson's Short Story and its publication.

In 2015, Larson started writing a fictional short story about a working class Chinese-

American woman who receives a kidney donation from a wealthy white woman (the "Short

Story" or "The Kindest" as the story was eventually named).  The Short Story is divided into five

parts.[1]  Each part explores the different stages in the main character's journey.  *The Kindest* deals

with the complexities of indebtedness, addiction, love, shame, and race, and its central aim is to

depict a person of color resisting a white savior.  [Am. Compl. ¶ 18].

The second part of *The Kindest* includes a brief letter that is sent by the donor character

to the kidney recipient character.  The letter is a small part of the overall narrative and is used

primarily to introduce the kidney donor character, and to set the stage for the eventual meeting

between the recipient and the donor. [Am. Compl. ¶ 19].

There are five variants of The Kindest that have been published.  Each of the variants are

referenced in the Counterclaim and are attached to this Memo as Exhibits A through E.  While

each variant contains a letter which is used by Larson to introduce her characters, the letter is a

---

[1] The Amended Complaint erroneously says there were four parts.  There were five parts to the story.

minor part of her story and comprises less than 5% of the total word count of each variant.[2]  The Short Story was last modified in 2018.  [See Ex. E and Larson Aff.]

In June 2016, Dorland learned that Larson was writing a story about a "woman who receives a kidney" that was "partially inspired" by Dorland's own kidney donation.  [Coutercl. ¶¶ 63-67]. Although Dorland knew as early as 2017, that *The Kindest* was "published in the Emerging Writers issue of American Short fiction ("ASF"), a literary anthology" [Coutercl. ¶¶ 82], it was not until June 2018, that Dorland claims that that she "accidentally" came across a promotion for *The Kindest* on the ASF website.  It was at this point that Dorland claims she read the story for the first time, and she was "shocked" to see "a version of the Dorland Letter" in the Short Story.  [Coutercl. ¶ 88]

Dorland's counterclaim recounts how their so-called "friendship" deteriorated, including how "Dorland was left feeling that Ms. Larson had taken advantage of their friendship . . . in order to further her own artistic development." [Coutercl. ¶¶ 69-81].  Of course, Larson's perception of the relationship was that it was cordial but nothing more.  [Am Compl. ¶ 16].

Dorland alleges that in using Dorland's kidney donation experience and loosely referencing Dorland's difficult upbringing in *The Kindest*, Larson "knew or should have known that emotional distress was likely to result."  [Countercl. ¶ 208]  In these allegations, Dorland references a perceived violation of trust and friendship resulting from the copying of the Dorland Letter by Larson [Countercl. ¶ 199]; using the same "sign off" or valediction, namely the word, "kindly" in the final version of *The Kindest* that Dorland used in her Letter  [Countercl. ¶ 202]; misrepresenting the nature and publication status of *The Kindest* [Countercl. ¶ 203]; snubbing

---

[2] According to the word count function of Microsoft Word, the Dorland Letter [Exhibit F] contains 381 words.  The average length of each of the variants of *The Kindest* [Exhibits A through E] is 5,483.  The average length of the letters in the five variants of *The Kindest* is 249 words.  On average, the letters in each of the five variants of the Short Story comprises 4.5% of the Story.  See, Affidavit of Sonya Larson submitted with this Memorandum which summarizes the word count mathematics.

Dorland at a professional writing conference [Countercl. ¶ 206]; and ostracizing Dorland from mutual acquaintances and isolating her from a valuable support network. [Countercl. ¶ 207]. Dorland claims that these actions constituted "extreme and outrageous conduct" that caused her "emotional distress." [Countercl. ¶ 208]. Of course, Larson sees her connection with Dorland as a "nominal relationship."  [Am. Compl. ¶ 16].

> D.    Dorland claims to have suffered emotional distress as a result of Larson's actions.

Dorland claims that the letters in each of the five variants of *The Kindest* is substantially similar to the Dorland Letter, and therefore infringes Dorland's copyright for which she is entitled to damages.  [See, generally Countercl. ¶¶ 88-162]. Dorland then claims that Larson's "hurtful and shocking artistic and personal betrayals" inflicted emotional distress on Dorland [Coutercl. ¶¶ 167] and that Larson knew this was likely to happen. [Coutercl. ¶¶ 170].  Dorland bases this assumption on the contention that Larson knew about Dorland's abuse and trauma as a child and adolescent, and that Larson incorporated these personal experiences into *The Kindest* in violation of the Parties' friendship and Dorland's trust.  [Coutercl. ¶¶ 199-200]. Dorland further claims that Larson knew or should have known that her pattern of behavior would cause Dorland emotional distress.  [Coutercl. ¶ 208].

