UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONYA LARSON,<br><br>   Plaintiff<br><br> v.<br><br>DAWN DORLAND PERRY,<br>COHEN BUSINESS LAW GROUP, PC and<br>JEFFREY A. COHEN, ESQUIRE,<br><br>   Defendants.<br><br>   AND<br><br>DAWN DORLAND PERRY<br><br>   Plaintiff-in-Counterclaim<br> v.<br><br>SONYA LARSON<br><br>   Defendant-in-Counterclaim | C. A. No.: 1:19-CV-10203-IT |

## DAWN DORLAND PERRY'S OPPOSITION TO SONYA LARSON'S MOTION TO DISMISS COUNTERCLAIMS

Comes now the Defendant and Plaintiff-in-Counterclaim, Dawn Dorland Perry ("Ms. Dorland") and submits this opposition to Sonya Larson's ("Ms. Larson") Motion to Dismiss Ms. Dorland's Counterclaim (the "Counterclaim") in this matter (ECF No. 75).

### I. INTRODUCTION

Through her Counterclaim, Ms. Dorland seeks to protect her rights and interests in a letter that she carefully crafted and sent to the final recipient in a kidney donation chain in which Ms. Dorland participated in 2015. After she sent the letter to the recipient of the kidney, Ms.

Dorland shared the letter in a "private" and "secret" Facebook group that she created, inviting who she believed to be friends and family to join the group so she could share the details of her journey through the process of donating her kidney to a stranger. Little did she know that Ms. Larson – someone who Ms. Dorland had once considered a friend – had joined the group for the sole purpose of lurking to mine details, information and insights for her own personal gain. Information and insights which she would ultimately incorporate into her own short story, *The Kindest*.[1]

      Not only did Ms. Larson manipulate her friendship with Ms. Dorland – and her access to Ms. Dorland's personal information – but she lied to Ms. Dorland, time and time again, to prevent Ms. Dorland from knowing what she was doing, and of course, from shutting down her access to the intimate details of Ms. Dorland's unique experiences.

      While Ms. Larson could have easily gleaned the information she learned from her manipulation and exploitation of her friendship with Ms. Dorland, and taken that information to write her own story – properly using her own words – that is not what she did. Instead, whether because of lack of talent, lack of imagination, or a stubborn insistence on hurting Ms. Dorland, Ms. Larson stole Ms. Dorland's words, heartfelt words that expressed Ms. Dorland's childhood trauma as the root of her motivation to donate her kidney, and she plunked them directly into a short story that she wrote about a woman Ms. Dorland's age, with Ms. Dorland's physical characteristics, and Ms. Dorland's mannerisms. And through this story, Ms. Larson mocked the character who shared Ms. Dorland's characteristics, and used her main character to express disdain toward this character. Not at issue in this motion, but as documents produced by Ms. Larson thus far have shown, Ms. Larson has already disclosed that she views the "Ms. Dorland"

---

[1] The most ironic of titles. See also, https://www.newyorker.com/magazine/2009/07/27/the-kindest-cut.

character in her short story to be portraying a "white savior" narrative. Ms. Larson has expressed through her communications that Ms. Dorland's protestations about Ms. Larson's copying of Ms. Dorland's work does Ms. Dorland a "disservice" because Ms. Dorland should not want to be associated with this negative portrayal that Ms. Larson has created.

Ms. Larson infringed Ms. Dorland's copyright, and she intentionally inflicted emotional distress upon Ms. Dorland. There is no basis upon which to dismiss Ms. Dorland's claims. Further, Ms. Larson has not asked this Court to dismiss Ms. Dorland's declaratory judgment or injunctive relief claims.

Ms. Dorland respectfully requests that the Court deny Ms. Larson's motion in its entirety.

## II. BACKGROUND

Ms. Dorland incorporates her Counterclaim herein in its entirety, and summarizes the facts contained therein for the convenience of the Court.

### Ms. Dorland's Friendship with Ms. Larson

Ms. Dorland met Ms. Larson in 2007, at Grubstreet in Boston, and their friendship truly began in 2010. Counterclaim, ¶¶ 8, 10. Ms. Larson was aware, at least since 2011, of Ms. Dorland's traumatic upbringing, and her struggle to come to terms with it as an adult. Id. at ¶ 18. After Ms. Dorland moved from Boston, she and Ms. Larson stayed in touch through writing conferences, particularly at GrubStreet's Muse & The Marketplace. Id. at ¶ 21.

