UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SONYA LARSON,

        Plaintiff

    v.

DAWN DORLAND PERRY,
COHEN BUSINESS LAW GROUP, PC and
JEFFREY A. COHEN, ESQUIRE,

       Defendants.

       AND

 DAWN DORLAND PERRY

       Plaintiff-in-Counterclaim
    v.

SONYA LARSON

       Defendant-in-Counterclaim

C. A. No.: 1:19-CV-10203-IT

**<u>DAWN DORLAND PERRY'S MEMORANDUM OF LAW IN SUPPORT OF HER
MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS BY SONYA LARSON</u>**

Submitted By:

Suzanne M. Elovecky, Esq. (BBO #670047)
Partridge Snow & Hahn, LLP
30 Federal Street
Boston, MA 02110
selovecky@psh.com
(617) 292-7900
(617) 292-7910 FAX

I.     Introduction

Defendant and Plaintiff-in-Counterclaim Dawn Dorland Perry ("Ms. Dorland") brings this motion to compel the production of documents from Plaintiff and Defendant-in-Counterclaim, Sonya Larson ("Ms. Larson").  Following multiple attempts at resolving the matter through patience, discussion, and a prolonged conference pursuant to Local Rules 7.1 and 37.1, Ms. Dorland finds herself hamstrung between Ms. Larson's continued flouting of the Federal Rules of Civil Procedure and an imminent discovery deadline.  The parties have yet to take depositions in this matter, due to the outstanding documents and dispute.

The discovery dispute is one not only over specific requests, although that of course is part of the necessary analysis, but also Ms. Larson's counsel's approach to the document collection and review. Counsel has repeatedly stated that he simply forwarded document requests and subsequent email communications to his client and left her to her own devices to determine what was relevant and responsive, and therefore what would be produced.  When pressed on the significant concerns, outlined below, counsel's repeated refrain is that Ms. Dorland's claims are unlikely to yield significant damages, implying in some fashion that as a result, Ms. Dorland is not entitled to the protections and requirements of the Federal Rules of Civil Procedure.

In the most remarkable exchange, Ms. Larson's counsel inexplicably waved off requests for documents related to Ms. Larson's claims for intentional interference and defamation – both of which are asserted against Ms. Dorland – claiming "the burden to prove my defamation and intentional interference claims is on me."  See February 9, 2021 email, attached hereto as **Exhibit A**, at p. 2.  Of course, Ms. Larson is required to produce all requested documents concerning her tort claims, regardless of counsel's arguments to the contrary.

1

As Ms. Dorland sets out fully below, the documents produced to date reflect that the document collection was incomplete.  Yet, counsel has steadfastly refused to engage and to make a meaningful subsequent production.  Therefore, Ms. Dorland seeks an order compelling Ms. Larson to conduct a search of all files within her possession, custody and control, and to produce responsive documents that are relevant to the parties' claims and defenses in this litigation.

**II.    Ms. Dorland's Requests for Production and Ms. Larson's Responses; Documents To Be Produced.**

This case concerns a copyright dispute between Ms. Larson and Ms. Dorland.  As the pleadings reflect, Ms. Larson initiated this lawsuit following Ms. Dorland's exposure of Ms. Larson's use of Ms. Dorland's writings in the short story titled "The Kindest".  In Ms. Larson's view, as expressed in the operative complaint, Ms. Dorland's exposure of Ms. Larson's wrongdoing somehow entitles ***Ms. Larson*** to a declaration that she had not copied Ms. Dorland's work, as well as damages for defamation and intentional interference.  However, the version of the story that Ms. Larson has submitted to the Court, and the manner in which she frames her case, completely ignores prior published versions of the story, versions that Ms. Dorland reacted to during the relevant time period, which contain much closer copies of Ms. Dorland's work than the current version.

Through her tort claims, Ms. Larson claims damages resulting from Ms. Dorland's communications with publishers and others about Ms. Larson's use of Ms. Dorland's letter, claiming that Ms. Dorland's communications defamed Ms. Larson, and that they resulted in losses to Ms. Larson's relationships with two entities:  Boston Book Festival ("BBF") and American Short Fiction ("ASF").

Ms. Dorland responded with counterclaims for infringement of her copyright, a request for a declaration concerning her copyright, and for intentional infliction of emotional distress.

2

Following motion practice, this Court dismissed Ms. Dorland's claim for intentional infliction of emotional distress.  Ms. Dorland is not seeking documents related to that claim (although some of her requests, which were served several months before the Court's decision on that motion was issued, had related to that claim; those requests are not implicated herein).

