UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONYA LARSON<br><br>                     Plaintiff,<br>v.<br><br>DAWN DORLAND PERRY, et al.<br><br>                     Defendants. | Civil Action No.<br><br>1:19-cv-10203-IT |

**OPPOSITION OF PLAINTIFF, THIRD PARTY DEFENDANT
TO THE MOTION TO COMPEL
OF DEFENDANT, THIRD PARTY PLAINTIFF, DAWN DORLAND PERRY**

**I.**     **Introduction.**

    A.     <u>This is a dispute between two writers centered around a letter Dorland-Perry posted on Facebook that was addressed to the unknown recipient of one of her kidneys.</u>

This is an action involving a dispute between two writers. The dispute centers around a letter Defendant, Dorland-Perry (hereinafter, "Dorland") wrote in July 2015. The letter was written shortly after Dorland donated one of her kidneys to an unknown recipient. The letter was posted on a limited access Facebook Group Forum that Dorland used as a platform to share her kidney donation experience. [Second Amended Complaint ("SAC") ¶¶ 12-13]

Dorland claims that admittance to the Facebook Group was by invitation only. Larson was added to the Facebook group by Dorland without her permission.

(SAC ¶ 12).  Although Dorland has not yet divulged how many people were in the Facebook Group, Larson recalls seeing Facebook posts that indicated that there were between 250 and 300 people in the group.  (SAC ¶ 11)

The 2015 Dorland Letter was posted on Facebook without a copyright notation, and it was registered with the U.S. Copyright Office on June 10, 2018, almost three years after it was first posted.  (SAC ¶¶ 13-14)

Larson admits that she saw the 2015 Dorland Letter and found it interesting.  Larson claims she did not copy the letter but instead recorded a few thoughts and ideas from the letter in her notes for future reference. (SAC ¶ 17)

> B. <u>Larson was partly inspired by Dorland's letter as well as by many other things and life experiences to write a story about race and the white savior narrative.  One vehicle for the narrative is the donation of a kidney from a wealthy white woman to a working-class Chinese American woman.</u>

Ultimately, Larson wrote a short story, which she calls *The Kindest*.  The story is a fictional account about an alcoholic, working class Chinese-American woman living in Boston with her husband.  The Chinese-American woman receives a kidney from a wealthy white woman. (SAC ¶ 18)  Larson's story includes a brief letter in the second part of the narrative that is sent by the kidney donor character to the recipient character.  The letter is a small part of Larson's story and it is used primarily to introduce the kidney donor character, and to set the stage for the eventual meeting of the recipient and the donor. (SAC ¶ 19)

*The Kindest* has received widespread critical acclaim and it has been published in several variants that have evolved over time.  The first publication was as an audio book published in 2016 by www.Audible.com.  (SAC ¶ 28)  The story was next published in print in 2017, by American Short Fiction.  (SAC ¶ 31)  In 2018, Larson submitted the story to a competition run by the Boston Book Festival ("BBF") as part of its One City/One Story event.  *The Kindest* was

chosen as the winner of the competition and it was slated to be distributed in print to 30,000 people and online to countless more people in multiple languages. (SAC ¶¶ 32-35)

Larson acknowledges that she used a few words and phrases from the Dorland 2015 Letter in early versions of *The Kindest*. However, the version of the story that the BBF printed and that was ready for distribution in August 2018, did not contain any words or phrases that were the same as those in Dorland's 2015 Letter, except for the word "kindly" that is used in the sign off of the letter. Of course, the word "kindly" mirrors the title Larson gave to the Story. (Exhibit A - Larson Aff. ¶ 2)

      C.      <u>Dorland has been on a campaign to discredit Larson ever since she learned that Larson's story contained a kidney donation.</u>

From the moment that Dorland realized that Larson's story mentioned a kidney donation, Dorland has been on a rampage to discredit Larson and prevent the further distribution of *The Kindest*. (SAC ¶¶ 23-25, 37-45)

The Second Amended Complaint in this Action contains three counts against Dorland.[1]

In Count I, Larson accuses Dorland of intentionally interfering with her advantageous business relationship with ASF. Sometime after *The Kindest* was published by ASF, Dorland contacted ASF and accused Larson of "plagiarizing" her 2015 Letter in the Story. (SAC ¶ 64) Dorland called and emailed various ASF employees and board members for weeks about these plagiarism allegations. (SAC ¶ 65) As a direct result of Dorland's demands and actions, ASF, in consultation with Larson, decided to pull *The Kindest* from the ASF website, earlier than it had envisioned it would. (SAC ¶ 67)

---

[1] This Opposition is directed solely to the claims in Dorland's Motion to Dismiss and does not address any issues related to Defendants, Cohen Business Law Group, PC and Jeffrey A. Cohen, hereinafter, collectively "Cohen Law."

