UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SONYA LARSON,

               Plaintiff

     v.

DAWN DORLAND PERRY,
COHEN BUSINESS LAW GROUP, PC and
JEFFREY A. COHEN, ESQUIRE,

           Defendants.

        AND

 DAWN DORLAND PERRY

            Plaintiff-in-Counterclaim
     v.

SONYA LARSON

            Defendant-in-Counterclaim

C. A. No.: 1:19-CV-10203-IT

## DAWN DORLAND PERRY'S OPPOSITION TO SONYA LARSON'S MOTION TO COMPEL FURTHER ANSWERS TO INTERROGATORIES AND TO PRODUCE ALL <u>REQUESTED DOCUMENTS</u>

Dawn Dorland Perry ("Ms. Dorland") submits this Opposition to Sonya Larson's ("Ms. Larson") Motion to Compel Further Answers to Interrogatories and to Produce All Requested Documents. Ms. Dorland opposes both Ms. Larson's request for further discovery and her request for attorney's fees, as the present motion has no basis in fact or law, and instead seeks to muddy the waters and deflect attention from Ms. Larson's own clear discovery failings as addressed in Ms. Dorland's currently-pending motion to compel. <u>See</u> ECF No. 106. In fact, as set forth below, where Ms. Larson's motion to compel was improperly filed as an "emergency"

motion with no meaningful attempt to meet and confer prior to a previously-scheduled status conference, Ms. Dorland is seeking her attorney's fees in connection with her opposition to this Motion.

### i.        Introduction

Ms. Dorland produced all of the relevant and responsive documents in her possession, custody and control in the summer of 2020 in response to Ms. Larson's ***first*** request for production of documents, leaving little to no remaining documents requiring production in response to the duplicative and/or irrelevant second set of requests.  Ms. Dorland responded to Ms. Larson's interrogatories where she was able, and where the interrogatories sought information related to the claims remaining in this litigation, rather than claims which were dismissed earlier this year.  There is simply no further discovery to be had from Ms. Dorland related to this litigation.

As set forth more fully below, Ms. Larson's motion consists of nothing more than gamesmanship, attempting to deflect attention from Ms. Larson's own discovery failings. Therefore, no relief is warranted, and instead, Ms. Dorland should be awarded her attorney's fees, as this motion is advanced in bad faith without following this Court's clearly established prerequisite of a meaningful meet and confer process.

### ii.       Relevant Factual and Procedural Background

Ms. Dorland's Background and Kidney Donation

Dawn Dorland was raised in poverty in rural Iowa and graduated *magna cum laude* from Scripps College with a B.A. in Religious Studies in 2002, and with a M.T.S. in World Religions from Harvard Divinity School in 2004.  See Declaration of Dawn Dorland Perry ("Dorland Dec."), ¶¶ 2-4.  After a career in television production, Ms. Dorland decided to focus on writing

as a career, and returned to school for an M.F.A. in creative writing, which she obtained at the University of Maryland in 2014.  Id. at ¶¶ 5-8.  Both before and after obtaining her M.F.A., Ms. Dorland was involved with GrubStreet in Boston, both taking and teaching classes, and generally participating in the vibrant writing community that has developed at GrubStreet over the past decades.  Id. at ¶¶ 6-9.  Through that involvement, Ms. Dorland met Ms. Larson in 2007, whom, over time, Ms. Dorland believed to be her friend.  Id. at ¶ 7.

In 2015, Ms. Dorland initiated a paired exchange kidney donation chain. Id. at ¶¶ 10-12. Ms. Dorland had been considering donating a kidney since she first was exposed to the concept through the New Yorker article "The Kindest Cut", which was published in July of 2009. Id. For reasons that were fundamentally connected to Ms. Dorland's upbringing, which unfortunately was colored by poverty and abuse, Ms. Dorland saw the opportunity to give of herself to a stranger in need as a way to reconcile with and move on from her past.  Id. at ¶ 10. After a move from the east to west coast with her spouse, and feeling settled in her new home and writing career, Ms. Dorland contacted the University of California at Los Angeles, and began the process of medical and psychological clearance, leading to her kidney donation in June of 2015.  Id. at ¶ 11-12.

