UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SONYA LARSON,

    Plaintiff

v.

DAWN DORLAND PERRY,
COHEN BUSINESS LAW GROUP, PC and
JEFFREY A. COHEN, ESQUIRE,

    Defendants.

AND

DAWN DORLAND PERRY

    Plaintiff-in-Counterclaim

v.

SONYA LARSON

    Defendant-in-Counterclaim

C. A. No.: 1:19-CV-10203-IT

**DECLARATION OF DAWN DORLAND PERRY**
**IN SUPPORT OF HER OPPOSITION TO SONYA LARSON'S MOTION TO COMPEL**

    I, Dawn Dorland Perry, state the following under oath:

    1.    I am over the age of 18, and the following is based on my own personal knowledge.

    2.    I was raised in poverty in rural Iowa.

    3.    I graduated magna cum laude from Scripps College with a B.A. in Religious studies in 2002.

    4.    I graduated from Harvard Divinity School in 2004 with an M.T.S. in World Religions.

1

5. After a career in television production, I decided to focus on a career in writing.

6. Initially, I became involved with GrubStreet in Boston as a writing student, taking classes and participating in workshops.

7. Through my involvement in GrubStreet, I met Sonya Larson in 2007, whom I believed I developed a friendship with over the following years.

8. Ultimately, I decided to pursue writing full time, and I obtained my M.F.A. at the University of Maryland in 2014.

9. Eventually, I was honored as a Teaching Scholar (2014-2017) by GrubStreet at the Muse and the Marketplace conference, GrubStreet's annual, flagship event, and hired by GrubStreet as an online writing instructor.

10. In 2009, I read an article in the New Yorker titled "The Kindest Cut," which was about living kidney donation.  Since I read that article, I had considered donating one of my kidneys to a stranger.  My reasons for considering this gesture were deeply connected to my upbringing, which was unfortunately colored by poverty and abuse.  It was important to me to reconcile with my past, and I hoped to do so by giving of myself to a stranger in a way that many people do only for family.

11. In 2013, while I was completing my M.F.A., I moved to Los Angeles with my husband.  Once settled in Los Angeles, I contacted the medical school at the University of California at Los Angeles ("UCLA") to inquire about living kidney donation.

12. Fortunately, I passed the medical and psychological clearance hurdles, and was able to donate one of my kidneys in June of 2015.

13. During the preparation for my surgery, I sought the support of my closest friends and my family, and decided to create a "private" Facebook group so that I could communicate with this small group all at once, rather than through multiple separate communications.

14. The "private" setting meant that only members could access the group and the postings, comments, and other content within the group.

15. Facebook gave me the option to set this group up as a "secret" group, which meant that if a non-member searched from the main Facebook page, this group, and the content posted within the group, would not be included in search results.

16. While I was the primary owner of the group, my husband also was given permission to post to the group, particularly during my surgery when I was unable to post.

17. By the time of my surgery in June of 2015, there were approximately three dozen members in the group. Sonya Larson, whom I believed to be a supportive friend, was one of those members.

18. I do not have a clear memory of who I added to the group when, nor am I aware that Facebook maintains records concerning that process.

19. During the discovery process of this litigation, I spent significant time searching Facebook's functionality related to my group, seeking logs or other records concerning the group, and did not find any information that tracked group membership.

20. After my surgery, I continued to post to my private group, and I continued to add close friends and family to the group, as well as some acquaintances whom I trusted. I also occasionally removed people who were not active in the group, sometimes asking them first if they wished to stay involved, due to the intimate nature of the information that I shared in the group.

21. I also had my own Facebook page, also known as a "Facebook wall," or "timeline" which is where all of my "Facebook friends" see my general posts. I have, and historically have had, several hundred (if not thousands) "Facebook friends," which include my true friends, my family, including extended family, acquaintances, co-workers (current and former), and others. While I did post some information about my kidney donation on my general "Facebook wall," it was limited in nature, and much less personal.

22. My kidney donation initiated a paired exchange kidney donation chain. This means that I provided my kidney to one recipient, whose spouse provided their kidney to another person who was able to come off the deceased donor list. The reason for this is that the spouse of the person who received my kidney was not a compatible donor for their spouse, so a wider circle – or chain – was required. Through my donation, an additional recipient was able to be included, and an additional life impacted.

23. Once it was determined that all four surgeries were successful, the UCLA medical team asked me to participate in encouraging other healthy members of the public to consider participating in living kidney donation. I agreed to do so, and willingly participated in several public events.

24. In order to publicize these events, I utilized my Facebook wall, and not my private Facebook group, in order to reach a wider audience.

25. I was thoughtful about which Facebook platform I used for various posts concerning my kidney donation. For example, if I wanted to share information about the person I donated my kidney to, and that person's family, I utilized my private and secret group, to keep that person's information private.

26. In the months after my surgery, I crafted a letter to the final kidney recipient in the donation chain. This letter was not addressed to the person who received my kidney, but rather the other individual who was able to receive a viable organ as a result of the chain in which I participated.

27. I provided the letter to the administrators of the UCLA kidney transplant team so they could in turn provide it to the recipient, who had remained anonymous to me.

28. My transplant coordinator told me that she had been touched by my letter, and I later heard from another member of the team who told me that she and others had also been moved by my letter. After I heard this, I chose to share my letter in my private Facebook group, and I posted it there.

29. I did not post my letter on my more public Facebook wall.

30. Sonya Larson was a member of my private Facebook group when I posted my letter.

31. During the time that Sonya Larson was a member of my private Facebook group, Facebook would show me who had "seen" my posts and comments.

32. At one point in 2015, I noted that Sonya Larson had "seen" every post that I made in my private Facebook group, including the post wherein I shared my letter. I did not take "screen shots" of this information, but I had found it odd because she never commented on any of the posts nor spoke with me directly about my kidney donation. In fact, in 2015 during an email exchange, she seemed to deny knowledge of my kidney donation, despite my knowing she had "seen" these posts and comments.

33. Once Sonya Larson ceased being a member of my Facebook group, at some point in 2016, Facebook no longer provided me with information about posts that Sonya Larson "saw".

34. In 2017, I learned that American Short Fiction published a short story written by Sonya Larson titled "The Kindest." I was aware that the story was available on the ASF website, but that it was behind a paywall. I did not purchase the hardcopy issue, nor did I pay to subscribe electronically. I did not read Sonya Larson's story in 2017, as I expected it would be too painful to do so.

35. In June of 2018, I was reviewing the ASF website for professional reasons, and I saw a link to "The Kindest", which was being highlighted. It was not behind a paywall, and I chose to read the story. This was the first time that I read the story, and the first time that I saw that the story included my letter. I was appalled to see that my letter was included in this story; the letter clearly included my language, structure, tone, and personal experience.

Signed under the penalties of perjury.

*Dawn Dorland P.*
Dawn Dorland Perry

Dated: April 19, 2021