UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONYA LARSON<br><br>                    Plaintiff,<br>v.<br><br>DAWN DORLAND PERRY, et al.<br><br>                    Defendants. | Civil Action<br><br>No. 1:19-cv-10203-IT |

**PLAINTIFF, SONYA LARSON'S**
**I.    REPLY TO DEFENDANT, DAWN DORLAND PERRY'S OPPOSITION TO LARSON'S MOTION TO COMPEL, AND**
**II.   LARSON'S FURTHER RESPONSE IN OPPOSITION TO DORLAND-PERRY'S MOTION TO COMPEL**

This is an ongoing dispute between two writers, Plaintiff, Defendant in Counterclaim, Sonya Larson ("Larson") and Defendant, Plaintiff in Counterclaim, Dawn Dorland Perry ("Dorland").

**I.    LARSON'S REPLY TO DORLAND'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

   **A.    Brief Overview of Proceedings**

Larson works for a creative writing center in Boston known as GrubStreet. Larson has published a number of short stories and is working on a novel. One of Larson's published stories, *The Kindest,* is the subject of this Action. [Larson Aff. ¶ 1]

Dorland reportedly teaches writing, edits the work of other writers and is working on a novel. [Doc. 75, ¶ 1] Dorland has not divulged if she has published any of her work.

This Action has been ongoing for a year and a half. Dorland's claim for intentional infliction of severe emotional distress was dismissed by the Court in its entirety. [Doc. 99] The remaining claims against Dorland [Second Amended Complaint ("SAC"), Doc. 91], include the following:

>Count I – Intentional Interference by Dorland with Larson's advantageous business relations with American Short Fiction ("ASF").

>Count II – Intentional Interference by Dorland with Larson's advantageous business relations with the Boston Book Festival ("BBF").

>Count VII – Defamation claim against Dorland.

>Dorland's former attorneys (Cohen Business Law Group, PC and Jeffrey A. Cohen, hereinafter collectively "Cohen Law"), were sued for intentionally interfering with Larson's advantageous business relations with the BBF and for violations of Mass. Gen. Laws, Chapter 93A. [SAC, Counts III, IV, V & VI]

>Dorland filed a counterclaimed against Larson for copyright infringement. [Doc. 75 starting at p. 20]

The Parties have exchanged written discovery including interrogatories and document requests. Further, Dorland has subpoenaed documents from ASF, the BBF, GrubStreet, and Middlebury College (VT), where Larson participated in the Bread Loaf Writers' Conference. There are over 7,000 documents that have been produced in this Action. Although some of the documents are duplicates or draft copies of *The Kindest*, it is still necessary for counsel to scrutinize each electronic or paper document that has been produced.

Depositions of the Parties have been noticed several times, but no depositions have yet been taken. All depositions are on hold pending resolution of the present discovery dispute.

>**B.**     **The key documents in this Action include Dorland's 2015 Letter that she posted on Facebook and Larson's short story, *The Kindest*.**

*The Kindest* is a fictional short story about an alcoholic, working class, Chinese-American woman who receives a kidney donated by a wealthy white woman. The story explores the complexities of indebtedness, addition, love, shame and race, and its central aim is to depict a person of color resisting a "white savior." [SAC ¶ 18] Larson was inspired to write *The Kindest* for several reasons, including the altruistic, real-life donation by Dorland of one of her kidneys to an unknown recipient. Larson maintains that *The Kindest* is a creative work of pure fiction that is not about Dorland. Dorland does not seem to accept this, and insists that Larson's story is somehow about Dorland, or that it owes its existence to Dorland. [Larson Aff. ¶ 2]

The crux of the dispute centers around a letter that Dorland posted on an invitation only Facebook group forum in 2015. [Exhibit A] The letter was written by Dorland and addressed to the unknown recipient of her kidney. Larson admits that she was invited by Dorland to join the Facebook group, that she saw the letter and took notes from it for future reference. Larson <u>never copied</u> Dorland's letter. [Larson Aff. ¶ 3]

