1           IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2

3    SONYA LARSON,                        )
                                          )
4                   Plaintiff            )
                                          )
5              -VS-                       )  CA No. 19-10203-IT
                                          )  Pages 1 - 22
6    DAWN DORLAND PERRY, et al,           )
                                          )
7                   Defendants           )

8

9               **MOTION HEARING BY TELEPHONE**

10       BEFORE THE HONORABLE MARIANNE B. BOWLER
            UNITED STATES MAGISTRATE JUDGE
11

12

13

14

15                              United States District Court
                                1 Courthouse Way
16                              Boston, Massachusetts  02210
                                May 14, 2021, 2:30 p.m.
17

18

19

20

21

22

23                       LEE A. MARZILLI
                    OFFICIAL COURT REPORTER
                  United States District Court
24                1 Courthouse Way, Room 7200
                     Boston, MA  02210
25                   leemarz@aol.com

1   A P P E A R A N C E S:

2

3       ANDREW D. EPSTEIN, ESQ., Barker, Epstein & Loscocco,
    176 Federal Street, Suite 502, Boston, Massachusetts, 02110,
    for the Plaintiff.

4

5       SUZANNE M. ELOVECKY, ESQ., Partridge Snow & Hahn,
    30 Federal Street, Boston, Massachusetts 02110, for the
    Defendants.

6

    ALSO PRESENT:  Stella Oyalabu, Esq.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

   THE CLERK:  Do we have all the counsel who are
going to be arguing this motion?

   MS. ELOVECKY:  There's one other counsel of
record, Matthew Greene, who represents defendants Jeffrey
Cohen and the Cohen Business Law Group, but he doesn't have
a motion on for today, and I'm not sure he planned to weigh
in.

   THE CLERK:  Okay, great.

   MS. OYALABU:  I'm here, Stella Oyalabu on behalf
of Cohen Business Group and Jeffrey Cohen.

   MS. ELOVECKY:  Stella, can I just ask, do you have
a notice of appearance on the docket?

   MS. OYALABU:  No, I do not.

   MS. ELOVECKY:  Could I just get the spelling of
your name?

   MS. OYALABU:  Yes.  My last name is spelled
O-y-a-l-a-b-u; Stella is spelled S-t-e-l-l-a.

   MS. ELOVECKY:  Thank you.

   THE COURT:  Good afternoon.  Do we have everyone?

   THE CLERK:  Judge, this is the Clerk.  We do have
everyone.

   THE COURT:  We do have everyone and the Court
Reporter?

   THE CLERK:  Yes.

1          THE COURT:  All right, then you can call the case.

2          THE CLERK:  Okay.  This is the United States District

3    Court for the District of Massachusetts which is now in

4    session, the Honorable Marianne B. Bowler presiding.  This is

5    the case of Larson v. Perry, et al, Civil Action No. 19-10203.

6          Please be advised that any recording or rebroadcasting

7    of court proceedings is prohibited and may result in sanctions

8    as deemed appropriate or necessary by the Court.

9          Would counsel starting with plaintiff's counsel please

10   identify themselves for the record.

11         MR. EPSTEIN:  Thank you.  Good afternoon, your Honor.

12   This is Andrew Epstein representing Sonya Larson.

13         THE COURT:  Thank you.

14         MS. ELOVECKY:  Good afternoon, your Honor.  This is

15   Suzanne Elovecky representing Dawn Dorland Perry.

16         THE COURT:  Thank you.

17         Well, we're here for the hearing -- who else?

18         MS. OYALABU:  Good afternoon, your Honor.  This is

19   Stella Oyalabu representing Cohen Business Law Group and

20   Jeffrey Cohen, and we have no position in this matter, this

21   motion.

22         THE COURT:  Thank you.  All right, we're here for a

23   hearing on two motions, Docket Entry 106 and Docket Entry 110,

24   so I'll take them in that order.  I remind you, Counsel, we

25   have until 2:30.  I have a criminal matter at that time, and

1    because of the time slot at the prison, I have to be prompt.

2    So on Perry's motion to compel.

3         MS. ELOVECKY:  Thank you, your Honor.  She does go by

4    Dawn Dorland in her professional capacity, so that's the name

5    we tend to use in this matter.

