```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


    SONYA LARSON,                     )
                    Plaintiff         )
                                      )
    vs.                               )  No. 1:19-cv-10203-IT
                                      )
    DAWN DORLAND PERRY,               )
                    Defendant.        )
                                      )
                                      )
                                      )



            BEFORE THE HONORABLE MARIANNE B. BOWLER
                UNITED STATES MAGISTRATE JUDGE
                        MOTION HEARING




            John Joseph Moakley United States Courthouse
                         One Courthouse Way
                    Boston, Massachusetts 02210


                           May 17, 2021
                             3:15 p.m.



                    Kristin M. Kelley, RPR, CRR
                       Official Court Reporter
            John Joseph Moakley United States Courthouse
                   One Courthouse Way, Room 3209
                    Boston, Massachusetts 02210
                     E-mail: kmob929@gmail.com

              Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:
 2
 3           Andrew D. Epstein
 4           Barker, Epstein & Loscocco
 5           176 Federal Street, Suite 502
 6           Boston, MA 02110
 7           617-482-4900
 8           Photolaw@aol.com
 9           for Plaintiff.
10
11           Suzanne M. Elovecky
12           Partridge Snow & Hahn
13           30 Federal Street
14           Boston, MA 02110
15           617-292-7900
16           Selovecky@psh.com
17           for Defendant.
18
19           Stella T. Oyalabu
20           Boyle | Shaughnessy Law PC
21           695 Atlantic Avenue, 11th Flr.
22           Boston, MA 02111
23           617-451-2000
24           Soyalabu@boyleshaughnessy.com
25           For Cohen Business Law Group, PC.
```

```
                    P R O C E E D I N G S
         THE CLERK:  The United States District Court for the
District of Massachusetts is now in section, the Honorable
Marianne B. Bowler presiding.  Today is May 17, 2021, in the
case of Larson versus Perry, et al., Civil Action 19-10203,
which will now be heard.
         As a reminder to everyone on the phone call, please no
recording or rebroadcasting of this court proceeding as it's
prohibited, and doing so may result in sanctions as deemed
appropriate or necessary by the Court.
         Counsel, before I have you identify yourself for the
record, I ask for the benefit of the court reporter you
identify yourself each time before speaking.  I know we have a
male and a female on either side, but I think it's still
helpful.  For the plaintiff first.
         MR. EPSTEIN:  This is Andrew Epstein.  I'm the
attorney for Sonya Larson.
         THE COURT:  Thank you.
         MS. ELOVECKY:  Good afternoon, your Honor.  This is
Susan Elovecky.  I represent Dawn Dorland Perry.
         THE COURT:  Thank you very much.
         MS. OYALABU:  Good afternoon, your Honor.  This is
Stella Oyalabu for Cohen Business Law Group and Jeffrey Cohen.
We have no position in this motion.  Thank you.
         THE COURT:  Thank you.  All right.  Mr. Epstein, it's
```

```
 1   your motion, docket entry 110.
 2           MR. EPSTEIN:  I don't know if we finished
 3   Interrogatory No. 1 and 2.  I'm happy to go through them again.
 4   I think we have basically discussed them.  I think the position
 5   was that Ms. Dorland should be producing some of the documents
 6   we requested as she was claiming to be an author, editor and
 7   writing educator.  We wanted to know what she wrote, what she
 8   edited.
 9           THE COURT:  I believe I ruled on 1 and 2.  Let's pick
10   up with 3.
11           MR. EPSTEIN:  No. 3 was the identity of the members of
12   Dorland's semiprivate Facebook group.  At the time, it was a
13   public Facebook group.  We're trying to find out the identity
14   of the recipients, which we think were pretty extensive.
15   Miss Larson noted that there were about 250 people who were
16   members, and Ms. Dorland claims there was not that many.  I
17   counted over 70 participants in the group just from documents
18   that had been produced by Ms. Dorland, with names.  She's now
19   claiming we should keep the names of the members of the
20   Facebook group confidential.  I don't see any need for that.
21   She should be able to simply click on the members' module to
22   see how many members there were at various times.
23           One of the documents that Miss Dorland did produce had
24   the number 68 associated with it, which could be the beginning
25   of the total count of people who were members of the Facebook
```

