# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SONYA LARSON,

       Plaintiff

    v.

DAWN DORLAND PERRY,
COHEN BUSINESS LAW GROUP, PC and
JEFFREY A. COHEN, ESQUIRE,

      Defendants.

      AND

DAWN DORLAND PERRY

       Plaintiff-in-Counterclaim

    v.

SONYA LARSON

       Defendant-in-Counterclaim

C. A. No.: 1:19-CV-10203-IT

**DAWN DORLAND PERRY'S ~~RESTATED~~ AMENDED COUNTERCLAIMS
ASSERTED AGAINST SONYA LARSON[*]**

    Dawn Dorland Perry, known professionally and artistically as Dawn Dorland ("Ms.

Dorland") brings these ~~Counterclaims~~ counterclaims against the Plaintiff/Defendant-in-

Counterclaim, Sonya Larson ("Ms. Larson") in this action, to enforce her copyright in a letter

that she wrote following an altruistic, living kidney donation she participated in during 2015.

---

[*] ~~Ms. Dorland restates her Counterclaims without amendment or changes for purposes of completeness of filing with her answer to the Second Amended Complaint.~~

Ms. Larson had access to that letter because Ms. Dorland invited Ms. Larson to a private and secret Facebook group wherein Ms. Dorland shared updates and personal details with her friends and family. Unbeknownst to Ms. Dorland, Ms. Larson made the decision to abandon the parties' friendship in favor of Ms. Larson's writing career. Instead of offering support to Ms. Dorland surrounding her surgery and donation of her kidney, Ms. Larson mined the Facebook page for source material for her writing – not only for ideas – which may be hurtful to a friend but permissible under the law – but for actual text.

While Ms. Larson told Ms. Dorland in July of 2016 that her short story – *The Kindest* – was an unpublished work in progress, and that it was not at all about a "kidney donation," Ms. Dorland would later find out that her "friend" had lied to her. *The Kindest* had been published as early as February or March of 2016, was in fact about a kidney donation, and – most remarkably – contained a near exact copy of Ms. Dorland's letter written to the final recipient in the surgical chain from Ms. Dorland's kidney donation. Not only did Ms. Larson copy Ms. Dorland's unique, creative and heartfelt words, but she knowingly coopted Ms. Dorland's expression concerning her childhood trauma and abuse – knowing full well, after years of friendship, the emotional distress that this (as well as her other actions) would inflict on Ms. Dorland.

From 2016 to 2019, Ms. Larson proceeded to publish multiple ~~version~~ versions of The Kindest, each containing an infringing version of Ms. Dorland's letter. Ms. Larson's actions constitute not only copyright infringement, but also intentional infliction of emotional distress, where she manipulated her friendship with Ms. Dorland, made material misrepresentations in order to mislead Ms. Dorland from discovery of her infringement, and engaged in other extreme and outrageous conduct designed to inflict harm on Ms. Dorland.

To add insult to injury, Ms. Larson initiated the instant lawsuit claiming that Ms. Dorland wrongfully accused Ms. Larson of plagiarism. From the outset, Ms. Larson knew that she had committed plagiarism, and initiated this action nonetheless in an attempt to intimidate, blackmail, and scare Ms. Dorland into abandoning her rightful intellectual property claims. This suit was brought not to vindicate any of Ms. Larson's rights, but instead to prevent Ms. Dorland from enforcing rights of her own.

Through this Counterclaim, Ms. Dorland seeks damages from Ms. Larson, as well as a declaration concerning her exclusive copyright over her letter, an injunction preventing any further publication of the infringing work, and her attorney's fees, as permitted by law.

## **PARTIES**

1.      Plaintiff-in-Counterclaim Dawn Dorland Perry, known professionally as Dawn Dorland, ("Ms. Dorland") is an author, editor and writing educator who resides in Los Angeles, California.

2.      Defendant-in-Counterclaim Sonya Larson ("Ms. Larson") is an author and a director at GrubStreet, a creative writing Center in Boston.  Ms. Larson resides in Somerville, Massachusetts.

## **JURISDICTION AND VENUE**

3.      Jurisdiction and venue are appropriate in this Court because Plaintiff-Counterclaim Defendant Sonya Larson ("Ms. Larson") voluntarily brought this lawsuit in this Court. These counterclaims arise out of the same occurrence as those addressed in the Complaint in this matter.

**FACTUAL ALLEGATIONS**

Ms. Dorland's Educational and Professional Background

4.      Ms. Dorland was born and raised in rural Iowa.  She subsequently attended

Scripps College in California, from which she graduated *magna cum laude* with a B.A. in

Religious Studies in 2002.

5.      In 2004, Ms. Dorland obtained a Master's in World Religions from Harvard

Divinity School in Cambridge, Massachusetts, and in 2014, she received a Master's in Fine Arts

("MFA") from the University of Maryland.

6.      Ms. Dorland has a diverse professional background, as she pursued an academic

career in religious studies for several years before changing tracks and rising in the ranks in

television advertising to the executive level, where she worked on Emmy nominated anti-tobacco

commercials, and other recognized campaigns.

7.      In 2009, however, Ms. Dorland devoted herself to her writing fiction and non-

fiction full time, leaving the advertising profession, and becoming involved full time with

workshops at GrubStreet in Boston, as well as summer programs at the Fine Arts Work Center in

Provincetown.  Once she was able to obtain funding for the full-time program MFA program at

the University of Maryland, she moved from Boston to Washington, D.C. for that opportunity.

Once she completed the residency requirements of her MFA, Ms. Dorland moved to Los

Angeles, California, where she still resides today.


Ms. Dorland's Friendship with Ms. Larson

8.      Ms. Dorland met Ms. Larson in 2007 when Ms. Dorland first registered for part-

time classes at GrubStreet, where Ms. Larson worked full-time as the Program Coordinator.

