# EXHIBIT PP

1

1   VOLUME:  I   EXHIBITS:  See Index   PAGES: 1-197

2            COMMONWEALTH OF MASSACHUSETTS

3        FOR THE DISTRICT OF MASSACHUSETTS

4   ***********************************

5   SONYA LARSON,

6            Plaintiff

7   vs.                    No. 1:19-CV-10203-IT

8   DAWN DORLAND PERRY, ET AL,

9            Defendants

10

11  ***********************************

12       ZOOM DEPOSITION of DAWN DORLAND PERRY

13            APPEARING REMOTELY

14     Friday, September 3, 2021 - 11:00 a.m.

15

16  Reporter:  Jill Kourafas, RPR, MA CSR#149308

17   Appearing remotely from Norfolk County

18

19

20  _____

21  REPORTERS, INC. - CAPTURING THE OFFICIAL RECORD

22       617.786.7783 - www.reportersinc.com

23           Scheduling@reportersinc.com

24

1    end a letter, would you agree?

2        A.   I chose to end it that way.

3        Q.   Okay.  And then you signed it "Kindly,

4    Dawn"?

5        A.   That's what is here in the document, yes.            02:44PM

6    That's my customary email signature.

7        Q.   That's what I understand you claim, yes.

8             So would you characterize your letter as

9    being basically factual?

10            MS. ELOVECKY:  Objection.                            02:45PM

11       A.   I hear the word "factual," I think of two

12   possibilities.  It could mean does it contain

13   only facts or does it tend to emphasize facts?

14   So I'm confused.

15       Q.   Well, does it contain facts?                        02:45PM

16            MS. ELOVECKY:  Objection.

17       A.   Yes, it contains facts.

18       Q.   What facts does it contain?

19            MS. ELOVECKY:  Objection.

20       A.   Is my task to go through and call out --            02:45PM

21   do a reading, a mental reading and call out the

22   facts as I read them?

23       Q.   Yes, please.

24       A.   Okay.  I'm stuck on whether recipient is

1   a fact or not.  There's a recipient.  So okay,

2   there's a fact.

3          My name is Dawn Dorland, fact.

4          I was 35 at the time.  I am still white,

5   I am still female.  And -- well, we didn't --      02:46PM

6      Q.  I'm sorry, you are absolutely correct.  I

7   don't mean to intercede.

8      A.  And I then "I am now living with my

9   husband in LA."  Those are all facts.

10         Are you keeping a tally?                    02:46PM

11         The next phrase is a fact about the date

12   when I first learned about living kidney donation

13   and it was in an article.

14         The next part of the sentence is

15   compound, but it is factual describing how I      02:47PM

16   interacted with the need for and the possibility

17   of a living kidney donation over the intervening

18   years from 2009, the composition of the letter,

19   2015.

20         And then the last sentence of that          02:47PM

21   paragraph I say I believe that I knew.  That's

22   getting maybe a little more emotional and

23   speculative, but it was true if that's what you

24   mean by "facts," that's also a fact.

129

1    Q.   I'm sorry.

2    A.   I'm happy to stop because I want to make

3    sure I'm being helpful in answering your

4    question.

5         What did you want to say about that                    02:47PM

6    sentence?

7    Q.   I don't know what sentence you're

8    referring to.

9    A.   Okay.

10        I was referring to the sentence beginning          02:47PM

11   "I believe that I knew" at the end of the second

12   full paragraph of my letter.

13   Q.   All right.  Got it.

14   A.   And it is an emotional truth I'm trying

15   to describe.  I'm not totally clear on what you        02:48PM

16   consider a fact for this purpose, but I'll go on.

17        That I was beckoning back to the not

18   being able to shake the feeling in the

19   intervening years that I could do something to

20   help the situation of people who need kidneys and     02:48PM

21   have no living donor, that I was in every

22   position to give, why not me?  And I couldn't

23   shake that feeling.

24        And so that's the fact I'm trying to

130

1    convey in that sentence.  It's an emotional

2    truth.

3        Q.   But it's certainly a truth that you felt?

4        A.   Yes.

5        Q.   At the time?                              02:48PM

6        A.   Yes.

7        Q.   Okay.

8        A.   In that sense the entire level is

9    factual.  Shall I keep going?

10       Q.   Please.                                   02:49PM

11       A.   Okay.

12            So the next sentence I'm looking at is

13   "Once I had all the information" and now I'll

14   look at it.

