# EXHIBIT QQ

```
 1      VOLUME:  2  EXHIBITS:  See Index    PAGES:  1-257
 2              COMMONWEALTH OF MASSACHUSETTS
 3            FOR THE DISTRICT OF MASSACHUSETTS
 4      ***********************************
 5    SONYA LARSON,
 6           Plaintiff
 7    vs.                          No. 1:19-CV-10203-IT
 8    DAWN DORLAND PERRY, ET AL,
 9           Defendants
10
11      ***********************************
12         ZOOM DEPOSITION of DAWN DORLAND PERRY
13                 APPEARING REMOTELY
14       Wednesday, September 22, 2021 - 11:30 a.m.
15
16      Reporter: Jill Kourafas, RPR, MA CSR#149308
17       Appearing remotely from Norfolk County
18
19
20      _____
21    REPORTERS, INC. - CAPTURING THE OFFICIAL RECORD
22          617.786.7783 - www.reportersinc.com
23              scheduling@reportersinc.com
24
```

```
 1      A.    Outrageous how?
 2      Q.    An outrageous amount of money to read an
 3   issue of American Short Fiction that contained
 4   The Kindest.
 5            MS. ELOVECKY:  Objection.
 6      A.    I don't understand the question at all.
 7            What's outrageous about the price of a
 8   literary magazine?  I think writers should be
 9   compensated, and I find $12 a perfectly suitable
10   price.
11            I don't have any expertise in the market
12   for literally fiction or what goes into setting
13   those prices.
14      Q.    And your testimony is that when
15   Ms. Larson's story -- actually, I don't know what
16   your testimony was, so you tell me.
17            When you learned that Ms. Larson's story,
18   The Kindest, was published by American Short
19   Fiction, were there any pages from the story that
20   were included on the American Short Fiction
21   website?
22            MS. ELOVECKY:  Objection.
23            You can answer to the extent that you're
24   able.
```

```
 1    A.    Yes, as I recall.
 2    Q.    And you recall that the first page of the
 3  story was available for free on the America Short
 4  Fiction website, is that correct?
 5          MS. ELOVECKY:  Objection.
 6    A.    No, that is not correct.
 7    Q.    Correct me, please.
 8    A.    Well, when you are on -- when you are on
 9  an online interface in that format, page numbers
10  are not delineated clearly.
11          When I said "one page," as I said at that
12  time in that sentence, I said I was looking at
13  screenshots or iPhone photos people had taken of
14  the physical book of the first page of the story.
15          That's different from finding it online,
16  Attorney Epstein.
17    Q.    I'm really confused now.
18          So did American Short Fiction publish any
19  portion of The Kindest that you're able to see on
20  the American Short Fiction website in August of
21  2017?
22          MS. ELOVECKY:  Objection.
23          You can answer to the extent that you're
24  able.
```

1    A.    Yes.

2    Q.    To the extent that you are able, what did
3    American Short Fiction publish in August of 2017?

4    A.    I cannot recall clearly, but I seem to
5    remember that the pay wall would have been just
6    before my letter as it occurs in the story.  It
7    was certainly before my letter because I never
8    saw the letter.  But when one goes to an online
9    interface, typically there's some front matter of
10   the story, the introductory paragraph, or maybe
11   not even introductory if a story starts right in.
12   There are several paragraphs available.

13        I am unable to delineate the page numbers
14   for you, Attorney Epstein, in an online context.
15   But I read what was there.  And when I later in
16   2018, by accident, did encounter my letter in the
17   full text of the story, I seem to remember that
18   the pay wall online in 2017 was just before my
19   letter, but that's just an impression I had, and
20   I cannot say that with any certainty.  I've no
21   way of recalling exactly what I read online.

