# EXHIBIT SS

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF MASSACHUSETTS
 3              C.A. No. 1:19-CV-10203-IT
 4   * * * * * * * * * * * * * * * * * * * * * *
 5   SONYA LARSON,
 6                          Plaintiff,
 7   vs.
 8
 9   DAWN DORLAND PERRY, et al.,
10                          Defendants.
11   * * * * * * * * * * * * * * * * * * * * * *
12                     VOLUME II
13          DEPOSITION OF: SONYA C. LARSON
14                 Conducted Remotely
15                  11 Oxford Street
16               Malden, Massachusetts
17    Tuesday, September 28, 2021         11:11 a.m.
18
19
20
21
22
23
24
```

Sonya Larson vs
Dawn Dorland Perry, et al

Sonya C. Larson
September 28, 2021

220

1        Q.   Okay.   And in your second amended

2   complaint, you allege that Dawn Dorland defamed you,

3   correct?

4        A.   Yes.

5        Q.   Okay.   So please tell me each instance in

6   which you believe that Dawn Dorland defamed you.

7             MR. EPSTEIN:   Objection.

8        A.   I think that that is a difficult task.

9        Q.   I am sure that it is, actually, but I still

10   need you to answer the question.

11        A.   Well, I believe that she called me a

12   plagiarist to many people and organizations in my

13   life.

14        Q.   Okay.   And so what is the first instance

15   that you're aware of that you're referring to in

16   your answer?

17        A.   Could you clarify what you mean by "first."

18        Q.   As far as you are aware of the allegation

19   that you are bringing in this case concerning Dawn

20   Dorland making defamatory statements, what is the

21   first defamatory statement that you are aware of?

22        A.   I don't believe you've answered my

23   question.   What do you mean by first?

24        Q.   What's the first statement that you believe

Sonya Larson vs
Dawn Dorland Perry, et al

Sonya C. Larson
September 28, 2021

221

1    was made?

2        A.  You mean chronologically?

3        Q.  Sure.  Let's go that way.

4        A.  I have to try to recall.

5        Q.  So just for -- for your purposes while

6    you're trying to recall, the chronological order

7    just for purposes of organizing your answer.  If you

8    mix up what was first and what was second, that's

9    not, like, going to be an issue.  So let's just go

10   with what you remember as the first.

11       A.  I believe that the first communication that

12   she had with another person in which she said that I

13   committed plagiarism and/or that I was a plagiarist

14   was to the literary agent, Samantha Shea.

15       Q.  And what precisely was the defamatory

16   statement that you believe Ms. Dorland made to

17   Samantha Shea?

18           MR. EPSTEIN:  Objection.

19       A.  I don't have that verbatim in my memory.

20       Q.  So, as you sit here today, you do not know

21   this aspect of your own claim?

22           MR. EPSTEIN:  Objection.

23       A.  No.  That's not what I'm saying.

24       Q.  So why don't you tell me what you can.

Sonya Larson vs
Dawn Dorland Perry, et al

Sonya C. Larson
September 28, 2021

222

1    What was the statement made to Samantha Shea upon

2    which you base your allegation and claim for

3    defamation?

4          A.  Are you asking for the exact statement?

5          Q.  No.  I am asking for your view and your

6    current knowledge on the basis of your claim that a

7    defamatory statement was made to Samantha Shea.

8          A.  I'm afraid I'm going to have to ask you to

9    clarify the question.

10         Q.  Okay.  You testified that Dawn Dorland made

11   a statement to Samantha Shea that you view as

12   defamatory, correct?

13              MR. EPSTEIN:  Objection.

14         A.  I -- I mean, yes.

15         Q.  Okay.  And I'm asking you what that

16   statement was.

17         A.  But, again, I'm asking, do you want me to

18   tell you that exact statement?

19         Q.  Are you able to tell me that exact

20   statement?

21         A.  From memory, no.

22         Q.  Okay.  So why don't you answer on the

23   record what you do remember.

24         A.  I do remember that she contacted the

223

1   literary agent, Samantha Shea, to say that I had

2   committed plagiarism --

3        Q.  When did --

4        A.  -- and that she later, I believe, followed

5   up with Samantha Shea to tell her more specifically

6   about me specifically.

7        Q.  And when did you first find out about that

8   communication?

9        A.  With Samantha Shea, I believe it was after

10  a production of Dorland's documents in discovery.

11       Q.  So you were not aware of Ms. Dorland's

12  communications with Samantha Shea at the time that

13  you filed your complaint, is that correct?

