# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SONYA LARSON,

        Plaintiff

v.

DAWN DORLAND PERRY,
COHEN BUSINESS LAW GROUP, PC and
JEFFREY A. COHEN, ESQUIRE,

        Defendants

C.A. No. 1:19-cv-10203-IT

_____

DAWN DORLAND PERRY,

        Plaintiff-in-Counterclaim

v.

SONYA LARSON,

        Defendant-in-Counterclaim


## DAWN DORLAND PERRY'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................................... 1

II.  FACTS ................................................................................................................... 2

III.  STANDARD OF REVIEW .................................................................................... 6

IV.  ANALYSIS ............................................................................................................ 7

    A.  Copyright: Counterclaim Counts I-III, Complaint Count VIII ......................... 7

        1.  Ms. Larson is liable for copyright infringement of Ms. Dorland's Letter. ................... 8

        2.  The Registered Version of *The Kindest* Contains a Derivative of the Donor Letter, and is to That Extent, Not Protectable. ......................................... 10

        3.  Ms. Larson's Use of the Dorland Letter in *The Kindest* is Not Defensible Fair Use. 12

    B.  Defamation ........................................................................................................ 20

    C.  Intentional Interference with Advantageous Business Relationship with ASF (SAC Count I) / BBF (SAC Count II) .................................................... 27

        1.  Elements of the Action ................................................................................. 27

V.  CONCLUSION ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

Arista Records, LLC v. Doe 3, 604 F.3d 110, 124 ............................................................ 16

Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) .................................. 6

Black Dog Tavern Co., Inc. v. Hall, 823 F. Supp. 48, 60 (D. Mass. 1993) .......................... 28

Campbell v. Acuff-Rose Music, Inc., 510 U.S. 659 (1994) ...................................... passim

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................... 7, 20, 28

Comerica Bank & Tr., N.A. v. Habib, 433 F. Supp. 3d 79 (D. Mass. 2020) ..................... 6, 12

Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 67 (1st Cir. 2009) ................................. 9

Fitzgerald v. CBS Broad., Inc.,  491 F. Supp. 2d 177, 189 (D. Mass. 2007) .............................. 12

Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, (1991) ......................... 8, 9

Ferdman v. CBS Interactive, Inc., 342 F. Supp. 3d 515 (S.D.N.Y 2018) .................................. 16

G.S. Enter., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 273 (1991) ............................. 28

Harper & Row Publishers, Inc. v. Nation Ents., 471 U.S. 539 (1985) ............................ 16, 18, 19

HipSaver, Inc. v. Kiel, 464 Mass. 517, 526 n.11, 984 N.E.2d 755 (2013) .................................. 25

IvyMedia Corp. v. iLIKEBUS, Inc., 252 F. Supp. 3d 34, 38 (D. Mass. 2017) ........................... 10

Johnson v. Gordon, 409 F.3d 12, 18 (1st Cir. 2005) ......................................................... 8, 9

Kahalas v. Schiller, 164 F. Supp. 3d 241, 246 (D. Mass. 2016) ....................................... 28

Levinsky's, Inc. v. Wal–Mart Stores Inc., 127 F.3d 122, 127 (1st Cir.1997) ............................. 25

LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) ........................................... 7

Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) ............................. 7

Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) ......................................................... 7

Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC, 560 F.3d 53, 58 (1st Cir. 2009) ................. 8

Monsarrat v. Newman, 28 F.4th 314 (1st Cir. 2022) ................................................... 12, 13

Rapid Pharmaceuticals AG v. Kachroo, 180 F. Supp. 3d 96, 104 (D. Mass. 2015) ..................... 27

Mass Cash Register, Inc. v. Comtrex Systems Corp., 901 F. Supp. 404, 422 (D. Mass. 1995) ... 28

Massachusetts Sch. Of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 42 (1st Cir. 2006) 22

Mullane v. Breaking Media, Inc., 433 F. Supp. 3d 102, 111-12 (D. Mass 2020) ....................... 21

Noonan v. Staples, Inc., 707 F. Supp. 2d 85, 90 (D. Mass. 2010) ..................................... 21, 22

NXIVM Corp. v. Ross Inst., 364 F.3d 471, 477 (2d Cir. 2004) ................................................. 16

Piccone v. Bartels, 785 F.3d 766 (1st Cir. 2015) ......................................................... 21, 25

Ravnikar v. Bogojavlensky, 438 Mass. 627, 629-30 (2003) ............................................. 20

Reilly v. Assoc. Press, 59 Mass. App. Ct. 764, 770 (2003) ............................................. 21, 22

Riley v. Harr, 292 F.3d 282, 289 (1st Cir. 2002) ......................................................... 21

Saad v. American Diabetes Assoc., 123 F. Supp.3d 175, 177-178 ....................................... 25

Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 60 (1st Cir. 2000) ........................... 9

Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F. 3d 29, 60 (1st Cir. 2012) .... 13, 18, 20

Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, 685 F. Supp. 2d 217 (D. Mass. 2010) ........................................... 12, 18, 19, 20

Taylor v. Swartwout, 445 F.Supp.2d 98 (D. Mass. 2006) ............................................. 22

TMTV, Corp. v. Mass Productions, Inc., 645 F.3d 464 (1st Cir. 2011) ........................... 11, 12, 15


**Statutes**

17 U.S.C. § 103(b) ......................................................................................... 11

17 U.S.C. § 107 ............................................................................................. 13

**Other Authorities**

4 Nimmer on Copyright § 13.05[A][l][d] ............................................................... 16

Restatement (Second) Torts § 773 ......................................................................... 28

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................ 6

# I.    **INTRODUCTION**

This action was commenced on January 30, 2019, when Sonya Larson ("Ms. Larson") sued Dawn Dorland Perry ("Ms. Dorland") over Ms. Dorland's attempts to preserve and protect her own rights in a deeply personal letter that she crafted and sent to the final recipient in a kidney donation chain, in which Ms. Dorland donated one of her kidneys to a stranger.  Ms. Larson was of the erroneous belief that because Ms. Dorland shared her heartfelt creative letter in a private Facebook group, it was entitled to no protection, and that Ms. Larson could use Ms. Dorland's personal words and expressions in Ms. Larson's own short story titled *The Kindest*.

When Ms. Dorland discovered that Ms. Larson had copied Ms. Dorland's work, after *The Kindest* was published on a free-access website in May of 2018, Ms. Dorland took immediate steps to protect her copyright interest in her own original work.  Ms. Dorland wrote a measured email, outlining her belief that *The Kindest* contained a copy of her letter, to the publisher of the story that she had read online.  Subsequently, Ms. Dorland discovered (from Ms. Larson's website) that *The Kindest* had been selected as the Boston Book Festival's ("BBF") featured short story in 2018.  Faced with the prospect that her deeply personal and heartfelt work would be published under Ms. Larson's name yet again, and this time with as many as 10,000 paper copies being distributed in the Greater Boston area, Ms. Dorland reached out to the BBF to share with the organizers her concerns about this misappropriation of her work.

In the midst of Ms. Dorland's attempts in 2018 to resolve this matter with Ms. Larson and the BBF, Ms. Dorland discovered that Ms. Larson had published an earlier version of *The Kindest*, in 2016.  The letter in that version was a much closer copy, using not only several instances of Ms. Dorland's original writing, but also co-opting Ms. Dorland's creative expression of her own childhood and the difficulties she had during that time of her life.

