UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONYA LARSON<br><br>Plaintiff,<br>v.<br><br>DAWN DORLAND PERRY, et al.<br><br>Defendants. | Civil Action<br><br>No. 1:19-cv-10203-IT |

**MEMORANDUM IN SUPPORT OF THE MOTION OF
PLAINTIFF-THIRD PARTY DEFENDANT, SONYA LARSON
FOR PARTIAL SUMMARY JUDGMENT AGAINST
DAWN DORLAND PERRY, DEFENDANT-PLAINTIFF IN COUNTERCLAIM ON**

December 8, 2022

Respectfully submitted,
Plaintiff, Third-Party Defendant,
Sonya Larson,

By her attorneys,
*/s/ Andrew D. Epstein*

Andrew D. Epstein, BBO No.155140
photolaw@aol.com
Barker, Epstein, & Loscocco
176 Federal Street
Boston, MA 02110
(617) 272-5700

## Table of Contents

I.      **Preliminary Statement of Facts.**                                          1

    A.      Larson's story is about the meeting between a poor          1
Chinese-American woman who receives a kidney from a wealthy
white woman.  Dorland's Facebook letter was written to a woman
who received a kidney in a chain of events started by Dorland.

    B.      Dorland wrote a short letter to the final recipient in the     2
kidney chain she started.

    C.      Dorland read Larson's story for the first time in June 2018,   3
and accused Larson of plagiarism and raised "ethical issues"
with American Short Fiction

II.     **Standard of Review; Copyright defenses, side by side analysis.**      3

III.    **Additional Statement of Material Facts.**                             5

    A.      Larson has written five slightly different variations          5
of *The Kindest*.

    B.      Almost immediately after Dorland first read *The Kindest* in    6
June 2018, she contacted ASF to make her plagiarism allegations and
raise what she calls her "ethical issues."

    C.      Dorland refused to deal directly with Larson, continued to     8
pressure ASF to "pull" *The Kindest*, and hired legal counsel.

    D.      Dorland learned that *The Kindest* won a contest sponsored      10
by the BBF, and she relentlessly pressured the BBF to address her
ethical issues while leaving the Cohen Defendants to deal with
copyright issues.

    E.      Dorland set out to damage Larson's reputation within the       10
writing community by contacting writer's conferences, publishers and
Larson's employer.

    F.      The BBF asked Larson to modify the letter portion of her story, 11
which she did.

**IV.**   **Argument.**                                                                       18

    A.   Dorland Intentionally Interfered with Larson's Advantageous      18
Business Relations.

    B.   In Massachusetts, all libel is actionable per se, if it prejudices or   21
tends to prejudice a plaintiff among a considerable and respectable class
of people.

    C.   Larson made a fair use under 17 U.S.C. § 107 of the Dorland Letter   24
in the first four (4) variants of *The Kindest*.

        (1)  Purpose and Character of Use                                     24

        (2)  Nature of Copyrighted Work                                      27

        (3)  Amount and Substantiality of Work Used                          28

        (4)  Effect on Potential Marked or Value of Work                     29

        (5)  Larson made a fair use of the Dorland Letter                    29

    D.   Side-by-side comparison of the Dorland Letter and the final version of   29
*The Kindest.*

**V.**   **Conclusion.**                                                                     30

## Table of Authorities

### Cases

Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith, 11 F.4th 26, 51
(2d Cir. 2021), cert. granted, 212 L. Ed. 2d 402, 142 S. Ct. 1412 (2022)     26

Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 100 (2d Cir. 2014)     28

Bassichis v. Flores, 490 Mass. 143 (2022)     1

Biswas v. Rouen, No. 18-CV-9685 (RA), 2019 WL 5260821, at *3
(S.D.N.Y. Oct. 16, 2019), aff'd, 808 F. App'x 53 (2d Cir. 2020)     7

Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579,
114 S. Ct. 1164, 1171 (1994)     25, 28

Cariou v. Prince, 714 F.3d 694, 708 (2d Cir. 2013)     27

Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132, 143,
note 9 (2d Cir. 1998))     30

Cavicchi v. Koski, 67 Mass. App. Ct. 654, 657–58 (2006)     18, 20

CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc., 97 F.3d 1504,
(1st Cir. 1996)     5

Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600,
(1st Cir. 1988)     4-5

Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361,
111 S.Ct. 1282 (1991)).     4

Google LLC v. Oracle Am., Inc., 141 S.Ct. 1183, 1197 (2021).     26

Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539,
105 S. Ct. 2218, 2233 (1985)     26

Hamann v. Carpenter, 937 F.3d 86, 93 (1st Cir. 2019))     18

James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co., 112 F.3d 1240
(1st Cir.1997)     21

Johnson v. Gordon, 409 F.3d 12, 19 (1st Cir. 2005)     5, 13, 19

Kahalas v. Schiller, 164 F. Supp. 3d 241, 246 (D. Mass. 2016)                    21

Latin Am. Music Co. v. Am. Soc. of Composers, Authors                           13, 19
and Publishers, 642 F.3d 87, 89-90 (1st Cir. 2011)

Matthews v. Freedman, 157 F.3d 25, 27 (1st Cir.1998)                             4

McAdoo v. Univ. of N. Carolina at Chapel Hill, 225 N.C. App. 50                  11, note 5
736 S.E.2d 811, 816 (2013)

Monsarrat v. Newman, 28 F.4th 314, 321 (1st Cir. 2022)                           24, 27, 29

N. Jersey Media Grp. Inc. v. Pirro, 74 F. Supp. 3d 605 (S.D.N.Y. 2015)          28

Núñez v. Caribbean Int'l News Corp., 235 F.3d 18, 21 (1st Cir. 2000)            24, 29

Omnipoint Commc'ns MB Operations, LLC v. Town of Lincoln,                        4
107 F.Supp. 2d 108 (D. Mass. 2000)

O'Neil v. Ratajkowski, 563 F. Supp. 3d 112, 129–30 (S.D.N.Y. 2021)             27

Reilly v. Associated Press, 59 Mass. App. Ct. 764, 774 (2003)                   22

Roberts v. Columbia Coll. Chicago, 821 F.3d 855, 864 (7th Cir. 2016)            11 -note 5, 22

Rotbart v. J.R. O'Dwyer Co., Inc., No. 94 Civ.2091(JSM),                         27
1995 WL 46625, at *4 (S.D.N.Y. Feb. 7, 1995)

Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 60 (1st Cir. 2000)          4

Sharratt v. Housing Innovations, Inc., 365 Mass. 141 (1974)                      21, 22

Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory,                        24, 27, 28, 29
689 F.3d 29, 59–60 (1st Cir. 2012)

Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.,                                 27
756 F.3d 73, 83 (2d Cir. 2014).

TMTV, Corp. v. Mass Prods., Inc., 345 F. Supp. 2d 196, 210                       30
(D.P.R. 2004); aff'd, 645 F.3d 464, 470 (1st Cir. 2011)

United States v. Miami Univ., 91 F. Supp. 2d 1132, 1160 (S.D. Ohio 2000),       24
aff'd, 294 F.3d 797 (6th Cir. 2002))

United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990)                      18, 19, 21

Warner Bros. Inc. v. Am. Broad. Co's, Inc., 720 F.2d 231, (2d Cir. 1983)          5

Well–Made Toy Mfg. Corp. v. Goffa Int'l Corp., 354 F.3d 112 (2nd Cir.2003),      30
abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154,
130 S. Ct. 1237 (2010)


**United States Constitution**

Article I, § 8                                                                    25


**Statutes**

Visual Artists Rights Act (17 U.S.C. § 106A)                                      8

17 U.S.C. §301(a)                                                                 7

17 U.S.C. § 412;                                                                  13, 19

17 U.S.C. § 504(c)                                                                8, 13, 20

20 U.S.C. § 1232g (Family Educational Rights and Privacy Act ("FERPA"))          24

20 U.S.C. § 1232g(d).                                                             24


**Other Authorities**

Battle of the Remedies: Copyright v. Plagiarism, Boston University               8
Journal of Science and Technology Law, Summer 2020.

1 Nimmer on Copyright, § 3.01                                                     30

"Who is the Bad Art Friend?" by Robert Kolker, New York Times                     17
Magazine, Sunday,  October 10, 2021.

