# Exhibit 36

The New York Times Magazine    https://www.nytimes.com/2021/10/05/magazine/dorland-v-larson.html

# Who Is the Bad Art Friend?

Art often draws inspiration from life — but what happens when it's your life? Inside the curious case of Dawn Dorland v. Sonya Larson.

By Robert Kolker
Published Oct. 5, 2021   Updated Oct. 11, 2021

*To hear more audio stories from publications like The New York Times, download Audm for iPhone or Android.*

**There is a sunny earnestness** to Dawn Dorland, an un-self-conscious openness that endears her to some people and that others have found to be a little extra. Her friends call her a "feeler": openhearted and eager, pressing to make connections with others even as, in many instances, she feels like an outsider. An essayist and aspiring novelist who has taught writing classes in Los Angeles, she is the sort of writer who, in one authorial mission statement, declares her faith in the power of fiction to "share truth," to heal trauma, to build bridges. ("I'm compelled at funerals to shake hands with the dusty men who dig our graves," she has written.) She is known for signing off her emails not with "All best" or "Sincerely," but "Kindly."

On June 24, 2015, a year after completing her M.F.A. in creative writing, Dorland did perhaps the kindest, most consequential thing she might ever do in her life. She donated one of her kidneys, and elected to do it in a slightly unusual and particularly altruistic way. As a so-called nondirected donation, her kidney was not meant for anyone in particular but instead was part of a donation chain, coordinated by surgeons to provide a kidney to a recipient who may otherwise have no other living donor. There was some risk with the procedure, of course, and a recovery to think about, and a one-kidney life to lead from that point forward. But in truth, Dorland, in her 30s at the time, had been wanting to do it for years. "As soon as I learned I could," she told me recently, on the phone from her home in Los Angeles, where she and her husband were caring for their toddler son and elderly pit bull (and, in their spare time, volunteering at dog shelters and searching for adoptive families for feral cat litters). "It's kind of like not overthinking love, you know?"

> **Sign up for The New York Times Magazine Newsletter**  The best of The New York Times Magazine delivered to your inbox every week, including exclusive feature stories, photography, columns and more. Get it sent to your inbox.

Several weeks before the surgery, Dorland decided to share her truth with others. She started a private Facebook group, inviting family and friends, including some fellow writers from GrubStreet, the Boston writing center where Dorland had spent many years learning her craft. After her surgery, she posted something to her group: a heartfelt letter she'd written to the final recipient of the surgical chain, whoever they may be.

*Personally, my childhood was marked by trauma and abuse; I didn't have the opportunity to form secure attachments with my family of origin. A positive outcome of my early life is empathy, that it opened a well of possibility between me and strangers. While perhaps many more people would be motivated to donate an organ to a friend or family member in need, to me, the suffering of strangers is just as real. … Throughout my preparation for becoming a donor … I focused a majority of my mental energy on imagining and celebrating you.*



Dawn Dorland in Los Angeles. Kholood Eid for The New York Times

**The procedure went** well. By a stroke of luck, Dorland would even get to meet the recipient, an Orthodox Jewish man, and take photos with him and his family. In time, Dorland would start posting outside the private group to all of Facebook, celebrating her one-year "kidneyversary" and appearing as a UCLA Health Laker for a Day at the Staples Center to support live-organ donation. But just after the surgery, when she checked Facebook, Dorland noticed some people she'd invited into the group hadn't seemed to react to any of her posts. On July 20, she wrote an email to one of them: a writer named Sonya Larson.

Larson and Dorland had met eight years earlier in Boston. They were just a few years apart in age, and for several years they ran in the same circles, hitting the same events, readings and workshops at the GrubStreet writing center. But in the years since Dorland left town, Larson had leveled up. Her short fiction was published, in Best American Short Stories and elsewhere; she took charge of GrubStreet's annual Muse and the Marketplace literary conference, and as a mixed-race Asian American, she marshaled the group's diversity efforts. She also joined a group of published writers that calls itself the Chunky Monkeys (a whimsical name, referring to breaking off little chunks of big projects to share with the other members). One of those writing-group members, Celeste Ng, who wrote "Little Fires Everywhere," told me that she admires Larson's ability to create "characters who have these big blind spots." While they think they're presenting themselves one way, they actually come across as something else entirely.

When it comes to literary success, the stakes can be pretty low — a fellowship or residency here, a short story published there. But it seemed as if Larson was having the sort of writing life that Dorland once dreamed of having. After many years, Dorland, still teaching, had yet to be published. But to an extent that she once had a writing community, GrubStreet was it. And Larson was, she believed, a close friend.

Over email, on July 21, 2015, Larson answered Dorland's message with a chirpy reply — "How have you been, my dear?" Dorland replied with a rundown of her next writing residencies and workshops, and as casually as possible, asked: "I think you're aware that I donated my kidney this summer. Right?"

Only then did Larson gush: "Ah, yes — I did see on Facebook that you donated your kidney. What a tremendous thing!"

Afterward, Dorland would wonder: If she really thought it was that great, why did she need reminding that it happened?

**They wouldn't cross** paths again until the following spring — a brief hello at A.W.P., the annual writing conference, where the subject of Dorland's kidney went unmentioned. A month later, at the GrubStreet Muse conference in Boston, Dorland sensed something had shifted — not just with Larson but with various GrubStreet eminences, old friends and mentors of hers who also happened to be members of Larson's writing group, the Chunky Monkeys. Barely anyone brought up what she'd done, even though everyone must have known she'd done it. "It was a little bit like, if you've been at a funeral and nobody wanted to talk about it — it just was strange to me," she said. "I left that conference with this question: *Do writers not care about my kidney donation?* Which kind of confused me, because I thought I was in a community of service-oriented people."

