# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

SONYA LARSON,

           Plaintiff

v.

DAWN DORLAND PERRY,
COHEN BUSINESS LAW GROUP, PC and
JEFFREY A. COHEN, ESQUIRE,

           Defendants

           C.A. No. 1:19-cv-10203-IT

---

DAWN DORLAND PERRY,

           Plaintiff-in-Counterclaim

v.

SONYA LARSON,

           Defendant-in-Counterclaim

## DAWN DORLAND'S RESPONSE TO SONYA LARSON'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Defendant/Plaintiff in Counterclaim Dawn Dorland Perry ("Ms. Dorland" or "Dorland") hereby responds to Plaintiff/Defendant-in-Counterclaim Sonya Larson's Statement of Undisputed Material Facts ("SUMF"), as follows:

1.      Larson has written and had published 23 short stories and essays to date, including *Gabe Dov* that was published in 2007 by <u>Best American Short Stories</u>, and *The Kindest*, which is the subject of this Action. She is also working on her first novel. [Larson Aff. ¶ 1, attached to her Memorandum as Exhibit 1.]

1

**Dorland Response**:   Not disputed for purposes of summary judgment.  Further responding, Ms. Dorland states that this fact is irrelevant to the claims and defenses in this matter, and not properly included in this SUMF.

2.      Larson wrote a fictional short story called "*The Kindest*," which is about the meeting between a poor alcoholic Chinese-American woman (Chuntao) who receives a kidney anonymously from an affluent white kidney donor (Rose).  The story was written in five different variations, each of which contains a brief letter about one-third of the way into the tale, through which Larson introduces her kidney donor character to her recipient character. [Larson Aff. ¶ 2]

**Dorland Response**: Not disputed for purposes of summary judgment.  Further responding, Ms. Dorland states that this fact is irrelevant to the claims and defenses in this matter, and not properly included in this SUMF.

3.      Dorland is a living kidney donor who donated one of her kidneys on June 24, 2015, to a then unknown recipient.  The surgery took place at the UCLA Medical Center near where Dorland lives. [Countercl. ¶ 23]

**Dorland Response**:  Not disputed.

4.      Around the time of her surgery, Dorland started a Facebook group where she could post information about kidney donations and get support from various members of her group. [Countercl. ¶ 34]

**Dorland Response**: Not disputed for purposes of summary judgment.

5.      Dorland referred to her Facebook group as "private/closed." [Exhibit 2]

**Dorland Response**: Not disputed.

6.      Larson was <u>involuntarily</u> added to the Facebook group by Dorland. [Larson Aff. ¶ 3]

**Dorland Response**: Disputed in part.  As an initial matter, Ms. Larson herself stated in 2015 that she "joined" Ms. Dorland's private/closed Facebook group. <u>See</u> Oct. 28, 20222 Amadei Aff., Ex. N (Doc. No. 181-14) (in a July 12, 2016

email, Sonya Larson states "my memory is that I did indeed join the FB group); Secondarily, while any invitee received access to the group, Ms. Dorland made clear in the first post viewed by any member that all were able to decline the invitation.  Oct. 28, 2022 Amadei Aff., Ex. B, Doc. No. 181-2 (April 22, 2015 post in private Facebook Group, drafted by Ms. Dorland as an "introduction" to the group, stating, "You've been invited to this private/closed group … please feel free to decline the invitation or to leave the group at any time.").

Further responding, Ms. Dorland states that this fact is irrelevant to the claims and defenses in this matter, and not properly included in this SUMF.

7.      Dorland and Larson met through GrubStreet, a Boston-based writing center where Larson worked for 16 years.  [Larson Aff. ¶ 4; 2nd Am. Compl. ¶16 (Dkt. 91); Countercl. ¶¶ 8-16 (Dkt. 96)].

        **Dorland Response**: Not disputed for purposes of summary judgment.

8.      Dorland's kidney was given to an unknown person who was not known to Dorland at the time.  [Countercl. ¶ 24]

        **Dorland Response**:  Not disputed.

9.      After Dorland's surgery, Dorland learned that her kidney was given to a California Rabbi.  The Rabbi's wife (Debbie Striks) wanted to donate one of her own kidneys to her husband, but she was not a compatible donor. [Countercl. ¶ 24]

        **Dorland Response**:  Not disputed.  Further responding, this information is not relevant to either party's claims or defenses, and further unnecessarily shares the identity of a kidney donor in a publicly-filed document; this fact is not properly included in this SUMF.

10.     The Rabbi's wife, later determined to be a woman named Debbie Striks, also became a living kidney donor, and she donated one of her kidneys to an unknown recipient. [Exhibit 3] The unknown recipient was later determined to be a woman in Oregon. [Countercl. ¶ 24-5]

        **Dorland Response**:  Not disputed.  Further responding, this information is not relevant to either party's claims or defenses, and further unnecessarily shares the

3

identity of a kidney donor in a publicly-filed document; this fact is not properly included in this SUMF.

11. This series of events, known as a kidney chain, included four people, four surgeries and two kidneys.

   **Dorland Response**:  Not disputed.

12. Dorland decided she wanted to contact the Oregon woman who was the final recipient in the kidney chain she started.  She wrote a short letter in July 2015, and gave it to a nurse at the UCLA Medical Center with the understanding that it would be sent to the coordinator at the hospital where the Oregon woman received Debbie Striks' kidney. [Countercl. ¶ 49]

   **Dorland Response**:  Not disputed for purposes of summary judgment.  Further responding, this information is not relevant to either party's claims or defenses, and further unnecessarily shares the identity of a kidney donor in a publicly-filed document; this fact is not properly included in this SUMF.

