# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONYA LARSON, | |
| Plaintiff | |
| v. | |
| DAWN DORLAND PERRY, COHEN BUSINESS LAW GROUP, PC and JEFFREY A. COHEN, ESQUIRE, | |
| Defendants. | |
| | C.A. No. 1:19-CV-10203-IT |
| DAWN DORLAND PERRY, | |
| Plaintiff-in-Counterclaim | |
| v. | |
| SONYA LARSON, | |
| Defendant-in-Counterclaim | |

**DAWN DORLAND PERRY'S OPPOSITION TO SONYA LARSON'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT OF DORLAND'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ........................................................................... 1

III.  STANDARD OF REVIEW ............................................................................. 1

IV.  MS. LARSON FAILED TO COMPLY WITH LOCAL RULE 56.1 AND THE COURT'S STANDING ORDER REGARDING MOTION PRACTICE .............................. 2

    A.   MS. LARSON FAILED TO RESPOND TO MS. DORLAND'S STATEMENT OF FACTS ........................................................................................................... 2

    B.   MS. LARSON FAILED TO FILE AN OPPOSITION TO MS. DORLAND'S MOTION FOR SUMMARY JUDGMENT ........................................................................ 3

    C.   MS. LARSON FAILED TO COMPLY WITH THE COURT'S STANDING ORDER. 4

V.   ARGUMENT ................................................................................................... 4

    A.   INTENTIONAL INTERFERENCE ........................................................... 4

    B.   DEFAMATION .......................................................................................... 12

    C.   SONYA LARSON HAS NOT MET THE BURDEN OF PROOF…………………………………………………………………………...17

VI.  CONCLUSION .............................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**

Arista Records, LLC v. Doe 3, 604 F.3d 110, 124 (S.D.N.Y. Apr. 29, 2010) ............................ 22

Authors Guild, Inc. v. HathiTrust, 755 F.3d 87 (2d Cir. 2014) .................................................... 25

Broadcast Music, Inc. v. C.B.G., Inc., 2013 WL 6074121, at *2 (D. Mass. Nov. 15, 2013) ......... 2

Brown v. Armstrong, 957 F. Supp. 1293, 1298 (D. Mass. 1997).................................................. 3

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1968) ........................................................... passim

Cochran v. Quest Software, Inc., 328 F. 3d 1, 6 (1st Cir. 2003) .................................................. 2

Comerica Bank & Tr., N.A. v. Habib, 433 F. Supp. 3d 79, 92 (D. Mass. 2020).............. 20, 21, 26

Coquico, Inc. v. Rodriguez Miranda, 562 F. 3d 62, 67 (1st Cir. 2009) ........................................ 28

Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 189 (D. Mass. 2007) ................... 20, 21, 23

Hamann v. Carpenter, 2018 WL 2012689, at *2 (D. Mass. Apr. 30, 2018).................................. 9

Harper & Row Publishers, Inc. v. Nation Ents., 471 U.S. 539 (1985) ................................. passim

Mallon v. Marshall, 224 F. Supp. 3d 97,100 (D. Mass. Sept. 30, 2016) ...................................... 2

Mandel v. Boston Phoenix, Inc. .................................................................................................... 1

Mass Cash Register, Inc. v. Comtrex Systems Corp., 901 F. Supp. 4040, 422 (D. Mass. 1995)... 9

Medina-Munos v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) .............................. 9

Nunez v. Caribbean Intern. News Corp., 235 F. 3d 18, 24-25 (1st Cir. 2000) ...................... 26, 27

Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc., 884 F.2d 1510, 1513 (1st Cir. 1989).. 16

Rakes v. U.S. .................................................................................................................................. 2

Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 289 F.3d 29, 59-60 (1st Cir. 2012) 20

Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, 685 F.
    Supp. 2d 217, 226 (D. Mass. 2010) ................................................................................ 20, 28

TufAmerica, Inc. v. Diamond, 968 F. Supp. 2d 588, 599 (S.D.N.Y. 2013) ............................... 25

Wired Informatics, LLC v. OmniMD, Inc., 2022 WL 623870, at *1 (D. Mass. Mar. 3, 2022) ..... 3

Zamoyski v. Fifty-Six Hope Road Music Ltd., Inc. ...................................................................... 1

**Statutes**

17 U.S.C. § 101 .......................................................................................................................... 27

17 U.S.C. § 102 .......................................................................................................................... 14

17 U.S.C. § 501(a) ........................................................................................................................ 6

**Other Authorities**

Restatement (3d) Torts § 18 .......................................................................................................... 8

Restatement (Second) Torts § 773 ................................................................................................ 9

Williston on Contracts (4th ed.), § 12:3 ........................................................................................ 7

**Rules**

Local Rule 56.1 ............................................................................................................................. 2

## I.      INTRODUCTION

Defendant/Plaintiff-in-Counterclaim Dawn Dorland Perry ("Ms. Dorland")

submits this Opposition to Plaintiff/Defendant-in-Counterclaim Sonya Larson's ("Ms. Larson")

Cross-Motion for Summary Judgment and Reply in Further Support of Ms. Dorland's Motion for

Summary Judgment.

Justifiably protecting the intellectual property rights of one's work is not

unlawful.  Copyright infringement is.  Yet, here, Ms. Larson, who concedes that she copied Ms.

Dorland's letter and boasted about passing it off as her own, is indignant about the harms *she*

suffered to her professional reputation because of Ms. Dorland's efforts to reasonably protect her

rights to her own deeply personal letter.  With her professional reputation hanging in the balance,

Ms. Larson filed suit for these harms that she claims are a result of Ms. Dorland, but are actually

the natural consequences of her own unethical and unlawful actions.  For the reasons set forth

below and in Ms. Dorland's Motion for Summary Judgment, this Court should grant the Motion

for Summary Judgment in Ms. Dorland's favor on all counts.

## II.     FACTUAL BACKGROUND

Ms. Dorland incorporates by reference the Facts section presented in her

Memorandum in Support of Motion for Summary Judgment, Doc. No. 184, Sec. II, pp. 2-6, and

the Statement of Undisputed Material Facts filed contemporaneously therewith, Doc. No. 183.

## III.    STANDARD OF REVIEW

The presence of cross-motions for summary judgment neither dilutes nor distorts

the standard of review.  Zamoyski v. Fifty-Six Hope Road Music Ltd., Inc., 718 F. Supp. 2d 128,

130 (D. Mass. Jun. 2, 2010) (quoting Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 2015 (1st

Cir. 2006.  The moving party is responsible for identifying those portions of the record which it

believes demonstrates the absence of a genuine issue of material fact. Id. (citing Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1968)).  The moving party can meet its burden either by offering

evidence to disprove an element of the plaintiff's case or by demonstrating an absence of

evidence to support the non-moving party's case.  Id. (citing Rakes v. U.S., 254 F. Supp. 2d 47,

52 (D. Mass. 2005) (quoting Celotex, 477 U.S. at 4). The non-moving party may not rest on the

mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a

genuine issue for trial.  Celotex, 477 U.S. at 324.  The court may "safely ignore conclusory

allegations, improbable inferences, and unsupported speculation."  Cochran v. Quest Software,

Inc., 328 F. 3d 1, 6 (1st Cir. 2003).  Ultimately, the test is whether, as to each essential element,

there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

party.  Mallon v. Marshall, 224 F. Supp. 3d 97,100 (D. Mass. Sept. 30, 2016) (citations omitted).

