UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SONYA LARSON | |
| Plaintiff, | Civil Action |
| v. | No. 1:19-cv-10203-IT |
| DAWN DORLAND PERRY, et al. | |
| Defendants. | |

**REPLY MEMORANDUM IN SUPPORT OF THE MOTION OF
PLAINTIFF-THIRD PARTY DEFENDANT, SONYA LARSON
FOR PARTIAL SUMMARY JUDGMENT AGAINST
DAWN DORLAND PERRY, DEFENDANT-PLAINTIFF IN COUNTERCLAIM AND
FURTHER OPPOSITION TO DORLAND'S MOTION FOR SUMMARY JUDGMENT**

January 9, 2023

Respectfully submitted,
Plaintiff, Third-Party Defendant,
Sonya Larson,

By her attorneys,
*/s/ Andrew D. Epstein*

Andrew D. Epstein, BBO No.155140
photolaw@aol.com
Barker, Epstein, & Loscocco
176 Federal Street
Boston, MA 02110
(617) 272-5700

# **Table of Contents**

Page

I.    **June 2018 was a busy month for Dorland, with respect to Larson**          6
      **and *The Kindest*.**

II.   **Dorland's email to Bread Loaf was defamatory.**                          **7**

III.  **Where is the truth?**                                                    9

IV.   **After ASF pulled *The Kindest* and after the BBF decided to forgo**      10
      **use of Larson's story, what were Dorland's motives**
      **in moving forward?**

V.    **Larson is a private citizen, a public figure or a limited**             11
      **purpose public figure.**

VI.   **Intentional interference by Dorland and the Cohen Defendants.**          11

      A.    Dorland used improper motives or improper means                     12
            to punish Larson.

      B.    The Cohen Defendants used improper motives or improper              14
            means to pressure the BBF and Larson.

VII.  **The Final Version of The Kindest is not a derivative work**             15
      **and therefore does not infringe the Dorland Letter.**

VIII. **The signoff for both letters.**                                         17

IX.   **Opposition to Counts I and II of Dorland's**                            18
      **Counterclaim (Dkt 96).**

X.    **Conclusion.**                                                           19

# <u>Table of Authorities</u>

**I.**      <u>**Cited Cases**</u>                                                                    <u>**Page**</u>

<u>Alharbi v. Theblaze, Inc.</u>, 199 F. Supp. 3d 334 (D. Mass. 2016)            8, 11

<u>Amador v. McDonald's Corp.</u>, 601 F. Supp. 2d 403 (D.P.R. 2009)          15

<u>Andreas v. Volkswagen of Am., Inc.</u>, 336 F.3d 789 (8th Cir. 2003)          19

<u>Bassichis v. Flores</u>, 490 Mass. 143 (2022)                                         14

<u>Blanch v. Koons</u>, 467 F.3d 244 (2d Cir. 2006)

<u>Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.</u>, 843 F.2d 600       17
(1st Cir. 1988)

<u>Cornwell v. Dairy Farmers of Am., Inc.</u>, 369 F. Supp. 2d 87 (D. Mass. 2005)   10

<u>Cavicchi v. Koski</u>, 67 Mass. App. Ct. 654 (2006)                              12

<u>Derek Andrew, Inc. v. Poof Apparel Corp.</u>, 528 F.3d 696 (9th Cir. 2008)      15

<u>Felipe Vicini Llub. v. Uncommon Productions</u>, 663 F.3d 6 (1st Cir. 2011)      11

<u>Harper & Row Publishers, Inc. v. Nation Enterprises</u>, 471 U.S. 539,          20
105 S. Ct. 2218 (1985)

<u>Hutchinson v. Proxmire</u>, 443 U.S. 111, 134-36 (1979)                         11

<u>IvyMedia Corp. v. iLIKEBUS, Inc.</u>, 252 F. Supp. 3d 34 (D. Mass. 2017)        14

<u>Jackson v. Johnson & Johnson & Janssen Pharms., Inc.</u>, 330 F. Supp. 3d 616   16
(D. Mass. 2018)

<u>James L. Miniter Ins. Agency, Inc. v. Ohio Indemnity Co.</u>, 112 F.3d 1240     12
(1st Cir. 1997)

<u>Johnson v. Gordon</u>, 409 F.3d 12 (1st Cir. 2005)                              15

<u>Kahalas v. Schiller</u>, 164 F. Supp. 3d 241 (D. Mass. 2016)                    12

