UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONYA LARSON<br><br>                      Plaintiff,<br>v.<br><br>DAWN DORLAND PERRY, et al.<br><br>                      Defendants. | Civil Action<br><br>No. 1:19-cv-10203-IT |

**MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION OF THIS COURT'S MEMORANDUM & ORDER OF SEPTEMBER 14, 2023, BY PLAINTIFF-THIRD PARTY DEFENDANT, SONYA LARSON WITH RESPECT TO LARSON'S CLAIM FOR INTENTIONAL INTERFERENCE
WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS**

Plaintiff, Third-Party Defendant, Sonya Larson ("Larson") submits this Memorandum in support of her Motion for Reconsideration of the Court's Memorandum & Order of September 14, 2023, with respect to Larson's claim for intentional interference with advantageous business relationships. As grounds for her Motion, Larson states as follows:

1.      This court held that Larson failed to establish one key element of her cause of action for intentional interference, namely, that she suffered "economic harm" or "pecuniary loss" as a result of Dorland's actions. [Order, Dkt. 211, p. 34-5] Larson believes that the Court failed to give due consideration to the attorney's fees Larson incurred in defending against Dorland's claims for plagiarism and copyright infringement and the eventual financial impact

that the *New York Times*' article, "Who is the Bad Art Friend?" had on Larson's employment with GrubStreet.

2.  The economic harm that Larson suffered came when she lost her job at GrubStreet. [See Affidavit of Sonya Larson, Dkt. 189-1 p. 8, ¶ 19; ("As a result of the pressure that the media attention inflicted on GrubStreet after the publication of the *New York Times* article, "WHO IS THE BAD ART FRIEND?," I was fired from my job, a job I loved very much.")]

3.  Larson was fired after a series of events all perpetrated by Dorland starting in 2018, which concluded with the 2021 *New York Times*' article that led to her termination of employment.

**A.    Time line of relevant events.**

4.  On June 4, 2018, Dorland emailed the editors of American Short Fiction ("ASF") demanding that The Kindest be pulled from publication. [Memo, Dkt. 189, p. 13] Next, Dorland emailed and telephoned the Boston Book Festival ("BBF") on June 7, 2018, and raised her legal and ethical concerns about The Kindest. [Memo, Dkt. 189, p. 16] On the same day, Dorland contacted Bread Loaf Writer's Conference at Middlebury College and accused Larson of plagiarism. [Id.]

5.  On July 2, 2018, Dorland wrote to Larson's employer asking that Larson be suspended from her job at GrubStreet "with or without pay." [Memo, Dkt 189, p. 19]

6.  Even after Larson totally rewrote the letter section of her short story, which Dorland admits "neutralized" her claim of plagiarism, Dorland continued to pressure the BBF to address her "ethical issues." [Id. at p. 18]

7.       Meanwhile on July 3, 2018, the Cohen Defendants acting on Dorland's behalf escalated Dorland's claim from plagiarism to copyright infringement demanding statutory damages and attorney's fees that were clearly not available to Dorland because of the untimely registration of her Facebook letter. [Id. at p. 19; see also, 17 U.S.C. § 412]

8.       Next, Dorland contacted the *Boston Globe* where she managed to get the first of two scathing articles published about Larson and her short story. [Memo Dkt. 189, p. 20-22] By this time, both the Cohen Defendants and Dorland increased the monetary demands made on the BBF and Larson. Additionally, Dorland became dissatisfied with the acknowledgement that Dorland herself wrote, and that the BBF had agreed to publish as part of The Kindest. [Id. at p. 21]

9.       On August 13, 2018, the BBF notified Larson that it decided to cancel the One City/One Story ("1C/1S ") event for the year because there was seemingly no end to the new demands made to the BBF by Dorland and her attorneys. [Id. at p. 22]

10.      The next day, the *Boston Globe* published a second scathing article, this time comparing the 2016 Brilliance Audio letter in The Kindest to the Dorland Letter, misleading readers into thinking that the 2016 version of the story was the version the BBF was going to publish as part of the 1C/1S event. [Id.]

11.      Even after the BBF decided to cancel the 1C/1S event in its entirety, Dorland's attorney sent a letter to Larson's legal counsel on September 6, 2018, demanding that Larson enter into a stipulated judgment for $180,000 in damages, plus pay $15,000 for Dorland's actual legal expenses. [Id. at p. 23]

12. Although Dorland forced the BBF to cancel the 1C/1S event and forego publication of The Kindest, Dorland was not yet satisfied. In late December 2018, Dorland asked Larson's present counsel to accept service in a lawsuit Dorland was planning to bring against Larson. [Id.]