> E.    Larson entered her Short Story in a competition run by the Boston Book Festival

Larson eventually entered *The Kindest* in a competition sponsored by the Boston Book Festival ("BBF").  [Am. Compl. ¶ 32]  Larson won the competition. [Am. Compl. ¶ 35] However, because of the claims of plagiarism and copyright infringement first lodged by Dorland against various literary groups and then against the BBF by her legal counsel, Larson changed the letter in her Story to remove any possible similarity to the Dorland Letter.  [Am.

Compl. ¶ 43 and Exhibit E to this Memo.].  The only remaining similar word in Larson's Short

Story is the word "kindly" used in the valediction.  [Countercl ¶ 160]

The Parties attempted to resolve their differences with the BBF though legal counsel but

were unsuccessful.  Irrespective of the merits of Dorland's claims of copyright infringement, the

BBF was concerned that a lawsuit by Dorland had the potential to financially cripple the BBF

and jeopardize its future existence.  As a result, the BBF rescinded its selection of *The Kindest* as

its contest winner.  [Am. Compl. ¶ 57]

Larson alleges that the BBF decision was based on Dorland's persistence, aided and

abetted by claims of copyright infringement made Dorland's attorneys, and warnings of

thousands of dollars in legal fees and damages under the Copyright Act.  [Am. Compl. ¶ 59].

## II.    **Discussion**

### A.    Legal Standard for Motion to Dismiss under Rule 12(b)(6)

The standard of review for a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is whether

the plaintiff has provided enough factual allegations that, when taken as true, state a claim to

relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  If

a plaintiff fails to "nudge their claims across the line from conceivable to plausible, their

complaint must be dismissed." Bell Atlantic Corp. v. Twobly, 550 U.S. at 570.  "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the alleged misconduct." Ascroft v. Iqbal,

556 U.S. 662, 678 (2009).   Moreover, this plausibility standard "is not akin to a 'probability

requirement,'" but asks instead for "more than sheer possibility that a defendant acted

unlawfully." Ascroft v. Iqbal, 556 U.S. at 678.

An inquiry into a claim's plausibility requires a two-step analysis. <u>Rodriques-Reyes v. Milina-Rodriguez</u>, 711 F.3d 49, 53 (2013); <u>Iqbal</u> at 678-79. First, the court must separate any conclusory legal allegations from factual allegations. Second, the court must consider whether the remaining factual allegations give rise to a plausible claim of relief. <u>Rodriques-Reyes</u>, 711 F.3d at 53.

Larson submits that Dorland's claims fail to allege sufficient facts that would warrant a finding of copyright infringement leading to damages or attorney's fees, or of the intentional infliction of emotional distress sufficient to meet Massachusetts' standards.

B.   <u>Count I – Dorland's Copyright Infringement Claim fails to establish that there is substantial similarity between her letter and the letter in *The Kindest*.</u>

In order to prove copyright infringement, one must show that the alleged infringer had access to the original work and that the accused work is substantially similar to the original. <u>CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.</u>, 97 F.3d 1504, 1513 (1st Cir. 1996) (a plaintiff must "prove that the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar.") <u>See also</u>, <u>Johnson v. Gordon</u>, 409 F.3d 12, 17–18 (1st Cir. 2005).

Larson admits that she read the Dorland Letter and found it interesting.  Therefore, this Court need only focus on whether the letters in the published versions of *The Kindest* were substantially similar to the Dorland Letter. To that end, Larson submits that (1) Dorland's claims incorrectly focus on the minutiae of the letters and lose sight of the expression in Larsons story, and (2) the works are not substantially similar either in substance or purpose.

Both the Dorland Letter and *The Kindest* deal with the general issue of kidney donations. However, both exist in different universes and have dramatically different purposes.  To that end, focusing on individual words and phrases in the letters that are part of *The Kindest* is like losing

sight of the forest for the trees.  LovePop, Inc. v. PaperPopCards, Inc., 286 F. Supp. 3d 283, 288

(D. Mass. 2018) (The court should take pains not to focus too intently on particular unprotected

elements at the expense of a work's overall protected expression.); CMM Cable Rep, Inc., 97

F.3d at 1513  (A plaintiff must "prove that the copying of copyrighted material was so extensive

that it rendered the offending and copyrighted works substantially similar.")