### Ms. Dorland's Kidney Donation

After several years of interest in the topic, Ms. Dorland donated her kidney in a short kidney surgical chain in June of 2015. Counterclaim, ¶¶ 22-25. Ms. Dorland's kidney donation was a "paired exchange" with a young mother in Oregon. Id. at ¶ 26. However, as that term signifies, Ms. Dorland did not donate her kidney to the young mother in Oregon, as her kidney

was not compatible with that individual; Ms. Dorland donated her compatible kidney to a Los Angeles-based father of 12, whose wife was not a compatible donor. Id. at ¶ 24-26. In response, his wife donated her kidney to the young mother in Oregon. Id. After her kidney donation, Ms. Dorland wrote a letter to the young mother in Oregon (the "Dorland Letter"). Id. at ¶ 49.

Ms. Dorland's Private Facebook Group & Ms. Larson's Dishonesty

In connection with her kidney donation, Ms. Dorland created a private Facebook group, through which she shared updates about her donation with her friends and family. Counterclaim, ¶ 34-35. One of the people she invited to the group was Ms. Larson, because of a mistaken belief that Ms. Larson was a friend. Id. at ¶ 38.

After Ms. Dorland sent the Dorland Letter to the young mother in Oregon, she shared it with her friends and family in the Facebook group. Counterclaim, ¶ 55. Ms. Larson had access to the Facebook group, as she admitted on multiple occasions. Id. at ¶ 39. Ms. Dorland also knew that Ms. Larson had access to the group, as she interacted with all of the posts to the group. Id. at ¶¶ 47-48. Ms. Larson saw the Dorland Letter, she read the Dorland Letter, she took notes on the Dorland Letter, she recorded passages from the Dorland Letter, and she recorded passages and paragraphs from the Dorland Letter. Id. at ¶¶ 56-60. Yet, when Ms. Dorland emailed with Ms. Larson shortly after her kidney donation, Ms. Larson disclaimed any knowledge until she was pressed, when she ultimately was forced to say, "Ah yes – I did see on Facebook that you donated your kidney. What a tremendous thing!" Id. at ¶ 62.

Ms. Larson's Kidney Story

In 2016, Ms. Dorland learned through a mutual acquaintance that Ms. Larson had done a public reading of a story about a kidney donation. Counterclaim, ¶ 63. Given Ms. Larson's previous disclaimers of knowledge about Ms. Dorland's donation, this was a surprising piece of

4

information, and it was even more surprising when their mutual friend asked Ms. Dorland if she was the "inspiration" for Ms. Larson's story.² Id. at ¶ 64. Ms. Dorland subsequently engaged in an email exchange with Ms. Larson, wherein Ms. Larson was defensive, dishonest, disingenuous, and self-aggrandizing. Id. at ¶¶ 66-73. Despite Ms. Larson's inflated ego, her apparent belief that her friend's experience was hers for the taking, and her ability to spin any situation to her own benefit, she somehow failed to share with Ms. Dorland that she had appropriated Ms. Dorland's letter into her work in progress as her own work. Id. She also failed to tell Ms. Dorland that she had entered into a contract with Audible/Brilliance/Plympton in February of that year (2016). Id. at ¶ 117. Instead, she lied to Ms. Dorland, stating that she was "still working on the story" and didn't "feel quite ready to show the full thing to people". Id. at ¶ 69. Ms. Larson further lied to Ms. Dorland, stating that her story was not about a kidney donation. Id. at ¶ 77. Ms. Larson also lied in stating that she had "not even mentioned" the short story to anyone other than her writing group – when, in fact, she had entered into a contract to publish the story. Id. at ¶¶ 76, 117.

Ms. Larson was clearly invested in keeping Ms. Dorland in the dark about her short story.

Ms. Larson also lied to Ms. Dorland - clearly trying to keep Ms. Dorland invested in their "friendship" – stating that she had intended to tell Ms. Dorland about the story "should it ever be published." Counterclaim, ¶ 78. Of course *– **Ms. Larson knew it had already been published***. Id. at ¶ 117.