As a defense to the claim for copyright infringement, Ms. Larson has claimed that her copying of Ms. Dorland's letter is protected by the Fair Use doctrine.  As this Court explained in its decision on Ms. Larson's motion to dismiss Ms. Dorland's counterclaim, the analysis of the fair use defense requires a factual examination of "the purpose of Larson's use," and the "nature of Larson's work", among other factors.  See ECF No. 99, p. 8-9.

**The Document Requests and Responses**

On **July 30, 2020**, Ms. Dorland served Ms. Larson with a Request for Production pursuant to Rule 34 of the Massachusetts Rules of Civil Procedure.  Following multiple requests for extensions,[1] Ms. Dorland did not receive a response to her request, or any documents, until January 12, 2021.  Upon review of the documents produced, it was readily apparent that the production was woefully insufficient. Therefore, Ms. Dorland promptly sought a conference pursuant to Local Rules 7.1 and 37.1, and that conference took place on January 15, 2021.  Due to the sheer number of issues with Ms. Larson's production, Ms. Dorland conducted the request-by-request portion of the discussion take place via email, and Ms. Larson's counsel agreed. Thereafter, following a detailed review of the production, Ms. Dorland's counsel sent a comprehensive email outlining the discovery concerns.  That January 25, 2021 email is attached

---

[1] Ms. Larson's requests for extensions were explained as necessary due to (a) the birth of Ms. Larson's daughter in September of 2020 and unforeseen complications suffered by both mother and child, and (b) Ms. Larson's counsel's representations that he was dealing with medical issues for a close family member, requiring his full attention.  Ms. Dorland was respectful of these significant matters, and afforded extensions during and through the fall of 2020. However, as the months progressed and the response was still not forthcoming, Ms. Dorland increased her requests for the production, seeking a conference pursuant to Local Rule 7.1.  Ms. Dorland did not engage in motion practice concerning these delays, once again, out of respect and concern for the medical issues cited, in conjunction with a realistic view of the discovery deadlines.

hereto as **Exhibit B**.  Through the 7.1 conference, both via telephone and email, Ms. Dorland raised the following significant and pervasive concerns:

      1)      In the context of "general objections" stated in Ms. Larson's response to Ms. Dorland's request for production,[2] Ms. Larson refused to produce electronically stored information in electronic format, claiming that she "objects to producing electronic copies of documents in the formats requested in that they are not required by the Federal Rules.  Plaintiff will produce paper copies of all relevant, material and non-objectionable documents".  See Ms. Larson's Response to Ms. Dorland's Request for Production of Documents, attached hereto as **Exhibit C**, on Page 1.  See also, Ms. Dorland's Request for Production of documents at Instruction Nos. 6-8, specifying the requested (standard) electronic format for Electronically Stored Information ("ESI"), attached hereto as **Exhibit D**.  Ms. Larson's counsel explained this objection during the parties' conference to state that he only works with paper and does not have the capacity to collect or produce in electronic format.  Of course, Rule 34 does, in fact, contemplate the production of electronically-stored documents in electronic format, and sets forth a process when that format is disputed.  Ms. Larson did not engage in that process and did not respond in any manner to Ms. Dorland's request for the issue to be resolved through conference.[3]

---

[2] Of course, it is well settled that "general objections" are not acceptable since the 2015 amendment to the Federal Rules of Civil Procedure.

[3] Pursuant to the comments to Rule 34, "In the written response to the production request that Rule 34 requires, the responding party must state the form it intends to use for producing electronically stored information if the requesting party does not specify a form or if the responding party objects to a form that the requesting party specifies. Starting the intended form before the production occurs permit the parties to identify and seek to resolve disputes before the expense and work of the production occurs.  A party that responds to a discovery request by simply producing electronically stored information in a form of its choice, without identifying that form in advance of the production in the response required by Rule 34(b), runs a risk that the requesting party can show that the produced form is not reasonably usable and that it is entitled to production of some or all of the information in an additional form."  See Committee Notes on Rules – 2006 Amendment.

2)      Ms. Dorland did not object to the paper production as a mere technicality and made that clear to Ms. Larson through the conference.  First, as Ms. Dorland explained, the production served on January 12, 2021 contained a black line across the top of each page, which in several instances obscured one more lines of text.  See, e.g., "P80" of the Larson production, attached hereto as **Exhibit E**, reflecting a black line obscuring the second line of text on the page.  (Ms. Larson subsequently replaced the paper production with a new version that lost the black line; Ms. Dorland isn't seeking a third production of these same pages, but instead uses this as an illustration of why the paper production was not adequate.)  Second, as Ms. Dorland further explained, none of the emails produced in paper format contained their attachments, whether indicated in the "top" email or earlier in an email chain. Third, a paper production does not permit any assurance that all metadata fields have been disclosed, such as cc's or bcc's, and the document's "created" date or "modified" date.  These points of information are particularly important in a case like this one, where various revisions, versions, and drafts are relevant.