In Count II, Larson accuses Dorland of intentionally interfering with her advantageous business relationship with the BBF. Sometime after Dorland learned that Larson won the One City/One Story competition, first Dorland, and then her attorneys contacted the BBF and frequently made unsupportable claims against the BBF for copyright infringement, as well as claims for damages including Statutory Damages and attorney fees under the Copyright Act. (SAC ¶ 72) Even <u>if</u> Larson copied any portion of Dorland's 2015 Letter, that copying occurred long before Dorland registered the copyright to her 2015 Letter in 2018. Therefore, <u>at best</u>, Dorland can only seek to recover her actual damages plus any profits that Larson earned from *The Kindest*. In no event will Dorland be entitled to either Statutory Damages under 17 U.S.C. § 504(c), or attorney's fees under § 505. See, 17 U.S.C. § 412 [2].

Larson modified *The Kindest* for the BBF so that the letter within the Story bears <u>no</u> similarity to Dorland's 2015 Letter. (Larson Aff. ¶ 2) Nevertheless, Dorland and her attorneys continued their crusade against Larson and the BBF, threatening legal action against the BBF unless they agreed to Dorland's demands. Fearing that a lawsuit would cripple its modest resources, and as a direct result of Dorland's escalating and baseless threats, the BBF decided to revoke its decision to use Larson's Story. (SAC ¶ 73)

In Count VII, Larson accuses Dorland of defamation for disingenuously accusing Larson of plagiarizing her 2015 Letter by using it "in whole or in part" in *The Kindest*.[3] Dorland contacted ASF, the BBF, Larson's employer, writer's conferences, the *Boston Globe* and others

---

[2] Title 17 U.S.C. § 412: In any action under this title . . . no award of statutory damages or of attorney's fees, as provided by <u>sections 504</u> and <u>505</u>, shall be made for--
**(1)** any infringement of copyright in an unpublished work commenced before the effective date of its registration; or
**(2)** any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

[3] The accusation that Larson used Dorland's 2015 Letter "in whole or in part" in *The Kindest* was made by Dorland and confirmed by Cohen Law in a letter sent to the BBF dated July 3, 2018. Exhibit B.

spreading false and malicious claims of plagiarism against Larson. (SAC ¶ 109) Dorland's statements were made to discredit Larson and disparage her in front of her friends, acquaintances, colleagues, relatives, employers and other professionals in the writing community throughout the United States. (SAC ¶ 110)

After various motions to dismiss were filed and decided by this Court, Dorland eventually answered the Second Amended Complaint and filed various counterclaims, including one for copyright infringement of Dorland's 2015 Letter.

It is against this backdrop that the Parties have been conducting fact discovery.

## II.   The Discovery process has resulted in the production of thousands of documents.

### A.   The issues in this Action do not warrant the volume of documents that have been produced.

The volume of documents that have been produced by both Parties to date as well as those obtained through subpoenas issued to ASF and the BBF is, in a word, staggering. Additionally, Dorland has subpoenaed documents from Larson's employer, GrubStreet, and from Middlebury College, but Dorland's counsel has not yet been produced copies of these documents.

The number of documents produced to date is far beyond the proportional needs of this Action. If this Court is ever going to give fair meaning to the words "proportional to the needs of the case" under Fed. R.Civ.P 34, this Action epitomizes such a need. Discovery has been rampant and unchecked to date. The liability issues in this Action are relatively straightforward and the potential maximum damages for Dorland's copyright claim, amounts to $425, which is the gross total remuneration Larson has received from *The Kindest*. (Larson Aff. ¶ 3)

### B.   Larson brought claims against Dorland for her tortious interference with advantageous business relationships with ASF and the BBF.

In order for Larson to prove tortious interference with an advantageous business relationship, she will have to demonstrate the following:

a.) that a business relationship from which Larson might benefit existed;

b.) that Dorland knew of the relationship and intentionally interfered with the relationship for an improper purpose or by improper means, and

c.) that Larson was damaged by that interference.

Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 62 Mass. App. Ct. 34, 38 (2004).

Even before Dorland filed this Motion to Compel, Larson believes that Dorland already had the key documents that are proportional to the needs of this case. For example, Larson produced a copy of her agreement with ASF, which includes an acknowledgement that Larson was paid $300 for the right to publish *The Kindest*. Also, ASF supplied 748 pages of documents to Dorland by subpoena. This is in addition to the communications Dorland had directly with ASF, which Dorland initiated and of which she has full knowledge. Larson maintains that text conversations that she had with members of her writer's group and other friends have no bearing on a claim for interference with an advantageous business relationship against Dorland. Dorland's actions are key to this claim. Rather than getting into discovery disputes over Dorland's demands, Larson has now supplied copies of all text and email messages to Dorland.

The same is true for Larson's tortious interference claim against Dorland relative to the BBF. On May 17, 2018, Larson was informed that she won the One City/One Story competition. (Larson Aff. ¶ 4) Dorland knew that *The Kindest* was going to be published by the BBF and it was going to be "featured in the festival's One City One Story (1C1S) section." (See Exhibit B) As a fellow writer who lived and worked in Boston for years, and who participated in programs

at Grub Street, Dorland likely knew that publication and distribution of *The Kindest* would be beneficial to Larson.  Furthermore, Dorland knows what she and her attorneys communicated with the BBF, and how the BBF responded.

Dorland will probably deny that she intentionally and purposefully interfered with the relationship Larson had with ASF and the BBF when she and/or her legal counsel contacted these entities.  Whether or not Dorland's and/or the Cohen Law's actions and communications vis-a-vis Larson's relationships with ASF and the BBF were justified or not, is a matter for this court to consider at a future time. (See, Gouin v. Gouin, 249 F. Supp. 2d 62, 75 (D. Mass. 2003) and United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 814–17 (1990) (evidence of improper motives or the use of improper means in relation to either the existing contract or the prospective one may present a jury question).

The important thing is that long before this Motion was filed by Dorland, Dorland had almost 3,000 pages of documents from the BBF as well as documents from Larson.  As was stated with respect to a similar claim against ASF, Dorland knows what she and her attorneys communicated to the BBF, and exactly how the BBF responded.

Again, Larson maintains that text conversations she had with members of her writer's group and other friends have no bearing on claims against Dorland for interference with an advantageous business relationship.  Dorland's actions are key.  Notwithstanding, Dorland has now been supplied with copies of all text messages despite Larson's assertion that they are irrelevant and well beyond the proportional needs of this case.

> C. <u>Larson also accuses Dorland of defamation for communicating her alleged plagiarism allegations to numerous writing organizations.</u>

Dorland produced a number of communications she made to ASF, the BBF, Bread Loaf Writers' Conference and many others that contain allegations of plagiarism and copyright

infringement against Larson. Whether the documents supplied by Dorland are complete remains to be seen.

  D. <u>None of the Parties have yet to be deposed in this Action and further discovery is being sought from Dorland.</u>

Dorland has been noticed for a deposition on several occasions, namely, February 19, 25, 26, and April 1, 2021. Dorland's counsel refused to let her client be deposed claiming that she needs all of Larson's documents first. Finally, on the day that fact discovery in this Action ends (April 14, 2021), the date for Dorland's deposition has been set. Dorland will be questioned as to the sufficiency of her document production. Once again, Dorland knows was she communicated to ASF, the BBF, writer's groups and others and she knows what these entities said in response. Text messages between Larson and her writer's group and friends will not impact what Dorland said about Larson to ASF and the BBF.

The allegations of plagiarism and copyright infringement are intertwined with all of the claims in this Action, and these allegations will likely have to be resolved at trial. In any event, Larson has now produced all of the requested text messages despite her contention that they are irrelevant and well beyond the proportional needs of this case.

  E. <u>Dorland is continuing with her campaign to discredit Larson.</u>

Shortly after this Court's Memorandum and Order of February 2, 2021, in which Dorland's claim for the intentional infliction of emotional distress was dismissed, Larson propounded a set of interrogatories to Dorland. By agreement between counsel, Dorland was given additional time until April 2, 2021, to respond to the interrogatories. Larson is hopeful that full and complete responses will be forthcoming. Time will tell.