Ms. Dorland sought support from her closest friends and family during the preparation and surgery through a "private" and "secret" Facebook group, which she created and managed a month or so before her surgery.  Id. at ¶¶ 13-15. By utilizing a small group on social media, Ms. Dorland could provide updates to her inner circle with a single post instead of multiple contacts, reducing the burden to herself, and while she was out of commission due to surgery, to her spouse or others who were managing the communications.  Id. at ¶ 16.  Ms. Larson was one of the approximate three dozen people that Ms. Dorland initially included – as of the time of her

3

surgery – in her private and secret Facebook group. Id. at ¶ 17. Once again, as of that time, Ms. Dorland believed that Ms. Larson was her friend. Id.

As time went on following her surgery, which was very successful leading to improved health for both the recipient of her own kidney and others in the donation chain, the UCLA medical team sought Ms. Dorland's participation in encouraging healthy members of the public to consider living kidney donation. Id. at ¶ 23. Ms. Dorland was happy to do so, and willingly participated  Ms. Dorland did not use her private, secret Facebook page for these public appeals, but rather her own Facebook page, which was facing all of her "Facebook friends", including acquaintances, coworkers, distant relatives, and more. Id. at ¶ 24.  Ms. Dorland was very thoughtful concerning what she posted on her own Facebook page, as opposed to what she posted in the private, secret group.  Id. at ¶ 25.  For example, posts that included photos or information about the recipient of her kidney or other donors, she wished to keep within an inner circle for privacy reasons, and those posts remained in the private, secret group. Id.  Posts concerning the public media events to which she was invited to participate, and which were designed to encourage others to donate for purposes of lifesaving for those in need, she shared more widely through her broader Facebook page and network. Id. at ¶ 24

Following Ms. Dorland's successful surgery, she crafted a heartfelt letter to the final kidney recipient in the donation chain. Id. at ¶ 26. This was not the individual who received Ms. Dorland's kidney, but rather another individual who was able to receive a viable organ as a result of the chain in which Ms. Dorland participated. Id. Ms. Dorland provided the letter to the administrators of the UCLA kidney transplant team so that they could in turn provide it to the anonymous kidney recipient.  Id. at ¶ 27. After learning that her transplant coordinator had been moved and inspired by her letter, Ms. Dorland shared the letter with the members of her private

and secret Facebook group. Id. at ¶ 28. She did not post the letter to her own broader Facebook

page. Id. at ¶ 29.  At the time that she posted the letter to her private and secret Facebook group,

Ms. Larson was still a member of that group. Id. at ¶ 30.

Ms. Larson's Use of Ms. Dorland's Letter

Unbeknownst to Ms. Dorland, Ms. Larson was harvesting Ms. Dorland's posts, both from

her private and secret group and from her own Facebook page, and was writing what was later

termed a "take down" of Ms. Dorland.  See Exhibit A (email chain amongst Ms. Larson's

writing group terming the early version of "The Kindest" as a "take-down" of Ms. Dorland).

Ms. Larson methodically reviewed ***every single post*** that Ms. Dorland made in her private and

secret group, something that Facebook indicated through a "seen by" notification available to

Ms. Dorland so long as Ms. Larson remained a member, including Ms. Dorland's letter to the

final kidney recipient in the donation chain. See Dorland Dec., ¶ 31.  During 2015 and 2016, Ms.

Larson wrote messages to her friends and co-workers, sharing Ms. Dorland's posts, and mocking

Ms. Dorland at every turn.  See Exhibit B (excerpts from Ms. Larson's production).  Ms.

Dorland had no idea this was happening and continued to include Ms. Larson within her inner

circle, sharing her most intimate details, for more than a year after Ms. Dorland's successful

kidney donation.

In 2016, a mutual friend of Ms. Larson and Ms. Dorland posted on Facebook that they

heard Ms. Larson read an excerpt from a story about a kidney donation; this friend asked Ms.

Dorland if she had been the inspiration for Ms. Larson's story.  Ms. Dorland knew nothing about

this story prior to this Facebook post.  Ms. Dorland reached out to Ms. Larson with a brief email

inquiring.  See Exhibit C (2016 email chain between Ms. Dorland and Ms. Larson). Ms. Larson

responded with extreme defensiveness and deflection, ultimately denying that her story had