Larson's story contains a letter about one-third of the way through *The Kindest* that was written by the "white savior" kidney donor and sent to the kidney recipient. The letter was used as a literary device to introduce the kidney donor character. [SAC ¶ 19 & Larson Aff. ¶ 4] There have been five evolving variations of *The Kindest* that have been published. Each of the variants contains about 5,500 words. The letter in the Audible/Brilliance variant is 250 words long, and the letter in the ASF variant is 237 words long, and the variant in the BBF variant is 268 words in length. By contrast, Dorland's 2015 letter contains 381 words. [Larson Aff. ¶ 5]

The final version of *The Kindest* is the BBF version which was written in 2018. This version was written so that the letter within the story would have no similarity to Dorland's 2015

letter. This is the final version of *The Kindest* that Larson intends to write. The BBF version was later published in an anthology entitled Welcome to the Neighborhood (Ohio Univ. Press, 2019) [Larson Aff. ¶ 6]

### C. **Larson admits she had access to Dorland's Letter but denies that the letter in *The Kindest* is substantially similar to Dorland's letter.**

Larson admits that she had access to Dorland's 2015 Letter while she was part of the Facebook group that Dorland started. Larson also admits that there is <u>some</u> similarity between <u>a few words and phrases</u> in Dorland's letter, and <u>a few words or phrases</u> in initial versions of the letter that is included in the first four variants of *The Kindest*.

Since access to the 2015 Letter is not an issue, Dorland's counterclaim for copyright infringement hinges on whether there is <u>substantial</u> similarity between Dorland's letter and the letter in the differing variants of Larson's story. <u>See</u> for example, <u>Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab., Inc.</u>, 997 F. Supp. 2d 92, 111 (D. Mass. 2014)

> Works are substantially similar if "an ordinary person of reasonable attentiveness would, [upon reviewing both works], conclude that the defendant unlawfully appropriated the plaintiff's protectable expression." <u>Johnson v. Gordon</u>, 409 F.3d 12, 18 (1st Cir.2005). In other words, the copying must be so extensive that the similarities amount to a "wrongful appropriation of expression." <u>Id</u>.

Not only does Larson deny that there is sufficient similarity to warrant a finding of copyright infringement, she also believes that her use of a few words or phrases from Dorland's 2015 letter in *The Kindest* is a *de minimus* use and/or a fair use under 17 U.S.C. § 107.

The other key inquiries in this Action focus on whether Dorland was justified in contacting ASF and the BBF, accusing Larson of plagiarism and eventually copyright infringement, and forcing ASF and the BBF to withdraw Larson's story from publication.

When Dorland contacted ASF, *The Kindest* had already been published in print by ASF and it appeared as an audio story on Audible.com and Brilliance Audio. [Larson Aff. ¶ 7] Rather than directly confronting Larson with her plagiarism claims, Dorland relentlessly emailed and called ASF. When ASF disagreed with elements of Dorland's argument, she told them that "[b]ased on ASF's response to my claim of plagiarism, my attorney and I are pursuing legal remedies." [Exhibit B] Dorland's goal was to persuade ASF to remove Larson's story from publication, and to get one of Dorland's own essays published. [Exhibit C]

Dorland then contacted the BBF and made similar claims of plagiarism. When her lawyers, Cohen Law got involved in the dispute, the claims were escalated to copyright infringement. [Exhibit D] In order to avoid any possible future controversy for the BBF, Larson completely rewrote the letter in her story so that there is only <u>one</u> word in the letter included in *The Kindest*, that shares commonality with Dorland's 2015 letter, namely the word "kindly" that is used in the sign-off of the letter and which mirrors the title of Larson's story. [Larson Aff. ¶ 8] Nonetheless, Dorland and her lawyers continued to make relentless demands and legal threats against the BBF until the BBF rescinded its decision to publish *The Kindest* out of fear of getting sued by Dorland. [Exhibit E]

Even after the BBF rescinded publication, Dorland continued to threaten legal action against Larson. For example, on September 6, 2018, Dorland's demanded that Larson "execute a stipulated judgment in the amount of $180,000 to be held and not filed unless and until" Larson "violates the further terms of a written settlement agreement" that she "cease and desist" further publication of The Kindest or any derivative thereof, and that Larson pay Dorland $15,000.00 in legal expenses. [Exhibit F] Dorland's lawyers reiterated these demands in another letter sent on October 26, 2018. [Exhibit G]