6         So this is Suzanne Elovecky on behalf of Dawn Dorland

7    and in support of Dawn Dorland's motion to compel.  We filed

8    this motion to compel in March of 2021, more than six months

9    after initially serving requests for production on the

10   plaintiff and defendant in counterclaim, Sonya Larson.  This

11   motion to compel was filed to seek the production, a meaningful

12   production of documents after an initial production was

13   provided that clearly fell short of the obligations imposed by

14   the rules.

15        In response to the motion, there have been several

16   arguments raised about whether or not any productions or

17   further productions are required in this matter due to the fact

18   that Ms. Larson has the position that she received a total of

19   $425 for the story at issue, and therefore that is the sole

20   value of this matter.  However, that is not the only claim at

21   issue.  There are copyright claims at issue, and my client,

22   Ms. Dorland, is also defending against tort claims.  This is a

23   much broader issue than just a $425 dispute.  This also is an

24   intellectual property dispute, which may not be quantifiable at

25   this time but obviously has a lot of inherent value that goes

1 beyond a dollar figure.

2      I think it's also very interesting that while

3 advancing an argument about proportionality, Ms. Larson is

4 serving a second set of production requests and also advancing

5 her own motion to compel.

6      Now, what remains most troubling about Ms. Larson's

7 production is the apparent lack of involvement of counsel, and

8 that was from the time that the requests were first served in

9 August all the way through at least the first production in

10 January.  Many responses to inquiries about the scope of the

11 production, the scope of search terms used, any inquiry into

12 the process that resulted in the initial incomplete production

13 was met with answers like, "Well, I don't know.  I just sent

14 the requests to my client and had her search for things."  And

15 that really causes a complete lack of confidence in what took

16 place here and in what's been provided.  There are --

17      THE COURT:  May I interrupt you for just a moment

18 because, I mean, I've read the papers, so I know the

19 background.  But, you know, it appears to me in reading it that

20 the document production is more or less complete at this point,

21 except possibly for the documents regarding the NEA award.  So

22 let's kind of go through what it is that you don't have and

23 parse that through to see if we could get this resolved.

24      MS. ELOVECKY:  All right.  I mean, I do think that in

25 some ways, we're at a bit of a disadvantage because you don't

1  know what you don't have when it's a negative, but I do have

2  some items here that I have identified where I have concerns

3  where I believe that there's more outstanding.  One is that the

4  production to date has had very little in regards to Facebook

5  posts or Facebook communications, where the documents that have

6  been provided to date actually indicate that there potentially

7  were Facebook posts of the story at issue and concerning my

8  client in a way that would be relevant to this matter, so

9  that's one item that we're still looking for.

10          Another is that in --

11          THE COURT:  Well, let's just take one at a time.

12  Let's hear from the other side.

13          MS. ELOVECKY:  Okay.

14          MR. EPSTEIN:  I am unaware of any Facebook posts that

15  Sonya Larson made.  If she made any, we will be happy to

16  produce them.  I believe -- and, Sonya, you can answer this

17  question if you're on the line -- I believe you're on the line,

18  are you not?

19          MS. LARSON:  Yes, I am.

20          MR. EPSTEIN:  Oh, okay, that's all we need you to say.

21  Thank you.  But if there are Facebook posts mentioning "The

22  Kindest" or Dawn Dorland, I'm going to encourage you to look

23  for them and get them to me, and I will produce them.  We've

24  already agreed to produce the NEA documents, so that's really a

25  nonissue.

1        THE COURT:  All right, so all Facebook posts will be

2   produced.

3        MS. ELOVECKY:  Okay, the next -- shall I go on, your

4   Honor?

5        THE COURT:  Yes, please.

6        MS. ELOVECKY:  Okay.  The next item is text messages.

7   Now, several text messages were produced; that is for sure.

8   There were three documents that were produced that appeared to

9   be the result of searches, and the titles of the documents were

10  versions of my client's name; but by seeing the titles of those

11  documents, it appears that only three search terms were used

12  for text messages.  One was "Dawn," I think one was "Dorland,"

13  and one was a nickname that's been assigned to her by the

14  plaintiff and her cohort.  And the way that those were produced

15  is that only the line where the search hit appeared is present

16  on this single PDF, which makes it so that the production is

17  essentially nonsensical.  So, in my view, the production of

18  text messages was incomplete based on the search terms, and the

19  format of the production was not useful and was not produced in

20  the ordinary course.  That's not the way text messages are

21  maintained.  I understand the way text chains work.  I saw the

22  discussion that was in Attorney Epstein's papers, but there's

23  ways to do this that is useful --

24        THE COURT:  Just a moment.  I mean, have you sat down

25  and had a meet-and-confer and asked opposing counsel to use the

1    certain search terms that were not included in the first

2    search?