1    group back in 2015.  There's a left-hand side bar that has been
2    redacted with a module called "members".  Since it's been
3    redacted, we can't access it.  She should be able to remove the
4    redaction and at least show us that, in fact, she can get the
5    members of her group.  She claims that she just didn't keep
6    page views of every one of the pages of her Facebook group,
7    which is a possibility, but from what she's produced, she can
8    remove the redactions to see how many members there were.
9             We'll take names if she doesn't have the numbers.  I
03:21 10   counted over 70.  I can go back and recount and compare names
11   with the ones on my list.
12             THE COURT:  All right.  Let me hear from your sister.
13   What's your objection?
14             MS. ELOVECKY:  Thank you, your Honor.  So there's a
15   few things going on here at once.  First of all, there was not
16   a private and public Facebook group.  Miss Dorland had a secret
17   group and her own Facebook account which resulted in a Facebook
18   wall or timeline, which is more widely available based on the
19   way that she set up her settings.  That's the first point.
03:21 20             The second point is that Miss Dorland submitted with
21   her opposition to this motion an affidavit that explains the
22   timeline, the invitations that she made to the private group,
23   the approximate numbers of the invitations that she made and
24   the estimated, because there are no records to confirm,
25   estimated population of the group over time, including today.

1                The production that Mr. Epstein is referring to was
2       made in June of 2020 and the issue about the redactions in that
3       production were not raised until the very recent time.  So what
4       I recall of the redactions from the Facebook productions was
5       that it did not redact information concerning the Facebook
6       group, which is at issue, but rather Miss Dorland's Facebook
7       friends and their comments and Facebook activity that is
8       unrelated to the group.  That was the only redaction that we
9       made, not anything related to the group.
03:23 10                As far as the names of the people in the group, it is
11      completely true and accurate that we did not redact names of
12      people in the production that we made, nor do we think we
13      should have, however, what's being requested now is a complete
14      list of names.
15                I just have to pause to say Interrogatory No. 3 asks
16      for a lot more than what my brother just explained.  It does
17      not just ask for how many members are there today.  It asks for
18      the complete history outlining when people were admitted, how
19      they were admitted, how many people were in the group for
03:23 20    different periods of time.  Those aren't records kept by
21      Facebook or my client.
22                The names and identity of the people in the group have
23      no relationship to whether or not Ms. Larson copied
24      Miss Dorland's letter.  There's just no relevance to the names
25      of the people in the group.  We have produced every page that

```
 1    could be printed from that Facebook group.  It's all been
 2    produced.
 3              So a list of other members, I believe that my brother
 4    mentioned on Friday that he had no intention of contacting or
 5    dealing with these people, I don't see what the relevance is
 6    whatsoever for this case to the specific identities of all
 7    members of the group.  Again, I would refer the Court and my
 8    brother to the Dorland affidavit that was submitted, along with
 9    her opposition, to the Motion to Compel.
10    The last thing I want to say on this point, your
11    Honor, is that if my brother had taken the opportunity to
12    confer prior to filing this motion, these conversations could
13    have been had, the Facebook group could have been explained
14    more fully, as I'm assuming incorrectly that my brother is not
15    a Facebook expert or user --
16              THE COURT:  Listen, last week we talked about the
17    problems.  There had not been adequate meet and confer.  I
18    think the objections to three are well taken.  Your objection
19    is sustained.
20              What about four?  Mr. Epstein?
21              MR. EPSTEIN:  Four goes hand in hand with number
22    three, your Honor.  I'm not going to bother the Court with
23    trying to rule on that.  So based upon your ruling from number
24    3, I'll withdraw my request for number 4.
25              THE COURT:  Six through 10.
```

MR. EPSTEIN:  Miss Dorland made an issue about her supposed tough relationship with Miss Larson.  This was done in her counterclaim.  There were quite a few paragraphs in her counterclaim, paragraph 17, 18, 19, 20, 21, where she talks about the true friendship that started to develop between Miss Larson and Miss Dorland, meals they shared together, time, coffee.  These are things that normally would happen between friends.