9.      While the two were friendly in 2008 and 2009, they began to develop a true friendship in 2010.

10.      Throughout 2010 and 2011, Ms. Dorland and Ms. Larson frequently socialized. They were both active at GrubStreet, are approximately the same age, had many mutual friends, shared their passion for writing and educating aspiring writers, and generally enjoyed each other's company.

11.      Ms. Dorland and Ms. Larson's friendship played out through significant email correspondence, shared cocktails, meals, invitations to each other's birthday celebrations, gatherings with each other's spouses and GrubStreet writing colleagues.

12.      Ms. Dorland and Ms. Larson also participated in writing workshops and other literary events together.

13.      Ms. Dorland and Ms. Larson were guests at and/or were invited to each other's homes on several occasions.

14.      Ms. Dorland and Ms. Larson's conversations included their career paths and personal lives.

15.      When Ms. Larson's partner at the time's mother passed away, in 2011, Ms. Dorland attended the services and provided support to Ms. Larson and her partner.

16.      Throughout their friendship, Ms. Dorland and Ms. Larson shared with one another various personal details about their lives, their pasts, and their aspirations.

17.      Over the course of their friendship, through conversation, as well as non-fiction writing that she shared, Ms. Dorland told Ms. Larson that Ms. Dorland had a difficult childhood, wherein she suffered physical and emotional abuse, neglect, and poverty.

18.     Ms. Larson knew, at least since 2011 when Ms. Dorland published an essay on the GrubStreet website, of Ms. Dorland's traumatic upbringing, and her struggle to come to terms with it as an adult.

19.     Just prior to Ms. Dorland's move to Washington, D.C. to attend the full-time MFA program, Ms. Larson attended a farewell dinner hosted by Ms. Dorland and her spouse at their Jamaica Plain apartment.  At that dinner, Ms. Larson gave Ms. Dorland a very thoughtful and personal going away gift, which Ms. Larson put together herself with many personal touches, and references to the friends' shared history.

20.     After Ms. Dorland moved, Ms. Dorland and Ms. Larson stayed in touch.  While it was difficult to keep up regular communication while in school full-time, Ms. Dorland and Ms. Larson reconnected several times each year at writing conferences.

21.     Specifically, from 2014 - 2017, Ms. Larson invited Ms. Dorland to Boston to participate in GrubStreet's Muse & The Marketplace writing conference as an instructor.

<u>Ms. Dorland's Living Kidney Donation</u>

22.     In or about 2009, Ms. Dorland first read about living kidney donations, and hoped that she would one day be able to contribute to someone in need through such a donation, knowing that such a contribution would make a significant impact on the life of the recipient.

23.     In 2015, after she obtained her MFA, and while living within a short distance of the world-renowned UCLA campus hospitals, Ms. Dorland realized the time to act on her long-held hope of making such a contribution had arrived.

24.     In June of 2015, as a nondirected donor, Ms. Dorland started a short kidney surgical chain:  she provided her compatible kidney to a Los Angeles-based father of 12, whose

wife was not a compatible donor.  His wife, in response, donated her non-compatible kidney to a young mother in Oregon – a stranger to both Ms. Dorland and to the recipient of her kidney.

25.     Because Ms. Dorland had designated her kidney for the greatest need, interstate health officials themselves identified the young mother in Oregon as the final recipient in Ms. Dorland's surgical chain.

26.     Within this surgical chain, Ms. Dorland participated in what is termed a "paired exchange" with the young mother in Oregon.

27.     A "paired exchange" refers to the algorithmic practice of matching one or more willing but incompatible donor-recipient pairs within a surgical chain of donations between strangers and often over distances, across cities and states.

28.     This practice permits several incompatible donors to essentially "mix and match" until each has a compatible donor and recipient so that the chain is complete.

29.     The Oregon recipient had not otherwise identified a living donor and was waiting on the deceased donor list for a transplant when Ms. Dorland elected to donate her kidney.

30.     Ms. Dorland's nondirected or "altruistic" donation meant that the young mother could receive a living kidney rather than a cadaveric kidney.

31.     Living kidneys perform on average 50% or 5 years longer than kidneys transplanted from deceased donors, reducing the need for multiple transplants or dialysis over the lifespan of an individual with kidney disease.

32.     In Ms. Dorland's chain, the entire process consisted of four surgeries across all patients and was a success for all of the patients.

33.     Ms. Dorland successfully recuperated within the expected time period and remains healthy with one kidney today.

Ms. Dorland's Private Facebook Group and the Dorland Letter

34.     As Ms. Dorland was preparing for her kidney retrieval surgery, in April of 2015, she created a Facebook Group to share her experience with her friends and family (the "Facebook Group").

35.     From the moment of its creation, Ms. Dorland designated the Facebook Group both "private" and "secret" which, according to Facebook policies in 2015, meant that the group was not visible in Facebook search results, and that comments and other activity would not be seen anywhere other than inside the group.

36.     In order for someone to be added to the Facebook Group, Ms. Dorland would need to add them, as the administrator, and then that person would decide whether or not they wanted to join.  If they accepted, they would be part of the Facebook Group and would be able to see Ms. Dorland's posts and the other members' comments.

37.     By virtue of being a "private" and "secret" group forum, the Facebook Group was not open to the public.

38.     One of the friends Ms. Dorland invited to the Facebook Group was Ms. Larson.

39.     Ms. Larson has admitted multiple times that she had access to the Facebook Group.

40.     Ms. Dorland posted updates concerning her surgery to her Facebook Group, as well as updates concerning her kidney-recipient's recuperation.

41.     Ms. Dorland also posted information concerning living kidney donations, generally.

42.     Following Ms. Dorland's surgery, her recipient's surgery, and her recipient's wife's surgery, all three Los Angeles-based individuals of the Dorland surgical chain met onsite

at UCLA's Ronald Reagan Medical Center with Ms. Dorland's spouse and her kidney-recipient's adult children. After recovering from their surgeries, Ms. Dorland, her recipient, and his wife held an additional meeting six weeks later where Ms. Dorland and her spouse were introduced to other members of her recipient's family. Ms. Dorland and her spouse posted about these gatherings discreetly in Ms. Dorland's private/secret Facebook Group.