15            (Pause.)                                  02:49PM

16            Here I'm describing factually how I felt

17   about this opportunity.  It only motivated me

18   more, as I think I described earlier, to donate

19   my kidney when I could impact not only one

20   person's body, but many people's bodies, and then  02:49PM

21   extension into their lives and their families'

22   lives.

23            And then --

24       Q.   That was the feeling that you had at the

131

1    time that you wrote the letter, is it not?

2         MS. ELOVECKY:  Objection.

3    A.   Yes.  As -- I was trying to say that I'm

4    sorry if I didn't, that's what I meant, that this

5    sentence captures my feeling based on the facts I

6    had engaged with during my research of the

7    process.

8         There's a lot of facts in that sentence

9    about how living kidney donation works in our

10   country.

11        So I would not agree that it's just a

12   sentence about a feeling.  I disagree with that.

13   Q.   Okay.  Please go on.

14   A.   The next sentence begins "Personally" and

15   the first part of the sentence I say "My

16   childhood was marked by trauma and abuse."  Fact.

17   Then with a semicolon, I attached the sentence,

18   the independent clause, "I didn't have the

19   opportunity to form secure attachments with my

20   family of origin."

21        This is -- there's many ways that we can

22   understand our human interactions, our

23   relationships, and also the way our psychology

24   forms.  You know, we get back to the nuture

02:49PM

02:50PM

02:50PM

02:50PM

1    versus nature debate, but at the time,

2    especially, I had begun to learn about attachment

3    theory in relationships, and that is evident in

4    how I composed this part of my letter.

5            That at the time I was starting to think          02:51PM

6    about, and you can apply -- one can apply many

7    lenses to one's life.  At the time I was applying

8    the lens of attachment theory, which, I believe,

9    comes out of psychology.

10       Q.   Okay.                                              02:51PM

11       A.   Okay.  The next sentence I will look at

12   starts with "A positive outcome."  In this

13   sentence I'm -- you could say I'm looking at the

14   bright side.  There are many costs as an aside to

15   you, Attorney Epstein, I've been faced with many     02:51PM

16   costs with the way I was raised and the

17   circumstances I was born into from abuse to

18   poverty and neglect; however, as an adult I also

19   see and I'm proud of the person now that those

20   experiences shaped me into, and that's how I can     02:52PM

21   be optimistic and actually even identify positive

22   outcomes of pretty harrowing young circumstances,

23   and that's what I'm trying to say in this next

24   sentence.

1          On the other hand, my experiences were so

2     from a singular, and in some ways isolating that

3     I've ended up being this kind of person who will

4     do this for a stranger.  And you, yourself, said

5     in this deposition that you don't know that many          02:52PM

6     people who have done this.  And I think that I

7     was anticipating a response from people and,

8     indeed, I already started to receive a response

9     of "Why are you different than me?  And why were

10    you, Dawn, specifically motivated to do this?"          02:52PM

11         And that's what I'm grasping towards with

12    that line.

13    Q.   Okay.  That's good.

14    A.   And the next sentence, I think is kind of

15    in the same bucket, Attorney Epstein, while          02:53PM

16    perhaps many more people.  I'm here talking about

17    my own experience of outsiderness because of my

18    upbringing in rural poverty and having been

19    abused that, well, on the bright side, I'm doing

20    something that people who are really entrenched          02:53PM

21    in families and have maybe secure attachments

22    with their family of origin, they wouldn't dream

23    of doing it, they wouldn't need to do, or it

24    would never occur to them.  But someone that

1    lived outside of my family of origin, through no

2    fault of my own at least, on the bright side,

3    here I am electing to do this and that's a

4    positive outcome of what is otherwise pretty

5    harrowing circumstances.                              02:53PM

6        Q.   Okay.  You wanted to be helpful to other

7    people, and that's a good thing.  Would that be a

8    fair characterization?

9        A.   It is fair, but incomplete.

10       Q.   Sure.  Understood.                            02:53PM

11       A.   And then I -- before I go on, I should

12   say that I felt very satisfied to lyrically state

13   that in the phrase "The suffering of strangers is

14   just as real" because I was trying to articulate

15   to this unknown person why this person did matter   02:54PM

16   to me even though I didn't know them and I had no

17   formal connection to them, blood or otherwise.

18           The next sentence begins with "I can't

19   tell you how happy" and it's a fact that I was

20   pleased.  I was gratified that all the surgeries     02:54PM

21   went well because the main challenge before me,

22   preparing for surgery was to run through all the

23   risks and all the poor outcomes that could occur.