22        I do recall seeing the first physical
23   page of the story taken by iPhone and posted by
24   Sonya, and maybe a friend or two, with whom I'm

```
 1   also friends on Facebook.  I remember seeing that
 2   physical page photographed and circulated.
 3           So when I refer to a page that I'm sure
 4   that I read, I know it's that first page in the
 5   physical book, but I cannot tell you with any
 6   certainty what was published online with ASF.
 7   They could certainly tell you that.  They could
 8   help you with that question, Attorney Epstein.
 9       Q.   So when is the first time that you read
10   any version of The Kindest in its entirety?
11       A.   In 2018.
12       Q.   Do you remember the date offhand?
13       A.   No.
14       Q.   If I can draw your attention to Exhibit 9
15   in the documents that I sent to you.
16       A.   Sure.  One moment.  Let me just pull it
17   up.
18           Okay, I'm there.
19       Q.   And if you could go to the document
20   numbered Dorland 00401.
21       A.   Okay, I'm there.
22       Q.   The fourth paragraph said, "I did read
23   the story over the weekend when I came across
24   it."
```

```
 1              Do you see that?
 2       A.    I do see that.
 3       Q.    And the date of that -- that document,
 4   which starts on Dorland 00400, is an email from
 5   you dated Sunday, June 3, 2018 to Samantha Shea.
 6              If you are correct and that email chain
 7   is correct that June 3 was a Sunday and you read
 8   it that weekend, would that help to refresh your
 9   memory as to when you first read any version of
10   The Kindest in its entirety either June 2 or
11   June 3, 2018?
12       A.    Yes.
13              I remember now that it was the day after
14   my birthday.
15       Q.    When is your birthday?
16       A.    June 1.  Made for a shitty birthday.
17       Q.    The version of The Kindest that you read
18   on June 2 or June 1 or June 2?
19       A.    It was not June 1, Attorney Epstein, it
20   was the day after my birthday.
21       Q.    So the version of The Kindest that you
22   read on June 2, 2018 was the American Short
23   Fiction print edition, was it not?
24       A.    I read it online, Attorney Epstein.
```

```
 1      Q.   Was it the American Short Fiction
 2   version?
 3      A.   I read it online at American Short
 4   Fiction.  I'm just unsure that they would call it
 5   the print version if it's online.  I'm not sure
 6   about that.
 7      Q.   Certainly the American Short Fiction
 8   version?
 9           MS. ELOVECKY:  Objection.
10      A.   Online.
11      Q.   Yes, I understand.
12           Have you more -- strike that question.
13           Have you read more than one version of
14   The Kindest?
15      A.   At this point, yes.
16      Q.   How many versions have you read?
17      A.   I don't remember.
18      Q.   Did you listen to the audible.com
19   version?
20           MS. ELOVECKY:  Objection.
21           You can answer.
22      A.   No.  I don't think I've ever listened to
23   that in its entirety.
24      Q.   Have you listened to any part of it?
```

1  A. Yes.

2  Q. And then in the third paragraph of that
3  letter that starts: "Would administrators," you
4  identify the short story as being The Kindest.

5  Do you see that?

6  A. Yes.

7  Q. You say "It has come to my attention,"
8  what information regarding the Bread Loaf Writers
9  Conference came to your attention when you wrote
10  that email on June 7, 2018?

11  MS. ELOVECKY: Objection.

12  You can answer, if you're able.

13  A. Yes. As I recall, Sonya had published in
14  her own bio on her website that in the time
15  period when she had submitted The Kindest to
16  other publications or -- I'm not sure what the
17  range of application was that she was attaching
18  the story, that in that time period, Sonya
19  advertised on her website that she had received a
20  fellowship, and that was the basis of my inquiry
21  and that's what came to my attention with Sonya's
22  unpublication of this fellowship in this
23  particular time period that would've affected
24  possibly my writing being distributed and her