14       A.  Yes.

15       Q.  And what is the next statement that you are

16  alleging to be defamatory in this matter?

17       A.  By next what do you mean?

18       Q.  So we seem to be going at these

19  chronologically at your option; so the next

20  chronological statement that was made that you're

21  alleging to be defamatory.

22       A.  Chronologically, I don't -- I don't know in

23  my exact memory the order in which Dorland contacted

24  people regarding myself, but all around the same

Sonya Larson vs
Dawn Dorland Perry, et al

Sonya C. Larson
September 28, 2021

224

1  time one of those included American Short Fiction.

2       Q.  Okay.  And what is the defamatory statement

3  or statements that you are claiming that Dawn

4  Dorland made to American Short Fiction?

5       A.  Again, I'm going to need you to clarify.

6  I -- I do not understand whether you are seeking me

7  to tell you precisely the statement that she gave

8  or -- or what exactly.

9       Q.  Well, I'm asking you for as precise of

10  information you have.  I mean, this is a deposition.

11  Any answer that you have you can give.  If it's not

12  precise, then give me your summary or what you do

13  know as you sit here today.

14       A.  I believe that she contacted American Short

15  Fiction to say that my short story, "The Kindest,"

16  had plagiarized her.

17       Q.  And was that on one occasion?

18       A.  I don't remember.  I believe it was more

19  than one, and that she made phone calls to them as

20  well.

21       Q.  And what was said in the phone calls that

22  you are aware of that forms the basis of your

23  defamation claim in this matter?

24       A.  That she continued to say that my short

Sonya Larson vs
Dawn Dorland Perry, et al

Sonya C. Larson
September 28, 2021

225

1    story, "The Kindest," had plagiarized her.

2          Q.   And how did you learn of those phone

3    calls -- or, actually, strike that.

4               Were you a party to those phone calls?

5          A.   No.

6          Q.   Okay.  So how did you learn of those phone

7    calls?

8          A.   The editors of American Short Fiction told

9    me about them.

10         Q.   And, according to your testimony, the

11   defamation that was conveyed to American Short

12   Fiction was that you plagiarized Dawn Dorland, is

13   that correct?

14         A.   That's my understanding.

15         Q.   So was there anything else to that

16   statement that you're aware of that -- that forms

17   the basis of your defamation claim?

18         A.   I don't understand the question.  Could

19   you --

20         Q.   So all you've said is that she said that

21   you plagiarized her.  Is there anything else to that

22   statement that you recall as you sit here today that

23   you are alleging as defamatory?

24               MR. EPSTEIN:  Objection.

Sonya Larson vs
Dawn Dorland Perry, et al

Sonya C. Larson
September 28, 2021

235

1   that you're alleging to be defamatory by Dawn

2   Dorland.  Can you please tell me what statement

3   after the VSC contact you're claiming as part of

4   your complaint in this matter concerning defamation.

5           MR. EPSTEIN:  Objection.

6           A.  She contacted the association of literary

7   scholars, critics and writers.  I may not have that

8   exact term correct, but it was another literary

9   organization that had funded a fellowship that I had

10  received.

11          Q.  And do you know when that contact took

12  place?

13          A.  I believe around the same time that she had

14  contacted these other organizations.

15          Q.  And what defamatory statement do you allege

16  was conveyed in that contact?

17          A.  I don't know what precise statements were

18  made, but I believe from Dorland's own responses to

19  the interrogatories, they were regarding a claim of

20  plagiarism against me.

21          Q.  Okay.  And what was the next statement that

22  you allege was made by Dawn Dorland that you're

23  claiming as defamation?

24          A.  She also contacted The Boston Globe to make

Sonya Larson vs
Dawn Dorland Perry, et al

Sonya C. Larson
September 28, 2021

236

1    a claim of plagiarism against me.

2         Q.   And The Boston Globe ultimately published

3    two articles concerning your story, "The Kindest,"

4    correct?

5         A.   Yes.

6         Q.   Were there any defamatory statements, as

7    you understood them, in those articles?

8         A.   Yes.

9         Q.   Okay.   What were they?

10        A.   That my short story, "The Kindest," had

11   plagiarized Dawn Dorland.

12        Q.   Other than what was printed in The Globe,

13   are you claiming any other statements that

14   Ms. Dorland may have made to The Globe as allegedly

15   defamation?