Now, in 2022, Ms. Dorland is in the fourth year of defending herself against tort claims

brought against her for the legally protected activity of asserting her rights.  Ms. Larson admitted multiple times that she "verbatim grabbed" sentences from Ms. Dorland's letter, that she "excerpted" sentences from Ms. Dorland's "real-life letter," and that she remembered "writing down certain phrases".  Now, Ms. Dorland is defending herself against allegations in this long-protracted litigation that she somehow damaged Ms. Larson by stating the same things that Ms. Larson had previously admitted.  There is no basis in the facts or the law for Ms. Larson's tort claims, and they must be dismissed.  Similarly, where Ms. Larson's own admissions, as well as a comparison of the relevant texts, make clear that Ms. Larson infringed Ms. Dorland's copyright, both parties' copyright claims should be decided in Ms. Dorland's favor.

## II.  <u>FACTS</u>

Ms. Dorland and Ms. Larson are professional writers who met one another in or around 2007 at GrubStreet, a non-profit writing center, in Boston. <u>See</u> Countercl., Doc. No. 96, ¶ 8. Over the years and through their mutual involvement in the close-knit Boston writing community, Ms. Dorland came to consider Ms. Larson a friend.  Affidavit of H. Amadei, October 28, 2022 ("Amadei Aff.") at ¶ 45, Ex. PP at 182:5-18, Doc. No. 182-16; <u>see also</u>, Am. Compl., Doc. No. 91, ¶ 16; Doc. No. 96 ¶¶ 10-21.

Ms. Dorland donated her kidney in a non-directed (or altruistic) kidney donation in 2015. Doc. No. 96, ¶¶ 23-24.  Ms. Dorland's donation was originally inspired by an article about living kidney donations, which ultimately led her to the decision to donate. Amadei Aff., ¶ 6, Ex. C, Doc. No. 181-3.  Ms. Dorland's non-directed donation began a "paired exchange."  <u>Id</u>.  A "paired exchange" in kidney donations is when an incompatible donor/recipient pair are matched with another incompatible donor/recipient pair, where each donor gives a kidney to the other

2

person's intended recipient.[1]  Doc. No. 96, ¶ 27.

As part of the process to prepare for surgery, a major operation in which her kidney would be surgically removed, Ms. Dorland created a private Facebook group for support from her inner circle of friends and family, and to provide updates, answer questions, and receive messages of support.  Amadei Aff., ¶ 5, Ex. B, Doc. No. 181-2.  Up to the time of Ms. Dorland's surgery in June 2015, the group had no more than 36 people.  SUMF No. 3; Amadei Aff., ¶ 41, Ex. LL, Doc. 182-12.  Ms. Larson, who Ms. Dorland considered a friend, was a member of this private Facebook support group.  SUMF No. 4; Amadei Aff., ¶¶ 5, 9, 13, Ex. B, F, J, Doc. No. 181-2, Doc. No. 181-6, Doc. No. 181-10.

On July 7, 2015, following the successful surgery, Ms. Dorland posted a letter (the "Dorland Letter") that she wrote to the final recipient of her donation chain to her private group. SUMF Nos. 3-4; Amadei Aff., ¶ 6; Ex. C, Doc. No. 181-3.  In this deeply personal letter, which was in fact sent to its intended recipient, Ms. Dorland introduced herself as the donor who started their chain, which resulted in the final recipient coming off the transplant list, shared intimate details about her own experiences, her earnest motivations for the donation, as well as heartfelt words of support for the recipient. SUMF No. 3; Amadei Aff., ¶ 6, Ex. C; ¶ 45, Ex. PP at pp. 127-139, Doc. No. 181-3; 182-16.

Ms. Larson was so inspired by Ms. Dorland that, in her story, Ms. Larson included a donor letter received by her fictional protagonist.  See Amadei Aff., ¶ 4, Ex. A, p. 2-3, Doc. No. 181-1.  This letter, however, was not just any letter, but a nearly exact replica of Ms. Dorland's Letter. Id. at ¶ 4, Ex. A, p. 2; ¶ 6, Ex. C, Doc. No. 181-1, Doc. No. 181-3.  Ms. Larson, a

---

[1] See https://www.kidney.org/transplantation/livingdonors/incompatiblebloodtype (last accessed Oct. 27, 2022)

professional writer, could have written an original, equally emotional, letter. She did not. The fictional kidney donor was first named "Dawn Rothario," an obvious reference to Ms. Dorland. Id. at ¶ 4, Ex. A, p. 2-3, Doc. No. 181-1.

Ms. Larson continued to develop her story, and at the end of 2015, she received the opportunity to contribute her work for publication to Audible. SUMF Nos. 5, 7; Amadei Aff., ¶¶ 9-10; Exs. F & G, Doc. No. 181-6, Doc. No. 181-7. Ms. Larson's story was finished in late 2015, and bore the title *The Kindest*. SUMF No 7; Amadei Aff., ¶ 9-10, Exs. F&G Doc. No. 181-6, Doc. No. 181-7. The finished version contained the Dorland Letter; Ms. Larson was simply unable to resist copying Ms. Dorland's Letter, confiding to her friends, "I've tried to change it but I can't seem to-- that letter was just too damn good." SUMF Nos. 6, 8, 9; Amadei Aff., ¶ 13, Ex. J, Doc. No. 181-10. *The Kindest* was thereafter recorded as an audiobook and published on Audible and in other locations. SUMF No. 8; Amadei Aff., ¶ 49, Ex. TT, Doc. No. 182-20.

Ms. Dorland, still unaware that her letter had been published in audio format, contacted Ms. Larson on June 30, 2016, after hearing that Ms. Larson wrote a kidney donation story and asked to read it. SUMF No. 12; Amadei Aff., ¶ 17, Ex. N, Doc. No. 181-14. Ms. Larson responded to Ms. Dorland and admitted that she "was partially inspired by how [her] imagination took off after learning of Ms. Dorland's tremendous donation," but denied her request to read it ("I'm still working on the story and don't feel quite ready to show the full thing to people," which was a lie, since Audible had recorded *The Kindest* at this point). SUMF Nos. 11, 12; Amadei Aff., ¶ 17, Ex. N, Doc. No. 181-14. Ms. Dorland shared that she was surprised and hurt that Ms. Larson (who Ms. Dorland still considered a friend) would write a story, inspired by Ms. Dorland, but not tell her or provide support to Ms. Dorland in her own donation. Id. After a

series of further emails, Ms. Larson and Ms. Dorland appeared to make amends.  Id.

Meanwhile, Ms. Larson continued to seek opportunities to publish *The Kindest*.  SUMF Nos. 13, 20; Amadei Aff., ¶¶ 12, 23, Ex. I, T, Doc. No. 181-9, Doc. No. 181-20.  Notably, in the summer of 2017, *The Kindest* was selected by American Short Fiction ("ASF") for publication in print in their Emerging Writers' issue.  SUMF No. 13; Amadei Aff., ¶¶ 23, 54, Exs. T, YY, Doc. No. 181-20, Doc. No. 182-25.  ASF also published and featured *The Kindest* on its website in May 2018.  SUMF No. 14; Amadei Aff., ¶ 23, 27; Exs. T & X, Doc. No. 181-20, Doc. No. 181-24.

In 2018, Ms. Larson submitted *The Kindest* to the Boston Book Festival ("BBF") for its One City One Story competition ("1C1S"), whose selection allowed the story to be featured in print throughout Boston and receive special recognition at the Boston Book Festival.  Doc. No. 91, Am. Compl., ¶¶ 32-34. *The Kindest* was selected as the winner in May 2018.  Id., SUMF No. 20; Amadei Aff., ¶ 46, Ex. QQ at 177:20-178:4. Doc. No. 182-17.