Fed. Rules of Civil Procedure, Rule 56                                            3

Memorandum in support of the Motion of Sonya Larson ("Larson") for partial summary judgment on liability against Defendant, Dawn Dorland Perry ("Dorland") under Counts I, II and VII of the Second Amended Complaint (Dkt. 91) and on Counts I and II of Dorland's Counterclaims (Dkt. 96).   The parties include Larson, a published writer [See Larson Aff. ¶ 1, attached as Exhibit 1], Dorland, an aspiring writer, and Dorland's prior legal counsel, Cohen Business Law Group, LLC and Atty. Jeffrey A. Cohen.[1]  The dispute involves a short story written by Larson, and a letter Dorland composed and posted on Facebook.

## I.   Preliminary Statement of Facts.

A.   Larson's story is about the meeting between a poor Chinese-American woman who receives a kidney from a wealthy white woman.  Dorland's Facebook letter was written to a woman who received a kidney in a chain of events started by Dorland.

Larson wrote a fictional short story called "*The Kindest*," which is about the meeting between a poor alcoholic Chinese-American woman who receives a kidney anonymously from an affluent white kidney donor.  The story was written in five different variations, each of which contains a brief letter about one-third of the way into the tale, through which Larson introduces her kidney donor character to her recipient character. [Larson Aff. ¶ 2]

Dorland is a living kidney donor who donated one of her kidneys on June 24, 2015, to a then unknown recipient.  The surgery took place at the UCLA Medical Center near where Dorland lives.  [Countercl. ¶ 23]  Around the time of her surgery, Dorland started a Facebook

---

[1] Larson believes that Cohen Business Law Group, LLC and Atty. Jeffrey A. Cohen (collectively, the "Cohen Defendants") and Dorland worked in concert with each other to have Larson's short story removed from publication, punish Larson, recover damages and seek other relief.  However, in light of the recent decision in Bassichis v. Flores, 490 Mass. 143 (2022), by the Massachusetts Supreme Judicial Court, the Cohen Defendants appear to be immune from civil liability for conduct undertaken during judicial proceedings, including actions for tortious interference with business relations, bad faith, nefarious motives and breach of the duty of good faith and fair dealing.  See, Stipulation of Dismissal.  [Dkt # 178]

group where she could post information about kidney donations and get support from various members of her group. [Countercl. ¶ 34]  Dorland referred to her Facebook group as "private/closed." [Exhibit 2]

Larson was <u>involuntarily</u> added to the Facebook group by Dorland.  [Larson Aff. ¶ 3] Dorland claims that she and Larson were good friends, but Larson maintains that they were only acquaintances through GrubStreet, a Boston-based writing center where Larson worked for 16 years.  Larson says that she and Dorland were <u>never</u> good friends, <u>never</u> met for meals or drinks, <u>never</u> texted or called one another, and <u>never</u> did any other things that friends typically do with each other.  [Larson Aff. ¶ 4; 2nd Am. Compl. ¶16 (Dkt. 91); Countercl. ¶¶ 8-16 (Dkt. 96)].

Dorland's kidney was given to an unknown person who was not known to Dorland at the time.  [Countercl. ¶ 24]  After her surgery, Dorland learned that her kidney was given to a California Rabbi.  The Rabbi's wife wanted to donate one of her own kidneys to her husband, but she was not a compatible donor.  [Countercl. ¶ 24]  The Rabbi's wife, later determined to be a woman named Debbie Striks, also became a living kidney donor, and she donated one of her kidneys to an unknown recipient.  [Exhibit 3]  The unknown recipient was later determined to be a woman in Oregon.  [Countercl. ¶ 24-5]  This chain of events, known as a kidney chain, included four people, four surgeries and two kidneys.

B.    <u>Dorland wrote a short letter to the final recipient in the kidney chain she started.</u>

Dorland decided she wanted to contact the Oregon woman who was the final recipient in the kidney chain she started.  She wrote a short letter in July 2015, and gave it to a nurse at the UCLA Medical Center with the understanding that it would be sent to the coordinator at the hospital where the Oregon woman received Debbie Striks' kidney. [Countercl. ¶ 49]

On July 7, 2015, Dorland posted the letter to her Facebook group after it was "shared widely around the UCLA Transplant Team." [Exhibit 4 and Countercl. ¶ 55]  Dorland's Facebook letter is hereinafter referred to as the "Dorland Letter.  Dorland's Facebook readers were encouraged "to share my public kidney post." [Exhibit 5]

    C.    <u>Dorland read Larson's story for the first time in June 2018, and accused Larson of plagiarism and raised "ethical issues" with American Short Fiction</u>

In early June 2018, Dorland read the online version of Larson's story that was published by American Short Fiction ("ASF").  After reading the story, Dorland emailed ASF and accused Larson of plagiarism for allegedly using portions of the Dorland Letter in her story.  [Exhibit 6] Dorland asked ASF to withdraw *The Kindest* from publication.  Dorland also claimed she had "ethical issues" with Larson.  Dorland's ethical issues against Larson are central to Dorland's claims that resonate throughout this litigation.  Dorland's plagiarism accusations were ultimately changed to copyright infringement once the Cohen Defendants entered the dispute.

The Dorland Letter contains approximately 381 words.  [See Exhibits 4 and 7 [2].]  Each of the five variations of *The Kindest* contains approximately 5,500 words.  [Larson Aff. ¶ 5]

## II.    Standard of Review; Copyright defenses, side by side analysis.

Under Rule 56, a "District Court shall grant a motion for summary judgment only upon a showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, interrogatories, admissions and affidavits, if any.  A genuine issue of material fact exists if a reasonable juror could return a verdict for the non-moving party.  In deciding cross motions for summary judgment, each cross

---

[2] The Dorland Letter was registered with the U.S. Copyright Office on June 10, 2018 (Reg. No. TXu 20101-420).  The Dorland Letter identifies the Rabbi's wife, Debbie Striks, in two (2) places.  [Exhibit 7]. Dorland's Facebook Letter is identical except it contains a note stating that Dorland previously "shared [the letter] widely around the UCLA transplant team." [Exhibit 4]

motion is viewed independently, and the facts are viewed in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  (Omnipoint Commc'ns MB Operations, LLC v. Town of Lincoln, 107 F.Supp. 2d 108, 116–17 (D. Mass. 2000)).

Larson admits she saw the Dorland Letter [Countercl. ¶ 56-7], and that it and Dorland's kidney donation were part of the inspiration for *The Kindest*.  [Larson Aff. ¶ 6]  Larson denies she plagiarized or infringed the Dorland Letter and maintains she made a transformative fair use of the Dorland Letter in the first four versions of *The Kindest*.  Larson further claims that the fifth and final version of *The Kindest* is so substantially different from the Dorland Letter that it does not infringe it.  Even if this court were to decide that none of Larson's copyright defenses are viable, Dorland still must establish that the copying of the Dorland Letter "was so extensive that it rendered the infringing and copyrighted works 'substantially similar.'" (Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 60 (1st Cir. 2000)) (quoting Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282 (1991)).

A finding of substantial similarity requires an examination of the works as a whole, focusing on "what aspects of the plaintiff's work are protectible under copyright laws and whether whatever copying took place appropriated those [protected] elements." Matthews v. Freedman, 157 F.3d 25, 27 (1st Cir.1998).  After all, "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected.  Originality remains the *sine qua non* of copyright...." Feist, 499 U.S. at 348.

In assessing whether substantial similarity exists, an overall impression of similarity may not be enough.  See Matthews, 157 F.3d at 27.  If such an impression flows from similarities as to elements that are not themselves copyrightable, it will not satisfy the predicate requirement of originality necessary to ground a finding of actionable copying.  Id.; See also, Concrete Mach.

4

Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 608-9 (1st Cir. 1988), and Johnson v. Gordon, 409 F.3d 12, 19 (1st Cir. 2005).

When Larson was writing *The Kindest*, she found numerous sample letters online from organ donors to organ recipients, which she used for reference.  The sample letters contain information similar to that used by Dorland in her letter.  [Larson Aff. ¶ 7 and sample letters at Exhibit 8.]  CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc., 97 F.3d 1504, 1522 (1st Cir. 1996) (defendant radio station copied the ideas underlying plaintiff's radio promotion, and any similarities arise from uncopyrightable elements, "thus barring protection under the "merger" and "*scènes à faire*" doctrines.