It didn't take long for a clue to surface. On June 24, 2016, a Facebook friend of Dorland's named Tom Meek commented on one of Dorland's posts.

*Sonya read a cool story about giving out a kidney. You came to my mind and I wondered if you were the source of inspiration?*

*Still impressed you did this.*

Dorland was confused. A year earlier, Larson could hardly be bothered to talk about it. Now, at Trident bookstore in Boston, she'd apparently read from a new short story about that very subject. Meek had tagged Larson in his comment, so Dorland thought that Larson must have seen it. She waited for Larson to chime in — to say, "Oh, yes, I'd meant to tell you, Dawn!" or something like that — but there was nothing. Why would Sonya write about it, she wondered, and not tell her?

Six days later, she decided to ask her. Much as she had a year earlier, she sent Larson a friendly email, including one pointed request: "Hey, I heard you wrote a kidney-donation story. Cool! Can I read it?"

## 'I hope it doesn't feel too weird for your gift to have inspired works of art.'

Ten days later, Larson wrote back saying that yes, she was working on a story "about a woman who receives a kidney, partially inspired by how my imagination took off after learning of your own tremendous donation." In her writing, she spun out a scenario based not on Dorland, she said, but on something else — themes that have always fascinated her. "I hope it doesn't feel too weird for your gift to have inspired works of art," Larson wrote.

Dorland wrote back within hours. She admitted to being "a little surprised," especially "since we're friends and you hadn't mentioned it." The next day, Larson replied, her tone a bit removed, stressing that her story was "not about you or your particular gift, but about narrative possibilities I began thinking about."

But Dorland pressed on. "It's the interpersonal layer that feels off to me, Sonya. ... You seemed not to be aware of my donation until I pointed it out. But if you had already kicked off your fictional project at this time, well, I think your behavior is a little deceptive. At least, weird."

Larson's answer this time was even cooler. "Before this email exchange," she wrote, "I hadn't considered that my individual vocal support (or absence of it) was of much significance."

Which, though it was shrouded in politesse, was a different point altogether. *Who*, Larson seemed to be saying, *said we were such good friends?*

**For many years now,** Dorland has been working on a sprawling novel, "Econoline," which interweaves a knowing, present-day perspective with vivid, sometimes brutal but often romantic remembrances of an itinerant rural childhood. The van in the title is, she writes in a recent draft, "blue as a Ty-D-Bowl tablet. Bumbling on the highway, bulky and off-kilter, a junebug in the wind." The family in the narrative survives on "government flour, canned juice and beans" and "ruler-long bricks of lard" that the father calls "commodities."

Dorland is not shy about explaining how her past has afforded her a degree of moral clarity that others might not come by so easily. She was raised in near poverty in rural Iowa. Her parents moved around a lot, she told me, and the whole family lived under a stigma. One small consolation was the way her mother modeled a certain perverse self-reliance, rejecting the judgments of others. Another is how her turbulent youth has served as a wellspring for much of her writing. She made her way out of Iowa with a scholarship to Scripps College in California, followed by divinity school at Harvard. Unsure of what to do next, she worked day jobs in advertising in Boston while dabbling in workshops at the GrubStreet writing center. When she noticed classmates cooing over Marilynne Robinson's novel "Housekeeping," she picked up a copy. After inhaling its story of an eccentric small-town upbringing told with sensitive, all-seeing narration, she knew she wanted to become a writer.

At GrubStreet, Dorland eventually became one of several "teaching scholars" at the Muse conference, leading workshops on such topics as "Truth and Taboo: Writing Past Shame." Dorland credits two members of the Chunky Monkeys group, Adam Stumacher and Chris Castellani, with advising her. But in hindsight, much of her GrubStreet experience is tied up with her memories of Sonya Larson. She thinks they first met at a one-off writing workshop Larson taught, though Larson, for her part, says she doesn't remember this. Everybody at GrubStreet knew Larson — she was one of the popular, ever-present people who worked there. On nights out with other Grubbies, Dorland remembers Larson getting personal, confiding about an engagement, the death of someone she knew and plans to apply to M.F.A. programs — though Larson now says she shared such things widely. When a job at GrubStreet opened up, Larson encouraged her to apply. Even when she didn't get it, everyone was so gracious about it, including Larson, that she felt included all the same.

Now, as she read these strained emails from Larson — about this story of a kidney donation; *her* kidney donation? — Dorland wondered if everyone at GrubStreet had been playing a different game, with rules she'd failed to grasp. On July 15, 2016, Dorland's tone turned brittle, even wounded: "Here was a friend entrusting something to you, making herself vulnerable to you. At least, the conclusion I can draw from your responses is that I was mistaken to consider us the friends that I did."

Larson didn't answer right away. Three days later, Dorland took her frustrations to Facebook, in a blind item: *"I discovered that a writer friend has based a short story on something momentous I did in my own life, without telling me or ever intending to tell me (another writer tipped me off)."* Still nothing from Larson.

Dorland waited another day and then sent her another message both in a text and in an email: "I am still surprised that you didn't care about my personal feelings. ... I wish you'd given me the benefit of the doubt that I wouldn't interfere." Yet again, no response.

The next day, on July 20, she wrote again: "Am I correct that you do not want to make peace? Not hearing from you sends that message."

Larson answered this time. "I see that you're merely expressing real hurt, and for that I am truly sorry," she wrote on July 21. But she also changed gears a little. "I myself have seen references to my own life in others' fiction, and it certainly felt weird at first. But I maintain that they have a right to write about what they want — as do I, and as do you."

Hurt feelings or not, Larson was articulating an ideal — a principle she felt she and all writers ought to live up to. "For me, honoring another's artistic freedom is a gesture of friendship," Larson wrote, "and of trust."