13. On July 7, 2015, Dorland posted the letter to her Facebook group after it was "shared widely around the UCLA Transplant Team."  [Exhibit 4 and Countercl. ¶ 55] Dorland's Facebook letter is hereinafter referred to as the "Dorland Letter." [check

   **Dorland Response**:  Not disputed.

14. Dorland's Facebook readers were encouraged "to share my public kidney post." [Exhibit 5]

   **Dorland Response**:  Disputed. Notwithstanding the implication, Exhibit 5 does not refer to the Dorland Letter, which was posted solely in the private/closed group, but rather refers to a separate kidney donation advocacy post which Ms. Dorland shared from her own Facebook account (not the group).  See, e.g., Oct. 28, 2022 Amadei Aff., Ex. C (Doc. No. 181-3) Facebook entry in the DDP LKD (the private/closed group) sharing the Dorland Letter with the members of the group; contrasted with Larson Ex. 5 (dated August 5, 2015, almost one month later).  Further, the note to the members of the private group, encouraging them to share Ms. Dorland's public Facebook post, did include a reminder of the confidentiality of certain information that had been shared in the group.  Id.

15.     Dorland read the online version of Larson's story known as *The Kindest* for the first time in early June 2018.  Dorland read the version of the story that was published by American Short Fiction ("ASF").

>   **Dorland Response**:  Not disputed.

16.     Shortly after Dorland read Larson's story, Dorland emailed ASF and accused Larson of plagiarism for allegedly using portions of the Dorland Letter in her story. [Exhibit 6]

>   **Dorland Response**:  Not disputed.

17.     Dorland asked ASF to withdraw *The Kindest* from publication.  Dorland also claimed she had "ethical issues" with Larson. [Exhibit 6]

>   **Dorland Response**:  Disputed.  ASF published *The Kindest* in both a printed anthology and later, for a limited period of time on its website, in order to placate Ms. Larson after she complained that ASF failed to submit *The Kindest* to Best American Short Stories.  See Dec. 23, 2022 Amadei Aff., Exhibit E, Doc. No. 194-5.  Ms. Dorland's request to "withdraw *The Kindest* from publication" referred only to the on-line version, and not the print version.  See Larson Ex. 6. Further responding, Exhibit 6 does not state that Ms. Dorland had "ethical issues" with Larson.

18.     The Dorland Letter contains approximately 381 words. [See Exhibits 4 and 7.] Each of the five variations of *The Kindest* contains approximately 5,500 words. [Larson Aff. ¶ 5]

>   **Dorland Response**: Not disputed.  Further responding, Ms. Dorland states that this fact is irrelevant to the claims and defenses in this matter, and not properly included in this SUMF.

19.     Larson admits she saw the Dorland Letter [Countercl. ¶ 56-7], and that it and Dorland's kidney donation were <u>part</u> of the inspiration for *The Kindest*.  [Larson Aff. ¶ 6]

>   **Dorland Response**:  Not disputed.

20.     When Larson was writing *The Kindest*, she found numerous sample letters online from organ donors to organ recipients, which she used for reference.  The sample letters contain

information similar to that used by Dorland in her letter.  [Larson Aff. ¶ 7 and sample letters at

Exhibit 8.]

> **Dorland Response**:  Disputed. All but one of the letters contained in Larson Ex. 8
> are letters that are sent by a family member of a deceased donor; the single letter
> written by a living organ donor was not produced in discovery of this matter,
> notwithstanding a request for production requesting same.  See Dec. 23, 2022
> Amadei Aff., Ex. D, Doc. No. 194-4, at p. 8 (Larson's Resp. to RFP 18).  Further
> responding, none of the sample letters include Dorland's particular experiences or
> motivation for donating her kidney to an unknown recipient. See, Larson Ex. 8;
> Oct. 28, 2022 Amadei Aff., Ex. C (Doc. No. 181-3) (the Dorland Letter).

21.     Larson has written five slightly different variations of *The Kindest*, each of which

reflects Larson's writing process in which she regularly edits her stories to improve the language,

tone, and flow of the prose.  Each variation includes a short letter about one-third of the way into

the story in which the wealthy white kidney donor character, Rose, is introduced to the poor,

alcoholic Chinese-American kidney recipient and protagonist, Chuntao. [Larson Aff. ¶ 8]

> **Dorland Response**:  Not disputed for purposes of summary judgment.

22.     The different variations of *The Kindest* include the following: (Larson Aff. ¶ 9)

> (1)     Brilliance Audio – This was an early draft of *The Kindest* that was sent to
> a literary agency known as Plympton, Inc., for the limited purpose of seeing if Plympton
> could sublicense the audiobook rights to Audible.com. (See, Exhibit 9,Section 2.)
> Plympton was successful in sublicensing the audio rights to Audible.com.
>
> By mistake, and without Larson's knowledge or permission, Audible.com
> recorded and released this early draft as an audio story in August 2016. As soon as
> Larson discovered the mistake, she demanded that the story be re-recorded, which it was.
> Audible promptly removed the draft version and released the re-recorded version as an
> audiobook in October 2016.  Larson did not know until two years later that marketing
> giant AMAZON, which owns both Audible.com and Brilliance Audio, had also released
> the draft version via Brilliance Audio as a print-on-demand CD. [See,
> https://www.audible.com/ep/brilliance ]  Brilliance never had permission to release any
> recording of Larson's story.  Dorland purchased one of these audio recordings in 2018,
> after the present dispute started.  [A copy of the letter portion of the Brilliance Audio
> version, apparently transcribed by the Boston Globe, is attached as Appendix I.]
> [Dorland asked for, but the Globe refused to share its transcript with Dorland.  See
> Exhibit 10, email between the Globe and Dorland.]

**Dorland Response**:  Disputed.  Ms. Dorland disputes that the Brilliance Audio version of *The Kindest* was "without Larson's knowledge or permission," or that it was an "early draft".  Ms. Larson submitted the story for publication on November 30, 2015.  See Dec. 23, 2022 Amadei Aff., Ex. B, Doc. No. 194-2, (Nov. 30, 2015 email from S. Larson to Y. Goldstein with subject line: "A 3rd Audible Submission").