For a dispute to be "genuine," the "evidence relevant to the issue, viewed in the

light most flattering to the party opposing the motion, must be sufficiently open-ended to permit

a rational factfinder to resolve the issue in favor of either side."  Id.  A fact is "material" when it

might affect the outcome of the suit under the applicable law.  Id.; see also, Broadcast Music,

Inc. v. C.B.G., Inc., 2013 WL 6074121, at *2 (D. Mass. Nov. 15, 2013).

## IV.   MS. LARSON FAILED TO COMPLY WITH LOCAL RULE 56.1 AND THE COURT'S STANDING ORDER REGARDING MOTION PRACTICE

### A.   Ms. Larson Failed to Respond to Ms. Dorland's Statement of Facts

Pursuant to the Local Rules, all material facts not opposed are deemed admitted.

Ms. Larson has failed to respond to Ms. Dorland's statement of material facts by including a

"concise statement of material facts of record as to which it contends there exists a genuine issue

to be tried" with cites to the record.  Local Rule 56.1 requires that "[a] party opposing [a] motion

[for summary judgment] shall include a concise statement of the material facts of record as to

which it is contended that there exists a genuine issue to be tried, with page references to

affidavits, depositions and other documentation." <u>Wired Informatics, LLC v. OmniMD, Inc.</u>, 2022 WL 623870, at *1 (D. Mass. Mar. 3, 2022) (quoting Local Rule 56.1).  Ms. Larson's response in opposition and on cross-motion should at a minimum, have stated what specific facts are disputed.

Accordingly, Ms. Dorland requests that this Court deem Ms. Dorland's Statement of Undisputed Material Facts with support in the record as admitted.  See <u>Wired Informatics, LLC v. OmniMD, Inc.</u>, 2022 WL 623870, at *1 (D. Mass. Mar. 3, 2022) (deeming admitted the plaintiff's statement of undisputed material facts where defendant failed to comply with Local Rule 56.1); <u>see also</u>, <u>Brown v. Armstrong</u>, 957 F. Supp. 1293, 1298 (D. Mass. 1997) (finding that plaintiffs' 107-paragraph fact statement, which did not distinguish between the facts of the case generally, and the material facts that are genuinely in dispute, and which made conclusory statements and allegations not supported by citations to the record did not comply with Local Rule 56, and thus, the Court deemed all facts set forth in the defendants' fact statement to be admitted).  Like <u>Brown</u>, where Ms. Larson has failed to comply with the Local Rules, the facts presented by Ms. Dorland in her Statement of Undisputed Material Facts (Doc. No. 183) should be deemed admitted.

**B.**   **<u>Ms. Larson Failed to File an Opposition to Ms. Dorland's Motion for Summary Judgment</u>**

The Court's October 27, 2022 Order is clear: Ms. Larson shall file her opposition ***and*** any cross-motion for summary judgment no later than December 9, 2022.  <u>See</u> Doc. No. 179.  Despite the Court's clear instructions, however, Ms. Larson filed only a cross-motion for summary judgment, without opposing Ms. Dorland's Motion for Summary Judgment.  <u>See</u>, <u>generally</u>, Mem. In Support of the Mot. of Plaintiff-Third-Party Defendant, Sonya Larson for Partial Summary Judgment Against Dawn Dorland Perry, Defendant-Plaintiff in Counterclaim,

Doc. No. 189 ("Larson Mem."). As an initial matter, the document title makes no reference to an opposition. Finally, and as noted *supra*, Section III.A., Ms. Larson did not present a response to Ms. Dorland's statement of material facts of record, stating which facts she contended that there exists a genuine dispute to be tried.

Thus, with respect to those material facts as submitted by Ms. Dorland and supported by cites to the record, Ms. Dorland requests that this Court deem these facts admitted and find summary judgment in Ms. Dorland's favor on all counts.

### C. Ms. Larson Failed to Comply With the Court's Standing Order

Moreover, Ms. Larson further failed to comply with the Court's Standing order Regarding Motion Practice, para. 4, wherein the Court ordered that parties file evidentiary materials first, then the memorandum, and include citations to the CM/ECF generated document number and page number. The Court further ordered the parties utilize a specific citation convention, which Ms. Larson did not follow. Ms. Dorland therefore seeks any further relief as the Court deems just and warranted in light of Ms. Larson's disregard of the Court's Standing Order.

## V. ARGUMENT

### A. Intentional Interference

Ms. Larson's intentional interference claims arise from Ms. Dorland's communications with ASF and BBF. See Larson Mem., Doc. No. 189, at p. 19; see also, Second Am. Compl., Doc. No. 91, Count I and Count II.[1]  Ms. Dorland does not deny that she

---

[1] Notwithstanding the limited scope of Ms. Larson's Intentional Interference claims, she argues in her Memo at pp. 19-21 that Ms. Dorland's communications with other entities, such as GrubStreet, the Boston Globe, and Bread Loaf, somehow support this claim. Even more perplexing, Ms. Larson cites to Ms. Dorland's communications with Robert Kolker, a *New York Times* Magazine journalist, as support for her intentional interference claims. The

communicated with ASF and BBF.  She further does not deny that she appealed to these entities

to cease certain publications of *The Kindest*, which included a copy of Ms. Dorland's own

writing. Ms. Dorland further admits that, after her communications, (a) ASF removed an

electronic version of *The Kindest* from its website, and (b) BBF canceled the One City / One

Story ("1C1S") program for 2018.  However, as set forth in Ms. Dorland's Memorandum (but

not acknowledged by Ms. Larson), those communications were not made with an improper

means or motive, and were instead attempts by Ms. Dorland, either individually or through

counsel, to protect her own interests in the letter she wrote to the final recipient in her kidney

donation chain, and which is subject to copyright protection (the "Dorland Letter").

   As grounds for her intentional interference claims, Ms. Larson alleges that Ms.

Dorland "knew or should have known" that it was advantageous for Larson to publish her work

with these organizations; that Ms. Dorland was "looking for ever-changing remedies" to her

ethical issues; and that Ms. Dorland's attorneys asserted claims under the Copyright Act and

made demands for attribution, recognition for Ms. Dorland's kidney donation, links to a kidney

donation website, statutory damages and attorney's fees. See Larson Mem., Doc. No. 189, at p.

20.  In essence, Ms. Larson's argument is that Ms. Dorland interfered with Ms. Larson's

advantageous business relations by making alternative demands for relief outside of the statutory

remedies provided in the Copyright Act.  She cites no authority for the proposition that by so

doing, Ms. Dorland is liable for intentional interference with advantageous business

relationships.  Ms. Larson further points to Ms. Dorland's communications with other entities in

support of the claim that Ms. Dorland engaged in "improper conduct".  However, Ms. Dorland's

---

communications with Mr. Kolker took place in 2022, well after the relationships with ASF and
BBF had been impacted.

communications with parties *other than* ASF and BBF give no rise to liability to Ms. Larson for intentional interference with BBF and ASF.