<u>Levinsky's, Inc. v. Wal-Mart Stores, Inc.</u>, 127 F.3d 122 (1st Cir. 1997)      9

McAvoy v. Shufrin, 401 Mass. 593 (1988)                                    8

Monsarrat v. Newman, 514 F. Supp. 3d 386 (D. Mass. 2021),                  18
aff'd, 28 F.4th 314 (1st Cir. 2022)

Noonan v. Staples, Inc., 556 F.3d 20 (1st Cir. 2009)                        9

On Davis v. The Gap, Inc., 246 F.3d 152 (2d Cir. 2001),                    20
as amended (May 15, 2001)

Piccone v. Bartels, 40 F. Supp. 3d 198 (D. Mass. 2014),                     9
aff'd, 785 F.3d 766 (1st Cir. 2015)

Semerdjian v. McDougal Littell, 641 F. Supp. 2d 233 (S.D.N.Y. 2009)        20

Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory,                  18
689 F.3d 29 (1st Cir. 2012)

Walker v. President & Fellows of Harvard Coll., 82 F. Supp. 3d 524          9
(D. Mass. 2014)

## II.   **Statutes**

Title 17 U.S.C. § 504(b)                                                15, 19

17 U.S.C. § 412(2)                                                         15

20 U.S.C. § 1232g - Family Educational Rights and Privacy Act (FERPA)       8

M.G.L. c. 231, § 92                                                         9

## III.   **Other Authorities**

U.S. Constitution, Article. I, § 8, cl. 8                                  20

37 C.F.R. § 202.1(a)                                                       18

## IV.   **Appendix VI**

Cited cases and authorities that were inadvertently omitted from prior memo.

**I.**      <u>**Cited Cases**</u>                                   <u>**Page**</u>

<u>Feist Publ'ns. Inc. v. Rural Tel Service Co.</u>, 499 US 340,      App'x VI; 193-6, pp. 5 & 6
111 S.Ct. 1282 (1991)

<u>CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.</u>,      App'x VI; 193-6, pp. 5 & 6
97 F.3d 1504 (1st Cir. 1996)

<u>Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.</u>,      App'x VI; 193-6, p. 9
843 F.2d 600 (1st Cir. 1988)

<u>Harper & Row, Publishers, Inc. v. Nation Enterprises</u>,      App'x VI; 193-6, pp. 5 & 6
471 U.S. 539, 105 S.Ct. 2218 (1985)

<u>Matthews v. Freedman, 157 F. 3d 25</u> (1st Cir. 1998)      App'x VI; 193-6, p. 5

<u>Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory</u>,      App'x VI; 193-6, p. 9
689 F.3d 29 (1st Cir. 2012)


**II.**      <u>**Other Authorities**</u>

37 C.F.R. § 202.1(a)      App'x VI; 193-6, p. 9

I.      **June 2018 was a busy month for Dorland, with respect to Larson and _The Kindest_.**

On June 4, 2018, the first or one of the first people that Dorland contacted after she read _The Kindest_ was literary agent Samantha Shea.  Ms. Shea suggested that that Dorland begin "by speaking with your friend [Sonya Larson]."  [Exhibit 40]  Dorland did not follow Shea's advice.

Next, Dorland contacted ASF.  Rebecca Markovits, co-editor of ASF, also suggested that Dorland contact Larson directly "and work out a mutually agreeable solution."  [Exhibit 12; Dkt. 190-2, p. 3 *]  Dorland did not follow Ms. Markovits' advice.

Then Dorland contacted the BBF.  The BBF took a different approach and on June 7, 2018, suggested to Larson that she "make changes to the story prior to its publication in 1C1S." [Exhibit 19; Dkt. 190-9, p. 2]  On June 18, 2018, Norah Piehl of the BBF emailed Dorland telling her that after speaking with its "legal counsel and with Sonya, and in order to alleviate your concerns, we requested that Sonya completely redraft the portion of her story in question, and she has now done so.  Our lawyer has reviewed the rewritten text and we plan to move forward with publication of this revised version." [Exh. 19; Dkt. 190-9, p. 3]

In response, Dorland emailed Ms. Piehl in which she admitted that her "legal issue was neutralized." [Exhibit 20; Dkt. 190-10, p. 4]  In the same email, Dorland asked the BBF to assume the difficult task "of modeling ethical behavior among members of the writing community."   Dorland continued by stating that she expected the BBF "to acknowledge the remedies it took in order to proceed with the story.  Such an acknowledgement could even – graciously – include naming me, my service, and my work." [Id.]  At the BBF's suggestion, Dorland then submitted to the BBF an acknowledgment that Dorland found acceptable [See Exh. 21].  The BBF was prepared to publish a quite similar version of her acknowledgment.