13. The last straw came when Dorland contacted *New York Times*' best-selling author, Robert Kolker, who wrote the widely disseminated article, "Who is the Bad Art Friend?" for the *Times*.

14. Dorland's battle against Larson took over three years, starting in June 2018, and ending when the *New York Times*' article was published in October 2021. During this time, Dorland and her attorneys made relentless accusations and financial demands against ASF, the BBF and Larson designed to ultimately harm Larson both professionally and financially.

15. Clearly, Dorland injured Larson professionally when the BBF decided to cancel the 1C/1S event, and Larson had to pay legal fees to Attorney James Gregorio to defend herself. [See Larson Aff. attached hereto as Exhibit A.] However, Dorland's relentless quest to additionally harm Larson financially did not come until Larson was fired from her job at GrubStreet. Thus, Dorland finally inflicted additional pecuniary loss on Larson that Dorland had long hoped would happen sooner than it did.

**B. Dorland's motives were part of a continuum of events aimed at harming Larson in any way she could.**

Dorland was obstinate in her pursuit of Larson. Dorland did not stop when her efforts and those of her lawyers led to the cancellation of The Kindest as the 1C/1S selection. On July 2, 2018, Dorland told GrubStreet, Larson's employer, that she would be "comfortable" if Larson was suspended from GrubStreet "with or without pay." [Memo, Dkt 189; p. 19, Exh. 23] It took

three years, but Dorland's wish finally came true after the fallout from "Who is the Bad Art Friend?" article.  See, Cavicchi v. Koski, 67 Mass. App. Ct. 654, 657-58 (2006) ("The improper conduct 'may include ulterior motive (e.g., wishing to do injury) or wrongful means ( e.g., deceit or economic coercion)'. . . ; the plaintiff need not prove both." [Citations omitted].

      There is a direct proximate connection between Dorland's actions against ASF starting in June 4, 2018, her attorney's involvement against the BBF starting on July 3, 2018, and the *New York Times*' story that ultimately led to the termination of Larson's employment by GrubStreet. It was highly probable and predictable that a well-respected literary organization like GrubStreet would have a strong reaction to an article like "Who is the Bad Art Friend?" that directly implicated one of its employees in accusations of plagiarism and copyright infringement.  Larson said she was fired "as a result of the pressure that the media attention inflicted on GrubStreet after publication of the *New York Times* article. . . ."  [Dkt. 189-1; Larson Aff. ¶19]

      If Dorland had not contacted author Robert Kolker, and if the *New York Times*' article had never been published, Larson would not have been fired as she was.  The article was the culmination of a years-long onslaught of accusations hurled at Larson starting with Dorland's first contact of ASF in 2018, and it was the proximate cause of the termination of her employment in 2021.  Larson's firing resulted in her monetary loss, caused proximately by Dorland's unrelenting efforts to destroy her nemesis both professionally and financially.  After the passage of over three years, Dorland finally got her wish. (Ward v. City of Bos., 367 F. Supp. 2d 7, 15 (D. Mass. 2005)) ("Whether negligent conduct is the proximate cause of an injury depends ... on whether the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct." Kent [v. Commonwealth], 437 Mass. at 320, 771 N.E.2d at 777.  "If a series of events occur between the negligent conduct and the ultimate harm, the court must determine

whether those intervening events have broken the chain of factual causation or, if not, have otherwise extinguished the element of proximate cause and become a superseding cause of the harm.")

C.     **Dorland created the 'condition or situation' that resulted in harm to Larson.**

About one month prior to the time Larson was fired by GrubStreet, she received a stellar performance review and a promotion. [Exh. A - Larson Aff. ¶ 2] The publication of the *New York Times*' article changed Larson's life. While Dorland might not have been able to predict that the Bad Friend article would go viral, it was predictable that GrubStreet would have an unfavorable reaction to accusations of plagiarism and copyright infringement made in a major national publication against one of its own employees.

Although GrubStreet disregarded Dorland's 2018 demand that Larson's employment be terminated, it was the publication of the Bad Art Friend article and the fallout from the publication that were foreseeable events. There was no superseding incident that caused economic harm to Larson. Dorland's actions which started in June 2018, and ended with the publication of the *New York Times* article in 2021, were the ultimate basis for Larson's firing and her economic loss. If the Bad Art Friend article had not been published, Larson would not have been fired from GrubStreet, and she would not have suffered pecuniary loss.