Larson acknowledges that there are a few words and phrases in the letters in early

versions of *The Kindest* that also appear in the Dorland Letter.  However, Dorland is

perpetuating the exact analysis that Courts frown upon – dissecting a work to the degree that one

is blinded to the expressiveness of the ensemble itself.  Situation Management Systems Inc., v.

ASP Consulting LLC,, 560 F.3d 53, 59 (1st Cir. 2009).  Dorland's focus on specific words and

phrases, as well as her preoccupation with a significant life experience, blinds her from the fact

that *The Kindest* is a story about relationships, and the complexities of indebtedness, addiction,

love, shame, and race.  Dorland's narrow focus on individual words and phrases and her

obsession with her kidney donation are not the proper inquiry in a substantial similarity analysis

under the circumstances.

C       The competing letters are not substantially similar to each other either in
        substance or in purpose.

The substantial similarity requirement focuses on the works in question from a holistic

perspective, and requires a showing that the copying was so extensive that the works were

rendered so similar that the later work represented a wrongful appropriation of expression.  See,

Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 33 (1st Cir.2001), and Segrets, Inc.

v. Gillman Knitwear Co., 207 F.3d 56, 62 (1st Cir. 2000). When comparing literary works to

determine if there is substantial similarity, the Court must bear in mind that, "the essence of

infringement lies in taking not a general theme but its particular expression through similarities

of treatment, details, scenes, events and characterization." <u>O'Neill v. Dell Pub. Co.</u>, 630 F.2d 685, 686 (1st Cir. 1980).

The First Circuit uses the "ordinary observer" test as one aid in determining whether there is substantial similarity between two works.  Under the ordinary observer test, a work is substantially similar to the copyrighted work if an ordinary person of reasonable attentiveness would, upon reading both, conclude that the defendant unlawfully appropriated the plaintiff's protectable expression. <u>See</u>, <u>Concrete Mach. Co. v. Classic Lawn Ornaments</u>, 843 F.2d 600, 607 (1st Cir.1988); <u>Educ. Testing Servs. v. Katzman</u>, 793 F.2d 533, 541 (3d Cir.1986). Works can be substantially similar despite the presence of disparities.  The key is whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the works'] aesthetic appeal as the same." <u>Peter Pan Fabrics, Inc. v. Martin Weiner Corp.</u>, 274 F.2d 487, 489 (2d Cir.1960).

Here, both authors use letters dealing with the concept of a kidney donation. However, Dorland and Larson drafted the letters from different perspectives and for different purposes. These different perspectives and purposes effect the ultimate substance of the letters including their aesthetic appeal, details, scenes, events and character of the overall works. <u>O'Neill</u>, <u>Supra</u>, 630 F.2d at 686.

The Dorland Letter was written in 2015 by Dorland and sent to the ultimate recipient of her kidney.  It marks a milestone in the context of Dorland's experience of donating a kidney. Alternatively, Larson's letter, which is included in the second part of the five-part Short Story, functions as a tool to introduce the two central figures, and sets the stage for their eventual meeting.  While Dorland's letter recounts her personal experience in donating a kidney, the

letters in *The Kindest* introduce the kidney donor who revels in the hope that her altruistic gesture will give renewed life to her recipient.

Essentially, the Dorland Letter reflects on a personal experience and the need for more organ donors [Countercl. Exhibit A], while the letters in *The Kindest* express hopefulness of a future outcome between the two characters. Finally, the Dorland Letter exists within the context of Dorland's personal life experience, while the letters in *The Kindest* exist in a fictional discussion about how race, class, economics, and physical health operate when two people's lives cross paths. At no point has Dorland *ever* asserted that the creation and distribution of her letter was intended to reflect an engagement with such a discussion. Ultimately, the letter in Larson's Short Story is both a small part of the narrative and is used to express dramatically different ideas than the Dorland Letter.

      D     <u>Should this Court find that Larson's use was substantially similar to the Dorland Letter, such use was *de minimus*</u>.