Over the course of the next two years, Ms. Larson's treatment of Ms. Dorland was increasingly destructive; Ms. Dorland did not know why. Counterclaim, ¶¶ 80-81. However, over time, Ms. Dorland learned that Ms. Larson had copied Ms. Dorland's letter in The Kindest – initially, the structure, tone, and much of the content, through the version published in the web

---

² A reasonable question, given the rarity of altruistic kidney donations.

version of American Short Fiction. Id. at ¶¶ 82-104. Later, Ms. Dorland learned that an earlier version of The Kindest, published prior to the parties' email exchange in 2016, contained a nearly verbatim version of the Dorland Letter. Id. at ¶¶ 114-136.

Ms. Dorland has since learned of other versions, as well, which are also infringing on Ms. Dorland's copyright. See Counterclaim, generally.

Ms. Dorland has suffered damages as a result of Ms. Larson's infringing works, as well as Ms. Larson's intentional infliction of emotional distress, through her lies, manipulation and exploitation of Ms. Dorland.

### III. ARGUMENT

#### A. The Motion to Dismiss Standard

When considering a motion to dismiss under Rule 12(b)(6), a court "accept [s] as true all well pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiffs." Sarvis v. Polyvore, Inc., No. CIV.A. 12-12233-NMG, 2013 WL 4056208, at *2–3 (D. Mass. Aug. 9, 2013) citing Gargano v. Liberty International Underwriters, Inc., 572 F.3d 45, 48 (1st Cir.2009). "The general rules of pleading require 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. "This short and plain statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Id. "To survive a motion to dismiss, the complaint must allege 'a plausible entitlement to relief.'" Fitzgerald v. Harris, 549 F.3d 46, 52 (1st Cir.2008).

#### B. Ms. Dorland's Copyright Claim Survives a Motion to Dismiss Inquiry

##### 1. Ms. Dorland Alleges Substantial Similarity.

Throughout her Counterclaim, Ms. Dorland alleges that the various versions of letter contained in *The Kindest* is substantially similar to the Dorland Letter. For example, in

6

Paragraphs 87 through 104, Ms. Dorland walks through the similarities between the ASF Web Letter, from the ASF Web version of *The Kindest*, and alleges that it is substantially similar to the Dorland Letter. See Counterclaim, ¶¶ 87-104. Similarly, in Paragraphs 114 through 129 of the Counterclaim, Ms. Dorland walks through the additional similarities between the Brilliance Letter, from the Brilliance version of the *The Kindest*, and the Dorland letter, and alleges that the Brilliance version is also substantially similar to the Dorland Letter. See Counterclaim, ¶¶ 114-129. Ms. Dorland did the same for the BBF version of *The Kindest* (see Counterclaim, ¶ 142) and the 2019 publication of *The Kindest* (see Counterclaim, ¶ 148).

Ms. Larson implores the Court to not lose "sight of the forest for the trees," and to not "focus too intently on particular unprotected elements at the expense of a work's overall protected expression," citing to case law in support of such cautions. See Larson Brief at p. 9. However, these cautions are misplaced. The cases cited seek to limit a court's over-scrutiny of the ***plaintiff's*** work – not the infringing work. See LovePop, Inc. v. PaperPopCards, Inc., 286 F.Supp. 3d 283 (D. Mass. 2018) ("in assessing substantial similarity, a court must focus upon the constituent elements of the ***plaintiff's*** work that are original") (emphasis supplied; internal quotations omitted). Here, Ms. Larson is pointing to Ms. Dorland's allegations comparing the works and demonstrating the similarities and actual copying, terming it a "narrow focus on individual words and phrases," and – inexplicably – Ms. Dorland's "obsession with her kidney donation". When, in fact, it is Ms. Dorland's demonstration that Ms. Larson did, in fact, copy her work. Ms. Larson's attempt to focus on her story ideas (i.e., the "purpose" of the letter in her story) – which are not the subject of copyright law and which are not at issue here – is not relevant, and does not support her motion.

7

## 2. Ms. Larson is Not Shielded By a *de minimus* Defense

Ms. Larson's attempt to employ the "*de minimus*" defense is unavailing and reflects a fundamental misunderstanding of the concept of a "*de minimus*" copying of a protected work. See Larson Brief, p. 11. While Ms. Larson attempts to argue that "even if" the letter contained within the various versions of *The Kindest* is "substantially similar" to the Dorland Letter, "such use was de minimus". Id. However, as courts have explained, "'*de minimis* copying' represents simply the converse of substantial similarity." Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC, 560 F.3d 53, 59 (1st Cir. 2009) citing 2 Nimmer & Nimmer, Nimmer on Copyright, § 8.10(G), at 8-26 (2008). Copying simply cannot be both "substantially similar" and "de minimus".