3)      In each of Plaintiff's objections, she limited her production to documents relevant to the "Amended Complaint," omitting the counterclaim from her objection language.  When asked if documents related to the counterclaim were withheld, counsel stated that he did not know because he provided the document request to his client, and she had sole input on the document collection.  Counsel stated he did not know what his client did, but that she knew that a motion to dismiss was pending, so she may have withheld documents on that basis. Notwithstanding Ms. Dorland's engagement in the conference process, Ms. Larson did not respond to Ms. Dorland's concerns or arguments on this issue laid out both in a phone call and in Ms. Dorland's counsel's January 25, 2021 email.  This is a violation of Rule 34(b)(2)(C) of the Federal Rules of Civil Procedure.

4)      Ms. Dorland raised the concern that there were no text messages included in the production, despite the fact that emails produced reflected that the parties had communicated via text.  Ms. Larson did not respond to this concern and refused to produce additional documents.

5)      Ms. Larson's response frequently stated that Ms. Larson would produce "documents that she has been able to locate," without clarifying that she was producing all document in her possession, custody or control.  While this may in some instances appear a technicality, where counsel admits that he had no involvement in the collection process, and it appears he gave his client little to no instruction concerning her obligations or the scope of discovery, this difference becomes meaningful.  This issue was raised in the course of the parties' conference, and Ms. Larson did not respond to these concerns in any fashion. Further, there was no representation or confirmation that Ms. Larson engaged in a diligent search or that she reached out to any third parties over which she may have control for responsive documents, as required.

6)      Ms. Larson frequently stated she would produce documents which were "relevant and material," which implies that Ms. Larson was making materiality determinations during her unsupervised collection.  This is not permissible under the Rules.  To the extent Ms. Larson was making materiality determinations, Ms. Dorland seeks an order compelling the production of all responsive documents, and not just those that Ms. Larson, a layperson, deems "material."

7)      Ms. Dorland further raised the following issues concerning specific requests, none of which were answered by Ms. Larson:

a.      Request No. 8:  Documents reflecting, referencing and/or concerning your membership in the Facebook group referenced in Paragraph 11 of the Complaint.  In response to this request, Ms. Larson objected, claiming that the request was "vague and ambiguous in that

6

Plaintiff did not ask to be a 'member' of the group.  While some documents that are being produced happen to mention the Facebook group, Plaintiff does not believe that she has any document that are relevant and material to this request as it is worded."  This objection is improper and disingenuous.  Request No. 8 specifically refers to the terms as they are used in Ms. Larson's own complaint, which she presumably understands without difficulty.  There can be no ambiguity when read in conjunction with the complaint.  Further, the objection lays bare the deficiencies with Ms. Larson's approach to this production.  It is not sufficient to state what Ms. Larson "believes" that she has in her possession, custody and control.  She is required to conduct a diligent search, and to produce the responsive documents.  The "Facebook group" takes center stage in Ms. Larson's own complaint, and it implicates Ms. Larson's access to Ms. Dorland's original writings, which were posted within that group.  Further, documents related to Ms. Larson's access to and membership in the group are relevant to this matter where Ms. Larson's understanding of the size of the group and the nature of the group are intertwined with Ms. Larson's defenses, including her fair use defenses.  Ms. Larson has stated in her pleadings and during motion practice that Ms. Dorland's letter constituted a "Facebook post", rather than original writing, and has further suggested that Ms. Dorland's posting of the letter on her private, secret Facebook page is relevant, although Ms. Dorland's assumptions concerning the number of members in the group is wholly incorrect, as she has suggested there were several hundred members in the group, when in fact, the number is much smaller.  Further, Ms. Larson herself has recently served a second request for production of documents on Ms. Dorland, which include four (4) separate requests seeking documents related to the Facebook group.  These document requests were served after the Court's decision on Ms. Larson's motion to dismiss.  Therefore,

any suggestion that documents related to Ms. Dorland's Facebook group are irrelevant is simply not credible.

       b.     In Request No. 9, Ms. Dorland requested "communications referencing or concerning the Facebook group referred to in Paragraph 11 of the Complaint".  Ms. Larson responded to state: "Plaintiff will produce documents she has been able to locate to date that are relevant and material to the 2015 Factual Letter that Ms. Dorland posted on her Facebook site." See Ms. Larson's response to Ms. Dorland's request for production, at p. 4-5.  Once again, this response, and objection, is insufficient.  Ms. Dorland raised this issue with Ms. Larson, and a response was refused.  Ms. Dorland refers to subsection (a) above concerning the relevance of these documents, and Ms. Larson's mirrored requests.