As part of discovery, Larson has produced over 60 copies of *The Kindest*. The various drafts and different versions are the best evidence, perhaps the only evidence needed to attempt

to prove Dorland's allegations of plagiarism or copyright infringement.  Of course Larson maintains that the different versions of *The Kindest* will support her defenses that the use of a few words and phrases from the 2015 Dorland Letter were both *de minimus* and fair use.  Certainly, the concept of using a letter within a fictional tale for any purpose including introducing characters is just an idea that cannot be copyrighted.

By seeking to compel further discovery, Dorland is continuing to harass Larson, a vendetta she started in June 2016, when Dorland first learned that Larson wrote a story that included a kidney donation.  (SAC ¶¶ 21-23)  In addition to Dorland's many letters to ASF, the BBF and various writer's groups as well as Larson's employer, Dorland also contacted the Boston Globe, shortly after *The Kindest* won the One City/One Story competition.  Dorland complained that Larson's story plagiarized Dorland's 2015 letter.  One of Dorland's goals was to coerce the BBF to drop Larson's story.  Dorland was successful.  See Exhibit B.  The involvement of the press contributed to the decision of the BBF to pull the story from its One City/One Story festival event.  (Larson Aff. ¶ 1)

Dorland is hardly finished with her attacks against Larson.  Dorland recently contacted Robert Kolker, a New York Times best-selling author, in order to get him to write a story about this case.  Kolker pitched the idea for a story to the <u>New York Times Magazine,</u> which has agreed to publish the story as early as this Spring, long before this litigation is resolved.

Larson was contacted by Kolker by email on March 16, 2021, seeking Larson's comments on this pending Action.  (See Exhibit C)  Kolker claims that he reviewed all of the pleadings on PACER, and has had at least two conversations with Dorland.  There is seemingly no end to Dorland's continuing campaign against Larson both in this Court and in the press.

F. <u>The number of documents requested and produced in this Action is not proportional to the needs of this case.</u>

Counsel for Larson wrote to Dorland's attorney, telling her that the discovery being sought by Dorland is not proportional to the needs of this case. While damages for Larson's claims of intentional interference need to be established, Dorland's <u>potential</u> damages for copyright infringement, if liability can be established, are limited <u>at most</u> to $425, the amount that Larson received from the sale of licensing rights to *The Kindest* from ASF and Audible.com. (Larson Aff. ¶ 3)  As previously stated, Section 412 of the Copyright Act, does not entitle Dorland to either statutory damages or attorney's fees, because she did not register the copyright to her 2015 Letter until more than a year after Larson wrote and published the first version of *The Kindest*.

With respect to Dorland's claim of copyright infringement, Larson produced the original draft of *The Kindest* that was <u>never shared</u> with anyone, as well as the five published versions of *The Kindest*, each of which contains different variants of the letter within the story.  Larson has also produced over 60 interim drafts and copies of her Story.  (Larson Aff. ¶ 6)

Since Larson admits that she had access to Dorland's 2015 Letter, the only question is whether or not there is substantial similarity between the letter in *The Kindest* and Dorland's Letter. The principal evidence that Dorland needs to attempt to prove her copyright claim consists of the 2015 Letter, the original draft of *The Kindest*, and the five subsequently published versions of the Story.  The words in these documents speak for themselves.  Of course, they also speak to Larson's defenses that the use of a few words from the 2015 letter were both *de minimus* and fair use.

Fed. R. Civ. P. 26(b)(1) requires that discovery be limited to information that is relevant to any party's claim or defense and proportional to the claim.

> 'Discovery procedures set forth in the Federal Rules of Civil Procedure seek to further the interests of justice by minimizing surprise at trial and ensuring wide-ranging discovery of information.' To that end, Rule 26(b) permits 'discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.' Factors that must be considered in weighing proportionality include 'the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'

[citations omitted.] Patel v. 7-Eleven, Inc., No. CV 17-11414-NMG, 2019 WL 10959829, at *1 (D. Mass. Dec. 16, 2019)

The definition of relevance in Fed. R. Civ. P. 26(b)(1) reflects amendments made in December 2015 that were intended to "[r]estor[e] proportionality as an express component of the scope of discovery," thereby preventing over-discovery and the use of discovery "for delay or oppression." (Advisory Committee's note to the 2015 amendments) cited in United Therapeutics Corp. v. Watson Lab'ys, Inc., 200 F. Supp. 3d 272, 277 (D. Mass. 2016).