anything to do with a kidney donation.  Id.  Ms. Larson further stated that she had not shared her story with anyone, other than her writing group.  Id.  This was a lie.  Because, in fact, Ms. Larson had earlier that year, in fact, published the story with Plympton, the parent company for both Audible and Brilliance Audio, and as of the time of Ms. Larson and Ms. Dorland's email exchange in the summer of 2016, Plympton had already engaged a voice actor to record the story.  See Exhibit D (Plympton contract dated February of 2016, listing "The Kindest" as one of the stories to be published).  Unbeknownst to Ms. Dorland, Plympton had recorded Ms. Larson's story in a form that included a letter that was nearly word-for-word identical to Ms. Dorland's own letter that she had written in 2015.  See Exhibit E (comparison of Ms. Dorland's letter side-by-side with Brilliance Audio version of Ms. Larson's copy contained in "The Kindest," as attached to the Amended Complaint at Exhibit J).  As Ms. Dorland learned through discovery in this litigation, it was only as a result of Ms. Dorland's correspondence with Ms. Larson in the summer of 2016 that Ms. Larson became concerned that her short story contained Ms. Dorland's original writing.  See Exhibit F (text message between Ms. Larson and Y. Goldstein, wherein Ms. Larson states that she asked for a re-recording after a conversation with Ms. Dorland).  Ms. Larson then wrote to Audible and asked them to re-record the portion of the story that - as Ms. Larson admitted – contained Ms. Dorland's writing – based on Ms. Larson's "ethical concerns".  See Exhibit G (email from S. Larson to Audible).  Ethical concerns that Ms. Larson did not have when she submitted the story for publication; ethical concerns that Ms. Larson did not have before Ms. Dorland reached out concerning the fact that Ms. Larson had used her access to Ms. Dorland's personal information for her own gain without the courtesy of informing Ms. Dorland.  Of course, at that time, Ms. Dorland was unaware that Ms. Larson's wrongdoing went well beyond the "discourteous" and instead constituted copyright infringement.  Because Ms. Dorland

did not know that Ms. Larson had copied Ms. Dorland's heartfelt letter and incorporated it within her story, Ms. Dorland agreed to move on from what she saw as a minor dispute with Ms. Larson.  See Ex. C.

In 2017, Ms. Larson's story, now titled "The Kindest," was chosen for publication by American Short Fiction ("ASF").  See Exhibit H (Ms. Larson's contract with ASF).  It was published first in a print volume of short stories.  Subsequently, Ms. Larson complained to the ASF publication staff that they had failed to adequately promote her story by sending it to the publishers of Best American Short Stories ("BASS"), sending several emails berating the ASF staff for the administrative error, incredulously assuming that had her story been sent, it would have also been chosen. See Exhibit I (emails between S. Larson and ASF re: BASS submissions). In an attempt to appease Ms. Larson and stop her complaints, the ASF staff offered to feature Ms. Larson's story on their website – something that had not originally been discussed, based on correspondence produced in discovery.  Id.  Ms. Larson accepted this "compromise,"[1] and cooperated with ASF concerning the website publication.  Id.

While "The Kindest" was featured on the ASF website, Ms. Dorland happened to be reviewing the ASF website for other purposes and happened across the link for "The Kindest." Dorland Dec., ¶ 35.  Ms. Dorland had previously been aware that ASF had published Ms. Larson's story, but Ms. Dorland had not chosen to pay for a subscription.  Id. at ¶ 34.  However, in 2018, when "The Kindest" was highlighted on the website, it was not behind a paywall, and so Ms. Dorland decided to read the story for the first time.  Id. at ¶ 35. When Ms. Dorland clicked through to the story, she was appalled to see that "The Kindest" contained a letter which was undeniably her own letter, with only slight changes that did nothing to obscure her tone,

---

[1] There is nothing in the ASF/Larson contract that requires (a) ASF's submission of Larson's story to BASS, or (b) publication of Larson's story on the ASF website.  See Ex. H.

language and structure.  Id. at ¶ 35. Ms. Dorland was particularly shocked by this revelation, because while she had realized from her conversations with Ms. Larson from 2016 (as well as subsequent in-person interactions wherein Ms. Larson had avoided all conversation and eye contact with Ms. Dorland) that Ms. Larson was not, in fact, a "friend," she had not realized that Ms. Larson was capable of being so brazenly dishonest and unethical.

Ms. Dorland was highly motivated to protect her own writing and, after consulting with a professional to determine the appropriate path, she reached out to ASF to inform them that the work that they had published included her text.  Ms. Dorland did not yet have the benefit of counsel, and her own colloquial understanding informed her initial communications, wherein she cited Ms. Larson's "plagiarism" of her work.