On December 26, 2018, Dorland emailed Larson's lawyer to say that she was "naming" Larson "as the Defendant in my lawsuit." Dorland demanded counsel's response "within five business days." [Exhibit H] Larson filed suit in this action shortly after her counsel received this email, with the hope that Dorland would finally stop attacking her. The only thing that quelled Dorland's campaign was the filing of Larson's lawsuit in January 2019. But as will be shown, the calm was only temporary. Dorland continues, <u>even to this day</u>, to launch aggressive attacks against Larson both in this Action and most recently in the press.

**D.      Larson had good reason to file a motion to compel production on an "Emergency" basis.**

Larson served her first set of Interrogatories on Dorland on February 24, 2021, and a second set of document requests the following day. Larson's attorney gave Dorland until April 3, 2021 to answer interrogatories and respond to the document requests. Answers and responses were received via email on the evening of April 3, 2021. [Epstein Aff. ¶ 1]

Counsel for Larson spent almost all day on Sunday, April 4 (Easter Sunday/Passover), preparing Larson's Motion to Compel that is presently before the court. [Epstein Aff. ¶ 3] Larson's motion was delineated as an emergency motion when it was filed on April 5, because there was insufficient time to comply with Local Rule 7.1, before scheduled depositions were set to start. Larson's deposition had been noticed for Friday, April 9, and Dorland's deposition was scheduled for the last day of discovery, April 14, 2021. Although Cohen Law's depositions had been noticed on several occasions prior to the end of discovery, and most recently for April 8, 2021, counsel for Cohen Law could never seem to find an acceptable date. [Epstein Aff. ¶ 4]

Additionally, there was a scheduling conference with Judge Talwani at 3:30 PM the same day the emergency motion was filed (April 5).  Larson labeled her motion an emergency motion so that it would be brought to the attention of the court at the scheduling conference.  Larson was not trying to circumvent the meet and confer requirements of Local Rule 7.1.  She was simply up against five deadlines within ten days; the scheduling conference on April 5, 2021 at 3:30 PM; Larson's deposition on April 9; Dorland's deposition on April 14; fact discovery ending on April 14, 2021; and the depositions of the Cohen Law defendants that had not even been scheduled because of scheduling conflicts with counsel for the Cohen Law defendants.

Furthermore, the fourteen (14) day period for Opposing a Motion under Rule 7.1(b)(2) would have been automatically set by the court for April 20, 2021.  Larson's Motion could not wait for these deadlines to pass.  Also, Judge Talwani probably removed the emergency designation from the motion so that she would not have to rule on it and could refer the discovery dispute to a magistrate judge for resolution.

### E.  **Many of the facts Dorland reports in her Opposition are either irrelevant, misleading or patently false.**

Dorland's rendition of many of the facts in her Opposition are either irrelevant, misleading or patently false.  For example, Dorland's alleged impoverished upbringing has nothing to do with the Motions to Compel that are before the court.  The supposed "take down" of Dorland mentioned in her Opposition (Doc. 120 at p. 5) was a comment from a member of Larson's writers' group (the "Chunky Monkeys") and were not words used by Larson.  In fact, in Exhibit A to Dorland's Opposition, Larson said that she wished Dorland "was handling this [situation] differently."  Dorland is clearly cherry-picking language to mislead the court.

Moreover, Dorland's statement that Larson "complained to" and "berated" the ASF staff for not sending *The Kindest* to the publishers of the Best American Short Stories ("BASS")

is utterly false. [Doc. 120 at p. 7] Exhibit I to Dorland's Opposition [Doc. 120] shows that it was "automatic" for ASF to send its stories to BASS, but that the issue in which *The Kindest* was published was sent to an old address and not received by BASS on a timely basis -- a circumstance that was nobody's fault. Larson was not "incredulously assuming that had her story been sent, it would have been chosen," as Dorland states (Id.). Larson assumed no such thing. She was merely inquiring of ASF because the editor of BASS contacted Larson to say that she had been on the lookout for Larson's story and had not received it. [Larson Aff. ¶ 10] Once again, Dorland is attempting to portray Larson as an aggressor who "complained" and "berated" others about her short story, an accusation which is simply not supported by the facts.