3         MS. ELOVECKY:  Your Honor, we had a meet-and-confer in

4    January that was followed up with several emails, and when I

5    asked questions about search terms, I was shut down completely.

6    So, yes, we had a meet-and-confer.  No, there was not a

7    discussion about search terms.

8         THE COURT:  Well, how many search terms do you want?

9         MS. ELOVECKY:  So the ones of my client's name are

10   sufficient.  I think the only others that we would look for

11   would be "The Kindest" and "kidney."

12        THE COURT:  All right, can we do a search with those

13   terms?

14        MR. EPSTEIN:  Absolutely, your Honor.

15        THE COURT:  All right.

16        MR. EPSTEIN:  I believe we've already done it for "The

17   Kindest," which is the name of the story.  I'm not sure we've

18   done it for "kidney," although I did put in one of my

19   memorandums the search terms that Ms. Larson used.  I don't

20   remember if "kidney" was one of them, but I am happy to have

21   her go back and look for "kidney" as one of the search terms

22   for text messages.

23        THE COURT:  All right, next item?

24        MS. ELOVECKY:  Well, your Honor, the rest of the text

25   message issue is the format of the search hits and the fact

1   that the conversations are really not present.  It's only the

2   very line with the search hit.  So I think that that production

3   should be supplemented so that the actual discussion that

4   contains the text message is readable.

5         THE COURT:  Well, again, at your meet-and-confer, did

6   you ask your brother for this?

7         MS. ELOVECKY:  Again, your Honor, we had a discussion

8   that was very much one-sided, and at the time of our

9   meet-and-confer, these documents had not yet been produced.

10  These documents were produced after the -- well, I received

11  these documents after the opposition to my motion was filed.  I

12  note that Attorney Epstein mailed it sooner than that, and his

13  tracking information shows that it was delivered the day before

14  I received it, but that was still two weeks after the motion

15  was filed.

16        THE COURT:  All right, go on.

17        MS. ELOVECKY:  The other category of documents is that

18  in Ms. Larson's reply brief, she mentioned emails that she has

19  that she has not yet produced and offers to produce in her

20  briefing but has not yet produced.  I don't have other specific

21  categories of documents because I can't know what she has

22  without having it.  And, again, I have not had any assurance,

23  and I think we've seen that even in this hearing thus far, that

24  there has been much oversight in this process of document

25  searching and collection.  The fact that Facebook posts have

1    not yet been reviewed, searched, and produced, to me is part of

2    this problem.

3            THE COURT:  All right.  Mr. Epstein?

4            MR. EPSTEIN:  There are 15 documents that my client

5    has revealed that she has.  One is the NEA grant information

6    which we've already agreed to produce.  So the 14 other

7    documents, the first one includes emails with her parents.  You

8    know, her parents are obviously going to be, "Oh, poor Sonya,"

9    you know, "we're behind you a hundred percent," and if you want

10   us to produce them, we're happy to produce them.

11           THE COURT:  Do you want them?

12           MS. ELOVECKY:  Emails with her parents were already

13   produced, and that actually wasn't the tone in those emails, so

14   the answer is "yes."

15           THE COURT:  All right.

16           MR. EPSTEIN:  They will be produced.  One document is

17   a document with Eve -- I don't remember her last name, but

18   she's the founder and director of GrubStreet, which is Sonya

19   Larson's employer.  That should be produced because it was

20   requested by subpoena, but we will be happy to produce the

21   emails.  I think there is one or two emails, or however many

22   emails -- I don't want to quantify it -- but we will produce

23   those emails.  There are three emails from people offering

24   Sonya some emotional support.  Again, we will produce those.

25   An email from someone who's contacted by Dawn Dorland, we'll

1    produce that document.  An email to someone saying that Sonya

2    Larson could not attend an event that she said she was going to

3    go to because of the time constraints of this ongoing dispute.

4    If that's relevant, we'll be happy to produce that.

5            An email from someone asking Sonya for -- she said to

6    me legal advice.  I don't know what kind of legal advice they

7    were asking from Sonya Larson, but maybe Sonya has become an

8    expert in certain aspects of law just on the basis of this

9    litigation.  You know, if that could be relevant, we'll produce

10   it.

11           Two emails from Ms. Larson who was looking for a

12   lawyer to represent her before I got involved in this action.