We just ask Miss Dorland to explain when they shared meals, when they had coffee, when she shared a glass of wine together, when they texted or talked on the telephone, when they visited each other's homes, when they told each other every details of their life, what writings workshops did they participate in together, when did Miss Dorland apparently tell Miss Larson about her difficult childhood upbringing, what was the very thoughtful and personal going away gift that Sonya Larson supposedly put together for Miss Dorland, how did they stay in touch when Miss Dorland moved to Washington D.C. to go to the University of Maryland.

These are questions that go to the credibility of Miss Dorland as a witness, because Miss Larson told me the other day, I don't think I have ever been in a room together with Dawn Dorland, just the two of us, at any time in my entire life.  And this is a true friend?

THE COURT:  It seems to me that this is material that,

```
 1    while it may be relevant, would be best explored at deposition.
 2            MR. EPSTEIN:  Happy to do it at deposition, but I'm
 3    limited to seven hours, and we've got 7,000 documents.  Not all
 4    of them are relevant.  We're not going to go through 7,000
 5    documents, but seven hours can get used up in a hurry during
 6    deposition.  If Miss Dorland would like to say, I was mistaken
 7    by calling her a true friend, I thought she was a friend, we
 8    just didn't have meals together, we didn't go out for coffee or
 9    a glass of wine after work, fine.  If she withdraws all of
10    those things, I have no problem with it.
11            MS. ELOVECKY:  Your Honor, may I?
12            THE COURT:  No.  I'm going to make a ruling.  Denied
13    without prejudice, to be renewed if necessary after the
14    deposition.
15            MR. EPSTEIN:  Fair enough.
16            THE COURT:  Moving on.
17            MR. EPSTEIN:  We're on to interrogatory No. 15.  What
18    I'm asking for here is a detailed description of what
19    Miss Dorland perceives to be plagiarized or the infringed
20    portions of her 2015 Facebook letter in the Boston Book
21    Festival version of the story.  She went into great detail
22    paragraph 90 to 104, and then 119 to 129, of her counterclaim
23    as to what portions of the letter she believed were infringed
24    in the American short fiction version of the story, but when I
25    got to the Boston Book Festival version of the short story,
```

|   |   |
|---|---|
| 1 | we're asking Miss Dorland to tell us what similarities are |
| 2 | there between your 2015 letter and the letter in Miss Larson's |
| 3 | short story, the Boston Book Festival version of the short |
| 4 | story. |
| 5 | Miss Larson will have to explain these to the jury and |
| 6 | should now really be required to do so in advance of her |
| 7 | deposition so I know what questions to ask when we get there. |
| 8 | THE COURT:  I think that's quite reasonable.  What's |
| 9 | your response? |
| 03:29 10 | MS. ELOVECKY:  Your Honor, Interrogatory No. 15 |
| 11 | doesn't ask what's similar.  It doesn't ask how they're alike. |
| 12 | It asks what infringes.  That's asking for a legal analysis |
| 13 | from a layperson.  Miss Dorland obviously did not draft her |
| 14 | counterclaim.  She, of course, reviewed it for its accuracy, |
| 15 | but it's not a verified counterclaim.  It's attorney work |
| 16 | product, as would be any answer to Interrogatory No. 15 the way |
| 17 | that it's drafted.  My client is not an attorney.  So while she |
| 18 | might be able to say what she thinks is similar, that's not |
| 19 | what interrogatory 15 asks for. |
| 03:30 20 | MR. EPSTEIN:  Number 15 says, "Please state in as much |
| 21 | detail as possible in what way or ways you believe the final |
| 22 | Boston Book Festival version of *The Kindest* infringes |
| 23 | Miss Dorland's letter." |
| 24 | MS. ELOVECKY:  That's correct, which is a legal |
| 25 | analysis that is required in response as to infringement. |

```
 1            THE COURT:  Can you rephrase it, Mr. Epstein, and not
 2   use the word "infringe"?
 3            MR. EPSTEIN:  Sure.  Of course.  In what way
 4   substantially similar, which is the buzzword in copyright
 5   infringement.
 6            THE COURT:  Yes.
 7            MS. ELOVECKY:  Similar makes more sense because
 8   substantially similar is also looking for a legal analysis.
 9            THE COURT:  All right.  Similar.  Allowed with the
10   term being modified to "similar".
11            MR. EPSTEIN:  Great.
12            THE COURT:  16.
13            MR. EPSTEIN:  No. 16 is troubling, not a troubling
14   interrogatory, but what is happening is troubling.  As I
15   explained in my brief, Miss Dorland went to the Boston Globe
16   and got some publicity for the Book Festival and put
17   Miss Larson in a bad light.
18            Because of certain newspaper deadlines, Miss Larson
19   was never able to articulate and fully express her views and
20   claims to the Globe reporter.
21            The troubling part is that Miss Larson continued to
22   contact the press.  Back in March of this year, Miss Larson,
23   March 16th, Larson was contacted by a reporter by the name of
24   Robert Kolker.  Kolker is a very respected New York Times best
25   selling author.  He asked Miss Larson if she would agree to be
```