43.     Several members would express their support of Ms. Dorland and her kidney donation by either "liking" Ms. Dorland's posts, or commenting on her posts, using their own words.

44.     Ms. Larson never "liked" a post.

45.     Ms. Larson never commented on a post.

46.     Facebook would also track who "saw" each post, and Ms. Dorland was able to see that information, as well.

47.     Ms. Larson "saw" *every* post.

48.     Ms. Larson "saw" *every* comment, whether made by Ms. Dorland or another member of the Facebook Group.

49.     Shortly after the June 2015 procedure in Los Angeles, Ms. Dorland wrote a letter to the woman in Oregon – the final recipient in the surgical chain. A true and accurate copy of the letter Ms. Dorland wrote is attached hereto as **Exhibit A** ("the Dorland Letter").

50.     The Dorland Letter detailed Ms. Dorland's motivations behind making an altruistic kidney donation and is written in Ms. Dorland's unique and personal style.

51.     Ms. Dorland carefully crafted the Dorland Letter using her own words, without referring to other letters, works or writings.

52.     The Dorland Letter is creative and original.

9

53.     Immediately after Ms. Dorland wrote the Dorland Letter and it was fixed, and as a function of Copyright Law, Ms. Dorland had a copyright in the Dorland Letter.

54.     Ms. Dorland subsequently registered the Dorland Letter with the U.S. Copyright Office.  Proof of the registration is attached hereto as **Exhibit B**.

55.     On July 7, 2015, Ms. Dorland posted the Dorland Letter to the Facebook Group.

56.     Ms. Larson had access to the Dorland Letter.

57.     Ms. Larson read the Dorland Letter.

58.     Ms. Larson took notes on the Dorland Letter.

59.     Upon information and belief, Ms. Larson recorded entire passages from the Dorland Letter.

60.     Upon information and belief, Ms. Larson recorded specific phrases and paragraphs from the Dorland Letter.

61.     Notwithstanding Ms. Larson's interactions with the Dorland Letter and Ms. Dorland's Facebook Group, when Ms. Dorland corresponded with Ms. Larson in July of 2015, Ms. Larson disclaimed any knowledge of Ms. Dorland's kidney donation.

62.     In a July 2015 email exchange, when Ms. Dorland reminded Ms. Larson that Ms. Dorland had donated her kidney, Ms. Larson responded to say, "Ah yes – I did see on Facebook that you donated your kidney. What a tremendous thing!"

Ms. Dorland Learns that Ms. Larson is Writing About Kidney Donation

63.     In June of 2016, Ms. Dorland was informed by a friend in Boston that he had attended a reading in a Boston area bookstore where Ms. Larson had read an excerpt from a short story that she was working on about a woman who received a living kidney donation.

10

64.     Ms. Dorland's friend asked Ms. Dorland if she had been the "inspiration" for Ms. Larson's story.

65.     Ms. Dorland was very surprised to learn that Ms. Larson was working on a story about a kidney donation, since the two women had crossed paths at national literary events, corresponded and interacted on social media several times in the year since Ms. Dorland had donated her kidney, and Ms. Larson had not mentioned that she was working on a story about a kidney donation.

66.     Ms. Dorland emailed Ms. Larson in June of 2016 and casually asked her about the story and asked if she could read it.

67.     In response to Ms. Dorland's email, Ms. Larson stated that yes, she had been working on a short story about a "woman who receives a kidney," that was "partially inspired by how my imagination took off after learning of your own tremendous donation."

68.     Ms. Larson further stated, "I hope it doesn't feel too weird for your gift to have inspired works of art[.]"

69.     Ms. Larson ultimately declined to share the story, stating that she was "still working on the story" and didn't "feel quite ready to show the full thing to people".

70.     While the two authors continued to exchange emails over the course of the next days and weeks, Ms. Larson admitted that she joined Ms. Dorland's Facebook Group.

71.     In an email later in the chain, in July of 2016, Ms. Larson again stated, "your tremendous gift certainly prompted my imagination[.]"

72.     In Ms. Dorland's view, at that point in time, her friend had used her personal details, to which she had gained access by virtue of their friendship, but yet had not provided even the most minimal support, such as an email or check-in via the Facebook Group.  Ms.

Dorland was left feeling that Ms. Larson had taken advantage of their friendship and Ms.

Dorland's gesture in order to further her own artistic development.

73.     However, by the end of the discussion, wherein Ms. Dorland believed the two

authors were taking the time to carefully and thoughtfully share their perspectives, Ms. Dorland

was clear with Ms. Larson that she willing to let the situation go and resume their friendship.

74.     Throughout the 2016 email discussion, however, the Dorland Letter was not

raised.

75.     There was no indication in 2016 that the Dorland Letter was used in Ms. Larson's

short story, which Ms. Larson characterized in her emails as a work in progress.

76.     In fact, in the course of the email chain between Ms. Dorland and Ms. Larson,

Ms. Larson informed Ms. Dorland that she had not even mentioned the short story to anyone

other than her writing group.

77.     Further, Ms. Larson had told Ms. Dorland that her story was actually not about a

kidney donation, but rather about "race, shame, grandiosity, addition."

78.     During this summer 2016 email chain, Ms. Larson informed Ms. Dorland that she

had intended to tell Ms. Dorland about the story "should it ever be published."

79.     At the conclusion of the email chain, in August of 2016, Ms. Dorland believed the

two authors had made peace, and were looking forward to their next opportunity to speak in

person and resume their relationship.

80.     In fact, Ms. Larson stated in the final email to Ms. Dorland, "I look forward to

seeing you again with the strength of this conversation between us."

81.     Ms. Dorland did not realize at the time that Ms. Larson had knowingly and

deliberately lifted several sentences from the Dorland Letter verbatim, and had expressed as

much via text message to other friends. See Exhibit C, January 23, 2016 text messages from Ms. Larson. She further stated an inability to change those sentences, because it was "just too damn good." See id.