24   I had to not only sign waiver forms saying I

1    wouldn't hold anyone responsible if, one, my

2    kidney got left on an airplane; two, my kidney

3    got left in a cab; three, the doctor dropped my

4    kidney on the floor and stepped on it.

5        I mean, now I'm kind of paraphrasing, but      02:55PM

6    I had to waive rights and indemnify anyone

7    against liability that could occur just out of

8    accident or circumstance.

9        I had to prepare, Attorney Epstein, for

10   the possibility that I could die on the table      02:55PM

11   during my retrieval surgery, my recipient could

12   die on the table during his transplant surgery.

13   My kidney could be transplanted successfully and

14   fail and cause that person's death.  My recipient

15   could have a rejecting reaction in his body and    02:55PM

16   reject my kidney.  And I know it's a "he" now,

17   but he or she could suffer very harmful health

18   consequences from that situation.

19       I had to sit with all those risks and I

20   had to face them as an individual, and I had to    02:56PM

21   decide if I wanted to do it anyway.

22       I'm sorry.  My screen froze.  Let me get

23   back to the exhibit.  I forgot where I started

24   that train of thought.

1          So that's why I was so pleased to cut the

2    chase.  I was so pleased that everybody's

3    surgeries was successful, and not only that, we

4    got to meet and it was very gratifying to all of

5    us.                                                    02:56PM

6          Then the next sentence begins:

7    "Throughout my preparation of becoming a donor,"

8    here I am trying to articulate -- and I know my

9    task here is facts -- again, I'm trying to state

10   as accurately as possible for this person who may   02:56PM

11   never hear from me again how I centered them and

12   what this meant for them through the whole

13   process.

14          (Crying.)

15          And, yes, that factually states my           02:57PM

16   emotions.

17          Then the next part of the letter begins

18   "My gift" and it was factual that I had no

19   expectations for receiving anything from my

20   gesture.                                             02:57PM

21          And then the next part of the letter I

22   write "That this person is deserving because when

23   someone needs to be medically cleared to receive

24   a kidney, they have to jump through their own

1    hoops, and this person may have felt that they

2    didn't even deserve to ask anyone to do this for

3    them.  And when I realized that as many as half

4    of the people who need this, never ask anyone.  I

5    was so moved and I was so motivated to be there

6    for them.

7          It's an extension maybe of me imagining

8    that I could be that person because of my lack of

9    family connections and my history with shame and

10   stigma, and so I did it for that person, but I

11   was also doing it for myself, and so that's a

12   fact.

13         The next paragraph begins "Please know"

14   and that's factually stating how my family and I

15   felt about what I was sending into the world and

16   that we were completely at peace with it, and we

17   wanted this person to know, you don't have to

18   feel obligated, you deserve this and we need

19   nothing from you.  Be well.  Be well.  And that's

20   a fact.

21         That brings us to the end of the letter

22   where I sign it "Kindly, Dawn" which is how I

23   sign all my correspondence to this day.  And then

24   I included my email address.  This person could

02:58PM (lines 5)
02:58PM (lines 10)
02:58PM (lines 15)
02:59PM (lines 20)

1   still contact me tomorrow.  I have no idea.  I

2   forgot my email was in there.  Maybe I'll have a

3   surprise one day.  I don't know.

4       Q.   From the emotions that you just

5   displayed, you obviously did receive something          02:59PM

6   about your gesture of donating a kidney, you did

7   something nice for the world, nice for the person

8   who got Debbie Striks' kidney, and as you said,

9   you did it for yourself too.

10          So even though this recipient hasn't         03:00PM

11  gotten to you, you feel better about this, don't

12  you, about having giving a kidney, even to this

13  day?

14      A.   Well, it's a very complicated question to

15  field in the middle of litigation that has come       03:00PM

16  out of this gesture, but I can answer by saying

17  that when you go through donor education, the

18  only thing, and this is even medically, medically

19  when you become a living kidney donor, my surgeon

20  told me, my transplant surgeon said,                  03:00PM

21  "Technically, in terms of your own life

22  expectancy, Dawn, you will lose a month of your

23  life expectancy."  He told me, "I cannot

24  medically tell you that this is good for your

1    health, but everyone always says the only thing

2    you get is to feel good about it."