1   benefiting from my writing in this way by
2   receiving a fellowship.
3       Q.   I'm sorry.  I didn't mean to interrupt
4   you, but is it your testimony that it's because
5   it's within the same time period that Ms. Larson
6   got a tuition fellowship to Bread Loaf Writers
7   Conference that you assumed that The Kindest was
8   part of her application?
9           MS. ELOVECKY:  Objection.  That misstates
10  her testimony.
11      A.   No.
12          MS. ELOVECKY:  You can answer.
13      A.   No, that misstates what I said, and, no,
14  the answer to that question as stated is "no."
15  That's not correct.
16      Q.   Correct me then, please.
17      A.   I explained --
18      Q.   You have an open opportunity.  Go ahead,
19  take it.
20      A.   Well, it feels asked and answered because
21  I just explained why I identified this time
22  period.  My interests were in protecting my work,
23  and so according to the time period when I
24  believe it's held out that my writing was

```
 1  submitted as part of The Kindest to other
 2  publishers and other literary stakeholders that
 3  according to that time period, I, in a very
 4  narrow particular way identified Bread Loaf as a
 5  place where my writing may have been submitted.
 6  And that is the question I raised.
 7          And I thought if Sonya had received a
 8  fellowship with writing with a story that
 9  contained my writing that I deserved to know
10  about it as the owner of that writing.
11     Q.   But you have no concrete, written or oral
12  evidence that Ms. Larson submitted The Kindest as
13  part of her 2017 tuition fellowship application
14  to Bread Loaf, did you?
15          MS. ELOVECKY:  Objection.
16          You can answer.
17     A.   In my letter, I make it clear that I'm
18  raising the question, and I've just explained why
19  I raised the question, what evidence I was basing
20  my question on.
21          I was protecting my interests, which I
22  believed had potentially been compromised by this
23  other author.  And I had every right to pursue
24  and, indeed, my efforts paid dividends by my
```

```
 1   uncovering what Sonya attempted to obscure from
 2   all of us.
 3       Q.   Well --
 4       A.   And she had originally copied my letter
 5   and published it and then tried to cover it up.
 6       Q.   Do you have any evidence that Ms. Larson
 7   submitted The Kindest to the Bread Loaf Writers
 8   Conference in order to get a tuition fellowship
 9   at Bread Loaf?
10           MS. ELOVECKY:  Objection.  That
11   questioned has been asked and answered twice.
12       A.   And my letter does not state equivocally
13   that I know this.  My letter is very clear with
14   the motivations that I have articulated to them
15   -- them to you in my testimony, Attorney Epstein,
16   that I'm raising the question, and I've given you
17   the extra information now of what evidence I had,
18   that my evidence was narrowly spoke to this frame
19   in time and where my writing, what might have
20   ended up with Sonya's name on it and how she
21   might have profited.  That was the intent of my
22   inquiry, and an inquiry it was, because I was
23   raising a question.
24           I never stated to the contrary, and you
```