16             MR. EPSTEIN:   Objection.

17        A.   I'm not sure.   She said a lot to The Globe.

18        Q.   Other than what's in the articles, what

19   knowledge do you have concerning what Dawn Dorland

20   said to The Globe?

21             MR. EPSTEIN:   Objection.

22        A.   I have all of the emails that she sent to

23   them.   She -- yeah.   I have all the emails she sent

24   to them.

238

1    memory is that she repeatedly told them that I had
2    committed plagiarism against her.
3         Q.   Okay.  And after The Globe, what was the
4    next statement that you're claiming to be
5    defamatory?
6         A.   She also contacted my employer, Grub
7    Street, and made the claim that my short story, "The
8    Kindest" had committed plagiarism against her.
9         Q.   Were there any other statements made to
10   Grub Street, other than a claim of plagiarism that
11   you are claiming as defamatory?
12            MR. EPSTEIN:  Objection.
13       A.   I mean, I'm not sure.  She made statements
14   about me that were false, but I -- but I don't have
15   those in mind regarding this legal action.
16       Q.   Does that mean that you're not including
17   those in your claim?
18            MR. EPSTEIN:  Objection.
19       A.   I don't know what you mean exactly.
20       Q.   I'm asking you what defamatory statements
21   that you believe were made by Dawn Dorland that form
22   the basis of your claim in this litigation?
23       A.   I understand.
24       Q.   Yeah.  And you then testified that you

279

1     Ms. Dorland made defamatory statements?

2          A.   Yes.

3          Q.   And what entities are those?

4          A.   The Bread Loaf Writers' conference is one.

5          Q.   Okay.  And what false statements do you

6     allege that Ms. Dorland made to the Bread Loaf

7     Writers' conference?

8          A.   She suggested that I had applied for and

9     received a fellowship to the Bread -- Bread Loaf

10    Writers' conference using plagiarized material.

11         Q.   When you say, "she suggested," what do you

12    mean by that?

13         A.   I mean that she spoke -- that she said that

14    there was plagiarism in the short story, "The

15    Kindest," and that the author of that short story

16    had received -- applied for and received a

17    fellowship to the Bread Loaf Writers' conference and

18    that she continually emailed and called Bread Loaf

19    to reassert her claim.

20         Q.   And how did you find out about these

21    communications?

22         A.   I learned about them when Jennifer Groats

23    contacted me.

24         Q.   And when did she contact you?

Sonya Larson vs
Dawn Dorland Perry, et al

Sonya C. Larson
September 28, 2021

281

1        A.  Emails that Ms. Dorland had sent various
2   staff members of Bread Loaf.
3        Q.  And in those emails, did Ms. Dorland
4   reference you by name?
5        A.  I don't remember, but she did reference my
6   short story by name.  I do know that.
7        Q.  Are there any other entities with which you
8   claim that Ms. Dorland communicated any false
9   statements concerning you?
10       A.  Yes.
11       Q.  And what entity?  What is one of them?
12       A.  The reporter, Kat Rosenfeld.
13       Q.  And who is Kat Rosenfeld?
14       A.  I don't know, aside from the fact that she
15   is a writer and a reporter.
16       Q.  And what statements do you allege were made
17   by Ms. Dorland to Kat Rosenfeld?
18       A.  I don't have them in front of me; so if
19   you're looking for the exact statement, I don't have
20   that photographic --
21       Q.  I didn't --
22       A.  I know, but I'm telling you the answer to
23   your question.  But I know that she was, once again,
24   claiming that my short story had plagiarized her,

Sonya Larson vs
Dawn Dorland Perry, et al

Sonya C. Larson
September 28, 2021

282

1   and in my memory, she included a link to one of the

2   Boston Globe articles which, of course, names me and

3   names my story, and she was urging Ms. Rosenfeld to

4   write about this.

5       Q.   And when did --

6           MR. EPSTEIN:  Suzanne, before you go on,

7   my -- my computer froze for a second.

8           MS. ELOVECKY:  Okay.

9           MR. EPSTEIN:  The last -- the last I heard

10  was Kat Rosenfeld and she was a writer and reporter.

11  That's the last thing I heard.

12          Perhaps, Valerie if you could read from the

13  record, I'll have the benefit of what I missed.  I'm

14  sorry to interrupt.  I just --

15          MS. ELOVECKY:  No.  That's fine.  We did

16  didn't notice that you had frozen.