Ms. Dorland came across the online version of *The Kindest* posted by ASF in June 2018.  SUMF No. 15; Amadei Aff. ¶ 29, Ex. Z, Doc. 181-26.  She immediately recognized the letter in *The Kindest* as her own.  SUMF No. 16; Amadei Aff. ¶ 29, 46, Exs. Z, QQ, Doc. No. 181-26; Doc. No. 182-17.  Ms. Dorland moved quickly in efforts to protect her rights and reached out to ASF to express her valid concerns.  SUMF No. 19; Amadei Aff. ¶ 29, Ex. Z, Doc. No. 181-26.  Ms. Dorland also learned around this time that *The Kindest* had been selected for the 1C1S.  SUMF No 20; Amadei Aff. ¶ 46, Ex. QQ at 73:13-21, Doc. No. 182-17.  Ms. Dorland also reached out to the BBF. SUMF No. 21; Amadei Aff. ¶¶ 30, 31; Exs. AA, BB, Doc. No. 182-1, Doc. No. 182-2.

Both ASF and BBF conducted their own investigations.  Amadei Aff., ¶¶ 29, 31, Exs.

BB, Z, Doc. No. 181-26, Doc. No. 182-2.  As a result of their investigations, ASF, with consent

from Ms. Larson, removed *The Kindest* from the website, and the BBF ultimately canceled 1C1S

for that year.  Amadei Aff., ¶ 29, 34, Exs. Z (at p. 22), EE, Doc. No. 181-26; Doc. No. 182-5.

Undeterred, perhaps even more determined, Ms. Larson continued to seek publication of

*The Kindest*, and indeed, despite all the fallout from the summer of 2018, published the story in

an anthology titled *Welcome to the Neighborhood*, which published in 2019.  Amadei Aff., ¶ 43,

Ex. NN, Doc. No. 182-14.  Ms. Larson registered the version of *The Kindest* that appeared in

*Welcome to the Neighborhood* at the United States Copyright Office. Id., see also, Doc. No. 91, ¶

44.

Ms. Larson—whose theft of Ms. Dorland's Letter is the impetus of this dispute—initiated

this action against Ms. Dorland on January 30, 2019, seeking declaratory relief of non-

infringement of copyright and damages for intentional interference and defamation.  Ms. Dorland

asserted a copyright infringement counterclaim against Ms. Dorland, seeking damages,

injunctive, and declaratory relief.  Ms. Dorland now moves for summary judgment on all claims.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Comerica Bank & Tr., N.A. v. Habib, 433 F. Supp. 3d 79, 88 (D. Mass. 2020) (quoting Fed. R.

Civ. P. 56(a)).  Once a party has properly supported its motion for summary judgment, the

burden shifts to the non-moving party, who may not rest on mere allegations or denials of his

pleading, but must set forth specific facts showing there is a genuine issue for trial.  See Barbour

v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986)).

The Court is "obliged to [ ] view the record in the light most favorable to the nonmoving

party, and to draw all reasonable inferences in the nonmoving party's favor." <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." <u>Prescott v. Higgins</u>, 538 F.3d 32, 39 (1st Cir. 2008) (quoting <u>Medina–Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990)). A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

## IV.    ANALYSIS

### A.    Copyright: Counterclaim Counts I-III, Complaint Count VIII

At the center of this dispute is whether Ms. Larson is liable for copyright infringement of Ms. Dorland's Letter. The salient publications of *The Kindest*, and more specifically, the letter contained therein, presented in this action are: (1) the 2015-2016 Audible/Brilliance audio recordings ("Audible/Brilliance Version"; <u>see</u> Doc. No. 96-4; <u>see also</u>, Amadei Aff., ¶ 49, Ex. TT, Doc. No. 182-20; (2) the 2017 publication in American Short Fiction ("ASF Version"; <u>see</u> Doc. No. 96-3); and (3) the version that was registered at the U.S. Copyright Office ("Registered Version"; <u>see</u> Doc. No. 91-6), and subsequently published in the Welcome to the Neighborhood anthology.

As detailed below, Ms. Larson is liable for copyright infringement of the Dorland Letter in all versions of *The Kindest*, including but not limited to the Audible/Brilliance Version, the ASF Version, and the Registered Version, and accordingly, this Court should grant Ms. Dorland's Motion for Summary Judgment as to Counterclaim Counts I-III. Further in this regard, Ms. Larson's Count VIII, seeking a declaratory judgment as to entitlement to the copyright of *The Kindest* and non-infringement of copyright, should be dismissed. ***For purposes of this Motion, Ms. Dorland is moving as to liability only, and will prove damages after***

***liability is determined.***

    1.    <u>Ms. Larson is liable for copyright infringement of Ms. Dorland's Letter</u>.

To succeed on a copyright infringement claim a plaintiff must demonstrate "(1)

ownership of a valid copyright, and (2) copying of constituent elements of the work that are

original." <u>Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC</u>, 560 F.3d 53, 58 (1st Cir. 2009)

(quoting <u>Feist Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361, 111 S.Ct. 1282, 113

L.Ed.2d 358 (1991)).

    a.    Ms. Dorland owns a valid copyright to the Dorland Letter

With respect to the first requirement, Ms. Larson has not disputed Ms. Dorland's

copyright to the Dorland Letter. <u>See</u>, Feb. 2, 2021 Order, Doc. No. 99 ("Here, Larson does not

dispute Dorland's copyright to the Dorland Letter and thus the question of infringement is

reduced to whether Dorland has adequately alleged the second step of the <u>Feist</u> test, 'copying of

constituent elements of the work that are original.'").

    b.    Ms. Larson copied the Dorland Letter in *The Kindest*.

    (1)    Ms. Larson admits to copying the Dorland Letter

The analysis of whether copying of an original work occurred is itself a two-part test.

<u>Feist</u>, 499 U.S. 340, 361 (1991). "Plagiarists rarely work in the open and direct proof of actual

copying is seldom available. To fill that void, the plaintiff may satisfy [her] obligation indirectly

by adducing evidence that the alleged infringer enjoyed access to the copyrighted work and that

a sufficient degree of similarity exists between the copyrighted work and the allegedly infringing

work to give rise to an inference of actual copying." <u>Johnson v. Gordon</u>, 409 F.3d 12, 18 (1st

Cir. 2005). In this case, however, one need not to draw an inference of copying; Ms. Larson has

made several admissions concerning her use of the Dorland Letter. SUMF No. 6; Amadei Aff.,

¶¶ 9, 13, 42, 47, Exs. F, J, MM, RR, Doc. Nos. 181-6, 181-10, 182-13, 182-18 at pp. 55, 115,

122. Further, the later versions of *The Kindest*, all of which bear more than a passing similarity to the Dorland Letter, are therefore also infected with infringement.

The first-step burden of showing access to the copyrighted work may be satisfied by either direct or circumstantial evidence. Johnson, 409 F.3d at 18. In this regard, it is not disputed that Ms. Larson had access to and viewed the Dorland Letter, which Ms. Dorland posted on her private Facebook group. SUMF No. 3; Amadei Aff., ¶¶ 6, 41, Exs. C, LL, Doc. No. 181-3, 182-12 at 5. Ms. Larson cannot deny having had access to the original work.

Ms. Larson further admitted that after completing *The Kindest*, she "felt nervous about sending it out because it literally has sentences that [she] ***verbatim grabbed from Dawn's letter on FB***." Amadei Aff., ¶ 13, Ex. J, Doc. No. 181-10 (emphasis added). In this same conversation, Ms. Larson further claimed that she "tried to change [the letter] but I can't seem to—that letter was just too damn good." Id. See also, Ex. UU, Doc. No. 182-21. Given the facts and admissions above, there is no doubt that Ms. Larson actually copied the Dorland Letter.

> (2) The infringing and copyrighted works are substantially similar.