Additionally, a side-by-side comparison of the Dorland Letter, particularly with the letter in the final version of *The Kindest*, will establish as a matter of law that there is no similarity between the two works.  For example, anyone receiving a letter from a total stranger who purports to be the donor of a life-saving kidney, would expect that person to identify themselves. This is just what both Dorland and Larson did in their letters.  No reasonable jury, properly instructed, could find that this similarity is substantial enough to constitute copyright infringement.  Warner Bros. Inc. v. Am. Broad. Co's, Inc., 720 F.2d 231, 240 (2d Cir. 1983).

**III.     Additional Statement of Material Facts**

A.     Larson has written five slightly different variations of *The Kindest*.

Larson has written five slightly different variations of *The Kindest*, each of which reflects Larson's writing process in which she regularly edits her stories to improve the language, tone, and flow of the prose.  Each variation includes a short letter about one-third of the way into the story in which the wealthy white kidney donor character, Rose, is introduced to the poor, alcoholic Chinese-American kidney recipient and protagonist, Chuntao.  [Larson Aff. ¶ 8]

The different variations of *The Kindest* include the following:  (Larson Aff. ¶ 9)

(1)    Brilliance Audio – This was an early draft of *The Kindest* that was sent to a literary agency known as Plympton, Inc., for the limited purpose of seeing if Plympton could sublicense the audiobook rights to Audible.com. (See, Exhibit 9, Section 2.)  Plympton was successful in sublicensing the audio rights to Audible.com.

By mistake, and without Larson's knowledge or permission, Audible.com recorded and released this early draft as an audio story in August 2016.  As soon as Larson discovered the mistake, she demanded that the story be re-recorded, which it was.  Audible promptly removed the draft version and released the re-recorded version as an audiobook in October 2016.  Larson did not know until two years later that marketing giant AMAZON, which owns both Audible.com and Brilliance Audio, had also released the draft version via Brilliance Audio as a print-on-demand CD.[3]  Brilliance never had permission to release any recording of Larson's story. Dorland purchased one of these audio recordings in 2018, after the present dispute started.  [A copy of the letter portion of the Brilliance Audio version, apparently transcribed by the Boston Globe, is attached as Appendix I.] [Dorland asked for, but the Globe refused to share its transcript with Dorland.  See Exhibit 10, email between the Globe and Dorland.]

(2)    Audible.com – The re-recorded Audible.com version of *The Kindest* was published as an audiobook in October 2016.  Larson was paid $125 for the audio rights.  [A copy of the transcribed Audible.com version is attached as Appendix II.]

(3)    American Short Fiction, Inc. ("ASF") – The ASF version was published in print in August 2017 and online in May 2018.   ASF paid Larson $300 for a license to use her story.  [See, Exhibit 11]  [A copy of the ASF version is attached as Appendix III.]

(4)    Boston Book Festival ("BBF") – Competition Version.  In February 2018, Larson entered a slightly revised version of *The Kindest* in a competition sponsored by the Boston Book Festival ("BBF").  The competition was called One City/One Story ("1C/1S").  The text of the letter in the story from Rose to Chuntao is the same as the letter in the ASF version, however the rest of the story contains numerous revisions.  [A copy of the BBF version is attached as Appendix IV.]

(5)    Final Version.  Larson wrote the final version of *The Kindest* in June 2018, at the suggestion of the BBF. This version was written after Dorland contacted the BBF and alleged that *The Kindest* plagiarized the Dorland Letter.  The BBF never published this version, but in December 2019, it was included in a book of short stories called, *Welcome to the Neighborhood*, published by Ohio Univ. Press.  [A copy of the final version is attached as Appendix V.]

B.    Almost immediately after Dorland first read *The Kindest* in June 2018, she contacted ASF to make her plagiarism allegations and raise what she calls her "ethical issues."

---

[3] See, https://www.audible.com/ep/brilliance

Dorland says that she first became aware that *The Kindest* was published in 2016, but she did not read the story until the weekend of June 2-3, 2018. [Countercl. ¶ 87] When Dorland read the story, she claims she saw "similarities" between the Dorland Letter and the letter in the ASF version of *The Kindest*. Rather than confronting Larson with her concerns, she chose to go directly to ASF and accuse Larson of plagiarism. [Exhibit 12; BATES Dorland 00122-3]

On Monday, June 4, 2018, Dorland sent an email to the "Editors" of ASF demanding that Larson's story be pulled from publication, that Dorland be given an acknowledgement for her text in Larson's story, and that ASF consider allowing Dorland to write "an article for ASF raising ethical issues germane to all writers." [Exhibit 12; BATES Dorland 00122-3] Dorland's repeated preoccupation with what she calls her "ethical issues" serves as one basis for the improper methods or means that Dorland and the Cohen Defendants used repeatedly to interfere with Larson's advantageous relationships with both ASF (2nd Am. Compl., Count I (Dkt. #91), and subsequently with the BBF (2nd Am. Compl., Count II) (Dkt #91).

Dorland clearly wanted to benefit from the recognition that Larson was receiving from *The Kindest* and to get recognition for her own kidney donation. As evidenced by Dorland's behavior from the start of this litigation and continuing to date, she also clearly resents the attention that Larson received from her story, and she is seeking retribution.

While plagiarism may have a place in academic settings, there is simply no legal remedy for plagiarism. The closest legal remedy is copyright infringement. See 17 U.S.C. §301(a). (Biswas v. Rouen, No. 18-CV-9685 (RA), 2019 WL 5260821, at *3 (S.D.N.Y. Oct. 16, 2019), aff'd, 808 F. App'x 53 (2d Cir. 2020) ("True plagiarism is an ethical, not a legal offense and is enforceable by academic authorities, not courts…. When a party asserts that it did not

receive proper credit, the claim is in effect, plagiarism, and is cognizable—if at all—only under the Copyright Act.")

Arguably, Dorland may have been justified in contacting ASF for information about Larson's story.  However, Dorland wanted much more than information.  She wanted ASF to pull *The Kindest* from publication, she wanted recognition for her kidney donation, she wanted attribution to the Dorland Letter, and she wanted to write an article for ASF addressing her ethical issues.  [Exhibit 12: specifically BATES: Dorland 00123] ("Remedies I would find acceptable range from ASF's pulling the story to the author making an acknowledgement of my text.  I would also, or in addition, consider writing an article for ASF raising ethical issues germane to all writers. . . . ") Neither recognition nor attribution are available civil remedies under the Copyright Act (§§ 504-505).  Attribution under the Copyright Act is available only for works of visual art under the Visual Artists Rights Act (17 U.S.C. § 106A) but not for textual works.  See also, Battle of the Remedies: Copyright v. Plagiarism, Boston Univ. Journal of Science and Technology Law, Summer 2020, pp. 435-6.[4]

C.   Dorland refused to deal directly with Larson, continued to pressure ASF to "pull" *The Kindest*, and hired legal counsel.

The day after ASF received Dorland's email, Rebecca Markovits, Co-Editor of ASF, told Dorland that she was consulting the magazine's legal advisors.  Dorland responded that she

---

[4] "[C]opyright law does not recognize the attribution right for literary works. . . . "[C]urrently, there is no legal resolution for plagiarism, yet the relevant communities strongly discourage its members from committing plagiarism by not attributing a work or piece of work to its proper source. . . .  For example, a student could be expelled or a professor's employment could be terminated. . . .  [W]hile those accused of copyright infringement are afforded the opportunity to defend themselves in court and could potentially defeat the infringement accusation, those accused of plagiarism must often fight the steep, commonly unsuccessful, battle against public disapproval. . . .  Thus, copyright law should not expand the attribution right to include literary works."

wanted ASF to "pull" the story while ASF was seeking legal advice, and that she too was "in the process of securing legal counsel." [Exhibit 12: <u>specifically</u> BATES: Dorland 00121-2.]

Ms. Markovits told Larson of Dorland's allegations. Larson hired Atty. James Gregorio who conveyed to Dorland via Markovits that he was "happy" to talk with Dorland or her attorney. Dorland pointedly refused to give Ms. Markovits permission to share with Larson or her attorney the emails Dorland sent to ASF. [Exhibit 12: <u>specifically BATES:</u> Dorland00120-21.] Neither Dorland nor her attorney ever reached out to Larson or her attorney about Dorland's plagiarism claims made to ASF. [Larson Aff. ¶ 10]

On June 14, 2018, Ms. Markovits emailed Dorland and said that both lawyers that ASF consulted thought Larson had a fair use defense. Markovits also said she discussed with Larson that "she might rewrite the lines in question and replace those lines in our published version of the story." Markovits asserted that while this matter seemed to be perhaps "a personal betrayal within your friendship," it was "not a matter of publishing ethics." [Exhibit 12: <u>specifically</u> <u>BATES:</u> Dorland00119-20.] ASF told Dorland that ASF was a "tiny operation with a tinier budget," and she encouraged Dorland to address her complaint directly with Larson. [Exhibit 12: <u>specifically</u> BATES; Dorland 00119.]