Case 1:19-cv-10203-IT   Document 192-6   Filed 12/09/22   Page 6 of 14



Sonya Larson in Massachusetts. Kholood Eid for The New York Times

**Like Dawn Dorland,** Sonya Larson understands life as an outsider. The daughter of a Chinese American mother and white father, she was brought up in a predominantly white, middle-class enclave in Minnesota, where being mixed-race sometimes confused her. "It took me a while to realize the things I was teased about were intertwined with my race," she told me over the phone from Somerville, where she lived with her husband and baby daughter. Her dark hair, her slight build: In a short story called "Gabe Dove," which was picked for the 2017 edition of Best American Short Stories, Larson's protagonist is a second-generation Asian American woman named Chuntao, who is used to men putting their fingers around her wrist and remarking on how narrow it is, almost as if she were a toy, a doll, a plaything.

Larson's path toward writing was more conventional than Dorland's. She started earlier, after her first creative-writing class at the University of Wisconsin-Madison. When she graduated, in 2005, she moved to Boston and walked into GrubStreet to volunteer the next day. Right away, she became one of a handful of people who kept the place running. In her fiction, Larson began exploring the sensitive subject matter that had always fascinated her: racial dynamics, and people caught between cultures. In time, she moved beyond mere political commentary to revel in her characters' flaws — like a more socially responsible Philip Roth, though every bit as happy to be profane and fun and provocative. Even as she allows readers to be one step ahead of her characters, to see how they're going astray, her writing luxuriates in the seductive power that comes from living an unmoored life. "He described thick winding streams and lush mountain gorges," the rudderless Chuntao narrates in "Gabe Dove," "obviously thinking I'd enjoy this window into my ancestral country, but in truth, I wanted to slap him."

Chuntao, or a character with that name, turns up in many of Larson's stories, as a sort of a motif — a little different each time Larson deploys her. She appears again in "The Kindest," the story that Larson had been reading from at the Trident bookstore in 2016. Here, Chuntao is married, with an alcohol problem. A car crash precipitates the need for a new organ, and her whole family is hoping the donation will serve as a wake-up call, a chance for Chuntao to redeem herself. That's when the donor materializes. White, wealthy and entitled, the woman who gave Chuntao her kidney is not exactly an uncomplicated altruist: She is a stranger to her own impulses, unaware of how what she considers a selfless act also contains elements of intense, unbridled narcissism.

In early drafts of the story, the donor character's name was Dawn. In later drafts, Larson ended up changing the name to Rose. While Dorland no doubt was an inspiration, Larson argues that in its finished form, her story moved far beyond anything Dorland herself had ever said or done. But in every iteration of "The Kindest," the donor says she wants to meet Chuntao to celebrate, to commune — only she really wants something more, something ineffable, like acknowledgment, or gratitude, or recognition, or love.

Still, they're not so different, Rose and Chuntao. "I think they both confuse love with worship," Larson told me. "And they both see love as something they have to go get; it doesn't already exist inside of them." All through "The Kindest," love or validation operates almost like a commodity — a precious elixir that heals all pain. "The thing about the dying," Chuntao narrates toward the end, "is they command the deepest respect, respect like an underground river resonant with primordial sounds, the kind of respect that people steal from one another."

They aren't entirely equal, however. While Chuntao is the story's flawed hero, Rose is more a subject of scrutiny — a specimen to be analyzed. The study of the hidden motives of privileged white people comes naturally to Larson. "When you're mixed-race, as I am, people have a way of 'confiding' in you," she once told an interviewer. What they say, often about race, can be at odds with how they really feel. In "The Kindest," Chuntao sees through Rose from the start. She knows what Rose wants — to be a white savior — and she won't give it to her. ("So she's the kindest bitch on the planet?" she says to her husband.) By the end, we may no longer feel a need to change Chuntao. As one critic in the literary journal Ploughshares wrote when the story was published in 2017: "Something has got to be admired about someone who returns from the brink of death unchanged, steadfast in their imperfections."

For some readers, "The Kindest" is a rope-a-dope. If you thought this story was about Chuntao's redemption, you're as complicit as Rose. This, of course, was entirely intentional. Just before she wrote "The Kindest," Larson helped run a session on race in her graduate program that became strangely contentious. "Many of the writers who identified as white were quite literally seeing the racial dynamics of what we were discussing very differently from the people of color in the room," she said. "It was as if we were just simply talking past one another, and it was scary." At the time, she'd been fascinated by "the dress" — that internet meme with a photo some see as black and blue and others as white and gold. Nothing interests Larson more than a thing that can be seen differently by two people, and she saw now how no subject demonstrates that better than race. She wanted to write a story that was like a Rorschach test, one that might betray the reader's own hidden biases.

When reflecting on Chuntao, Larson often comes back to the character's autonomy, her nerve. "She resisted," she told me. Chuntao refused to become subsumed by Rose's narrative. "And I admire that. And I think that small acts of refusal like that are things that people of color — and writers of color — in this country have to bravely do all the time."

**Larson and Dorland** have each taken and taught enough writing workshops to know that artists, almost by definition, borrow from life. They transform real people and events into something invented, because what is the great subject of art — the *only* subject, really — if not life itself? This was part of why Larson seemed so unmoved by Dorland's complaints. Anyone can be inspired by anything. And if you don't like it, why not write about it yourself?

But to Dorland, this was more than just material. She'd become a public voice in the campaign for live-organ donation, and she felt some responsibility for representing the subject in just the right way. The potential for saving lives, after all, matters more than any story. And yes, this was also her own life — the crystallization of the most important aspects of her personality, from the traumas of her childhood to the transcending of those traumas today. Her proudest moment, she told me, hadn't been the surgery itself, but making it past the psychological and other clearances required to qualify as a donor. "I didn't do it in order to heal. I did it because I had healed — I thought."