As reflected in the attachment to that email, the story that Ms. Larson submitted for publication included the very close copy of the Dorland letter, including the passage about Ms. Dorland's personal childhood experiences, and Ms. Dorland's unique turn of phrase, "My gift, which begat yours, trails no strings."  Id.

On December 28, 2015, Ms. Larson sent a second version of *The Kindest* to her contacts at Plympton, stating "I've since revised *The Kindest* to make it much tighter. Is it okay to send along an updated version, once the paperwork's ready?" See Dec. 23, 2022 Amadei Aff., Ex. C, Doc. No. 194-3 (Dec. 28, 2015 email exchange, with attachment).  As reflected in the attachment to that email, the "much tighter version" of *The Kindest* did not include changes to the letter portion of the story, which remained a very close copy of the Dorland Letter including the language referenced above.

In May of 2016, Ms. Larson was aware that a voice actor was lined up to record her story, and asked yet again to submit a revised version where she had "made slight revisions on the level of language – mostly to ease the rhythm and tone. The new version is attached.  Is it possible that Emily could read this version instead?"  See Dec. 23, 2022 Amadei Aff., Ex. A, Doc. No. 194-1 (Email chain between S. Larson and authorcare@audible.com). It is not disputed that this version also did not contain changes to the letter portion of the story.

It was not until after the story had been recorded that Ms. Larson requested change to the letter portion of *The Kindest*.  See Oct. 28, 2022 Amadei Aff., Ex. O, Doc. No. 181-15.

Further responding, Ms. Larson's claim that Audible had published an "early draft" without her permission or authorization is further proven as an attempt to change history when viewed in conjunction with other submissions she had made in attempts to get *The Kindest* published.  In January of 2016, Ms. Larson submitted *The Kindest* to the New Yorker for publication, with the same version of the letter portion of the story that was published by Brilliance Audio.  See, e.g., Dec. 23, 2022 Amadei Aff., Ex. L, Doc. No. 194-12 (email chain between S. Larson and *The New Yorker*); Ex. M (Doc. No. 194-13 (the submission to *The New Yorker*, as produced by S. Larson with the document title, "*The Kindest*, for the New Yorker.pdf" bearing the "date modified" of 1/18/2016, the same date as the initial email submission reflected in Dec. 23, 2022 Amadei Aff., Exhibit L).

7

(2)    Audible.com – The re-recorded Audible.com version of *The Kindest* was published as an audiobook in October 2016.  Larson was paid $125 for the audio rights. [A copy of the transcribed Audible.com version is attached as Appendix II.]

**Dorland Response**: Not disputed for purposes of summary judgment.

(3)    American Short Fiction, Inc. ("ASF") – The ASF version was published in print in August 2017 and online in May 2018. ASF paid Larson $300 for a license to use her story. [See, Exhibit 11] [A copy of the ASF version is attached as Appendix III.]

**Dorland Response**:  Not disputed for purposes of summary judgment.

(4)    Boston Book Festival ("BBF") – Competition Version.  In February 2018, Larson entered a slightly revised version of *The Kindest* in a competition sponsored by the Boston Book Festival ("BBF"). The competition was called One City/One Story ("1C/1S"). The text of the letter in the story from Rose to Chuntao is the same as the letter in the ASF version, however the rest of the story contains numerous revisions. [A copy of the BBF version is attached as Appendix IV.]

**Dorland Response**:  Not disputed for purposes of summary judgment.

(5)    Final Version.  Larson wrote the final version of *The Kindest* in June 2018, at the suggestion of the BBF.  This version was written after Dorland contacted the BBF and alleged that *The Kindest* plagiarized the Dorland Letter. The BBF never published this version, but in December 2019, it was included in a book of short stories called, *Welcome to the Neighborhood*, published by Ohio Univ. Press. [A copy of the final version is attached as Appendix V.]

**Dorland Response**:  Not disputed for purposes of summary judgment.

23.    Dorland says that she first became aware that *The Kindest* was published in 2016, but she did not read the story until the weekend of June 2-3, 2018. [Countercl. ¶ 87]

**Dorland Response**:  Not disputed.

24.    When Dorland read the story, she claims she saw "similarities" between the Dorland Letter and the letter in the ASF version of *The Kindest*.  Rather than confronting Larson with her concerns, Dorland chose to go directly to ASF and accuse Larson of plagiarism. [Exhibit 12; BATES Dorland 00122-3]

**Dorland Response**: Disputed. Exhibit 12 is a document that speaks for itself; Dorland disputes the mischaracterization of the document contained in Fact No. 24.  First, Dorland did not state that she saw "similarities" in the two letters, she stated that "I am dismayed to confirm the similarities between Sonya's fictional

8

donor's motivations and my own, as well as the story's title, plucked from an article I'd pointed Sonya to because it had very much inspired and informed my own donation." See Larson Ex. 12 at Bates No. DORLAND000123. Later in the email, Ms. Dorland states, "I believe that the letter in Sonya's story plagiarizes the letter that I wrote to the final recipient in my short kidney chain, a letter to which Sonya had access as a member of a private friends-and-family Facebook group where I shared updates and information about my donation." Ms. Dorland goes on in the email to state that while the "similarities" between Dorland's donation and the donation in *The Kindest* was troubling, it was a topic for debate, while the copying of her writing was "a serious issue." Id.

25.     On Monday, June 4, 2018, Dorland sent an email to the "Editors" of ASF

demanding that Larson's story be pulled from publication, that Dorland be given an

acknowledgement for her text in Larson's story, and that ASF consider allowing Dorland to

write "an article for ASF raising ethical issues germane to all writers." [Exhibit 12; BATES

Dorland 00122-3]

> **Dorland Response**:  Disputed.  Ms. Dorland disputes Ms. Larson's characterizations of the June 4, 2018 email, which is a document which speaks for itself.  Ms. Dorland disputes that she "demanded" that Larson's story be pulled from publication, or any other remedy, as she instead listed a set of potential remedies that she would find "acceptable," without stating that she required all to be imposed. See Larson Ex. 12 (Doc. No. No. 190-2 at p. 7).