      1.     Ms. Dorland and Her Attorneys' Communications With Ms. Larson and Her Attorneys Do Not Give Rise to Liability for Intentional Interference

As an initial matter, Ms. Larson misapprehends the communications at issue between Ms. Dorland and the publishers. Ms. Dorland did not contact ASF or BBF to assert a legal claim against Ms. Larson, but rather against the publisher (ASF) and potential publisher (BBF) of the infringing work. Ms. Dorland did not, at any time, through counsel or on her own, make a claim for statutory damages or attorney's fees against Larson or ASF, nor has Ms. Larson cited any evidence stating that such a claim was made. The only claim for statutory damages, including attorney's fees, was made to BBF, who had not yet published the infringing work. It is well-settled that when a work is infringing, liability can attach not only to the infringing author (*i.e.*, Ms. Larson), but also the publisher of an infringing work. See 17 U.S.C. § 501(a) ("Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be."); see also, Harper & Row Publishers, Inc. v. Nation Ents., 471 U.S. 539 (1985) (magazine that published unauthorized copies of manuscript held liable for copyright infringement). While Ms. Dorland had not registered the Letter with the U.S. Copyright Office in advance of Ms. Larson's copying, she completed the registration in June of 2018, before BBF published *The Kindest*. Therefore, Ms. Dorland's counsel's assertion that the BBF may be subject to statutory damages was accurate. See, Dec. 23, 2022 Amadei Aff., Ex. K, Doc. No. 194-11.

Further, Ms. Larson appears to claim that in light of Ms. Dorland's (either individually or through counsel) attempt to resolve the dispute pursuant to non-monetary terms, or at least with monetary terms that were not identical to (but rather significantly less than)

statutory damages, this somehow converts her lawful communications to unlawful communications. In support of this proposition, Ms. Larson cites no authority. Of course, it is simply preposterous to suggest that a potential copyright infringement plaintiff's attempts to resolve a dispute short of litigation actually constitutes intentional interference with advantageous business relationships.

Ms. Dorland does not dispute that she reached out to ASF and BBF to alert them to her belief that Ms. Larson had copied her work. Ms. Dorland's communications, however, do not rise to the level of such contact such that any reasonable jury would find were "improper motive or means." Ms. Larson seemingly argues that the relief Ms. Dorland sought from the BBF, with the aid of her attorneys who fiercely advocated on her behalf, were not part of the statutory remedies available under the Copyright Act, and therefore making such demands were "unlawful". Of course, a party's demands during settlement discussions are not limited to statutory remedies only. See e.g., Williston on Contracts (4th ed.), § 12:3 ("[P]ublic policy also requires that parties of full age and competent understanding must have the greatest freedom of contracting, and contracts, when entered into freely and voluntarily, must be upheld and enforced by the courts"). Statutory remedies are not exclusive, nor are parties bound to resolve disputes on the availability of statutory remedies. Thus, to the extent that Ms. Larson is arguing that Ms. Dorland's offer of remedies outside the statutory framework is actually a violation of the relevant statute, that argument also fails. Ms. Larson appears to suggest that Ms. Dorland's attorneys' advocacy on her behalf is somehow improper, and even goes so far to conclude without evidence, that Ms. Dorland and her attorneys were "[c]learly . . . conspiring to force the BBF to drop *The Kindest*." Larson Mem., Doc. 189, at p. 19. Contrary to the unsupported conclusion drawn by Ms. Larson, the demands from Ms. Dorland and her counsel during the parties' early

settlement discussions were neither "unreasonable" nor "unjustifiable" just for the sake of being alternative to the statutory remedies offered under the Copyright Act.   Nor did her demands include the BBF's "dropping" *The Kindest*; in fact, they were designed to support and/or co-exist with the BBF's publication of The Kindest.  See, Larson Ex. 22, Doc. No. 191-2

2.   There Is No Evidence Of Any Other Improper Means

As set forth in Ms. Dorland's opening memorandum, Ms. Dorland's comments and statement about Ms. Larson, and Ms. Dorland's position that *The Kindest* includes a copy of Ms. Dorland's work, cannot constitute improper means unless those statements were unlawful pursuant to some other standard.  See Restatement (3d) Torts § 18 ("the defendant's conduct must have been wrongful in some way recognized elsewhere by the law"); see also, Mass Cash Register, Inc. v. Comtrex Systems Corp., 901 F. Supp. 4040, 422 (D. Mass. 1995) ("It is essential to this cause of action that the defendant acted without lawful cause").  Ms. Larson has likewise failed to prove that Ms. Dorland acted with an improper motive.

Ms. Larson has failed to establish any facts from the record to support her intentional interference claims.  As set forth in Ms. Dorland's Memorandum in support of her Motion for Summary Judgment (Doc. No. 184), the record is silent on the required "improper means or motive" for a claim of intentional interference.  To establish that Ms. Dorland acted with an improper means or motive, Ms. Larson must demonstrate that Ms. Dorland "acted out of a spiteful, malignant purpose that has no connection" to a legitimate corporate interest.  See, Hamann v. Carpenter, 2018 WL 2012689, at *2 (D. Mass. Apr. 30, 2018).  "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  Medina-Munos v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  Here, the facts demonstrate that Ms. Dorland reached out to ASF, BBF, among others, to

protect her own rights in her writing.  See, e.g., Oct. 28, 2022 Amadei Aff., Exs. Z, BB, Doc. No. 181-26, 182-2.  Aside from conclusory averments, Larson has not submitted any evidence, nor shown in the record that Ms. Dorland's actions were unreasonable or unjustifiable.  The evidence as cited to in Ms. Dorland's opening brief, in fact, shows the opposite.

        3.      Ms. Dorland Had No Improper Motive For Reaching Out to ASF and BBF

Ms. Dorland is well-within her rights to protect her legal interest in her work.  See Restatement (Second) Torts § 773 (asserting in good faith or threatening in good faith to protect a legally protected interest is not improper interference if the actor believes that her interest may be otherwise impaired or destroyed by the performance of the contract or transaction).  Contrary to Ms. Larson's conclusory arguments that Ms. Dorland's intent was to "destroy Larson's career" and to "harm Larson," Ms. Larson has not referenced any evidence from the record to establish that Ms. Dorland had any motive behind communicating with ASF and BBF, other than to protect her own work and safeguard her interests.

As Ms. Dorland's emails with ASF and BBF show, Ms. Dorland even proposed various resolutions to address her valid concerns about Ms. Larson's plagiarism in *The Kindest*, including, a statement of attribution and recognition, and information for kidney donation websites, to be included in the publication of *The Kindest*.  See, e.g., Oct. 28, 2022 Amadei Aff., Ex. Z, Doc. No. 181-26.  These facts demonstrate that Ms. Dorland, in fact, did not intend to "destroy Larson's career" or "harm Larson," but was merely seeking resolution for the harm already done to her by Ms. Larson's misappropriation of the Dorland Letter.  Of course, when those discussions fell through, then Ms. Dorland was further well-within her right to pursue additional legal recourse for her good-faith belief that Ms. Larson had copied her letter.