**\* All page references are to the page numbers shown on the official docket entries.**

Meanwhile, on June 7, 2018, Dorland contacted Bread Loaf Writers' Conference at Middlebury College and made allegations of plagiarism based on her hunch that Larson submitted *The Kindest* as part of her 2017 Bread Loaf fellowship application.  Larson denies ever using *The Kindest* as part of her Bread Loaf application.  [Exhibit 1, ¶ 16]  Later, Dorland made her plagiarism accusations to over thirty (30) other writing programs, individuals in the writing community, and media contacts.  [See, Larson Aff. Exhibit 1, ¶¶ 17]

II.  <u>Dorland's email to Bread Loaf was defamatory</u>.

Dorland's email to Bread Loaf said that "one of your 2017 fellows might have <u>applied</u> for and <u>secured</u> her fellowship on the basis of writing that plagiarizes my unpublished work." [emphasis added]  While Larson was not identified in this email (although she was in subsequent emails), *The Kindest* was specifically mentioned in the next short paragraph, as was the year of the fellowship application.  [Exhibit 17 – Dkt. 190-7, p. 2]  With these clues, it was not difficult for Bread Loaf to determine that Dorland was talking about Larson.  Dorland's email did <u>not</u> say that <u>in her opinion</u> the letter portion of *The Kindest* plagiarized the Dorland Letter.  She stated <u>as a fact</u> that Larson's story plagiarized her work.  The words "might have" refer to the submission to Bread Loaf, and not to the "fact" of plagiarism.

In contrast, Dorland's first emails to ASF and the BBF said that "I believe that the letter in Sonya's story plagiarizes the letter I wrote to the final recipient in my short kidney chain, a letter to which Sonya had access."  [<u>See</u>, for example, Exh, 6, Dkt. 189-6, p. 3]  The email to Bread Loaf, unlike those to ASF and the BBF, did not include a statement of Dorland's belief or opinion.  The plagiarism claim to Bread Loaf was presented as a statement of fact, with Dorland acting as sole judge and jury, without any back-up material from which Bread Loaf could make its own assessment.

In her most recent Memorandum [Dkt. 196, p. 18], Dorland admits that she "did not know at the time of her initial email to Bread Loaf whether Ms. Larson had submitted *The Kindest* as part of her application for a scholarship to attend that conference."  This is evidence of Dorland's reckless disregard for the truth.  (McAvoy v. Shufrin, 401 Mass. 593, 598–99 (1988)) ("Actual malice exists where the defendant publishes the defamatory communication with knowledge that it was false or with reckless disregard for whether it was false or not." Defendant "cannot ensure a favorable verdict merely by testifying that he published under the subjective belief that the statements were true."  [citations omitted]

This is not to suggest that Larson is required to prove actual malice or reckless disregard for the truth.  She is not.  As a private figure, Larson is only required to prove "negligence as opposed to malice."  (Alharbi v. Theblaze, Inc., 199 F. Supp. 3d 334, 358 (D. Mass. 2016)).  Dorland was required to act reasonably in checking on the truth or falsity of her communications with Bread Loaf before sending her email.  (Id.)  Dorland could easily have inquired about Bread Loaf's plagiarism policy without identifying Larson, *The Kindest* or the year of her fellowship application.  Because of the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g), passage of which was widely publicized in the press at the time, Bread Loaf would likely have stonewalled Dorland, but at least she would not now be facing defamation accusations.

What could Dorland hope to gain by emailing Bread Loaf?  Could Bread Loaf take away the knowledge that Larson received while at the conference?  Certainly not.  This would be like un-ringing the proverbial bell.  Could she perhaps persuade Bread Loaf to rescind the fellowship?  Maybe.  But the fact is that Larson still won the fellowship, and with entirely different stories and not with *The Kindest*.  Could Dorland embarrass, humiliate, and publicly

rebuke Larson, or hold her up to contempt, scorn, ridicule or impair her standing in the community?  These are distinct possibilities.