Of course, Larson's loss of income is in addition to the expense she incurred for legal services in defending against the accusations made by Dorland and her attorneys to ASF and the BBF. (For an analogous situation involving the Massachusetts Consumer Protection Act, see Columbia Chiropractic Grp., Inc. v. Trust. Insurance Co., 430 Mass. 60, 63 (1999), where the SJC held that if a violation of G.L. c. 93A, § 11, forces another to incur attorney's fees, those fees are a loss of money or property and may be recovered as 93A damages. "[L]itigation expenses

were actual damages (a 'loss of money') caused by the G.L. c. 93A violation, [and] those expenses were recoverable. . . .") Compare, Tech Plus, Inc. v. Ansel, 59 Mass. App. Ct. 12, 18–20 (2003), where plaintiffs failed to show that they suffered any pecuniary loss as a result of the defendants' conduct.   While the plaintiffs were removed as sales representatives on the transaction in question, they received all the commissions they would have received had they continued as sales representatives with respect to that transaction. There was no evidence that the plaintiffs suffered any other harm to their existing or prospective business relationships with any entity.  Because the plaintiffs failed to prove an essential element of their claims of intentional interference, i.e., actual pecuniary loss as a result of the defendants' actions, the judge correctly allowed the defendants' motion for judgment n.o.v. on those claims.  Long distance telephone call expenses would have been a sufficient loss of money or property for plaintiffs to recover attorney's fees under G.L. 93A for defendants' wrongful acts, but the record does not demonstrate that the plaintiffs advanced this contention before the Superior Court judge, and they are, therefore, barred from asserting it for the first time on appeal.  [Id. at 20]

A negative reaction to continued employment of Larson by GrubStreet after publication of the Bad Art Friend article was reasonably predictable. (Lawrence v. Kamco, Inc., 8 Mass. App. Ct. 854, 857–59 (1979)) (failure to repair a broken window in an establishment that serves liquor on Christmas Eve, was a dangerous condition that remained so until its repair after Christmas.)

> On the evidence the jury could have found that the defendant's negligent acts had permitted a situation, dangerous to persons like the plaintiff, to continue without adequate warning. . . .  Even if the defendant could not have foreseen the precise manner in which the injury occurred, "(w)here the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct. . . ."

>The jury could have found that the possibility of someone's falling against the jagged edges of the broken glass was the type of general harm which the defendant should have foreseen. Under the Restatement's analysis of proximate cause, the particular manner in which the injury occurs (the plaintiff's being pushed by two arguing patrons) becomes immaterial because the general danger of a patron's being jostled or bumped, or of his slipping, tripping or stumbling into the window should have been foreseen by the defendant.
>
>[Citations omitted.]

Similarly, Dorland should have foreseen that any article published by one of the world's most respected newspapers would create problems for Larson. Clearly, Dorland wanted Larson's employment to be terminated when she first wrote to GrubStreet in 2018. When this did not happen, Dorland ultimately solicited Robert Kolker to write his article for the *Times*. Dorland sought to punish Larson in every way she could, and the result was that she did punish her – professionally, when the BBF canceled the 1C/1S event, <u>and</u> financially, when Larson incurred legal fees and expenses and ultimately lost her job at GrubStreet.

Larson's eventual firing from GrubStreet, and the payment of legal fees to defend against Dorland's claims of plagiarism and copyright infringement are sufficient evidence of pecuniary losses stemming from the continuing actions of Dorland and her attorneys to warrant summary judgment on Larson's claim for tortious interference with respect to the relationships she had with ASF and the BBF. [Dkt. 211, p. 35]

WHEREFORE, Larson requests that the Count reconsider its findings with respect to Larson's claim for intentional interference with advantageous business relationships, and enter partial summary judgment on this issue in favor of Larson.

September 26, 2023

    Respectfully submitted,
    Plaintiff,
    Sonya Larson,

    By her attorneys,
    */s/ Andrew D. Epstein*

    Andrew D. Epstein, BBO No.155140
    photolaw@aol.com
    Barker, Epstein, & Loscocco
    176 Federal Street
    Boston, MA 02110
    (617) 272-5700
    Direct Tel: (617) 272-5700

### Certificate of Service

I certify that Plaintiff-Third Party Defendant, Sonya Larson's Motion for Reconsideration and Memorandum in support thereof was filed through the court's ECF system and a copy was sent electronically on the day it was filed to all counsel of record.

    */s/ Andrew D. Epstein*
    _____

September 26, 2023    Andrew D. Epstein