Within the substantial similarity analysis lies the issue of whether the degree of copying was so trivial that it is deemed to be *de minimus*. <u>On Davis v. The Gap, Inc.</u>, 246 F.3d 152, 173 (2d Cir. 2001), as amended (May 15, 2001); see also 2 <u>Nimmer on Copyright,</u> § 8.01[G] at 8-26 (2008). *De minimis* can mean that copying has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying. <u>See</u> <u>Nimmer</u> § 13.03 [A], at 13–27.

There is no bright line that distinguishes between what is *de minimus* copying and what constitutes substantial similarity. However, the legal maxim "de minimis non curat lex," translated to "the law does not concern itself with trifles," insulates from liability those who cause insignificant violations of the rights of others. <u>Ringgold v. Black Entm't Television, Inc.</u>, 126 F.3d 70, 74 (2d Cir. 1997) A *de minimus* analysis may be guided by either the

aforementioned ordinary observer test, <u>Concrete Mach. Co.</u>, 843 F.2d at 607; <u>Educ. Testing</u>

<u>Servs. v. Katzman</u>, 793 F.2d 533, 541 (3d Cir.1986), or a "fragmented literal similarity" test.

<u>Rose v. Hewson</u>, No. 17CV1471 (DLC), 2018 WL 626350, at *4–5 (S.D.N.Y. Jan. 30, 2018),

citing <u>TufAmerica, Inc. v. Diamond</u>, 968 F. Supp. 2d 588, 598 (S.D.N.Y. 2013) and <u>Nimmer on</u>

<u>Copyright</u> § 13.03.

  If this Court uses the ordinary observer test, it must attempt to replicate the response of

an ordinary person of reasonable attentiveness.  <u>Concrete Mach. Co.</u>, 84 F.2d at 607.  This Court

must be objective and emotionally neutral.  It must remain impartial and be guided by the works

themselves, and whether the competing works reach the level of substantial similarity.

Something less than substantial similarity is not infringement. To that end, the Court must

scrutinize Dorland's letter and Larson's Short Story holistically to determine if the quantity of

the copied work is so minor that it verges as inconsequential in relation to the work as a whole.

This is especially important given the dramatically different ways in which the competing works

are used.

  With respect to the Dorland Letter, an ordinary person of reasonable attentiveness would

conclude that Larson did <u>not</u> unlawfully appropriate Dorland's expression.  <u>Concrete Mach. Co.</u>,

843 F.2d at 607 (Works can be substantially similar despite the presence of disparities.  The key

is whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to

overlook them, and regard [the works'] aesthetic appeal as the same."). Certainly, an ordinary

person would recognize the commonality of a kidney donation in both the Dorland Letter and

Larson's Story, and the similarity of a few words and phrases, but no rational fact finder would

mistake Dorland's Letter for Larson's Story.  The aesthetic appeal in context, or in this case, the

literary appeal between the works are simply not the same.  See, Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir.1960).

     E.      The Fragmented Literal Similarity test is an alternate test for infringement.

Courts have recognized that even when parts of a pre-existing work have been copied, the copying, although literal, is not comprehensive and therefore, not infringing. (May v. Sony Music Entm't, 399 F. Supp. 3d 169, 180 (S.D.N.Y. 2019)) ("[F]ragmented literal similarity exists where the defendant copies a portion of the plaintiff's work exactly or nearly exactly, without appropriating the work's overall essence or structure.")  Under the fragmented literal similarity test, "the question of substantial similarity is determined by an analysis of 'whether the copying goes to trivial or substantial elements of the original work."  Id.  See, also, Rose v. Hewson, No. 17CV1471 (DLC), 2018 WL 626350, at *4–5 (S.D.N.Y. Jan. 30, 2018), citing TufAmerica 968 F.Supp,. 2d at 598 and Nimmer § 13.03.  The copied text must be significant to the author's work to be infringing both quantitatively and qualitatively.  May, 399 F. Supp. 3d at 180, Ringgold, 126 F.3d at 75.

Here, Larson took a few notes from the Dorland Letter and used a few words and phrases from the letter in early versions of *The Kindest* in a totally different way than Dorland used her words and phrases. This does not pass the quantitative or qualitative test of fragmented literal similarity test. Unlike the situation in Situation Mgmt. Sys., Inc., 560 F.3d at 58–59, where the plaintiff identified hundreds of instances of verbatim copying and rough paraphrasing in defendant's works, Dorland can only identify a few words and phrases from her 381-word letter that Larson used.  The percentage of the original work that Larson used constitutes only a tiny percentage of the overall work. Therefore, Dorland fails to show how Larson's use rises to the

level found in the <u>Situation Management</u>, thus failing to show that Larson surpassed the infringement threshold.