What Ms. Larson overlooks is that it is not the **volume** of the copying that forms the heart of the inquiry, but rather the nature of the copying. "That the copying involved only a small portion of the plaintiff's work does not by itself make the copying permissible. Indeed, 'even if the similar material is quantitatively small, if it is qualitatively important, the trier of fact may properly find substantial similarity.'" Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC, 560 F.3d 53, 59 (1st Cir. 2009) citing Nimmer on Copyright, § 13.03 [A][2][a], at 13-55.

Here, Ms. Larson copied – quantitatively and qualitatively – the core of Ms. Dorland's letter in the Brilliance Version of *The Kindest*. Each paragraph of the letter contained in *The Kindest* contains significant portions of Ms. Dorland's words and work, to the point that – as alleged in the Counterclaims – the letter contained in the Brilliance audio version of *The Kindest* is substantially similar to the Dorland Letter. While the subsequent versions of *The Kindest* were altered in an attempt to disguise the copying, the similarities are still apparent in each of the subsequent versions, and the letter contained in each subsequent version of *The Kindest* – the

8

ASF Web Version, the ASF variant, the BBF Version and the WTTN Version – all continue to be substantially similar.

While Ms. Larson suggests that this Court must review Ms. Larson's "short story" in comparison to Ms. Dorland's letter – that is not the case. Ms. Dorland's Counterclaim does not allege that the "short story" is a copy of the Dorland Letter. Ms. Dorland's Counterclaim alleges that the letter contained within the short story copies the Dorland Letter. Ms. Larson of course attempts to re-focus the inquiry in this manner, because the letter is but a portion of *The Kindest*. But of course, to focus on what portion of the copied material comprises the ***infringing work*** would permit Ms. Larson to create as much non-infringing content as she wishes in order to pass a *de minimus* and/or substantial similarity test. However, that is not the inquiry, according to the law: "the relevant question in each case is whether the similarity relates to matter that constitutes a substantial portion of [the pre-existing] work – not whether such material constitutes a substantial portion of the allegedly infringing work." TufAmerica, Inc. v. Diamond, 968 F. Supp. 2d 588, 595 (S.D.N.Y. 2013) citing Williams v. Broadus, No. 99 Civ. 10957(MBM), 2001 WL 984714, at *3 (S.D.N.Y. Aug. 27, 2001).

       3.    Under the Fragmented Literal Similarity Test, Ms. Dorland's Copyright Claim Survives a Motion to Dismiss

Regardless of the test applied, Ms. Dorland has properly alleged substantial similarity. In this matter, Ms. Dorland has alleged that Ms. Larson copied not only exact words and phrases of the Dorland Letter, but that she also copied the overall structure and essence of the Dorland Letter. See Counterclaim, ¶¶ 92-104 (comparing both the similarity of structure and phraseology of the two letters). Nevertheless, either test – the fragmented literal similarity test, or the ordinary observer test – favor Ms. Dorland, as Ms. Dorland has adequately pled her claim of

9

copyright infringement, including Ms. Larson's copying of the essence, the structure, and significant portion of the phrasing of Ms. Dorland's letter.

It further must be pointed out here that at this Motion to Dismiss stage, it is the allegations of the Counterclaim which must be taken as true, and not Ms. Larson's view of the facts, whether from the Amended Complaint or her opposition. See Larson Brief, p. 13. While Ms. Larson asks the Court to accept that she "took a few notes from the Dorland Letter and used a few words and phrases from the letter in early versions of *The Kindest*," these "facts" are not in the Counterclaim, and cannot be considered for purposes of this motion to dismiss.