       c.     In request No. 16, Ms. Dorland requested "All documents reflecting edits to "The Kindest" during the period of 2014 through the present."  Ms. Larson objected, stating the request is overbroad, and referring Ms. Dorland to other documents produced.  Once again, this is insufficient.  As Ms. Dorland pointed out during the 7.1 conference, this request goes to the heart of this matter, and is particularly relevant given the multiple published versions of the story.  Further, as Ms. Dorland pointed out in her January 25, 2021 email, there are specific reasons for this request, including but not limited to an email that Ms. Larson produced in conjunction with her initial disclosures which makes clear that, after submitting an earlier version of "The Kindest" to Plympton, she sought a re-recording of the story, as follows:  "I do have one major question, however: one of my stories ("The Kindest") contains a letter sent from one character to another, which includes a couple sentences that I'd excerpted from a real-life letter.  I'm now realizing that for ethical reasons I am uncomfortable keeping those lines in, and would very much like to revise them.  I know that the story has already been recorded, but is

there any way that those few lines might be re-recorded with the new lines?  I understand that this may be a HUGE pain.  But I feel quite strongly about this and want to see if such a change is possible."  <u>See</u> P82 of Larson production, attached hereto at **<u>Exhibit F</u>**.  Subsequently, according to the documents produced, Ms. Larson sent a redlined excerpt of the sections she wanted re-recorded, but she did not produce that attachment.  This attachment, and any other edits to "The Kindest," are clearly relevant to the core issues in this case.

These edits are further relevant inasmuch as they go to the "nature of Ms. Larson's use" of Ms. Dorland's writings.  As reflected in the documents produced, Ms. Larson originally drafted "The Kindest," and the kidney-donor character, with the name "Dawn" rather than "Rose."  <u>See</u> **<u>Exhibit G</u>** (excerpt from early draft of "The Kindest", as produced).  As a member of Ms. Larson's writing group stated, "[t]he first draft of the story really *was* a take-down of Dawn, wasn't it?  The character had Dawn's name, and everybody in that workshop immediately recognized Dawn Dorland in the story …".  <u>See</u> P79 of Larson's Production, attached hereto as **<u>Exhibit H</u>**.  This clearly goes to the "nature of the use," as well as Ms. Larson's state of mind in utilizing Ms. Dorland's works within her short story.

    **d.**    In Request No. 20, Ms. Dorland requested "All documents concerning the June 22, 2016 reading of "The Kindest" referenced in Paragraph 21 of the Complaint."  Ms. Larson did not object to this request on any grounds, but instead merely stated that "Plaintiff will produce the portion of "The Kindest" that she read on June 22, 2016."  That is not what was requested and given the absence of any timely objections (***no objections to date***), Ms. Dorland is entitled to all of the requested documents.  Further, where the June 22, 2016 reading is raised in Ms. Larson's operative complaint as a relevant event, this request is proper, and is not overly broad or unduly burdensome.  Finally, where the June 22, 2016 reading was the event that

informed Ms. Dorland that Ms. Larson had written a story related to a kidney donation, and

documents reflect that Ms. Larson was very concerned about Ms. Dorland's reaction to the story,

any communications concerning the reading were likely to touch on matters that are relevant to

all of the parties' claims, including but not limited to further admissions by Ms. Larson that she

did, in fact, copy Ms. Dorland's letter.  See, e.g., **Exhibit J.**

      e.     In Request No. 43, Ms. Dorland requested all communications between

Ms. Larson and her writing group concerning "The Kindest" regardless of whether the story had

been assigned that title at the time of the communication.  In Request No. 44, Ms. Dorland

requested communications between Ms. Larson and her writing group concerning Ms. Dorland

and the Dorland letter.  In Request No. 45, Ms. Dorland sought communications between Ms.

Larson and her writing group concerning the BBF and the One City One Story contest.  In

Request No. 46, Ms. Dorland requested communications between the writing group that Ms.

Larson had been copied on, even if not an author.  To each of these requests, while Ms. Larson

objected and limited her response to non-privileged emails (which was not a limitation present in

the vast majority of responses), she *agreed to produce all such documents*.  See Exhibit B.

However, a review of the production makes clear that all such documents were not produced.