To date, Larson has produced about 425 pages of paper documents. In addition, she has produced two thumb drives, one containing approximately 1,270 pages of documents and the other over 420 email and text messages. Dorland has produced almost 500 pages of documents, which do not include documents related to the dismissed claim for intentional infliction of emotional distress.

ASF has produced 748 pages of documents, and the BBF has produced 3,778 pages of documents. While some of the documents are duplicative including multiple versions of Larson's Story, and a few pages are blank, counsel still has to spend an inordinate amount of time in reviewing each of the over 7,000 documents.

Rule 34 requires that each request "must describe with reasonable particularity each item or category of items to be inspected." As Larson states in her attached affidavit, she was not

absolutely sure what Dorland was seeking from her when she received the requests from her counsel. Dorland's motion to compel more clearly describes the categories of documents that she is seeking which is why Larson produced another 420 text and email messages that were recently found. (Larson Aff. ¶ 7)[4]

### III.  Discussion of the responses Dorland thinks are deficient.

Here are the specific requests which Dorland contends are deficient:

**Request #8:** "Documents reflecting, referencing and/or concerning your membership in the Facebook group. As Larson said, in context, the word "membership" is vague. Larson did not join the group as a "member." She was involuntarily included in the Facebook Group. As is stated in ¶ 11 of the Second Amended Complaint, "Larson was added to this Facebook group forum without her knowledge or permission." Furthermore, Larson has never disputed that she had access to the 2015 Dorland Letter. Paragraph 17 of the SAC states:

> 17. Larson saw the 2015 Factual Letter that Dorland posted on Dorland's Facebook group page and she found it interesting. Larson did not download or print the 2015 Factual Letter but instead recorded a few thoughts and ideas from the letter in her notes for future reference.

Larson repeats that she does not have any documents that reflect, reference and/or concern her "membership" in the Group. She does have documents that reference Dorland's Facebook Group but not her membership in the Group. However, rather than relying on what is

---

[4] In a footnote to Doricent v. Am. Airlines, Inc., No. CIV. A. 91-12084Y, 1993 WL 437670, at *10 (D. Mass. Oct. 19, 1993), Professor Arthur Miller, Reporter of the Civil Justice Advisory Committee of the District of Massachusetts, explains that "[o]ne of the basic problems with discovery is that too little effort is made to serve properly drafted and well-thought-out requests. Indeed, in many instances, the best way to avoid needless discovery disputes might be for the party seeking discovery to serve several narrowly worded but well-focused discovery requests instead of a single global request intended to "cover all bases." The latter type of request often ends up being so ambiguous and broad that no adequate response can be made and it virtually invites objection. Counsel must recognize that properly drafted and painstakingly tailored discovery requests are the very foundation of successful pretrial processing of the case."

arguably an ambiguous and vague request, she has produced all documents that reference the Facebook Group.

**Request #9:**  Dorland is seeking communications referencing or concerning the Facebook Group as referred to in Paragraph 11 of the SAC.  Dorland asserts in her counterclaim that Larson never commented on any of Dorland's Facebook posts.  (See Dorland's Answer and Counterclaim, Doc. # 75, Paragraphs 44 and 45.)

Requests for documents as well as interrogatories are carefully worded discovery tools.  Parties cautiously and narrowly respond to document requests and tailor answers interrogatories as they are written.  Larson maintains that some of Dorland's requests, like Request No. 9, are very specific.  Dorland asked for communications referencing the Facebook Group.  She did not ask for communications concerning any Facebook posts.  In an attempt to avoid a continuing discovery dispute, Larson has now produced all communications that reference or concern posts Dorland made to Facebook.

**Request No. 16:**  In this request, Dorland is seeking all documents reflecting edits to *The Kindest*.  In her initial disclosures, Larson supplied copies of the five published versions of her Story.  She has since provided over sixty (60) copies of her Story.  Some of these versions contain minor edits to a work in progress.  They do not necessarily contain edits to the letter included in Larson's Story.  It took Ms. Larson many hours to compile these examples.  This is a further instance where the effort involved in compiling the requested documents far exceeds the proportional needs of this case.  Also, the redlined attachment specifically request by Dorland in her Motion has been produced.  Dorland has known for many months that Audible.com re-recorded part of Larson's Story.  This information was never withheld from Dorland.  (Larson Aff. ¶ 8)