Shortly thereafter, Ms. Dorland reviewed Ms. Larson's biography page on Ms. Larson's website, and saw that Ms. Larson had self-identified as the highlighted author for One City/One Story, a feature of the 2018 Boston Book Festival.  See Exhibit J (Dorland000410).  Ms. Dorland therefore contacted the Boston Book Festival by telephone to inquire whether it was "The Kindest" for which Ms. Larson was selected.  See Ms. Dorland's response to Interrogatory No. 13, attached to Motion to Compel.  The Boston Book Festival appeared to be surprised that Ms. Larson had been publicizing her selection at that early date, as the BBF had yet to announce their selection, and Ms. Dorland noted that Ms. Larson subsequently removed the information from her website.  Id.  Nevertheless, it was later confirmed that the BBF had, in fact, selected The Kindest as its featured story.

Ms. Larson's dishonesty continued.  While the BBF worked with both Ms. Larson and Ms. Dorland to broker an agreement concerning Ms. Larson's copying of Ms. Dorland's letter, the BBF was clear with Ms. Larson:  Ms. Dorland has a valid claim, and a jury may find in her

favor.  See Exhibit K (email from BBF to Ms. Larson).  The BBF was very clear with Ms.

Larson: you may rewrite the letter contained in The Kindest completely – not just changing

words or phrases, but the entire structure and tone – ***with her only option being to withdraw her***

***story from the program***.  Id. (June 8, 2018 email from BBF to Ms. Larson).  Yet, in

communications to her writing group, Ms. Larson completely mischaracterized the BBF's stance,

telling her support group that the BBF "offered that [she] might" make changes "just to get [Ms.

Dorland] off their backs," and Ms. Larson "said sure".  See Exhibit L (June 25, 2018 email from

S. Larson to writing group). This was clearly another lie.

   While the BBF was attempting to facilitate an agreement, the Boston Globe discovered

that Brilliance Audio still had an offering of the first version of "The Kindest" that Ms. Larson

had published, with a near exact copy of Ms. Dorland's letter.  After the Globe pointed this out

to the BBF, the BBF decided to cancel its 2018 One City/One Story program.  Ms. Dorland does

not know the BBF's reason for the cancelation, but the timing speaks volumes.

   Following the BBF's cancellation of the 2018 One City/One Story program, and despite

the fact that **Ms. Larson** copied **Ms. Dorland's letter**, Ms. Larson filed suit against Ms.

Dorland.  Ms. Larson initially brought claims of defamation, violation of G.L. c. 93A, and

intentional interference with contracts, as well as requests for declaratory judgment concerning

Ms. Larson's copyright interests in the short story The Kindest. See ECF No. 1 (Complaint).

Ultimately, Ms. Larson voluntarily dismissed her 93A claim against Ms. Dorland, and the Court

subsequently dismissed the intentional interference with contract claims.  Ms. Larson later

moved to amend her complaint to add claims for intentional interference with advantageous

business relationships, and Ms. Dorland brought counterclaims for copyright infringement and

seeking declaratory judgment concerning her copyright interests in her letter.

<u>Ms. Larson's 2021 Discovery Requests</u>

In 2020, the parties exchanged written discovery requests. Ms. Dorland responded to Ms. Larson's requests through diligent search of her documents and a thorough production, which took place in June and July of 2020.

However, Ms. Larson did not respond to Ms. Dorland's discovery requests for several months, citing various reasons including Covid-19, the birth of a child, and counsel's spouse's medical issues. Ms. Dorland afforded generous extensions, respecting the significant issues that were cited. However, following an extensive meet and confer process, Ms. Dorland was forced to file a motion to compel. <u>See</u> ECF No. 106.

On February 24, 2021, Ms. Larson served Ms. Dorland with interrogatories, and on February 25, 2021, Ms. Larson served Ms. Dorland with a second request for production of documents. The interrogatories served on Ms. Dorland do not comply with Rule 33 of the Federal Rules of Civil Procedure, which states: "No party shall serve upon any other party as of right more than thirty interrogatories, including interrogatories subsidiary or incidental to, or dependent upon, other interrogatories, and however the same may be grouped or combined[.]" Fed. R. Civ. P. 33(a)(2). By way of example, Interrogatory No. 1, served by Ms. Larson, states as follows:

> **<u>Interrogatory No. 1</u>**
> In Paragraph 1 of your Counterclaim, you allege that you are an author, editor and writing educator. Please describe in as much detail as possible, the factual basis for the allegation that you are an author by identifying as part of your answer to this interrogatory all articles, stories, books, essays and other writings you have written from 2015 to date that have been produced, printed, distributed and/or published by you and/or by third-parties either in print and/or electronically; in addition, please describe in as much detail as possible, the factual basis for the allegation that you are an editor by identifying all articles, stories, books, essays and other writings you have edited from 2015 to date, identifying for whom you edited said articles, stories, books, essays and other writings, when you edited said articles, stories, books, essays and other writings,

for what purpose or purposes said articles, stories, books, essays and other writings were edited, and state whether any of said articles, stories, books, essays and other writings were ever produced, printed, distributed and/or published by third-parties or self-published either in print and electronically, and state where and when they were produced, printed, distributed and/or published; and please describe the factual basis for your claim that you are a writing educator by stating when and where you have taught any writing classes from 2015 to date, and identify as part of your answer to this interrogatory, where you taught said classes, how many students were in your classes, how much you were paid for teaching said classes and identify by whom you were paid.