In addition, it is totally disingenuous for Dorland to claim that she "does not know" the reasons why the BBF pulled *The Kindest* from its 2018 One City/One Story program. Documents produced months ago by the BBF – in response to Dorland's own subpoena – clearly state that the BBF canceled the program due to Dorland's relentless demands and a fear of getting sued by her. For example, on August 13, 2018, BBF Executive Director Deborah Z. Porter sent an email to the One City/One Story sponsor stating that "[t]he author of the story was accused of plagiarism and while we think it is a baseless accusation, we are being slammed with demands currently and the potential of a lawsuit in the future if we go forward with distributing the story." [Exhibit I]

> On August 14, 2018, BBF Executive Director Porter sent an email to Larson stating:
>
> I am sorry to say that Norah and I have made the decision to cancel One City One Story this year. After thinking we had a path towards a solid agreement with Dawn Dorland and feeling that we were out of danger from being sued, her lawyer was back in touch late last week with new demands. There is seemingly no end to this, and we can not afford to spend any more time or resources at this moment or risk law suits in the future that could affect not only us, but our sponsor for One City One Story.

> Sadly for us, we have already printed 30,000 copies of your story using the acknowledgement Dawn and her lawyer had approved (but now want to change.) That represents a total loss in printing costs for us. This is obviously not the outcome that we prefer, but we feel we have no other choice at this point.

[Exhibit J]

That Dorland who subpoenaed these emails from the BBF can still claim that she "does not know the BBF's reason for the cancelation" is simply not credible. [Doc. 120, p. 9] Dorland appears to be trying to deflect attention from her own egregious behavior; behavior that resulted in claims against her for tortious interference with advantageous business relations.

Additionally, Dorland sent several emails to Larson's employer from June 2018 through January 2019, accusing Larson of creating a hostile work environment, retaliation, intimidation, and personal abuse. Dorland demanded that GrubStreet should enact a "formal censure or penalty" and/or be "suspending Sonya from her position as Director of Race and Advocacy and/or Director of the Muse Conference briefly, with or without pay." [Exhibit K] Dorland's quest for vengeance is misguided, bizarre, and seemingly knows no limits.

### F. Further comments to the claims made by Dorland in her Opposition to Larson's Motion to Compel.

**Interrogatory No. 1.** Paragraph 1 of the Counterclaim states that Dorland is "an author, editor and writing educator." Larson asked Dorland to state what she has written and edited and what and where she has taught writing from 2015 to date.

Dorland's answer to Interrogatory No. 1 is indicative of Dorland's obstinate unwillingness to answer simple questions. The requested information is very basic. Larson could spend a considerable part of her allotted seven (7) hours of deposition time under Fed. R. Civ. P. 30(d)(1), eliciting information from Dorland about her writing career. For example, it would be helpful and relevant for Larson to know in advance what Dorland has written, and if

anything has been published, and if so, where and when it was published and how much Dorland earned from each publication.

Other than her 2015 Facebook post, Larson would like to know if Dorland has written anything, fact or fiction, about kidney donations or claims of plagiarism or copyright infringement. The same is true for her editing and teaching experience. What and for whom has she edited materials and where does she teach now and where has she taught in the past.

It would be useful for Larson to know if any of Dorland's writings are about either actual or fictionalized kidney donations, or if they were about "ethical issues" such as plagiarism, which is one of the topics Dorland pitched to ASF as an acceptable remedy. [Exhibit L]  Also, when Bread Loaf declined to give in to Dorland's demands to know about what materials were in Larson's Fellowship application, Dorland wrote in a June 18, 2018 email, "I am writing an article about plagiarism in the writing community and will list this response on behalf of the Breadloaf Writing Conference." [Exhibit M]  Larson has a right to see this article. Whatever Dorland wrote, pitched and/or sent to others is directly related to this case. Instead of answering Interrogatory 1 as it is written, Dorland claims that the information requested is a side issue and that the question is unclear and confusing. [Doc. 120, p. 11]  The interrogatory is not confusing. Dorland just does not want to answer it as she is required to do.