13   I'm not sure that's attorney-client privilege.  I'm not sure

14   how relevant it is.  You know, I was chosen to represent her.

15   I'd prefer not to have that one produced, so I'm going to

16   respectfully suggest that we not produce that unless the Court

17   orders otherwise.

18           And then an email from someone who is writing a blog

19   post about "The Kindest."  I don't know what that was.  Again,

20   I have not seen that particular document, but it certainly is a

21   category of a document that exists; and, you know, if it helps

22   to resolve this discovery dispute, we will produce it.

23           THE COURT:  All right, next category?

24           MS. ELOVECKY:  Those are my categories of documents,

25   your Honor.  I do have my arguments concerning my Rule 37

1   request.

2       THE COURT:  All right, I'll hear you.

3       MS. ELOVECKY:  Okay, pursuant to Rule 37, I believe

4   that this is a case where sanctions are warranted.  These

5   requests were served in August of 2019.  I understand, and I

6   have stated in I believe all of my briefings, and I understood

7   and was rather flexible during the fall concerning certain

8   medical issues being experienced by both Ms. Larson and

9   Attorney Epstein.  I haven't raised that as a point of

10  contention, but when we got to December and January and we had

11  to push for documents, we had to do that.  And documents were

12  not produced until January.  At that time, we had a

13  meet-and-confer by telephone with multiple follow-ups via

14  email.  Via email, I asked Attorney Epstein for responses.  He

15  stated that there was no need for further productions because

16  of the low value of this case.  When I reminded him of his

17  claims against my client, he stated -- and I included this in

18  my papers as an exhibit -- he stated, "No.  Those claims are

19  mine to prove," somehow suggesting that I'm not entitled to

20  documents related to his claims against my client.

21      At that point it was clear that we were hitting up

22  against discovery deadlines, we were trying to schedule

23  depositions, but I didn't have the documents I needed.  I let

24  counsel know that I was going to be moving ahead with this

25  motion, but it wasn't until I said, "I'm filing the motion

1   tomorrow," that Attorney Epstein said, "Oh, Sonya Larson said

2   she found more documents."  We had no choice but to proceed

3   because we had a deadline with the discovery period and with

4   depositions, and there was no indication that these documents

5   would be forthcoming within that time period.  So we filed our

6   motion, and almost two weeks after the filing, we had over 500

7   documents, all of them highly relevant, at least a vast

8   majority of them highly relevant, including statements about

9   the use of my client's letter in Ms. Larson's story -- by

10  Ms. Larson these statements were made -- and that was all

11  produced approximately two weeks after the motion was filed.

12  Under Rule 37, this is a basis for sanctions.  We had both

13  opportunities and attempts to confer.  Significant time was

14  permitted well beyond deadlines.  This was not a trigger-finger

15  reaction.

16          THE COURT:  All right, Mr. Epstein, as to the

17  documents that we have gone through and that you have agreed to

18  be produced, can we have a time frame?

19          MR. EPSTEIN:  It's May 14.  Certainly by the end of

20  the month.

21          THE COURT:  All right.  And we've covered all

22  categories; am I correct?

23          MS. ELOVECKY:  All of the categories that I am aware

24  of, your Honor.

25          THE COURT:  All right, the motion is allowed as to the

1    production, and the documents that we've talked about will be

2    produced by the end of May.

3          As to the motion for sanctions, it's denied without

4    prejudice.  It can be renewed at the end of the case.

5          All right, moving on to Docket Entry No. 110,

6    emergency motion to compel answers to interrogatories and for

7    production of documents.

8          MR. EPSTEIN:  Okay, thank you, your Honor.  I'm just

9    fumbling through papers, and I appreciate you allowing me a few

10   seconds to move some papers around on my desk.

11         THE COURT:  But please note that I do have a criminal

12   matter at 2:30.

13         MR. EPSTEIN:  Oh.  So we tried to focus this.  I'm

14   sure Ms. Elovecky has spent almost as much time as I have.  I

15   have logged, and I'm almost embarrassed to say, 584 hours on

16   this case already.

17         THE COURT:  All right, what I want to focus on is by

18   category what you want and what you don't have.

19         MR. EPSTEIN:  I would like the interrogatories that we

20   sent out in response to the counterclaim to be answered.  We

21   want to know Ms. Dorland's claim to be a writer and an editor

22   and a teacher.  What has she written?  What did she teach?  We

23   would like --

24         THE COURT:  Okay, so let's go through the

25   interrogatories that you're not satisfied with one by one.