1   interviewed for a feature story he was commissioned to write
2   for the New York Times Sunday Magazine.  During the
3   conversation, Miss Larson was informed by Robert Kolker that
4   Dorland contacted him in January of this year, January 2021,
5   and asked him to write a story about this ongoing litigation.
6   Dorland, according to Kolker, had at that time in March at
7   least two telephone conversations with him and provided a
8   number of documents to the reporter.
9           Dorland has refused to provide any information about
10  her exchanges with Kolker.  She's claiming only that
11  communications she's had with reporters or the media prior to
12  the commencement of civil litigation is relevant.
13          Larson has a right to know what Dorland told
14  Mr. Kolker.  She has the right to obtain all e-mail and text
15  communications with him.  She has the right to obtain all
16  documents.  This is nothing privileged about communications
17  with a newspaper reporter.  It is just something that should be
18  produced when requested, and Miss Dorland absolutely refuses to
19  do that.
20          In addition to that, apparently Miss Dorland wrote to
21  the Boston Globe editorial board after the two articles came
22  out in the Boston Globe.  She wrote to the New York Times,
23  apparently there's a podcast called Dear Sherbert, and a
24  reporter named Kat Rosenfield, that she contacted in the fall
25  of 2018, hoping to have stories written about Larson, to write

|    |    |
|---:|---|
| 1  | negative things about GrubStreet, which is Larson's employer, |
| 2  | and to write negative things about views in the Marketplace |
| 3  | Conference, which is the conference that Miss Larson runs for |
| 4  | GrubStreet. |
| 5  | It really is an ongoing battle.  If that were the only |
| 6  | thing, that would be -- that's one aspect.  Just within the |
| 7  | last two weeks Miss Larson had a telephone conversation where |
| 8  | Dorland e-mailed text messages between Miss Larson and her |
| 9  | friend that she obtained through discovery and sent it to a |
| 03:35 10 | member of the GrubStreet community, saying, this is going to be |
| 11 | in the New York Times. |
| 12 | This is just horrible.  We'd like Dorland to stop |
| 13 | e-mailing random people and stop sending text messages she |
| 14 | received through discovery, but at the very least we need to |
| 15 | know copies of e-mails she sent to anyone about the story. |
| 16 | It's the same with interrogatory 18 and also with the |
| 17 | document request that we propounded where we wanted her to give |
| 18 | us everything that she sent to anyone, including individuals |
| 19 | and entities.  This is a troubling scenario that I'm reporting |
| 03:35 20 | on here. |
| 21 | THE COURT:  My ruling on this is going to be the same. |
| 22 | I think that you should try and explore this at the deposition. |
| 23 | Then if you're not satisfied, you can come back. |
| 24 | MR. EPSTEIN:  Even for the documents, your Honor? |
| 25 | That would make the deposition a lot easier and a lot -- |

1  whatever documents she gave to Mr. Kolker --

2          THE COURT: I think that you have to establish at the
3  deposition what the documents were, and we'll go from there.