82. 81.While Ms. Dorland and Ms. Larson did continue to interact during 2016 and early 2017, Ms. Larson suddenly and inexplicably refused to speak to Ms. Dorland at the 2017 Muse & the Marketplace conference. Despite the fact that Ms. Dorland attended that conference at Ms. Larson's invitation, Ms. Larson refused to even greet Ms. Dorland when Ms. Dorland approached Ms. Larson, creating a very tense atmosphere for the parties' mutual friends and Ms. Dorland.  Ms. Larson provided no explanation for her abrupt cessation of the relationship.

Ms. Dorland Learns that Ms. Larson Published *The Kindest* with American Short Fiction

83. 82.Three months after Ms. Larson unilaterally and publicly ended the parties' friendship during the 2017 Muse conference, Ms. Dorland learned that *The Kindest* had been published in the Emerging Writers issue of American Short Fiction ("ASF"), a literary anthology.

84. 83.Ms. Dorland learned of the publication through a Facebook post on Ms. Larson's Facebook page in or about August of 2017.  The post was open to the public.

85. 84.In Ms. Larson's public Facebook post, she thanked and/or acknowledged several authors and fellow students.  She did not acknowledge or thank Ms. Dorland.

86. 85.While Ms. Dorland learned, at some point in 2017, that the ASF publication was available both in hard copy (in book format), and also on-line on ASF's website, the on-line version required a paid subscription.  Ms. Dorland did not pay to read Ms. Larson's story either on line or via the hard copy.

87.   86. At that time, in August of 2017, Ms. Dorland understood – from the 2016 email exchange with Ms. Larson – that Ms. Larson's story was loosely inspired by, but otherwise not at all related to, Ms. Dorland's own kidney donation history.

Ms. Dorland Discovers that Ms. Larson Copied the Dorland Letter in *The Kindest*

88.   87. In early June 2018, Ms. Dorland accidentally came across an online promotion of *The Kindest* on ASF's website, which was published free of charge, and read it for the first time.

89.   88. Ms. Dorland was shocked to see, for the first time, that *The Kindest* included a version of the Dorland Letter.

90.   89. The letter included in *The Kindest*, as published by ASF on its website, is substantially similar to the Dorland Letter.

91.   90. Ms. Dorland immediately recognized her own letter when she read the letter included in *The Kindest* as published by ASF.  The letter included in *The Kindest*, as published on the ASF website, is attached hereto as Exhibit C D (the "ASF Web Letter").

92.   91. In addition to striking similarities with the phrasing, the letter included in *The Kindest* followed the structure of the Dorland Letter, paragraph by paragraph.

93.   92. The ASF Web Letter opens by addressing the reader with "Dear Recipient," as does the Dorland Letter.  See Exhibits A and C.

94.   93. The first paragraph then introduces the writer by name, age, race, and location, as does the Dorland Letter.  See Exhibits A and C.

95. ~~94.~~The second paragraph explains to the reader how the author of the letter came to learn about kidney donations, and why they were motivated to donate, as does the Dorland Letter.  See Exhibits A and C.

96. ~~95.~~The third paragraph – which the ASF Web Letter breaks into two paragraphs - discusses the medical process, what the author learned through that process, and shares some personal details about the author of the letter, as does the Dorland Letter.  See Exhibits A and C.

97. ~~96.~~The ASF Web Letter, in discussing the medical process, uses the term "paired exchange," as does the Dorland Letter.  See Exhibits A and C.

98. ~~97.~~However, the kidney donation described in *The Kindest* is not a paired exchange.

99. ~~98.~~Ms. Dorland's kidney donation, which was part of a surgical chain, was a paired exchange.

100. ~~99.~~The next paragraph speaks to the author's preparation for surgery and focusing on the reader during that process, as does the Dorland Letter.  See Exhibits A and C.

101. ~~100.~~Using phraseology and emphasis nearly identical to the Dorland Letter, the ASW Web Letter states, "I withstood the pain by imagining and rejoicing in YOU."  See Exhibit ~~C~~D.

102. ~~101.~~The next paragraph, in both letters, includes the authors' expression of pleasure that the reader is healthy, and an affirmation that the reader deserves the gift given by the author not because of anything they did, but simply because.  See Exhibits A and C.

103. ~~102.~~In both letters, the author expresses an interest to know more about the reader, including a potential meeting, but makes clear that if the reader is not interest in meeting, the author will "accept" that response.  See Exhibits A and C

104.   103.Both letters end with a single word as a sign off; in the Dorland Letter, it is "Kindly," which is Ms. Dorland's typical email sign off since 2007, and in the ASF Web Letter, it is "Warmly."  See Exhibits A and C.

105.   104.The ASF Web Letter is substantially similar to the Dorland Letter.

106.   105.As Ms. Larson later explained, the donor's letter is integral to the plot of *The Kindest*, as it "is used primarily to introduce the character of the kidney donor, and to set the stage for the eventual meeting of the recipient character and the donor character."

107.   106.While the hard copy version of The Kindest may contain variations of the text in the letter, it is substantially similar to the Dorland Letter, and constitutes a copy of the Dorland Letter.

108.   107.Upon information and belief, Ms. Larson made certain changes to The Kindest, including the letter contained therein, while it was published on the ASF website.

109.   108.Notwithstanding those changes, which are reflected in certain filings in this litigation (see ECF No. 29-3), each version of the letter contained in The Kindest, as published by ASF, is substantially similar to the Dorland Letter and infringes on Ms. Dorland's copyright.

110.   109.After she recognized her own writing in *The Kindest*, Ms. Dorland contacted ASF to express her concerns.

111.   110.Subsequently, ASF removed *The Kindest* from its website.

112.   111.Ms. Larson profited from ASF's publication of *The Kindest*, both on the website and in the hard copy book publication.