3         And I narratively, because I'm a writer

4    and an artist, the way I handled people wanting

5    to know "why did you do this and why don't I want            03:01PM

6    to do it?"  The way I handled that in this letter

7    was to excavate the personal reasons, but that

8    does not mean that I primarily did it for myself,

9    and I assure you there's been many times, even

10   though I do not in the least regret my kidney               03:01PM

11   donation, and I told my recipient that, but there

12   have been many times that what has come out of

13   this process and what Sonya did with my work, has

14   caused me trauma and harm.

15        And so, no, I haven't been able to just,               03:01PM

16   in an unfettered way, feel good about what I have

17   done.  No, I have not which is different than

18   regretting it.

19        Q.   Understood.

20        A.   Thank you.                                        03:02PM

21        MR. EPSTEIN:  Before I forget, I would

22   like to mark Exhibit 1 as Exhibit B in this

23   deposition, which is an email chain that includes

24   Samantha Shea.  Really the part I'm zeroing in on

1           So, no, it didn't make me sick.  Again, I
2    was surprised.  It got worse.  That wasn't the
3    bad part.
4        Q.  Well, I'm going to go in increments.  I
5    don't want to jump around too, too much.          04:19PM
6           Do you know of any reason why Sonya was
7    prevented in any way from writing a story that
8    contained something about a kidney donation?
9           MS. ELOVECKY:  Objection.
10       A.  No, of course not.  That's not true.      04:20PM
11   She's not prevented from writing a story about a
12   kidney donation.  Of course not.
13       Q.  You claim that Sonya and you were good
14   friends, don't you?
15       A.  (No response.)                             04:20PM
16          MS. ELOVECKY:  I'm sorry, Dawn.  You have
17   to say that out loud, your answer.
18       A.  I'm confused because you used two tenses
19   of verbs.  You used present and the past, I
20   believe.  Could you restate?  I didn't think you  04:20PM
21   were done with your question, that's why I didn't
22   speak.
23       Q.  Okay.  Did you think that in the latter
24   part of 2015, before you heard from Tom Meek

1    about Ms. Larson reading a portion of her story

2    in the Boston bookstore that you and Ms. Larson

3    were friends?

4        A.    Certainly.

5        Q.    What do you base your friendship on?           04:21PM

6              MS. ELOVECKY:   Objection.

7              You can answer.

8        A.    Years of getting to know one another and

9    sharing our lives and meeting for drinks and

10   being in a really exciting group of mutual           04:21PM

11   friends and writers, working writers, and

12   teachers, and us climbing the rungs and going to

13   grad school at the same time, and us being around

14   the same age and solidifying and leaving romantic

15   relationships all at the same time, and the           04:21PM

16   emails we shared.

17              Yeah, I definitely considered her a

18   friend.  She was one of the only three writers --

19   I mentioned the other two -- who I added to the

20   group even though I didn't have time to have a        04:21PM

21   personal conversation because my surgery was

22   scheduled to my surprise so swiftly.  I had no

23   way to imagine that this is what would happen by

24   my allowing myself in friendship to be vulnerable

1    to my friend Sonya.

2        Q.   You said that you shared drinks together.

3    Did you ever go out, just the two of you, to a

4    bar or to a restaurant and just have a drink?

5        A.   Yes.  I did not hear the end of your          04:22PM

6    question.  I was answering and you were still

7    speaking.

8        Q.   "At any time" was the last part of my

9    question.  I'll repeat the question.

10           Did you and Sonya go out together, just        04:22PM

11   the two of you, and have a drink together at any

12   time?

13       A.   Yes.

14       Q.   When?

15       A.   In 2009.                                      04:22PM

16       Q.   Any other times?

17       A.   Yes, I believe so.

18       Q.   When?

19       A.   Around that same time and into the

20   following year.                                        04:23PM

21       Q.   So twice in 2009 and once in 2010?

22           MS. ELOVECKY:   Objection.

23       A.   That's not what I said.

24       Q.   What did you say?

1      A.   Could we have the record read back,
2  please?
3      Q.   We could.  But I just want -- we are not
4  going on the record right now.  I want to go on
5  what your memory is.                                    04:23PM
6           You said when I asked you if you ever had
7  drinks together and you said "yes," and I said
8  "when," you said "2009" and then I think you said
9  "another time in 2009."  Were there two occasions
10  in 2009 or just one?                                   04:23PM
11      A.   It's possible there was more than one.
12  The reason I'm certain about one is because there
13  was an email and also because I remember that
14  particular conversation.
15           And, you know, the way memory works is       04:23PM
16  if your -- the way I understand it, if you are in
17  the same place, you don't necessarily create a
18  distinct memory.  And I've also seen emails where
19  we reference this bar, Troquet, on the Boston
20  Common, "Let's go get a drink at Troquet."  And       04:24PM
21  so my memory seems solidified by an email I'd
22  seen that we did it a couple times at least and
23  certainly at least once.
24      Q.   You and Sonya went together, the two of