1    Q.   Just the best of your knowledge and
2    present memory.  We're not asking for anything
3    more than that.
4         After you consulted with Samantha Shea,
5    you then wrote a letter to American Short
6    Fiction, is that correct?
7    A.   It's an email, and I could confirm if we
8    look at the dates together.  You have all the
9    documents, Attorney Epstein.
10   Q.   Can you remember any other person or
11   organization that you went to or consulted
12   between the time when you emailed Samantha Shea
13   and when you emailed American Short Fiction?
14   A.   No.
15   Q.   So sometime around the time that you were
16   emailing with American Short Fiction, did you
17   also contact the Bread Loaf Writers Conference?
18   A.   Yes, that timing appears the way you put
19   it based on the documents we just looked at.
20   Q.   Okay.  Did you next contact the -- strike
21   that.
22        At some point around there, you read a
23   post, is it, that Sonya Larson put on Facebook
24   where she claims that she won the Boston Book

```
 1   Festival contest?
 2          MS. ELOVECKY:  Objection.
 3          You can answer.
 4     A.   No.
 5     Q.   Is there some other organization in
 6   between that you contacted?
 7     A.   Attorney Epstein, your last question was
 8   about a Facebook post, so I'm not responding
 9   about contacts.  Please don't take what I'm
10   saying out of context.
11     Q.   Let me try it again.  When did you
12   contact the Vermont Studio Center?
13     A.   I don't remember.
14     Q.   Was it before you contacted Bread Loaf or
15   after?
16     A.   I don't remember.
17     Q.   Was it before you contacted the Boston
18   Book Festival or after?
19     A.   After.
20     Q.   How did you learn that Sonya Larson won
21   the One City One Story contest?
22     A.   Sonya published that information in her
23   bio on her website, and that's where I read it.
24   And I told the BBF when they asked me on the
```

```
 1   phone how did I know, because it had not been
 2   announced, I informed Raquel Hitt, with whom I
 3   spoke, that I read it on Sonya's own bio and she
 4   said, "Oh."
 5       Q.   Why were you reading Sonya Larson's bio
 6   on her website?
 7            MS. ELOVECKY:  Objection.
 8            You can answer.
 9       A.   As I explained before, when I discovered
10   that my rights of my own work were possibly being
11   infringed, I went to see where else Sonya may
12   have published my writing under her name.
13       Q.   You went to Sonya's website out of
14   curiosity, is that what you're basically saying?
15            MS. ELOVECKY:  Objection.  She said what
16   she said.
17       A.   No, I do not agree with that
18   characterization of what I said.  I went to her
19   website in pursuit of my rights.
20       Q.   At what point did you contact the
21   Association of Literary Scholars, Critics and
22   Writers?
23       A.   I don't remember.
24       Q.   Was it before you contacted the Boston
```

```
 1   Book Festival or after?
 2       A.   After.
 3       Q.   When you noticed that Sonya had posted on
 4   her website that she won the One City One Story
 5   contest, what did you do?
 6            MS. ELOVECKY:  Objection.
 7            You can answer, if you're able.
 8       A.   In the same manner that Samantha Shea had
 9   said it would be appropriate to contact the
10   publishers of The Kindest where I had found it
11   online, published by American Short Fiction.  In
12   that same spirit, I immediately reached out to
13   the Boston Book Festival simply wanting to know
14   whether the story for which Sonya had won the
15   honor was The Kindest because Sonya has published
16   many stories and I did not jump to any
17   conclusions.  I thought certainly it could be a
18   different story of Sonya's because in Sonya's bio
19   that she published, she only said she had been
20   selected to be the author.  She did not list the
21   story that had been chosen.  And I've given this
22   document, as I found her website in the wild,
23   online, I had given that to my attorney.  I
24   believe you've seen it.
```

1    I, then, without jumping to conclusions
2    in pursuit of protecting my rights to my own
3    work, I reached out immediately to the publishers
4    of, eventually, the story for One City One Story
5    and I asked Raquel Hitt, director of operations,
6    could she confirm that the story in question was
7    The Kindest, and if not, to forget I called.
8         She could neither -- she would not
9    confirm or deny the story was The Kindest, but
10   the manner of her response made me quite
11   concerned that the story -- that the BBF was
12   about to reproduce 30,000 times was, in deed, The
13   Kindest.  I became concerned and I reached out to
14   them immediately to give them every advantage of
15   time to prevent infringing my work at such a big
16   scale because I knew that would be devastating
17   for me, for them and for Sonya.
18      Q.   When you found out that the BBF, indeed,
19   was going to use Sonya's story, The Kindest, what
20   did you do?
21         MS. ELOVECKY:  Objection.
22         You can answer, if you're able.
23      A.   My correspondence is on the record from
24   this point out.

CERTIFICATE

Commonwealth of Massachusetts

Norfolk, ss.

    I, Jill M. Kourafas, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

    That DAWN DORLAND PERRY, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the said witness.

    IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of October, 2021.

*Jill Kourafas, CSR, RPR*
_____
Jill Kourafas, Notary Public
Registered Professional Reporter
Certified Shorthand Reporter
License #149308

My Commission expires:
June 11, 2027

**THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME IN ANY RESPECT UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.**