17          MR. EPSTEIN:  Yeah.  I did.

18          MS. ELOVECKY:  Sorry.

19          MR. EPSTEIN:  That's all right.

20          THE REPORTER:  "Answer:  I know, but I'm

21  telling you the answer to your question.  But I know

22  that she was, once again, claiming that my short

23  story had plagiarized her, and in my memory, she

24  included a link to one of the Boston Globe articles

286

1   starts, as you see, at the top of the page with an

2   email to Christopher -- I mean -- I'm sorry -- from

3   Christopher Castellani.  Do you agree with me that's

4   what we're looking at at the top of the page?

5       A.  Yes.

6       Q.  And the second email which is the one I'd

7   like you to focus on is an email from

8   eve@grubstreet.org, correct?

9       A.  Yes.

10      Q.  And that's Eve Bridberg, correct?

11      A.  Uh-huh.

12      Q.  From this production, we don't see whether

13  anyone else is on this email chain, correct?

14      A.  Yes.

15      Q.  Were you on this email chain?

16      A.  No.

17      Q.  Okay.  You see that in the email from Eve

18  Bridberg she stated as the second sentence, "Do you

19  have a sense of whether she'll own up to her own

20  laziness?"  Did I read that correctly?

21      A.  Yes.

22      Q.  Prior to seeing this email today, had you

23  seen this email previously?

24      A.  No.

287

1     Q.  Had Eve Bridberg ever shared with you that

2  she held a view that you had acted with laziness?

3     A.  No.

4     Q.  She -- then the next question -- I was

5  going to call it a sentence, but it is a question --

6  is (as read) "Or to over, dash, borrowing in early

7  drafts?"  Do you see that?

8     A.  Yes.

9     Q.  Had Ms. Bridberg ever spoken to you

10  concerning any view that she may have held that you,

11  quote, over-borrowed, in early drafts?

12     A.  I don't remember.

13     Q.  And that's not something that would stick

14  out in your memory?

15     A.  I mean, that's a hypothetical question.  I

16  don't know how to answer it.

17     Q.  Has anyone ever told you that you

18  over-borrowed from Dawn Dorland's letter?

19     A.  Do you mean did they use that phrase?

20     Q.  First, yes.

21     A.  Not to my memory.

22     Q.  Has anyone ever used any other phrase

23  suggesting that you improperly utilized Dawn

24  Dorland's letter on being broad on her --

292

1        Q.  But, specifically, the letter within your
2   story, is it your testimony that you don't know when
3   or why you made changes to that letter?
4        A.  Are you speaking about a specific time
5   frame?
6        Q.  The one we're talking about here in between
7   your note from your friend and the publication with
8   American Short Fiction.
9        A.  I absolutely made changes to my story.  I
10  know that because the editors of American Short
11  Fiction and I corresponded about many changes that
12  they wanted me to make and that I wanted to make to
13  my short story but --
14       Q.  My question was --
15       A.  I'm answering your question.  But I can't
16  tell you from memory right now whether those many
17  revisions that we went over included revisions to
18  the letter portion of my short story.
19       Q.  Okay.  So I'm just going to summarize the
20  list again just to help make sure that we're on the
21  same page and that we get a complete answer.  Okay?
22       A.  Okay.
23       Q.  So thus far in response to my question as
24  to which people or entities Ms. Dorland made what

293

1   you allege to be defamatory statements, you have

2   responded, Samantha Shea, American Short Fiction --

3   there's more -- Grub Street, Bread Loaf, Kat

4   Rosenfeld, and the literary scholar entity, Vermont

5   Studio Center, and Boston Globe, correct?

6        A.  Yes.

7        Q.  Are there any other individuals or entities

8   that you claim Ms. Dorland made a statement that was

9   false?

10            MR. EPSTEIN:  I just want to object.  I'm

11   not sure your list is fully complete, but I think

12   the record will reflect the completeness.

13        A.  Yes.  So this is difficult for me because

14   you're asking me to do this entirely from memory; so

15   I want to state that on the record.  But, again,

16   from memory, I believe that she also contacted

17   someone named Samantha Hunt.

18        Q.  And what was the statement made to Ms. Hunt

19   that you claim to be defamatory?