The second step of the analysis to determine whether copying actually occurred requires evidence of "substantial similarity" between the original work and the alleged infringing work. Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 60 (1st Cir. 2000) (quoting Feist, 499 U.S. 340 (1991)). This step is also satisfied. Substantial similarity is measured with an "ordinary observer" test which examines whether an ordinary person would find that the defendant unlawfully appropriated the plaintiff's protectable expression. See Coquico, Inc. v. Rodrigeuz-Miranda, 562 F.3d 62, 67 (1st Cir. 2009) ("Under that metric [of the 'ordinary observer'], the allegedly infringing work will be deemed substantially similar to the allegedly infringed work if an ordinary observer would be disposed to overlook any disparities in the works."); see also,

IvyMedia Corp. v. iLIKEBUS, Inc., 252 F. Supp. 3d 34, 38 (D. Mass. 2017).

As previously observed, Ms. Larson admitted that she "verbatim grabbed" language from the Dorland Letter.  SUMF No. 6; Amadei Aff. ¶, 13 Ex. J, Doc. No. 181-10.  The word "verbatim" in its ordinary meaning means "in the exact words" or "word for word."[2]  Indeed, a comparison of the Dorland Letter to the Audible/Brilliance Version, ASF Version, and the Registered Version shows Ms. Larson used significant and meaningful passages concerning the donor's motivations to donate and the intent of the letter, in addition to copying the same structure and composition of the Dorland Letter.  See Amadei Aff., ¶¶ 51, 52, 53, Ex. VV, WW, XX, Doc. Nos. 182-22, 182-23, 182-24.

Ms. Larson herself had suspicions about whether her copying was "ethical," and accordingly, made superficial changes to the letter in *The Kindest*.  SUMF 10; Amadei Aff., ¶ 18, Ex. O, Doc. No. 181-15.  These cursory revisions, however, still mimicked the exact same style, tone, and structure of the Dorland Letter, where an ordinary observer would still find the letter in *The Kindest* substantially similar to the Dorland Letter.  Tellingly, following legal analysis, the organizers of the Boston Book Festival advised Ms. Larson in 2018 that "Dawn [Dorland] may have a valid claim" and inquired whether Ms. Larson would wish to either "redraft the letter to avoid any resemblance in structure or language to the original; [the Boston Book Festival's lawyer] particularly said that paraphrases (such as the introductory paragraph of each sentence) would need to be avoided" or withdraw from One City/One Story.  SUMF 22; Amadei Aff., ¶ 33, Ex. DD, Doc. No. 182-4 .

    2.    The Registered Version of *The Kindest* Contains a Derivative of the Donor Letter, and is to That Extent, Not Protectable.

A comparison of the Donor Letter and the Registered Version shows that the Registered

---

[2] See, https://www.merriam-webster.com/dictionary/verbatim (last accessed October 26, 2022).

Version infringes Ms. Dorland's copyrighted expression as a derivative work. Of course, Ms. Dorland is not claiming a monopoly over letters from donors; but rather, seeks to protect *her* expression contained within *her* Letter. A derivative work is defined as one "based upon one or more preexisting works, such as a . . ., dramatization, *fictionalization*, motion picture version, sound recording, . . . , or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101 (emphasis added), see also, Campbell v. Acuff-Rose Music, Inc., 510 U.S. 659, 574 n.4 (1994). Dorland's non-fiction letter was wholly copied by Ms. Larson, with only editorial revisions, but still representing Ms. Dorland's original work, the version of the letter in *The Kindest* is a derivative work.

With respect to that preexisting work, any elements that the author of the derivative work borrowed from the underlying work . . . remain protected by the copyrights in the underlying work. Id. Importantly, "the copyright in a derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." 17 U.S.C. § 103(b). Therefore, a copyright holder may bring a suit for unauthorized distribution of an unregistered derivative work so long as the suit is based on elements "borrowed" from a registered underlying work and not on elements original to the derivative work. See Gordon, 409 F.3d at 20; see also, TMTV, Corp. v. Mass Productions, Inc., 645 F.3d 464, 470 (1st Cir. 2011) ("Infringement can occur where—without copying a single line—the later author borrows wholesale the entire backdrop, characters, inter-relationships, genre, and plot design of an earlier work.").

Focusing on the elements of the Dorland Letter that are original expressions, Ms. Larson

is also liable for copyright infringement with the Registered Version. While superficial differences exist between the letter in the copyrighted version of *The Kindest* and the Dorland Letter, the protectable copyrighted expressions are substantially similar and share overlap in style, structure, tone and language. See Amadei Aff. ¶ 53, Ex. XX, Doc. No. 182-24. Trivial modifications are not a defense. TMTV, Corp. v. Mass Productions, Inc., 645 F.3d 464, 471 (1st Cir. 2011) (finding that the addition of new scenes and dialogue, or minor character trait variations did not make for any significant differences between the new work and the original work).

   3. Ms. Larson's Use of the Dorland Letter in *The Kindest* is Not Defensible Fair Use.

  Ms. Larson cannot prove a fair use defense to copyright infringement, and accordingly, summary judgment should be granted in Ms. Dorland's favor. Fair use is an affirmative defense for which its proponent – here, Ms. Larson – bears the burden of proof. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994); see also, Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, 685 F. Supp. 2d 217, 226 (D. Mass. 2010) ("Gregory I") ("Fair use is an affirmative defense, and the burden of proof is on the accused infringer rather than the copyright holder").

  Fair use is a mixed question of law and fact, but a court may properly resolve fair use at the summary judgment stage when no material facts are at issue, and the parties dispute only the ultimate conclusions to be drawn from the admitted facts. See Comerica Bank & Tr., N.A. v. Habib, 433 F. Supp. 3d 79, 92 (D. Mass. 2020) (quoting Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 189 (D. Mass. 2007)). "Fair use is a statutory limitation to the otherwise exclusive rights enjoyed by copyright holders." Monsarrat v. Newman, 28 F.4th 314, 321 (1st Cir. 2022).

  Four factors are considered in assessing a fair use defense: (1) the purpose and character

of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107.  Fair use is evaluated on a case-by-case basis and the factors are weighed "together in light of the purposes of copyright." See Campbell, 510 U.S. 569, 577 (1994); see also, Monsarrat, 28 F.4th at 321 (citing Nunez v. Caribbean Int'l News Corp., 235 F.3d 18, 21 (1st Cir. 2000).

a. Purpose and Character of the Use

In evaluating the "purpose and character of the use," the Court must assess "whether and to what extent the new work is transformative."  Comerica Bank, 433 F. Supp. 3d at 92 (quoting Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994)).  "The enquiry here may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like."  Campbell, 510 U.S. at 579.  The Court must determine whether the new work merely supersedes the objects of the original creation or instead, adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.  Id.  Moreover, the First Circuit has held that "verbatim" copying reflects "minimal intellectual labor and judgment."  Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F. 3d 29, 60 (1st Cir. 2012) ("Gregory II").  "Verbatim" copying may only thus be considered transformative when the copying serves a purpose separate and distinct from the original artistic purpose for which the works were created, such as, news reporting or documentary filmmaking.   Comerica, 433 F. Supp. 3d at 93 (finding that videos of live musical performances served no transformative purpose).

Here, the purpose and character of the use of the letter in *The Kindest* is no different from

the purpose and character of the Dorland Letter. In both instances, the personal letters are written from a kidney donor to a recipient of a kidney, discussing the motivation for donation, and the hopes and dreams of the author. See, e.g., Amadei Aff., ¶¶ 6, 49, Exs. C, TT, Doc. Nos. 181-3, 182-20; see also, Doc. No. 96-3. That the letter in *The Kindest* is encased in a fictional narrative does not "alter the first with new expression, meaning, or message." See Campbell, 510 U.S. at 579. In fact, the letter in *The Kindest* was the same letter composed by Ms. Dorland and was used in the story in the same manner as the use in real life; that is, a personal letter from the organ donor to an organ recipient, for the purpose of sharing the donor's motivations and desire to connect in the shared experience with the recipient of the organ.

        (1)     The Use Of The Letter Is Not Parody, And Thus, Not Transformative Fair Use.