Dorland then said that "[b]ased on ASF's response to my claim of plagiarism, my attorney and I are pursuing legal remedies." As a direct result of Dorland's intention to pursue her legal remedies, ASF decided to pull *The Kindest* from online publication. [Exhibit 12: <u>specifically</u> BATES: Dorland00118.] [Larson Aff. ¶ 11]

Larson was justifiably proud of having her story published by ASF and, as a writer, she lost a valuable benefit when *The Kindest* was pulled. [Larson Aff. ¶ 12] The benefits were both in readership and intangible as Dorland herself acknowledges. [Exhibit 13] Larson is seeking

damages against Dorland for her intentional interference with Larson's advantageous business relations with ASF, which resulted in ASF pulling the story and causing her damage.

D.      Dorland learned that *The Kindest* won a contest sponsored by the BBF, and she relentlessly pressured the BBF to address her ethical issues while leaving the Cohen Defendants to deal with copyright issues.

In early June 2018, while Dorland was still pressuring ASF to give in to her demands, Dorland apparently noticed on Larson's website that she had won the BBF competition that year. Dorland correctly guessed that Larson won the 1C/1S contest for her short story, *The Kindest*.

Dorland lost little time in contacting the BBF to accuse Larson of plagiarism.  On June 7, 2018, Dorland telephoned the BBF and left a message about her plagiarism allegations and followed up the call with a copy of the same letter she sent to ASF two days earlier.  Dorland continued to make relentless calls and emails to the BBF.  [See Exhibit 14]  In one of her emails Dorland says, "[r]eproducing "The Kindest," which contains portions of another author's work [Dorland's] could have serious legal and ethical consequences."  [Exhibit 15]

As the 1C/1S winner, Larson was due to receive widespread attention for her story throughout Eastern Massachusetts, and she would likely have had numerous press interviews, and would have garnered immeasurable goodwill.  [Larson Aff. ¶ 13]  As the winner of the competition, Larson gave the BBF a license to publish her story during the full term of her copyright.  [See Agreement with BBF at Exhibit 16.]

E.      Dorland set out to damage Larson's reputation within the writing community by contacting writer's conferences, publishers and Larson's employer.

Meanwhile, on June 7, 2018, Dorland launched yet another campaign against Larson, this time accusing her of using plagiarized material for a fellowship application she submitted to the prestigious Bread Loaf Writer's Conference at Middlebury College.  Dorland's campaign started with an email entitled, "Possible Plagiarism in Tuition Fellow's 2017 Application."  [Exhibit 17]

10

Even though Dorland used the word "possible" and did not explicitly name Larson, *The Kindest* was specifically mentioned in the email.  Dorland was obviously trying to discredit Larson in any way she could, calling and emailing Bread Loaf repeatedly with her accusations.  Of course, Larson was identified as the would-be plagiarist in subsequent emails that Dorland sent.  [See selected emails at Exhibit 18.]

While Dorland correctly guessed that Larson won the 1C/1S competition with *The Kindest*, Dorland was simply wrong in guessing that *The Kindest* was submitted as part of Larson's fellowship application to Bread Loaf.  Larson applied for and won the fellowship using other short stories she had written.  [2nd Am. Compl. ¶ 41]  [Larson Aff.¶¶ 14-16]  To compound her error, Dorland also contacted dozens of other programs and individuals in the writing community, asking first if *The Kindest* was part of Larson's application and then identifying Larson by name, as well as alleging that Larson was a plagiarist.  [See, Larson Aff. ¶ 16, identifying over 30 people and writing programs contacted by Dorland.]  These contacts made by Dorland both orally and in writing spread false and malicious claims of plagiarism against Larson, and caused damage to her reputation within the writing community, where these false claims were most damaging.[5]  [Larson Aff. ¶ 17]

     F.     <u>The BBF asked Larson to modify the letter portion of her story, which she did.</u>

---

[5] Several courts have acknowledged that there is no question that an allegation of plagiarism is damaging to a writer.  (<u>Roberts v. Columbia Coll. Chicago</u>, 821 F.3d 855, 864 (7th Cir. 2016)) (plagiarism is considered by most writers, teachers, journalists, scholars, and even members of the general public to be the "<u>capital intellectual crime</u>."  Plagiarism is considered an <u>egregious</u> and <u>serious offense</u>.)  [Emphasis supplied]  <u>McAdoo v. Univ. of N. Carolina at Chapel Hill</u>, 225 N.C. App. 50, 54, 736 S.E.2d 811, 816 (2013) (plagiarism is a "serious <u>academic</u> offense" [Emphasis supplied]

In a series of quickly moving events starting on June 8, 2018, the BBF asked Larson to modify the letter in her story so that it would not resemble the Dorland Letter in any way. Larson complied within days, and on June 13th, sent a revision to the BBF. [Exhibit 19]  This revised story became the final version of *The Kindest* [See Appendix V].  The BBF was satisfied that the revised letter was not at all similar to the Dorland Letter.  [Larson Aff. ¶ 17]

Then, on June 18, 2018, Dorland acknowledged <u>at least</u> twice in emails sent to Rebecca Ostriker, Arts Editor of the Boston Globe and to Norah Piehl of the BBF that after Larson modified the letter in the final version of her story, Dorland's copyright claim was "neutralized." Dorland sent the following email to Norah Piehl:

> I was under the impression that, as a leading literary organization [the BBF] would assume the task, no matter how difficult, of modeling ethical behavior among members of the writing community.  I wouldn't have been surprised if BBF had found it repugnant to grant a writer who committed plagiarism such a wonderful platform.  At the very least, <u>with the legal issue neutralized</u>, I would have expected the organization to acknowledge the remedies it took in order to proceed with the story.  Such an acknowledgment could even – graciously – include naming me, my service, and my work."  [Exhibit 20; BATES: BBF01182, emphasis supplied]

With the copyright claims "neutralized," the only claims that Dorland had against the BBF were her "ethical" concerns.

On June 19, 2018, in an attempt to appease Dorland, the BBF asked Dorland to "propose some text for a brief . . . gracious acknowledgment" which could be published with *The Kindest* that she would find satisfactory to address her ethical issues.  Dorland suggested the following:

> This story appears in an altered form from its first publication in *American Short Fiction*. A section of the story was substantially revised because it bore a clear resemblance to the unpublished work and service of the writer Dawn Dorland, a living kidney donor.  The Boston Book Festival, 1C1S, and the author Sonya Larson express their sincere regrets.

[Exhibit 21]

12

While Norah Piehl of the BBF agreed to consider Dorland's request to provide information about kidney donations on its 1C/1S web page [Exhibit 22 – see mid-page BATES: BBF 01162], "the entire 1C1S selection committee" was "unanimous" that the BBF had fulfilled its "obligations both legally and ethically and that the original wording of the credit line is sufficient for our purposes."  [Exhibit 22; BATES: BBF01161]

On July 2, 2018, after contacting ASF, the BBF, Bread Loaf and many others, Dorland launched a fourth line of attack against Larson by writing to her employer, GrubStreet.  Dorland asked Eve Bridburg, Exec. Director of GrubStreet, to try to persuade Larson to formally apologize to Dorland.  And in a particularly spiteful request, Dorland said she would be "comfortable" if Larson was suspended from GrubStreet "with or without pay."  [Exhibit 23; BATES: DORLAND000344]

The next day, on July 3, 2018, the Cohen Defendants sent a letter to the BBF, escalating Dorland's claim from plagiarism to copyright infringement, and demanding that the BBF stop any further "printing, copying, distribution or other activities related to 'The Kindest' until this matter has been resolved."  The Cohen Defendants further threatened that if the BBF did not comply with its demands, they would seek "the full measure of penalties for statutory copyright infringement under 17 U.S.C. § 504(c), which . . . could be as high as $150,000."  Clearly, the Cohen Defendants and Dorland were working in tandem to intimidate the BBF and Larson. [Exhibit 24]

The Cohen Defendants knew or should have known that in order to recover statutory damages and attorney's fees under the Copyright Act, Dorland would have had to register the copyright to the Dorland Letter before Larson allegedly infringed it. [See § 412; Latin Am. Music Co. v. Am. Soc. of Composers, Authors and Publishers, 642 F.3d 87, 89-90 (1st Cir.