The writing world seemed more suspicious to her now. At around the time of her kidney donation, there was another writer, a published novelist, who announced a new book with a protagonist who, in its description, sounded to her an awful lot like the one in "Econoline" — not long after she shared sections of her work in progress with him. That author's book hasn't been published, and so Dorland has no way of knowing if she'd really been wronged, but this only added to her sense that the guard rails had fallen off the profession. Beyond unhindered free expression, Dorland thought, shouldn't there be some ethics? "What do you think we owe one another as writers in community?" she would wonder in an email, several months later, to The Times's "Dear Sugars" advice podcast. (The show never responded.) "How does a writer like me, not suited to jadedness, learn to trust again after artistic betrayal?"

## 'I'm thinking, When did I record my letter with a voice actor? Because this voice actor was reading me the paragraph about my childhood trauma.'

By summer's end, she and Sonya had forged a fragile truce. "I value our relationship and I regret my part in these miscommunications and misunderstandings," Larson wrote on Aug. 16, 2016. Not long after, Dorland Googled "*kidney*" and "*Sonya Larson*" and a link turned up.

The story was available on Audible — an audio version, put out by a small company called Plympton. Dorland's dread returned. In July, Larson told her, "I'm still working on the story." Now here it was, ready for purchase.

She went back and forth about it, but finally decided not to listen to "The Kindest." When I asked her about it, she took her time parsing that decision. "What if I had listened," she said, "and just got a bad feeling, and just felt exploited. What was I going to do with that? What was I going to do with those emotions? There was nothing I thought I could do."

So she didn't click. "I did what I thought was artistically and emotionally healthy," she said. "And also, it's kind of what she had asked me to do."

**Dorland could keep** "The Kindest" out of her life for only so long. In August 2017, the print magazine American Short Fiction published the short story. She didn't buy a copy. Then in June 2018, she saw that the magazine dropped its paywall for the story. The promo and opening essay on American Short Fiction's home page had startled her: a photograph of Larson, side-by-side with a shot of the short-fiction titan Raymond Carver. The comparison does make a certain sense: In Carver's story "Cathedral," a blind man proves to have better powers of perception than a sighted one; in "The Kindest," the white-savior kidney donor turns out to need as much salvation as the Asian American woman she helped. Still, seeing Larson anointed this way was, to say the least, destabilizing.

Then she started to read the story. She didn't get far before stopping short. Early on, Rose, the donor, writes a letter to Chuntao, asking to meet her.

*I myself know something of suffering, but from those experiences I've acquired both courage and perseverance. I've also learned to appreciate the hardship that others are going through, no matter how foreign. Whatever you've endured, remember that you are never alone. … As I prepared to make this donation, I drew strength from knowing that my recipient would get a second chance at life. I withstood the pain by imagining and rejoicing in YOU.*

Here, to Dorland's eye, was an echo of the letter she'd written to her own recipient — and posted on her private Facebook group — rejiggered and reworded, yet still, she believed, intrinsically hers. Dorland was amazed. It had been three years since she donated her kidney. Larson had all that time to launder the letter — to rewrite it drastically or remove it — and she hadn't bothered.

She showed the story's letter to her husband, Chris, who had until that point given Larson the benefit of the doubt.

"Oh," he said.

Everything that happened two years earlier, during their email melée, now seemed like gaslighting. Larson had been so insistent that Dorland was being out of line — breaking the rules, playing the game wrong, needing something she shouldn't even want. "Basically, she'd said, 'I think you're being a bad *art friend*,'" Dorland told me. That argument suddenly seemed flimsy. Sure, Larson had a right to self-expression — but with someone else's words? Who was the bad art friend now?

Before she could decide what to do, there came another shock. A few days after reading "The Kindest," Dorland learned that the story was the 2018 selection for One City One Story, a common-reads program sponsored by the Boston Book Festival. That summer, some 30,000 copies of "The Kindest" would be distributed free all around town. An entire major U.S. city would be reading about a kidney donation — with Sonya Larson as the author.

This was when Dawn Dorland decided to push back — first a little, and then a lot. This wasn't about art anymore; not Larson's anyway. It was about *her* art, her letter, her words, her life. She shopped for a legal opinion: Did Larson's use of that letter violate copyright law? Even getting a lawyer to look into that one little question seemed too expensive. But that didn't stop her from contacting American Short Fiction and the Boston Book Festival herself with a few choice questions: What was their policy on plagiarism? Did they know they were publishing something that used someone else's words? She received vague assurances they'd get back to her.

While waiting, she also contacted GrubStreet's leadership: What did this supposedly supportive, equitable community have to say about plagiarism? She emailed the Bread Loaf writing conference in Vermont, where Larson once had a scholarship: What would they do if one of their scholars was discovered to have plagiarized? On privacy grounds, Bread Loaf refused to say if "The Kindest" was part of Larson's 2017 application. But Dorland found more groups with a connection to Larson to notify, including the Vermont Studio Center and the Association of Literary Scholars, Critics and Writers.

When the Boston Book Festival told her they would not share the final text of the story, Dorland went a step further. She emailed two editors at The Boston Globe — wouldn't they like to know if the author of this summer's citywide common-reads short story was a plagiarist? And she went ahead and hired a lawyer, Jeffrey Cohen, who agreed she had a claim — her words, her letter, someone else's story. On July 3, 2018, Cohen sent the book festival a cease-and-desist letter, demanding they hold off on distributing "The Kindest" for the One City One Story program, or risk incurring damages of up to $150,000 under the Copyright Act.