26.     Dorland was seeking to have ASF pull *The Kindest* from publication.  Dorland

also wanted recognition for her kidney donation, attribution to the Dorland Letter, and she

wanted to write an article for ASF addressing her so-called, "ethical issues."

> ("Remedies I would find acceptable range from ASF's pulling the story to the author making an acknowledgement of my text. I would also, or in addition, consider writing an article for ASF raising ethical issues germane to all writers.")

[Exhibit 12:  specifically BATES: Dorland 00123]

> **Dorland Response**:  Disputed. Ms. Dorland disputes Ms. Larson's characterization of the June 4, 2018 email, which is a document which speaks for itself.

27.     The day after Rebecca Markovits, Co-Editor of ASF, received Dorland's email,

Dorland responded that she wanted ASF to "pull" the story while ASF was seeking legal advice,

and that she too was "in the process of securing legal counsel." [Exhibit 12: <u>specifically</u>

BATES: Dorland 00121-2.]

> **Dorland Response**: Ms. Dorland disputes Ms. Larson's characterization of
> Exhibit 12, which is a document which speaks for itself. <u>See</u> Doc. No. 190-2.

28.     Sometime after Ms. Markovits of ASF told Larson of Dorland's allegations,

Larson hired Atty. James Gregorio.  Atty. Gregorio conveyed to Dorland via Markovits that he

was "happy" to talk with Dorland or her attorney.  Dorland pointedly refused to give Ms.

Markovits permission to share with Larson or her attorney the emails Dorland sent to ASF.

[Exhibit 12: specifically BATES: Dorland00120-21.]

> **Dorland Response**: Ms. Dorland disputes the characterizations of the email
> chain at Exhibit 12, as it is a document which speaks for itself.

29.     Neither Dorland nor her attorney ever reached out to Larson or her attorney about

Dorland's plagiarism claims made to ASF. [Larson Aff. ¶ 10]

> **Dorland Response**:  Not disputed.

30.     On June 14, 2018, Ms. Markovits emailed Dorland and said that both lawyers that

ASF consulted thought Larson had a fair use defense.  Markovits also said she discussed with

Larson that "she might rewrite the lines in question and replace those lines in our published

version of the story."  Markovits asserted that while this matter seemed to be perhaps "a personal

betrayal within your friendship," it was "not a matter of publishing ethics."  [Exhibit 12:

<u>specifically BATES</u>: Dorland00119-20.]  ASF told Dorland that ASF was a "tiny operation with

a tinier budget," and she encouraged Dorland to address her complaint directly with Larson.

[Exhibit 12: <u>specifically</u> BATES; Dorland 00119.]

> **Dorland Response**: Ms. Dorland disputes the characterizations of the email
> chain at Exhibit 12, as it is a document which speaks for itself.

31.     As a result of Dorland's intention to pursue her legal remedies, ASF decided to

pull *The Kindest* from online publication. [Exhibit 12: <u>specifically</u> BATES: Dorland00118.]

[Larson Aff. ¶ 11]

>    **Dorland Response**: Disputed.  Exhibit 12 is a document that speaks for itself;
>    Exhibit 11 contains hearsay evidence, not subject to any exception, and is not
>    admissible at summary judgment.  Only ASF and its representatives know, and
>    are qualified to testify as to, the reason for its actions.

32.     Larson was proud of having her story published by ASF and, as a writer, she lost

a valuable benefit when *The Kindest* was pulled.  [Larson Aff. ¶ 12]  The benefits were both in

readership and intangible as Dorland herself acknowledges. [Exhibit 13]

>    **Dorland Response**:  Disputed.  *The Kindest* was published by ASF in a hard-
>    bound book which was never "pulled" from publication or distribution. <u>See</u> Dec.
>    23, 2022 Amadei Aff., Ex. F, Doc. No. 194-6.  Further responding, Ms. Dorland
>    disputes that she "acknowledges" anything concerning the publication of *The
>    Kindest* by ASF, as the deposition testimony referenced at Exhibit 13 concerns the
>    BBF and the One City / One Story program, not ASF.

33.     In early June 2018, while Dorland was still pressuring ASF to give in to her

demands, Dorland apparently noticed on Larson's website that she had won the BBF competition

that year.  Dorland correctly guessed that Larson won the 1C/1S contest for her short story, *The

Kindest* . [Dorland's Statement of Undisputed Material Facts #20]

>    **Dorland Response**: Not disputed for purposes of summary judgment.  Further
>    responding, the only record evidence cited for this "Fact" is Ms. Dorland's own
>    statement of fact, #20, which states only that "Ms. Dorland learned from Ms.
>    Larson's own webpage, that Ms. Larson had been selected for the Boston Book
>    Festival's ("BBF") short story feature known as One City / One Story".  See Doc.
>    No. 183 at #2.  *The Kindest* is not mentioned at all in Statement of Fact No. 20.

34.     On June 7, 2018, Dorland telephoned the BBF and left a message about her

plagiarism allegations and followed up the call with a copy of the same letter she sent to ASF

two days earlier. Dorland continued to make relentless calls and emails to the BBF. [See Exhibit

14]  In one of her emails Dorland says, "[r]eproducing "*The Kindest*," which contains portions of

another author's work [Dorland's] could have serious legal and ethical consequences." [Exhibit 15]

> **Dorland Response**:  It is not disputed that Ms. Dorland telephoned the BBF and left a message.  Ms. Larson cites no evidence for the assertion that the message was "about her plagiarism allegations", and Ms. Dorland disputes same. Ms. Dorland further disputes that she made "relentless calls and emails to the BBF", and the evidence cited reflects two emails which contain references to two phone calls.

35.     As the IC/1S winner, Larson was due to receive widespread attention for her story throughout Eastern Massachusetts, and she would likely have had numerous press interviews, and would have garnered immeasurable goodwill. [Larson Aff. ¶ 13]

> **Dorland Response**: Disputed.  No evidence is cited for the speculative statements contained in Ms. Larson's affidavit.