That Ms. Larson's professional reputation was tarnished by her own conduct of plagiarism does not establish that Ms. Dorland had the motive to do same.  See, e.g., Larson Ex.

37, Doc. No. 192-7, p. 2 (Deborah Porter of the BBF noting, "I feel that this lays 100% of the blame for this situation on Dawn Dorland, when a hefty percentage goes to Sonya."); see also, Oct. 28, 2022 Amadei Aff., Ex. HH, Doc. No. 182-8 (Email from Deborah Porter of the BBF to Ms. Larson, "Just in case no one has said this to you, you should never have submitted a story to us that had a plagiarism claim against it and then continued to withhold that information from us when we picked the story.  It seems to me that we have grounds to sue you for reimbursement of the $10,000 we have sunk into printing *The Kindest* plus legal fees.")[2]  Ms. Larson's "harm" is a direct result of her own conduct and not of Ms. Dorland's.

Ms. Larson has no reasonable expectation of establishing that Ms. Dorland acted with improper motive, and therefore Ms. Dorland is entitled to judgment as a matter of law on the interference with advantageous business relations claims, where Ms. Dorland's statements to ASF and BBF and actions directed at enforcing and protecting her work were justified.

4. For the Purpose of the Intentional Interference Claims, Ms. Dorland's Communications with Others is Immaterial.

Finally, Ms. Larson references certain communications Ms. Dorland had with individuals or entities that are not ASF or BBF in arguing that Ms. Dorland acted with "improper means or motive." Ms. Dorland does not dispute the fact that she reached out to third-parties, including GrubStreet, Ms. Larson's former employer, and an organization with which Ms. Dorland was also affiliated with and employed by to inform them of her fact-based belief that Ms. Larson had plagiarized (*i.e.*, copied) her work.  Ms. Dorland's communications with

_____

[2] The record shows that Larson did, in fact, know that upon publishing The Kindest, Ms. Dorland would have cause to raise issues.  See, e.g., Oct. 28, 2022 Amadei Aff., Exhibit U, Doc. No. 181-21 (June 16, 2017 text message between S. Larson and S. Boren), wherein Larson informs her friend that ASF would be publishing *The Kindest*, Ms. Larson states "I am excited but also worried that DD [Dawn Dorland] is going to murder me."  Ms. Boren responds, "Eh. Whatever. Just don't use her note."  Of course, Ms. Larson did not take her friend's advice.

GrubStreet were not those of an unaffiliated member of the public seeking to harm Ms. Larson, but rather in Ms. Dorland's capacity as a former student, a presenter at the GrubStreet annual conference, the Muse and the Marketplace, and a GrubStreet online instructor.  See Larson Ex. 23, Doc. No. 191-3 at p. 3-4.  In making the plea to GrubStreet, Ms. Dorland's suggestions as potential action by GrubStreet to address Ms. Larson's conduct, as Ms. Dorland's supervisor, was to suggest that GrubStreet "persuad[e] Sonya to apologize to me formally," or that GrubStreet "facilitate a reconciliation."[3]  Id.  Ms. Dorland was well within her rights in reaching out to GrubStreet, and given Ms. Dorland's own affiliation with that entity, there was ample reason for her to do so.[4]  In various statements made, both Ms. Larson and Grub Street have referred to Ms. Dorland's communications with GrubStreet as an "HR Complaint."  See Dec. 23, 2022 Amadei Aff., Ex. G, Doc. No. 194-7.

Regardless of the nuances of the relationships between both Ms. Larson and Ms. Dorland with GrubStreet, Ms. Dorland's communications with GrubStreet have no relation to the intentional interference claim with respect to Ms. Larson's relationship with ASF or BBF.  That Ms. Larson was eventually fired from GrubStreet also has no relation to ASF or BBF.  Instead, as reflected in a public statement on Ms. Larson's separation from GrubStreet, Ms. Larson was terminated because of issues unrelated to *The Kindest*.  See Dec. 23, 2022 Amadei Aff., Ex. G, Doc. No. 194-7 ("Although the disputed story was not written or workshopped at GrubStreet, nor

---

[3] At the time that Ms. Dorland had suggested a reconciliation with Ms. Larson, she was unaware that Ms. Larson had, in fact, been targeting Ms. Dorland with ridicule and mockery within Ms. Larson's social group for years.  See Dorland Memo, Doc. No. 184, at pp. 16-17; see also, Oct. 28, 2022 Amadei Aff., Ex. UU, Doc. No. 182-21.  It was not until discovery in this litigation that Ms. Dorland appreciated that Ms. Larson was not Ms. Dorland's friend in the years of 2015-the present.

[4] Some weeks later, when faced with GrubStreet's inaction concerning the issues, Ms. Dorland resigned her position with GrubStreet.  See Dec. 23, 2022 Amadei Aff., Ex. I, Doc. No. 194-9.

was the source material in question [the Dorland Letter] part of any GrubStreet class or community platform, certain documents relating to the lawsuit that recently came to light raise issues that are integral to who we are as an artistic community.")  Accordingly, these unsupported facts, which are also immaterial, are simply irrelevant to the intentional interference claims.

### B.    **Defamation**

Ms. Larson has failed to present any genuine dispute of material fact for trial with respect to defamation.  Accordingly, Count VII of Ms. Larson's Second Amended Complaint must be dismissed.  Ms. Dorland properly and legally engaged in conversations with Bread Loaf and other entities in an attempt to protect her own legal interests in her copyrighted work.  The statements she made, however, were true, and even if this Court were to ultimately determine that none of the versions of *The Kindest* contained a copy of the Dorland Letter, Ms. Dorland's statements still constituted her firmly held opinions.

The entirety of Ms. Larson's defamation claim rests on the following identified statements: (1) Ms. Larson suggests that Ms. Dorland was not truthful in disclosing to Bread Loaf that she was "in the midst of a legal process with the editors of a literary magazine [ASF]," despite—in Ms. Larson's words—Ms. Dorland "only dealing with her ethical concerns with ASF at this time," Larson Mem., Doc. No. 189 at p. 22; (2) Ms. Dorland identifying Ms. Larson and "using the word 'plagiarism' in the same short paragraph" where she identified Ms. Larson to Bread Loaf, id.; (3) Ms. Dorland did not state that it is her opinion that *The Kindest* plagiarized her work, but instead "used the word 'plagiarizes' as a statement of fact, id.; and (4) Ms. Dorland "made the absolute statement that *The Kindest* 'contains material to which I own the copyright,'" id., at p. 23.  None of these statements, however, are defamatory.

As a threshold matter, rather than identifying with clarity which statements she

believes caused harm, Ms. Larson claims that Ms. Dorland's defamatory conduct was reaching

out to Bread Loaf and sharing her validly held concerns about Ms. Larson's plagiarism of Ms.