## III.    <u>Where is the truth?</u>

Dorland is claiming truth as an absolute defense to Larson's plagiarism allegations. Massachusetts law, M.G.L. c. 231, § 92, says that "[t]he defendant in an action for writing or for publishing a libel may introduce in evidence the truth of the matter contained in the publication charged as libelous; and the truth shall be a justification unless actual malice is proved.") (<u>Noonan v. Staples, Inc.</u>, 556 F.3d 20, 26 (1st Cir. 2009)) (Under Massachusetts law the truth or falsity of the statement is immaterial, and the libel action may proceed, if the plaintiff can show that the defendant acted with "actual malice" in publishing the statement.) <u>See</u>, <u>also</u>, <u>Walker v. President & Fellows of Harvard Coll.</u>, 82 F. Supp. 3d 524, 532 (D. Mass. 2014) (<u>Piccone v. Bartels</u>, 40 F. Supp. 3d 198, 214 (D. Mass. 2014), <u>aff'd</u>, 785 F.3d 766 (1st Cir. 2015)) ("In the context of the Actual Malice Statute, 'actual malice' means 'common-law malice,' namely 'ill will' or 'malevolent intent.'")  <u>See Noonan</u>, 556 F.3d at 30 (plaintiff need only prove "disinterested malevolence" rather than "knowing falsity" or "reckless disregard for the truth on the part of the defendants.").  (<u>Levinsky's, Inc. v. Wal-Mart Stores, Inc.</u>, 127 F.3d 122, 135 (1st Cir. 1997)) (Common law malice refers only to state of mind, specifically, ill will or spite.)

Dorland claims that all of her actions against ASF, the BBF, Bread Loaf and other entities, were undertaken "in an attempt to protect her own legal interests in her copyrighted work."  [Dorland Memo, Dkt. 196 at p. 15]  Even if Larson accepts that Dorland contacted ASF

in order to get *The Kindest* removed from publication because of her claims that it plagiarizes part of the Dorland Letter; and even if Dorland contacted the BBF to prevent Larson's story from being used in the 1C1S event because she alleged that Larson's story plagiarized portions of the Dorland Letter, how do we reconcile Dorland's emails to Bread Loaf with reasonably acceptable behavior?  (Cornwell v. Dairy Farmers of Am., Inc., 369 F. Supp. 2d 87, 110 (D. Mass. 2005)) ("Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn or ridicule, or tend to impair his or her standing in the community."

## IV.    After ASF pulled *The Kindest* and after the BBF decided to forgo use of Larson's story, what were Dorland's motives in moving forward?

What were Dorland's motives in contacting Bread Loaf in June 2018?  Why did she email Bread Loaf again on November 18, 2018, long after the publication of *The Kindest* had run its course, complaining that Bread Loaf told Larson about her June inquiry?  [Exhibit 18, Dkt. 190-8, p. 2]  Why did Dorland supply the Brilliance Audio version of *The Kindest* to the Boston Globe for comparison with the Dorland Letter, when she knew full-well that the Brilliance Audio version was never considered for use by the BBF in the 1C1S event?  Why did Dorland email GrubStreet to demand an apology, and then ask that Larson be punished, including that she be suspended from her job?  [Exhibit 23]  Why did Dorland continue for many months, to contact reporters at the Boston Globe, New York Times' "Dear Sugar" podcast, and other media outlets, urging them to write negative articles about Larson, Larson's employer, and the conference that Larson ran?  [Exhibit 38]  Why did Dorland, over two years later, seek out Robert Kolker, who wrote the "Bad Art Friend" article that resulted in Larson being fired?  Were these things done to enhance Dorland's own reputation or to maliciously attack Larson?

The answers to these questions are that Dorland's quest to embarrass and defeat Larson got very personal.  Dorland attacked Larson at every turn.  However one characterizes Dorland's

behavior, it is clear that she acted with actual malice, malevolent intent, disinterested malevolence, ill will, and/or reckless disregard for the truth.  In short, Larson was defamed by Dorland.

**V.      Larson is a private citizen, a public figure or a limited purpose public figure.**

Larson is one of perhaps millions of people who aspire to be successful fiction writers. That Larson earned a modicum of success early in her career for having a few short stories published does not make her a limited purpose public figure.  It was Dorland's accusations of plagiarism that thrust Larson into the limelight, and specifically Dorland's direct pitching of media outlets to publicize her complaints.  See Felipe Vicini Llub. v. Uncommon Productions, 663 F.3d 6, 13-14 (1st Cir. 2011):

> ("[a] controversy must be more than a 'cause célèbre,' or 'a matter that attracts public attention,'  Rather, it must be shown that 'persons actually were discussing some specific question ... [and] a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution.'  Also, . . . , the controversy must predate the alleged defamation. '[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.")  [Citations omitted.]