      F.    <u>Larson's use of a few words and phrases from the Dorland letter is fair use.</u>

In addition to the *de minimus* doctrine and the lack of substantial similarity, the Court can find that Larson's use of a few words and phrases from Dorland' Letter was transformative fair use under 17 U.S.C. §107. Fair use "tempers the protection of copyright by allowing an author to use a limited amount of copyrighted material under some circumstances." <u>Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.</u>, 996 F.2d 1366, 1373 (2d Cir.1993).

The Supreme Court in <u>Campbell v. Acuff–Rose Music, Inc.</u>, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), said that "[f]rom the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, 'To promote the Progress of Science and useful Arts.' " <u>Id.</u> at 575, 114 S.Ct. 1164 (quoting U.S. Const., Art. I, § 8, cl. 8).

Section 107 says that despite the exclusive rights given under copyright, the use of a copyrighted work for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. The list is "illustrative and not limitative" and it provides only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses. <u>Campbell</u>, 510 U.S. at 577–78. Larson believes that her use of a few words and phrases from the Dorland Letter is forgiven under the fair use doctrine.

In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include:

    (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

(1)     <u>Purpose and character of the use</u>.  Dorland created her Facebook Group "to share her experience with her friends and family." [Coutercl. ¶ 34]  Dorland posted updates concerning her surgery [Coutercl. ¶ 40] and information concerning living kidney donations in general [Coutercl. ¶ 41]  Following her surgery, Dorland wrote a letter to the woman in Oregon who was the final recipient of her kidney in the surgical chain that Dorland started. [Coutercl. ¶ 49].  A copy of the letter was posted to Dorland's Facebook Group on July 7, 2015. [Coutercl. ¶ 55]  In the letter, Dorland writes about "the dire need in our country for kidneys" and hoping that "many more people would be motivated to donate an organ to a friend or family member in need." [Coutercl. Ex. A]  Thus, while the letter was posted to a private Facebook Group, it was actually addressed to the country at large in hopes of motivating others to consider organ donations.

Larson uses the Dorland Letter in a short story for a purpose that is totally different from what Dorland intended when she wrote and posted her letter.  Larson's use is highly transformative.  (<u>Authors Guild, Inc. v. HathiTrust</u>, 755 F.3d 87, 96 (2d Cir. 2014)) ("A use is transformative if it does something more than repackage or republish the original copyrighted work. The inquiry is whether the work "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message...." citing <u>Campbell</u>, 510 U.S. at 574  "[T]he more transformative the new work, the less will be the significance of other factors ... that may weigh against a finding of fair use." . . . [A] transformative work is one that serves a new and different function from the original work and is not a substitute for it.")

The fact that Larson earned $425 to date from licensing *The Kindest* [Am. Compl. ¶¶ 30-31] does not alter the transformative nature of her work.  See, Blanch v. Koons, 467 F.3d 244, 253 (2d Cir. 2006).  In fact, *The Kindest* may help to promote Dorland's expressed aim of encouraging others to consider organ donations. This factor strongly favors Larson.

    (2)    The Nature of the Copyrighted Work

Dorland's Counterclaim does not say what she ultimately intended to do with her letter other than to share her kidney donation experience with friends and family [Countercl. P 34], and to motivate others to make organ donations. [Countercl. Ex. A.]  What is more interesting is that Dorland says that several members of her Facebook Group expressed support for Dorland's kidney donation by "liking" or commenting on the posts.  [Countercl. P. 43]  Dorland complains that Larson "never commented on" or "liked" any of her posts.  [Countercl. P. 44-45]  This makes the Dorland's Letter seem chatty just like most Facebook posts, but not something to be protected.

It is also interesting that the Dorland Letter is one of many posts that Dorland made to her Facebook Group.  Dorland refers to her "posts" [plural] in her Counterclaim [p. 43], and she alleges that Larson "saw" every post and every comment that was made, whether by Dorland or another member of the Facebook Group." [Countercl.¶¶ 46-48]  It is also interesting that the letter is the only post that has been registered with the U.S. Copyright Office and that it took almost three years for Dorland to get around to register her letter.  [See Affidavit of Andrew D. Epstein submitted herewith.]  Thus, it does not seem like Dorland has spent much time in trying to protect her Facebook posts, other than the tardy registration of the Dorland Letter.