What Ms. Dorland alleged is that Ms. Larson had access to Ms. Dorland's letter, through Ms. Dorland's private and secret Facebook group, Ms. Larson read the letter, she took notes on the letter, she recorded entire passages from the letter, and she recorded specific phrases and paragraphs from the letter. See Counterclaim, ¶¶ 55-60. Ms. Dorland further alleged that in the Brilliance Version of *The Kindest*, Ms. Larson not only copied the structure and essence of the Dorland Letter, as well as certain phrases, as set forth in Paragraphs 92-104 of the Counterclaim, but she had also copied direct passages that were personal to Ms. Dorland, such as "my own childhood was marked by trauma and abuse; I [wasn't given an] opportunity to form secure attachments with my family of origin." See Counterclaim, ¶¶ 120-121. Ms. Dorland further alleged that Ms. Larson copied phrases used by Ms. Dorland that are so unique that Google searches evidence that they have never before – or since – been used. See Counterclaim, ¶¶ 125-127. It is apparent, from a review of the texts, that Ms. Larson copied the vast majority of Ms. Dorland's letter, and did not add to it. See Counterclaim, Exhibits A and D. In other words, the letter contained in the Brilliance version of *The Kindest* is not only substantially similar to the Dorland Letter, it is nearly identical. Therefore, regardless of which test is employed, Ms.

Dorland has adequately pled substantial similarity, and therefore, Ms. Larson's motion to dismiss must be denied.

    4.  Ms. Larson's Copying of Ms. Dorland's Letter Does Not Constitute Fair Use

  Ms. Larson's fair use argument fails on several grounds.  ***First***, as set forth above, Ms. Larson did not use "a few words and phrases" from the Dorland Letter – she copied the Dorland Letter nearly in its entirety, both structurally and substantively.  See Counterclaim, ¶¶ 92-104; 115-129.  ***Second***, Ms. Larson contends that because Ms. Dorland has not stated what she intended to do with her letter, it is "not something to be protected."  See Larson Brief, p. 16.  Of course, Ms. Larson cites no case law or other support for this statement, because there is none.  Further, Ms. Dorland could not have been more clear about what she did with the letter – she sent it to the recipient.  The Dorland Letter is a letter.  It was – as Ms. Larson concedes in her brief – sent to the final recipient in the kidney donation chain.  See Larson Brief, p. 15.  After Ms. Dorland sent it, she shared it with her private and secret Facebook group.  See Counterclaim, ¶¶ 49-55.

  Third, Ms. Larson does not state what "fair use" she has employed.  She lists some potential fair uses: criticism, comment, news reporting, teaching, scholarship, or research.  See Larson Brief, p. 14. At no time in her brief does Ms. Larson identify what "fair use" excuses her copying of Ms. Dorland's work.  Instead, she focuses her discussion of the "purpose and character of the use" (first prong) on Ms. Dorland's use of her own letter, rather than Ms. Larson's use of the copied materials.  See Larson Brief, p. 15.  Ms. Larson then attempts to characterize Ms. Dorland's intent, starting "Larson uses the Dorland Letter in a short story for a

purpose that is totally different from what Dorland intended when she wrote and posted her letter." Id. Of course, Ms. Larson does not know what Ms. Dorland intended.[3]

While Ms. Larson claims her use of the Dorland Letter was "transformative," this argument fails. First, it is clear from review of the Dorland Letter alongside the Brilliance Version of *The Kindest*, and the letter included therein, that Ms. Larson did not alter the text of Ms. Dorland's letter in any meaningful way. Second, Ms. Larson injects new facts into the analysis, through the statement that she "earned $425 to date from licensing *The Kindest*", which is impermissible at the motion to dismiss stage. Finally, as stated above, Ms. Larson has failed to explain what fair use she is claiming.

Ms. Larson further persistently mischaracterizes the nature of Ms. Dorland's copyrighted work. See Larson Brief, p. 16-17. Ms. Dorland wrote an original and heartfelt letter to the final recipient in the kidney donation chain, which she subsequently posted on her private and secret Facebook group. See Counterclaim, ¶¶ 49-55. There is no doubt that letters, such as this, are afforded copyright protection. See, e.g., Salinger v. Random House, Inc., 811 F.2d 90, 94 (2d Cir.), opinion supplemented on denial of reh'g, 818 F.2d 252 (2d Cir. 1987) ("[t]he author of letters is entitled to a copyright in the letters, as with any other work of literary authorship.) citing Meeropol v. Nizer, 560 F.2d 1061, 1069 (2d Cir.), cert. denied, 434 U.S. 1013 (1977); 1 Nimmer on Copyright § 5.04 (1986); W. Patry, Latman's The Copyright Law 130 (6th ed. 1986). Yet, Ms. Larson persistently insists on referring to Ms. Dorland's copyrighted work as a "Facebook post." Larson Brief, p. 16 ("It is also interesting that the letter is the only post that has been registered with the U.S. Copyright Office"). It is not a "Facebook post," it is a