First, while the email transmitting an early draft of "The Kindest" to Ms. Larson's writing group

was produced (and, subsequently, the attachment was also produced), there are no emails or

other communications (as defined by the Local Rules) that indicate the writing group's receipt of

that email, their comments on the draft, or discussions that were later referred to in subsequent

emails (i.e., as referenced above, the discussion of how everyone in the group who read the story

immediately recognized that the "Dawn" in the early draft of the story was, in fact, "Dawn

Dorland").  Second, the production contains several emails between Ms. Larson and her writing

group concerning the issues raised by Ms. Dorland over Ms. Larson's use of Ms. Dorland's letter in "The Kindest," but only for the time period of July 18, 2016 through August 9, 2018.  The emails reflect that the writing group spoke extensively of Dawn Dorland, assigning her the nickname "DFD" (which is identified as meaning "**D**awn **F**\*cking **D**orland"), mocking her clothing, her manner of speaking, her care of her pet, and her reactions to having her work appropriated by someone she had – correctly or incorrectly – deemed a friend.  <u>See, e.g.</u>, p. 208-214, 220-225 of Larson's Production, attached hereto as **Exhibit K**.  However, all of these discussions stop on the eve of what was arguably the most crucial event in this case: the BBF's decision to cancel the One City, One Story program, and therefore the publication of "The Kindest".  This decision by the BBF implicates each and every issue in this case, including Ms. Larson's copying of Ms. Dorland's work, Ms. Larson's tortious interference claim concerning the BBF and Ms. Larson's defamation claim.  The final email produced by Ms. Larson between herself and her writing group took place before the Boston Globe published its second article.  Based on prior email exchanges, it is highly unlikely that Ms. Larson did not discuss the cancellation (and any damages she may have suffered or not suffered) and the second newspaper article with her writing group.  <u>See, e.g.</u>, **Exhibit K**.

    Put simply, it is not credible that Ms. Larson and her writing group ceased all communications concerning Ms. Dorland, Ms. Dorland's letter, "The Kindest", the BBF, and the One City One Story program on the eve of the second Globe article, and never spoke of them again.  It is also not credible that these communications are privileged.[4]  Where Ms. Larson agreed to produce these documents, further productions are **<u>required</u>**.  In this instance, where

---

[4] Some of the emails reflect that one of the members of the writing group, Celeste Ng, is married to an attorney who wrote to the group concerning his view of the dispute.  However, those communications <u>were produced</u>, which is appropriate, where even if Ms. Larson had engaged this attorney, any privilege that would have otherwise existed was waived when the discussions took place in an email chain with all of the members of the writing group.

Ms. Larson's counsel admitted no knowledge as to the document collection process or the decision-making concerning what was produced and what was withheld, Ms. Dorland has no confidence that that search and production was sufficient, particularly given the clear omissions identified herein.

                    f.       In Request No. 50, Ms. Dorland requested "All communications between your friends and the BBF, as referenced in P's Initial Disc. 131, to the extent you were copied and/or have a copy in your possession, custody and control."  In the referenced document, the BBF wrote to Ms. Larson and stated: "Sonya, Please ask your friends to stop writing to us on your behalf. Our decision is final.  Just in case no one has said this to you, you should never have submitted a story to us that had a plagiarism claim against it and then continued to withhold that information from us when we picked the story. It seems to me that we have grounds to sue you for reimbursement of the $10,000 we have sunk into printing "The Kindest" plus legal fees. Kindly ask your friends not to write to us.  We have spent enough time on this already."  See P 269 of the Larson production, attached hereto as **Exhibit L**.  In response to a subpoena served on the BBF by Ms. Dorland, the BBF produced several emails between it and Ms. Larson's writing group members, wherein those writing group members wrote to the BBF expressing dismay at the cancellation of the One City One Story program.  See, e.g., BBF02606-7 (wherein Ms. De Leon, of Ms. Larson's writing group, wrote to the BBF expressing her "sincere shock (and disappointment and sadness and frankly, anger) in your decision to cancel One City One Story this year"; in response, the BBF responded to Ms. De Leon, asking "what gives you the right to be angry about our decision?" and stating, "[t]hat story should never have been submitted to us in the first place as it carried a threat of lawsuit from the get-go and about which we knew nothing. Sonya Larson withheld this information from us.  If we had known, we would not have

chosen her story."), attached hereto as **Exhibit M**.  Once again, given the prolific nature of the emails between Ms. Larson and her writing group up to August 9, 2018, it is simply not credible that the emails sent by the writing group members to the BBF, as well as the BBF's responses, were not forwarded to Ms. Larson, with commentary.  Each of those emails would be responsive to multiple requests which Ms. Larson agreed to produce.  It also cannot be seriously questioned that these emails speak to the causation between Ms. Dorland's statements concerning Ms. Larson's use of her letter in "The Kindest" and any damages that Ms. Larson may have suffered during 2018.   Ms. Larson's decision (unsupervised by her attorney) not to produce communications between herself and no less than three (3) members of her writing group concerning these emails is improper, and does not evidence compliance with Rule 34 of the Federal Rules of Civil Procedure.[5]