Dorland notes that the original draft of *The Kindest* refers to the kidney-donor character as "Dawn." Larson does not dispute this, which is obvious from the original draft of Larson's Story which was produced months ago. The name Dawn was initially used as a placeholder name. Dawn eventually became the character "Rose," which is Larson's Mother's name. (Larson Aff. ¶ 9)

**Request No. 20:** In this request, Dorland is looking for all documents concerning the June 22, 2016 reading of *The Kindest* at a Boston bookstore. Paragraph 21 of the SAC acknowledges that Larson read "from the fourth part of the story where the donor and recipient finally meet. Larson did not read any part of the Fictional Letter that is included in her Short Story." Larson has already supplied Dorland with that portion of the story she read at the Boston bookstore. All of the documents relevant to this request have also been produced. It must be noted that Larson never copied Dorland's 2015 Letter. She took notes from the letter. (SAC ¶ 17)

Dorland notes that the communications seem to end when the BBF decided to cancel *The Kindest* as its festival winner. Before Dorland's counsel filed the pending Motion to Compel, Dorland was informed that some additional emails and texts were located and would be produced. All of these communications have now been sent to opposing counsel.

**Request No. 43:** As with Request 20, before Dorland filed the pending Motion to Compel, her counsel was informed that some additional emails and texts were located and would be produced. Finding these documents was a tedious and time-consuming process, but they have now been sent to opposing counsel on a thumb drive.

**Requests Nos. 44 to 50:** These seven requests are closely related. Dorland is asking for the following: communications between Larson and her writer's group concerning Dorland or

the Dorland letter (#44); communications between Larson and her writer's group concerning the BBF, the Story, the contest or Dorland (# 45); communications between Larson and her writer's group concerning the Story and Dorland (# 46); communications between Larson and her writer's group and any other entity concerning the Story, Dorland or the Dorland letter (# 47); communications between Larson and her writer's group concerning the Dorland Letter (# 48); communications between Larson and her writer's group concerning the kidney donations (# 49); and communications between your friends and the BBF concerning the Story.

Larson believes that she supplied responses to these requests last summer. In case any of these documents were lost in electronic transfers or in some other way, Larson has produced them again. In looking for these documents within her writer's group communications, Larson used the search terms, Dawn, Dorland, DD, DFD, kidney, letter, The Kindest, BBF, all with the date rage January 1, 2010 to the present. (Larson Aff. ¶ 10)

**Requests 58 and 59:** Dorland is seeking communications between Larson and other persons concerning Dorland's allegations of copying and/or plagiarism and allegations of infringement. Dorland sent an email to Bread Loaf Writers' Conference at Middlebury College saying that she contacted various writing communities and made allegations of plagiarism against Larson. Larson believes that all such communications have been produced either by Dorland herself or by ASF or the BBF.

Dorland's is seeking to compel Larson to produce communications with people that Larson knows such as Sari Boren and Lisa Borders. As explained, there are some text messages with people such as Ms. Boren and Ms. Borders that were recently found. These communications have now been produced. Larson may have worked with Ms. Boren on a

statement to the Globe reporter, but the Globe never referenced or published any part of the statement. Regardless, the statement to the Globe was produced months ago by the BBF.

**Request No. 68:** This request is seeking documents and communications evidencing Dorland's contacts with various writing communities regarding the allegations of plagiarism. This request is confusing and misleading. For example, in an email to Bread Loaf, Dorland said that she contacted various writing communities and made allegations of plagiarism against Larson. Dorland was asked to supply copies of these communications. Larson only has those documents and communications that Dorland produced. If Dorland did not produce these documents and communications, Larson does not have them. (Larson Aff. ¶ 11)

**Exhibit O** to the Motion to Compel does show that there were 15 replies to one of Larson's posts about the July 26, 2018 Boston Globe article, <u>Inspiration or Plagiarism, Writing Hackles Raised in Boston Dispute</u>. Larson did not intentionally withhold the replies. The replies were not transferred to Larson's thumb drive with the original post. The replies have now been produced.

**Exhibit P:** Larson did not intentionally withhold communications she had with Audible.com. It was never a secret that Audible.com agreed to re-record a portion of *The Kindest*. Dorland has known about this since early 2018. Larson thought she had supplied these communications. (Larson Aff. ¶ 12) In any event, these documents have been sent to Dorland again.