The interrogatories contain twenty-five (25) numbered interrogatories, each as dense, unclear and confusing as the exemplar above.  Further, as with the exemplar above, several of the interrogatories have nothing to do with the case, the claims, or defenses of the parties. Interrogatory No. 1 asks Ms. Dorland to outline the following:

- All articles she has written from 2015 to date;
- All stories she has written from 2015 to date;
- All books she has written from 2015 to date;
- All essays she has written from 2015 to date;
- All other writings she has written from 2015 to date;
- All articles she has edited from 2015 to date;
- All stories she has edited from 2015 to date;
- All books she has edited from 2015 to date;
- All essays she has edited from 2015 to date;
- All other writings she has edited from 2015 to date;
- For what purposes any works she has edited were edited;
- Whether any works she has edited were published;
- Where any works she has edited were published;
- When any works she has edited were published;
- When she taught writing classes from 2015 to date;
- Where she taught writing classes from 2015 to date;
- How many students were in all writing classes she taught from 2015 to date;
- How much she was paid for all writing classes taught from 2015 to date; and
- Who paid her for all writing classes taught from 2015 to date.

None of the facts sought by Interrogatory No. 1 are relevant to this case, and the vast majority of the interrogatories served on Ms. Dorland are similar in nature, focusing on side issues wholly unrelated to the parties' claims or defenses, and in many instances, seemingly

11

designed to showcase the disparity of the two writers' lists of publications.  Of course, this comparison is meaningless, wherein Ms. Larson has published short stories, and while Ms. Dorland has written short stories, she has not sought to have them published, and instead focuses on other types of long-form fiction, while also raising her now three-year old son.

Ms. Dorland sought a brief extension to the 30-day deadline for the responses to the discovery served on February 24 and 25, 2021, until April 2, 2021.  This constituted a one-week extension for the interrogatories, and less than one week for the document requests.  On April 2, 2021, Ms. Dorland's counsel was engaged in defending a client's deposition and was unable to finalize the production and sought a brief additional extension to the weekend, and served the discovery responses on April 3, 2021, which was a Saturday.  This is of course to be contrasted to the more than six months' extension that Ms. Larson enjoyed in responding to the discovery served upon her by Ms. Dorland.

At 9 a.m. on April 5, 2021, Ms. Larson circulated an "Emergency Motion to Compel" (i.e., the present motion), announcing she intended to file the motion at 11 a.m., stating "if you wish to confer about this Motion in accordance with L.R. 116.3 (e) and (f), let me know as soon as possible."  See Exhibit M, April 5, 2021 email from D. Epstein.  Counsel did not seek to confer about the substance of the discovery responses in any meaningful manner and provided little to no time for discussion about the substance of the motion or the dispute.   Further, the undersigned had previously scheduled commitments during the 9 and 10 a.m. hours on April 5, 2021 and was unable to alter that schedule to review the draft motion or conduct a call.  While Ms. Larson's counsel did agree to hold off on filing her motion until after noon to permit a phone call at noon, he did not engage in a meaningful discussion, and only referred to his motion for any reference to his basis for the motion to compel, let alone the "emergency" basis pursuant to

which he was filing.  The parties reached no agreements, based on counsel's refusal to engage in a meaningful manner or in a reasonable time frame.

Of course, the only basis upon which to deem the motion an "emergency" was Ms. Larson's desire to file the motion to compel prior to the previously scheduled status conference scheduled for April 5, 2021 at 3:30 p.m.  That status conference was scheduled for the purpose of efficiently managing the discovery deadline in the face of Ms. Dorland's pending motion to compel.  Ms. Larson provided no reason for the designation of her motion as an "emergency," so Ms. Dorland is left to assume that the reason was strategic, designed only to play a game of "tit-for-tat" in light of Ms. Dorland's pending motion to compel.