Dorland's career as an editor of other people's work and a writing teacher are topics raised by Dorland herself and Larson has the right to inquire as to the extent of Dorland's editing teaching endeavors. These endeavors may be highly relevant to the issue of plagiarism.

**Interrogatory 2.**  In this Interrogatory, Larson wants to know what, if anything, Dorland has done with her 2015 Facebook Letter. Has she written any articles, stories, books, essays or other things that include or reference the letter? It is important for Larson's fair use defense to

know if Dorland has done anything with the letter other than to post it on Facebook and circulate it among hospital administrators at UCLA. There is nothing overly broad, unduly burdensome or irrelevant about this question; it is key to one of Larson's fair use defenses. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590–91, 114 S. Ct. 1164, 1177–78, 127 L. Ed. 2d 500 (1994)

> The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." § 107(4). It requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market" for the original.

Dorland has yet to demonstrate any potential commercial use of her 2015 Letter. Thus, Dorland has not demonstrated any market harm.

**Interrogatories 3 and 4.** In these Interrogatories, Larson is seeking the identity of the members of Dorland's semi-private Facebook group, and the identity of people who chose not to become members. Dorland makes a distinction between her private Facebook group and her public Facebook group. Despite Dorland's claim that she is trying to protect the identity of the recipient of her kidney donation, Dorland has not produced any documents that are private and personal. In fact, all names in Dorland's 2015 Facebook letter were redacted. [Exhibit A] Also, Dorland has redacted all personal information and photographs from the documents she did produce. [An example of a redacted document is shown in Exhibit N.] Dorland has been very public about the donation of her kidney. She was featured on a Jumbotron at a Los Angeles Laker's game in 2017, and reportedly marched alongside a large float in the annual New Year's Rose Bowl football parade, and wore a t-shirt in public announcing her kidney donation. [Exhibit O]

Moreover, in Exhibit N, in the right-hand sidebar, there is a module for group members, with images of some of the group's members and the number "68" which could be the beginning

of the count total.  Additionally, in the left-hand sidebar, there is a module called "Members." Dorland can simply click on that module to produce a list of all current members.  If Dorland is truly concerned about the identities of the members of her Facebook group, she can always seek to have the court enter a protective order.

While Larson has no present intention of contacting anyone from this group, the number of people in the group is important.  Dorland appears to have done nothing with her 2015 letter other than to post it on Facebook on July 7, 2015, <u>without</u> a copyright notation, and then waiting almost three years before registering the letter with the Copyright Office.  The letter was seen by potentially hundreds of people.  There is nothing secret or personal about Dorland's 2015 letter, which was very widely disseminated.[1]

**Interrogatories 6 through 10 and 21.**  Dorland made an issue of her supposed close friendship with Larson in her counterclaim.  Dorland claims that it was because of this "true friendship" that Larson was invited to join her private Facebook group.  [Doc. 75 ¶¶ 9 through 20]  Interrogatories 6 through 10 and 21 relate to Dorland's perceived close friendship with Larson and the reasons why Larson was invited to join the Facebook group.  They do not relate to Dorland's now dismissed claim for the intentional infliction of severe emotional distress.

Dorland should be compelled to state the basis for her friendship with Larson.  If Dorland does, in fact, believe she and Larson had a "true friendship," then it should not be difficult for her to substantiate this claim.  Dorland should be able to provide a list of activities that she and Larson did together, such as meals they shared, times they had coffee or drinks, times they texted or talked on the phone, times they visited each other's homes, checked in on each other, told each

---

[1] According to Benjamin Franklin, "Three can keep a secret, if two of them are dead."  <u>Benjamin Franklin: (brainyquote.com)</u>

other of events in their lives, and/or times they reached out to each other when they were distressed or in need.  What "writing workshops" did they "participate in together?"  What "personal details about their lives, their pasts, and their aspirations" did they share?  When did "Ms. Dorland [tell] Ms. Larson that Ms. Dorland had a difficult childhood?" [¶ 17]  What facts substantiate Dorland's claim that "Ms. Larson knew . . . of Ms. Dorland's traumatic upbringing" [¶ 18]; what was the "very thoughtful and personal going away gift" that Larson supposedly put together for Dorland? [¶ 19]   How did they "stay in touch" [¶ 20] when Dorland moved to the Washington, DC area, and later to the Los Angeles area?  When and how did Larson "invite Ms. Dorland to participate in GrubStreet's Muse & the Marketplace conference as an instructor? [¶ 21] These questions are not difficult to answer.  Dorland made each of these things relevant by including them in her Counterclaim, and she should be compelled to answer these questions. The answers to these interrogatories relate to Dorland's credibility as a witness.