1          MR. EPSTEIN:  So we're looking for answers to what

2     she's written, what she teaches and --

3          THE COURT:  No, please, so that the record is clear,

4     what interrogatory are we talking about?

5          MR. EPSTEIN:  This is Interrogatory No. 1, your Honor.

6     I'm sorry.

7          THE COURT:  All right, what's your objection?

8          MS. ELOVECKY:  Your Honor, my objection is that

9     Interrogatory No. 1, first of all, is very vague and ambiguous.

10    It is almost an entire page in and of itself, and it's not

11    broken up in subparts.  It's also asking for information that

12    is completely irrelevant to this matter.  My client's career is

13    not on trial here.  What she has written, what she hasn't

14    written, where she has taught, how she taught, none of that is

15    at all relevant to a copyright infringement issue, to tort

16    claims, or to anything else at issue in this case; and to me

17    and to the way that it appears in this interrogatory, it is

18    designed as nothing but an attempt to harass and embarrass my

19    client.  She does not have the same level of publications as

20    Sonya Larson, which is something that has been paraded through

21    every version of the complaint in a derogatory and demeaning

22    way, and that is all that this interrogatory is looking to

23    continue.

24         THE COURT:  Overruled.  The response to 1 is to be

25    produced.

1            Moving on, Mr. Epstein?

2            MR. EPSTEIN:  Interrogatory No. 2 is looking for

3    whether she's written about kidney donations, anything to do

4    with a kidney donation.  And one of things that I mentioned in

5    my brief is that it goes to the fair use defense as to the

6    market value of her 2015 Facebook letter, and I quoted *Campbell*

7    *v. Acuff-Rose Music*, which is the Supreme Court case that talks

8    about the fact that market value is one of those important

9    things that could be considered in a fair use defense.

10           So we need to know what Ms. Dorland has written about

11   kidneys or kidney donations.  What has she done with her 2015

12   letter?  As far as we can see, she's done very little with it,

13   if anything at all, other than to make postings on Facebook.

14           THE COURT:  What's your response?

15           MS. ELOVECKY:  We answered Interrogatory No. 2.  We

16   answered it in full.  I don't understand why this is in a

17   motion, why we're being forced to spend attorneys' fees on

18   arguing over something that's been answered.

19           THE COURT:  All right, Mr. Epstein, your sister says

20   she's responded.  What else is it you're looking for?

21           MR. EPSTEIN:  All I'm looking for is a statement that

22   Ms. Dorland has not written anything about kidney donations

23   other than what she's posted on her Facebook pages, both the

24   private ones and the public ones.

25           THE COURT:  All right, can we get that in affidavit

1    form?

2          MS. ELOVECKY:  Well, your Honor, that's not what the

3    request asked for, but, yes, we can.  I mean, the answer said

4    that what she has done with the letter is to send it to the

5    administrators at the hospital where she donated her kidney.

6    That's what she said she did; that's what she did.  If she had

7    done something else, it would be in this interrogatory answer.

8          THE COURT:  All right, I'm satisfied with that.

9          Moving on to the next one, Mr. Epstein.

10         MR. EPSTEIN:  Well, given the time constraints, I'm

11   going to skip over the members of the supposedly private and

12   secret Facebook group.  There are --

13         THE COURT:  Are you waiving that?

14         MR. EPSTEIN:  No, I'm not.  We'd like to know who's on

15   there.  Ms. Larson believes that she saw up to 250 people who

16   were on the Facebook group, and Ms. Dorland claims that there

17   are only a handful, 25 or 30 people in the Facebook group.  It

18   shows how widely disseminated this letter really was, that

19   there have been redacted pages from the Facebook production

20   that Ms. Dorland produced; and if we get rid of the deletions

21   and redactions, we'll see exactly how many people were on the

22   Facebook post at that time.  I just would like to see the

23   unredacted copies of the Facebook pages that were produced.

24         MS. ELOVECKY:  May I respond, your Honor?

25         THE COURT:  Yes, please.

1              MS. ELOVECKY:  Okay, that actually is inaccurate.  The

2     redactions from the Facebook pages were made to protect

3     Ms. Dorland's Facebook friends that are not in the group.  When

4     we produced documents back in June and July of 2020, we

5     produced documents that were complete from the Facebook group.