4          MR. EPSTEIN: Fair enough. Interrogatory No. 23 and
5  24, we're looking for, as I said in our hearing that we had
6  last Friday, there are about 14 additional documents that we
7  will be producing. I do not believe any of those documents
8  have anything to do with damages.

9          We ask Miss Dorland in these interrogatories to tell
10 us basically what the damages are that she thinks she's
11 entitled to. There's nothing in the GrubStreet production to
12 be forthcoming from a subpoena that was issued to GrubStreet
13 that would have anything to do with damages, but she should be
14 able to quantify her claim for damages from the information she
15 has. She's going to have to do this at trial. She should be
16 compelled to do so now.

17         THE COURT: Well, I'm inclined to agree. What's your
18 position?

19         MS. ELOVECKY: Your Honor, my position is two-fold.
20 First is that the documents that were discussed there being
21 produced are still forthcoming and actually do include
22 information about damages and include Miss Larson's NEA grant,
23 which was awarded on the basis of the story at issue. That is,
24 I believe, based on prior communications, upward around
25 $25,000, while my brother continues to cite the figure of $425,

1   ignoring this other piece of information that was only produced
2   after our motion was filed.
3           The second part is that, in this case where the only
4   claim that survived against Miss Larson by Miss Dorland is for
5   a copyright infringement, the only damages we're looking at
6   have to do with the profits earned by Miss Larson.  It's all
7   coming from Miss Larson's documents.  So the requirement that I
8   produce that back to her seems rather counterintuitive.  My
9   response to the interrogatory includes a reference to the fact
10  that Miss Larson's production is not yet complete on this
11  front.  So unless and until that production is completed,
12  neither can be our response to this interrogatory.
13          MR. EPSTEIN:  As I indicated on Friday, we are going
14  to get you these additional documents by the end of the month.
15          THE COURT:  All right.  Damages are also part of the
16  required disclosures under 26(a)(1) to be produced.
17          MS. ELOVECKY:  Of course, but we need the information
18  from the plaintiff before we can do our own damages analysis.
19  The timing is set forth the way it is for a reason.  We're
20  waiting for the rest of this information.  This isn't a slip
21  and fall with my client looking at her doctor's records to find
22  out damages or missing work.  This leans a hundred percent on
23  Miss Larson's documents.
24          THE COURT:  Counsel, I'm well aware that it's not a
25  slip and fall.  To be produced within 2 weeks of the other

```
 1   documents being produced.
 2           All right.  That deals with 23 and 24.
 3           MR. EPSTEIN:  It does.
 4           THE COURT:  Motion is allowed, in part, and denied, in
 5   part, to the extent set forth on the record in detail.
 6           MR. EPSTEIN:  Okay.  Document request No. 6 is looking
 7   for the documents from places that Miss Dorland contacted.  We
 8   had heard that the Authors Guild and Vermont Studio Center,
 9   various literary agents and authors were contacted.  We don't
10   know what Miss Dorland said to them.  We don't know what
11   documents she produced or what e-mails or texts.  We're just
12   really looking to find out what it was that she sent to all of
13   these individuals.  There's a list of them.  I enumerated them
14   in my motion.  We just want to find out about those contacts.
15   We know that Miss Dorland contacted people but we don't know
16   what she said to them and we don't know what documents she sent
17   to them.  That would be very important and highly relevant and
18   useful in a deposition.
19           THE COURT:  What's your response?
20           MS. ELOVECKY:  My response is that other than the
21   copies that we've already discussed concerning Robert Kolker,
22   my client produced all documents in her possession, custody and
23   control concerning this matter.  Every e-mail that she sent and
24   received that she has in her possession, custody and control
25   was produced.  Nothing was withheld.  Again, the only exception
```

```