113.   Ms. Dorland learned later, although she was unaware at the time, that Ms. Larson knew she had plagiarized the Dorland Letter, and stated in text messages to friends that she remembered writing down certain phrases from that letter, but that she believed such copying

without giving credit to her source was permissible because the letter had been posted on Facebook. See Exhibit C, Text Messages from Ms. Larson.

114. ~~112.~~Ms. Dorland suffered damages as a result of Ms. Larson's copying of the Dorland Letter into the ASF version of *The Kindest*.

Infringing Publication of the Dorland Letter by Audible and Brilliance Audio

115. ~~113.~~After she discovered the use of her letter in *The Kindest*, Ms. Dorland conducted internet searches to see if there were other instances of publication of the story utilizing her letter.

116. ~~114.~~In July of 2018, Ms. Dorland discovered an audio recording of *The Kindest*, published by Brilliance Audio, available to the public on the internet, that contained a different version of the letter from that used in the ASF Web version of *The Kindest*.

117. ~~115.~~A copy of the Brilliance version of the letter included in *The Kindest*, which was provided by Ms. Larson in this litigation, is attached hereto as **Exhibit ~~D~~ E** (the "Brilliance Letter").

118. ~~116.~~What Ms. Dorland subsequently learned, is that the Brilliance Letter **pre-dated** the ASF Web Letter.

119. ~~117.~~In fact, contrary to Ms. Larson's statements to Ms. Dorland in the summer of 2016, Ms. Larson entered into a contract with Plympton, Inc. in February of 2016 to publish *The Kindest*.

120. ~~118.~~*The Kindest* was recorded by at least one voice actor and released as an audio file available to the public by both Audible.com and Brilliance Audio in 2016.

121.   ~~119.~~The version initially published by Ms. Larson, and the version that Ms. Dorland heard in July of 2018, contains a letter written by the kidney donor character in *The Kindest* that has significant similarities to the Dorland Letter.

122.   ~~120.~~For example, in her letter, Ms. Dorland speaks of her childhood, stating "Personally, my own childhood was marked by trauma and abuse; I didn't have the opportunity to form secure attachments with my family of origin." See Exhibit A.

123.   ~~121.~~In the Brilliance Letter, Ms. Larson's character writes, "My own childhood was marked by trauma and abuse; I wasn't given an opportunity to form secure attachments with my family of origin." See Exhibit ~~D~~E.

124.   ~~122.~~Of course, in light of their decade-plus friendship, which included the sharing of personal writing projects, Ms. Larson is well aware of Ms. Dorland's difficult and traumatic upbringing and knows that copying this part of Ms. Dorland's story for her own artistic gain would cause emotional distress for Ms. Dorland.

125.   ~~123.~~Ms. Dorland wrote in the Dorland Letter, "While perhaps many more people would be motivated to donate an organ to a friend or family member in need, to me, the suffering of strangers is just as real." See Exhibit A.

126.   ~~124.~~In the Brilliance Letter, Ms. Larson's character writes, "While others might desire to give to a family member or friend, to me the suffering of strangers is just as real." See Exhibit ~~C~~E.

127.   ~~125.~~Ms. Dorland also employed her own unique and artistic turn of phrase, stating, "My gift, which begat [another member of the chain's], ***trails no strings***." See Exhibit A (emphasis supplied).

128. ~~126.~~Ms. Larson copied that phrase directly, stating "My gift, you must know, *trails no strings*." See Exhibit ~~D~~ E (emphasis supplied).

129. ~~127.~~A simple Google search for the phrase "trails no strings" evidences that there is <u>no other instance</u> wherein that phrase has been used.

130. ~~128.~~ Throughout the Brilliance Letter, there are multiple other instances of direct copying of not only the structure and tone of the Dorland letter, but exact words and phrases.

131. ~~129.~~The Brilliance Letter is substantially similar to the Dorland letter.

132. ~~130.~~Ms. Larson has since admitted that after Ms. Dorland learned, in the summer of 2016, that Ms. Larson had taken advantage of her friendship with Ms. Dorland, and access to Ms. Dorland's private Facebook Group, mining it for material to shape Ms. Larson's own story concerning a kidney donation, Ms. Larson decided to edit the letter in *The Kindest* "in order to further avoid resemblance between" the Dorland Letter and the clearly infringing copy.

133. ~~131.~~Ms. Larson chose to make these edits despite the fact that the Brilliance Letter had already been published.

134. ~~132.~~Ms. Larson chose to make these edits despite the fact that she had misled Ms. Dorland into believing that her story concerning a kidney donation – which Ms. Larson told Ms. Dorland, falsely, in 2016, wasn't actually about a donation at all - was an unpublished work in progress.

135. ~~133.~~Ms. Larson chose to make these edits knowing that Ms. Dorland did not know that the Dorland Letter had been incorporated into *The Kindest*.

136. ~~134.~~Despite Ms. Larson's statements that she intended for these edits to carry across all published versions of *The Kindest*, the prior publications remained available on the internet, accessible to the public, for several years.

137. ~~135.~~Ms. Larson profited from the publication of *The Kindest* by Plympton on both Audible.com and Brilliance Audio.

138. ~~136.~~Ms. Dorland was damaged by Ms. Larson's copying of the Dorland Letter into the Audible.com and Brilliance versions of *The Kindest*.

Infringement Through Submission to the Boston Book Festival

139. ~~137.~~During 2018, Ms. Larson submitted *The Kindest* to the Boston Book Festival ("BBF").

140. ~~138.~~In June 2018, Ms. Dorland learned that the BBF had selected Ms. Larson's story as a winner of the One Story/One City competition.

141. ~~139.~~Ms. Dorland contacted the BBF to inform the organization that *The Kindest* used her unauthorized copyrighted material.

142. ~~140.~~While Ms. Dorland attempted in good faith to negotiate with both the BBF and Ms. Larson, through counsel, to reach mutually agreeable terms, the parties were ultimately unable to reach an agreement.

143. ~~141.~~Absent an agreement, *The Kindest* continued to infringe on the Dorland Letter without permission or attribution.