1    you to a bar, a restaurant called "Troquet" on

2    the Boston Common, and you had a drink together,

3    is that what your testimony is?

4        A.   Yes.

5        Q.   And you claim there's an email that                    04:24PM

6    confirms this meeting?

7        A.   There's emails that suggest more than one

8    meeting.  But I know for certain we did it at

9    least once.  And there are emails that seem to

10   evidence that.  I just happened to see these              04:24PM

11   emails in the course of my document production

12   responding to your requests.

13       Q.   So you produced the emails wherein this

14   meeting between you and Ms. Dorland [sic-Larson]

15   happened in 2009?                                          04:25PM

16          MS. ELOVECKY:  Objection.

17       A.   I'm Ms. Dorland.  I'm Dawn.

18       Q.   You produced emails that confirm that you

19   and Ms. Larson met at a bar called "Troquet" in

20   Boston and had a drink together sometime in 2009?          04:25PM

21          MS. ELOVECKY:  Objection.

22       A.   I can't answer that because I don't

23   decide about production.  I relied on my counsel.

24       Q.   Did you ever share meals together, just

1  the two of you?

2     A.   Possibly, but I don't have a distinct

3  memory.  It might have been at a conference,

4  either Sonya's conference, the Muse, or AWP.

5  It's called "AWP," like "apple," "Washington,"          04:26PM

6  "pear."

7          It stands for the Association of Writing

8  Programs, and it's just morphed into being a

9  professional writing conference with about 10,000

10  writers a pop.                                           04:26PM

11     Q.   Other than at the conferences, did you

12  and Ms. Larson ever go out to dinner together?

13     A.   I remember just --

14          MS. ELOVECKY:  Objection.

15          But you can answer.                              04:26PM

16     A.   I remember distinctly having Sonya in my

17  home for a meal when I was moving to Maryland, DC

18  for my MFA.  She --

19     Q.   Tell me --

20     A.   I'm still speaking.  May I finish?              04:27PM

21     Q.   You may finish.  I wish your answers were

22  a little shorter sometimes, but you may finish.

23          MS. ELOVECKY:  Objection.  This is a

24  deposition.  Her answers are her answers.

1      A.   Sonya attended at least one meal in my

2   home that I prepared and it wasn't a very big

3   group.  There were six people.  There's a

4   photograph of it.  It was my sendoff and it's the

5   dinner where she brought me a gift which was                    04:27PM

6   unexpected and really lovely and special to me.

7           And that's why I -- when I moved -- I'm

8   still speaking Attorney Epstein.  May I finish?

9      Q.   Go ahead.

10     A.   Thank you.                                              04:27PM

11          And that's why when I left Boston, I

12   considered Sonya such a great friend because I

13   thought that she -- she really distinguished

14   herself from other people even at that very

15   meaningful gathering of mine.  And then I believe            04:27PM

16   that she may have also attended a Valentine's

17   dinner.

18          My husband had a tradition of cooking

19   Valentine's dinner for friends and opening that

20   day up to friendship.  And I remember seeing                  04:28PM

21   emails where Sonya was talking about coming.  I

22   had invited her.  So that's at least two.  Those

23   are meals in my home that I cooked.

24          MS. ELOVECKY:  And, Drew, for the record

1    if you are going to ask the question, I'd ask you

2    not roll your eyes and shake your head while my

3    client is answering it.  If you want a complete

4    answer to your questions, you need not to react

5    in that fashion.                                              04:28PM

6         MR. EPSTEIN:  The only reason I'm rolling

7    my eyes, if I am, in fact, rolling my eyes is

8    that her answers are very long.  Sometimes

9    very long --

10        MS. ELOVECKY:  Honestly, that was less         04:28PM

11   than 60 seconds.

12        MR. EPSTEIN:  Let me finish what I'm

13   saying.  And when you object, instead of

14   objecting with an exacerbated "ha" in your voice,

15   you know, if you stop that, I will stop, you       04:28PM

16   know, eye contact or eye movements that I have.