20        A.  Again, this would be so much easier if you

21   could present these documents in front of all of us

22   here to be able to look at them ourselves, but

23   again, if you're asking me entirely from memory, I

24   believe that she contacted Samantha Hunt with her

333

```
 1              (Document marked as Exhibit 24
 2              for identification)
 3   BY MS. ELOVECKY:
 4        Q.  You should have Exhibit 24 on your screen.
 5        A.  Yup.
 6        Q.  And this is the article titled, (as read)
 7   "Inspiration or Plagiarism, question mark.  Writing
 8   hackles raised in Boston dispute," and it's dated
 9   July 26, 2018, correct?
10        A.  Correct.
11        Q.  Now, if you turn to Page 8 of Exhibit 23,
12   it's where the comments begin.  I endeavored to
13   expand all of the comments, although some of them
14   break across a page in a way I could not avoid.  I
15   would just like you to review for me these comments
16   and identify for me anything that you see as
17   reflecting harm that you've suffered to your
18   reputation.
19        A.  I just want to say it's a little hard for
20   me to do this because there are comments here that
21   have replies that are not expanded.  There are also
22   comments that have been blocked, it appears, that
23   were at one point not blocked.
24        Q.  Can you show me an example of where the
```

338

1    of comments on this article, you've identified two

2    comments, plus one word from a third comment which

3    you see as potentially harmful to your reputation,

4    correct?

5            MR. EPSTEIN:  Objection.

6        Q.  I'll restate that because I did -- let

7    me -- let me just restate that.

8            You view two comments, plus one word from

9    one third comment that you view as depicting damage

10   to your reputation?

11           MR. EPSTEIN:  Objection.

12       A.  I would say they are reflective of damage

13   to my reputation.

14       Q.  Other than the comments to -- well, let me

15   show you the second article first.

16               (Document marked as Exhibit 26

17               for identification)

18   BY MS. ELOVECKY:

19       Q.  Okay.  I'm now showing you what's been

20   marked as Exhibit 26.  This is a Boston Globe

21   article dated article August 13th, 2018, and the

22   title is "Boston Book Festival cancels One City One

23   Story event amid plagiarism flap."  Did I read that

24   correctly?

339

1       A.  Yes.

2       Q.  Okay.  And if you turn to Page 4, at the

3  bottom of the page, do you see first that the

4  article reflects that there are only two comments to

5  this article, correct?

6       A.  Yes.

7       Q.  And do either of these two comments which

8  bridge Pages 4 and 5 of this exhibit reflect any

9  expression from the commenters that you view as

10  demonstrating any harm to your reputation?

11      A.  I'm not sure.  I'd have to speak with my

12  attorney.

13      Q.  Well, I'm asking you about your view.  I'm

14  not asking you about your attorney's view.  I'm not

15  asking about a legal -- I'm not -- there's no legal

16  question.  I'm asking you what you view these

17  comments as.

18      A.  Sure.  These are comments that reflect what

19  I presume are an untolled number of readers of this

20  article who came away with an impression of me as a

21  plagiarist, and as we know, this article is the

22  direct result of Ms. Dorland contacting The Boston

23  Globe in an effort to get this article published.

24      Q.  Other than -- strike that.

350

1        A.   Oh, okay.  Yes, I did.

2        Q.   Okay.  And did you review correspondence

3    between yourself and Sarah Green?

4        A.   I don't remember.  If there was

5    correspondence, then, yes.

6        Q.   You have claims against Dawn Dorland for

7    intentional interference with advantageous

8    relationships, don't you?

9        A.   Yes.

10       Q.   Okay.  And what is your understanding as to

11   what interference Dawn Dorland had with American

12   Short Fiction?

13            MR. EPSTEIN:  Objection.

14       A.   I'm not a legal scholar, but my

15   understanding of that concept is that -- actually,

16   could you rephrase the question.  I'm trying to

17   remember exactly what it was.

18       Q.   What interference did Dawn Dorland enact

19   between yourself and American Short Fiction?

20            MR. EPSTEIN:  Objection.

21       A.   Again, I'm not a legal scholar, but my

22   layperson's understanding of that concept applies as

23   such, which is that Ms. Dorland raised the specter

24   of legal action and litigation against American

Sonya Larson vs
Dawn Dorland Perry, et al

Sonya C. Larson
September 28, 2021

360

1   from the ASF website, was there any other result

2   which you see as flowing from Dawn Dorland's

3   communications with ASF?

4           MR. EPSTEIN:  Objection.

5       A.  I'm sorry.  I'm going to have to have you

6   repeat the question one more time.  Any more result,

7   is that the -- the words you used?

8       Q.  So it's your -- it's your opinion that

9   because of Dawn Dorland's statements to ASF, they

10  removed the story from the website, correct?

11      A.  Yes.

12      Q.  Was there any other effect -- let's use

13  that word -- of Dawn Dorland's statements to ASF

14  that you're aware of?