Ms. Larson argues, alternatively, that her use of the Dorland Letter is parody, and thus, fair use. For the purposes of copyright law and the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that prior author's works. See Campbell, 510 U.S. at 580. If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger. Id., 510 U.S. at 580.

Applying these principles to the facts, Ms. Larson's claim that the use of the Dorland Letter is parody must fail. "The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived." Id., 510 U.S. at 582. In this case, no such "parodic character" is perceptible. "What makes for this recognition is quotation of the

original's most distinctive or memorable features, which the parodist can be sure the audience will know." Id., 510 U.S. at 588. Absent knowledge of the Dorland Letter (which had, at the time of Ms. Larson's writing *The Kindest*, been shared only with the few dozen members of Ms. Dorland's private Facebook group) there is no reference point from which any intended parody could be drawn; rather, the letter in *The Kindest* is a direct copying of the Dorland Letter, not to comment on or critique the original work, but to simply reproduce her words in furtherance of the themes contained in Ms. Larson's story.

Moreover, Ms. Larson's own characterizations of *The Kindest* as a story of the "complexities of indebtedness, addiction, love, shame, and race" and the "central aim [ ] to depict a person of color resisting a [W]hite savior narrative" contrast with the character of parody. See, Doc. No. 91, ¶ 18; see also, Campbell, 510 U.S. at 580 (defining parody as "literary or artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule" or "composition in prose or verse in which the characteristic turns of thought and phrase in an author or class of authors are imitated in such a way as to make them appear ridiculous"). There is nothing to suggest Ms. Larson's use of the letter was for "comic effect" or "ridicule" of Ms. Dorland's Letter, outside of those individuals in Ms. Larson's writing group, whose collectively held contempt for Ms. Dorland was only known to them. See Amadei Aff., ¶¶ 19, 50, Exs. P, UU, Doc. Nos. 181-16, 182-21. While indeed, Ms. Larson certainly did ridicule Ms. Dorland during the time that she was drafting *The Kindest*, and elicited ridicule from Ms. Larson's friends, the ridicule was private and understood only between Ms. Larson and her inner circle of friends. There is otherwise no parodic character that is reasonably perceived, nor any indication that the audience for *The Kindest* would understand Ms. Larson's work to be parody of the Dorland Letter. Accordingly, Ms. Larson's use is not a fair use as parody.

Fair use presupposes good faith and fair dealing and one pertinent consideration is whether the user stands to profit from exploitation of the copyrighted material without paying the customary price. Arista Records, LLC v. Doe 3, 604 F.3d 110, 124, citing Harper & Row Publishers, Inc. v. Nation Ents., 471 U.S., at 560. While bad faith is potentially a lesser factor in considering fair use, it has been held that zero consideration of bad faith would be error. See, e.g., Ferdman v. CBS Interactive, Inc., 342 F. Supp. 3d 515 (S.D.N.Y 2018) ("("[W]hile the subfactor pertaining to defendants' good or bad faith must be weighed, and while it was error for the district court not to have fully and explicitly considered it, we find that even if the bad faith subfactor weighs in plaintiffs' favor, the first factor still favors defendants in light of the transformative nature of the secondary use.") citing NXIVM Corp. v. Ross Inst., 364 F.3d 471, 477 (2d Cir. 2004); 4 Nimmer on Copyright § 13.05[A][l][d] ("One frequent factor recognized by courts relevant to the 'character' of the use is the propriety of the defendant's conduct.").

Here, the evidence of Ms. Larson's bad faith in copying the Dorland Letter is overwhelming. Unbeknownst to Ms. Dorland at the time, Ms. Larson and her peer group began ridiculing Ms. Dorland in 2015, with the pattern continuing into at least 2020, if not to the present.[3] For example, in 2016, a writing group member said that "the first draft of the story really was a take-down of Dawn, wasn't it? The character had Dawn's name, and everybody in that workshop immediately recognized Dawn Dorland in the story." Amadei Aff., ¶ 19, Ex. P, Doc. No. 181-16 at p. 1. Ms. Larson mocked Ms. Dorland's organ donation advocacy on

---

[3] As set forth above, supra at p. 15, Ms. Larson's ridicule and mockery of Ms. Dorland does not result in the misappropriation of the letter being deemed a "parody" as a matter of law; to do so would also contradict Ms. Larson's clear statements concerning her intent in writing *The Kindest.* See Amadei Aff., ¶ 55, Ex. ZZ (wherein Ms. Larson stated publicly that her story, and the alleged "white savior narrative" contained therein "has nothing to do with Ms. Dorland's personal story … My piece is fiction. It is not her story… my story has nothing to do with her.")

multiple occasions.  <u>See</u> Amadei Aff., ¶ 50, Ex. UU, Doc. No. 182-21 at Larson P115, P30006.

She also discussed repeatedly her understanding that Ms. Dorland would be unhappy with the

publication of *The Kindest*, and spoke with her peers about how to handle that:  "we'll all ice her

out if she tries to mess with you," (<u>id.</u> at Larson P99) and "you should post [your story] to Grub

Writers of Color because the great thing about that is that if Dawn came after you, they would

draaaag her," to which Ms. Larson responded, "Hmmm, that is actually a really good idea!

Truly!" (<u>id.</u> at Larson P137).  Ms. Larson also contemplated, along with a friend, writing

multiple stories about Ms. Dorland.  (<u>id.</u> at Larson P99).  Ms. Larson further misrepresented to

her peer group, including professional contacts, the nature of her communications with Ms.

Dorland.  For example, in 2018, after the existence of the Brilliance Version was uncovered, Ms.

Larson told her contact at Audible, Yael Goldstein, that she had asked Audible to re-record *The

Kindest* in 2016 because Dawn was "very angry about it.  She seemed to think she had some

ownership over the topic of kidney donation."  <u>Id.</u> at LarsonP300001.  This was not true.  See

Amadei Aff., ¶ 17, Ex. N. Put plainly, Ms. Larson generally engaged in relentless mockery of

Ms. Dorland, before and after Ms. Dorland knew that Ms. Larson had copied her work.  <u>See</u>

Amadei Aff., ¶ 50, Ex. UU, Doc. No. 182-21 at Larson P3000007.

     As further evidence of bad faith, Ms. Larson was dishonest with Ms. Dorland in 2016

concerning the publication of *The Kindest*.  In 2016 correspondence, Ms. Dorland asked to read

the story, but Ms. Larson demurred, stating on July 11, 2016:  "I'm still working on the story and

don't feel quite ready to show the full thing to people, but I'd be happy to send it once it's

finished."  Amadei Aff., ¶ 17, Ex. N, Doc. No. 181-14.  Yet, as of that time*, The Kindest* had

already been recorded for audio publication, and Ms. Larson had sent the story other potential

publishers.  Amadei Aff., ¶¶ 11, 12, Exs. H, I, Doc. Nos. 181-8, 181-9. Through her

misrepresentation, Ms. Larson intentionally misdirected Ms. Dorland, preventing her from discovering the misappropriation in 2016.

b. Nature of the Copyrighted Work

The second fair use factor examines the "nature" of the copyrighted work. The scope of fair use is narrower with respect to unpublished works. Gregory I, 685 F. Supp. 2d at 227. Determining the nature of copyrighted work is a two-factor evaluation: (1) whether the copyrighted work is factual or creative; and (2) whether the copyrighted work has previously been published. See Gregory II, 689 F.3d at 61. The right of first publication encompasses not only the choice of whether to publish at all, but also the choices of when, where, and in what form first to publish a work. Gregory I, 685 F. Supp. 2d at 227.