2011)]; See also, Johnson, 409 F.3d at 20.  Dorland did not register the copyright to the Dorland Letter until almost three years after it was first posted on Facebook in 2015, and long after Larson allegedly plagiarizing it.  [Exhibit 7]  Shortly after the July 3, 2018 letter was received by the BBF, the Cohen Defendants were sent a copy of Larson's revised version of *The Kindest* by Paul Sennott, the BBF's attorney.  [Exhibit 25; Gregorio Aff. ¶ 8]

Dorland realized that litigation alone would not fully resolve the dispute she had with Larson.  In her deposition, Dorland admitted that "[t]here are aspects of my dispute with Ms. Larson, with Sonya, that are outside of the jurisdiction of the court."  When asked what concerns were not going to be resolved, she answered, "the ethical aspects of this situation I find myself in with Sonya."  [Exhibit 26 -  Dorland Dep. p. 60, lines 4-22.]  Thus, while the Cohen Defendants pursued Dorland's claims against the BBF for copyright infringement, Dorland relentlessly pursued remedies for her "ethical issues" against the BBF, ASF, and Larson herself.

Sometime in mid-June 2018, Dorland contacted the *Boston Globe* to urge the paper to write an article about her allegations of plagiarism against the BBF and Larson.  On June 20, Graham Ambrose, a reporter from the Globe, contacted Larson for her comments.  [Exhibit 27]

On July 20, 2018, Attorney Michael Hanna, an attorney in the Cohen Defendants law firm, sent a letter to James Gregorio, Larson's attorney.  Atty. Hanna requested that Atty. Gregorio "please contact this office to discuss this matter further, as time is of the essence for all involved.  Otherwise, please stop interfering with our efforts to prevent the further violation of our client's rights."  [Exhibit 28 & Gregorio Aff. ¶ 7]  On July 23, 2018, Atty. Gregorio telephoned Atty. Hanna, now his main contact with the Cohen Defendants, to convey Ms. Larson's general willingness to cooperate with settlement negotiations between Dorland and the BBF.  Atty. Hanna also indicated that Dorland was still taking issue with the revised letter in the

final version of Larson's story, although he could not be specific about her concerns.  Atty. Gregorio asked Atty. Hanna to send the language Dorland still had a problem with, though Hanna never did.  [Gregorio Aff. ¶¶ 7 & 9]  Dorland also had an issue with the changes Larson made to the letter in the final version of her story, but she refused to identify the language, citing the cost of her attorney's time.  [Exhibit 29; Dorland dep p. 2-213]

On July 24, 2018, Atty. Gregorio called Atty. Hanna.  Hanna said that Dorland would no longer be satisfied with the acknowledgement that she herself suggested in writing.  [Exhibit 21] Dorland now wanted an acknowledgement of her contribution to Larson's story, her name cited, language about how to learn more about donating a kidney, a kidney donation website address, and $5,000.  Gregorio told Hanna that there was no point in discussing settlement if there was going to be a negative article in the Globe instigated by Dorland.  Atty. Gregorio recalls Hanna saying; "If we get everything we want, we will give our full effort to kill the story."  [Gregorio Aff.¶ 11] Negotiations went nowhere.

Then, on July 26, 2018, the Globe published an article entitled, "*Inspiration or Plagiarism? Writing Hackles Raised in Boston Dispute*." [Exhibit 30]  The article implicated the BBF and Larson in Dorland's plagiarism/copyright infringement claims and her ethical issues.

About a week later, on August 1, 2018, Atty. Hanna called Atty. Gregorio to ask if Larson and the BBF still wanted to settle.  Atty. Gregorio asked Hanna if he had seen the Globe article.  Hanna said yes.  Gregorio then asked what Dorland wanted.  Hanna replied, the exact same thing as before: $5,000, attribution, and a link to a kidney donation website.  Gregorio said this was unreasonable given the circumstances, but that Larson might consider a mutual release of all claims.  The conversation between attorneys ended.  [Gregorio Aff. ¶ 13]

On Friday, August 3, 2018, Dorland backed off of her settlement demands, claiming she still wanted $5,000, kidney donation language, and reference to a kidney website, but she gave up on her name being included.

On Monday, August 6, 2018, the BBF had 30,000 copies of *The Kindest* printed along with this acknowledgement:

> "The Kindest" originally appeared, in slightly different form, in American Short Fiction, Summer 2017.  To learn more about the national organ shortage, or to help a friend, family member, or stranger in need, visit www.kidneyregistry,org.  [Exhibit 31]

On Friday, August 10, 2018, in a telephone conversation between Atty. Gregorio and Atty. Hanna, Hanna increased Dorland's demand to $10,000, a $1,500 donation to the National Kidney Registry, full name attribution, and a link to a kidney website.  [Gregorio Aff. ¶ 14]

On August 13, 2018, BBF Exec. Director Porter notified Larson that it decided to cancel the 1C/1S event for 2018.  The BBF said it thought Dorland's claims were "baseless," but it could not take Dorland's relentless pressure and legal threats. Porter sent this email to Larson.

> After thinking we had a path towards a solid agreement with Dawn Dorland and feeling that we were out of danger from being sued, her lawyer was back in touch late last week with new demands. There is seemingly no end to this, and we cannot afford to spend any more time or resources at this moment or risk law suits in the future that could affect not only us, but our sponsor for One City One Story. ¶ Sadly for us, we have already printed 30,000 copies of your story using the acknowledgement Dawn and her lawyer had approved (but now want to change.)" [Exhibit 32]

On August 14, 2018, the Boston Globe published another article entitled, *Boston Book Festival Cancels One City One Story Event Amid Plagiarism Flap*. [Exhibit 33]  The Globe article also included side-by-side comparisons of the "unauthorized" Brilliance Audio version of the story that Dorland was able to purchase [Appendix I] and the letter in the ASF version of *The Kindest* [Appendix III].  Not only was the Brilliance Audio version never intended to be published, it was published without any of the added context, such as the daisy-shaped note

16

paper inscribed with a blue gel pen that arrived while Chuntao was home alone, and the racial
dynamics inherent in the story.  Most importantly, the Globe published the Brilliance Audio
version of *The Kindest*, and not the final version of the story that the BBF was going to use in the
1C/1S event.

Then, even after the BBF canceled the 1C/1S event, Atty. Hanna sent yet another letter to
Atty. Gregorio on Sept. 6, 2018, demanding that Larson enter into a "stipulated judgment" for
$180,000, which would be held in escrow to ensure Larson will not violate the terms of a written
settlement agreement that the parties would have to craft; that Larson agree not to violate the
copyright to the Dorland Letter, including an agreement not to write anything derivative thereof;
and pay actual legal expenses of $15,000.  [Exhibit 34]  [Gregorio Aff. ¶ 15] Even if Larson had
infringed the Dorland Letter (which she did not), neither attorney's fees nor the claimed damages
were available to Dorland under <u>any</u> theory of law.

On December 26, 2018, Dorland emailed Larson's present counsel and asked if he would
accept service on behalf of Larson for a lawsuit that Dorland was planning to initiate presumably
in California.  Dorland gave Attorney Epstein five days to respond.  Epstein immediately notified
the Cohen Defendants.  [Exhibit 35]  This present action was filed on January 30, 2019.

Despite the ongoing litigation, Dorland's grandstand play came in 2021, when she
contacted Robert Kolker, a New York Times and Oprah Book Club best-selling author about this
dispute.  Kolker eventually wrote an article that ran in the Sunday, <u>New York Times Magazine</u>
on October 10, 2021, entitled, "Who is the Bad Art Friend?"  [Exhibit 36]  The article went viral
with thousands of people taking sides, some with Dorland and others with Larson.[6]  As a result

---

[6] Google: "Who is the Bad Art Friend."  See, for example, <u>New York Times 'Bad Art Friend'</u>
<u>story sparks viral debate on social media (yahoo.com)</u>

of the pressure that the media attention to the "Bad Art Friend" article inflicted on GrubStreet, Larson was fired from her job, a job that she loved.  [Larson Aff. ¶ 19]

IV.   **Argument**

A.   Dorland Intentionally Interfered with Larson's Advantageous Business Relations.

There are four elements required to establish interference with advantageous business relations: (1) the plaintiff had an advantageous business relationship for economic benefit with a third party, (2) the defendants knew of that relationship, (3) the defendants intentionally interfered with that relationship through improper motive or means, and (4) the plaintiff's loss of the advantage resulted directly from the defendants' conduct. (Hamann v. Carpenter, 937 F.3d 86, 93 (1st Cir. 2019))

> [A] claim of tort liability for intentional interference with contractual or other economic relations is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of interference itself.  Defendant's liability may arise from improper motives or from the use of improper means.... (United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 816–17 (1990)).