From Larson's point of view, this wasn't just ludicrous, it was a stickup. Larson had found her own lawyer, James Gregorio, who on July 17 replied that Dorland's actions constitute "harassment, defamation per se and tortious interference with business and contractual relations." Despite whatever similarities exist between the letters, Larson's lawyer believed there could be no claim against her because, among other reasons, these letters that donors write are basically a genre; they follow particular conventions that are impossible to claim as proprietary. In July, Dorland's lawyer suggested settling with the book festival for $5,000 (plus an attribution at the bottom of the story, or perhaps a referral link to a kidney-donor site). Larson's camp resisted talks when they learned that Dorland had contacted The Globe.

## 'This is not about a white savior narrative. It's about us and our sponsor and our board not being sued if we distribute the story.'

In reality, Larson was pretty vulnerable: an indemnification letter in her contract with the festival meant that if Dorland did sue, she would incur the costs. What no one had counted on was that Dorland, in late July, would stumble upon a striking new piece of evidence. Searching online for more mentions of "The Kindest," she saw something available for purchase. At first this seemed to be a snippet of the Audible version of the story, created a year before the American Short Fiction version. But in fact, this was something far weirder: a recording of an even earlier iteration of the story. When Dorland listened to this version, she heard something very different — particularly the letter from the donor.

*Dorland's letter:*

*Personally, my childhood was marked by trauma and abuse; I didn't have the opportunity to form secure attachments with my family of origin. A positive outcome of my early life is empathy, that it opened a well of possibility between me and strangers. While perhaps many more people would be motivated to donate an organ to a friend or family member in need, to me, the suffering of strangers is just as real.*

*Larson's audio version of the story:*

*My own childhood was marked by trauma and abuse; I wasn't given an opportunity to form secure attachments with my family of origin. But in adulthood that experience provided a strong sense of empathy. While others might desire to give to a family member or friend, to me the suffering of strangers is just as real.*

"I almost fell off my chair," Dorland said. "I'm thinking, When did I record my letter with a voice actor? Because this voice actor was reading me the paragraph about my childhood trauma. To me it was just bizarre." It confirmed, in her eyes, that Larson had known she had a problem: She had altered the letter after Dorland came to her with her objections in 2016.

Dorland's lawyer increased her demand to $10,000 — an amount Dorland now says was to cover her legal bills, but that the other side clearly perceived as another provocation. She also contacted her old GrubStreet friends — members of the Chunky Monkeys whom she now suspected had known all about what Larson was doing. "Why didn't either of you check in with me when you knew that Sonya's

kidney story was related to my life?" she emailed the group's founders, Adam Stumacher and Jennifer De Leon. Stumacher responded, "I have understood from the start this is a work of fiction." Larson's friends were lining up behind her.

In mid-August, Dorland learned that Larson had made changes to "The Kindest" for the common-reads program. In this new version, every similar phrase in the donor's letter was reworded. But there was something new: At the end of the letter, instead of closing with "Warmly," Larson had switched it to "Kindly."

With that one word — the signoff she uses in her emails — Dorland felt trolled. "She thought that it would go to press and be read by the city of Boston before I realized that she had jabbed me in the eye," Dorland said. (Larson, for her part, told me that the change was meant as "a direct reference to the title; it's really as simple as that.") Dorland's lawyer let the festival know she wasn't satisfied — that she still considered the letter in the story to be a derivative work of her original. If the festival ran the story, she'd sue.

**This had become** Sonya Larson's summer of hell. What had started with her reaching heights she'd never dreamed of — an entire major American city as her audience, reading a story she wrote, one with an important message about racial dynamics — was ending with her under siege, her entire career in jeopardy, and all for what she considered no reason at all: turning life into art, the way she thought that any writer does.

Larson had tried working the problem. When, in June, an executive from the book festival first came to her about Dorland, Larson offered to "happily" make changes to "The Kindest." "I remember that letter, and jotted down phrases that I thought were compelling, though in the end I constructed the fictional letter to suit the character of Rose," she wrote to the festival. "I admit, however, that I'm not sure what they are — I don't have a copy of that letter." There was a moment, toward the end of July, when it felt as if she would weather the storm. The festival seemed fine with the changes she made to the story. The Globe did publish something, but with little impact.

Then Dorland found that old audio version of the story online, and the weather changed completely. Larson tried to argue that this wasn't evidence of plagiarism, but proof that she'd been trying to *avoid* plagiarism. Her lawyer told The Globe that Larson had asked the audio publisher to make changes to her story on July 15, 2016 — in the middle of her first tense back-and-forth with Dorland — because the text "includes a couple sentences that I'd excerpted from a real-life letter." In truth, Larson had been frustrated by the situation. "She seemed to think that she had ownership over the topic of kidney donation," Larson recalled in an email to the audio publisher in 2018. "It made me realize that she is very obsessive."

It was then, in August 2018, facing this new onslaught of plagiarism claims, that Larson stopped playing defense. She wrote a statement to The Globe declaring that anyone who sympathized with Dorland's claims afforded Dorland a certain privilege. "My piece is fiction," she wrote. "It is not her story, and my letter is not her letter. And she shouldn't want it to be. She shouldn't want to be associated with my story's portrayal and critique of white-savior dynamics. But her recent behavior, ironically, is exhibiting the very blindness I'm writing about, as she demands explicit identification in — and credit for — a writer of color's work."

Here was a new argument, for sure. Larson was accusing Dorland of perverting the true meaning of the story — making it all about her, and not race and privilege. Larson's friend Celeste Ng agrees, at least in part, that the conflict seemed racially coded. "There's very little emphasis on what this must be like for Sonya," Ng told me, "and what it is like for writers of color, generally — to write a story and then be told by a white writer, 'Actually, you owe that to me.'"

---

## 'I feel instead of running the race herself, she's standing on the sidelines and trying to disqualify everybody else based on minor technicalities.'