36.     As the winner of the competition, Larson gave the BBF a license to publish her story during the full term of her copyright.  [See Agreement with BBF at Exhibit 16.]

> **Dorland Response**:  Not disputed.

37.     On June 7, 2018, Dorland sent an email the prestigious Bread Loaf Writer's Conference at Middlebury College, accusing the author of *The Kindest* (whom she later named) of using plagiarized material for a fellowship application.

> **Dorland Response**:  Disputed.  Fact No. 37 is uncited, despite referencing an email.  That email speaks for itself, and Ms. Dorland disputes the characterization of same.

38.     The email sent by Dorland started with the subject line, "Possible Plagiarism in Tuition Fellow's 2017 Application." [Exhibit 17]

> **Dorland Response**: Undisputed.

39.     Dorland explicitly names *The Kindest* in the email. [See selected emails at Exhibit 18.]

**Dorland Response**:  Disputed.  Ms. Dorland cannot respond to Fact No. 39, as it references a single "email," but cites to a collection of emails at Ex. 18. Therefore, Ms. Dorland disputes this fact.

40.     Larson did not apply for a fellowship at Bread Loaf using *The Kindest*.  She received her fellowship using other short stories she had written. [2nd Am. Compl. ¶ 41] [Larson Aff.¶¶ 14-16]

**Dorland Response**:  Not disputed solely for purposes of summary judgment.

41.     Dorland also contacted dozens of other programs and individuals in the writing community, asking first if *The Kindest* was part of Larson's application and then identifying Larson by name, as well as alleging that Larson was a plagiarist.  [See, Larson Aff. ¶ 16, identifying over 30 people and writing programs contacted by Dorland.]

**Dorland Response**:  Disputed in part. Ms. Dorland does not dispute that she contacted the persons and entities listed at Larson Ex. 1, ¶ 16.  However, that list contains many duplicates of contacts, such as listing both the "Dear Sugars Podcast" (y) and its representative, Steve Almond (cc) separately, when in fact, they were recipients of the same email.

Ms. Dorland further disputes that she asked each of these people "if *The Kindest* was part of Larson's application and then identifying by name, as well as alleging that Larson was a plagiarist," and no evidence is cited in support of that proposition.

42.     Shortly after Dorland contacted the BBF, the BBF asked Larson to modify the letter in her story so that it would not resemble the Dorland Letter. Larson complied within days, and on June 13th, sent a revision to the BBF.  [Exhibit 19]  This revised story became the final version of *The Kindest* [See Appendix V]. The BBF was satisfied that the revised letter was not at all similar to the Dorland Letter. [Larson Aff. ¶ 17]

**Dorland Response**: Disputed in part.  Ms. Dorland disputes the final sentence of Fact No. 42, as ¶ 17 of Ms. Larson's affidavit does not address the matter raised in Fact No. 42.  Assuming Ms. Larson intended to cite to ¶ 18 of her affidavit, Ms. Dorland disputes the final sentence of Fact No. 42 on the grounds that the only evidence cited is Ms. Larson's self-serving hearsay testimony, which is not subject to any exception to the rule prohibiting the admission of hearsay evidence.

13

Ms. Dorland further disputes that the revised letter was "not at all similar to the Dorland Letter."

43.     On June 18, 2018, Dorland acknowledged at least twice in emails, one sent to Rebecca Ostriker, Arts Editor of the Boston Globe, and the other to Norah Piehl of the BBF that after Larson modified the letter in the final version of her story, Dorland's copyright claim was "neutralized."  [Exhibit 20; BATES: BBF01182, emphasis supplied]

> **Dorland Response**:  Disputed.  As an initial matter, the documents referenced herein speak for themselves, and Ms. Dorland disputes Ms. Larson's characterization of same.  Further responding, Ms. Dorland states that as of the date of these emails, Ms. Dorland had not yet seen the new version of *The Kindest*, and could not have drawn any conclusions concerning the revisions' impact on her claims; the revised version was provided to Ms. Dorland, through counsel, for the first time on July 10, 2018.  See Dec. 23, 2022 Amadei Aff., Ex. H, Doc. No. 194-8.

44.     On June 19, 2018, the BBF asked Dorland to "propose some text for a brief . . . gracious acknowledgment" which could be published with *The Kindest* that she would find satisfactory to address her ethical issues. Dorland suggested the following:

> This story appears in an altered form from its first publication in *American Short Fiction*. A section of the story was substantially revised because it bore a clear resemblance to the unpublished work and service of the writer Dawn Dorland, a living kidney donor. The Boston Book Festival, 1C1S, and the author Sonya Larson express their sincere regrets.

[Exhibit 21]

> **Dorland Response**: Not disputed.

45.     While Norah Piehl of the BBF agreed to consider Dorland's request to provide information about kidney donations on its 1C/1S web page [Exhibit 22 – see mid-page BATES: BBF 01162], "the entire 1C1S selection committee" was "unanimous" that the BBF had fulfilled its "obligations both legally and ethically and that the original wording of the credit line is sufficient for our purposes." [Exhibit 22; BATES: BBF01161]

> **Dorland Response**:  Ms. Dorland disputes Ms. Larson's characterizations of Exhibit 22, which is a document that speaks for itself.

46.     On July 2, 2018, Dorland wrote to Eve Bridburg, Exec. Director of GrubStreet Larson's employer), to try to persuade Larson to formally apologize to Dorland. Dorland also said she would be "comfortable" if Larson was suspended from GrubStreet "with or without pay." [Exhibit 23; BATES: DORLAND000344]

> **Dorland Response**:  Ms. Dorland disputes Ms. Larson's characterizations of Exhibit 23, which is a document that speaks for itself.