Dorland's letter, and the possibility that the Dorland Letter, as copied in *The Kindest*, supported

Ms. Larson's award of a fellowship at Bread Loaf.  Yet, because Ms. Larson has failed to make a

showing sufficient to establish the existence of essential elements of her defamation claim on

which she bears the burden of proof, Ms. Larson's defamation claim fails as a matter of law. See,

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

       1.    Ms. Dorland's Statements are True and Therefore Not Defamatory

As to the first statement, whether Ms. Dorland described her communications as

"a legal process" or "ethical concerns" is irrelevant to any harm purportedly suffered by Ms.

Larson.  Ms. Larson has not shown, and indeed cannot show, that this statement by Ms. Dorland,

wherein she characterizes her communications with ASF, were false, or that they caused her any

reputational harm.  Ms. Dorland had sent ASF a letter outlining her claim, and requesting relief –

a classic "demand letter."  See Larson Ex. 6, Doc. No. 189-6.  In response, ASF informed Ms.

Dorland that they were working with legal advisors to analyze Ms. Dorland's claim, and later

informed Ms. Dorland that they were also working with Ms. Larson's legal advisors. See Larson

Ex. 12, Doc. No. 190-2.   It was not defamatory to classify these various exchanges and

communications as a "legal process."

       With respect to the second and third statements, Ms. Larson ignores the fact that

Ms. Dorland's claims are in fact, true; that is, Ms. Larson did, in fact, plagiarize, misappropriate,

and copy Ms. Dorland's letter.  See, Dorland SUMF No. 6, Doc. No. 183; Oct. 28, 2022 Amadei

Aff., at Exs. F, J, MM, RR (Doc. Nos. 181-6, 181-10, 182-18, at pp. 55, 115, 122).  Ms. Larson

has admitted her use of the Dorland Letter on multiple occasions.  That this fact was disclosed to

Bread Loaf and others in the writing community is not defamation because it is a true statement,

the truth of which, Ms. Larson cannot deny.[5]

Finally, Ms. Dorland's statement that *The Kindest* "contains material to which I own the copyright" is also true, where, as a matter of law, copyright protection exists once an original work is fixed in a tangible medium of expression (see 17 U.S.C. § 102); thus, Ms. Dorland owned a copyright to her letter, which Ms. Larson subsequently used in *The Kindest*.

2.   Ms. Larson Cannot Prove An Essential Element of Her Claim

Ms. Larson's defamation claim must also fail because there is no dispute of material fact regarding the required state-of-mind/intent element. See, Celotex, 477 U.S. at 322 (a court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case").  Namely, Ms. Larson is unable to show that Ms. Dorland's conduct in reaching out to Bread Loaf was negligent, stating only in conclusory fashion that Ms. Dorland "should have been aware of FERPA [the Family Educational Rights and Privacy Act]" or "[a]t the very least, [Ms. Dorland] was negligent in contacting Bread Loaf regarding its plagiarism policies vis-à-vis Larson."  Larson Mem., Doc. No. 189, at p. 24.  The assertion that Ms. Dorland "should have been aware of FERPA" is without factual support, lacks any merit or discussion, and should therefore be disregarded.[6]  Ms. Larson further has not cited to the record or introduced facts that show that Ms. Dorland was acting negligently in asserting her legally-protectible interests in reaching out to Bread Loaf (and other organizations).

Of course, the record is replete with evidence of Ms. Dorland's sincerely-held

---

[5] Even in these papers, Ms. Larson admits to using Ms. Dorland's language, without attribution. See, e.g., Larson Statement of Facts at Fact No. 71 ("Larson used small portions of the Dorland Letter to tell a totally fictitious story") Doc. No. 188, p. 14.

[6] Of course, it was Bread Loaf and its parent entity, Middlebury College, that was subject to the FERPA regulations; which is likely the reason that they ultimately shut down communications, stating they would not discuss student applications.  See Larson Ex. 18, Doc. No. 190-8.

belief that Ms. Larson did in fact copy the Dorland Letter, as well as Ms. Larson's admissions of same. See, e.g., Dorland SUMF No. 6, Doc. No. 183; Oct. 28, 2022 Amadei Aff., Exs. F, J, Y, Z, BB, MM, RR, Doc. Nos. 181-6, 181-10, 181-25, 181-26; 182-2; 182-13, 182-18.  The record further reflects that the BBF's attorney also concluded that the version of *The Kindest* that Ms. Dorland had access to at the time of her communications could result in a valid claim, which would need to be decided by a jury, and for that reason, the BBF insisted that Larson re-write the letter portion of her story.  See, e.g., Oct. 28, 2022 Amadei Aff., Ex. DD (Doc. No. 182-4). Coupled with Ms. Larson's multiple admissions that she did, in fact, copy the Dorland Letter, there can be no real dispute that Ms. Dorland's statements, that Larson plagiarized her letter, were true.

        The fact that Ms. Dorland reached out to Bread Loaf by email is not disputed.  It is further uncontroverted that Ms. Dorland did not know at the time of her initial email to Bread Loaf whether Ms. Larson had submitted *The Kindest* as part of her application for a scholarship to attend that conference.  However, none of the statements contained in the email rise to the level of defamation where Ms. Dorland's statements were fully based in fact.  Further, any supposed harm suffered by Ms. Larson was only a result of being exposed for her own actual wrongdoings in copying Ms. Dorland's letter in the first place (which Ms. Larson cannot deny). The fact that parties disagree on the interpretation of a fact does not mean that there is a "genuine dispute." See, e.g., Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc., 884 F.2d 1510, 1513 (1st Cir. 1989) ("The disagreement must also be material: "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.")

        Ms. Larson argues that Ms. Dorland "did not tell the truth" and "spread false

information" to Bread Loaf but has failed to cite to the record or support these statement with

any evidence as to how any of what Ms. Dorland wrote was untruthful.  Indeed, the qualified

language of Ms. Dorland's email to Bread Loaf shows that Ms. Dorland was seeking information

regarding Ms. Larson's submission, and thus gathering information about the extent of Ms.

Larson's misappropriation and efforts to publish *The Kindest*, which contained a copy of the

Dorland Letter.  See, e.g., Doc. No. 182-3 (wherein Ms. Dorland stated by email: "It has come to

my attention that one of your 2017 fellows ***might have*** applied for and secured her fellowship on

the basis of writing that plagiarizes my unpublished work.").  As set forth in Ms. Dorland's

memorandum, (a) the term "plagiarism" is defined, and Ms. Larson's actions fall within that

definition, and (b) Ms. Larson herself has admitted to doing what is defined as plagiarism.  See

Dorland Mem., Doc. No. 184, at pp. 22-24.  Ms. Larson now characterizes these admissions as

"gossipy comments" between Ms. Larson and her friends.  See Larson Mem., Doc. No. 189, p.

23.  However, that is not the case.  Texts and emails concerning whether or not Ms. Larson

copied the Dorland letter do not constitute "gossip", which is – yet again – a defined term.  The

Cambridge Dictionary defines "gossip" as "conversation or reports about other people's private

lives that might be unkind, disapproving, or not true."  See

https://dictionary.cambridge.org/us/dictionary/english/gossip (last accessed 12/21/2022).  While

Ms. Dorland does agree that many of the conversations that Ms. Larson engaged in about Ms.