Furthermore, Dorland bears the burden of demonstrating that Larson is a public figure.  Alharbi, 199 F. Supp. 3d at 354–55.  See also, Hutchinson v. Proxmire, 443 U.S. 111, 134-36 (1979) ("Plaintiff was not a limited purpose public figure prior to the controversy engendered by the Golden Fleece Award; his access, such as it was, came after the alleged libel.")

**VI.     Intentional interference by Dorland and the Cohen Defendants.**

The elements of an intentional interference claim are included in Larson's Memorandum at Dkt 189, pp.24-27.  The third element, namely, improper motive and improper means will be discussed further here.  The wrongfulness (improper motive or improper means) must extend

beyond the interference itself.  See James L. Miniter Ins. Agency, Inc. v. Ohio Indemnity Co.,

112 F.3d 1240, 1250 (1st Cir. 1997).  In Cavicchi v. Koski, 67 Mass. App. Ct. 654, 657–58

(2006), the court held that "improper conduct "may include ulterior motive (e.g., wishing to do

injury) or wrongful means (e.g., deceit or economic coercion)."  The plaintiff need not prove

both.  Improper means include violation of a statute or common-law precept, e.g., by means of

threats, misrepresentation, or defamation.  As to improper motive, evidence of retaliation or ill

will toward the plaintiff will support the claim.

Larson does not have to prove that Dorland's actions were malicious, but there is amble

evidence to suggest that they were.  (James L. Miniter Ins., 112 F.3d at 1240, 1250  (1st Cir.

1997)) ("[T]he third element requires merely an improper interference, and not a malicious

one."); See also Kahalas v. Schiller, 164 F. Supp. 3d 241, 246 (D. Mass. 2016)

     A.     Dorland used improper motives or improper means to punish Larson.

Dorland's attorneys, the Cohen Defendants got directly involved in this controversy on

July 3, 2018, when they sent a cease and desist letter to the BBF [Exh. 24], alleging copyright

infringement and seeking unwarranted statutory damages "that could be as high as $150,000".

Even though her lawyers got involved, Dorland continued to deal directly with the BBF

over attribution, recognition for her kidney donation, and her ethical issues.  During this time

Dorland also contacted the Boston Globe and was successful in persuading the paper to publish

her allegations of plagiarism in two articles.  The first article ran in the Globe on July 26, 2018

[Exhibit 30]   The article said that "a small section of a piece of short fiction chosen by the

Boston Book Festival for its annual One City One Story program contained material lifted from

another, real-life source [i.e., the Dorland Letter]."  [Id.] While this article was damaging enough

to Larson and the BBF, Dorland was not nearly finished.

On August 14, 2018, the Globe published a second article, this time announcing that the BBF had canceled the 1C1S event based on Dorland's plagiarism allegations.  To make matters worse, Dorland supplied the Globe with a copy of the Brilliance Audio version of *The Kindest*, which was published out of context alongside the Dorland Letter for comparison purposes. Dorland knew full-well that the BBF was <u>never</u> going to use the Brilliance Audio version, but was instead going to use the totally rewritten and vetted Final Version of Larson's story. Dorland's conduct was disingenuous at best and spiteful at worst.

Dorland also contacted several other media outlets to see if she could garner the interest of a reporter who might further publicize Dorland's cause and her ultimate desire to inflict more pain on Larson.  [Exhibit 38]  In perhaps a bridge too far, Dorland found NY Times best-selling author Robert Kolker in 2021.  Kolker agreed to write a piece for the New York Times Sunday Magazine.  The article, "Who is the Bad Art Friend?" was published on October 5, 2021, and it went viral.  [Exhibit 36]  As part of the fallout from the article, Larson was fired from the job she loved at GrubStreet. [Exh. 1, ¶ 19]

Simply put, Dorland threatened legal action against ASF and the BBF, both non-academic organizations, using plagiarism allegations as the means to coerce these literary organizations into giving her recognition for her kidney donation, money, attribution for her Letter, and remedies for her perceived "ethical issues."  In so doing, Dorland used improper means to interfere with Larson's advantageous business relations with ASF and the BBF.

Even when she attempted to bring her claims of plagiarism to Bread Loaf at Middlebury College, Dorland neglected to confirm the plain truth, and ended up defaming Larson.  When Dorland gave the Boston Globe the Brilliance Audio version of Larson's story for publication, her conduct was dishonest.  Dorland grossly twisted facts to suit her nefarious goals.