Additionally, the Dorland Letter is mostly factual and informational, and, while claiming to have published it to a limited Facebook audience, Dorland invited "likes" and "comments."

"Courts have generally adopted two types of distinctions in their analysis of the second factor: (1) whether the work is expressive or creative, such as a work of fiction, or more factual with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." (N. Jersey Media Grp. Inc. v. Pirro, 74 F. Supp. 3d 605, 619 (S.D.N.Y. 2015).

Because of the factual and informational nature of the letter and its publication, albeit limited to Dorland's Facebook Group, this factor under Section 107 again favors Larson.

(3)     The amount and substantiality of the portion used in relation to the copyrighted work as a whole

It has already been discussed that Larson was inspired by Dorland's Letter and that she used a few words and phrases in early versions of *The Kindest*.  The court should consider that "the amount and substantiality of the portion used in relation to the copyrighted work as a whole is small.  This is something of a sliding scale: the larger volume (or the greater importance) of the original taken, the less likely the taking will qualify as a fair use.  Adjmi v. DLT Entm't Ltd., 97 F. Supp. 3d 512, 533 (S.D.N.Y. 2015)

This factor thus employs both a quantitative and qualitative assessment, tempered, however, by determining the extent to which the appropriation is consistent with the transformative use.  May v. Sony Music Entm't, 399 F. Supp. 3d 169, 190 (S.D.N.Y. 2019).

As has been shown, Larson used only a small number of words and phrases from Doland's letter and Larson transformed the use into something vastly different from the Dorland Facebook post.  Thus, this factor greatly favors Larson.

(4)     The effect of the use upon the potential market for or value of the copyrighted work.

The fourth factor considers the effect of the use upon the potential market for or value of the copyrighted work. The question "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original." (Campbell, 510 U.S. at 590)

It is difficult to see how one Facebook post taken out of context with Dorland's other related Facebook posts would have any market value that could be usurped.  Thus, this fact greatly favors Larson.

Larson's use of the Dorland Letter satisfies the ultimate test of fair use, that is, whether the copyright law's goal of 'promoting the Progress of Science and useful Arts is better served by allowing the use than by preventing it. Blanch v. Koons, 467 F.3d 244, 251 (2d Cir. 2006)

G.    Dorland has not been damaged.

Dorland is seeking actual damages plus Larson's past and future profits from *The Kindest*.  [Counterclaim ¶182]. Even if this Court finds that Larson infringed the Dorland Letter, Dorland's damages are nominal at best.  Furthermore, Dorland is seeking attorney's fees under Section 505 of the Act. [Counterclaim ¶183].

Arguably, while early versions of *The Kindest* may have contained a few words and phrases similar to those in the Dorland Letter, Larson has since revised *The Kindest* and the final version of the story contains only the word "kindly."  [Countercl. ¶ 160]  All other accused words and phrases from the Dorland Letter have been removed from the final variant of *The Kindest*.  [See, Exhibit E.]  It should be noted that "kindly" is a play on the title of the Story.

Up through the time Larson completed the final version of her story for the Boston Book Festival [Exhibit E], she received total revenue of $425 from licensing *The Kindest*.  [Am.

Complt. ¶¶ 30-31]. Again, assuming Dorland is able to prove that Larson infringed the Dorland Letter, the maximum amount Dorland can recover is $425, and it is likely that after months of writing and promoting her story, Larson's expenses exceed her revenues; meaning that she did not earn any "profits" from the work.  Also, since the letter in *The Kindest* is only a small part of Larson's Story, Dorland is only entitled to a small portion of any profits earned.

Actual damages for copyright infringements are calculated in one of two ways, neither of which provides substantial potential recovery for Dorland.  First, damages may be calculated by measuring the difference between the original work's fair market value, and the profits lost as a result of the infringement. <u>Data Gen. Corp. v. Grumman Sys. Support Corp.</u>, 36 F.3d 1147, 1170 (1st Cir.1994). Damages may also be calculated by determining the amount a plaintiff would charge as a licensing fee to use the original work.  <u>See</u>, <u>Bruce v. Weekly World News</u>, 310 F.3d 25, 28 (1st Cir. 2002).  Dorland fails to show whether the Dorland Letter has any intrinsic, marketable or potential value, or whether the letter would command a reasonable licensing fee for use.  Therefore, Dorland's damages are nominal at best.