---

[3] Ms. Larson claims that the Dorland Letter "was actually addressed to the country at large", with no support for this statement, since the Dorland Letter was shared in a private and secret Facebook Group that had a limited number of members. See Larson Brief, p. 15; Counterclaim, ¶¶ 34-37.

letter, which is unequivocally afforded copyright protection. Ms. Larson also does not provide any support for her contention that Ms. Dorland's sharing of the Dorland Letter on her *private* and *secret* Facebook group constitutes publication of the Dorland Letter.

Finally, Ms. Larson's analysis of the impact of her copying of the Dorland Letter on the "potential market" for Ms. Dorland's letter misses the mark. Once again, Ms. Larson mischaracterizes the Dorland Letter as a "Facebook post," starting that "it is difficult to see how one Facebook post taken out of context with Dorland's other related Facebook posts would have any market value that could be usurped." Larson Brief, p. 18. The potential value is not in a "Facebook post." It is in the literary work that Ms. Dorland authored, and which she – not Ms. Larson – had the right to develop and market – if she so chose. As courts have clarified, it is not the existing market, but rather the "potential market" for the copyrighted work that is the relevant inquiry. See, e.g., Salinger v. Random House, 811 F.2d. at 99. Ms. Dorland is not required to establish that market at this motion to dismiss stage, nor does she need to demonstrate that she intends to market her letter at this stage of litigation.

Ms. Larson has failed to demonstrate fair use. ***First***, she failed to satisfy the first prong by showing that her admitted copying of Ms. Dorland's work fits within any of the categories of uses that can be fair. Instead, she has simply listed what types of uses have been deemed fair under the law and left the Court to guess which (if any) her copying falls within. ***Second***, Ms. Larson has obfuscated the true nature of the copyrighted work, glossing over the well-established legal protections afforded to letters as literary works, attempting to dismiss Ms. Dorland's work as a "Facebook post." However, it is Ms. Dorland's allegations in the Counterclaim that must be accepted as true, and as Ms. Dorland alleged, she carefully crafted the Dorland Letter using her own words, without referring to other letters, works or writings; the Dorland Letter is written in

13

Ms. Dorland's unique and personal style, and it is creative and original.  See Counterclaim, ¶¶ 49-55.  **Third**, Ms. Larson copied the whole of the Dorland Letter, in tone, structure, essence and content in the Brilliance Version of *The Kindest* – the letter within the Brilliance Version of *The Kindest* is nearly identical to the Dorland Letter.  See Counterclaim, ¶¶ 92-104; 115-129.  While Ms. Larson attempted to revise the letter contained within *The Kindest* for subsequent published versions, those subsequent versions remained substantially similar, with significant similarities that go well beyond fair use.  **Finally**, Ms. Larson's whole cloth copying of Ms. Dorland's letter has damaged the potential market and/or value of that work.  Therefore, each of the factors to consider in determining whether copying constitutes fair use weighs against Ms. Larson, and the fair use doctrine does no apply here, and Ms. Dorland therefore stated a claim for copyright infringement.

        5.        Ms. Dorland's Damages Cannot Be Determined At The Motion To Dismiss Stage

Ms. Larson claims that Ms. Dorland has not been damaged, but in order to do so, she once again inserts facts into the motion to dismiss record, notwithstanding the clearly established motion to dismiss standard that requires that all of the allegations in the Counterclaim be accepted as true, and that the Court limit its inquiry to the four corners of that document.  Ms. Dorland is entitled to conduct discovery into what profits Ms. Larson has earned as a result of the multiple publications of *The Kindest*, and Ms. Larson's counsel's representations concerning same in a motion to dismiss are not controlling.  Further, Ms. Dorland's interest in her copyright goes beyond the monetary, and she therefore would be entitled to nominal damages, even if Ms. Larson's profits and/or Ms. Dorland's damages are limited.  Further, Ms. Dorland is seeking other remedies in this litigation, in the form of a declaration and injunctive relief.  See, e.g., S. Credentialing Support Servs., L.L.C. v. Hammond Surgical Hosp., L.L.C., 946 F.3d 780, 787

14

(5th Cir. 2020) ("[t]he unavailability of statutory damages in this situation does not mean there is nothing to deter postregistration infringements; actual damages are available when a plaintiff can prove them. Although [the plaintiff] was unable to do so, it obtained another remedy that protects against future infringement: an injunction.)