    g.  In Requests 58 and 59, Ms. Dorland sought all communications between Ms. Larson and any other person concerning Ms. Dorland's allegations of both plagiarism and copyright violations.  In response to Request No. 58, seeking documents concerning Ms. Dorland's allegations of plagiarism, Ms. Larson objected on the grounds that the request was "confusing", "unduly vague" and "burdensome" (not "overly burdensome").  While it may be true that it is "burdensome" to engage in discovery, Ms. Larson is the plaintiff in this case, and she initiated this litigation.  The request, which goes to the heart of the claims and defenses of both parties to this action, is not "overly burdensome," and it demands a full response.  While Ms. Larson failed to indicate whether documents were being withheld, she stated that "subject to

---

[5] Both Ms. Dorland and her counsel understand that not every discussion between parties took place in writing, and that it is possible that the imagined documents do not exist.  However, where no confirmation has been forthcoming concerning the question of whether documents have been withheld, and where Plaintiff's counsel has made clear that he had little to no oversight over the collection of documents and the decision concerning what was "material" or "relevant", Ms. Dorland seeks this order requiring counsel's involvement and a thorough search and production of all responsive documents.

and without waiving the General objections and these specific objections, relevant and material non-privileged emails and text messages that are in Plaintiff's possession will be produced."  In response to Request No. 59, seeking communications between Ms. Larson and any other person concerning Ms. Dorland's copyright infringement allegations, Ms. Larson objected stating, "Plaintiff objects to this interrogatory to the extent that it implies that Ms. Dorland owns the copyright to the Dorland letter," and then proceeded to agree to produce "relevant and material non-privileged emails and text messages that are in Plaintiff's possession."  See Exhibit B at p. 16.  As is uniformly the case throughout Ms. Larson's responses, the responses to Request Nos. 58 and 59 are insufficient, and do not comply with the Rules.  There can be no real good faith believe that Request No. 58 is confusing, unduly vague or ambiguous, as it is a simple and straight forward request which speaks to the heart of Ms. Larson's tort claims against Ms. Dorland. Further, Ms. Larson's response to Request No. 59 is disingenuous, as whether or not Ms. Dorland "owns the copyright to the Dorland letter" has no bearing on Ms. Dorland's "allegation" that Ms. Larson infringed that copyright.

Further, Ms. Larson agreed to produce emails, text messages and other communications, but she produced not a single text message in the entirety of her production.

Finally, what is particularly troubling concerning these requests is that Ms. Larson identified several individuals in her initial disclosures who have knowledge concerning this matter, and yet produced no documents or communications with these individuals.  See, e.g., Ms. Larson's Initial Disclosures, attached hereto as **Exhibit N**, at p. 1-5.

One named individual in particular, Sari Boren, was identified as a "friend and fellow writer" in Ms. Larson's initial disclosures, stating that Ms. Boren has knowledge

concerning Ms. Larson's claims.  It is therefore conspicuous that none of the documents produced reflect communications with Ms. Boren.  This is particularly conspicuous where Ms. Boren is referenced by Ms. Larson references in emails that were produced (see P222 of the Larson Production, Ex. K), stating that she had worked with Ms. Boren ("Sari") in developing a statement to the Globe.  Similarly, no documents were produced reflecting communications with Lisa Borders, a known close friend of Ms. Larson's, also identified in her initial disclosures.

These inconsistencies reflect a serious and tangible concern that Ms. Larson's production, as well as her production process, was wholly insufficient and was not in compliance with the Federal Rules of Civil Procedure.

h.      In response to Request No. 68, which sought "all documents and communications evidencing Ms. Dorland's contacts with 'various writing communities in the United States' concerning her claims of plagiarism, as referenced in Paragraph 45 of the Complaint", Ms. Larson responded that "many of the requested documents were produced by Dorland or her legal counsel and will not be duplicated."  See Exhibit C.  Once again, this response is impermissible under the Rules.  Ms. Dorland is entitled to know what communications were provided to Ms. Larson, what is within Ms. Larson's possession, custody and control, and how those communications came to be in Ms. Larson's possession, custody and control, to the extent that can be determined through the documents.  Alternatively, upon a complete production, Ms. Dorland can explore this area through deposition testimony once Ms. Dorland is provided through these requests with all of the documents in Ms. Larson's possession, custody and control.  However, it is clear from the objection that Ms. Larson has within her possession, custody and control concerning these matters, but has refused to produce them.