**Exhibit Q:** With respect to Exhibit Q, there is no question that both Facebook and the group, GrubStreet Writers of Color are mentioned. However, Facebook was mentioned only to state that Dorland had "de-friended" Larson. Also, although the Grub Street Writers of Color

group was mentioned in this document, Larson did not post anything to it, and there is nothing to produce. For what it is worth, the communication has been produced.

**Exhibits R-T:** These exhibits contain various exchanges between counsel. All document production was sent by Larson via U.S. Express Mail for next day delivery. Larson has no explanation why there was any delay in receiving the production.

Larson was instructed to turn over everything she has that was not privileged but was responsive to Dorland's requests. Larson did not appreciate the full extent of this directive. Larson did not send some documents to her counsel because she thought they merely chit-chatty communications with her friends, and were totally irrelevant to any of the issues in this case. (Larson Aff. ¶ 13)

For example, one document (which has now been produced) was sent by Calvin Hennick, who is a member of Larson's writer's group known as the Chunky Monkeys. The email is dated February 26, 2019, and it deals with doing a photo shoot for a story that was being written about the Chunky Monkey's group. It was a request to get as many members of the writer's group as possible together in the photo. The email contains one mention of Dawn Dorland, which is not particularly flattering as shown below.

> **Calvin Hennick** <hennick.calvin@gmail.com>Tue, Feb 26, 2019 at 2:53 PM
> Reply-To: grubchunkymonkeys@googlegroups.com
> To: grubchunkymonkeys@googlegroups.com
>
> And no, not Emeritus. Once a Chunk, always a Chunk. Only way out is death (or marriage to Dawn Dorland).

The rest of the email deals with the photo shoot and whether or not people can attend. Even though it has no relevance to this Action, the email has now been produced.

In other instances, Larson was asked to produce documents in which *The Kindest* was mentioned. When Larson was finishing the course work for her Master's Degree, she was asked

by at least one professor and several students to share some of her work. Larson sent emails to these individuals with attachments of some of things she had written. Included with these emails were several stories, including *The Kindest*, the same version of the Story that was supplied to Dorland dozens of times.

First, Larson did not think these emails were relevant. Second, she claims that she does not have the necessary technical skills to edit these emails in order to remove obviously superfluous attachments, namely, stories that have nothing to do with *The Kindest*. (Larson Aff. ¶ 14) Although it has been extremely time-consuming, Larson's counsel tried to print out the emails and other documents, both at his home office and at a local Staples Store. He did this so he could try to physically remove irrelevant attachments. When printed, the text is so tiny that it is virtually illegible. (See Exhibit D) Nevertheless, the text messages are perfectly visible on a computer screen. In the end, all of these documents have been supplied to Dorland without redaction and without removing stories totally unrelated to *The Kindest*.

Because of the pandemic, Larson and her counsel have not met in person for over a year. If they had been able to meet, the discovery process might have been more efficient. Regardless, the amount of time Larson and her attorney have spent going through emails, text messages and other documents via mail, email, document drops, thumb drives and telephone calls is measured in days not in hours. (Larson Aff. ¶ 15)

If Dorland had been as specific and exacting in her ninety-two (92) Requests for Documents in the beginning as she has been in subsequent communications with counsel, her Motion to Compel would likely not have been necessary. The amount of time spent in finding, collecting, printing or electronically downloading literally thousands of pages of documents, and

for counsel to review them before production is entirely beyond the proportional needs of this case.

Under the circumstances, Larson believes that all requested documents, whether relevant or not, have now been supplied to opposing counsel, and she respectfully requests that this Court deny Dorland's Motion to Compel as moot.

                                                Respectfully submitted,
                                                SONYA LARSON,
                                                By her attorney,

                                                /s *Andrew D. Epstein*

March 29, 2021                                  _____
                                                Andrew D. Epstein, Esquire (BBO #155140)
                                                Barker, Epstein & Loscocco
                                                176 Federal Street
                                                Boston, MA 02110
                                                Tel: (617) 482-4900
                                                Fax: (617) 426-5251
                                                Photolaw@aol.com

## Certificate of Service

I certify that Plaintiff's Opposition to Dorland's Motion to Dismiss was filed through the court's ECF system and a copy was sent electronically on the day it was filed to all counsel of record.

*/s/ Andrew D. Epstein*
_____

March 29, 2021　　　　　　　　　　　　　　Andrew D. Epstein