At the April 5, 2021 status conference, the Court, sua sponte, removed the "emergency" designation from Ms. Larson's motion.

### iii.   **Argument**

As Ms. Dorland set forth in her responses and objections to Ms. Larson's discovery requests, several of the requests are so wholly unconnected to the claims and defenses of this litigation that Ms. Dorland sees no purpose for the requests other than to annoy, embarrass, or oppress Ms. Dorland, or to purposefully impose an undue burden and expense.  By moving to compel a response to these requests, Ms. Larson only compounds the harm imposed by these abusive requests, and Ms. Dorland therefore seeks her attorney's fees in not only responding to this motion, but in responding to the requests in the first instance.

Ms. Dorland responds to Ms. Larson's motion concerning specific discovery requests below.  However, as an initial matter, Ms. Dorland points out that in her motion Ms. Larson endeavors to "summarize" both the discovery requests and Ms. Dorland's responses, in many instances omitting substantive responses which would in fact resolve any dispute outlined in Ms.

Larson's motion.  In several instance, Ms. Dorland, pursuant to Fed. R. Civ. P. 33(d), referred to her document productions as part of her response to interrogatories, and that portion of her response was omitted in Ms. Larson's motion, claiming that certain facts were withheld from Ms. Dorland's interrogatory response, when in fact, said facts were incorporated by reference. Once again, this gamesmanship should not be rewarded or overlooked, and Ms. Dorland should be awarded her attorney's fees in light of this bad faith maneuver.

**Interrogatory No. 1**:  Ms. Dorland objected to Interrogatory No. 1 on several grounds, and she stands by those objections.  Ms. Larson did not set forth any justification for the this request in her motion to compel, and instead defeats her own claim of relevance by acknowledging that a "single sentence" in Ms. Dorland's counterclaim references Ms. Dorland's occupation.  Because Ms. Larson clearly seeks to attempt to embarrass Ms. Dorland by highlighting Ms. Dorland's lack of fiction publications, incorrectly assuming such a fact ***would*** embarrass Ms. Dorland, Ms. Dorland seeks a protective order preventing Ms. Larson from pursuing this line of questioning at Ms. Dorland's deposition, as it has absolutely no relevance to this litigation, and Ms. Larson has made painfully obvious her intent to continue down this path beyond an interrogatory and through to a motion to compel.

**Interrogatory No. 2**:  Ms. Larson seeks to compel a response to Interrogatory No. 2, despite the fact that ***Ms. Dorland responded to this Interrogatory***.  This further evidences the frivolous nature of this motion and the reasons for the Court's rules concerning the meet and confer process.

**Interrogatory Nos. 3 and 4**:  Ms. Larson claims she requires the identity of all people who were members of Ms. Dorland's private and secret Facebook Group – a group of which Ms. Larson was also a member of for a period of more than a year – and that she must know how Ms.

Dorland knew each person, how long she knew them, when they were admitted, how and when they were invited, and more. In 2020, Ms. Dorland produced multiple documents reflecting the posts made to her Facebook group, and those posts incidentally reflected certain members' identities, comments made, and other activity in the group. In attempting to explain why the identity of the members of the Facebook group is relevant, Ms. Larson instead only claims that information about Ms. Dorland's letter is relevant. The letter, including the Facebook posting of the letter within the group, was produced nearly one year ago. Ms. Larson states "All information related to the 2015 Letter could have relevance to Larson's defenses and it should be produced." The claims against Larson are for copyright infringement, and for a declaration concerning the copying that Larson engaged in. The members of Ms. Dorland's Facebook group, their relationships to Ms. Dorland, and the dates of their admission to the group is simply not relevant to that claim or Ms. Larson's so-called defenses.

**Interrogatories 6 through 10, 21**: Ms. Dorland initially brought a counterclaim of Intentional Infliction of Emotional Distress, which was dismissed by the Court earlier this year. Knowing of the dismissal, Ms. Larson nevertheless propounded discovery targeted at the since-dismissed claim. Ms. Dorland objected and continues to object. The claim was dismissed and the discovery sought has no relevance to the remaining claims.

**Interrogatory No. 15**: Ms. Larson propounded an interrogatory seeking a legal analysis that goes to the heart of this case. Ms. Dorland is not a lawyer, and is not equipped to respond to an interrogatory – under oath - seeking a legal analysis. In her motion, Ms. Larson points to analyses contained in Ms. Dorland's counterclaim. Ms. Dorland's counterclaim was not verified, was not under oath, and Ms. Dorland does not purport to have drafted it without the assistance of counsel. Ms. Dorland maintains her objections to Interrogatory No. 15.