**Interrogatory 15.**  Dorland's Counterclaim contains detailed descriptions of what she perceives to be the plagiarized or infringed portions of her 2015 letter in the early versions of *The Kindest*.  [See Counterclaim, Doc. 75, ¶¶ 90-104 and ¶¶ 119-129]  Larson rewrote the letter in her story that was set to be published by the BBF, in order to appease Dorland and to protect the BBF.  Larson maintains that the revised letter in the BBF version of her story contains nothing that is even remotely similar to Dorland's 2015 letter except for the sign off of the letter which uses the word "Kindly," which is a direct reference to the title of the Story.   Larson is asking Dorland to point out where there are any similarities between her 2015 letter and the letter within the BBF version of *The Kindest*.  Dorland will eventually have to explain the similarities to the jury and she should be required to do so now in advance of her deposition.

**Interrogatory No. 16** is indicative of how Dorland is continuing to attack Larson and prevent her from discovering highly relevant information.

As background for this Interrogatory, Larson was notified in June 2018, that *The Kindest* had been selected by the BBF as the winner of its One City/One Story contest. The BBF intended to print and distribute 30,000 copies of the Story and to publish it on the Internet in multiple languages. Past recipients of the One City/One Story contest received considerable publicity and media attention. Winning the contest was quite an achievement for Larson and was destined to be a sure boost to her writing career. [Larson Aff. ¶ 11]

After Dorland heard that Larson won the One City/One Story contest for *The Kindest*, Dorland called the BBF claiming that Larson's story plagiarized her 2015 Facebook letter. See subsequent email conversation. [Exhibit P] On July 3, 2018, Cohen Law followed up on Dorland's email and sent a demand letter to the BBF threatening a lawsuit and demanding substantial damages if the BBF published *The Kindest*. [Exhibit D] While the attorneys from Cohen Law, the BBF attorney and Larson's then lawyer were attempting to negotiate a resolution of Dorland's claims against the BBF, Dorland went to the Boston Globe with her claims of plagiarism and copyright infringement.

The Globe ended up publishing two newspaper articles alleging that Larson plagiarized Dorland's 2015 Letter in *The Kindest*. The articles cast Larson and the BBF in particularly bad light. [Exhibit Q]   Because of newspaper deadlines, Larson was never able to fully express her views on Dorland's claims to the Globe reporter. [Larson Aff. ¶ 12] Other than the usual boilerplate objections that the requested documents were overly broad, unduly burdensome and not proportionate to the needs of this case, Dorland produced a number of email letters by and between her and the Globe reporter.

Even after the Globe published its second article, Dorland repeatedly urged reporters at the the *Globe,* the *Boston Globe'*s Editorial Board, *New York Times*' "Dear Sugars" podcast, and the reporter Kat Rosenfield in the Fall of 2018, to write stories about Larson, to write negative things about GrubStreet, to write negative things about the Muse and the Marketplace conference that Larson runs, and/or to publish "as an open letter" Dorland's "resignation" as an online instructor from GrubStreet. [Exhibit R]

Then a few weeks ago, on March 16, 2021, Larson was contacted by a *New York Times* reporter named Robert Kolker, who asked if she would agree to be interviewed for a feature story he was commissioned to write for the *New York Times Magazine*. Kolker is a respected *New York Times* best-selling author.