6     Attorney Epstein does have some confusion about Facebook, and

7     it might be that he's not a frequent Facebook user, but

8     Ms. Dorland had the Facebook account which results in a

9     Facebook wall.  Everyone who has a Facebook account has one.

10    She had some postings there.  She also had a private and secret

11    group, which is what it is you hear and what's the requests

12    we're speaking to and what's the interrogatories they're

13    speaking to.  All of the redactions concerned friends and their

14    information and comment who were not in the group but that

15    Facebook populated along the margins of Ms. Dorland's Facebook

16    when she was creating the production.  That's what the

17    redactions were.

18              Concerning the number of people, which is what

19    Attorney Epstein claims is most important to him that were in

20    the Facebook group, Ms. Dorland submitted an affidavit that

21    clearly spelled out under oath the number of people and the

22    time periods.  The identity of those people, I do not see the

23    relevance.  Attorney Epstein admitted in his papers that he has

24    no intent to contact them.  I just do not see where the

25    identity of the people is all that relevant to this case, if at

1   all.

2          Further, in the documents that we did produce,

3   nobody's identity other than the recipient of a kidney, which

4   is medical information, nobody else's identity was redacted for

5   purposes of hiding anything.  Ms. Dorland doesn't have records

6   and cannot create from Facebook a record that shows the

7   timeline of entries and exits from the group.  It does not

8   exist, and I've stated this via email and otherwise to

9   Attorney Epstein.  So I'm really, as far as listing the

10  members, I don't -- I'm sorry?

11          THE COURT:  Hello?  Are you there?

12          MS. ELOVECKY:  Hi.  This is Suzanne.

13          THE COURT:  Are you there?

14          MS. ELOVECKY:  Yes.

15          MR. EPSTEIN:  Judge Bowler, are you there?

16          THE COURT:  I'm here, yes.

17          MR. EPSTEIN:  Okay.

18          MS. ELOVECKY:  Did I get cut off?

19          THE COURT:  I think momentarily you did.  All right,

20  given the hour, what is your availability for a hearing on

21  Monday to continue this?

22          MR. EPSTEIN:  I'm not available on Monday, your Honor.

23  I'm available anytime the rest of the week.

24          MS. ELOVECKY:  And I have availability every afternoon

25  next week.

1          THE COURT:  All right, let me just look at the

2     calendar here.  Oh, I'm emergency judge, so it's a busy, busy

3     week.  And, Mr. Epstein, you have no availability on Monday; am

4     I correct?

5          MR. EPSTEIN:  I have to be in Newton in the morning,

6     and I have a dental appointment that is a year and a half in

7     the making, your Honor, at 2:00 o'clock.  I could go to my

8     office at 3:00 o'clock.  I suppose I could be available at that

9     time.

10          THE COURT:  Well, why don't I put it down for 3:15,

11     give you a little bit more time.

12          MR. EPSTEIN:  That's great.

13          THE COURT:  And if you're late, well, just call in and

14     hang on, and we'll start a little late.

15          MR. EPSTEIN:  It's only a cleaning, your Honor, so it

16     shouldn't take more than a half an hour, 45 minutes maximum.

17          THE COURT:  Well, I had that yesterday for the first

18     time in two years.

19          MR. EPSTEIN:  The same problem that I had, your Honor.

20          THE COURT:  All right.  Well, we'll suspend, and I

21     will talk to you on Monday.

22          MR. EPSTEIN:  Thank you very much, your Honor.

23          THE COURT:  All right.

24          MS. ELOVECKY:  Thanks, your Honor.

25          MS. OYALABU:  Thank you, your Honor.

```
 1              (Adjourned, 2:29 p.m.)

 2                   C E R T I F I C A T E

 3


 4
      UNITED STATES DISTRICT COURT )
 5    DISTRICT OF MASSACHUSETTS    ) ss.
      CITY OF BOSTON               )
 6

 7

 8          I, Lee A. Marzilli, Official Federal Court Reporter,

 9    do hereby certify that the foregoing transcript, Pages 1

10    through 22 inclusive, was recorded by me stenographically at

11    the time and place aforesaid in Civil Action No. #, # v. NAME,

12    and thereafter by me reduced to typewriting and is a true and

13    accurate record of the proceedings.

14          Dated this 30th day of May, 2021.

15

16

17

18

19          /s/ Lee A. Marzilli

20          _____
            LEE A. MARZILLI, CRR
21          OFFICIAL COURT REPORTER

22

23

24

25
```