       1   is the Robert Kolker communications based on the timing and
       2   other factors, but everything else that my brother is
       3   seeking -- everybody always wants to have the documents that
       4   are helpful to their case, but if they don't exist, they don't
       5   exist.
       6           Some conversation that he's citing and has cited in
       7   his papers took place via telephone, and there's no documents
       8   that are a result of that.  Everything, again, that existed was
       9   produced, and we did a very thorough confirmation of that fact
03:42 10   upon receipt of the Motion to Compel.
      11           THE COURT:  All right.  Can we have that in affidavit
      12   form from the defendant?
      13           MS. ELOVECKY:  Yes.
      14           THE COURT:  All right.
      15           MR. EPSTEIN:  Okay.
      16           THE COURT:  I can't order produced what doesn't exist.
      17           MR. EPSTEIN:  I agree with you, your Honor.
      18           THE COURT:  What else, Mr. Epstein?
      19           MR. EPSTEIN:  Something I did not have in my motion
03:43 20   but it really is relevant in a lot of respects is I asked
      21   Miss Dorland to produce copies of any reports, statements,
      22   memorandum, testimony, court correspondence or documents
      23   relating to communications alleged in the amended complaint or
      24   Miss Dorland's counterclaim.
      25           THE COURT:  Mr. Epstein, I'm not going to deal with
```

```
 1   something that's not in the motion.
 2           MR. EPSTEIN:  Okay.  Then I'm all set, your Honor.
 3   That's the end of my list.
 4           THE COURT:  Have a meet and confer and decide whether
 5   or not you can get together on it.
 6           MR. EPSTEIN:  Okay.  That sounds fair.  I appreciate
 7   that.
 8           THE COURT:  All right.  Hearing nothing else then, we
 9   stand in recess.
10           MS. ELOVECKY:  Your Honor, I'm sorry.  I had started
11   to raise one more point.  Am I able or no?
12           THE COURT:  Yes.
13           MS. ELOVECKY:  So the first thing, your Honor, is that
14   when we spoke on Friday, there was a conversation about, and
15   this is on my motion, there was a conversation about text
16   messages that had been searched in the format in which they
17   were produced.  I didn't have in my notes a ruling concerning
18   that.  I just was not sure where we're leaving that topic.
19   That was the issue where searches had been run, search terms,
20   and the document that was produced included only one line that
21   contains the search term and not the full conversation.  I'm
22   not looking for the way that a text conversation spreads over
23   days.  I'm only looking for the relevant portions so we can see
24   the responses and how this was a conversation and not just a
25   single line.
```

```
 1              THE COURT:  I thought that we agreed you would have a
 2    further meet and confer and discuss optimal additional search
 3    terms?
 4              MS. ELOVECKY:  Okay.  Thank you, your Honor.  I didn't
 5    have that in my notes.
 6              MR. EPSTEIN:  I thought we were going to run the
 7    search terms using the words at this point, which apparently
 8    Miss Larson did not do.
 9              MS. ELOVECKY:  Right.  I had in my notes about the
10    additional search terms but not about the format of what was
11    produced and whether that would be rectified.
12              THE COURT:  That you will have a meet and confer on.
13              MS. ELOVECKY:  Thank you.
14              MR. EPSTEIN:  Okay.
15              THE COURT:  All right.  Hearing nothing else, stay
16    well and stay safe.
17              (Whereupon, the hearing adjourned at 3:45 p.m.)
```

```
 1                      C E R T I F I C A T E
 2
 3
 4   UNITED STATES DISTRICT COURT )
 5   DISTRICT OF MASSACHUSETTS    )
 6
 7
 8            I, Kristin M. Kelley, certify that the foregoing is a
 9   correct transcript from the record of proceedings taken May 17,
10   2021 in the above-entitled matter to the best of my skill and
11   ability.
12
13
14       /s/ Kristin M. Kelley                    June 16, 2021
15       Kristin M. Kelley, RPR, CRR                  Date
         Official Court Reporter
16
17
18
19
20
21
22
23
24
25
```