144. ~~142.~~The letter contained in *The Kindest*, which is central to the story, remains substantially similar to the Dorland Letter.

145. ~~143.~~Upon information and belief, Ms. Larson profited from *The Kindest's* selection by the BBF as a featured short story in 2018.

146. ~~144.~~Ms. Dorland has suffered damages as a result of Ms. Larson's copying of the Dorland Letter in the BBF version of the Kindest.

<u>Ms. Larson Infringes Ms. Dorland's Copyright by Publishing the Dorland Letter in 2019</u>

147. ~~145.~~Ms. Dorland, through counsel, put Ms. Larson on notice throughout 2018 that *The Kindest* infringed on her copyright in the Dorland Letter.

148. ~~146.~~Ms. Larson is aware of Ms. Dorland's registered copyright, as expressed in the Amended Complaint, which is the operative complaint, filed in this matter.

149. ~~147.~~Yet in 2019, Ms. Larson published *The Kindest*, containing yet another version of the Dorland Letter, in the anthology Welcome to the Neighborhood ("WTTN") (the "WTTN Letter").

150. ~~148.~~The WTTN Letter is substantially similar to the Dorland Letter.

151. ~~149.~~The WTTN Letter infringes on the Dorland Letter.

152. ~~150.~~Ms. Larson has profited from publication of *The Kindest* with WTTN.

153. ~~151.~~Ms. Dorland has suffered damages as a result of Ms. Larson's copying of the Dorland Letter in the WTTN version of the Kindest.


<u>Ms. Larson Registers a Copyright for *The Kindest*</u>

154. ~~152.~~On June 8, 2018, Ms. Larson registered a copyright for *The Kindest*.

155. ~~153.~~In that registration, she stated that the work was "completed" in 2018, and that the date of "first publication" was June 8, 2018.

156. ~~154.~~However, Ms. Larson has published *The Kindest* multiple times, beginning in 2016, prior to said registration.

157. ~~155.~~In the version of *The Kindest* for which she registered the copyright, Ms. Larson has edited the letter she copied from the Dorland Letter, attempting to conceal her infringement. <u>See</u> Amended Complaint at Exhibit F.

158. ~~156.~~In this "scrubbed" version of the Dorland Letter, Ms. Larson has now inserted an introductory paragraph, in a rudimentary attempt to alter the substantially similar structure of the two letters; removed her erroneous reference to a "paired exchange;" removed several of the phrases that were identical to the Dorland Letter, and generally shortened the letter.

159. ~~157.~~Ms. Larson failed, however, to create her own letter.  The letter in *The Kindest* is clearly still the Dorland Letter, and still infringes on Ms. Dorland's copyright.

160. ~~158.~~The registered version of The Kindest contains a letter that is substantially similar to the Dorland Letter.

161. ~~159.~~Most remarkably, Ms. Larson exchanged the one-word signature line to resemble the Dorland Letter.

162. ~~160.~~Not only does the new signature line copy the Dorland Letter, it copies Ms. Dorland's characteristic email sign off / signature: "Kindly."

163. ~~161.~~After three years – across several versions - of using the signature "Warmly, Rose M. Rothario", Ms. Larson edited the letter in her short story to brazenly (and hurtfully) mimic Ms. Dorland's unique email sign-off.

164. ~~162.~~This last-minute change of the signature line raises questions about Ms. Larson's long-held intent behind the title of the story.


Ms. Larson Obtained Grant Money As A Result Of Her Publication Of "The Kindest"

165.     Ms. Larson obtained a fellowship grant from the NEA, the National Endowment for the Arts, which required submissions of writing examples in order to be awarded the grant.

166.     In her initial disclosures, Ms. Larson stated that the grant award was based on "The Kindest" as well as other works. But during her deposition, Ms. Larson was asked "But

'The Kindest' was the only writing example you provided, correct?" to which Ms. Larson responded "That's correct."

167.    This grant was for $25,000, money which Ms. Larson could not have earned but for her illegal utilization of Ms. Dorland's letter, and had Ms. Dorland fully asserted her intellectual property rights, it would have cost Ms. Larson that sum.

Ms. Dorland's Has Suffered Emotional Distress Resulting from Ms. Larson's Actions

168.    163.Ms. Dorland has suffered significant emotional distress as a result of Ms. Larson's actions, which has manifested in physical symptoms.

169.    164.After extensive required testing, Ms. Dorland was medically and psychologically cleared to donate her kidney to a stranger in 2015 by a panel of UCLA medical professionals.

170.    165.The requisite evaluations included thorough psychological evaluations of her mental health and family life.

171.    166.As someone who had lived and struggled with the fallout of childhood abuse in her early adulthood, Ms. Dorland found her medical and psychological clearance an empowering benchmark of her own resilience and healing.

172.    167.Ms. Larson's cruel actions and deceptions, however, as set forth above, a set of hurtful and shocking artistic and personal betrayals, inflicted emotional distress upon Ms. Dorland, creating physical manifestations requiring medical treatment.

173.    168.Without limitation, Ms. Dorland has suffered sleeplessness, sleep bruxism, gastrointestinal disruption, anxiety, depression, panic attacks, weight loss and several incidents of self-harm.

174.   169.Ms. Dorland has sought treatment from medical providers for the emotional distress and the physical manifestations she has suffered resulting in significant financial cost.

175.   170.Ms. Larson knew, at all times, that her actions were likely to inflict emotional distress on Ms. Dorland.

176.   Ms. Larson compounded her actions by filing the instant suit, which she knew would cause continued and additional emotional distress to Ms. Dorland.

177.   Ms. Larson's filing of this suit also caused the stress and financial burden associated with litigation, costs of litigation, and resulted in Ms. Dorland being unable to pursue her rights for fear of the risk of further claims being brought against her.

178.   171.Ms. Dorland has suffered damages as a result of Ms. Larson's actions.

### COUNT I
### COPYRIGHT INFRINGEMENT

179.   172.Ms. Dorland incorporates the foregoing paragraphs as if fully stated herein.