17   Q.   What was the gift that Ms. Dorland -- I'm

18   sorry.  Let me start that again.

19        What was the gift Ms. Larson gave you,

20   Ms. Dorland?                                         04:29PM

21   A.   In the card that accompanied the gift

22   that Sonya brought to my going-away dinner, which

23   we called the "boo-hoo dinner" because we were

24   leaving Boston, she described that gift as a

1    manuscript, because I was embarking on my career

2    in the MFA and it consisted of -- what I

3    identified as awesome sundry organizational tools

4    from one of my favorite shops in Harvard Square

5    called the "Museum of Useful Things," I believe,                04:29PM

6    and going on memory, it was a nice document,

7    envelope like with a hard side and bungee cord to

8    close it, and also a page holder so one could

9    have a printed page, a paper page alongside a

10   screen and also a package of giant paper clips.                  04:29PM

11   I probably have one on me somewhere because I

12   still use them, and I became famous for using

13   them in my teaching at the University of

14   Maryland, and there may have been one or two

15   other things, but that's what I remember, and the               04:30PM

16   card.

17        Q.   I'm sorry, are you finished?

18        A.   After saying "and the card," then I'm

19   finished, yes.

20        Q.   You also said there's a photograph.  Did             04:30PM

21   you produce the photograph?

22        A.   I didn't make any decisions about

23   production.  I relied on the advice of my

24   counsel.

1      Q.   You said there's a photograph taken at

2   this meal at your house, the going-away meal, the

3   "boo-hoo meal," whatever you called it.

4           Do you still have a copy of that

5   photograph?                                              04:30PM

6      A.   Yes.

7      Q.   I'm going to ask that you not destroy it

8   and we might ask you to produce it.

9      A.   Noted.

10          MR. EPSTEIN:   Jill, I'm going to close up  04:31PM

11   very quickly.

12      Q.   Have you ever heard of a writer by the

13   name of Melissa Yancy?

14      A.   Yes.

15      Q.   What do you know she has written?         04:31PM

16      A.   Melissa Yancy, to my knowledge, won the

17   Drew Heinz fiction prize for her short story

18   collection "Dog Years."  And one of the stories

19   is about a kidney chain where I believe --

20   actually, I haven't read the story, I just       04:31PM

21   identified it.  And it's in my to-be read pile

22   years later still, but she told me in an

23   interaction, I believe on Facebook probably, that

24   that story which I believe is called "Go Forth,"

1                      CERTIFICATE

2       Commonwealth of Massachusetts

3       Norfolk, ss.

4              I, Jill M. Kourafas, a Notary Public in

5       and for the Commonwealth of Massachusetts, do

6       hereby certify:

7              That DAWN DORLAND PERRY, the witness

8       whose deposition is hereinbefore set forth, was

9       duly sworn by me and that such deposition is a

10      true record of the testimony given by the said

11      witness.

12             IN WITNESS WHEREOF, I have hereunto set

13      my hand this 5th day of October, 2021.

14      *Jill Kourafas, CSR, RPR*
        _____
15      Jill Kourafas, Notary Public
        Registered Professional Reporter
16      Certified Shorthand Reporter
        License #149308
17
        My Commission expires:
18      June 11, 2027

19

20         THE FOREGOING CERTIFICATION OF THIS

21         TRANSCRIPT DOES NOT APPLY TO ANY

22         REPRODUCTION OF THE SAME IN ANY RESPECT

23         UNLESS UNDER THE DIRECT CONTROL AND/OR

           DIRECTION OF THE CERTIFYING REPORTER.

<u>CERTIFICATE</u>

Commonwealth of Massachusetts

Norfolk, ss.

        I, Jill M. Kourafas, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

        That DAWN DORLAND PERRY, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the said witness.

        IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of October, 2021.

*Jill Kourafas, CSR, RPR*
_____
Jill Kourafas, Notary Public
Registered Professional Reporter
Certified Shorthand Reporter
License #149308

My Commission expires:
June 11, 2027


   THE FOREGOING CERTIFICATION OF THIS

   TRANSCRIPT DOES NOT APPLY TO ANY

   REPRODUCTION OF THE SAME IN ANY RESPECT

   UNLESS UNDER THE DIRECT CONTROL AND/OR

   DIRECTION OF THE CERTIFYING REPORTER.