15      A.  As it relates to ASF?

16      Q.  Yes, as it relates to your claim for

17  intentional interference with your relationship with

18  ASF.

19      A.  No.

20      Q.  Okay.  So how about the BBF; you claim that

21  Dawn Dorland interfered with your advantageous

22  relationship with the BBF, correct?

23      A.  Yes.

24      Q.  And how did she do so?

387

1          MR. EPSTEIN:  Objection.

2     A.  No.  I wouldn't say they sought my

3  acquiescence.

4               (Document marked as Exhibit 30

5               for identification)

6  BY MS. ELOVECKY:

7     Q.  So I'm showing you what's been marked as

8  Exhibit 30.  It's an email from you to Rebecca --

9  Rebecca Markovits dated April 25th, 2018.  Do you

10 see that?

11    A.  Yes.

12    Q.  And about halfway down the page there's an

13 entry in the chain that's dated June 24th, 2018, at

14 5:48 p.m. where you state, (as read) "Hello again,

15 Rebecca, I hope you're having a great weekend.  Go

16 ahead and sunset my piece, dash, you can remove it

17 now, if you'd like."  Did I read that sentence

18 correctly?

19    A.  Yes.

20    Q.  So you did email ASF and told them that

21 you -- well, you told them exactly what you wrote,

22 which is, "Go ahead and sunset my piece - you can

23 remove it now, if you'd like," correct?

24    A.  I did.

392

```
 1        Q.  So, in this email chain in the third entry,
 2   Christopher Castellani states, "The only way this
 3   Chunks cliffhanger works is if DD is the victim...."
 4   I'm pausing there.  DD stands for Dawn Dorland,
 5   correct?
 6        A.  I believe so.
 7        Q.  And then he goes on to say, (as read)
 8   "...tumbling down the stairs Big Little Lies style,
 9   period."  Did I read that correct?
10        A.  Yes.
11        Q.  And you're stating that you're not aware
12   that, when the character in Big Little Lies was
13   pushed down the stairs, that he died?
14           MR. EPSTEIN:  You didn't ask that question.
15   Object.
16        A.  I've never seen Big Little Lies.  I -- I
17   don't know who's in it.  I don't know what happens
18   in it.  I don't know.
19        Q.  Was it at all concerning to you that your
20   friends were joking about pushing Dawn Dorland down
21   the stairs Big Little Lies style?
22           MR. EPSTEIN:  Objection.
23        A.  This line of questioning is very strange.
24           Are you familiar with the nature of what it
```

400

1   quite is responding to your question the way that

2   you're seeking it from me, but yes.

3                    (Document marked as Exhibit 32

4                    for identification)

5   BY MS. ELOVECKY:

6       Q.  But you didn't say -- strike that.  It's

7   fine.  We'll leave the dodge on this record.

8            So I have now shown you what's been marked

9   as Exhibit 32.  This is an email chain between you

10  and your writing group, and the top email in the

11  chain is dated July 28th of 2018.  Do you see that?

12      A.  Yes.

13      Q.  And if you turn to Page 3.

14      A.  Yes.

15      Q.  In approximately in the middle of the page,

16  Whitney Scharer states, "I will never be able to

17  unsee this photo of DFD."  Did I read that

18  correctly?

19      A.  Yes.

20      Q.  What does DFD refer to?

21      A.  I believe it refers to Dawn fucking

22  Dorland.

23      Q.  And your group used that acronym for

24  Ms. Dorland pretty consistently throughout the

452

1  COMMONWEALTH OF MASSACHUSETTS )

2  SUFFOLK, SS.                 )

3       I, Valerie Rae Johnston, Shorthand Reporter and

4  Notary Public in and for the Commonwealth of

5  Massachusetts, do hereby certify that there came

6  before me on the 28th day of September 2021, at

7  11:11 a.m., the person hereinbefore named, who was

8  by me duly sworn to testify to the truth and nothing

9  but the truth of her knowledge touching and

10 concerning the matters in controversy in the cause;

11 that she was thereupon examined upon her oath, and

12 her examination reduced to typewriting under my

13 direction; and that the deposition is a true record

14 of the testimony given by the witness.

15      I further certify that I am neither attorney or

16 counsel for, nor related to or employed by, any

17 attorney or counsel employed by the parties hereto

18 or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20 and affixed my notarial seal this ____ day of

21 October 2021.

22                 _____

23                 Notary Public

24                 My commission expires:  8/5/22