"This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." Campbell, 510 U.S. at 586. Ms. Dorland's Letter, while a work of non-fiction, contains several creative elements, such as the use of idioms, unique expressions and subjective descriptions, as opposed to a dry recitation of facts. Amadei Aff., ¶ 6, Ex. C, Doc. No. 181-3. "Even within the field of fact works, there are gradations as to the relative proportion of fact and fancy. One may move from sparsely embellished maps and directories to elegantly written biography." Harper & Row Publishers, Inc. v. Nation Ents., 471 U.S. 539, 563 (1985) (citation omitted).

Ms. Larson does not appear to claim that the use of the letter in *The Kindest* is to disseminate the facts of Ms. Dorland's real-life kidney donation. While it is "factual," in that the Dorland Letter conveys some facts that actually occurred in real life, the protectible elements include the artistic expressions and specific word choices, which contribute to the overall style and tone of the letter. Thus, while the Dorland Letter is non-fiction based on the facts of Ms.

Dorland's own experience, its underlying nature is wholly creative.  See Amadei Aff., ¶ 6, Ex. C

(e.g., "My gift, which begat [REDACTED], trails no strings."); see also, Harper & Row, 471

U.S. at 563-64 ("Such use, focusing on the most expressive elements of the work, exceeds that

necessary to disseminate facts.").  Given that the Dorland Letter is a creative expression and was

published (at the time) only to a limited audience on a private Facebook group, this factor weighs

against a finding of fair use.

<blockquote>c.      Amount and Substantiality</blockquote>

"The third factor requires [the Court] to consider the amount and substantiality of the

portion used in relation to the copyrighted work as a whole."  Gregory I, 89 F.3d at 62 (internal

quotation omitted).  The quantity and value of the materials used are evaluated for

reasonableness in relation to the purpose of the copying.  Campbell, 501 U.S. at 586.  "Notably,

the third factor tilts against a finding of fair use when a party copies the most interesting and

moving parts of a work, as well as when more of the original is copied than necessary."

Comerica, 433 F. Supp. 3d at 94 (quoting Harper & Row Publishers, Inc., 471 U.S. 539, 560

(1985)).

This factor, too, weighs against a finding of fair use.  A comparison of the versions of the

letter in The Kindest with the Dorland Letter shows that in all versions of The Kindest, the

essence of the original, and indeed, the "most interesting and moving parts of the work" were

copied wholesale. See Amadei Aff., ¶¶ 51, 52, 53, Exs. VV, WW, XX, Doc. No. 182-22, 182-23,

182-24.

<blockquote>d.      Effect on the Market</blockquote>

The fourth fair use factor is the effect of the use upon the potential market for or value of

the copyrighted work.  Campbell, 510 U.S. at 590; see also, Comerica, 433 F. Supp. 3d at 95.

Often said to be the "single most important element of fair use, the fourth factor directs courts to

consider both (1) the degree of market harm caused by the alleged infringer's actions, and (2) "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original. <u>Id.</u> (citing <u>Gregory I</u>, 689 F.3d at 64); <u>see also</u>, <u>Gregory II</u>, 685 F. Supp. 2d at 228 (giving greater weight to the consideration of deterrence of injurious conduct by others). "The enquiry must take account not only of harm to the original but also of harm to the market for derivative works." <u>Campbell</u>, 510 U.S. at 590.

There are no facts in the record from which Ms. Larson will be able to rely on to show that this factor weighs in favor of finding fair use. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

Where, as here, there is no genuine dispute of material facts that go to fair use, of which Ms. Larson bears the burden, this Court should decide all copyright claims in Ms. Dorland's favor.

**B.      Defamation**

The elements of defamation in Massachusetts are: (1) a statement by defendant concerning the plaintiff made to a third party; (2) the statement had the potential to damage plaintiff's reputation in the community; (3) the defendant was at least negligent in making the statement; and (4) the statement either caused the plaintiff economic loss or is actionable without proof of economic loss." <u>Ravnikar v. Bogojavlensky</u>, 438 Mass. 627, 629-30 (2003). "The lodestar of Massachusetts defamation law is the axiom that truth is an absolute defense to

defamation." Noonan v. Staples, Inc., 707 F. Supp. 2d 85, 90 (D. Mass. 2010). Thus, if a statement is "substantially true," it cannot be defamatory. Id. (citing Reilly v. Assoc. Press, 59 Mass. App. Ct. 764, 770 (2003) ("[W]hen a statement is substantially true, a minor inaccuracy will not support a defamation claim.").

Even if an opinion implies a provably false assertion of fact, that statement will not be actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts. Mullane v. Breaking Media, Inc., 433 F. Supp. 3d 102, 111-12 (D. Mass 2020) (citing Riley v. Harr, 292 F.3d 282, 289 (1st Cir. 2002). A speaker is thus protected from defamation liability if she communicates the non-defamatory facts that undergird her opinion. Id. (quoting Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015); see also, Riley, 292 F.3d at 289 ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.").

Moreover, defendants are protected from defamation liability when the "full factual basis" for the statement is provided, and the statement "cannot reasonably be interpreted to suggest that the author had access to information about plaintiff's claim that was not accessible to others." Mullane, 433 F. Supp. 3d at 112-113 (finding that the defendants' statement is 'speculative' and at most amounts to a personal conclusion about the information presented); see also, Lyons v. Globe Newspaper Co., 415 Mass. 258 (1993) (precluding liability where speaker "clearly indicated to the reasonable reader that the proponent of the expressed opinion engaged in speculation and deduction based on the disclosed facts.").

    1.    Sonya Larson's Defamation Claim

In her Second Amended Complaint, Ms. Larson alleges that Ms. Dorland defamed her by "accusing Larson of plagiarizing" the Dorland Letter. See Compl., Doc. No. 91, ¶ 109. At her deposition, Ms. Larson testified that Ms. Dorland defamed her as follows: "I believe she called me a plagiarist to many people and organizations in my life." See Amadei Aff., ¶ 48, Ex. SS at 220:11-13, Doc. No. 182-19. Ms. Larson then walked through various accounts of situations where Ms. Dorland accused her of plagiarizing Ms. Dorland's letter in Ms. Larson's short story. Id. at 221-225; 235-236; 238. Ms. Larson further testified that Ms. Dorland defamed her when she "suggested" that Ms. Larson had "applied for and received a fellowship to the Breadloaf Writers' conference using plagiarized material." Id. at 279:4-10.

In summary, the only defamatory statements that are at issue in this case include (a) several statements wherein Ms. Dorland used the words "plagiarized," "plagiarist" or "plagiarism", in reference to Ms. Larson and *The Kindest* and (b) communications with Breadloaf, wherein Ms. Dorland "suggested" (according to Ms. Larson) that plagiarized materials were used in an application for a fellowship.

    2.    <u>Ms. Dorland's Statements Were True and Not Defamatory</u>

As Courts have repeatedly recognized, "[t]he lodestar of Massachusetts defamation law is the axiom that truth is an absolute defense to defamation. See <u>Noonan v. Staples, Inc</u>., 707 F.Supp.2d 85, 90 (D. Mass. 2010) (Young, D.J.) citing <u>Taylor v. Swartwout</u>, 445 F.Supp.2d 98, 102 (D. Mass. 2006) (Gorton, D.J.); <u>Massachusetts Sch. Of Law at Andover, Inc. v. Am. Bar Ass'n</u>, 142 F.3d 26, 42 (1st Cir. 2006); Reilly v. Assoc. Press, 59 Mass. App. Ct. 764, 770 (2003) ("when a statement is substantially true, a minor inaccuracy will not support a defamation claim").