> In Cavicchi v. Koski, 67 Mass. App. Ct. 654, 657–58 (2006), the court said that

> The improper conduct "may include ulterior motive (e.g., wishing to do injury) or wrongful means (e.g., deceit or economic coercion). . . , the plaintiff need not prove both.  Improper means includes violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, or defamation.  As to improper motive, evidence of retaliation or ill will toward the plaintiff will support the claim.  [Citations omitted.]

From the very beginning, the Cohen Defendants were holding Larson and the BBF hostage under threats of ever-increasing (and unwarranted) claims for statutory damages and attorney's fees under the Copyright Act, including a demand that Larson would not create anything they deemed derivative of the Dorland Letter in the future.  At the same time, Dorland was separately pressuring the BBF to address her ethical issues and to print information about kidney donations with links to kidney-related websites.  These unreasonable and unobtainable

demands made by Dorland and the Cohen Defendants acted as if the sword of Damocles was constantly hanging over the BBF and Larson, ready to drop at any time.  Ultimately, ASF pulled Larson's story, and the BBF canceled the 1C/1S event and killed *The Kindest*.

Dorland's conduct together with that of her attorneys jointly and separately constitute intentional interference with Larson's advantageous business relationships with both the ASF and the BBF.  First, both Dorland (as an aspiring writer herself) and the Cohen Defendants knew or should have known that it was advantageous to Larson for ASF to publish *The Kindest*, and for the BBF to use the story as part of its 1C/1S event.  [Exhibit 13]  Second, Dorland was looking for ever-changing remedies for what she calls her "ethical" issues.  Dorland acknowledged on multiple occasions that her copyright claims against the BBF were "neutralized" after Larson revised the letter in the final version of *The Kindest.* [Exhibit 20] Then she admitted that her ethical claims were "outside of the jurisdiction of the court." [Exhibit 26]  Despite this, she persisted in demanding attribution for the Dorland Letter and recognition for her kidney donation, as well links to kidney donation websites, damages, and attorney fees.  None of these remedies are cognizable under the law for claims of plagiarism.

Then on July 3, 2018, the Cohen Defendants asserted claims under the Copyright Act. While claims for actual damages, profit damages and injunctive relief are possible remedies under the facts of this action, attribution, recognition for Dorland's kidney donation, links to kidney donation websites, statutory damages and attorney's fees are not.  See, 17 U.S.C. § 412; Latin Am. Music., 642 F. 3d at 89-90; and Johnson, 409 F. 3d at 20  Clearly, the Cohen Defendants and Dorland were conspiring to force the BBF to drop *The Kindest*.

The unjustifiable demands made by Dorland and the Cohen Defendants constitute the additional element that is required for an intentional interference claim.  Geltman, 406 Mass. at

815.  Dorland coupled her unwarranted demands to redress her ethical issues with her attorneys'

unwarranted claims for statutory damages and attorney's fees.  At the same time, the Cohen

Defendants coupled Dorland's demands to address her ethical issues with possible copyright

remedies.  Both Dorland and the Cohen Defendants individually and collectively exceeded the

limits of what Copyright Law provides as remedies under Sections 504 and 505 of the Act.

- Dorland demanded that *The Kindest* be pulled by ASF without either trying to work with Larson or to allow her to revise the letter in her story as Ms. Markovits urged.  In fact, Dorland would not even let Markovits share emails Dorland sent to ASF with Larson or her attorney.  Dorland wanted to fight.

- Dorland and the Cohen Defendants made continuing demands for attribution to the Dorland Letter and recognition for her kidney donation, and made increasing demands for damages and attorney's fees to the BBF under the threat of litigation.

- Dorland asked GrubStreet to get an apology from Larson and at the same time requested that she be suspended from her longtime job "with or without pay."

- Dorland supplied the Brilliance Audio version of *The Kindest* for publication in the second Boston Globe article, knowing full well that this version of the story was not the version that the BBF was going to use in the 1C/1S event.  By this time (August 2018), Dorland was well-aware that the BBF was going to use Larson's story that contained the "neutralized" (and non-infringing) letter, which was dramatically different from the letter in the Brilliance Audio version.

- Dorland forced the BBF to abandon its 1C/1S event even after Larson "neutralized" Dorland's copyright claims, because "the woman's lawyer got in touch again with further demands.  It has become clear that our only recourse is to call off 1C/1S and move on." [Exhibit 37]

- As will be discussed in detail in the next section of this Memo, Dorland defamed Larson by falsely accusing her of applying for a fellowship at Bread Loaf, stating unequivocally that *The Kindest* plagiarizes Dorland's work to which she owns a copyright.  Dorland then communicated this to numerous colleagues and educators in the writing community. Violation of a statute or common-law precept by means of threats, misrepresentation, or defamation, are improper motives and evidence of retaliation or ill will toward the plaintiff that will support a claim of intentional interference.  Cavicchi, 67 Mass. App. Ct. at 657-58.

- Even after the BBF decided to kill the 1C/1S event for 2018, and not use *The Kindest*, Dorland continued to attempt to get negative articles written about Larson and her work.  [Exhibit 38]  This subsequent behavior by Dorland reflects

the deep-seated animosity and vindictive behavior that motivated all of Dorland's behavior starting in June 2018, and it evidences the improper conduct and wrongful means that Dorland used to try to bring down Larson.

- Then, in late 2018, Dorland threatened Larson with a lawsuit (presumably in California) and asked Larson's legal counsel to accept service of process.

- Finally, Dorland contacted Robert Kolker and persuaded him to write the article, *Who is the Bad Art Friend?* for the New York Times Magazine, publicity from which ultimately got Larson fired from GrubStreet. [Exhibit 36] [Larson Aff.¶ 18]

The totality of this resentful and malicious behavior is the "improper conduct" (e.g., wishing to do injury) and the "wrongful means (e.g., deceit, defamation or economic coercion)" that establishes Dorland's intentional interference with Larson's advantageous business relationships with both ASF and the BBF. (Id. at 658)  Clearly, Dorland's intent was to destroy Larson's career, and she used defamation, threats, unwarranted demands for attribution and recognition, demands to withdraw *The Kindest* from publication, unwarranted statutory damages and attorney's fees, and demands to get Larson fired.  Dorland's conduct and that of the Cohen Defendants establishes "wrongfulness beyond the interference itself." (See, Kahalas v. Schiller, 164 F. Supp. 3d 241, 246 (D. Mass. 2016)), citing James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co., 112 F.3d 1240, 1250 (1st Cir.1997) and Geltman, 406 Mass. at 816.  Both Dorland and the Cohen Defendants used threats, misrepresented material facts and established law, and defamed Larson in the course of the interference.  Dorland's real motive, aided by the Cohen Defendants, was to harm Larson.  And she did.  Id., at 817.

**B.** **In Massachusetts, all libel is actionable per se, if it prejudices or tends to prejudice a plaintiff among a considerable and respectable class of people.**

In Sharratt v. Housing Innovations, Inc., 365 Mass. 141 (1974), Massachusetts held that all libel is actionable per se.  The "words need not hold a plaintiff up to ridicule or damage his reputation in the community at large, or among all reasonable men.  It is enough that they do so

among 'a considerable and respectable class' of people."  Id. at 145.  Dorland accused Larson of committing the "capital intellectual crime" of plagiarism (Roberts, 821 F.3d at 864), thus impugning her professional integrity and reputation as a writer.

Dorland contends that truth is a complete defense to defamation.  Unfortunately, Dorland did not tell the truth.  Dorland guessed that Larson submitted *The Kindest* to Bread Loaf as part of her fellowship application.  She guessed incorrectly.  Then Dorland impugned Larson's reputation in the writing community by accusing her of plagiarism. [See Exhibit 18.]

Dorland first emailed Bread Loaf on June 7, 2018, almost a month before the Cohen Defendants sent their July 3rd demand letter to the BBF.  [Exhibit 24]  In June, only ASF and the BBF knew of Dorland's plagiarism claims, and it was still possible for the parties to work out a solution that would have kept the dispute private.  Besides, Dorland was acting as the sole judge of what constitutes plagiarism.  When Dorland contacted Bread Loaf and other groups, she spread false information and unlawfully defamed Larson.  (Sharratt, 365 Mass. at 145.)