---

But Ng also says this wasn't just about race; it was about art and friendship. Ng told me that Larson's entire community believed Dorland needed to be stopped in her tracks — to keep an unreasonable writer from co-opting another writer's work on account of just a few stray sentences, and destroying that writer's reputation in the process. "This is not someone that I am particularly fond of," Ng told me, "because she had been harassing my friend and a fellow writer. So we were quite exercised, I will say."

Not that it mattered. Dorland would not stand down. And so, on Aug. 13, Deborah Porter, the executive director of the Boston Book Festival, told Larson that One City One Story was canceled for the year. "There is seemingly no end to this," she wrote, "and we cannot afford to spend any more time or resources." When the Chunky Monkeys' co-founder, Jennifer De Leon, made a personal appeal, invoking the white-savior argument, the response from Porter was like the slamming of a door. "That story should never have been submitted to us in the first place," Porter wrote. "This is not about a white savior narrative. It's about us and our sponsor and our board not being sued if we distribute the story. You owe us an apology."

Porter then emailed Larson, too. "It seems to me that we have grounds to sue you," she wrote to Larson. "Kindly ask your friends not to write to us."

**Here, it would** seem, is where the conflict ought to end — Larson in retreat, "The Kindest" canceled. But neither side was satisfied. Larson, her reputation hanging by a thread, needed assurances that Dorland would stop making her accusations. Dorland still wanted Larson to explicitly, publicly admit that her words were in Larson's story. She couldn't stop wondering — what if Larson published a short-story collection? Or even a novel that spun out of "The Kindest?" She'd be right back here again.

On Sept. 6, 2018, Dorland's lawyer raised her demand to $15,000, and added a new demand that Larson promise to pay Dorland $180,000 should she ever violate the settlement terms (which included never publishing "The Kindest" again). Larson saw this as an even greater provocation; her lawyer replied three weeks later with a lengthy litany of allegedly defamatory claims that Dorland had made about Larson. Who, he was asking, was the real aggressor here? How could anyone believe that Dorland was the injured party? "It is a mystery exactly how Dorland was damaged," Larson's new lawyer, Andrew Epstein, wrote. "My client's gross receipts from 'The Kindest' amounted to $425."

To Dorland, all this felt intensely personal. Someone snatches her words, and then accuses her of defamation too? Standing down seemed impossible now: How could she admit to defaming someone, she thought, when she was telling the truth? She'd come too far, spent too much on legal fees to quit. "I was desperate to recoup that money," Dorland told me. She reached out to an arbitration-and-mediation service in California. When Andrew Epstein didn't respond to the mediator, she considered suing Larson in small-claims court.

On Dec. 26, Dorland emailed Epstein, asking if he was the right person to accept the papers when she filed a lawsuit. As it happened, Larson beat her to the courthouse. On Jan. 30, 2019, Dorland and her lawyer, Cohen, were both sued in federal court, accused of defamation and tortious interference — that is, spreading lies about Larson and trying to tank her career.

**There's a moment** in Larson's short story "Gabe Dove" — also pulled from real life — where Chuntao notices a white family picnicking on a lawn in a park and is awed to see that they've all peacefully fallen asleep. "I remember going to college and seeing people just dead asleep on the lawn or in the library," Larson told me. "No fear that harm will come to you or that people will be suspicious of you. That's a real privilege right there."

Larson's biggest frustration with Dorland's accusations was that they stole attention away from everything she'd been trying to accomplish with this story. "You haven't asked me one question about the source of inspiration in my story that has to do with alcoholism, that has to do with the Chinese American experience. It's extremely selective and untrue to pin a source of a story on just one thing. And this is what fiction writers know." To ask if her story is about Dorland is, Larson argues, not only completely beside the point, but ridiculous. "I have no idea what Dawn is thinking. I don't, and that's not my job to know. All I can tell you about is how it prompted my imagination." That also, she said, is what artists do. "We get inspired by language, and we play with that language, and we add to it and we change it and we recontextualize it. And we transform it."

When Larson discusses "The Kindest" now, the idea that it's about a kidney donation at all seems almost irrelevant. If that hadn't formed the story's pretext, she believes, it would have been something else. "It's like saying that 'Moby-Dick' is a book about whales," she said. As for owing Dorland a heads-up about the use of that donation, Larson becomes more indignant, stating that no artist has any such responsibility. "If I walk past my neighbor and he's planting petunias in the garden, and I think, Oh, it would be really interesting to include a character in my story who is planting petunias in the garden, do I have to go inform him because he's my neighbor, especially if I'm still trying to figure out what it is I want to say in the story? I just couldn't disagree more."

But this wasn't a neighbor. This was, ostensibly, a friend.

"There are married writer couples who don't let each other read each other's work," Larson said. "I have no obligation to tell anyone what I'm working on."

By arguing what she did is standard practice, Larson is asking a more provocative question: If you find her guilty of infringement, who's next? Is any writer safe? "I read Dawn's letter and I found it interesting," she told me. "I never copied the letter. I was interested in these words and phrases because they reminded me of the language used by white-savior figures. And I played with this language in early drafts of my story. Fiction writers do this constantly."

This is the same point her friends argue when defending her to me. "You take a seed, right?" Adam Stumacher said. "And then that's the starting point for a story. That's not what the story is about." This is where "The Kindest" shares something with "Cat Person," the celebrated 2017 short story in The New Yorker by Kristen Roupenian that, in a recent essay in Slate, a woman named Alexis Nowicki claimed used elements of her life story. That piece prompted a round of outrage from Writer Twitter ("I have held every human I've ever met upside down by the ankles," the author Lauren Groff vented, "and shaken every last detail that I can steal out of their pockets").

"The Kindest," however, contains something that "Cat Person" does not: an actual piece of text that even Larson says was inspired by Dorland's original letter. At some point, Larson must have realized that was the story's great legal vulnerability. Did she ever consider just pulling it out entirely?