47.     On July 3, 2018, the Cohen Defendants sent a letter to the BBF, accusing Larson of copyright infringement, and demanding that the BBF stop any further "printing, copying, distribution or other activities related to '*The Kindest*' until this matter has been resolved."  The Cohen Defendants further said that if the BBF did not comply with its demands, they would seek "the full measure of penalties for statutory copyright infringement under 17 U.S.C. § 504(c), which. . . . could be as high as $150,000." [Exhibit 24]

> **Dorland Response**: It is not disputed that Ms. Dorland's attorneys sent the referenced letter to the BBF.  Ms. Dorland disputes Ms. Larson's characterizations of Exhibit 23, which is a document that speaks for itself.

48.     Dorland did not register the copyright to the Dorland Letter until almost three years after it was first posted on Facebook in 2015, and long after Larson allegedly plagiarizing it. [Exhibit 7]

> **Dorland Response**:   It is not disputed that Ms. Dorland registered the copyright to the Dorland Letter on June 10, 2018.

49.     Shortly after the July 3, 2018 letter was received by the BBF, the Cohen Defendants were sent a copy of Larson's revised version of *The Kindest* by Paul Sennott, the BBF's attorney. [Exhibit 25; Gregorio Aff. ¶ 8]

> **Dorland Response**: It is not disputed that Ms. Dorland received the revised version of *The Kindest*, through counsel, on July 10, 2018.

50.     Dorland admitted that litigation alone would not fully resolve the dispute she had with Larson. In her deposition, Dorland said that "[t]here are aspects of my dispute with Ms. Larson, with Sonya, that are outside of the jurisdiction of the court."  When asked what concerns were not going to be resolved, she answered, "the ethical aspects of this situation I find myself in with Sonya." [Exhibit 26 - Dorland Dep. p. 60, lines 4-22.]

> **Dorland Response**: Ms. Dorland does not dispute that excerpts of her testimony are accurately quoted; Ms. Dorland disputes Ms. Larson's characterization of said testimony.

51.     Sometime in mid-June 2018, Dorland contacted the *Boston Globe* to urge the paper to write an article about her allegations of plagiarism against the BBF and Larson.  On June 20, Graham Ambrose, a reporter from the Globe, contacted Larson for her comments. [Exhibit 27].

> **Dorland Response**: Not disputed for purposes of summary judgment.

52.     On July 20, 2018, Attorney Michael Hanna, an attorney in the Cohen Defendants law firm, sent a letter to James Gregorio, Larson's attorney.  Atty. Hanna requested that Atty. Gregorio "please contact this office to discuss this matter further, as time is of the essence for all involved.  Otherwise, please stop interfering with our efforts to prevent the further violation of our client's rights." [Exhibit 28 & Gregorio Aff. ¶ 7]

> **Dorland Response**:   Exhibit 28 is a document that speaks for itself, and Ms. Dorland disputes characterizations of same; however, Ms. Dorland disputes the admissibility of the settlement communications between herself and/or her representatives, the BBF and/or its representatives, and Ms. Larson and/or her representatives.

53.     On July 23, 2018, Atty. Gregorio telephoned Atty. Hanna, now his main contact with the Cohen Defendants, to convey Ms. Larson's general willingness to cooperate with settlement negotiations between Dorland and the BBF.  Atty. Hanna also indicated that Dorland was still taking issue with the revised letter in the final version of Larson's story, although he

could not be specific about her concerns.  Atty. Gregorio asked Atty. Hanna to send the language

Dorland still had a problem with, though Hanna never did. [Gregorio Aff. ¶¶ 7 & 9]

> **Dorland Response**: Not disputed for purposes of summary judgment; however,
> Ms. Dorland disputes the admissibility of the settlement communications between
> herself and/or her representatives, the BBF and/or its representatives, and Ms.
> Larson and/or her representatives.

54.     Dorland also had an issue with the changes Larson made to the letter in the final

version of her story, but she refused to identify the language, citing the cost of her attorney's

time. [Exhibit 29; Dorland dep p. 2-213]

> **Dorland Response**:  Not disputed.

55.     On July 24, 2018, Atty. Gregorio called Atty. Hanna.  Hanna said that Dorland

would no longer be satisfied with the acknowledgement that she herself suggested in writing.

[Exhibit 21] Dorland now wanted an acknowledgement of her contribution to Larson's story, her

name cited, language about how to learn more about donating a kidney, a kidney donation

website address, and $5,000.  Gregorio told Hanna that there was no point in discussing

settlement if there was going to be a negative article in the Globe instigated by Dorland. Atty.

Gregorio recalls Hanna saying; "If we get everything we want, we will give our full effort to kill

the story." [Gregorio Aff.¶ 11]

> **Dorland Response**:  Not disputed for purposes of summary judgment; however,
> Ms. Dorland disputes the admissibility of the settlement communications between
> herself and/or her representatives, the BBF and/or its representatives, and Ms.
> Larson and/or her representatives.

56.     On July 26, 2018, the Globe published an article entitled, "*Inspiration or

Plagiarism? Writing Hackles Raised in Boston Dispute.*"  [Exhibit 30] The article implicated the

BBF and Larson in Dorland's plagiarism/copyright infringement claims and her ethical issues.

> **Dorland Response**:  Not disputed.

57.     On August 1, 2018, Atty. Hanna called Atty. Gregorio to ask if Larson and the

BBF still wanted to settle. Atty. Gregorio asked Hanna if he had seen the Globe article.  Hanna

said yes.  Gregorio then asked what Dorland wanted. Hanna replied, the exact same thing as

before: $5,000, attribution, and a link to a kidney donation website.  Gregorio said this was

unreasonable given the circumstances, but that Larson might consider a mutual release of all

claims.  The conversation between attorneys ended. [Gregorio Aff. ¶ 13]

> **Dorland Response**:  Not disputed; however, Ms. Dorland disputes the
> admissibility of the settlement communications between herself and/or her
> representatives, the BBF and/or its representatives, and Ms. Larson and/or her
> representatives

58.     On Monday, August 6, 2018, the BBF had 30,000 copies of *The Kindest* printed

along with this acknowledgement:

> "*The Kindest*" originally appeared, in slightly different form, in American Short Fiction,
> Summer 2017. To learn more about the national organ shortage, or to help a friend,
> family member, or stranger in need, visit www.kidneyregistry.org. [Exhibit 31]

> **Dorland Response**:  Not disputed.