Dorland constituted "gossip," her frank admissions of copying the Dorland Letter do not.

Further, one of the admissions was not made to a friend via text, but rather to her own publisher,

Plympton, wherein she asked to have *The Kindest* re-recorded because it "contains a letter sent

from one character to another; which includes a couple sentences that I'd excerpted from a real-

life letter. I'm now realizing that for ethical reasons I am uncomfortable keeping those lines in

and would very much like to revise them. I know that the story has already been recorded, but is there any way that those few lines might be re-recorded with the new lines?" See Oct. 28, 2022 Amadei Aff., ¶ 18, Ex. O, Doc. No. 181-15, p. 1.[7]  It is also irrelevant that Ms. Dorland did not know of these admissions at the time they were made – Ms. Dorland recognized her writing in the letter contained in *The Kindest*, and was honest in communicating that to third parties.

What is most glaring in Ms. Larson's memorandum of law concerning defamation is that at no time does Ms. Larson say that she did not copy the Dorland Letter.  Instead, she says Ms. Dorland was "merely guessing" and that she was "acting as the sole judge of what constitutes plagiarism," but she never states that she did not copy the Dorland Letter.  That is because she cannot do so.

In view of the foregoing, because Ms. Larson is unable to prove a genuine dispute of any material facts with respect to defamation, Count VII against Ms. Dorland must be dismissed.

C.      **Sonya Larson has not met the burden of proof of showing fair use.**

With respect to the copyright claims at issue in this action, Ms. Larson's only argument is that her use of Ms. Dorland's letter in the Brilliance/Audible version, the ASF version, and the BBF version[8] constitute fair use.  See, generally, Larson Mem., Doc. No. 189, at pp. 24-30.  Ms. Larson does not otherwise directly address Ms. Dorland's arguments relating to

---

[7] While Plympton ultimately agreed to re-record the letter in *The Kindest*, that revised version remained substantially similar to the Dorland Letter, and also is a copy of the Dorland Letter.
[8] Ms. Larson identified a separate "BBF version" of *The Kindest*, which was entered for the 1C1S contest with slight edits from the version that she submitted to ASF. The slight edits were not to the letter; the BBF version contains the same letter as appears in what Ms. Larson identified as the "ASF version." See, Larson Mem., Doc. 189, at p.6.  Ms. Dorland, on the other hand, identified only three versions based off the contents of the relevant text of the letter: Brilliance/Audible, the ASF version, and the version that was eventually registered with the Copyright Office.

the copyright claims raised in Ms. Dorland's Motion for Summary Judgment, including, for example, any opposition to the argument that Ms. Larson copied, indeed, "verbatim grabbed" from Ms. Dorland's letter.  Compare, Dorland Mem., Doc. No. 184, at p. 9, with Larson Mem., Doc. No. 189, at pp. 24-30.  Thus, with respect to the claims of copyright infringement supported by facts cited to the record, Ms. Larson has conceded these points and summary judgment is proper in Ms. Dorland's favor.

As a preliminary matter, Ms. Larson separates the Brilliance/Audible version into two versions in an effort to distinguish the version published on Brilliance as a "mistake."  See, Larson Mem., Doc. 189, at p.6.  As shown in the emails between Ms. Larson and the publishers, however, Ms. Larson knew that the Brilliance version would be published and such publication was not "by mistake." See Dorland Ex. O, Doc. No. 181-15, p. 1.  See also Dorland Response to Larson's Statement of Undisputed Material Facts at Fact Nos. 22 and 61.  Ms. Larson not only was fully aware that Audible was recording *The Kindest* prior to asking for any changes to the letter portion of the story, but she also sent the same version to *The New Yorker* for publication on January 18, 2016.  See Dec. 23, 2022 Amadei Aff., Exs. L and M, Doc. Nos. 194-12, 194-13.

Ms. Larson's arguments in support of her fair use defense, of which she carries the ultimate burden of proof, lack any citation to the record or evidence, and accordingly fail as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Fair use is an affirmative defense, and the burden of proof is on the accused infringer.  Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, 685 F. Supp. 2d 217, 226 (D. Mass. 2010).  A court may properly resolve fair use at the summary judgment stage when no material facts are at issue, and the parties dispute only the ultimate conclusions to be drawn from the admitted facts. See Comerica Bank & Tr., N.A. v. Habib, 433 F. Supp. 3d 79, 92 (D. Mass. 2020) (quoting

Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 189 (D. Mass. 2007)).

     1.     Ms. Larson's Use is Not Transformative

The basis of Ms. Larson's transformative use claim is that she added "context by using the letter in *The Kindest* to introduce the character, Rose to the character, Chuntao," and to "introduce[ ] white savior dynamics to *The Kindest*."  Larson Mem., Doc. No. 189, at p. 25. Whether and to what extent a new work is "transformative" is "whether the new work merely supersedes the objects of the original creation" or whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." See Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 289 F.3d 29, 59-60 (1st Cir. 2012).

In support of her argument for transformative use, Ms. Larson contrasts the facts of Harper & Row Publishers, Inc. v. Nation Ents., 471 U.S. 539 (1985), which held that a political commentary magazine's unauthorized publication of verbatim quotes from the "heart" of President Ford's memoir was not a fair use, to the facts of present case, namely that "the Dorland Letter is only a part of a much larger story." Larson Mem., Doc. No. 189, at p. 26. While Harper & Row analyzes the "purpose and use" factor, this factor was not determined by the magazine's use of quotes going to the "heart" of the matter, as Ms. Larson suggests.  Rather, when exploring the magazine's purpose and use of President Ford's quotes, the Court determined that the purpose and use merely supplanted the prior work, and thus this factor weighed against a finding of fair use. See Harper & Row, 471 U.S. at 562.

As a preliminary matter, Ms. Larson fails to cite to any evidence from the record to identify the purpose and use of Ms. Dorland's Letter.  Nonetheless, like Harper & Row, in this case, the purpose and use of the new work (*i.e.*, the letter in *The Kindest*) and Ms. Dorland's Letter are nearly identical.  That is, both are letters from a kidney donor to a recipient, where the purpose of the letter is for the donor to introduce themselves to the recipient and share

motivations and feelings in connection with the experience.  "In general, for a use to be transformative, the copyrightable expression in the original work must be used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings."  <u>Fitzgerald</u>, 491 F. Supp. 2d at 185.

Ms. Larson's emphasis on the balance of the text of *The Kindest* surrounding the letter to provide "context" and develop a fictitious story is a distraction and immaterial.  <u>See</u>, <u>id.</u> ("[A]ll reuse of copyrighted material occurs in a somewhat different context from the original use, and so to some extent changes the material.").  Where, as here, Ms. Larson concedes that she copied "verbatim" from Ms. Dorland's letter, the use may only be "considered transformative when the copying serves a purpose separate and distinct from the original artistic purpose for which the works were created, such as, news reporting or documentary filmmaking." <u>Comerica Bank & Tr., N.A. v. Habib</u>, 433 F. Supp. 3d 79, 93 (D. Mass. 2020).  Ms. Larson has not shown, and cannot show, that the purpose and use of the letter contained in *The Kindest* is separate and distinct, from the purpose and use of Ms. Dorland's letter, or that the prior work has been "altered with a new expression, meaning, or message."  Consequently, Ms. Larson has not met her burden of proof and this factor weighs against a finding of fair use.