Unfortunately for Dorland, there is no forum outside of academia for seeking redress for claims

of plagiarism.  The only forum where Dorland could gain advantage on her claims of plagiarism

is in the court of public opinion, a forum she was using to her full benefit.

However, attempting to protect one's copyright through claims of plagiarism does not

excuse defamation.  Nor does pressuring publishers to capitulate to one's growing demands, or

pressuring an employer to suspend an employee, or attacking a person in the press.  These

activities are improper.

> B.   The Cohen Defendants used improper motives or improper means to pressure the
>       BBF and Larson.

The Cohen Defendants were dismissed from this action based on the litigation privilege

as interpreted and expanded by the recent SJC decision in Bassichis v. Flores, 490 Mass. 143

(2022).  [Dkt. 178]  While Bassichis and the litigation privilege may render the Cohen

Defendants immune from liability in this action, it does not negate what the firm did and said in

misstating the facts and the law on behalf of Dorland as part of its litigation tactics.

The Cohen Defendants have consistently sought statutory damages and attorney's fees in

this dispute.  Neither category of damages is available to Dorland under the Copyright Act or any

other law.  Dorland admits that she did not register her letter with the Copyright Office "in

advance of Ms. Larson's copying."  [Memo Dkt. 196 p. 9]  Dorland registered the Dorland Letter

effective June 10, 2018.  [Exh. 7]  In her most recent memorandum, Dorland then inaccurately

asserts that the Cohen Defendant's position was correct and "that the BBF may be subject to

statutory damages."  [Memo Dkt. 196 p. 9]  This is contrary to well-established law.  (IvyMedia

Corp. v. iLIKEBUS, Inc., 252 F. Supp. 3d 34, 41 (D. Mass. 2017) ("The Copyright Act does not

permit statutory damages or attorneys' fees if the allegedly infringing activity begins before the

copyright was registered.")  The operative act that triggers enhanced damages is the registration

of the original work.  If the original work was infringed before it was registered, the damages

available to the copyright holder are limited to actual and profit damages under Section 504(b).

(Amador v. McDonald's Corp., 601 F. Supp. 2d 403, 410 (D.P.R. 2009)) (plaintiff may not

recover an award of statutory damages and attorney's fees for infringements that commenced

after registration if the same defendant commenced an infringement of the same work prior to

registration).  Since Dorland failed to register the copyright to the Dorland Letter before the

alleged infringement began, statutory damages and attorney's fees were not then, and are not

now available to Dorland.  (Johnson v. Gordon, 409 F.3d 12, 20 (1st Cir. 2005)) (registration is a

condition precedent for obtaining certain remedies, such as statutory damages and attorneys'

fees. See, 17 U.S.C. § 412).  This is the law even in the 9th Circuit where the Cohen Defendants

maintain their law offices.  (Derek Andrew, Inc. v. Poof Apparel Corp., 528 F.3d 696, 699

(9th Cir. 2008)) ("Title 17 U.S.C. § 412(2) leaves no room for discretion, however.

Section 412(2) mandates that, in order to recover statutory damages, the copyrighted work must

have been registered prior to commencement of the infringement, unless the registration is made

within three months after first publication of the work.")

　　　　The overreaching continued when Michael Hanna of the Cohen Defendants sent a letter

to Larson's lawyer, James Gregorio, on September 6, 2018 [Exh. 34], which was shortly after the

BBF decided not to use *The Kindest* in the 1C1S event, seeking attorney's fees that now totaled

$15,000.  Not surprisingly, no authority for recovering attorney's fees was included with

Hanna's demands.

## VII.　　The Final Version of The Kindest is not a derivative work and therefore does not infringe the Dorland Letter.

　　　　In her Opposition and Reply (Dkt. No 196, p. 29), Dorland claims that the "Final

Version" of Larson's story shares the "same tone, style, structure, in addition to similar wording

and phraseology" with the Dorland Letter.  Dorland uses wholly conclusory allegations and does not offer any case law or analysis to support her position.  (Jackson v. Johnson & Johnson & Janssen Pharms., Inc., 330 F. Supp. 3d 616, 620 (D. Mass. 2018)) ("Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact.")

Plainly, Dorland does not have a monopoly on letters sent by organ donors to their organ recipients.  As Larson demonstrated in her Affidavit (Exh. 1, ¶ 7), and in Exhibit 8 to her Memorandum [Dkt. 189-8, pp. 2-15], the Internet contains numerous examples of suggested letters that organ donors can send to organ recipients, many of which are quite similar to the Dorland Letter.