H.     <u>Attorney fees not available to Dorland because she did not register her copyright until after the alleged infringement.</u>

Additionally, Dorland is <u>not</u> entitled to attorney's fees as a matter of law because the Dorland Letter was not registered with the Copyright Office before the alleged infringement by Larson.  In order to recover attorney's fees, one must register an unpublished work either before the work is infringed, or within three months of publication. 17 U.S.C. § 412. Here, Dorland did not register the copyright to the Dorland Letter for almost three years after Larson allegedly infringed it.  [Countercl. ¶ 54 and Ex. B]  (<u>IvyMedia Corp. v. iLIKEBUS, Inc.</u>, 252 F. Supp. 3d 34, 41 (D. Mass. 2017)) "The Copyright Act does not permit statutory damages or

attorneys' fees if the allegedly infringing activity begins before the copyright was registered." Therefore, Dorland's request for attorney's fees must fail as a matter of law.

I.      Count IV - Intentional Infliction of Emotional Distress

Dorland is seeking damages against Larson for intentionally causing her emotional distress.  Dorland's claim for emotional distress is based on Dorland's perception that Larson was a friend who betrayed her by writing a story based on Dorland's kidney donation experience, and used a few words and phrases from the Dorland Letter in various versions of *The Kindest*. [Countercl. ¶¶ 197-202]

Even if this Court accepts as true for purposes of this Motion, all allegations made by Dorland, Larson's conduct as alleged does not rise to the level required by Massachusetts law to prove intentional infliction of emotional distress.

In order for Dorland to prove she has an actionable claim, she must establish that (1) Larson intended, knew, or should have known that her conduct would cause emotional distress; (2) the conduct was so "extreme and outrageous" that it was "beyond all possible bounds of decency" and "utterly intolerable in a civilized community;" (3) the conduct actually caused emotional distress; and (4) that the emotional distress was severe to the degree that "no reasonable [person] could be expected to endure it."  Agis v. Howard Johnson Co., 371 Mass. 140, 144-4 (1976).  Liability cannot be predicated on "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1977) (internal quotations omitted).

It is also insufficient if "the defendant has acted with an intent which is tortious or even criminal, or that she intended to inflict emotional distress, or even that her conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to

punitive damages for another tort." Id.  These particular standards are "aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feeling are involved." Agis, 371 Mass. at 145.  A judge may grant a motion to dismiss where the conduct alleged in the complaint does not rise to such levels.

Dorland fails to show how drawing inspiration from her life experience amounts to atrocious and utterly intolerable conduct within a civilized society. Moreover, a mere perceived betrayal of a friendship and hurt feelings does not give rise to an actionable claim for emotional distress.

Furthermore, Dorland has not alleged nor can she establish that Larson owed Dorland any duty of care with respect to their relationship. Even if the Parties were friends to one degree or another, and even if there were a few words and phrases from the Dorland Letter that were used in early variants of *The Kindest*, and even if Larson was influenced by Dorland's kidney donation experience as alleged, such behavior does not amount to extreme and outrageous conduct on the part of Larson that gives rise to a viable action for the emotional distress Dorland claims she suffered.  Larson feels badly, as she would for any person who is suffering, but she is simply not responsible for Dorland's emotional distress.

## IV.    Conclusion

For all of the above reasons, Dorland has failed to allege plausible claims from which reasonable inferences can be made that Larson is liable for copyright infringement, attorney's fees or the intentional infliction of emotional distress, and Larson requests this Court to dismiss Dorland's Counterclaims in their entirety.

Sonya Larson,
By her attorney,

May 15, 2020                    /s/ *Andrew D. Epstein*
                               _____
                               Andrew D. Epstein, Esquire
                               BBO #155140
                               Barker, Epstein, & Loscocco
                               176 Federal Street
                               Boston, MA 02110
                               (617) 482-4900
                               FAX: (617) 426-5251
                               Email: Photolaw@aol.com


Certificate of Service


        I certify that Plaintiff, Defendant in Counterclaim's Motion to Dismiss the Counterclaim
of Defendant, Plaintiff in Counterclaim was filed through the court's ECF system and a copy was
sent electronically on the day it was filed to all counsel of record.


                               */s/ Andrew D. Epstein*
                               _____
May 15, 2020                   Andrew D. Epstein