    C. **Ms. Dorland's Intentional Infliction of Emotional Distress Claim Survives a Motion to Dismiss Inquiry**

Ms. Dorland sufficiently pled her claim for Intentional Infliction of Emotional Distress. As set forth in the Counterclaim, Ms. Larson's conduct, wherein she misled Ms. Dorland, manipulated their friendship for purposes of gaining access to Ms. Dorland's personal information through her private and secret Facebook Group, lied to Ms. Dorland by telling her that she had not finished the story she was working on about a kidney donation and had not published it – when it had in fact been published for several months – ostracized Ms. Dorland from their mutual friend group, including Ms. Dorland's mentors, and co-opted personal aspects of Ms. Dorland's life, including but not limited to sensitive matters such as Ms. Dorland's childhood trauma and abuse. Ms. Larson did all of these things knowing that it would cause severe emotional distress to Ms. Dorland. See Counterclaim, ¶¶ 197-212. As Ms. Dorland alleged in the Counterclaim, Ms. Larson's actions were extreme and outrageous, Ms. Larson knew it would cause emotional distress, it did, in fact cause emotional distress, and the emotional distress that Ms. Dorland has suffered is severe.

The cases cited by Ms. Larson do not command dismissal of Ms. Dorland's claim. First, Agis v. Howard Johnson Co., 371 Mass. 140 (1976) is not on point, and in fact, supports Ms. Dorland's claim. In that case, the Massachusetts Appeals court reversed the dismissal of a claim for intentional infliction of emotional distress, holding that such a claim can, in fact, proceed without allegations of bodily injury resulting from said emotional distress. Id. at 144. In that

15

case, the court held that the claim should be permitted to proceed where the "plaintiff has alleged facts and circumstances which reasonably could lead the trier of fact to conclude that defendant's conduct was extreme and outrageous, having a severe and traumatic effect upon plaintiff's emotional tranquility." Id. at 145.[4] That is the same as here, evidencing that Ms. Dorland has adequately stated her claim.

In the case Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456 (1997), the Massachusetts Supreme Judicial Court affirmed the dismissal of a claim for intentional infliction of emotional distress, but on summary judgment – after the parties had the benefit of discovery and the development of the factual record. Here, Ms. Dorland has alleged that Ms. Larson's conduct was extreme and outrageous, that she knew her conduct would result in Ms. Dorland's emotional distress, and that it did, in fact, result in severe emotional distress, for which Ms. Dorland was required to seek medical treatment, and incurred medical expenses. See Counterclaim, ¶¶ 197-212.

Ms. Dorland has sufficiently pled her claim for intentional infliction of emotional distress, and will prove same at trial. Therefore, she respectfully requests that Ms. Larson's motion be denied.

## IV. **CONCLUSION**

Based on the foregoing, Ms. Dorland respectfully requests that Ms. Larson's Motion to Dismiss be denied in its entirety.

---

[4] Here, Ms. Dorland has alleged that Ms. Larson's conduct was "extreme and outrageous," but did not explicitly state that it was "beyond all possible bounds of decency" or that it was "utterly intolerable in a civilized community". While Ms. Dorland does not believe that the case law requires a literal recitation of these exact phrases, in the event the Court disagrees, Ms. Dorland would request the opportunity to amend her Counterclaim to include said phrases.

Respectfully submitted,

DAWN DORLAND PERRY

By her Attorneys,

PARTRIDGE SNOW & HAHN LLP

DATED: June 19, 2020

*/s/ Suzanne Elovecky*
Suzanne M. Elovecky (BBO #670047)
30 Federal Street
Boston, MA 02110
(617) 292-7900
(617) 292-7910 FAX
selovecky@psh.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants, if any, on June 19, 2020.

*/s/ Suzanne M. Elovecky*
Suzanne M. Elovecky

3853852.2/30402-2