These communications are key to Ms. Larson's claims for defamation and intentional interference, and it is not permissible for her to refuse to produce these documents.

      i.      Ms. Dorland raised the following additional issues in the course of the conferences between counsel:

- Email threads were produced in one installment (i.e., rather than individual sent and received emails being produced). While the undersigned understands the temptation to reduce the duplication created by producing multiple emails in the same chain, each of those emails is responsive, and must be produced. Here, where Ms. Larson failed to do so, two issues (at least) arose: (1) email chains reflected that various branches broke off, and not all relevant messages were captured through the single chain production (see Exhibit A at first bullet point); (2) attachments to the various emails within the chain were omitted.[6]

- In at least one instance, a "Slack" message that was produced reflects that Ms. Larson produced only her own message and withheld what is indicated as "15 replies". See P227 of the Larson Production, attached hereto as **Exhibit O**.

- In August of 2018, Ms. Larson indicated that she located the "old" version of "The Kindest" on line in July of 2018 and communicated with Audible at that time to have it removed. See P. 244-247, attached hereto as **Exhibit P**. Despite this reference, no communications or documents were produced concerning this July 2018 exchange, despite the clear relevance of any attempt by Ms. Larson to remove an infringing (or allegedly infringing) version of "The Kindest" from circulation.

- Ms. Larson failed to produce any documents in the form of Facebook or other social media postings, despite the fact that the documents that were produced indicate that

---

[6] As a practical matter, **all** email attachments were omitted throughout the production, regardless of whether they were attached to an embedded email within the chain, the top email in a chain, or a stand alone email that was not part of the chain.

there was activity concerning "The Kindest" and Ms. Larson's dispute with Ms. Dorland on at least Facebook, if not also Twitter.  In particular, Ms. Larson's production reflected that she intended to post about her story (and potentially also Ms. Dorland) on a Grub Street Writers of Color group.  See, e.g., P137-138 of the Larson Production, attached hereto as **Exhibit Q**.  This was but one example, which represents yet another failing of the search and collection process undertaken by Ms. Larson in this matter.

**Plaintiff's Response to Ms. Dorland's Concerns**

During the parties' January 15, 2021 telephone discussion concerning these issues, Plaintiff's counsel stated that he would review Ms. Dorland's concerns with his client and supplement the production as necessary.  Following Ms. Dorland's January 25, 2021 email delineating her concerns, counsel had no response.  The next email received from Plaintiff's counsel was an email seeking counsel's agreement to a potential joint motion to extend discovery deadlines. Subsequently, on January 29, 2021, Plaintiff's counsel served, via email, notices of deposition concerning Ms. Dorland's co-defendants.

Previously, in January of 2021, shortly after receiving Ms. Larson's first production, Ms. Dorland had noticed Ms. Larson's deposition, aspirationally, for February 5, 2021.

On February 3, 2021, Plaintiff's counsel wrote to defendants' counsel seeking to "reschedule" Ms. Larson's deposition from February 5, 2021 (despite the fact that Ms. Dorland made clear she would not be taking said deposition until documents were produced).  In response, Ms. Dorland's counsel reminded Ms. Larson's counsel of the outstanding discovery disputes, asking for the status on the further document production.  That email exchange is attached hereto as **Exhibit R**.  Following Ms. Dorland's inquiry, Ms. Larson's counsel, surprisingly, responded to state "I thought you were going to get me a summary of exactly what

you are looking for.  I will make better copies of what I sent previously and send them to you

ASAP."  See Exhibit R.  When the undersigned responded that said summary was transmitted

over a week prior, Ms. Larson's counsel stated he could not find it, although later responded that

he located the email.  Id.

On February 8, 2021, Ms. Larson's counsel represented that he "mailed to each of you a

thumb drive containing the additional electronic documents that Suzanne requested at our recent

7.1 conference."  However, that thumb drive contained merely 73 documents, which consisted of

(a) reproduction of a few emails in PDF format (not the requested electronic format), and (b)

what is assumed to be certain attachments, which were not clearly associated with a particular

email in any reasonable fashion, which were almost without exception versions of "The

Kindest."  See **Exhibit S**.  Ms. Larson's counsel's explanation of this supplemental production

stated as follows:

> I sent your email to my client and asked that she put everything you requested on
> a smart drive.  There are many documents on the drive most of which are copies
> of the short story.
>
> Thousands of pages of documents have been provided to you through document
> production and subpoenas. ***I am not going to ask my client to search for any
> more documents other than the ones I produced previously and the ones I just
> mailed to you and Matthew.***  A search for more documents, even if they exist will
> take an unreasonable amount of time and money to fulfill.