15

**Interrogatory No. 16**:  Ms. Dorland objected to Interrogatory No. 16 as overbroad and unduly burdensome.  Ms. Dorland responded clearly concerning her contacts during 2018, which is the year that the complaint was filed in this matter.  She further clearly stated that "[t]hese are the only communications I had with reporters or the media prior to the commencement of litigation."  Ms. Dorland was clear in her response as to the time frame her response encompassed, which in Ms. Dorland's view is the relevant time frame.  None of the claims contained in Ms. Larson's operative complaint implicate communications with the New York Times or Robert Kolker.  Nor is there any allegation in the record that communications between Ms. Dorland and Mr. Kolker contain any information that is relevant to this litigation. Further, and once again, had Ms. Larson permitted a reasonable meet and confer period, the parties could have discussed and clarified this request, rather than litigating a minor issue through motion practice.

**Interrogatory No. 18**:  Ms. Larson moves to compel a further response to Interrogatory No. 18, claiming that Ms. Dorland failed to divulge certain contacts.  This is not true. Interrogatory No. 18 references Ms. Dorland's document production, which includes the vast majority of the contacts that Ms. Larson references in her motion to compel.  Ms. Dorland responded to Interrogatory No. 18 to the best of her ability, including through the reference to her document production, including Bates Number References, which Ms. Larson fails to address in her motion to compel.  In fact, it appears that the list of names of persons that Ms. Dorland communicated with was lifted directly from Ms. Dorland's document production, which was incorporated by reference within her response to Interrogatory No. 18.

**Interrogatory No. 23 and 24**:  Ms. Larson's production is not complete, as a motion to compel is pending.  Ms. Larson has not been forthcoming with her documents or her

information, as it was only after Ms. Dorland filed a motion to compel that Ms. Dorland

discovered that, notwithstanding Ms. Larson's statement in her interrogatory responses that a

$25,000 National Endowment of the Arts award was won "in part" due to The Kindest, that it

was, in fact, entirely based upon this short story.  Yet even in the present motion to compel, Ms.

Larson claims her only profits from The Kindest was $300 from ASF and $125 from Audible.

Ms. Dorland cannot and will not compute her damages until discovery is complete, including

Ms. Larson's deposition. The same is also true for Ms. Dorland's belief, if any, concerning "how

Larson profited" (Interrogatory No. 24).  However, Ms. Dorland objects to Interrogatory No. 24

as Ms. Dorland's "belief" concerning Ms. Larson's profits resulting from The Kindest is not

relevant, as it is the jury and/or the Court's belief and/or conclusions that are relevant to this

litigation.

**Document Requests 1 and 2**:  Ms. Larson's argument concerning the relevance of these

requests once again reflects her "tit for tat" mentality in this discovery process.  Ms. Larson

produced multiple copies of the short story "The Kindest" because "The Kindest" incorporated

one or more versions of Ms. Dorland's original writing, and that copying is the focus of this

litigation.  Ms. Dorland's writing career, her work product outside of the letter, and her

publication history is simply not relevant to this litigation, nor has Ms. Larson articulated any

basis upon which it would be.

**Request No. 6**:  Ms. Dorland has produced all of the documents in her possession,

custody and control that are responsive to Request No. 6 which were created between 2015 and

2018, as she clearly stated in her response to the request for production.  The documents from

that time period referenced by Ms. Larson in her motion to compel simply do not exist, despite

Ms. Larson's wish that they do.  Some of the "contacts" referenced took place via telephone and

were described in the documents which were previously produced.  While Ms. Dorland did

reference a prior message in her email to "Dear Sugar," that prior correspondence was not

relevant to the dispute between Ms. Larson and Ms. Dorland, and therefore was not produced.

Ms. Dorland further did not maintain her text messages with Mr. Cheek, as they took place

several years ago, prior to the anticipation of litigation, and Ms. Dorland chose not to save them.

Similarly, the email between Ms. Dorland and Mr. Castellani, which Ms. Larson has and

produced with her initial disclosures in early 2020, is simply not responsive to Request No. 6, as

it does not reference Larson, One City/One Story, plagiarism or copyright infringement.  Once

again, these are the type of discussions and clarifications that need not take place in the course of

motion practice, had a reasonable meet and confer process been initiated.