Larson was informed by Kolker that Dorland contacted him in January 2021, to ask him to write a story about this ongoing Action. Dorland has had <u>at least</u> two phone conversations with Kolker, and has likely provided numerous documents to the reporter. [Larson Aff. ¶ 13] Dorland has flatly refused to provide any information about her exchanges with Kolker. She is claiming that only communications that she has had with reporters or the media <u>prior</u> to the commencement of litigation are relevant to this Action. [Doc. 120, p. 16] This is nonsense. Larson has a right to know what Dorland told Kolker, and she has right to obtain all email and text communications with him and all documents she has provided to the press. This information is not protected by any privilege, and Dorland should be compelled to answer this interrogatory and produce documents.

**Interrogatories 23-24.** With minor exceptions, Larson maintains that her production of documents is total and complete. The only documents she has withheld are about 15 emails to her colleagues, a few friends and acquaintances, and her parents. Dorland already has all of her

own emails to and from GrubStreet, and she has subpoenaed additional documents from GrubStreet that are slated to be produced soon. The emails with her parents are partly personal and she would prefer to keep them private. None of the emails with her parents deal with damages. [Larson Aff. ¶ 14] Of course, Larson will produce them if this court deems them to be relevant. Accordingly, once GrubStreet produces the documents that it has, Dorland should be able to quantify her claim for damages. She will have to do this at trial and she should be compelled to do so now.

**Document Request 6.** It is not credible that Dorland's previous email to the Dear Sugar's podcast at the New York Times is "not relevant to the dispute between Ms. Larson and Ms. Dorland, and therefore was not produced." [Doc. 120, p. 18] Unless there is some other "artistic betrayal" that Dorland is claiming in her life for which she is trying to get publicity, this letter is responsive to this request and must be produced.

Dorland's claim that this request is irrelevant and duplicative is wholly disingenuous. The second set documents requests do not concern Dorland's now-dismissed intentional infliction of emotional distress claim. They are directly related to Larson's claims for defamation, intentional interference, and violations of Chapter 93A. In particular, the documents requested regard Larson's ongoing and expanding claim of defamation against Dorland. Dorland produced correspondence she had with the New York Times' Dear Sugar podcast and journalist Kat Rosenfield, both in an effort to smear Larson in the national press. [Exhibit R]

Furthermore, Dorland is exhibiting an astonishing capacity to mislead the court outright in stating that these requests are "irrelevant." Dorland emailed New York Times-bestselling author Robert Kolker in January of 2021, in an effort to get him to write a national story about this case. Kolker is now writing a feature story about this case for the New York Times

Magazine, to be published as early as this Spring.  Dorland has blatantly refused to divulge this enormous piece of information, and share her correspondence with Kolker, despite the fact that such correspondence is directly responsive to Interrogatory Number 16 and Request Number 6.  Dorland's statements to Kolker are obviously directly relevant to Larson's claim of defamation.

In addition, in Dorland's response to the interrogatories, she states that she contacted Tin House, the Vermont Studio Center, and the Association of Literary Scholars, Critics and Writers.  Dorland has not produced any correspondence with these organizations.  Dorland admits in her interrogatory answers that she contacted a few organizations regarding her complaints against Larson, but she fails to state that she also contacted the Authors Guild, PEN America, the Vermont Studio Center, the literary agent Samantha Shea, authors Jennifer Haigh, Steve Almond, Chip Cheek, Michael Collier, Samantha Hunt, Bret Anthony Johnston, Deborah Plummer, Ethan Gilsdorf, Sondra Levenson, Kathy Sherbrooke, Maud Casey, and Andrew Goldstein.  She also does not name the individuals she "knew" and contacted at Bread Loaf Writers' Conference, Middlebury College, the University of Maryland, Tin House, the Vermont Studio Center, PEN America, the Authors Guild, GrubStreet, and the Association of Literary Scholars, Critics, and Writers.  Larson was able to find out about these contacts, but she does not necessarily know what Dorland communicated to them. [Larson Aff. ¶ 15]

Larson also knows that Dorland sent text messages in 2018 to the author Chip Cheek about her complaints against Larson.  Dorland has not produced these text messages and they must be produced.  [Larson Aff. ¶ 16]