180.   173.Ms. Larson reproduced and distributed, and continues to reproduce and distribute, the versions of the Dorland Letter in *The Kindest* without permission in violation of Ms. Dorland's exclusive rights under 17 U.S.C. § 106.

181.   174.The Dorland Letter constitutes copyrightable subject matter under the laws of the United States under 17 U.S.C. § 102(a)(1).

182.   175.The various versions of *The Kindest* contain copies of the Dorland Letter.

183.   176.Specifically, the Brilliance Audio version, the ASF Web Version, the hard copy version published by ASF, any and all versions published by Audible.com, the version printed by the BBF, the version published by Welcome to the Neighborhood, and any other versions of *The Kindest*, all contain copies of the Dorland Letter and therefore infringe on Ms. Dorland's copyright.

184. ~~177.~~Each copy of the Dorland Letter contained in each version of *The Kindest* is substantially similar to the Dorland Letter.

185. ~~178.~~The Dorland Letter was registered with the United States Copyright Office as indicated in Exhibit B.

186. ~~179.~~Ms. Larson reproduced and distributed, and continues to reproduce and distribute, the Dorland Letter and *The Kindest* without permission in violation of Ms. Dorland's exclusive rights under 17 U.S.C. § 106.

187. ~~180.~~Therefore, Ms. Larson has committed copyright infringement and continues to infringe the copyright in the Dorland Letter.

188. ~~181.~~As a result of such copyright infringement, Ms. Dorland has suffered damages in an amount to be determined at trial.

189. ~~182.~~As a result of Ms. Larson's copyright infringement, Ms. Dorland is to recover actual damages and/or Ms. Larson's past and future profits.

190. ~~183.~~As a result of Ms. Larson's copyright infringement, Ms. Dorland is entitled to recover her attorney's fees pursuant to 17 U.S.C. § 505.

## COUNT II
## DECLARATORY RELIEF

191. ~~184.~~Ms. Dorland incorporates the foregoing paragraphs as if fully reinstated herein.

192. ~~185.~~There exists a live case and controversy between Ms. Larson and Ms. Dorland concerning the matters stated herein.

193. ~~186.~~Ms. Dorland is the author of the Dorland Letter, and is the owner of all rights to that letter, including the registered copyright.  See Exhibit B.

194. ~~187.~~Ms. Larson copied the Dorland Letter, without permission or attribution, and incorporated it into *The Kindest*, throughout several various versions.

195. ~~188.~~Ms. Larson has admitted that the Dorland Letter is a crucial and central character development element of *The Kindest*.

196. ~~189.~~Ms. Larson's use of the Dorland Letter constitutes infringement of Ms. Dorland's copyright.

197. ~~190.~~Ms. Dorland seeks declarations from the Court as follows:

    a.   Ms. Dorland has a valid copyright interest in the Dorland Letter, as reflected in Exhibit B;

    b.   Ms. Dorland's valid copyright interest in the Dorland Letter pre-dates the registration, as it existed as a matter of law once the Dorland Letter was fixed, as reflected in the July 7, 2015 post in the Facebook Group;

    c.   Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter when she copied the Dorland Letter in the Brilliance Audio version of The Kindest in 2016;

    d.   Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter when she copied the Dorland Letter in all versions of *The Kindest* published on Audible.com in 2016, 2017, 2018 and 2019;

    e.   Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter when she copied the Dorland Letter in the ASF Web Version of *The Kindest* in 2017 and 2018;

  f. Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter
when she copied the Dorland Letter in the ASF hard copy version of the
*The Kindest* printed in 2017;

  g. Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter
when she copied the Dorland Letter in the BBF One City One Story
version of *The Kindest* printed in 2018;

  h. Ms. Larson infringed on Ms. Dorland's copyright to the Dorland Letter
when she copied the Dorland Letter in the Welcome to the Neighborhood
anthology version of *The Kindest* in 2019; and

  i. Ms. Larson's registered copyright in *The Kindest*, reflected at Exhibit G to
the Amended Complaint in this matter, is hereby declared invalid as a
result of Ms. Larson's infringement of Ms. Dorland's copyright to the
Dorland Letter.

**COUNT III**

**INJUNCTIVE RELIEF PURSUANT TO 17 U.S.C. § 502**

198. ~~191.~~Ms. Dorland incorporates the foregoing paragraphs as if fully reinstated
herein.

199. ~~192.~~Ms. Larson reproduced and distributed, and continues to reproduce and
distribute, the Dorland Letter and *The Kindest,* which contains an unauthorized copy of Ms.
Dorland's copyrighted material – the Dorland Letter - without permission in violation of Ms.
Dorland's exclusive rights under 17 U.S.C. § 106.

200. ~~193.~~Therefore, Ms. Larson has committed copyright infringement and continues
to infringe the copyright in the Dorland Letter.

201. ~~194.~~Ms. Larson has refused to remove ~~the~~ *The Kindest* from circulation, continues to publish *The Kindest* and will continue to infringe the Dorland Letter unless enjoined by this Court.

202. ~~195.~~Therefore, Ms. Dorland is entitled to an order from this Court, enjoining Ms. Larson from any further publication of *The Kindest* in its current form, or in any form that includes the Dorland Letter.

## COUNT IV
## ~~INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS~~
## ABUSE OF PROCESS

203. ~~196.~~Ms. Dorland incorporates the foregoing paragraphs as if fully ~~stated herein.~~restated herein.

204. Prior to the filing of this lawsuit, Ms. Lawson knew that she had intentionally and deliberately plagiarized the Dorland Letter.