Here, the statements at issue (not specifically defined in the Second Amended Complaint)

include statements by Ms. Dorland that Ms. Larson "plagiarized" her work. Taking Ms. Larson's accusations at face-value and without making inquiry into the specific statements made by Ms. Dorland, Ms. Larson's claim fails as a matter of law on the grounds that any statement that Ms. Larson plagiarized Ms. Dorland's work was true. Merriam-Webster defines "plagiarize" as a transitive verb meaning "to steal and pass off (the ideas or words of another) as one's own: use another's production without crediting the source. See, e.g., https://www.merriam-webster.com/dictionary/plagiarize (last visited 10/28/2022).

Ms. Larson has repeatedly to the use of the Dorland Letter in her short story The Kindest. First in 2016, when Ms. Larson texted friends to state:

> I think I'm *DONE* with the kidney story but I feel nervous about sending it out b/c it literally has sentences that I verbatim grabbed from Dawn's letter on FB. I've tried to change it but I can't seem to—that letter was just too damn good. I'm not sure what to do… feeling morally compromised/like a good artist but a shitty person…

See SUMF No. 6; Amadei Aff., Ex. J, Doc. No. 181-6. Next, later in 2016, after Ms. Larson submitted The Kindest for publication with Audible/Plympton, she wrote to her contacts at Audible with concerns about her use of Ms. Dorland's letter:

> I do have one major question, however; one of my stories ("The Kindest") contains a letter sent from one character to another; which includes a couple sentences that I'd excerpted from a real-life letter. I'm now realizing that for ethical reasons I am uncomfortable keeping those lines in, and would very much like to revise them. I know that the story has already been recorded, but is there any way that those few lines might be re-recorded with the new lines?

See SUMF No. 10; Amadei Aff., ¶ 18; Ex. O, Doc. No. 181-15, p. 1. In later communications with her friends, Ms. Larson claimed she "could not remember" if she included lines from the Dorland Letter:

> I def. remember writing down certain phrases from that letter, because I thought it was so weird, and I wouldn't be surprised if I ended up using some, or phrases close to them. That's the shitty party. The problem is I don't know what they are

– I don't have a copy of the letter, and I don't remember.

See Amadei Aff., ¶ 50, Ex. UU, Doc. No. 182-21 at p. 15.  In response to the above statement, Ms. Larson's friend, Whitney Scharer, inquired, "and you can't find the letter?"  Id.  Ms. Larson responded:  "I feel like a COMPLETE idiot, but also super defensive, because Jesus, it's fiction, and people pull language from real life all the time!"  Id.  Similarly, in a conversation with her friend Celeste Ng, wherein Ms. Ng passionately encouraged Ms. Larson not to make any concessions to Ms. Dorland concerning the plagiarism issue, Ms. Larson stated that her "concern" was that "there might be shared language indeed."  See Amadei Aff., ¶ 50, Ex. MM, Doc. No. 182-13 at p. 1-2.  Ms. Larson then went on to say "I do remember it, and I remember jotting down phrases. Am kicking myself now a bit, but trying to remember that she has no case."  Id.

Even without Ms. Larson's statements, the fact that Ms. Larson plagiarized (stole and passed off as her own) Ms. Dorland's letter is clear from the publications themselves.  The first version of the letter that Ms. Dorland saw was the version published by ASF.  SMUF No. 15; Amadei Aff., ¶ 29, 46 Exs. Z and QQ, Doc. No. 181-26; Doc. No. 182-17.  Upon reading the letter in ASF, Ms. Dorland instantly recognized her own letter; it particularly stuck out to Ms. Dorland that, despite the fact that Ms. Larson's short story included a 1:1 kidney donation (e.g., an altruistic donor provided a kidney directly to Ms. Larson's protagonist, rather than the donation being part of a "chain", as was Ms. Dorland's), the letter in Ms. Larson's story referred to a "paired exchange."  At her deposition, Ms. Larson admitted she – to this day – does not know the definition of the term "paired exchange", stating "that phrase is from Dorland's letter." Amadei Aff., ¶ 47, Ex. RR, Doc. No. 182-18 at 30:8-19. In subsequent questioning, Ms. Larson admitted that she still does not know what that phrase means.  Id. at 64:9-23.

Based on not only the clear admissions by Ms. Larson, but also on the similarity of the Dorland Letter to the subsequently-drafted versions of The Kindest which contain letters that closely resemble the Dorland Letter, Ms. Larson did, in fact, "plagiarize" Ms. Dorland's letter, that is: she stole and passed off Ms. Dorland's words as her own, and used Ms. Dorland's production without crediting the source. See, supra, p. 24 (definition of plagiarism).

3.    <u>Ms. Dorland Shared Her Protected Opinions With Relevant Organizations</u>

Massachusetts courts historically and consistently have held that an expression of pure expression is not actionable as defamation. <u>See, e.g.</u>, <u>Saad v. American Diabetes Assoc</u>., 123 F. Supp.3d 175, 177-178. ("Under Massachusetts law, "an expression of 'pure opinion' is not actionable" for defamation. <u>HipSaver, Inc. v. Kiel</u>, 464 Mass. 517, 526 n.11, 984 N.E.2d 755 (2013). Therefore, a statement generally must contain an "objectively verifiable assertion," to be defamatory. <u>See</u> <u>Levinsky's, Inc. v. Wal–Mart Stores Inc</u>., 127 F.3d 122, 127 (1st Cir.1997). "[A] statement cannot be defamatory if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." <u>Piccone v. Bartels</u>, 785 F.3d 766, 771 (1st Cir.2015) (internal quotations omitted)").

Despite the fact that it was and is true that Ms. Larson plagiarized the Dorland Letter, Ms. Dorland was very careful in her language with the various entities she spoke with about this issue and did not make absolute statements. As reflected herein, the statements made by Ms. Dorland were clearly subjective in nature – and she conceded as much in those communications. For example, when communicating with ASF about her concerns over plagiarism, Ms. Dorland said the following:

> BUT HERE'S THE PROBLEM: My friend's kidney story, "The Kindest,"
> includes a letter from a donor to her recipient. I believe that the letter in Sonya's

story plagiarizes the letter that I wrote to the final recipient in my short kidney chain, a letter to which Sonya had access as a member of a private friends-and-family Facebook group where I shared updates and information about my donation.

Another writer's appropriation of my personal kidney story, fictionally, is one kind of debate; another writer's use of a text that I authored is, to my mind, however, a serious issue. _I will forward you my own kidney letter as a separate email attachment for your comparison.

If you agree that the letter in Sonya's story bears a problematic resemblance to the one that I composed and shared with her privately ….

SUMF No. 19; Amadei Aff., ¶ 29, Ex. Z, Doc. No. 181-26 at p. 4-5. Where Ms. Dorland made

clear that it was her "belief" that Ms. Larson had plagiarized the Dorland Letter, and she invited

ASF to reach its own conclusion through a comparison of the texts, it is clear that she was

expressing an opinion, rather than an absolute fact. Similarly, in her correspondence with the

BBF, Ms. Dorland introduced her concerns to that entity by forwarding the correspondence with

ASF, with the following preamble:

As I explained on the phone, in a separate email I will forward my personal writing – a letter to the final recipient in my own kidney chain, written in 2015, to which the author of The Kindest had access—on which the donor-recipient letter in Ms. Larson's story is clearly based.

Id. Similarly, in her communications with Breadloaf, Ms. Dorland was equivocal in her

language, seeking information rather than making absolute statements. In her initial June 7,

2018 correspondence with Breadloaf, Ms. Dorland used the subject line "Possible plagiarism in

Tuition Fellows' 2017 application". In her email, she stated: "It has come to my attention that

one of your 2017 fellows **might have** applied for and secured her fellowship on the basis of

writing that plagiarizes my unpublished work." See Amadei Aff. ¶ 32, Ex. CC, Doc. No. 182-3

(emphasis supplied). Despite Ms. Larson's allegations, Ms. Dorland did not **state** that Ms.

Larson used The Kindest in her application, but rather she **asked** Breadloaf if that was the case.