Dorland's use of the word "possible" and "might have" in her first email to Bread Loaf does not excuse her actions.  (Reilly v. Associated Press, 59 Mass. App. Ct. 764, 774 (2003)) ("[D]efamation can occur by innuendo as well as by explicit assertion....")  In her email to Bread Loaf, Dorland said she was "in the midst of a legal process with the editors of a literary magazine [ASF]."  [Exhibit 17].  In truth, Dorland was only dealing with her ethical concerns with ASF at this time.  Then, Dorland specifically identified *The Kindest* as the work in question, and used the word "plagiarism" in the same short paragraph.  Of course, she later identified Larson in subsequent communications with Bread Loaf and others.  [See, e.g., Exhibit 18; BATES Middlebury000021 and Dorland000132]  Also, Dorland did not say that in her opinion, *The Kindest* plagiarizes her work, but instead used the word "plagiarizes" as a statement of fact.

Id. at 769  ("The determination whether a statement is one of fact or opinion is generally considered a question of law ... "examin[ing] the statement in its totality in the context in which it was ... published.")  Dorland said the 2017 fellow "might have applied and secured her fellowship on the basis of writing that plagiarizes my unpublished work."  [emphasis supplied]  The words "might have" clearly refer to the submission of *The Kindest* to Bread Loaf and not to Dorland's claim that Larson plagiarized Dorland.  Also, all of the examples of gossipy comments Dorland references in her Memo from p. 22 through p. 27, are email and text exchanges by and between Larson and her friends, and in other emails with the BBF.  These gossipy comments were obtained by Dorland during discovery, long after her plagiarism accusation was made to Bread Loaf and the damage to Larson was done.  When Dorland contacted Bread Loaf and the others with her plagiarism accusations, she was merely guessing, without giving any evidence of plagiarism except her own assessment and conclusion.

These "half" truths and innuendo are enough to support a claim of defamation.  Dorland emailed Bread Loaf and others fully intending to discredit and harm Larson, leaving the recipients of her harmful missives to accept Dorland's accusations.  Dorland was not as careful in her language as she claims.  She made the absolute statement that *The Kindest* "contains material to which I own the copyright" and that she was in the midst of a legal process because of this. [Exhibit 17]  Clearly, Dorland absolutely accused Larson of receiving a prestigious fellowship with plagiarized work, and she was wrong.

Dorland's contact of Bread Loaf is a particularly egregious example of her violation of Larson's rights.  Dorland had absolutely no right to ask Bread Loaf to divulge what writing samples Larson might have used in her 2017 Fellowship application to Middlebury College.  Even parents of college students who are over the age of 18, cannot get information from a

student's educational records without the student's written permission.  See, generally, Family

Educational Rights and Privacy Act ("FERPA") 20 U.S.C. § 1232g, and specifically, 20 U.S.C. §

1232g(d).  (United States v. Miami Univ., 91 F. Supp. 2d 1132, 1160 (S.D. Ohio

2000), aff'd, 294 F.3d 797 (6th Cir. 2002)) (FERPA was designed to protect students' rights to

privacy by limiting the transferability of their records without their consent.)

Dorland should have been aware of FERPA.  At the very least, she was negligent in

contacting Bread Loaf regarding its plagiarism policies vis-à-vis Larson.  More importantly, she

should never have identified *The Kindest* or Larson by simply guessing at the truth.

**C.    Larson made a fair use under 17 U.S.C. § 107 of the Dorland Letter in the first four (4) variants of *The Kindest*.**

Larson asserts that her use of a few words or phrases from the Dorland Letter in the first

four variants of *The Kindest* is fair use.  Under fair use, Larson did not need permission to use

these words or phrases because fair use "is not an infringement of copyright."  [§ 107]

In assessing a fair use defense, Congress has directed courts to consider the following

non-exclusive factors in Section 107: (1) the purpose and character of the use, including whether

such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the

copyrighted work; (3) the amount and substantiality of the portion used in relation to the

copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value

of the copyrighted work.  (Monsarrat v. Newman, 28 F.4th 314, 321 (1st Cir. 2022) (We evaluate

fair use on a case-by-case basis and weigh the factors "together in light of the purposes of

copyright.") (citing, Núñez v. Caribbean Int'l News Corp., 235 F.3d 18, 21 (1st Cir. 2000)).

**(1) Purpose and Character of Use**

In Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 59–60 (1st

Cir. 2012), the court said that the first inquiry as to the purpose and character of a use is

24

"whether and to what extent the new work is 'transformative'" that is, "whether the new work merely supersedes the objects of the original creation" or whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579, 114 S. Ct. 1164 (1994).  The purpose and character of the use must be balanced with the copyright's goal of "promot[ing] science and the arts."  Article I, § 8, of the U.S. Constitution, Gregory, 689 F.3d at 60.

The Dorland Letter by itself is a fragment of Dorland's kidney donation story.  The Letter needs context to explain fully why Dorland was trying to connect to an unnamed Oregon woman.  Without context, the Dorland Letter lacks clarity and purpose.  At best, it is fodder for a factual account that can still be told.  The Dorland Letter needs more detail for it to have full meaning.  There are many unanswered questions.  What happened after Dorland's surgery and her later meeting with her recipient?  Who is Debbie Striks?  Why did Dorland want to meet the Oregon woman who received a kidney from a woman named Debbie Striks?  How did the surgery impact the Oregon woman's life?  Frankly, the Oregon woman never responded to Dorland, so the letter reached a dead end, without gaining value.  Dorland admits that no one contacted her to use the Letter. [See, Exhibit 39]  In Dorland's own words;

> Q. Did anyone ever contact you at any time from the time it [the Dorland Letter] was first posted on July 7, 2015?  Did anyone ever contact you for permission to use the July 2, 2015 letter or any parts of the letter at any time?  A. No, not that I recall.  That would have been nice."  Dorland deposition, pp. 161-2, lines 20-23 / 1-3.

Larson transformed the Dorland Letter and added context by using the letter in *The Kindest* to introduce the character, Rose to the character, Chuntao.  The letter also introduces white savior dynamics to *The Kindest*, which are not at all part of Dorland's saga.  This is significantly different from the context and meaning of the Dorland Letter.

25

In <u>Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith</u>, 11 F.4th 26, 51 (2d Cir. 2021), <u>cert. granted,</u> 212 L. Ed. 2d 402, 142 S. Ct. 1412 (2022), the court said "that determinations of fair use are highly contextual and fact specific, and are not easily reduced to rigid rules. As the Supreme Court put it, both the historical background of fair use and modern precedent 'make[ ] clear that the concept [of fair use] is flexible, that courts must apply it in light of the sometimes conflicting aims of copyright law, and that its applications may well vary depending upon context,'" citing, <u>Google LLC v. Oracle Am., Inc.,</u> 141 S.Ct. 1183, 1197 (2021).

Unlike in <u>Harper & Row Publishers, Inc. v. Nation Enterprises</u>, 471 U.S. 539, 564-5, 105 S. Ct. 2218, 2233 (1985), where the "heart" of President Ford's memoire was published without permission, the Dorland Letter is only a part of a much larger story.  It is not a stand-alone document. It lacks a full grasp of Dorland's surgery, and her desire to meet the Oregon woman.

Larson used small portions of the Dorland Letter to tell a totally fictitious story.  It is essential to Larson's story that the kidney recipient is Chinese-American (as is Larson), and that her wealthy donor is white, since the racial dynamics that play out between the characters are central to *The Kindest*.  [Larson Aff. ¶ 6]  Racial dynamics are not part of Dorland's saga. Dorland can still tell about her donation, in whatever genre or medium she would like.  However, for over seven (7) years since the Dorland Letter was first published in 2015, Dorland has not used her letter other than on Facebook, and there is no evidence that anyone ever contacted Dorland for permission to use the Letter.  [Exhibit 38]

Larson used a few words and phrases from the Dorland Letter, but for entirely different purposes than Dorland used them.  None of the letters in Larson's story are open letters to the last person in a four-person kidney chain.  Larson gave the Dorland Letter new meaning, with a totally different purpose or character from that which Dorland intended when she wrote the

letter.  Gregory, 689 F.3d at 59–60.  (Monsarrat, 28 F.4th at 322 (displaying copyrighted images in a timeline, even without additional commentary, was "transformative" because it was "plainly different from the original purpose for which they were created").