"Yeah, that absolutely was an option," Larson said. "We could have easily treated the same moment in that story using a phone call, or some other literary device." But once she made those changes for One City One Story, she said, the festival had told her the story was fine as is. (That version of "The Kindest" ended up in print elsewhere, as part of an anthology published in 2019 by Ohio University's Swallow

Press.) All that was left, she believes, was a smear campaign. "It's hard for me to see what the common denominator of all of her demands has been, aside from wanting to punish me in some way."

Dorland filed a counterclaim against Larson on April 24, 2020, accusing Larson of violating the copyright of her letter and intentional infliction of emotional distress — sleeplessness, anxiety, depression, panic attacks, weight loss "and several incidents of self-harm." Dorland says she'd had some bouts of slapping herself, which dissipated after therapy. (This wasn't her first lawsuit claiming emotional distress. A few years earlier, Dorland filed papers in small-claims court against a Los Angeles writing workshop where she'd taught, accusing the workshop of mishandling a sexual-harassment report she had made against a student. After requesting several postponements, she withdrew the complaint.) As for her new complaint against Larson, the judge knocked out the emotional-distress claim this past February, but the question of whether "The Kindest" violates Dorland's copyrighted letter remains in play.

**The litigation crept along** quietly until earlier this year, when the discovery phase uncorked something unexpected — a trove of documents that seemed to recast the conflict in an entirely new way. There, in black and white, were pages and pages of printed texts and emails between Larson and her writer friends, gossiping about Dorland and deriding everything about her — not just her claim of being appropriated but the way she talked publicly about her kidney donation.

"I'm now following Dawn Dorland's kidney posts with creepy fascination," Whitney Scharer, a GrubStreet co-worker and fellow Chunky Monkey, texted to Larson in October 2015 — the day after Larson sent her first draft of "The Kindest" to the group. Dorland had announced she'd be walking in the Rose Bowl parade, as an ambassador for nondirected organ donations. "I'm thrilled to be part of their public face," Dorland wrote, throwing in a few hashtags: #domoreforeachother and #livingkidneydonation.

Larson replied: "Oh, my god. Right? The whole thing — though I try to ignore it — persists in making me uncomfortable. … I just can't help but think that she is feeding off the whole thing. … Of course, I feel evil saying this and can't really talk with anyone about it."

"I don't know," Scharer wrote. "A hashtag seems to me like a cry for attention."

"Right??" Larson wrote. "#domoreforeachother. Like, what am I supposed to do? DONATE MY ORGANS?"

Among her friends, Larson clearly explained the influence of Dorland's letter. In January 2016, she texted two friends: "I think I'm DONE with the kidney story but I feel nervous about sending it out b/c it literally has sentences that I verbatim grabbed from Dawn's letter on FB. I've tried to change it but I can't seem to — that letter was just too damn good. I'm not sure what to do … feeling morally compromised/like a good artist but a shitty person."

That summer, when Dorland emailed Larson with her complaints, Larson was updating the Chunky Monkeys regularly, and they were encouraging her to stand her ground. "This is all very excruciating," Larson wrote on July 18, 2016. "I feel like I am becoming the protagonist in my own story: She wants something from me, something that she can show to lots of people, and I'm not giving it."

"Maybe she was too busy waving from her floating thing at a Macy's Day parade," wrote Jennifer De Leon, "instead of, you know, writing and stuff."

Others were more nuanced. "It's totally OK for Dawn to be upset," Celeste Ng wrote, "but it doesn't mean that Sonya did anything wrong, or that she is responsible for fixing Dawn's hurt feelings."

"I can understand the anxiety," Larson replied. "I just think she's trying to control something that she doesn't have the ability or right to control."

"The first draft of the story really *was* a takedown of Dawn, wasn't it?" Calvin Hennick wrote. "But Sonya didn't publish that draft. … She created a new, better story that used Dawn's Facebook messages as initial inspiration, but that was about a lot of big things, instead of being about the small thing of taking down Dawn Dorland."

On Aug. 15, 2016 — a day before telling Dorland, "I value our relationship" — Larson wrote in a chat with Alison Murphy: "Dude, I could write pages and pages more about Dawn. Or at least about this particular narcissistic dynamic, especially as it relates to race. The woman is a gold mine!"

Later on, Larson was even more emboldened. "If she tries to come after me, I will FIGHT BACK!" she wrote Murphy in 2017. Murphy suggested renaming the story "Kindly, Dawn," prompting Larson to reply, "HA HA HA."

Dorland learned about the emails — a few hundred pages of them — from her new lawyer, Suzanne Elovecky, who read them first and warned her that they might be triggering. When she finally went through them, she saw what she meant. The Chunky Monkeys knew the donor in "The Kindest" was Dorland, and they were laughing at her. Everything she'd dreaded and feared about raising her voice — that so many writers she revered secretly dismissed and ostracized her; that absolutely no one except her own lawyers seemed to care that her words were sitting there, trapped inside someone else's work of art; that a slew of people, supposedly her friends, might actually believe she'd donated an organ just for the likes — now seemed completely confirmed, with no way to sugarcoat it. "It's like I became some sort of dark-matter mascot to all of them somehow," she said.

But there also was something clarifying about it. Now more than ever, she believes that "The Kindest" was personal. "I think she wanted me to read her story," Dorland said, "and for me and possibly no one else to recognize my letter."

Larson, naturally, finds this outrageous. "Did I feel some criticism toward the way that Dawn was posting about her kidney donation?" she said. "Yes. But am I trying to write a takedown of Dawn? No. I don't care about Dawn." All the gossiping about Dorland, now made public, would seem to put Larson into a corner. But many of the writer friends quoted in those texts and emails (those who responded to requests for comment) say they still stand behind her; if they were ridiculing Dorland, it was all in the service of protecting their friend. "I'm very fortunate to have friends in my life who I've known for 10, 20, over 30 years," Larson told me. "I do not, and have never, considered Dawn one of them."