59.     On Friday, August 10, 2018, in a telephone conversation between Atty. Gregorio

and Atty. Hanna, Hanna increased Dorland's demand to $10,000, a $1,500 donation to the

National Kidney Registry, full name attribution, and a link to a kidney website. [Gregorio Aff. ¶

14].

> **Dorland Response**:  Not disputed; however, Ms. Dorland disputes the
> admissibility of the settlement communications between herself and/or her
> representatives, the BBF and/or its representatives, and Ms. Larson and/or her
> representatives.

60.     On August 13, 2018, BBF Exec. Director Porter notified Larson that it decided to

cancel the 1C/1S event for 2018. The BBF said it thought Dorland's claims were "baseless," but

it could not take Dorland's relentless pressure and legal threats. Porter sent this email to Larson.

After thinking we had a path towards a solid agreement with Dawn Dorland and feeling that we were out of danger from being sued, her lawyer was back in touch late last week with new demands.  There is seemingly no end to this, and we cannot afford to spend any more time or resources at this moment or risk law suits in the future that could affect not only us, but our sponsor for One City One Story. ¶ Sadly for us, we have already printed 30,000 copies of your story using the acknowledgement Dawn and her lawyer had approved (but now want to change.)" [Exhibit 32]

> **Dorland Response**:  Disputed.  Exhibit 32 does not contain the word "baseless", and no evidence is cited in support of the stated fact. Ms. Dorland does not dispute the accuracy of the quote from Exhibit 32, which is a document that speaks for itself.

61.    On August 14, 2018, the Boston Globe published another article entitled, *Boston Book Festival Cancels One City One Story Event Amid Plagiarism Flap*. [Exhibit 33] The Globe article also included side-by-side comparisons of what Larson claims is the "unauthorized" Brilliance Audio version of the story that Dorland was able to purchase [Appendix I] and the letter in the ASF version of *The Kindest* [Appendix III]. The Brilliance Audio version was published without any of the added context, such as the daisy-shaped note paper inscribed with a blue gel pen that arrived while Chuntao was home alone, and the racial dynamics inherent in *The Kindest*.

> **Dorland Response**:  Disputed in part. It is not disputed that the Boston Globe published an article on August 14, 2018, as reflected at Exhibit 33, which is a document that speaks for itself; Ms. Dorland disputes any characterizations of same.
>
> Ms. Dorland disputes that the Brilliance Audio version of *The Kindest* was "unauthorized," as Ms. Larson submitted the story for publication on November 30, 2015.  See Dec. 23, 2022 Amadei Aff., Ex. B, Doc. No. 194-2 (Nov. 30, 2015 email from S. Larson to Y. Goldstein with subject line: "A 3rd Audible Submission").
>
> As reflected in the attachment to that email, the story that Ms. Larson submitted for publication included the very close copy of the Dorland letter, including the passage about Ms. Dorland's personal childhood experiences, and Ms. Dorland's unique turn of phrase, "My gift, which begat yours, trails no strings."  Id.
>
> On December 28, 2015, Ms. Larson sent a second version of *The Kindest* to her contacts at Plympton, stating "I've since revised *The Kindest* to make it much

tighter. Is it okay to send along an updated version, once the paperwork's ready?" See Dec. 23, 2022 Amadei Aff., Ex. C, Doc. No. 194-3, (Dec. 28, 2015 email exchange, with attachment).  As reflected in the attachment to that email, the "much tighter version" of *The Kindest* did not include changes to the letter portion of the story, which remained a very close copy of the Dorland Letter including the language referenced above.

In May of 2016, Ms. Larson was aware that a voice actor was lined up to record her story, and asked yet again to submit a revised version where she had "made slight revisions on the level of language – mostly to ease the rhythm and tone. The new version is attached.  Is it possible that Emily could read this version instead?"  See Dec. 23, 2022 Amadei Aff., Ex. A., Doc. No. 194-1 (Email chain between S. Larson and authorcare audible.com). It is not disputed that this version also did not contain changes to the letter portion of the story.

It was not until after the story had been recorded that Ms. Larson requested change to the letter portion of *The Kindest*.  See Oct. 28, 2022 Amadei Aff., Ex. O, Doc. No. 181-15.

62.    The Globe published the Brilliance Audio version of *The Kindest* , and not the final version of the story that the BBF was going to use in the 1C/1S event.

**Dorland Response**: Not disputed.

63.    After the BBF canceled the 1C/1S event, Atty. Hanna sent yet another letter to Atty. Gregorio on Sept. 6, 2018, demanding that Larson enter into a "stipulated judgment" for $180,000, which would be held in escrow to ensure Larson will not violate the terms of a written settlement agreement that the parties would have to craft; that Larson agree not to violate the copyright to the Dorland Letter, including an agreement not to write anything derivative thereof; and pay actual legal expenses of $15,000. [Exhibit 34] [Gregorio Aff. ¶ 15]

**Dorland Response**: Disputed.  The letter referred to by Mr. Gregorio is a document which speaks for itself, and the characterizations of same are disputed. See Dec. 23, 2022 Amadei Aff., Ex. K, Doc. No. 194-11 (9/6/2018 letter from M. Hanna to J. Gregorio, stating that as part of a settlement, they would expect "Your client will execute a stipulated judgment in the amount of $180,000 to be held and not filed unless and until your client violates the further terms of a written settlement agreement").   Ms. Dorland further disputes the admissibility of the settlement communications between herself and/or her representatives, the BBF and/or its representatives, and Ms. Larson and/or her representatives.

64.     On December 26, 2018, Dorland emailed Larson's present counsel and asked if he would accept service on behalf of Larson for a lawsuit that Dorland was planning to initiate presumably in California.  Dorland gave Attorney Epstein five days to respond. Epstein immediately notified the Cohen Defendants. [Exhibit 35] This present action was filed on January 30, 2019.