The focus of the inquiry is on the alleged infringing material, *i.e.*, the letter, and whether the new use is transformative of the original.  Instead of focusing on the letter, Ms. Larson directs attention to the balance of the story to argue that the purpose and use of the letter have been significantly altered from Ms. Dorland's original.  Indeed, this redirection to the irrelevant text of *The Kindest* only further evidences the fact that there is nothing new added to the original letter that "alter[s] the first with a new expression, meaning, or message."

a.   <u>Parodic Fair Use Defense Has Been Waived.</u>

Ms. Larson has not opposed the argument that her use of Ms. Dorland's Letter is

not a parody.  Nor does she claim in her Cross-Motion that it was.  In fact, Ms. Larson goes to

great lengths in her cross-motion to distance the letter in The Kindest from Ms. Dorland and Ms.

Dorland's experiences.  Accordingly, Ms. Larson has effectively waived this defense.

b.    <u>Ms. Larson's Copying Was in Bad Faith.</u>

Ms. Larson further concedes that her actions in copying Ms. Dorland's Letter

were in bad faith.  As set forth in Ms. Dorland's Motion for Summary Judgment, "[f]air use

presupposes good faith and fair dealing."  <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110, 124

(S.D.N.Y. Apr. 29, 2010).  In addition to the evidence cited in Ms. Dorland's Memorandum

(Doc. No. 184, at pp. 16-17), further evidence of Ms. Larson's bad faith is found where Ms.

Larson—in a final act of spite—changed the closing of the letter from the word "Warmly" to

"Kindly," which Ms. Larson knew was Ms. Dorland's signature closing in her written

communications.  <u>See</u>, Oct. 28, 2022 Amadei Aff., Ex. W, Doc. No. 181-23 (messages

exchanged between Ms. Larson and "alison": alison: "I like the Kindest only because it reminds

me of Dawn's email signature, sonya: HA HA HA—"Kindly",  alison: Just name it "Kindly,

Dawn" sonya: HA HA HA").  There is no dispute, and Ms. Larson has thus conceded, that her

conduct in copying Ms. Dorland's letter constituted bad faith.

2.    Nature of the Copyrighted Work

"The fact that a work is unpublished is a critical element of its 'nature'."  <u>Harper</u>

<u>& Row</u>, 471 U.S. at 564 (recognizing further that the scope of fair use is narrower with respect to

unpublished works).  "[I]t has never been seriously disputed that the fact that the plaintiff's work

is unpublished is a factor tending to negate the defense of fair use.  Publication of an author's

expression before she has authorized its dissemination seriously infringes the author's right to

decide when and whether it will be made public, a factor not present in fair use of published

works."  <u>Id.</u>, at 551.  "We conclude that the unpublished nature of a work is a key, though not

21

necessarily determinative, factor tending to negate a defense of fair use. Id. at 554. Thus, "[w]hile even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public or disseminated to the press, the author's right to control the first public appearance of his expression weighs against such use of the work before its release." Id. "The right of first publication encompasses not only the choice whether to publish at all, but also the choices of when, where, and in what form first to publish a work." Id. Where a defendant has usurped an author's right to decide whether previously unpublished material should be made public, that weighs against fair use. Fitzgerald v. CBS Broadcasting, Inc., 491 F. Supp. 2d 177, 187 (D. Mass. Jun. 22, 2007).

With respect to this second factor, Ms. Larson states that the Dorland Letter was "effectively a published work," but again fails to cite to any case law or any evidence from the record to support this conclusion. See, generally, Larson Mem., Doc. No. 189, at p. 27-28. Ms. Larson further implies that because Ms. Dorland's private Facebook group of which she was a member did not have "any requirement of confidentiality," that such absence of a notice deprives Ms. Dorland of her right of first publication. See id., at p. 28. Ms. Larson further suggests that Ms. Dorland had no expectation of confidentiality, and thus, was deprived of her right to first publication because of the disclosure of the name of an individual in Ms. Dorland's kidney chain.

Despite these facts, it is uncontroverted that Ms. Dorland's letter was made available to a select group of individuals in a private Facebook group. See, Oct. 28, 2022 Amadei Aff., Ex. B, Doc. No. 181-2 ("Dear Friend, You've been invited to this private/closed group because I have disclosed by upcoming kidney donation to you, or because I regard you as someone who will be supportive . . . [P]lease feel free to decline the invitation or leave the group at any time . . . Outside of this group, please exercise discretion."); see also, Oct. 28, 2022 Amadei Aff., Ex.

N,  Doc. No. 181-14 at p. 7 (Ms. Larson stating in a July 12, 2016 email, "And my memory is that I did indeed join the FB group").  Moreover, Ms. Larson suggests that she herself agrees that there was no publication of Ms. Dorland's letter as defined in 17 U.S.C. § 101.  See, Larson Mem., Doc. No. 189, at p. 27 ("Courts have found that the second statutory factor favors fair use even though the work in question was technically unpublished under the statutory definition").  Accordingly, and contrary to Ms. Larson's arguments in her memorandum, there is no genuine dispute that Ms. Dorland's letter was posted to a private Facebook group, which requested discretion from its members, and therefore, for purposes of fair use analysis, is an unpublished work.  The second fair use factor weighs against a finding of fair use.

> 3.    Amount and Substantiality

As the Court previously noted in discussion of copyright infringement, "[t]he question is not whether an ordinary observer would mistake the entirety of Larson's story for the Dorland Letter, but whether Larson improperly copied the Dorland Letter in her short story. See TufAmerica, Inc. v. Diamond, 968 F. Supp. 2d 588, 599 (S.D.N.Y. 2013) ("the relevant question in each case is whether the similarity relates to matter that constitutes a substantial portion of the pre-existing work—not whether such material constitutes a substantial portion of the allegedly infringing work")." Feb. 2, 2021 Order, Doc. No. 99, at p. 7, n. 2.  Likewise, in the fair use context, "a taking may not be excused merely because it is insubstantial with respect to the *infringing* work. . . . [N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate."  Harper & Row, 471 U.S. at 565.