The side-by-side comparison between the Dorland Letter and the letter in the Final Version of Larson's story shown in Appendix VI, shows that there is no overlap in tone, style, structure, wording or phraseology between the two letters.  Compare the following examples dealing with dialysis and the need for kidney donors:

The Dorland Letter:

> In 2009 I read my first article about living kidney donation, and in the years since, I have been constantly reminded – whether triggered by my reading (I am a writer), or through the stories of people I know – of the harrowing experience of dialysis and the dire need in our country for kidneys.

Sample Internet letter from Donor to Recipient [See Larson Aff. Exh. 1, ¶ 7 & Exh. 8–Dkt 189-8, p. 13]:

> In December, 2010 I watched a television program which detailed the horrific effects of renal disease and dialysis and then proceeded to describe the kidney donation process. Until seeing that program I was sadly ignorant regarding the situation and the struggles inherent to those suffering kidney failure.

Larson's letter in the Final Version of *The Kindest*:

> I am a thirty-eight-year-old white female, and I live in Newton, Massachusetts (born and raised).  Last year, while lost in a difficult period, I saw a documentary about altruistic kidney donation.   As the credits rolled, I felt shocked by the daily hardship of so many people in need.  Equipped with this new awareness, I set forth on a journey to offer a great gift, to do my part in bettering a fellow human's life.

Where is the similarity in tone, style, structure, wording and phraseology?  Frankly, the sample letter retrieved from the Internet is closer to the Dorland Letter than is Larson's version, thus implicating the *scènes à faire* and merger defenses.

Larson made more than minor trivial changes to the letter of her Final Version of *The Kindest*.  She totally changed the tone, style, structure, wording and phraseology to differentiate her expression from that of Dorland.  Even if there is some similarity in sentiment, the two competing letters lack the substantial similarity that is required for an infringement claim.  (Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 606 (1st Cir. 1988)) (Substantial similarity is an elusive concept, not subject to precise definition.  It refers only to the expression of the artist's concept, not the underlying idea itself; mere identity of ideas expressed by two works is not *substantial* similarity giving rise to an infringement action.")

## VIII.   The signoff for both letters.

There is one minor match that shows up in the signoff that Rose uses in her letter, namely the word, "kindly."  Dorland claims that Larson should not have used the word "kindly," because Dorland regularly ends her letters this way.  [Dorland Dep. p. 2-156, lines 0-9]  This is a reach.

Despite Dorland's claim, Larson's use of the word "kindly' is directly related to the title of her story and not to what Dorland perceives to be some proprietary way to end a letter.  Besides, single words are not protected by copyright.  Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 51–52 (1st Cir. 2012).  See also 37 C.F.R. § 202.1(a) (listing "words" as "works not subject to copyright.)

**IX.     Opposition to Counts I and II of Dorland's Counterclaim (Dkt 96).**

If it was not obvious from Larson's Memorandum (Dkt. 189), Larson opposes Dorland's

Motion for summary judgment on Counts I and II of her copyright counterclaims, (Dkt 96).

Larson is claiming fair use, *scènes à faire* and merger defenses to the first four variants of *The*

*Kindest*.  As has been previously discussed, Larson does not believe that the Final Variation of

*The Kindest* infringes the Dorland Letter, nor is it a derivative thereof.

Contrary to what Dorland's claims, the letters in the first four variations of *The Kindest*

are transformative and are used for entirely different purposes and have different characteristics

than the Dorland Letter.  While Dorland introduces herself in the Dorland Letter, Larson does

much more than make introductions.  While Larson introduces her characters, Rose and Chuntao,

she also introduces the racially-charged white savior dynamics that are central to her story.  Is

Rose a substitute for Dorland and is Chuntao an alter-ego for the Oregon woman?  Certainly not.

The context, meaning and purpose of the two competing letters are totally different.  Larson's

letter supersedes the Dorland Letter by adding something new, with a further purpose or different

character, altering the first with new expression, meaning, or message.  (Gregory, 689 F.3d at

59–60) (Monsarrat v. Newman, 514 F. Supp. 3d 386, 390 (D. Mass. 2021), aff'd, 28 F.4th 314

(1st Cir. 2022) (defendant did not publish the copyrighted post for the same purposes for which

plaintiff initially created it.)