See Exhibit A (emphasis supplied).  In response, the undersigned reminded Ms. Larson's counsel

that Ms. Larson (under his signature) brought other claims which are subject to discovery.  Ms.

Larson's counsel, incredulously, responded, "***The burden to prove my defamation and***

***intentional interference claims is on me***."  Id. (emphasis supplied). Of course, it is not counsel's

prerogative to withhold documents relevant to ***any*** claim on the grounds that only the plaintiff

has the right to said documents.

Since the thumb drive was produced, containing only copies of the short stories and duplicative emails, no further documents have been produced following Ms. Larson's refusal to engage further in the conference, and her stated refusal to search for or produce additional documents.

However, on the eve of filing this motion, knowing that the motion was to be filed on Monday, March 15, 2021, Ms. Larson's counsel emailed to defendants' counsel stating:

> I just heard from my client, and she tells me that she found at least a few additional documents we need to produce. She needs a few days to see if there are any more. If you send me your motion without filing it in court, I will again go through it with Ms. Larson to see if there are even more documents to which you are entitled. If there are documents to which you are entitled, I will send them to you with or without your motion. If you do not file your motion, we can avoid the pressure of a motion and response hanging over our heads, and at the same time, not have to involve the court.

See March 12, 2021 (6:33 p.m.) email from D. Epstein to S. Elovecky and M. Greene, attached hereto as **Exhibit T**. The undersigned cannot delay this motion any further, as the discovery period closes within the month, and depositions need to be scheduled. This is particularly the case where Ms. Larson's counsel only transmits documents via U.S. Mail, claiming lack of facilities in his home office, and the U.S. Mail has caused multiple delays in prior productions. Further, the delays and obfuscation that took place between January 25, 2021 and March 12, 2021 resulted in motion practice (which was already drafted and being compiled for filing as of the evening of March 12, 2021), and therefore significant expense, both in the conference process and the motion practice.

In light of the bad faith conduct outlined above, Ms. Dorland seeks sanctions in the form of attorney's fees for the time required to attempt to resolve these issues for nearly two months, on the heels of seeking any production at all for the period of July 30, 2020 (when the document requests were served) and January 13, 2021, when an insufficient production was finally made.

### III.   **Ms. Dorland's Request for Sanctions**

Rule 34 of the Federal Rules of Civil Procedure sets forth parties' obligations and the process for the production of documents in litigation.  Rule 37 of the Federal Rules of Civil Procedure set forth the process by which to address disputes.  That Rule clearly states that if a motion to compel is granted or if the requested discovery is provided after the motion is filed, the court to pay reasonable expenses in bringing a motion.  See Fed. R. Civ. P. Rule 37(a)(4)(A). Here, Ms. Dorland made every effort to resolve this dispute pursuant to Local Rules 7.1 and 37.1, conducting telephone conferences and follow-up email summaries.  At no point did Ms. Larson engage in a meaningful discussion about the concerns raised, instead stating no further searches would be conducted, based on counsel's perceived devaluation of Ms. Dorland's claim, with no acknowledgment of Ms. Dorland's defenses.  At no point did Ms. Larson claim that the documents being sought were not relevant, but only that she shouldn't have to put the time and energy into searching her files.  When an incomplete supplemental production was made, it was done without organization, without tying attachments to emails in any discernable fashion, and without addressing approximately 98% of the issues raised during the counsel conferences.  See Exhibit S, menu page from thumb drive.

### IV.   **Conclusion**

Based on the foregoing, Ms. Dorland respectfully requests an order as follows:  (a) requiring Ms. Larson to conduct a search of her files and to produce all responsive documents as identified in this memorandum; (b) for sanctions as a result of the interim refusal to even engage with the discovery issues; and (c) for leave for Ms. Dorland to either take or complete Ms. Larson's deposition outside the discovery period to take testimony on any late (or later) produced documents.

Respectfully,

DAWN DORLAND PERRY,

By her attorneys,


*/s/ Suzanne Elovecky*

Suzanne Elovecky, Esq. (BBO # 670047)
PARTRIDGE, SNOW & HAHN LLP
30 Federal Street, 7th Floor
Boston, MA  02110
(617) 292-7900
selovecky@psh.com

Dated:  March 15, 2021


## CERTIFICATE OF SERVICE


    I, Suzanne Elovecky, hereby certify that on March 15, 2021, I filed served a copy of the foregoing on all parties of record via the Court's ECF filing system.


   /s/ Suzanne Elovecky
Suzanne Elovecky

21