**Request No. 10**:  Ms. Dorland's damages relate to Ms. Larson's profits associated with

her publication of Ms. Dorland's copyrighted work.  Unless and until Ms. Larson completes her

production and other discovery (including her deposition), Ms. Dorland cannot compute her

damages.  Ms. Dorland filed a motion to compel and is awaiting resolution of that pending

motion.  Ms. Dorland is further awaiting Ms. Larson's deposition, which will be scheduled after

motion practice is completed.  Further, any documents that Ms. Dorland may have concerning

damages are either (a) the result of Ms. Larson's production, or (b) protected by the work

product doctrine and/or attorney-client privilege.

**Request No. 13**:  Through Request No. 13, Ms. Larson seeks documents relevant to Ms.

Dorland's claim for intentional infliction of emotional distress, which was dismissed by the

Court months ago, and which Ms. Larson knows was dismissed.  These documents are not

relevant to the remaining claims and defenses in this litigation, and Ms. Dorland's objections are

reasonable.

### Ms. Larson is Not Entitled to Attorney's Fees

As an initial matter, Ms. Larson certainly would not be entitled to attorney's fees should her motion be denied in its entirety, which Ms. Dorland believes would be the correct result. However, in the event the Court believes one or more of Ms. Dorland's responses merits supplementation, Ms. Larson is nevertheless not entitled to attorney's fees under the Federal Rules of Civil Procedure.  While Rule 37 of the Federal Rules of Civil Procedure permit the awarding of sanctions under certain circumstances when a motion to compel is successful, the Rule is clear that a court "must not order this payment if … the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action."  Fed. R. Civ. P., Rule 37(a)(5)(A)(i).  here, Ms. Dorland served her discovery responses on a Saturday afternoon.  At 9 a.m. exactly on the very next business day, Ms. Larson sent a draft motion to compel indicating her intent to file the motion at 11 a.m.  Ms. Larson did not seek a conference pursuant to Local Rule 37.1, nor did she seek a conference pursuant to Local Rule 7.1.  Instead, she stated "if you wish to confer … let me know as soon as possible."  During the brief call that was held, Ms. Larson's counsel did not express a willingness to discuss particular discovery responses, but instead rested on the draft motion and insisted that it must be filed before the status conference scheduled for that afternoon.  Of course, that was not the case.  There was no deadline for filing motions, and the fact that a potential dispute may be percolating could have been addressed with the Court informally during the status conference which was being held for that very purpose.  Instead, Ms. Larson allowed zero business days to pass prior to filing her motion, shutting down any opportunity to resolve disputes absent motion practice.  In her haste, she has moved to compel responses that were already provided, she has overlooked references to documents produced and the incorporation of said documents within interrogatory responses, and

she has not carefully considered her pursuit of information and documents that are relevant only to claims that have long since been dismissed. There was no good faith attempt here to resolve any disputes or to obtain information and/or documents prior to filing the present motion.

### Ms. Dorland is Entitled to Protective Order and Her Attorney's Fees

Rule 37 of the Federal Rule of Civil Procedure allows for a protective order to be entered in favor of any litigant opposing a motion to compel. Ms. Dorland respectfully requests a protective order from this Court on any topic outlined above wherein the Court deems discovery improper, and specifically requests said protective order to apply to her deposition, which is to be held at an undetermined date in the future.

Rule 37 permits an award of reasonable expenses incurred in opposing the motion, including attorney's fees. Ms. Dorland respectfully requests such an award here, to be paid by Ms. Larson or her counsel. Ms. Dorland suggests that it is particularly appropriate here where the present motion was filed absent adherence to the Court's strict requirements concerning the meet and confer process, with a motion to compel being drafted less than one business day after the service of discovery responses, and almost no opportunity provided to confer with the setting of a "deadline" of filing an "emergency" motion (which was later conformed by the Court to a non-emergency motion).

### iv.    Conclusion

Based on the foregoing, Ms. Dorland respectfully requests that Ms. Larson's motion to compel be denied in its entirety, that Ms. Larson's request for attorney's fees be denied, and that Ms. Larson be required to pay Ms. Dorland's reasonable expenses and attorney's fees in connection with opposing this motion.

Respectfully Submitted,

DAWN DORLAND PERRY,

By her attorneys,


/s/ Suzanne Elovecky
Suzanne Elovecky (BBO # 670047)
PARTRIDGE, SNOW & HAHN LLP
30 Federal Street, 7th Floor
Boston, MA  02110
(617) 292-7900
selovecky@psh.com

Dated:  April 19, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 19, 2021.


/s/ Suzanne M. Elovecky
Suzanne M. Elovecky (BBO #670047)