## II.     LARSON'S FURTHER RESPONSE AND AFFIDAVIT IN OPPOSITION TO DORLAND-PERRY'S MOTION TO COMPEL

Dorland states on Page 1 of her Motion to Compel [Doc. 106] that Larson refused to engage concerning her production.  Larson's counsel believes that the potential maximum monetary damages available to Dorland in this action is the $425 she has earned from *The Kindest.*  [Larson Aff. ¶ 17]  This low amount does not justify more needless production.  Over 7,000 pages of documents had already been produced.  Nevertheless, Larson found the January 25, 2021 email from Dorland's counsel helpful in clarifying more specifically what documents were being sought.  [Larson Aff. 18]

Dorland's statement on page 2 of her Replay Brief (Doc. # 118) that Larson sent additional documents on a thumb drive the day after Larson filed her opposition to the Dorland's Motion to Compel is misleading.  On March 12, 2021, <u>before</u> Dorland's Motion to Compel was filed in court, Dorland's counsel was notified by email that additional responsive documents were located and would be produced.  The documents were sent via U.S. Express Mail and delivered to Attorney Elovecky's office on March 29, 2021.  [Epstein Aff. ¶ 5]

Larson provided her counsel with copies of all documents that she believed were responsive to Dorland's requests.  For example, the August 13, 2018 email chain with Larson's writing group about the BBF's decision to cancel the One City/One Story program in 2018 was part of these documents.  That certain documents apparently were not in the production initially sent to Dorland is clearly due to some clerical or technical error. There was no nefarious withholding of documents at any time. [Larson Aff. ¶ 19]

On Page 4 of her Reply Brief [Do. 118], Dorland claims that Larson preferred not to produce certain text messages.  This is not true.  Larson's delay in sending any text messages was due to her confusion about what specific text messages were responsive to the requests, and

more importantly where the bounds of those text conversations lie.  Text message conversations do not come in contained forms (as with emails), but instead are part of a continuous string of conversations.  Even with the help of her attorney, Larson was confused about the limits of production given the amount of time and effort it took to segregate texts that mention the words "Dawn," "Dorland," "kidney" and the like, from clearly chatty and totally irrelevant tests.  Again, Larson maintains that there was no nefarious withholding of documents.  [Larson Aff. 20]

In her Reply Brief [Doc. 118, p. 6, note 4], Dorland claims that there is one area where production appears incomplete.  Larson claims that applicants for NEA grants apply via an extensive online portal.  Furthermore, Larson submitted the final BBF version of *The Kindest* to the NEA.  The letter in this version of the story contains only one word in common with Dorland 2015 letter, the signoff "Kindly."   [Larson Aff. ¶ 21]   In reviewing this Reply, Larson found that she does have a few emails with the NEA.  Even though they are of limited or doubtful relevance, she will produce them.

As the NEA's own website says, "The National Endowment for the Arts Literature Fellowships program offers $25,000 grants in prose (fiction and creative nonfiction) and poetry to published creative writers that enable the recipients to set aside time for writing, research, travel, and general career advancement." [www.arts.gov/grants/creative-writing-fellowships ] Larson's fellowship was not awarded in return for publication or as royalties for *The Kindest*.  The NEA does not publish works and it did not publish *The Kindest*.   The grant was awarded for Larson's promise and skills as a writer and to support her future projects.  Id.

### III.  CONCLUSION.

In summary, Dorland insisted that Larson produce all documents that are responsive to her requests, which she has now done.  Larson will produce her emails with the NEA, and the

few remaining personal emails if this court deems them to be relevant. Dorland simply must do the same by fully answering all interrogatories and fully responding to all document requests.

|  |  |
|---|---|
|  | Respectfully submitted,<br>SONYA LARSON,<br>By her attorney, |
|  | /s *Andrew D. Epstein* |
| April 27, 2021 | Andrew D. Epstein, Esquire (BBO #155140)<br>Barker, Epstein & Loscocco<br>176 Federal Street<br>Boston, MA 02110<br>Tel: (617) 482-4900<br>Fax: (617) 426-5251<br>Photolaw@aol.com |

## Certificate of Service

I certify that Plaintiff's Motion for Leave together with a Reply and a further Opposition and two affidavits were filed through the court's ECF system copies were sent electronically on the day they were filed to all counsel of record.

|  |  |
|---|---|
|  | */s/ Andrew D. Epstein* |
| April 28, 2021 | Andrew D. Epstein |