~~197.    By using her friendship with Ms. Dorland, and access to Ms. Dorland's personal information concerning Ms. Dorland's participation in a living kidney donation, in order to further her own writing and artistic career, Ms. Larson intended to inflict emotional distress upon Ms. Dorland.~~

~~198.    Ms. Larson copied Ms. Dorland's letter, the Dorland Letter, violating Ms. Dorland's trust, and the friendship that the parties had built beginning in 2007.~~

~~199.    Through their friendship, Ms. Larson knew that Ms. Dorland had suffered trauma and abuse as a child and adolescent, and Ms. Larson saw that Ms. Dorland wrote about that trauma in the Dorland Letter.~~

200. ~~Ms. Larson copied Ms. Dorland's writings about her personal experiences, including her trauma and abuse, and incorporated those writings into *The Kindest*, without Ms. Dorland's knowledge or permission.~~

201. ~~When pressured by third parties to make edits to her copy of the Dorland Letter, Ms. Larson nevertheless failed to create her own letter, with her final version of *The Kindest* (see Amended Complaint, Ex. F) continuing to contain an infringing copy of the Dorland Letter.~~

202. ~~Even in her final, failed attempt to create a non-infringing copy, Ms. Larson could not resist to include a further intentionally harmful jab at Ms. Dorland—changing the sign-off in the letter from "warmly"—as it had been in all published versions from 2016 until 2019—to "kindly"—the same sign-off that Ms. Dorland has used in her correspondence since 2007.~~

203. ~~Ms. Larson further misrepresented to Ms. Dorland the truth about (a) the nature of the story she was writing, and (b) the status of the story (i.e., saying it was not completed or published, when it had in fact been published for several months).~~

205. Nevertheless, Ms. Lawson filed the instant lawsuit hoping to make Ms. Dorland abandon her intellectual property rights to the Dorland Letter.

206. Ms. Larson filed a Complaint in this matter riddled with knowing misrepresentations in order to hale Ms. Dorland into Court under the Court's jurisdiction, despite the lack of any actionable claim.

207. Ms. Larson's purpose in initiating suit was not to vindicate her rights, nor to protect her own intellectual property. Instead, Ms. Larson had the improper purpose of scaring, coercing, or intimidating Ms. Dorland into abandoning Ms. Dorland's rightful intellectual property claim in the Dorland Letter.

208. In bringing this wrongful action, Ms. Larson has damaged Ms. Dorland by damaging her reputation and knowingly inflicting further emotional distress on Ms. Dorland through her improper pursuit of these claims, which Ms. Dorland has suffered and continues to suffer. Additionally, participation in this frivolous suit has forced Ms. Dorland to retain counsel and invest substantial time in her defense.

209. By utilizing this lawsuit as a form of coercion to obtain a collateral advantage not properly involved in this proceeding itself, Ms. Larson utilized process for an illegitimate purpose resulting in damage to Ms. Dorland.

210. Such abuse of process has caused Ms. Dorland damage.

204. Additionally, Ms. Larson misrepresented to Ms. Dorland her knowledge and understanding about Ms. Dorland's kidney donation, despite the fact that Ms. Larson had seen every single post and comment in Ms. Dorland's Facebook Group.

205. Ms. Larson used Ms. Dorland's Facebook Group as a source of research for *The Kindest* yet pretended to have no knowledge of Ms. Dorland's kidney donation—which was the very purpose of the Facebook Group—until Ms. Dorland forced Ms. Larson to acknowledge that she had been aware of Ms. Dorland's surgery.

206. In 2017, after Ms. Dorland confronted Ms. Larson concerning her actions, and after Ms. Larson stated her intention to proceed with the parties' friendship, Ms. Larson abruptly ceased speaking with Ms. Dorland in the midst of a professional writing conference, in an unprofessional, embarrassing, and intentionally harmful manner.

207.   Ms. Larson has further taken steps to ostracize Ms. Dorland from their mutual acquaintances in the writing community, isolating Ms. Dorland from a valuable support network, including Ms. Dorland's mentors.

208.   Ms. Larson knew or should have known that emotional distress was likely to result from her conduct; said emotional distress did in fact result from her conduct.

209.   The actions described above were and are extreme and outrageous conduct.

210.   Ms. Dorland has suffered harm due to emotional distress in the form of chronic sleeplessness, sleep bruxism, gastrointestinal disruptions, panic attacks, anxiety, depression and self-harm.

211.   Ms. Dorland has further incurred significant medical expenses in connection with the emotional distress, and the physical manifestation of the emotional distress.

212.   Ms. Dorland's emotional distress is so severe and is of a nature that no reasonable person could be expected to endure it.

## JURY DEMAND

**DAWN DORLAND PERRY DEMANDS A TRIAL BY JURY FOR ALL CLAIMS SO TRIABLE.**

WHEREFORE, Ms. Dorland respectfully requests that this Court:

A. Enter judgment in Dawn Dorland Perry's favor on Counts VII and VIII of the Amended Complaint;

B. Enter a judgment on in Dawn Dorland Perry's favor on Counts I, II, III and IV of the Counterclaim and award all damages to which she is entitled;

C. Award Dawn Dorland Perry damages for emotional distress suffered as a result of Sonya Larson's abuse of process;

D. C.Award Dawn Dorland Perry her reasonable attorney's fees;

E. D.Award Dawn Dorland Perry interest and costs on all damages assessed against Counterclaim Defendant;

F. E.Enjoin Sonya Larson from any and all further publication, distribution, circulation, posting or any other form of infringement of Dawn Dorland Perry's copyright in the Dorland Letter; and

G. F.Grant all such other and further relief to Dawn Dorland Perry as the Court deems just and proper.

Respectfully submitted,

DAWN DORLAND PERRY

By her attorney,


/s/ Suzanne M. Elovecky
Suzanne M. Elovecky (BBO #670047)
PARTRIDGE SNOW & HAHN LLP
30 Federal Street
Boston, MA  02110
(617) 292-7900 / (617) 292-7910 FAX
selovecky@psh.com

DATED:  September 8, 2020January ____, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants, if any, on September 8, 2020January ____, 2022.

/s/ *Suzanne M. Elovecky*

\\psh.int\dfs\UserRedirect\bdf\Desktop\Larson v. Dorland -
Original restated Counterclaim.docxProposed Amended