Id.

4.     Ms. Larson's Copying, Rather than Ms. Dorland's Communications, Caused Ms. Larson's Damages.

Where Ms. Dorland communicated only truthful statements, and Ms. Larson has admitted to using verbatim portions of the Dorland Letter, Ms. Dorland did not cause any reputational harm to Ms. Larson.  Ms. Larson's reputation was harmed when Ms. Larson chose to copy the work of another into *The Kindest*, without attribution.  Ms. Larson has heard this before:  In 2018, after the BBF canceled 1C1S, Debbie Porter of the BBF wrote to Ms. Larson and stated: "Just in case no one has said this to you, you should never have submitted a story to us that had a plagiarism claim against it and then continued to withhold that information from us when we picked the story.  It seems to me that we have grounds to sue you for reimbursement of the $10,000 we have sunk into printing "The Kindest" plus legal fees."  See Amadei Aff, ¶ 37, Ex. HH, Doc. No. 182-8 at p. 2.  Accordingly, there can be no liability assigned to Ms. Dorland on defamation grounds..

### C.     Intentional Interference with Advantageous Business Relationship with ASF (SAC Count I) / BBF (SAC Count II)

1.     Elements of the Action

To show intentional interference with advantageous business relations, a plaintiff must establish that (1) she had a business relationship for economic benefit with a third party; (2) the defendants knew of the relationship; (3) the defendants interfered with the relationship through improper motive of means and (4) the plaintiff's loss of advantage resulted directly from the defendant's conduct.  Rapid Pharmaceuticals AG v. Kachroo, 180 F. Supp. 3d 96, 104 (D. Mass. 2015) (citation omitted).

2.  The Record Is Silent on Improper Means or Motive

Both intentional interference claims against Ms. Dorland must be dismissed, where no reasonable jury could find any evidence of improper motive or improper means.  Interference

alone is not enough to support liability; the interference must also be proven wrongful by some measure.  Mass Cash Register, Inc. v. Comtrex Systems Corp., 901 F. Supp. 404, 422 (D. Mass. 1995) (citations omitted).  It is essential to this cause of action that the defendant acted without lawful cause.  Id.; see also, Restatement (3d) Torts § 18 ("the defendant's conduct must have been wrongful in some way recognized elsewhere by the law").  A mere allegation of purported improper conduct will not defeat a motion for summary judgment.  Mass Cash, 901 F. Supp. at 422.  Improper conduct may exist if a party used threats, misrepresented any facts or defamed anyone in the course of the interference.  Kahalas v. Schiller, 164 F. Supp. 3d 241, 246 (D. Mass. 2016).  None of that is present here.

A party is justified in interfering with another's advantageous business relations by filing a lawsuit in a good faith effort to assert legally protected rights.  G.S. Enter., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 273 (1991); see also, Black Dog Tavern Co., Inc. v. Hall, 823 F. Supp. 48, 60 (D. Mass. 1993) (declining to enter summary judgment on intentional interference with advantageous business relationship claim absent evidence of bad faith); see also Restatement (Second) Torts § 773 (asserting in good faith or threatening in good faith to protect a legally protected interest is not improper interference if the actor believes that her interest may otherwise be impaired or destroyed by the performance of the contract or transaction). The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  Celotex, 477 U.S. at 323 (1986).

Ms. Larson alleges that Ms. Dorland interfered with her business relations with ASF when Ms. Dorland "contacted ASF and accused Larson of 'plagiarizing' her 2015 Factual Letter by using it in *The Kindest*."  Doc. No. 91, ¶ 64.  Ms. Larson deemed the manner in which Ms.

Dorland was acting as "aggressive and coercive" and therefore, "malicious and/or improper in method or means." Id., ¶ 66. These allegations find no support in the record, and accordingly, this claim must be dismissed.

Indeed, Ms. Dorland admits that she reached out to ASF to notify them of her honestly held and factually true belief that Ms. Larson had copied the Dorland Letter, which inspired and was used in *The Kindest*. As set forth in the above analysis of copyright infringement Ms. Larson herself admitted that she had copied the Dorland Letter. Supra, at p.10. Further, evidence in the record shows that Ms. Dorland's communications with ASF were limited in quantity and restrained in tone. See Amadei Aff., ¶ 29, Ex. Z, Doc. No. 181-26. Based on these emails in the record, where Ms. Dorland and ASF are corresponding in what can only be described as a cordial and professional, albeit urgent, manner, there is no evidence that ASF perceived these emails as coercive or aggressive. Also relevant to ASF's response to Ms. Dorland's allegations: Ms. Larson consented to the sunsetting of the article from the website. Amadei Aff., ¶ 34, Ex. EE, Doc. No. 182-5.

Likewise, Ms. Larson's claim of intentional interference with her business relationship with the BBF must also fail. Here, too, the record does not support any finding that Ms. Dorland acted with the requisite "improper means or motive" in reaching out to the BBF to assert in good faith her legally protectable interests. See Restatement (Second) Torts, § 773. Specifically, Ms. Larson alleges "Dorland and her agents, servants and attorneys contacted the BBF and frequently made unsupportable claims against the BBF for possible copyright infringement, as well as claims for Statutory Damages and attorneys fees under the Copyright Act," again allegedly "deploying aggressive and coercive correspondence with the BBF without just cause," "threaten the BBF," "grossly misrepresent facts," and "make unwarranted demands." Doc. No. 91, ¶¶ 72-

73, 75.  There is, however, nothing in the record to support that Ms. Dorland's actions were

anything but reasonable when asserting her legally protectable rights.

Beginning on or around June 4, 2018, Ms. Dorland reached out to the BBF to alert them

of her belief that Ms. Larson had plagiarized the Dorland Letter in *The Kindest*, which had been

selected for the BBF's 2018 1C1S.  Amadei Aff., ¶¶ 30, 31, Ex. AA, BB, Doc. Nos. 182-1, 182-

2.  Following the initial email, the BBF and Ms. Dorland attempted to connect by telephone, but

apparently were unable; follow-up email communications were exchanged between the BBF and

Ms. Dorland. Id.  The BBF informed Ms. Dorland that they would "give it the serious

consideration it deserves" and proceeded to conduct their own investigation. Id. at 4. As a result

of their review, the BBF—at the advice of their own counsel—requested that Ms. Larson either

rewrite the letter in its entirety, or withdraw from the 1C1S. Amadei Aff., ¶ 33, Ex. DD, Doc.

No. 182-4.  Ms. Larson elected to rewrite the letter.  Id.  Indeed, when Ms. Dorland first raised

her claim with the BBF, the BBF appeared inclined to proceed with publishing *The Kindest*, and

by way of compromise, offering Ms. Dorland a credit at the end of the story.  Nothing set forth in

the follow-up email communications suggests any improper motive or means.

## V.  Conclusion

Based on the foregoing, Ms. Dorland requests that the Court dismiss all claims

brought by Sonya Larson against Ms. Dorland (request for declaratory judgment, defamation and

intentional interference with advantageous business relations), and find in favor of Ms. Dorland

liability for her copyright claims.

Dawn Dorland Perry

By Her Attorney,

PARTRIDGE SNOW & HAHN LLP

/s/Suzanne M. Elovecky
Suzanne M. Elovecky (BBO# 670047)
Hannah Y. Amadei (BBO# 710509)
30 Federal Street
Boston, MA  02110
(617) 292-7900
(617) 292-7910 FAX
selovecky@psh.com
hamadei@psh.com

DATED:       October 28, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of October 2022, this document was filed
and served through the ECF system and sent electronically to the registered participants as
identified on the Notice of Electronic Filing (NEF).

/s/ Hannah Y. Amadei
Hannah Y. Amadei (BBO #710509)

4346650.5/30402-2