The first fair use prong also requires an analysis of whether the use was commercial. O'Neil v. Ratajkowski, 563 F. Supp. 3d 112, 129–30 (S.D.N.Y. 2021) (Where a use only "trivially affected" the value of a for-profit service, this factor is assigned relatively little weight.  Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., 756 F.3d 73, 83 (2d Cir. 2014). Moreover, "[t]he more transformative the new work, the less will be the significance of other factors, like commercialism.  (Cariou v. Prince, 714 F.3d 694, 708 (2d Cir. 2013). In light of Larson's totally transformative use of the Letter, this factor weighs heavily in Larson's favor.

## 2. **Nature of Copyrighted Work**

The Dorland Letter was "shared widely around the UCLA Transplant Team"  [Exhibit 4]. Even though the Dorland Letter was registered with the Copyright Office as an unpublished work, and it may not have been distributed to the public by sale or other transfer of ownership, or by rental, lease, or lending as provided under the definition "publication" in Section 101, the Dorland Letter was effectively a published work.  This is not a new notion.

Courts have found that the second statutory factor favors fair use even though the work in question was technically unpublished under the statutory definition.  Courts commonly look past the statutory definition of publication when considering this issue.  See, Rotbart v. J.R. O'Dwyer Co., Inc., No. 94 Civ.2091(JSM), 1995 WL 46625, at *4 (S.D.N.Y. Feb. 7, 1995) (finding that an unfixed, undisseminated talk, delivered publicly, had been "de facto published" for purposes of fair use)  Swatch Grp., 756 F.3d at 88–89 ("although the sound recording is statutorily unpublished. . . , the publication status of the work favors fair use.")

27

Larson was added to Dorland's Facebook group <u>involuntarily</u> without any requirement for confidentiality. [Larson Aff. ¶ 3] In fact, Dorland did not expect confidentiality from her readers except to redact Mrs. Striks' name if Facebook emails were shared [Exhibit 5]. Also, Mrs. Striks' name is included in the copy sent to the Copyright Office. This is a public record. So much for confidentiality and privacy. This factor favors Larson.

### 3. <u>Amount and Substantiality of Work Used</u>

The "amount and substantiality of the portion used in relation to the copyrighted work as a whole" is a "pliable" factor, not a "cold calculation [ ] of the percentage of a work used versus unused." <u>Gregory</u>, 689 F.3d at 62. Aside from the Brilliance Audio version of her story that was never meant to be published, Larson contends that she used only as much of the Dorland Letter as she had to use to tell the story of Rose and Chuntao without losing all value. (<u>N. Jersey Media Grp. Inc. v. Pirro</u>, 74 F. Supp. 3d 605, 620–21 (S.D.N.Y. 2015)) ("there are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use. "[T]he extent of permissible copying varies with the purpose and character of the use." <u>Campbell</u>, 510 U.S. at 586–87. Indeed, for some purposes, it may be necessary to copy the entire copyrighted work, and the third factor would not weigh against a finding of fair use in such circumstances. <u>Authors Guild, Inc. v. HathiTrust</u>, 755 F.3d 87, 100 (2d Cir. 2014)

Even if Larson used Dorland's entire text (which she did not), the entirety of the Dorland Letter constitutes less than 7% of Larson' story at a maximum (5,500 words in *The Kindest* versus 381 words in the Dorland Letter). Even with this modest use, the letter in Larson's story is not a substitute for the Dorland Letter. Larson transformed the Dorland letter and made it into something with a totally different purpose and character that is different from what Dorland intended when she wrote her letter. <u>Gregory</u>, 689 F.3d at 59–60. This factor favors Larson.

    **4.**  <u>**Effect on Potential Marked or Value of Work**</u>

    There is no evidence that Dorland ever tried to sell the Dorland Letter.  <u>See</u> <u>Monsarrat</u> 28 F.4th 324–25 (the mere copyright of a work does not endow it with intrinsic value sufficient to weigh significantly in the fair use analysis, if it did, such a value would be present in every case, and thus prove to be largely beside the point in differentiating one case from another.)

    More significantly, Dorland admits that no one ever contacted her for permission to use the Dorland Letter. [Exhibit 39]  Where no market exists for a copyrighted work because the copyright holder "[n]ever tried to sell" it, the fourth factor favors fair use. <u>See</u> <u>Núñez</u>, 235 F.3d at 25.  Market effect is "the single most important element of fair use." <u>Gregory</u>, 689 F.3d at 64.  It is difficult to imagine that there is any intrinsic market for Dorland's Letter without adding much more context and detail.  The fourth factor favors Larson.

    <u>**Larson made a fair use of the Dorland Letter**</u>

    Larson used a letter in *The Kindest* to set up the white savior dynamic that is central to her story.  Dorland wrote her letter because she wanted to connect with the Oregon transplant recipient.  The purpose and character between the two letters cannot be greater.

    Furthermore, in the seven (7) years since the Dorland Letter was first posted on Facebook or in over three (3) years since this action was filed, there is no evidence that Dorland ever tried to sell or use her letter other than to try to communicate with the Oregon woman, and of course to attack Larson.  Consequently, all factors weigh in favor of Larson for a finding of fair use.

**D.**    **Side-by-side comparison of the Dorland Letter and the final version of**
       ***The Kindest.***

    Larson revised her story so that it would not be infringing.  Dorland admits that this "neutralized" her copyright claim.  [Exhibit 20]  A side-by-side comparison between the Dorland Letter and the letter in the final version of *The Kindest* [<u>See</u>, <u>Appendix VI</u>] shows that there is <u>no</u>

similarity between the two letters to support infringement.  Nor can Dorland claim that the letter

in the final version of *The Kindest* is a derivative work.  Courts have consistently held that

derivative works must borrow substantially from existing works to be infringing.   (Castle Rock

Ent., Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132, 143, note 9 (2d Cir. 1998)) ("[I]f the secondary

work sufficiently transforms the expression of the original work such that the two works cease to

be substantially similar, then the secondary work is not a derivative work and, for that matter,

does not infringe the copyright of the original work.  See 1 Nimmer § 3.01, at 3–3 ("'a work will

be considered a derivative work only if it would be considered an infringing work" if it were

unauthorized.'")  TMTV, Corp. v. Mass Prods., Inc., 345 F. Supp. 2d 196, 210 (D.P.R. 2004)

("In comparing two literary works…, it must be borne in mind that 'the essence of infringement

lies in taking not a general theme but its particular expression through similarities of treatment,

details, scenes, events and characterization.'"); aff'd, 645 F.3d 464, 470 (1st Cir. 2011) ("No

infringement claim lies if the similarity between two works rests necessarily on non-

copyrightable aspects of the original.")  See also, Well–Made Toy Mfg. Corp. v. Goffa Int'l

Corp., 354 F.3d 112, 117 (2nd Cir.2003), abrogated on other grounds by Reed Elsevier, Inc. v.

Muchnick, 559 U.S. 154, 155, 130 S. Ct. 1237, 1240 (2010) (citation and internal quotation

marks omitted) ("Because the allegedly derivative work... sufficiently transformed the

expression of the original work... such that the two works ceased to be substantially similar, the

secondary work is not derivative work and, for that matter, does not infringe the copyright of the

original work.")  The competing letters may share a kidney theme, but the details, scenes, events,

style, structure, tone, language and characterization of the letters are vastly different.

**V.    Conclusion.**

      Dorland and the Cohen Defendants intentionally interfered with Larson's business relations with

ASF and BBF; fair use prevails; final version of *The Kindest* is not infringing.

December 8, 2022

                                      Respectfully submitted,
                                        Plaintiff, Third-Party Defendant,
                                        Sonya Larson,

                                        By her attorneys,
                                        */s/ Andrew D. Epstein*

                                        Andrew D. Epstein, BBO No.155140
                                        photolaw@aol.com
                                        Barker, Epstein, & Loscocco
                                        176 Federal Street
                                        Boston, MA 02110
                                        (617) 272-5700

## Certificate of Service

     I certify that Plaintiff-Third Party Defendant, Sonya Larson's Motion for Partial Summary Judgment and Memorandum in support thereof was filed through the court's ECF system and a copy was sent electronically on the day it was filed to all counsel of record.

                                          */s/ Andrew D. Epstein*
                                        _____

December 8, 2022                                   Andrew D. Epstein