What about the texts where she says that Dorland is behaving just like her character? Here, Larson chose her words carefully. "Dawn might behave like the character in my story," she said. "But that doesn't mean that the character in my story is behaving like Dawn. I know she's trying to work through every angle she can to say that I've done something wrong. I have not done anything wrong."

**In writing, plagiarism** is a straight-up cardinal sin: If you copy, you're wrong. But in the courts, copyright infringement is an evolving legal concept. The courts are continuously working out the moment when someone's words cross over into property that can be protected; as with any intellectual property, the courts have to balance the protections of creators with a desire not to stifle innovation. One major help to Dorland, however, is the rights that the courts have given writers over their own unpublished letters, even after they're sent to someone else. J.D. Salinger famously prevented personal letters from being quoted by a would-be biographer. They were his property, the courts said, not anyone else's. Similarly, Dorland could argue that this letter, despite having made its way onto Facebook, qualifies.

Let's say the courts agree that Dorland's letter is protected. What then? Larson's main defense may be that the most recent version of the letter in "The Kindest" — the one significantly reworded for the book festival — simply doesn't include enough material from Dorland's original to rise to the level of infringement. This argument is, curiously, helped by how Larson has always, when it has come down to it, acknowledged Dorland's letter as an influence. The courts like it when you don't hide what you've done, according to Daniel Novack, chairman of the New York State Bar Association's committee on media law. "You don't want her to be punished for being clear about where she got it from," he said. "If anything, that helps people find the original work."

Larson's other strategy is to argue that by repurposing snippets of the letter in this story, it qualifies as "transformative use," and could never be mistaken for the original. Arguing transformative use might require arguing that a phrase of Larson's like "imagining and rejoicing in YOU" has a different inherent meaning from the phrase in Dorland's letter "imagining and celebrating *you*." While they are similar, Larson's lawyer, Andrew Epstein, argues that the story overall is different, and makes the letter different. "It didn't steal from the letter," he told me, "but it added something new and it was a totally different narrative."

Larson put it more bluntly to me: "Her letter, it wasn't art! It was informational. It doesn't have market value. It's like language that we glean from menus, from tombstones, from tweets. And Dorland ought to know this. She's taken writing workshops."

Transformative use most often turns up in cases of commentary or satire, or with appropriation artists like Andy Warhol. The idea is not to have such strong copyright protections that people can't innovate. While Larson may have a case, one potential wrinkle is a recent federal ruling, just earlier this year, against the Andy Warhol Foundation. An appeals court determined that Warhol's use of a photograph by Lynn Goldsmith as the basis for his own work of art was not a distinctive enough transformation. Whether Larson's letter is derivative, in the end, may be up to a jury to decide. Dorland's lawyer, meanwhile, can point to that 2016 text message of Larson's, when she says she tried to reword the letter but just couldn't. (*"That letter was just too damn good."*)

"The whole reason they want it in the first place is because it's special," Dorland told me. "Otherwise, they wouldn't bother."

If anything, the letter, for Dorland, has only grown more important over time. While Larson openly wonders why Dorland doesn't just write about her donation her own way — "I feel instead of running the race herself, she's standing on the sidelines and trying to disqualify everybody else based on minor technicalities," Larson told me — Dorland sometimes muses, however improbably, that because vestiges of her letter remain in Larson's story, Larson might actually take her to court and sue *her* for copyright infringement if she published any parts of the letter. It's almost as if Dorland believes that Larson, by getting there first, has grabbed some of the best light, leaving nothing for her.

**Last year, as** the pandemic set in, Dorland attended three different online events that featured Larson as a panelist. The third one, in August, was a Cambridge Public Library event featuring many of the Chunky Monkeys, gathering online to discuss what makes for a good writing group. "I know virtually all of them," Dorland said. "It was just like seeing friends."

Larson, while on camera, learned that Dorland's name was on the attendees list, and her heart leapt into her throat. Larson's life had moved on in so many ways. She'd published another story. She and her husband had just had their baby. Now Larson was with her friends, talking about the importance of community. And there was Dorland, the woman who'd branded her a plagiarist, watching her. "It really just freaks me out," Larson said. "At times I've felt kind of stalked."

Dorland remembers that moment, too, seeing Larson's face fall, convinced she was the reason. There was, for lack of a better word, a connection. When I asked how she felt in that moment, Dorland was slow to answer. It's not as if she meant for it to happen, she said. Still, it struck her as telling.

"To me? It seemed like she had dropped the facade for a minute. I'm not saying that — I don't want her to feel scared, because I'm not threatening. To me, it seemed like she knew she was full of shit, to put it bluntly — like, in terms of our dispute, that she was going to be found out."

Then Dorland quickly circled back and rejected the premise of the question. There was nothing strange at all, Dorland said, about her watching three different events featuring Larson. She was watching, she said, to conduct due diligence for her ongoing case. And, she added, seeing Larson there seemed to be working for her as a sort of exposure therapy — to defuse the hurt she still feels, by making Larson something more real and less imagined, to diminish the space that she takes up in her mind, in her life.

"I think it saves me from villainizing Sonya," she wrote me later, after our call. "I proceed in this experience as an artist and not an adversary, learning and absorbing everything, making use of it eventually."

Robert Kolker is a writer based in Brooklyn, N.Y. In 2020, his book "Hidden Valley Road" became a selection of Oprah's Book Club and a New York Times best seller. His last article for the magazine was about the legacy of Jan Baalsrud, the Norwegian World War II hero.