> **Dorland Response**.  Not disputed for purposes of summary judgment. Further responding, Ms. Dorland states that this fact is irrelevant to the claims and defenses in this matter, and not properly included in this SUMF.

65.     In 2021, Dorland contacted Robert Kolker, a New York Times and Oprah Book Club best-selling author about this dispute. Dorland was successful in persuading Kolker to write an article. The article ran in the Sunday, <u>New York Times Magazine</u> on October 10, 2021, entitled, "Who is the Bad Art Friend?" [Exhibit 36]

> **Dorland Response**:  Not disputed for purposes of summary judgment.  Further responding, Ms. Dorland states that this fact is irrelevant to the claims and defenses in this matter, and not properly included in this SUMF.

66.     The article went viral with thousands of people taking sides, some with Dorland and others with Larson.

> **Dorland Response**:  Not disputed for purposes of summary judgment.  Further responding, Ms. Dorland states that this fact is irrelevant to the claims and defenses in this matter, and not properly included in this SUMF.  Ms. Dorland further notes that this paragraph does not contain a cite to the record.

67.     As a result of the pressure that the media attention to the "Bad Art Friend" article inflicted on GrubStreet, Larson was fired from her job, a job that she loved. [Larson Aff. ¶ 19]

> **Dorland Response**:  Disputed. GrubStreet made a public statement concerning its separation from Sonya Larson and the reasons and considerations therefore. There is no evidence in the record that Ms. Larson lost her job "as a result of the pressure that the media attention to the "Bad Art Friend" article inflicted on GrubStreet. <u>See</u>, Dec. 23, 2022 Amadei Aff., Ex. G, Doc. No. 194-7 (Oct. 29, 2021 statement by GrubStreet).

68.     In her letter to Bread Loaf, Dorland did <u>not</u> say that <u>in her opinion</u>, *The Kindest* plagiarizes her work, but instead used the word "plagiarizes" as a statement of fact. [Exhibit 17]

>    **Dorland Response**:  Exhibit 17 is a document which speaks for itself, and Ms. Dorland disputes any characterization of same.

69.     The words "might have" clearly refer to the submission of *The Kindest* to Bread Loaf and not to Dorland's claim that Larson plagiarized Dorland. When Dorland contacted Bread Loaf and the others with her plagiarism accusations, she was merely guessing, without giving any evidence of plagiarism except her own assessment and conclusion. [Exhibit 17]

>    **Dorland Response**:  Exhibit 17 is a document which speaks for itself, and Ms. Dorland disputes any characterization of same.

70.     Dorland admits that no one contacted her to use the Dorland Letter. [<u>See</u>, Exhibit 39] In Dorland's own words;

>    Q. Did anyone ever contact you at any time from the time it [the Dorland Letter] was first posted on July 7, 2015? Did anyone ever contact you for permission to use the July 2, 2015 letter or any parts of the letter at any time? A. No, not that I recall.  That would have been nice." Dorland deposition, pp. 161-2, lines 20-23 / 1-3.

>    **Dorland Response**:    Not disputed.

71.     Larson used small portions of the Dorland Letter to tell a totally fictitious story. It is essential to Larson's story that the kidney recipient, Chuntao is Chinese-American (as is Larson), and that her wealthy donor, Rose is white, since the racial dynamics that play out between the characters are central to *The Kindest*. [Larson Aff. ¶ 6]

>    **Dorland Response**:  Disputed.  Fact No. 71 is not supported by the referenced citation.

72.     The Dorland Letter constitutes less than 7% of Larson' story at a maximum (5,500 words in *The Kindest* versus 381 words in the Dorland Letter).

>    **Dorland Response**: Not disputed for purposes of summary judgment; further responding, Ms. Dorland states that this fact is irrelevant to the claims and defenses in this matter, and not properly included in this SUMF.

73.    In the seven (7) years since the Dorland Letter was first posted on Facebook or in over three (3) years since this action was filed, there is no evidence that Dorland ever tried to sell or use her letter other than to try to communicate with the Oregon woman, and to attack Larson.

**Dorland Response**: Not disputed for purposes of summary judgment; further responding, Ms. Dorland states that this fact is irrelevant to the claims and defenses in this matter, and not properly included in this SUMF.

74.    A side-by-side comparison between the Dorland Letter and the letter in the final version of *The Kindest* [See, Appendix VI] shows that there is <u>no</u> similarity between the two letters to support infringement.  The competing letters may share a kidney theme, but the details, scenes, events, style, structure, tone, language and characterization of the letters are vastly different.

**Dorland Response**:  Disputed.  <u>See</u> Oct. 28, 2022 Amadei Aff., Exhibit XX, Doc. No. 182-24.

Respectfully submitted,

DAWN DORLAND PERRY

By Her Attorneys,

PARTRIDGE SNOW & HAHN LLP

*/s/Suzanne M. Elovecky*
Suzanne M. Elovecky (BBO # 670047)
Hannah Y. Amadei (BBO# 710509)
30 Federal Street
Boston, MA  02110
(617) 292-7900
(617) 292-7910 FAX
selovecky@psh.com
hamadei@psh.com

DATED:        December 23, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of December, 2022 a copy of the foregoing document has been served via ECF system as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicates as non-registered participants.

Andrew D. Epstein, Esq.                         Mark W. Shaughnessy, Esq.
Barker, Epstein & Loscocco                      Matthew H. Greene, Esq.
175 Federal Street, Suite 502                   Boyle | Shaughnessy Law PC
Boston, MA 02110                                695 Atlantic Avenue, 11th Floor
Photolaw@aol.com                                Boston, MA 02111
                                                mshaughnessy@boyleshaughnessy.com
                                                mgreene@boyleshaughnessy.com


                                    */s/ Suzanne M. Elovecky*
                                    Suzanne M. Elovecky


4394961.2/30402-2