Here, Ms. Larson concedes that her use of the Dorland Letter comprises nearly 7% of *The Kindest* ("5,500 words in *The Kindest* versus 381 words in the Dorland Letter").  This amount is not insubstantial.  See, e.g., Harper & Row, 471 U.S. at 548 (finding use not fair where new work contained author's original language totaling between 300 and 400 words and

constituting some 13% of the new work).  The cases cited by Ms. Larson are further inapposite to the analysis.  In Authors Guild, Inc. v. HathiTrust, 755 F.3d 87 (2d Cir. 2014), the court found that in that case, which dealt with a suit by authors and authors' associations against universities for their use of copyrighted works in a digital library, that "it was reasonably necessary for the [defendant-universities] to make use of the entirety of the works in order to enable the full-text search function."  In contrast, there is no "reasonable necessity," such as for a digital library's full-text search function, that Ms. Larson has identified in support of her wholesale copying of Ms. Dorland's letter.  Using "only as much of the Dorland Letter as she had to use to tell the story of Rose and Chuntao without losing all value" (see Larson Mem., Doc. No. 189, at p. 28) was neither reasonable nor necessary, where Ms. Larson, a self-proclaimed professional and published writer, could have crafted her own, independently created letter, using her own words, turns of phrases, metaphors, and similes, and/or other devices deployed in creative writing.

Moreover, Ms. Larson has not refuted the argument that the letter in *The Kindest* uses the "most interesting and moving parts" of Ms. Dorland's letter, and thus, this third factor "tilts against a finding of fair use." Harper & Row, 471 U.S. at 560.

4.    Effect on the Market

Despite the long duration of this litigation and having been afforded ample opportunity to do so, Ms. Larson has failed to adduce any evidence in support of her argument that the "effect on the market" factor weighs in favor of fair use.  In evaluating this factor, the Court considers both: (1) the degree of market harm caused by the *alleged infringer's* actions, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original.  Comerica, 433 F. Supp. 3d at 95.  Ms. Larson's arguments in this factor fall far short by failing to demonstrate from the record both the degree of market harm caused by her infringing use, and

whether wide-scale reproduction of personal letters in works of fiction (for similar purposes) would in general affect the market for such letters.  See, e.g., Nunez v. Caribbean Intern. News Corp., 235 F. 3d 18, 24-25 (1st Cir. 2000) ("In other words, we examine the effect of *this* publication on the market, and we also determine whether wide-scale reproduction of professional photographs in newspapers (for similar purposes) would in general affect the market for such photography").

      Contrary to Ms. Larson's contention, the absence of any evidence that anyone ever approached Ms. Dorland for permission to use the Dorland Letter-, does not foreclose the possibility of it happening in the future.  Tellingly, this factor analyzes the effect of the infringing use upon the *potential* market for the original, thus suggesting that the market for the original work may not yet be presently realized and protecting copyright owners' future interests, which Ms. Dorland, as the owner of her copyright could exploit at anytime during her lifetime, with protection extending another 70 years.  Moreover, as a professional writer herself, it is entirely reasonable that Ms. Dorland may sell or license the copyright to the letter, or that she may write her own work of fiction based on her donation experience, and include a letter from the donor to recipient.  There are several examples of movies, books, television series, and other forms of media and entertainment that are "based on true stories" or "inspired by true events," of which an original work of non-fiction is further developed into a work of fiction.

      This case is further distinct from Nunez (which found this fourth factor in favor of fair use), where in that case, the court found that a newspaper's publishing of a model's portfolio photos to highlight a controversy concerning them, did not harm the market for those photos.  Id. at 25.  Ms. Larson further mischaracterizes the court's analysis in Nunez by implying that "no market exists for a copyright work because the copyright holder 'never tried to sell' it" is wrong.

Nunez is more nuanced, where the court found in examining the context of that case, the market for professional photographs of models to newspapers to illustrate controversy is "small or nonexistent."

Merely concluding, without a basis, that "[i]t is difficult to imagine that there is any intrinsic market for Dorland's Letter without adding much more context and detail" is simply Ms. Larson admitting her failure to satisfy her burden of proof.  As with the other factors examined for fair use, Ms. Larson bears the burden of proving this fact.  Ms. Larson indeed has not shown evidence to allow the court to examine the effect on the potential market for Ms. Dorland's Letter, nor has any argument been presented by Ms. Larson as to identify the potential market (e.g., the market for personal letters for use in works of fiction).

Ms. Larson's anemic argument with respect to the effect on the market, arguably the "single most important element of fair use," does not show, as a matter of law, how in this case, this factor would weigh in favor of fair use. See Gregory, 689 F.3d at 64.

5.    The "Final Version" of The Kindest is An Unauthorized Derivative Work.

Contrary to Ms. Larson's groundless assertions, the competing letters themselves, share much more than just "a kidney theme."  See Larson Mem., Doc. 189, at p.30; see also, Oct. 28, 2022 Amadei Aff., Ex. XX, Doc. No. 182-24 (comparing the Dorland Letter and the letter contained in the "final" / registered version of The Kindest); Larson Appendix VI, Doc. No. 193-6.  As these references show, the letters share same tone, style, structure, in addition to similar wording and phraseology, such that an "ordinary observer would be disposed to overlook any disparities in the works."  See, Coquico, Inc. v. Rodriguez Miranda, 562 F. 3d 62, 67 (1st Cir. 2009).

Where here, Ms. Larson admits that she "revised her story so that it would not be infringing" she impliedly concedes infringement in the first instance. See, Larson Mem., Doc.

189, at p. 29.  A work that consists of ***editorial revisions***, annotations, elaborations, or other modifications, which as a whole, represent an original work of authorship, is a derivative work. 17 U.S.C. § 101 (emphasis added).  Therefore, there is no genuine dispute that the registered version of *The Kindest* (i.e., "the final version")—an editorial revision—is an unauthorized derivative work of Ms. Dorland's letter.

> 6.    When Ms. Larson's Fair Use Defense Fails, Ms. Larson Is Liable For Copyright Infringement as a Matter of Law.

Finally, where Ms. Larson has otherwise failed to oppose Ms. Dorland's motion for summary judgment on copyright infringement or present any genuine dispute of material facts pertinent to those claims, and further, where Ms. Larson's fair use defense fails for the reasons set forth above, this Court should find Ms. Larson liable for copyright infringement as a matter of law. See Celotex Corp., 477 U.S. at 322 (holding that "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

## VI.    CONCLUSION

In view of the foregoing, Ms. Dorland respectfully requests this Court grant Ms. Dorland's motion for summary judgment in her favor on all counts.

Respectfully submitted,

DAWN DORLAND PERRY

By Her Attorneys,

PARTRIDGE SNOW & HAHN LLP


*/s/Suzanne M. Elovecky*

Suzanne M. Elovecky (BBO # 670047)
Hannah Y. Amadei (BBO# 710509)
30 Federal Street
Boston, MA  02110
(617) 292-7900
(617) 292-7910 FAX
selovecky@psh.com
hamadei@psh.com

DATED:        December 23, 2022


## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2022 a copy of the foregoing document has been served via ECF system as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicates as non-registered participants.


Andrew D. Epstein, Esq.
Barker, Epstein & Loscocco
175 Federal Street, Suite 502
Boston, MA 02110
Photolaw@aol.com

Mark W. Shaughnessy, Esq.
Matthew H. Greene, Esq.
Boyle | Shaughnessy Law PC
695 Atlantic Avenue, 11th Floor
Boston, MA 02111
mshaughnessy@boyleshaughnessy.com
mgreene@boyleshaughnessy.com


*/s/ Suzanne M. Elovecky*
Suzanne M. Elovecky

4383605.4/30402-2

28