Even the commercial verses non-profit dichotomy favors Larson.  Larson grossed a total

of $425 from the first four versions of her story.  When one factors into this gross total, the years

of study that went into producing a few stories that literary organizations like ASF and the BBF

have come to recognize, then the exercise for an aspiring author to write short stories is part of a

long and uncertain process of becoming an established novelist.  This hardly makes writing short

stories early in a writing career a profit-making enterprise.  It is much more of a nonprofit

educational exercise than a commercial one.

   Despite the setbacks she received at the hands of Dorland, Larson had encouraging news

in November 2019, when she was notified that she won a $25,000 fellowship from the National

Endowment for the Arts.  The fellowship was based in part on the Final Version of *The Kindest*,

as well as on Larson's robust publishing record over the previous five years.   [Larson

Supplemental Aff. Exhibit 41]  While Dorland could not interfere with the NEA Grant after it

was awarded, she is claiming the entire grant proceeds as part of the profit damages she is

seeking from Larson under Section 504(b) of the Copyright Act.  [See, Exhibit 42, Dorland's

Answers to Larson's Interrogatories, No. 23.]

   Of course, Larson maintains that no part of the Final Version of her story infringes the

Dorland Letter or is derivative thereof.  However, even if it did infringe, Dorland would only be

entitled to a small portion of the NEA grant money commensurate with the contribution that the

relatively short Dorland Letter made to Larson's much longer story.  (Andreas v. Volkswagen of

Am., Inc., 336 F.3d 789, 795 (8th Cir. 2003)) "In establishing the infringer's profits [under

§504(b)], the copyright owner is required to present proof only of the infringer's gross revenue,

and the infringer is required to prove his or her deductible expenses and the elements of profit

attributable to factors other than the copyrighted work."

   Interestingly, although she could have claimed as actual damages the fair market value of

a license to use the Dorland Letter, Dorland did not list actual damages as part of her damages in

her answers to interrogatories.  [Exhibit 42, Int. 23.]  On Davis v. The Gap, Inc., 246 F.3d 152,

172 (2d Cir. 2001), as amended (May 15, 2001).  Either Dorland is waiving actual damages, or

the value of a license to use the Dorland Letter, taken from a "pre-infringement perspective" is *de minimis*.  <u>Semerdjian v. McDougal Littell</u>, 641 F. Supp. 2d 233, 239 (S.D.N.Y. 2009).

Furthermore, it is difficult to imagine that Larson's use of a few words or phrases from the Dorland Letter harmed the market for the letter.  If anything, it likely opened the market if there ever was one.  First, by Dorland's own plan, her Facebook unit was a private/closed group [Exhibit 2], open to only selected people.  Second, Dorland encouraged her readers to "share my public kidney post."  [Exhibit 5]  Third, the publicity that has surrounded this controversy for the past four and one-half years has failed to result in a single inquiry of someone wanting to use the Dorland Letter.  The fact that the copyright to the Dorland Letter will survive for the rest of Dorland's life plus 70 years, and that during this time, someone may come out of the woodwork to license the letter, is wishful thinking at its extreme.  Not even Dorland has used the letter -- except to attack Larson.

## X.   Conclusion.

Plagiarism may be relevant in academic settings, but such allegations are subjective, and Dorland made herself the sole arbiter of justice.  Copyright's goal of "promoting the Progress of Science and useful Arts," U.S. Const., art. I, § 8, cl. 8, together with defenses such as fair use, puts a limit on the ability of authors to prevent others from using concepts, ideas, or facts in the creative process.  <u>Harper & Row Pub., Inc. v. Nation Enter.</u>, 471 U.S. 539, 582, 105 S. Ct. 2218, 2241 (1985).  <u>Blanch v. Koons</u>, 467 F.3d 244, 259 (2d Cir. 2006).  Dorland and her attorneys ended up using improper means and methods to attack Larson.  Dorland was seeking revenge against Larson and not justice.  Dorland must be held accountable.

January 9, 2023

Respectfully submitted,
Plaintiff, Third-Party Defendant,
Sonya Larson,

By her attorneys,
*/s/ Andrew D. Epstein*

Andrew D. Epstein, BBO No.155140
photolaw@aol.com
Barker, Epstein, & Loscocco
176 Federal Street
Boston, MA 02110
(617) 272-5700

## Certificate of Service

I certify that Plaintiff-Third Party Defendant, Sonya Larson filed the within document through the court's ECF system and a copy was sent electronically on the day it was filed to all counsel of record.

*/s/ Andrew D. Epstein*
_____

January 9, 2023                                   Andrew D. Epstein